Farimah Faiz Brown, City Attorney (State Bar No. 201227)
Laura Iris Mattes, Deputy City Attorney (State Bar No. 310594)
Nubyaan Scott, Deputy City Attorney (State Bar No. 331584)
Marc Shapp, Deputy City Attorney (State Bar No. 266805)
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile: (510) 981-6960
Email: MShapp@berkeleyca.gov
       LMattes@berkeleyca.gov
       NScott@berkeleyca.gov

Attorneys for Defendant
CITY OF BERKELEY

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERKELEY HOMELESS UNION<br><br>            Plaintiff,<br><br>v.<br><br>CITY OF BERKELEY, THOMAS GREGORY, PAUL BUDDENHAGEN, PETER RADU, OKEYA VANCE-DOZIER, DOES 1-10<br><br>            Defendant. | Case No.  3:25-cv-01414-EMC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Judge: Hon. Edward M. Chen** |

Respondent CITY OF BERKELEY ("City") hereby submits its Opposition to Plaintiff Berkeley Homeless Union's Motion for Preliminary Injunction, ECF. No. 72. For the reasons set forth below, the Court should deny the motion and decline to issue any injunction against the City, any City officers, or City employees.

**TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................................................1

II.   STATEMENT OF FACTS .................................................................................................2

III.  LEGAL STANDARD.........................................................................................................8

IV.   ARGUMENT ......................................................................................................................9

      A.    BHU Does Not Demonstrate It Has Associational or Organizational
            Standing to Seek Injunctive Relief........................................................................9

      B.    Plaintiffs Cannot Succeed on the Merits..............................................................14

            1.    BHU Has Not Demonstrated a Likelihood of Prevailing on their
                  ADA Claims...............................................................................................14

            2.    BHU is Not Exposed to a State Created Danger.......................................17

      C.    BHU Cannot Show a Risk of Irreparable Harm. ..................................................22

      D.    The Balance of the Equites and the Public Interest Disfavor this Injunction. .......23

V.    OBJECTIONS TO EVIDENCE ........................................................................................24

      A.    Declaration of Yesica Prado..................................................................................24

      B.    Declaration of Gordon Gilmore (Miscaptioned as "Declaration of Trista
            Taylor")..................................................................................................................25

VI.   CONCLUSION..................................................................................................................25

1

## TABLE OF AUTHORITIES

2

## CASES

3

*Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531 (1987)................................................25

4

*Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075 (9th Cir. 2015)............................................9

5

*Arc of California v. Douglas*, 757 F.3d 975, (9th Cir. 2014)........................................................8, 9

6

*Blaike v. El-Tawansy*, No. 22-CV-04669-RS, 2022 WL 3692647, (N.D. Cal. Aug.
25, 2022) ................................................................................................................................18

7

8

*Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397 (1997)........................18

9

*Brandr Grp., LLC v. Elec. Arts Inc.*, No. 23-CV-02994-HSG, 2023 WL 4297571,
(N.D. Cal. June 30, 2023) ........................................................................................................8

10

*Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026 (9th Cir. 2001) .............................25

11

*Garcia v. City of Los Angeles*, 11 F.4th 1113 (9th Cir. 2021) .........................................................8

12

*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006).....................................................18

13

*Matilla v. NorthWestern Company*, No. CV 23-79-BU-SPW, 2025 WL 1042808
(D. Mont. Apr. 8, 2025) .........................................................................................................26

14

15

*Mayfield v. City of Mesa,* 131 F.4th 1100 (9th Cir. 2025) .............................................................15

16

*Nken v. Holder*, 556 U.S. 418 (2009).............................................................................................9

17

*Orr v. Bank of America, NT & SA* (9th Cir. 2002) 285 F.3d 764 .................................................26

18

*Prado v. City of Berkeley* 2024 WL 3697037, No. 23-cv-04537-EMC (N.D. Cal.
Aug. 6, 2024) .........................................................................................................................15

19

20

*Sacramento Homeless Union v. Cnty. of Sacramento*, No. 2:22-CV-1095-TLN-
KJN, 2024 WL 2785378, (E.D. Cal. May 30, 2024) .............................................................18

21

*Shen v. Albany Unified Sch. Dist.*, 436 F. Supp. 3d 1305 (N.D. Cal. 2020)................................18

22

*Stewart v. City & Cnty. of San Francisco, California*, 608 F. Supp. 3d 902 (N.D.
Cal. 2022)................................................................................................................................8

23

*Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003) ....................................................................17

24

*Travelers Cas. & Sur. Co. of America v. Telstar Const. Co., Inc.*, 252 F.Supp.2d
917 (D. Ariz. 2003) ................................................................................................................25

25

26

*Where Do We Go Berkeley v. California Department of Transportation* ("*Where
Do We Go Berkeley*"), 32 F.4th 852 (9th Cir. 2022) .............................................................15

27

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, (2008) ......................................................8, 25

28

**CITY OF BERKELEY'S OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION**

**RULES**

Fed. R. Evid. 601-602, 701, 801-802............................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CITY OF BERKELEY'S OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION**

## I.     INTRODUCTION

The City of Berkeley, like many cities in the Bay Area, is tasked with addressing the complex issue of homelessness within its jurisdiction. The City has adopted a Housing First approach which recognizes that people experiencing homelessness must first be able to access a decent, safe place to live before stabilizing, improving health, reducing harmful behaviors or increase income. In support of this mission, the City has dedicated significant staff and monetary resources. The City maintains a Homeless Response Team which is a multi-departmental effort to balance the needs and impacts of the people who live, work, or visit the area of a particular encampment – including and especially the people living in that encampment. Berkeley voters also approved an increase real estate tax which helps to fund the leasing of transitional housing motels as well as creating permanent supporting sites within Berkeley. As a result, in the last two years the City has seen a dramatic reduction in street homelessness.

Nevertheless, encampments continue to appear within the City despite fire, environmental health, and nuisance hazards and ongoing exhaustive City staff efforts to offer shelter when available and abate hazards. The City's actions with regard to these encampments reflect the City's ongoing commitment to balance compassion for unhoused residents with the need to maintain public health and safety.

In December 2024, the Berkeley City Manager ordered the abatement and closure of the Harrison Corridor to further lodging. In an attempt to prevent this action, BHU has filed a complaint requesting injunctive relief based on alleged violations of BHU members' rights under the Americans with Disabilities Act ("ADA"), California Government Code and the federal and state constitution. However, BHU has not met their burden to demonstrate that a preliminary injunction is warranted.

First, BHU cannot establish associational standing. BHU's paper thin record does not introduce testimony from any of its members supporting the basis of the organization's standing to pursue its claims. Neither does BHU present evidence of any interest at stake germane to its purpose. Because no individual plaintiffs are included in its motion, BHU similarly fails to

**CITY OF BERKELEY'S OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION**

demonstrate that the requested relief does not require the participation of individual members in the suit

Second, BHU cannot demonstrate a likelihood of success on the merits of either their ADA or state created danger claims. As to the ADA, BHU does not make the sufficiently individualized showing that an accommodation was necessary to any BHU member nor does it establish the existence of a reasonable accommodation that was denied.  BHU likewise relies on purely speculative dangers to support its state-created danger claims, that are not only hypothetical they are factually incorrect.

Lastly, the balance of the equities favors the City. The City has allocated millions of dollars and substantial staff time and other resources to the Harrison Corridor encampment, including efforts to find residents temporary shelter and permanent housing, and to mitigate the unsanitary and dangerous conditions that exist at the encampment. The City, the public at large, and the residents of the Harrison Corridor all share a vital interest in ensuring that health and safety nuisances are abated and general access to the public right of way is restored.

## II.     STATEMENT OF FACTS

The encampments in and along Harrison Street and 8th Street in West Berkeley (the "Harrison Corridor") have received more attention, from a services and intervention standpoint, of any encampment in the City of Berkeley (the "City"). Radu Decl. ISO TRO Opposition ("Radu 1 Dec."), Ex. A [ECF No. 15-1].  Of the hundreds of shelter offers the City has made to encampment residents, over one in five have been to people living in the Harrison Corridor. *Id*. In 2024, the City spent $5 million to fund a master lease at the Campus Motel on University Aversity to operate it as a low barrier, 24/7, non-congregate shelter and dedicate it entirely to people living in the Harrison Corridor. *Id*. The City has also provided a wide range of services to Harrison Corridor residents including: 1) the placement of a dumpster on 8th Street with service four times a week; 2) multiple port-a-potties with wash stations that are serviced regularly; 3) free mobile shower and laundry service; 4) multiple targeted treatments by the City's Environment Health Decision of the extensive network of rodent burrows and the provision of numerous new

2

tents and sterility tubs to maintain cleaner and more rodent proof condition, etc. *Id.*

However, despite this significant investment of money, time, and resources, dangerous and inhumane conditions continue to persist in the Harrison Corridor. On December 6, 2024, the City's Neighborhood Services Division and Environmental Health Division conducted a site visit at the Harrison Corridor. Radu 1 Dec., ¶ 5. The site visit revealed significant health and safety hazards including loose and scattered syringes; rodent harborage conditions and evidence of extensive and active rodent burrows; unmitigated human and animal waste; and open/rotting sources of food. *Id.* The sidewalks and vehicular lanes of traffic were also obstructed by the accumulation of personal belongings and debris in the area. *Id.* These findings were transmitted to City Manager Paul Buddenhagen in a memorandum dated December 12, 2024. *Id.* In addition to the significant public health concerns documented by the Environment Health Division, the memorandum discusses the exceedingly high rate of calls for Berkeley Police and Fire services. For example, police calls for service at the Harrison encampment in the one year period from August 1, 2023-July 31, 2024 totaled 252—on average one call every day and a half. Calls for Berkeley Fire service totaled 78 during that same time frame, with safety impacts for nearby residents, workers, and detrimental impacts on business operations. Based on these documented findings, on December 18, 2024, Berkeley City Manager Paul Buddenhagen ordered a full closure of Harrison Corridor encampment. *Id.*, ¶ 6.

On January 7, 2025, members of the City's Homeless Response Team ("HRT")—a multi-departmental group of City staff working together to address the needs of the unhoused population in Berkeley—and Berkeley Police posted 50 copies of a Public Notice throughout the Harrison Corridor. Declaration of Okeya Vance-Dozier ISO TRO Opposition ¶¶ 2, 3 ("Vance-Dozier 1 Dec.") [ECF No. 13]. The Public Notice informed encampment residents of the December 6, 2024 findings of significant health and safety hazards and the sidewalk and street obstructions, and ordered encampment residents to abate the nuisances by February 10, 2025. *Id.*, Ex A., p. 1 [ECF No. 13-1]. The Public Notice included a Fact Sheet that states in simple terms:

- The area has been declared a health hazard by the City's Health, Housing and

3

Community Services Department and a Public Nuisance by the City Manager's Office. For these reasons, the City Manager ordered the encampment to be closed on December 18, 2025 [sic].

- You have until February 10, 2025 to find another location for yourself and your belongings. By or before this date, you must leave the encampment and take anything of value with you. The City may come to clean up and permanently close this encampment at any time after February 10, 2025 without further notice.

- You have until February 10, 2025 to ensure your vehicle is in working order and properly licensed and registered or remove it from the closure area. The City will be enforcing against illegally parked vehicles in this area on or after February 10, 2025. After that date, remaining vehicles may be subject to tow and impounding.

- On February 10, 2025, this area will be declared a No Lodging and No Property area. Anyone remaining in this area after that date will be subject to citation or arrest and any personal property will be subject to immediate removal by the City.

*Id.*, Ex. A, p. 6 [ECF No. 13-1 at 6]. Both the Public Notice and the Fact Sheet informed encampment residents of the City's property storage service, how to seek ADA accommodations, and how to lodge an appeal of the hazard declaration. *Id.*, Ex. A, pp. 1, 4, 6-7 [ECF No. 13-1 at 1, 4, 6-7].

The Public Notice also noted that the City's primary goal is the end of unsheltered homelessness by connecting those living in this encampment to interim and permanent housing. Ex. A, pp. 7-8 [ECF No. 13-1 at 7-8]. It explained that the City does not control access or referrals to permanent supportive housings, even for those located with the City, but that the City staff could help connect individuals who were interested in this service. *Id.* The notice informed individuals that a limited number of shelter beds were available and provided contact information on how to access those services. *Id.* In other words, all encampment residents were given information regarding potential shelter options on January 7, 2025 and were encouraged to access those services separate and apart from any ADA related accommodations.

On January 14, 2025, the City held a community information event regarding a new interim housing program being offered by the City. Declaration of Thomas Gregory, filed ISO TRO Opposition ("Gregory 1 Decl."), ¶ 4 [ ECF No. 14]. Among others, ADA Program Coordinator Thomas Gregory spoke at the event on behalf of the City. *Id.* Mr. Gregory informed those present of their right to seek an ADA accommodation and offered dozens of copies of his

business card and encouraged individuals to contact him with any requests. *Id.*

On January 22, 2025, the City's Administrative Hearing Examiner held a hearing on encampment residents' appeal of the City Manager's nuisance declaration and order to abate the nuisance. Vance-Dozier 1 Decl., ¶ 5 [ECF No. 13]. The purpose of the hearing was not to adjudicate ADA accommodation requests from the Harrison Corridor residents, but instead was limited to considering the public's objections and complaints regarding the City Manager's public health nuisance declaration and order to abate the encampment. Vance-Dozier 1 Decl., Ex. C [ECF No. 13-3]. Based on the documents in the record and the testimony during the hearing, on January 29, 2025, the City's Administrative Hearing Officer issued a ruling overruling the appellants objections and affirming the City's ability to conduct a nuisance abatement. *Id.*, ¶ 6, Ex. C, pp. 9-12 [ECF Nos. 13 and 13-3 at 9-12]. The decision addressed arguments by Harrison Corridor residents including that the public health circumstances, such as the rat burrowing, should be dealt with differently. *Id.* However, because the Harrison Corridor is also littered with exposed syringes and human waste, it is dangerous to travel into the small spaces needed to access rodent burrows. *Id.* In addition, the litter and debris are so condensed that wiggling in the tight spaces could compromise the equipment needed for rodent control. *Id.* Furthermore, the vast amounts of debris, food waste, and feces at the encampment serve as a sustenance for the rats and therefore, the location needs to be deeply cleaned in order to abate the infestation. *Id.*

On January 31, 2025, HRT members posted 50 copies of a Second Public Notice throughout the Harrison Corridor. Vance-Dozier 1 Decl., ¶7 [ECF No. 13]. The Second Public Notice included a copy of the January 29, 2025 decision of the City's Administrative Hearing Officer, after the Fact Sheet and the information on requesting interim or permanent housing. *Id.*, Ex. C [ECF No. 13-3 at 9-12].

Following the posting of the Second Notice, the City received multiple requests from encampment residents regarding ADA accommodations. The City responded promptly and judiciously to each accommodation request. The City continued to consider ADA accommodation requests even several months after notice of the closure had been provided. For example, on April

5

25, 2025, Ms. Prado wrote to the City on behalf of three encampment residents, Eric Keiser, Shareef Muwakkil, and Austin White. Declaration of Thomas Gregory ("Gregory Declaration"), submitted herein, ¶¶ 5-7, Exhibits A-C. All three alleged to have various mental conditions, in addition to physical ones, that affected their ability to comply with the City's abatement order. *Id*. Similarly, all requested multiple accommodations including the ability to remain in place at the Harrison Corridor or be placed in a non-congregate shelters. *Id*. In response, the City accepted that the various conditions they alleged to have were disabilities and required no further documentation of those disabilities. *Id*. However, the City requested documentation reflecting the nexus between their disabilities and the requested accommodation. To the extent there existed accommodations that could be readily provided, such as packing assistance or storage, the City offered it at the outset. *Id*. The City thereafter received no response from Ms. Prado regarding Mr. Keiser, Mr. Muwakkil, or Mr. White. *Id*.

On April 22, 2025, staff from the City's Environmental Health Division conducted a further health and safety inspection of the conditions in the Harrison Corridor. Declaration of Ronald Torres, ("Torres Dec."), ¶ 5 [ECF No. 56-3]. During the inspection, Environmental Health staff observed multiple violations of the Berkeley Municipal Code due to rodent harborage, rotting food, feces, accumulations of garbage and debris, and scattered used syringes. *Id*.



Soiled diaper

Feces is said to be a major food source for rats in urban environments. While containing toxins and infectious bacteria capable of causing illness, poop also contains fats, proteins, carbohydrates, and minerals that can be ingested safely by certain animals, including rats.

**CITY OF BERKELEY'S OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION**




Uncontained garbage and rotting foods are providing sustenance for vermin that have lead to the current rodent infestation.



Blood contaminated syringes can contain synthetic opioids, other illegal drugs, and biological hazards.




Internal



Remnants of toilet paper and feces from the storm drain.

**CITY OF BERKELEY'S OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION**



Rodents use burrows to move from place to place. Burrows are typically found around concrete slabs and building foundations, under materials stored outdoors, and along fence rows.

Upon reviewing the report by his staff, Mr. Torres concluded "the conditions in the Harrison Corridor constitute an imminent hazard, including findings of used syringes, raw sewage, feces near sewer drains, and a proliferation of rat burrows." *Id.* ¶ 8. Mr. Torres further concluded, "Based on the findings of the April 22, 2025 Health and Safety inspection report, it does not appear that the serious health and safety concerns observed in December 2024 have improved." *Id.* ¶ 9.

## III.    LEGAL STANDARD

"The standard for issuing a temporary restraining order and issuing a preliminary injunction are substantially identical." *Brandr Grp., LLC v. Elec. Arts Inc.*, No. 23-CV-02994-HSG, 2023 WL 4297571, at *2 (N.D. Cal. June 30, 2023). An injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking an injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "The first factor is the 'most important.'" *Garcia v. City of Los Angeles*, 11 F.4th 1113, 1118 (9th Cir. 2021). "To establish a likelihood of success, plaintiffs need not conclusively prove their case or show that they are 'more likely than not' to prevail." *Stewart v. City & Cnty. of San Francisco, California*, 608 F. Supp. 3d 902, 911 (N.D. Cal. 2022). "Rather, a 'fair chance' of success is the standard for granting preliminary injunctive relief." *Id.* Post-*Winter*, a complaint's allegation of a plausible claim does not suffice to satisfy the success-on-the-merits element necessary for a preliminary injunction. *Arc of California v. Douglas*, 757 F.3d 975, 993-94 (9th Cir. 2014); see also *Angelotti*

8

*Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1087 (9th Cir. 2015). "The irreducible minimum [for a preliminary injunction] ... is that the moving party demonstrate a fair chance of success on the merits or questions serious enough to require litigation. No chance of success at all will not suffice."' *Arc of California*, 757 F.3d 975 at 994. As the Supreme Court explained, "[i]t is not enough that the chance of success on the merits be 'better than negligible.' [Citation.] Even Plaintiff acknowledges that '[m]ore than a mere "possibility" of relief is required.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## IV.    ARGUMENT

### A.    <u>BHU Does Not Demonstrate It Has Associational or Organizational Standing to Seek Injunctive Relief</u>

Organizations like BHU "may sue only if they can establish either organizational standing or associational (or representational) standing." *Emanuel Displaced Person Association 2 v. City of Portland,* 704 F.Supp.3d 1088, 1102 (D. Or. 2003); *see also Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) ("An association or organization can sue based on injuries to itself or to its members."). Organizational standing turns on whether an organization itself has suffered an injury in fact. *Smith*, 358 F.3d at 1101. By contrast, associational standing exists when an organization acts as a representative of members who have been injured in fact and thus could have sued on their own. *Simon v. E. Ky. Welfare Rts. Org*., 426 U.S. 26, 40 (1976). "The party invoking federal jurisdiction bears the burden of demonstrating standing." *Coalition on Homelessness v. City and County of San Francisco* ("*Coalition*"), 758 F.Supp.3d 1102, 1121 (N.D. Cal. 2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021)). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Ramirez*, 594 U.S. at 431; *see also Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007) ("Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence.").

Here, of the four original Plaintiffs only BHU has made a last-ditch effort to file a renewed motion for a preliminary injunction. Two of the Plaintiffs—Bouchard and Johnson—have settled their claims with the City. And Moore has not joined BHU's motion or separately moved for a preliminary injunction. Therefore, BHU may only obtain injunctive relief if it can demonstrate it has associational standing to sue on behalf of its members or organizational standing to sue for injuries it has suffered. It makes neither showing.

### i.    BHU Does Not Establish Associational Standing

"An entity possesses standing to sue on its members' behalf when it can satisfy the following three elements: (1) that its members otherwise would have standing to sue in their own right, (2) that the interests at stake prove germane to the entity's purpose, and (3) that neither the claim asserted nor the relief requested requires the participation of the individual members in the suit." *Imperial Sovereign Court v. Knudsen*, 699 F.Supp.3d 1018, 1034 (D. Mont. 2023) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Under the first prong of this test, an associational plaintiff "must show that a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). And to prevail on the third prong, the association must demonstrate that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). If "an association can satisfy these requirements, [a court will] allow the association to pursue its members' claims, without joining those members as parties to the suit." *Id.*

BHU meets none of these elements. As to the first prong, BHU fails to establish its members have standing to pursue the organization's ADA and related claims. Tellingly, BHU introduces no testimony from any of its members in support of its threadbare motion. This omission alone precludes BHU from obtaining injunctive relief. See *Assoc. Gen. Contractors v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194-95 (9th Cir. 2013) (finding an organization failed to demonstrate associational standing because it "d[id] not identify any affected members by name nor [did] it submit[] declarations by any of its members attesting to harm they have suffered or

10

1    will suffer" under the defendant's challenged program).  BHU provides a declaration from a

2    single BHU representative, Yesica Prado, in which Prado asserts she has "submitted over 21

3    formal requests for reasonable accommodations under the Americans with Disabilities Act (ADA)

4    to the City of Berkeley on behalf of BHU members residing at the 8th and Harrison encampment"

5    since late 2023.  ECF 72-2, p. 1 of 4, ¶ 2.  Prado maintains the City "has refused to meet within

6    me [sic] with BHU members on any of these requests—except perhaps Adrien Bouchard and

7    Nicholas Johnsons."[1]  *Id*.  But apart from these and other conclusory assertions, BHU offers no

8    evidence these members are "qualified individual[s] with a disability" and that the City denied

9    them or threatened to deny them the benefits of any public services, programs, or activities based

10   on their disability—the showing BHU's members would need to make to state a claim under Title

11   II of the ADA.  42 U.S.C. § 12132; *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir.

12   2004).  BHU likewise does not show the City acted with deliberate indifference, an essential

13   element of its state-created danger claim.  See *Martinez v. City of Clovis*, 943 F.3d 1260, 1274

14   (9th Cir. 2019) ("Under the state-created danger test, [the plaintiff] must finally show that the

15   officers acted "with 'deliberate indifference' to a 'known or obvious danger.'  This is 'a stringent

16   standard of fault, requiring proof that a municipal actor disregarded a known or obvious

17   consequence of his action.'") (internal citations omitted).  Nor does BHU demonstrate the City

18   violated or threatened to violate its members' constitutional rights.

19        Similarly, BHU makes no effort to satisfy the second and third requirements of

20   associational standing.  As to the second prong, it presents no evidence of any interest at stake

21   germane to its purpose—BHU does not identify its purpose in its moving papers nor does it argue

22   that "neither the claim[s] asserted nor the relief requested requires the participation of [its]

23   individual members in the lawsuit"—and it certainly makes no showing to this effect.  *See, e.g.*,

---

[1] BHU submits a second declaration in support of its motion, captioned "Declaration of Trista
Taylor in Support of TRO and PI."  But curiously, the declaration is not signed by Trista Taylor;
rather, the declarant identifies himself as "Gordon Gilmore."  BHU only cites this declaration
once in its motion, in support of its assertion that it has led cleanup efforts at the Harrison
encampment.  Motion, 7:20-21.  The declaration does not specify Gilmore's relationship to BHU
and otherwise lacks any foundation.  Nor is Gilmore's testimony material in any way to BHU's
claims.

*Cahto Tribe of Laytonville Rancheria v. Risling*, No. 2:10–cv–01306–GEB–GGH, 2010 WL 4721060 at *2 (E.D. Cal. Nov. 12, 2010) ("Movants also argue in their reply brief that Defendants do not adequately represent their interests because it is unclear whether they will challenge the court's subject matter jurisdiction under 28 U.S.C. § 1362.  This argument is waived since it was not made in the moving papers."); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir.2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

Lastly, BHU fails to satisfy the third prong to demonstrate that the relief does not require the participation of individual members in the suit. As an initial matter, BHU does not provide evidence that its members authorized Yesica Prado to engage in interactive process discussions with the City on their behalf or otherwise represent their interests.  *See Am. Unites for Kids v. Rousseau,* 985 F.3d 1075, 1098 (9th Cir. 2021) (an organization claiming associational standing must be "sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy'").  Furthermore, like the plaintiff in *Coalition*, BHU does not identify the individualized needs of its members.  "[O]n receiving a request for accommodation," a public entity "is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation."  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139.  But when an association's "claims require an 'ad hoc factual inquiry' for each member represented by the association, the organization does not have associational standing." *See City of South Lake Tahoe Retirees Association v. City of South Lake Tahoe*, No. 2:15–cv–02502–KJM–CKD, 2017 WL 2779013 at *3 (E.D. Cal. June 27, 2017) (citing *Association of Christian Schools Intern. v. Stearns*, 678 F.Supp.2d 980, 986 (C.D. Cal. 2008)).  Thus, "the individualized exercise needed to determine whether each" of BHU's members was "denied the benefit of . . . [a] reasonable accommodation," particular to each member's disability and needs, precludes BHU from demonstrating associational standing here.  *Bloom v. City of San Diego*, No. 3:17-cv-02324-AJB-MSB, 2021 WL 8053533 at *11 (S.D. Cal. June 8, 2021) ("And, whether the City denied reasonable accommodation to Plaintiffs is not a contention capable of classwide resolution because, as discovery reveals, many class members seek widely varied accommodations.").  Similarly, the court observed the Coalition failed to allege any of its members "experienced a foreseeable injury due to a state-created danger," such that they "would

have standing to [bring a state-created danger claim] in their own right." *Id.* at 1127.  The same is true for BHU here.

Because BHU makes virtually no attempt to carry its burden, the Court should deny its motion.  *See Citizens for Quality Education San Diego v. Barrera*, 333 F.Supp.3d 1003, 1031 fn. 20 (S.D. Cal. 2018) (on a motion for preliminary injunction, "[i]t is not the Court's duty to make legal arguments for Plaintiffs that they do not raise and the Court will not do so"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation").

### ii. *BHU Fails to Establish Organizational Standing*

"To determine whether organizational standing requirements have been satisfied, [courts] 'conduct the same inquiry as in the case of an individual: Has the plaintiff 'alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?'" *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)).  Organizations "therefore have the burden of demonstrating that (1) they have suffered an injury-in-fact, meaning an injury that is 'concrete and particularized' and 'actual and imminent,' (2) the alleged injury is 'fairly traceable' to the defendants' conduct, and (3) it is 'more than speculative' that the injury is judicially redressable." *Id.* (quoting *Lujan*, 504 U.S. at 560-61).

Until last year, "an organization suing on its own behalf [could] establish an injury when it suffered 'both a diversion of its resources and a frustration of its mission.'" *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest* (2010) 624 F.3d 1083, 1088 (9th Cir. 2010) (quoting *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)); *see also Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021) ("Organizations divert resources when they 'alter[ ] their resource allocation to combat the challenged practices,' but not when they go about their 'business as usual.' [Citation.]")  But "[t]his type of injury is no longer sufficient to establish organizational standing because the Supreme Court recently rejected the 'frustration-of-mission and diversion-of-resources theories.'" *Coalition*, 758 F.Supp.3d at 1128 (citing *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024)).  "[A]n

organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Hippocratic Medicine*, 602 U.S. at 394. "A plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" *Id.* (citing *Havens*, 455 U.S. at 379). An organization may now only assert standing when a challenged policy "directly affect[s] and interfere[s] with [its existing] core business activities." *Id.* at 395.

Although BHU does not demonstrate it had to redirect any resources because of the City's conduct—and so could not prevail on a diversion-of-resources theory, even if that theory was no longer obsolete—it certainly does not meet the higher bar set for organizational standing following *Hippocratic Med*. In its complaint, BHU describes itself as "a membership organization advocating for the rights of unhoused individuals in Berkeley, including disabled individuals who have been denied reasonable accommodations." Comp., ¶ 16, 4:11-14. But it does not allege or show it has suffered or will suffer any cognizable injury as an organization. In her declaration, Prado contends the City "refus[ed] to even meet with BHU members about their disabilities and ways to mitigate foreseeable dangers puts our members at risk." ECF No. 72-2, p. 3 of 4, ¶ 6. But neither the Prado declaration nor the Gilmore declaration addresses whether the City's cleanup operations will interfere with or otherwise impact BHU's core business activities. BHU does not even identify its core business activities.

As such, BHU lacks organizational standing to pursue its claims. *See Coalition*, 758 F.Supp. at 1129 (the plaintiff's allegations fell "short of establishing organizational standing" because the Coalition "d[id] not dispute that its expenditure of funds to replace tents and survival belongings [wa]s a direct response to the City's actions" rather than an infringement on its pre-existing core activities).

### B.    Plaintiffs Cannot Succeed on the Merits.

#### 1.    BHU Has Not Demonstrated a Likelihood of Prevailing on their ADA Claims.

BHU has not met its burden to put forth sufficient evidence to demonstrate a likelihood of success on the merits of its ADA claims. A plaintiff asserting a reasonable accommodation claim

14

under Title II "bears the initial burden of producing evidence of the existence of a reasonable accommodation that was denied or not provided." *Mayfield v. City of Mesa,* 131 F.4th 1100, 1110 (9th Cir. 2025) (citations omitted).  "If the plaintiff carries this burden, the defendant may nonetheless defeat the claim by showing that the plaintiff's proposed accommodation would cause an 'undue burden.'" *Id.* (citation omitted). Although, Title II requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," a modification is not necessary if it would fundamentally alter the nature of the service.  *Prado v. City of Berkeley* 2024 WL 3697037, *20, No. 23-cv-04537-EMC (N.D. Cal. Aug. 6, 2024). "For programs designed to address risks to the public, reasonableness depends on the nature of the risk, whether the proposed modification would affect the agency's ability to address the risk, and the probability of worsening the risk if the agency is forced to alter its programs." *Where Do We Go Berkeley v. California Department of Transportation* ("*Where Do We Go Berkeley*"), 32 F.4th 852, 862 (9th Cir. 2022). A court must also "take into account financial and other logistical limitations on [the program]." *Id.*

First, a reasonable accommodation claim must be "based on an *individualized* request or need." *Payan v. Los Angeles Comy. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir, 2021) (emphasis added) (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001)). BHU cannot assert a blanket claim that all BHU members must receive an accommodation but rather, it is their burden to seek and provide evidence of "the existence of a reasonable accommodation that was denied or not provided" for each individual who seeks accommodations. *Mayfield v. City of Mesa,* 131 F.4th 1100, 1110 (9th Cir. 2025) (citations omitted). Here, Prado's declaration does not name the members on whose behalf BHU purportedly submitted requests nor provide any declarations or documentation to support her attestation that there "at least 19 ADA requests outstanding." Prado Decl. ¶ 2. BHU also does not establish how many of their members are disabled. It does not appear that BHU is primarily composed of disabled individuals, and therefore to the extent BHU claims to represent non-disabled residents they would not have standing to pursue ADA claims. As such, BHU fails to adequately establish a sufficiently individualized basis to support an ADA claim.

Second, Title II of the ADA requires "a plaintiff [to] show that a public entity failed to make reasonable modifications that would accommodate plaintiff's disability without fundamentally altering the nature of program or activity." *Selene v. Legislature of Idaho*, 514 F. Supp. 3d 1243, 1256 (D. Idaho 2021). "Importantly, the ADA does not require an accommodation that an individual requests or prefers; instead, the ADA requires only a reasonable accommodation." *Id.* And even if the plaintiff can make the requisite showing, the defendant may nonetheless defeat the claim by showing that the plaintiff's proposed accommodation would cause "undue financial and administrative burdens" on the public entity. *Updike v. Multnomah Cnty.*, 870 F.3d 939, 950 (9th Cir. 2017). Again, BHU puts forth no evidence to demonstrate that the City failed to provide a reasonable accommodation.[2] Had it done so, the City's compliance with the ADA would have been clear.

For example, the accommodation requests submitted on behalf of Mr. Muwakkil, Mr. White, and Mr. Keiser, purported BHU members, in April 2025 do not qualify as reasonable accommodations because they would either fundamentally alter the nature of the City's abatement activity or fall outside the scope of services the City is required to provide. Gregory Decl. ¶¶5-7, Exhibits A-C. All three have requested either permission to remain at the Harrison Corridor or placement in shelter as a form of accommodation.[3] *Id.* However, requests to occupy public land for an indefinite period of time would not "reasonably modify" the City's abatement activity but instead would fundamentally alter the purpose of that activity—allowing the City to abate significant public health hazards. *See Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 862 (9th Cir. 2022).[4]

---

[2] BHU should not be able to submit new evidence or raise new arguments in its reply brief. "Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief." *Gerlach v. Rokita*, No. 1:22-CV-00072-TWP-MG, 2023 WL 2683132, at *3 (S.D. Ind. Mar. 29, 2023), *aff'd*, 95 F.4th 493 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1044, 220 L. Ed. 2d 378 (2025). In the event that BHU attempts to circumvent that limitation, the City requests the ability to file a surreply.

[3] Contrary to BHU's assertions that they have requested in person meetings and the ability to record the City has refused, none of these individuals requested the ability to record the meetings and the City has not refuse to meet with them. In fact, BHU terminated the process by declining to engage further after receiving the City's initial response.

[4] The City appropriately requested documentation from a qualified professional in response to the reasonable accommodation requests submitted on behalf of Mr. White, Mr. Muwakkil, and Mr. Keiser, each of whom claimed that disability-related limitations rendered them incapable of relocating from the Harrison encampment. These requests lacked verification from qualified experts regarding the nature of the individuals' impairments, the extent of their limitations, and

16

Similarly, BHU could not show that requests for comprehensive relocation support such as "executive functioning assistance," peer support workers, or prescheduled low-stimulation meetings with a consistent liaison are accommodations the City is obligated to provide under Title II of the ADA. The City does not operate programs that offer individualized relocation planning or disability advocates, and the ADA does not compel the City to create new programs or staff. *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) ("[P]ublic entities are not required to create new programs that provide heretofore unprovided services to assist disabled persons".) Where appropriate, the City has referred individuals to community resources such as the Center for Independent Living which is better positioned to offer such assistance.

On the other hand, the City has offered physical assistance with packing and lifting belongings, and a pre-scheduled storage service—specific, feasible forms of support that align with the City's available resources and the ADA's requirements. The City's ADA Coordinator has also continued to refer Plaintiffs to the HRT and has included their staff on interactive process communications. This correspondence demonstrates the City's good-faith engagement in the interactive process and its willingness to implement reasonable modifications that do not undermine the nature of the abatement effort.

For these reasons, BHU cannot prove a likelihood of prevailing on their ADA claims.

### 2. BHU is Not Exposed to a State Created Danger.

The Ninth Circuit recognizes liability based on a state-created danger *only* where a state or local official acts to place a person in a situation of known danger with deliberate indifference to

the necessity of the specific accommodations sought—particularly the request to remain in place. Under established Ninth Circuit precedent, a public entity has an affirmative duty to "gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1136–37 (9th Cir. 2001) (quoting *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999)). This duty encompasses the obligation to seek additional information before issuing a denial, where an accommodation may be warranted but the appropriate form is unclear. *Id.* Because the accommodations requested here would have effectively exempted the individuals from relocation—a substantial constraint on the City's need to abate hazardous conditions—it was both reasonable and legally proper for the City to request documentation substantiating their disability-related limitations and the nexus between those limitations and the requested accommodations. Not only is the City entitled to make this determination, it is BHU's burden prove it.  See *Volis v. HACLA Employees*, No. CV 13–01397 MMM (SPx), 2014 WL 12677316, at *4 (C.D. Cal. May 29, 2014) ("A disabled person requesting an accommodation under the ADA or Rehabilitation Act must show that the accommodation sought is reasonably related to his qualifying disability.").

17

their personal or physical safety. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061-62 (9th Cir. 2006). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997). "In examining whether [the city] affirmatively places an individual in danger, [a court does] not look solely to the agency of the individual, nor [does it rest its] opinion on what options may or may not have been available to the individual. Instead, [the court must] examine whether [the city] left the person in a situation that was more dangerous than the one in which they found [them]." *Kennedy*, 439 F.3d at 1062 .[5] The affirmative act must have exposed the plaintiff to 'an actual, particularized danger,' and the resulting harm must have been foreseeable." *Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th Cir. 2016) (internal citations omitted). Speculative dangers, as the ones relied upon in Prado's declaration, are insufficient to establish a state-created danger. *See Cobine v. City of Eureka*, 250 F.Supp. 3d 423, 433 (N.D. Cal. 2017) ("[I]n the absence of particular allegations that the state action put the Plaintiffs in an inherently dangerous situation, the Court is bound to find that the generalized dangers of living on the street preexisted Plaintiffs' relocation.").

Here, BHU fails to establish a likelihood of prevailing on its state-created danger claim.  It offers no evidence of any affirmative action the City has taken or intends to take that has "created or exposed" or will create or expose BHU or its members "to an actual, particularized danger that [they] would not otherwise have faced." In its motion, BHU argues the City plans to permanently close Eighth and Harrison without engaging in the interactive process or mitigate harm. Mot. 3:2-4.  In support of this contention, Prado ambiguously avers the "language he [the City's ADA Coordinator] used on April 29—indicating that the City will proceed with enforcement if the TRO is lifted—while refusing to even meet with BHU members about their disabilities and ways

---

[5] Plaintiffs assert a claim for state-created danger pursuant to article I, section 7 of the California Constitution. ECF. No. 1 ¶¶ 57-60; ECF. No. 43 at 19. Neither the courts of California nor the federal courts have recognized a state-created danger claim arising under the California Constitution. *See Sacramento Homeless Union v. Cnty. of Sacramento*, No. 2:22-CV-1095-TLN-KJN, 2024 WL 2785378, at *3 (E.D. Cal. May 30, 2024); *Blaike v. El-Tawansy*, No. 22-CV-04669-RS, 2022 WL 3692647, at *2 (N.D. Cal. Aug. 25, 2022); *Shen v. Albany Unified Sch. Dist.*, 436 F. Supp. 3d 1305, 1315 (N.D. Cal. 2020). "[I]t is emphatically not the role of this federal court to create new doctrines under the California state constitution. In light of the absence of any apparent foundation in California state law, this claim is dismissed." *Shen*, 436 F. Supp. 3d at 1315.

to mitigate foreseeable dangers puts our members at risk." But as the movant, BHU bears the burden of adducing evidence of the state-created danger and it has not done so absent this sole statement in the declaration and their moving papers. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" (italics added).); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("[P]laintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."). BHU cannot carry this burden based merely on its counsel's unverified assertions. *Singh v. Gonzales*, 221 Fed.Appx. 682, 683 (the "arguments of counsel are not evidence"); *Steenwyk v. Steenwyk*, No. 2:20-cv-02375-FLA (AFMx), 2024 WL 2206338 at *12 fn.10 (C.D. Cal. Mar. 28, 2024) ("Defendants do not cite any specific portions of the record in support of their arguments. . . . The court, therefore, disregards the [] Defendants' arguments as unsupported.").

Even assuming BHU has demonstrated the City intends to abate the Harrison encampment, BHU still has not shown it or its members would experience any state-created danger and foreseeable harm. Prado contends the encampment "is adjacent to the only public restrooms in the area accessible 24/7." ECF No. 72-2, ¶ 6. But Prado lays no foundation for this claim, nor does she define "area." Prado's testimony is also factually incorrect. The City maintains multiple public restrooms throughout Berkeley, including in public parks. Declaration of Okeya Vance-Dozier 3, submitted herein, ¶5. One of these parks, the Tom Bates Regional Sports Complex, is located a few blocks from the Harrison encampment and contains a restroom that is accessible at all hours. *Id*. BHU does not explain how abatement of the encampment would prevent its members from accessing these restrooms.

Prado also states that "the Eighth and Harrison site is within walking distance of the Dorothy Day House, where BHU members receive hot meals, clean water, and basic survival supplies." ECF No. 72-2, ¶ 7. She adds: "Many members, including those with chronic illnesses and mobility limitations, cannot carry supplies long distances." *Id*. First, Prado does establish that BHU members would lose access to these services or otherwise specify the alleged harm they would suffer. Second, the City's HRT provides and coordinates services throughout the City regardless of their location. Vance-Dozier Declaration 2, ¶¶ 10-13 [ECF No. 56-2]. Even if BHU

members are forced to relocate, they could still avail themselves of these services at various locations throughout Berkeley. *Id*. Third, Prado does not define the phrase "walking distance." That the Harrison encampment is 2.5 miles away from the Dorothy Day House compounds this ambiguity.  Declaration of Okeya Vance-Dozier 3, ¶4.  This is approximately a 58=minute walk. *Id*. If "many" BHU members "cannot carry supplies long distances," how could they frequent a facility that is a least an hour walk away?

Prado also contends "[m]any disabled residents rely on community watch groups and buddy systems within the encampment to ensure safety while sleeping, particularly those who are blind, hard of hearing, or managing PTSD," and that "[d]isplacement will scatter these networks and leave vulnerable individuals isolated."  ECF No. 72-2, ¶ 7.  Again, Prado fails to indicate these residents are BHU members, such that BHU has associational standing to seek relief on their behalf in the first place.  But even if they had, there is no reason to credit the hypothetical scenario that residents will be scattered and isolated.[6] The City has no prohibition from unhoused individuals living alongside others, the City simply desires to abate and close this particular encampment which poses severe public health and safety threats. To establish liability under the state-created doctrine, BHU must demonstrate the City's actions will subject its members to "an actual, *particularized* danger that [they] would not otherwise have face" that is "known or obvious" to the City.  *Martinez*, 943 F.3d at 1271, 1274 (emphasis added).  BHU does not articulate—much less substantiate—any such danger.  See *Polanco v. Diaz*, 76 F.4th 918, 927 (9th Cir. 2023) ("Affirmative state action that exposes a broad swath of the public to 'generalized dangers' cannot support a state-created-danger claim"); *Sinclair v. City of Seattle*, 61 F.4th 674, 676, 683 (9th Cir. 2023) (holding that the plaintiff had not alleged a state-created-danger claim because "the City-created danger was a generalized danger experienced by all those members of the public who chose to visit" a certain part of the city).

Additionally, Prado maintains "several residents are receiving care from Lifelong Medical and Bay Area Community Services, that come to the encampment," and that "[m]oving them without accommodation will disrupt medical treatments, interfere with mental health care, and

---

[6] BHU's paper-thin record does not evinces no foreseeable harm its members would face apart from being "isolated," which in and of itself does not constitute harm.

**CITY OF BERKELEY'S OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION**

jeopardize existing housing placement efforts." ECF No. 72-2, ¶ 7. Notwithstanding this conclusory and foundationless assertion, BHU makes no particularized showing its members would be injured by this alleged disruption of services or that the City has denied them suitable accommodations. See *Coalition*, 758 F.Supp.3d at 1127 ("Here, the [complaint] does not allege that a Coalition member (or individual Plaintiff) suffered injuries resulting from the City's challenged conduct that created or exposed them to an actual, particularized danger they would not otherwise have faced."). In fact, the City's HRT performs this type of outreach throughout the City. Vance-Dozier Declaration 2, ¶¶ 10-13. It has implemented systems to track the whereabouts of encampment residents following an abatement operation for this very purpose— to ensure they maintain continual access to medical treatment and mental health and housing services, among other resources. *Id*. These systems will remain available to BHU members even if the City clears the encampment and BHU makes no showing to the contrary.

Finally, BHU cannot meet the "stringent" standard to show the City would be acting with deliberate indifference. To meet this standard, BHU would have to show that the City and its officials "recognize the unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Herrera v. Los Angeles Unified Sch. Dist.*, 18 F.4th 1156, 1158 (9th Cir. 2021). "Ultimately, a state actor needs to know that something is going to happen but ignore the risk and expose the plaintiff to it." *Id*. at 1158-1159 (citation omitted).

Here, the City provided more than a month's notice from January 7, 2025 until the compliance deadline of February 10, 2025. Both of the notices posted in the Harrison Corridor, on January 7 and January 31, 2025, informed encampment residents of the City's property storage service, how to seek ADA accommodations, and how to lodge an appeal of the hazard declaration, and information on resources to find interim or permanent housing. Vance-Dozier 1 Decl., Ex. A, pp. 6-8 [ECF No. 13-1 at 6-8] and Ex. C, pp. 6-8 [ECF No. 13-3 at 6-8]. The City does not seek to prevent BHU members from seeking services or access to bathrooms, nor is it accurate that BHU members have nowhere to go. *See* Vance-Dozier 2 Dec., ¶ 7. The City's HRT takes measures to coordinate service provisions throughout the City of Berkeley, including the Harrison Corridor, through weekly case conferences with community service partner. *Id.*, ¶ 10. At those conference, the City communicates with service providers regarding unhoused members

**CITY OF BERKELEY'S OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION**

throughout the City. *Id*. This system ensures a continuity of case for services of Harrison Corridor encampment residence who relocate outside the abatement area. Thus, there is no evidence that the City's actions would deprive the BHU of any support they need. On these facts, the BHU simply cannot credibly assert the City acted with the requisite "deliberate indifference" required to sustain a state-created danger claim. *Id.*, ¶ 9 ("I would not coordinate a closure if I knew it would subject encampment residents to a danger they would otherwise not be subject to.").

For these reasons, BHU fails to meet the elements of a state-created danger claim.

### C.    BHU Cannot Show a Risk of Irreparable Harm.

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see also Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 760 n.8 (9th Cir. 2018) ("it is the plaintiff's burden to put forth specific evidence from which the court can infer irreparable harm").

In support of a temporary restraining order and/or a preliminary injunction order, a district court is required to make "requisite factual determinations regarding irreparable harm and apply those factual findings to the four-factor framework to determine whether injunctive relief is warranted"; failure to do so constitutes abuse of discretion. *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 1000 (9th Cir. 2011). As the *Flexible Lifeline* court noted, its decision that plaintiff failed to show irreparable harm is not a suggestion that plaintiff will not suffer harm; instead, its decision counsels against "our undertaking a searching review of an incomplete record to make the required factual findings in the first instance." *Id.*; *see also Herb Reed Enterprises, LLC v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250-51 (9th Cir. 2013) (reversing district court's order granting injunction because in its "cursory and conclusory" analysis of irreparable harm, the "district court made no factual findings that would support a likelihood of irreparable harm"). The district court's finding of the likelihood of irreparable harm must be based on the evidence in the record. *Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1173-73 (9th Cir. 2011) (grant of preliminary injunction reversed where the district court's findings of irreparable harm were

**CITY OF BERKELEY'S OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION**

unsupported by the record); *see also Toyo Tire Holdings of Americas Inc. v. Continental Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (a district court must make "specific findings" with respect to each of the Winter factors).

BHU's argument for why it will suffer irreparable harm is simply a recitation of its arguments regarding the likelihood of success on the merits of its ADA and state created danger claims. Accordingly, for all of the reasons described in the two sections above, this argument fails to make a showing of irreparable harm. This is especially true with regarding to the requirements that irreparable harm be actual and imminent – not conjectural or hypothetical. Because BHU seeks a preliminary injunction, it may not merely rely on allegations in its complaint—rather, it must "proffer evidence sufficient to establish a likelihood of irreparable harm." *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013); *see also Shaterian v. Wells Fargo Bank*, No. C-11-920 SC, 2011 WL 2314151, at *4 (N.D. Cal. June 10, 2011) ("[A] plaintiff may not support a motion for a preliminary injunction by merely pointing to his complaint and the facts alleged therein."). BHU comes nowhere close to making this showing. It presents no tangible evidence the City failed to engage in the interactive process with BHU members with disabilities or provide inadequate of the City's intent to abate the encampment. Further, because BHU's arguments regarding the potential loss of bathroom access, support services, case management, are not only hypothetical they are also inaccurate, they cannot support a showing of irreparable harm. To the contrary, remaining in the Harrison Corridor with feces, rodent infestation, scattered syringes, considerable criminal activity, and almost daily calls to fire or police department would likely pose more harm than leaving the area.

## D.    The Balance of the Equites and the Public Interest Disfavor this Injunction.

By contrast, the City has provided substantial evidence to support that the balance of equities and the public interest disfavor this injunction. Before imposing an injunction, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987). The courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations omitted).

The City has allocated millions of dollars and inordinate staff time and other resources to the Harrison Corridor encampment, including efforts to find residents temporary shelter and permanent housing, and to mitigate the unsanitary and dangerous conditions that exist at the encampment. Radu 1 Dec., Ex. A [ECF No. 15-1]. However, despite these ongoing efforts, the obstructions of the public right of way, the public health hazards, and the other dangers persist. Torres Dec., ¶¶ 8-9. Contrary to any claims Moving Plaintiffs assert about their efforts to keep the area surrounding their vehicles tidy, the health hazard conditions in the Harrison Corridor are no better now than in December 2024. *Id.*, ¶ 9. Moreover, abating these persistent hazardous conditions "first requires the removal of all debris, food sources, long-term vehicles, and other obstructions." *Id.*, ¶ 7. The City, the public at large, and the residents of the Harrison Corridor encampment all share have a vital interest in ensuring that health and safety nuisances are abated and general access to the public right of way is restored.

## V.    OBJECTIONS TO EVIDENCE

The City hereby objects to the following evidence BHU submits in support of its motion.

### A.    Declaration of Yesica Prado

The City objects to the Declaration of Yesica Prado on the following grounds:

Paragraphs 1-9: This testimony is speculative and constitutes inadmissible speculation, conjecture, imagination, or guesswork, improper opinion testimony by a lay witness, and/or inadmissible hearsay.  Fed. R. Evid. 601-602, 701, 801-802.  Prado does not aver how she acquired the information set forth in these paragraphs and whether they are based on her personal observations or other non-hearsay sources.  Prado likewise does not establish that the assertions are based on her personal knowledge.  *Travelers Cas. & Sur. Co. of America v. Telstar Const. Co., Inc.*, 252 F.Supp.2d 917, 924 (D. Ariz. 2003); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

Paragraph 8: This testimony is based on inadmissible hearsay.  Fed. R. Evid. 801(c); *Matilla v. NorthWestern Company*, No. CV 23-79-BU-SPW, 2025 WL 1042808 at *6 (D. Mont. Apr. 8, 2025).  The testimony is also based on unauthenticated documents.  Fed. R. Evid. 901; *see, e.g., Orr v. Bank of America, NT & SA* (9th Cir. 2002) 285 F.3d 764, 773-774.

**B.    Declaration of Gordon Gilmore (Miscaptioned as "Declaration of Trista Taylor")**

Paragraphs 1-13: This testimony is speculative and constitutes inadmissible speculation, conjecture, imagination, or guesswork, improper opinion testimony by a lay witness, and/or inadmissible hearsay.  Fed. R. Evid. 601-602, 701, 801-802.  The testimony is also not relevant. Fed. R. Evid. 401-403.

**VI.    CONCLUSION**

For the foregoing reasons, the City requests that the Court deny BHU's motion for a preliminary injunction.


Dated:  May 30, 2025

Respectfully submitted,

BERKELEY CITY ATTORNEY'S OFFICE


By: _____/s/ Laura Iris Mattes_____

Laura Iris Mattes
Deputy City Attorney
Attorney for City of Berkeley

CITY OF BERKELEY'S OPPOSITION TO BERKELEY HOMELESS UNION'S MOTION FOR PRELIMINARY INJUNCTION