Farimah Faiz Brown, City Attorney (State Bar No. 201227)
Marc Shapp, Deputy City Attorney (State Bar No. 266805)
Laura Iris Mattes, Deputy City Attorney (State Bar No. 310594)
Nubyaan Scott, Deputy City Attorney (State Bar No. 331584)
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile: (510) 981-6960
Email: MShapp@berkeleyca.gov

Attorneys for Defendant
CITY OF BERKELEY

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

BERKELEY HOMELESS UNION, et al.

Plaintiffs,

v.

CITY OF BERKELEY, THOMAS GREGORY, PAUL BUDDENHAGEN, PETER RADU, OKEYA VANCE, RASHI KESERWANI, DOES 1-10,
Defendant.

Case No. 3:25-CV-01414-EMC

**DEFENDANT CITY OF BERKELEY'S OPPOSITION TO PLAINTIFF'S BRIEF ON INTERACTIVE PROCESS MEETINGS**

[*Assigned to the Honorable Edward M. Chen*]

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 2

II. BACKGROUND .......... 2

III. ARGUMENT .......... 10

A. FEHA Principles Are Inapplicable to this Title II Case. .......... 10

B. The ADA Does Not Require the Creation of Housing or A Sanctioned Encampment. .......... 12

C. ADA Requires Good Faith Participation in the Interactive Process. .......... 13

D. The ADA Title II Framework Underscores Reasonable Process Limits. .......... 14

E. In Person Meetings Are Not Required under the ADA. .......... 15

F. If the Court Intervenes in the Interactive Process it Should Provide Clear Guidance to the Parties .......... 16

IV. CONCLUSION .......... 17

## TABLE OF AUTHORITIES

### CASES

*Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996) .... 16

*Crowder v. Kitagawa,* 81 F.3d 1480 (9th Cir. 1996) .... 17

*Dark v. Curry County*, 451 F.3d 1078 (9th Cir. 2006) .... 17

*Payan v. Los Angeles Community College District* No. 2:17-CV-01697-SVW-SK, 2018 WL 6164269 (C.D. Cal., Oct. 16, 2018) .... 14

*Scwarz v. Town of Fairfax*, No. 25-cv-06395-RS, 2025 WL 2410522, (N.D. Cal. Aug. 19, 2025) .... 15, 17, 18

*Tennessee v. Lane*, 541 U.S. 509 (2004) .... 13, 14

*Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003) .... 15, 16

*Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852 (9th Cir. 2022) .... 13, 14

*Zimmerman v. Oregon Dept. of Justice* 170 F.3d 1169 (9th Cir. 1999) .... 14, 17

### STATUTES

42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7) .... 16, 17

Americans with Disabilities Act ("ADA") .... passim

Fair Employment and Housing Act ("FEHA") .... 13, 14, 15

## I. INTRODUCTION

After almost eight months of engaging in interactive process discussions via email, telephone and in-person, no Berkeley Homeless Union ("BHU") member has ever accepted any accommodation the City of Berkeley has offered. Instead BHU has refused to respond over email, delayed and cancelled in-person meetings, made threats against City staff and counsel, and engaged in other concerning behavior. Title II of the Americans with Disabilities Act ("ADA") does not require a public entity to engage in endless and unproductive interactive process discussions that are not being conducted in good faith.

BHU's motion does not cite any caselaw establishing that the ADA requires the interactive process to occur via in-person meetings and fails to acknowledge or engage with the extensive interactive process record that has already been established. Based on this particular record, especially the concerning threats made against staff and the near impossibility of scheduling any real-time meetings, the City requests that the Court deny BHU's motion and order to parties to continue via email. The City also requests the Court make clear that neither party has an obligation to continue the interactive process through the October 31, 2025 sunset ordered by the Court if they determine the other party is not proceeding productively or in good faith, or for other good cause.

## II. BACKGROUND

On January 7, 2025, the City of Berkeley ("City") posted two public notices (the "Notices") notifying unhoused individuals in the Harrison Corridor ("Corridor") of the impending abatement action and directing them to relocate by February 10, 2025. Despite having notice of the intended abatement action for several weeks, BHU did not begin submitting accommodation requests until days before the relocation deadline. Declaration of Thomas Gregory ("Gregory Decl.") ¶19, Exh. C. For some individuals, including Austin White and Shareef Muwakkil, BHU did not submit accommodation request until almost *four months* after receiving the Notices. Gregory Decl. ¶¶11,24, Exhs. B and E. No explanation was given for this four-month delay, yet the City responded promptly and judiciously to each accommodation request.

All BHU reasonable accommodation requests began via email and continued in this manner for several months without objection. It was only after the Court's June 10 ruling on the BHU's motion for a preliminary injunction, that BHU's attorney, Mr. Prince, began to insist on in-person meetings and refused to engage in any further discussions over email—declining to reply to multiple emails that were outstanding at the time and remain outstanding to this date even though the City has attempted to follow up. Even though the City initially agreed to hold in-person meetings, there are only three individuals with whom the City was able to have in-person interactive process meetings with—Lewanda Parnell, Austin White and Shareef Muwakkil—because BHU and Mr. Prince failed to make anyone else available before the in-person process completely broke down due in large part to the behavior of BHU representatives.

Ms. Parnell, who BHU identified as living with vertigo and mental health conditions, requested (1) permission to retain her tents without the risk of removal, and (2) the ability to remain in the Harrison Corridor. Gregory Decl. ¶19, Exh. C. The City denied these specific accommodation requests as a fundamental alteration, but the interactive process continued. *Id*. Between February 3, 2025, and April 15, 2025, BHU expanded Ms. Parnell's requests to include: (1) permission to retain her tents; (2) a sanctioned encampment; (3) assistance with relocation; and (4) a pause in enforcement of the abatement action until she was able to find accessible housing. *Id*. The City requested documentation from a qualified professional explaining the nexus between these requests and Ms. Parnell's ability to comply with the Notices, which it received on June 4, 2025. *Id*.

Similarly, Shareef Muwakkil, who BHU identified as living with mobility limitations and mental health conditions, requested: (1) accessible non-congregate shelter placement; (2) ability to remain in the Corridor; (3) physical assistance with moving and lifting; (4) executive functioning support; (5) support with interpersonal interactions; and (6) pre-scheduled, low-stimulation meetings. Gregory Decl. ¶24, Exh. E. This request was received on April 25, 2024, four months after Mr. Muwakkil had been given notice of the intended abatement. *Id*. The City likewise requested documentation from a qualified professional explaining the nexus between these requests and Mr. Muwakkil's ability to comply with the Notices, which it received on June 4, 2025. *Id*.

Likewise, Austin White, who BHU identified as living with a non-apparent physical

disability and mental health conditions, requested: (1) stable non-congregate shelter; (2) accommodation for emotional support animals; (3) ability to remain in the Corridor; (4) physical assistance with moving and lifting; (5) executive functioning support; and (6) designated communication support. Gregory Decl. ¶11, Exh. B. Like Mr. Muwakkil, Mr. White submitted his request on April 25, 2025. *Id*. As with the other requests, the City sought documentation from a qualified professional regarding the nexus between these requests and Mr. White's ability to comply with the Notices, which it received on June 4, 2025. *Id*.

On June 10, 2025, this Court issued an order granting BHU limited injunctive relief requiring the parties to continue engage in interactive process discussions for 60 days with individuals residing in the Harrison Corridor at the time of the Court's order. With respect to BHU's ADA claim, this Court explained BHU was unlikely to succeed on its demand that the City accommodate BHU by allowing members to remain in the Harrison Corridor indefinitely or by providing interim or permanent housing. ECF No. 104. Since that ruling, however, BHU and its counsel have pursued a strategy in the interactive process that conditions engagement on the City's agreement to precisely those impermissible accommodations—indefinite stays in the Corridor (i.e., a sanctioned encampment) or interim or permanent housing—despite the Court's findings and the absence of supporting ADA precedent.

Even beyond the substantive disagreements, the procedural obstacles Mr. Prince has invoked make engaging productive in-person discussions nearly impossible. On June 10, 2025, Mr. Prince contacted the City's counsel to schedule this Court's ordered meet and confer regarding the interactive process. Declaration of Laura Iris Mattes ("Mattes Decl.") ¶ 3, Exh. A. The City promptly proposed general guidelines to implement the Court's order. In lieu of responding, Mr. Prince requested an in-person meeting and asserted that Judge Illman, not the parties, should structure the interactive process. *Id*. Mr. Prince's statements made clear that his objective was to force judicial involvement—the very relief this Court had denied the previous day. In fact, on June 12, Mr. Prince, without seeking the City's consent, unilaterally contacted Judge Illman to request his participation in the interactive process. *Id*. This action was contrary to the Court's clear instruction that judicial involvement was optional and would occur only if both parties agreed. Judge Illman's clerk confirmed that he would not become involved without both parties' consent, which was the only development that halted Plaintiffs' counsel's insistence.

Mattes Decl. ¶ 4, Exh. B. Unfortunately, this episode exemplifies Mr. Prince's adversarial approach to the interactive process and his unwillingness to engage collegially—attributes that have repeatedly impeded progress in the interactive process.

On June 13, the parties held an in-person meeting to discuss the interactive process and it became clear there were a number of preliminary disagreements. The City asked Mr. Prince to provide his position on certain disagreements in writing which he did as to only one issue, whether the Court's limited injunctive relief covered BHU members who were not living in the Harrison Corridor at the time of the Court's June 10 order. The City provided Mr. Prince its portion of the joint motion on June 16, 2025, but instead of finalizing the motion or seeking further clarification from the Court, Mr. Prince repeatedly stated his disagreement with the City's approach while also refusing to seek clarity from the Court. Mattes Decl. ¶ 5, Exh. C. Instead, Mr. Prince eventually agreed to proceed with the City's interpretation. This tactic introduced dysfunction and poor communication into the process, significantly frustrating the City's efforts to engage constructively with BHU members.

Mr. Prince's obstinance continued in his June 20, 2025, email in which he insisted all meetings occur in person and that "potential housing/shelter providers" be present. Mattes Decl. ¶ 6, Exh. D. The City reminded him, consistent with this Court's order and legal precedent, that housing is not a form of reasonable accommodation. He again suggested involving Judge Illman before the parties even began their initial meetings.

Between June 20 and June 24, the parties exchanged emails and reached a series of agreements regarding the parameters of the interactive process:

- The City clarified that Judge Chen's injunction order applied only to individuals residing in the Harrison Corridor on June 10, 2025, and that persons outside this area fell beyond the scope of the abatement action. The City agreed to proceed with individuals it independently verified were living in the Corridor at that time, while requiring those not verified to submit declarations under penalty of perjury or other documentation confirming their residence in the Corridor as of June 10.
- The parties further agreed that initial in-person meetings would include the resident, a representative of the City, and a representative of the Union, with the City determining its own representatives. The City reiterated, however, that housing or shelter is not a

reasonable accommodation under the ADA, and therefore no housing providers would attend.

- Meetings were to be scheduled for 60 minutes during business hours at City Hall or another mutually agreed location, with the City initiating scheduling through Yesica Prado and proceeding by alternative means if mutual availability for a meeting could not be arranged within 14 days or if a resident failed to attend. Meetings would be audio- and video-recorded, and participants could make their own recordings.
- The City agreed to abide by the ADA to ensure access to the in-person meetings by providing reasonable accommodations if necessary, while the requested nexus information from healthcare providers would be provided in writing or through remote participation if necessary.
- Any accommodations agreed upon would be reduced to writing and signed by the City, the Union, and the resident.
- Attorneys for both sides could attend meetings at any stage, and the process as a whole would conform to the ADA and applicable state and federal law.
- The parties did not agree to Plaintiffs' request for Judge Illman's participation but agreed to proceed with the interactive process for individuals not in dispute and continue to meet and confer regarding others. *Id*.

Finally, on June 27, more than two weeks after the Court's order, Mr. Prince attempted to schedule BHU's first in-person meetings for July 3, 2025. *Id*. The City arranged to host, but Mr. Prince canceled the day before due to BHU's scheduling conflicts. *Id*. He added that while rescheduling, he would begin "researching potential reasonable disability accommodations," despite acknowledging that the parties had already been engaged in such discussions for five months. He also took the unprecedented position that the City must offer both non-congregate shelter and any accommodations provided in prior settlements with Mr. Johnson and Mr. Bouchard. *Id*. The City again clarified its position on the applicable legal limits of the interactive process and continued to prompt Mr. Prince to reschedule the meetings he had insisted upon. *Id*.

On July 10, 2025—halfway through the 60 days that had been allotted to the interactive process—BHU members finally attended their first in-person interactive process meeting with the City. Gregory Decl. 7. Mr. Austin White was accompanied by nurse practitioner Olivia deBree,

Robbie Powelson, and BHU representatives Gordon Gilmore and Yesica Prado. Gregory Decl. 7. Mr. Prince did not attend this meeting nor any other interactive process meeting since. The parties had agreed the meeting would last one hour; however, Mr. White's meeting stretched to nearly three, due to the lack of productive discussion and heightened tension. Gregory Decl. 8. Mr. White grew frustrated by open discussion of the challenges he faced while unhoused, his prior negative interactions with City staff, and the City's request that he relocate without offering housing.

City staff attempted to reduce tension by inviting Mr. White to take breaks as needed and redirecting the discussion toward potential reasonable accommodations that would not result in a fundamental alteration. These efforts were undermined by BHU's approach, which focused on resurfacing state-created danger claims from its complaint and reciting its criticism of the City's homelessness policies. Gregory Decl. ¶20, Exh. A at 9-18. BHU also took the position that it would not respond to any of the accommodation requests during the meeting itself. *Id*. at 62:2578-2612. The meeting ended after Mr. White expressed frustration that the City could not provide housing or permit him to remain indefinitely. *Id*. at 46: 1918-1946. He also stated that he did not trust the City's stated limitations because of prior settlement agreements with other unhoused individuals—signaling that his representatives had prepared him for a settlement negotiation, not an ADA interactive process discussion about compliance with the City's Public Notice. *Id*. at 22:886-923. After Mr. White departed, BHU representatives agreed to provide a substantive response to the City's accommodation offers by July 14th and informed the City that the remaining scheduled participants for that day had canceled. *Id*. at 26:1087-1089.

Following Mr. White's in-person interactive process meeting, the City attempted to follow up via email as to the offered accommodations. Gregory Decl. ¶11, Exh. B. Specifically, the City's ADA Coordinator Thomas Gregory granted Mr. White's requests for physical assistance with moving and lifting, and offered him an extended time in which to relocate. He also provided a detailed explanation for why the City cannot accommodate his requests for sanctioned encampment, executive functioning support, and designated communication support. Yet, to date, BHU has refused to provide substantive responses to the City's written explanations or accept the accommodation offers for Mr. White. *Id*. Instead, BHU has made generalized assertions that the City's handling of the interactive process falls "short of what is required under the ADA Rules

and Code of Federal Regulations," challenged various City policies and municipal codes for the first time, mischaracterized the meetings that occurred, and continued to insist that the City is not accommodating BHU members unless it provides non-congregate shelter or creates a sanctioned encampment. *Id*.

The only other BHU members who have attempted to continue the interactive process in the over 90 days that have passed since this Court's order—Mr. Muwakkil and Ms. Parnell—were only able to attend their in-person meetings after three rounds of scheduling. In one instance, BHU had scheduled in-person meetings on July 14, 2025, but canceled three minutes before they were set to begin, citing conflicting appointments. Gregory Decl. ¶14. BHU later explained difficulties coordinating the schedules of "multiple individuals, many of whom have serious disabilities and limited access to transportation, communication, and consistent care," as well as the limited availability of Ms. deBree (who had already provided medical documentation). *Id*. Notably, however, despite these stated challenges, BHU has never explained its refusal to accept the City's offer to meet via Zoom or to continue discussions by email. Instead, Mr. Prince has insisted on in-person meetings, which he has himself never once attended. This is in direct contradiction of the parties' agreement that if a in-person meeting could not occur within a two-week timeframe, that the interactive process would continue by alternative means.

On July 18, 2025, the City hosted in-person interactive process meetings for Mr. Muwakkil and Ms. Parnell. Ms. Parnell was accompanied by Ms. deBree, Mr. Powelson, Mr. Gilmore and Ms. Prado. Mr. Parnell's meeting followed a similar and concerning pattern as Mr. White's. For example, after approximately 30 minutes of unfocused discussion in what had been scheduled as a one-hour meeting, the City tried to redirect the conversation to the task at hand: identifying accommodations that would assist Ms. Parnell in complying with the Notices. However, when the City's ADA Coordinator Thomas Gregory asked BHU whether the City program at issue here was the intended abatement, BHU answered "No." Gregory Decl. ¶20, Exh. D at 12: 458-462. When asked again whether Ms. Parnell can comply with the City's Notices, BHU stated that it would "take it under advisement." *Id*. at 13:534-542. In other words, even after nearly six months of engaging over email and scheduling an in-person interactive process discussion, BHU was still not prepared to discuss the accommodations Ms. Parnell needed to comply with the City's Notices.

As the meeting progressed, Ms. Parnell began making vague but troubling statements directed at the parents of Deputy City Attorney Iris Mattes, who was present, as well as at Mr. Gregory. Shortly thereafter, during a discussion about extending her time to relocate, Ms. Parnell raised her voice, interrupted Ms. Mattes, and said: “Say we, why don’t I take you out there with me and put you in the water, and you commit suicide with me?” Gregory Decl. ¶15, Exh. D at 34:1413-1414. Disturbed by this remark, Ms. Mattes reasonably understood it as a threat to drown her and stage it as a suicide, and she later filed a police report. Mattes Decl. ¶¶ 7-8, Exh. E. When Ms. Mattes attempted to address the seriousness of the statement, BHU representatives immediately dismissed her concerns and have since refused to acknowledge the comment, despite being provided with a video recording of the meeting. *Id*.

Shaken but continuing in good faith, Ms. Mattes attempted to participate in the meeting with Mr. Muwakkil that was scheduled to occur immediately after Ms. Parnell’s. To establish a baseline of safety, Ms. Mattes began the meeting by stating that while there may be disagreements over the requested accommodations, she requested that all those that were present refrain from yelling or making threats toward City staff or their families. Gregory Decl. ¶26, Exh. D at 3:86-94. Instead of being met with agreement, Mr. Powelson immediately interrupted her while Ms. Prado stated that she did not want to hear from Ms. Mattes. *Id*. at 3:96-113. When Ms. Mattes responded by making clear that if threats were made against her, the meeting would end, BHU responded by stating that this ground rule was “extremely defamatory” and “insulting,” and calling her a “bully.” *Id*. at 4:133-167. Ms. Prado became so agitated in the meeting that she repeatedly interrupted the meeting to tell Ms. Mattes not to speak. Because Ms. Mattes was not provided assurances from everyone present that they would not threaten her, she suggested calling her supervisor but gave everyone one last opportunity to agree. Once again, instead of agreeing, BHU directed her to go ahead and call her supervisor, making clear that good faith engagement was nearly impossible. *Id*. at 9:342-369. At this point, City staff would have acted reasonably if they never returned to this meeting out of a concern for their own safety. However, the City, including Ms. Mattes, proceeded with the in-person meeting as a testament to their commitment to this process.

Ultimately, the meeting made clear that the only request Mr. Muwakkil had was for more time to relocate. He stated he would confirm after the meeting how much time was needed, but

despite Mr. Gregory following up, the City has yet to receive that information even several months later. Gregory Decl. ¶27, Exh. E.

Following these meetings, Ms. Mattes sent Mr. Prince an email requesting that he instruct BHU members not to threaten City staff or interfere with the City's legal representation. Mattes Decl. ¶ 9, Exh. F. Mr. Prince has not responded to this request. Instead, he has repeatedly minimized the seriousness of the threats leveled against City staff, going so far as to baselessly accuse Ms. Mattes of fabricating events for which he was not present but for which video evidence exists. *Id*.

As a result of Mr. Prince and BHU's pattern of bad faith conduct—including last-minute cancellations, refusal to schedule requested meetings, threats against City staff and counsel, and dismissive behavior—the City has now been forced into the unprecedented situation of attempting to engage in the ADA Title II interactive process for nearly eight months. Throughout, some BHU members have refused to accept any accommodation short of housing or a sanctioned encampment, while others have made no effort to participate at all. This pattern demonstrates that BHU members have used the interactive process primarily to prolong their residence at the encampment despite the Court granting an injunction that was far narrower in both time and scope.

## III. ARGUMENT

### A. FEHA Principles Are Inapplicable to this Title II Case.

BHU's reliance on Fair Employment and Housing Act ("FEHA") principles to frame the City's interactive process obligations is misplaced. FEHA governs employment and housing relationships, regulating the duties of employers and housing providers, including their obligations to engage in an interactive process. CA Govt. Code § 12940. By contrast, Title II of the ADA governs public services and programs, requiring only that public entities provide reasonable modifications to ensure equal access without fundamentally altering programs or imposing undue burdens. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). Courts recognize that some interactive process engagement is required under Title II, but the obligations materially differ from those under Title I employment law or FEHA. *See Payan v. Los Angeles Community College District* No. 2:17-CV-01697-SVW-SK, 2018 WL 6164269, *14-15 (C.D. Cal., Oct. 16,

2018); *Zimmerman v. Oregon Dept. of Justice* 170 F.3d 1169, 1177–1183 (9th Cir. 1999); CA Govt. Code § 12940.

Moreover, the complaint did not assert FEHA claims nor invoke any FEHA provision as a basis for relief. Importing FEHA standards here conflates distinct legal frameworks and mischaracterizes the City's obligations. The issue before the Court is not entitlement to housing, shelter, or specific living arrangements, but whether assistance is necessary for BHU members to comply with the City's abatement notice. BHU's repeated demands for access to housing or sanctioned encampments illustrate a misuse of the interactive process: they seek relief outside the ADA's scope rather than engaging to address disability-related needs tied to the Notices.

Congress deliberately distinguished Title I and Title II of the ADA. *Zimmerman,*170 F.3d at 1177–1183. Title I imposes a structured interactive process on employers, including reassignment and job restructuring obligations. 42 U.S.C. § 12111. By contrast, Title II does not prescribe the same procedural obligations. *Zimmerman,* 170 F.3d at 1177–1183. While courts recognize that some interactive process engagement is necessary under Title II, the City's obligations here do not mirror those under employment law. *Id*. Public entities must balance resources, public safety, and service delivery while accommodating disabilities without creating undue burdens or fundamentally altering programs. *Tennessee*, 541 U.S. at 532. Applying FEHA's employment- or housing-based interactive process wholesale would impose obligations beyond the statutory standard and ignore Congress's intent.

One clear illustration of FEHA's inapplicability is the absence of a "fundamental alteration" defense. Under FEHA, employers or housing providers cannot deny an accommodation on this basis; the law emphasizes providing reasonable accommodations and engaging in the interactive process. By contrast, Title II explicitly permits denial of a requested modification if it would fundamentally alter a program or impose an undue burden. *Id.* at 532. Relying on FEHA's framework would misstate the standard, compel the City to provide accommodations exceeding ADA requirements, and improperly conflate obligations that Congress intentionally kept distinct between employment or landlord-tenant relationships and public services.

Accordingly, BHU's reliance on FEHA mischaracterizes both the legal standard and the City's obligations under Title II. The interactive process remains governed by Title II standards,

which permit reasonable accommodations while protecting the City from obligations that would fundamentally alter programs or impose undue burdens. FEHA's housing provider duties cannot reasonably be transposed to the City's abatement program, further demonstrating BHU's misapplication of the law.

### B. The ADA Does Not Require the Creation of Housing or A Sanctioned Encampment.

In all of the interactive process discussions thus far, whether in person or via email, BHU has insisted on the need for a sanctioned encampment or non-congregate shelter. This insistence, in spite of the direction from this Court in its PI motion and persuasive on-point case law, has created a significant barrier in the ability of the parties to proceed in good faith dialogue.

Under Title II of the ADA, a public entity is required to provide reasonable modifications to ensure meaningful access to its programs, services, and activities—but it is not required to create entirely new programs or assume the role of a housing provider. *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) Requiring the City to construct housing where it does not currently exist or identify specific alternative relocation sites for each unhoused individual with a disability would effectively compel the creation of a new program.

An analysis of *Scwarz v. Town of Fairfax*, No. 25-cv-06395-RS, 2025 WL 2410522, (N.D. Cal. Aug. 19, 2025) is useful here. In a very analogous situation, the unhoused residents filed a lawsuit against Fairfax claiming that an impending encampment closure violated their Fourteenth Amendment and ADA rights. *Id*. at *1. In rejecting the plaintiffs' ADA claims, the court concluded that plaintiffs had a low likelihood of prevailing because the abatement resulted from their status as unhoused individuals, not their disabilities. *Id*. at *3. The court further explained that accommodation requests that would require a municipality to create new housing programs, allowed unhoused people to remain in an encampment, or require a "full slate" of services would fundamentally alter the nature an abatement action. *Id*. The decision makes clear that ADA does not mandate constructing new housing, establishing encampments, or permanently transforming a city's homelessness management strategy. Rather, municipalities satisfy their duties by considering modifications that fit within existing frameworks, engaging in reasonable good faith dialogue, and offering feasible alternatives where accommodations would pose a fundamental alteration, undue burden, or require creation of new programs.

The City's approach mirrors Fairfax's. The City has made reasonable accommodations available, including time extensions and support services, while declining requests that exceed legal obligations, such as permanent housing or sanctioned encampments. BHU has responded by refusing to accept any of the offered accommodations and accusing the City of bad faith for not agreeing to their requested solutions. However, BHU's dissatisfaction with these limits or the current state of the law does not convert lawful denials into violations of the interactive process. Courts consistently hold that municipalities are not required to adopt plaintiffs' preferred solutions where those solutions would create fundamentally new programs. *See Townsend*, 328 F.3d at 518; *Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852, 862 (9th Cir. 2022) The City's conduct is therefore consistent with established law.

**C. ADA Requires Good Faith Participation in the Interactive Process.**

The ADA requires public entities to engage in good faith with qualified individuals with disabilities, consider reasonable modifications, and avoid discriminatory exclusions from services or programs. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7). Courts have emphasized that the interactive process is a mutual obligation, requiring cooperation from both the public entity and the individual seeking accommodations. *See Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Good faith entails more than neglected scheduling obligations, infrequent or nonexistent attendance, and obstructive methods. It requires clear communication, meaningful dialogue, and a willingness to accept reasonable modifications of policy that are within the boundaries of what the law allows and what is feasible for the entity. The City has repeatedly exhibited this commitment. Since January 2025, it has responded to written requests, extended timelines, and offered accommodations consistent with its legal obligations. Plaintiffs, by contrast, have often frustrated the process through demands for impermissible outcomes, disruptive conduct, and refusals to engage productively or even schedule meetings they've demanded.

Importantly, the City agreed to BHU's requests to begin in-person meetings after months of interactive process discussions via email in the hopes of making progress. Setting aside the challenges that have accompanied those meetings, the meetings had no meaningful impact on the status of the interactive process. **No one who had an in-person meeting with the City accepted any accommodation they City offered nor have they ever responded to any follow up**

**inquiries from the City.** In short, the City's good faith participation in in-person meetings did not lead to any productive outcome but instead resulted in threats to City staff and mutual frustration. The ADA does not require the continuation of this type of dialogue.

**D. The ADA Title II Framework Underscores Reasonable Process Limits.**

This Court has already ordered the City to continue the interactive process three times—first for sixty days, then until "further order," and again through the end of October. These orders underscore the Court's involvement in the lawsuit, but they also highlight the extraordinary nature of these proceedings. To the City's knowledge, such repeated court-ordered extensions of the interactive process are unprecedented in the context of Title II of the ADA. Congress did not design Title II to mirror the employment-focused structure of Title I, where detailed regulations prescribe a highly formalized interactive process. *Zimmerman*, 170 F.3d at 1177–1183.

For instance, in the employment setting, courts have held that employers may be required to reassign employees as part of their accommodation duty. *See Dark v. Curry County*, 451 F.3d 1078, 1089 (9th Cir. 2006); 42 U.S.C.A. § 12111(9)(B) That heightened duty is but one reflection of the unique statutory framework Congress enacted for workplaces that it did not intend for municipalities modifying policies for members of the public. *Zimmerman,* 170 F.3d at 1177–1183. By contrast, Title II requires only that public entities engage in good faith to identify reasonable modifications. *Crowder v. Kitagawa,* 81 F.3d 1480, 1485 (9th Cir. 1996). It does not require indefinite, open-ended dialogue or the employment-style obligations of reassignment and permanent restructuring of services. *Zimmerman,* 170 F.3d at 1177–1183.

The Court's orders here have already imposed on the City a level of extended process that likely goes beyond what Congress envisioned. *Id*. In *Where Do We Go Berkeley,* the Ninth Circuit made clear that "a six-month delay [of an encampment clearance was] a fundamental alteration of Caltrans's programs" and therefore, a sixth month delay was "not a reasonable modification of Caltrans's programs" under the ADA. *Id.* at 862, 64. Yet, at this stage, the City has already endured over eight months in delays to its planned abatement and closure action. The City has complied faithfully, but these circumstances reinforce the importance of ensuring that the process remains tethered to Title II's actual requirements: good faith communication, consideration of feasible modifications, and avoidance of discrimination—not the creation of new programs or the imposition of obligations the ADA never intended.

**E. In Person Meetings Are Not Required under the ADA.**

Plaintiffs' insistence on mandatory in-person meetings mischaracterizes both the law and the record. As recognized in *Scwarz*, public entities may exercise flexibility in conducting the interactive process, including the use of remote participation such as Zoom or other methods, when reasonable accommodations are offered. *Scwarz*, 2025 WL 2410522 at * 4. Flexibility in the method of participation does not constitute a failure to engage in the interactive process.

Counsel for Plaintiffs has conceded that, under his argument, only the "initial" interactive process meeting must occur in person.[1] However, this framing is inconsistent and illogical. For each individual involved, the interactive process had already been occurring exclusively over email for 3-6 months, at the choice of the individuals themselves, who were provided multiple methods of initiating the process through the Notices. During this multi-month period, they never insisted on in-person meetings. The purported "first meeting" for in-person participation only arose after the Court issued its initial order extending the interactive process for 60 days. In reality, there was no "first time" for any individual in the process—only for Mr Prince, who entered his appearance on behalf of BHU after the case was filed and has neglected to attend the ongoing interactive process meetings, frames it as such. This underscores the illogical nature of the argument that effective communication requires in-person participation. No explanation or evidence has been provided showing how a single in-person meeting is necessary to accommodate any disability of the individuals represented, particularly in light of the current circumstances.

Requiring continued in-person meetings or other even remote real-time meetings such as Zoom would also present an undue administrative burden and further delay the interactive process. As reflected in the record, Mr. Prince, BHU, and the individuals it purports to represent have all demonstrated poor handling of the in-person process: most members never provided their availability for in-person meetings while also refusing to respond via email, the scheduling of three meetings took almost two months, and multiple cancellations occurred. Most importantly, when presented with the ability to engage in real time communication with City staff, BHU members have been unable to adequately focus on the program for which accommodation is being sought and have made concerning threats against staff and their families. Given these facts

[1] This already marks a change from his prior position that multiple in-person meetings were required before a response could be provided on the City's offered accommodations.

and the present record, continued in-person or real-time meetings are unlikely to be effective and likely to expose City staff to further threatening behavior. Plaintiffs have also not established that they are not disadvantaged by proceeding through written communication, which has been the only form of communication shown to be effective and sufficient for meaningful engagement for months in both this encampment context and others.

Lastly, BHU's reliance on the Declaration of Ms. deBree to support why in-person meetings are required is baseless. Nowhere in her declaration is there any suggestion or reference to a nexus between in-person meetings and the ability of any of the individuals identified to participate meaningfully in the interactive process. To the contrary, her statements can reasonably be read to suggest that in-person meetings or real time Zoom conferences may exacerbate the mental health conditions of the participants.[2]

The City's provision of alternative means of participation satisfies its duty to provide effective communication and reasonable accommodations under the ADA.

**F. If the Court Intervenes in the Interactive Process it Should Provide Clear Guidance to the Parties.**

Over the course of the last eight months, the City has devoted substantial time and resources to engage in the interactive process—extending deadlines, responding to written requests, and attempting to facilitate dialogue in good faith. Despite this extensive engagement, BHU's primary response has been to accuse the City of mishandling the process because it has not provided the exact outcomes they demand, namely housing, sanctioned encampments, or other relief that falls outside the ADA's requirements. As a result, the process has devolved into a cycle of demands and objections that has lasted months without any progress or agreement.

Direct court oversight of Title II interactive processes is unprecedented to the City's knowledge. Nevertheless, the Court has ordered the parties to continue engaging in good faith, and the City will attempt to do so. However, the City respectfully submits that simply deciding whether in-person meetings are required is insufficient. The facts submitted in this brief and accompanying declarations demonstrate a months-long pattern of delay and obstruction by BHU.

[2] Further, Ms. deBree herself confirms that she has no legal training or expertise in the reasonable accommodation process or the Title II ADA framework—or any other disability law applicable to public entities. Her recommendations, including inferring that the Court should order an accommodation allowing plaintiffs to remain in the encampment to facilitate access to medical care, reflect a misunderstanding of the legal standards.

In this context, the City requests that the Court not only find (as caselaw shows it must) that in-person meetings are not required, but also further order the parties to continue interactive process discussions via email only. The City further requests that the Court also admonish BHU that the obligation to engage in good faith negotiations requires timely and substantive responses to the City's communications and make clear that neither party is required to further engage in the interactive process up through to October 31 if the other party fails to engage in good faith. This explicit guidance is needed as BHU has previously insisted that interactive process conversations cannot conclude before the end of the Court-ordered interactive process timeline and therefore every request needed to be held open for the entire period – a framework which is inconsistent with the ADA.

## IV. CONCLUSION

The foregoing demonstrates not only that in-person meetings are not required under Title II of the ADA, but also that BHU's behavior over the past eight months of interactive process discussions demonstrates, at a minimum, clear guardrails if the Court requires the process to continue any longer.

Dated: September 19, 2025

Respectfully submitted,

BERKELEY CITY ATTORNEY'S OFFICE

By: Laura Iris Mattes
Laura Iris Mattes
Deputy City Attorney
Attorney for City of Berkeley