Anthony D. Prince (SBN # 202892)
General Counsel, California Homeless Union/Statewide Organizing Council
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Tel: 510-301-1472

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERKELEY HOMELESS UNION, | Case No.: 3:25-cv-01414-EMC |
| Plaintiffs, | **PLAINTIFF'S SUPPLEMENTAL STATUS REPORT** |
| vs. | |
| CITY OF BERKELEY, et al., | Status Conference |
| Defendant. | Date: January 13, 2026 |
| | Time: 2:30 pm |
| | Judge: Hon. Edward M. Chen |

# PLAINTIFF BERKELEY HOMELESS UNION'S SUPPLEMENTAL

# STATUS REPORT

***(Note: This Supplemental Report was prepared by BHU President Yesica Prado. It includes information from the earlier-filed Joint Status Report but has been updated.)***

## I. Introduction

The Berkeley Homeless Union ("BHU") respectfully submits this status report regarding

the City of Berkeley's ("City") implementation of the Court-ordered interactive process under

the Americans with Disabilities Act (ADA). This report details a systemic failure by the City to

engage in the meaningful, good-faith dialogue required by law.

Instead of exploring reasonable modifications, the City has employed a uniform strategy of blanket denials, misdirection and procedural obstruction.

First, the City has admitted that there are many locations where camping is permitted within the City of Berkeley and the City does not have a blanket camping ban. At the same time, they have refused to provide a map or information about where those locations are, or how the spaces can accommodate individuals' disabilities.

The City has rejected all substantive accommodation requests—including medically necessary pleas for stability, assistance and accessible communication—by claiming any modification would constitute a "fundamental alteration" not of its *Homeless Encampment Policies*, but of the "public right-of-way" or "parking enforcement" policies. This misapplies the legal standard and sidesteps the policies BHU actually seeks to modify.

Second, the City has refused to propose any alternatives and engage with the specifics of each individual's disability-related barriers, thereby violating the fundamental "interactive" nature of the process. Its responses have been generic, non-responsive and have not advanced the goal of identifying feasible accommodations that would not aggravate BHU members' disabilities.

Furthermore, the City now cites a public health crisis to justify immediate dissolution of the injunction. This crisis, however, is in significant part a product of the City's own reduction of sanitation services and refusal to engage in good-faith accommodations. For the profoundly disabled residents of the Harrison Corridor, the trauma and instability of forced displacement— including the loss of shelter, community, and medical equipment—poses a far more immediate and severe threat to life and health than the targeted disease vector the City claims to address.

The City's request to lift the injunction seeks to use a public health emergency of its own making to evade its legal obligations under the ADA.

This report demonstrates that without judicial intervention, the interactive process will remain a hollow formality, and BHU members will suffer irreparable harm from the imminent enforcement of a policy that discriminates against them on the basis of their disabilities.

## II. Methodology of the interactive process

BHU took immediate action—simultaneously requesting an ADA accommodation for its members and appealing the abatement order. Given the hearing officer's preemptively conditional determination without considering the facts and people's disabilities that led to the environmental health impacts, the appeal hearing itself was futile.

The only pathway for BHU members to be meaningfully heard on how the abatement operations would impact their disabilities was via the interactive process.

*Timeline of requests and meetings*

Beginning on January 17 to April 25, 2025, BHU submitted formal ADA accommodation requests to the City's ADA Coordinator, Thomas Gregory, on behalf of 19 disabled BHU members residing at the 8th and Harrison Streets encampment.

The City's ADA Coordinator acknowledged receipt of the requests for 17 BHU members, but swiftly denied all accommodation requests. Two requests dated February 6, 2025, were completely ignored.

BHU actively followed-up on ADA requests for each member, and repeatedly asked for clarification of the perimeters of the program to make accommodation requests that the City would accept. However, the City refused to provide clear answers. **(Exhibit A)**

No substantive email responses followed until about July 10, 2025. Even then, the City's lengthy communications amounted to a blanket denial, failing to suggest any alternative accommodations for each BHU member. This refusal to engage in the "interactive process" violates the ADA's core requirement to provide access to programs to the maximum extent possible.

Three in-person meetings were held on July 11 and July 18, 2025 for Austin White, Shareef Miwukkil and Lewanda Parnell. These meetings functioned not as a collaborative dialogue but as a presentation of pre-determined denials. City staff's tone and intervention during these meetings triggered our BHU members' mental health disabilities, which did not give them an opportunity for meaningful participation.

Five more meetings were scheduled but were unilaterally canceled by Deputy City Attorney Iris Matties on July 21, 2025, citing alleged death threats against herself and City staff. But no evidence of such threats by any BHU member and counsel has ever been produced despite repeated requests by BHU members, counsel and formal public records requests for documentation of each alleged threat. This lack of evidence undermines the legitimacy of the cancellation and further stalled the entire interactive process.

Forced to continue without in-person meetings, BHU proceeded through writing and scheduled Zoom meetings. At these follow-up meetings, BHU requested for City staff with decision-making authority to be present. This request was denied.

While City counsel informed BHU that it could not decide which City staff would attend the interactive meetings, City attorneys simultaneously dictated who BHU could bring. For instance, BHU notified the City a reporter would attend over Zoom as a neutral third-party observer, solely to document the process at the members' own request, so their stories could be shared. BHU clarified that privacy concerns were the members' to waive, as it was their own medical histories under discussion. The request, as communicated in writing by BHU interim president Yesica Prado, was clear and professional **(Exhibit B)**:

*"A reporter will attend the next meeting as an impartial observer to document the process. All parties, including [BHU] members and the City, retain the right to have any person present at these interactive meetings. Please note that the reporter will not ask questions of City staff during our discussions. Any media inquiries will be directed through the proper City channels and media liaisons, in line with professional journalistic standards. As a working journalist myself, I confirm these are the best practices."*

Despite this, City counsel denied the request and threatened to cancel all meetings if a reporter was present. Faced with this ultimatum, BHU proceeded without the reporter to avoid derailing the process entirely for its members. Only one Zoom meeting occurred, for Lewanda Parnell on December 8, 2025.

During this Zoom meeting, Ms. Prado experienced a direct aggravation of her disabilities. The Zoom meeting format significantly exacerbates ADHD-related impairments in attention regulation, working memory and sensory processing. Sustained video conferencing requires constant attentional switching, simultaneous processing of visual and auditory stimuli, and compensation for reduced non-verbal cues. This results in sensory overstimulation, rapid cognitive fatigue, loss of train of thought, impaired short-term memory and escalating anxiety,

making it difficult to retain information and participate effectively. This documented aggravation is consistent with post-pandemic health studies examining "Zoom burnout," which document how video conferencing disproportionately impacts individuals with ADHD.

As a result, she requested an accommodation request to the Zoom meetings to in-person meetings, which she has emphasized it's necessary since the beginning via her accommodation request on February 3, 2025. When she emailed ADA Coordinator Thomas Gregory to reiterate this need for meaningful participation, City counsel intervened and refused her request, even though that jurisdiction to review, approve or deny an accommodation request belongs to the ADA Coordinator. Mr. Gregory did not respond to her request. **(Exhibit C)** This was despite her documented medical needs, Ms. Prado's willingness to provide additional medical documentation if required and the City's own guidance to "spend as much time and effort and money as you like to satisfy the request. Your supervisor might chastise you, but Disability Compliance Program will never complain that the City is being overly generous when it comes to providing accommodations."

- If you are willing and able to satisfy an accommodation request, you don't need Disability Compliance Program's blessing to do so. You may spend as much time and effort and money as you like to satisfy the request. Your supervisor might chastise you, but Disability Compliance Program will never complain that the City is being overly generous when it comes to providing accommodations.

- On the other hand, you should probably touch base with me before flat out denying the request.

- Whenever in doubt, feel free to contact me.

*Slide 13 of ADA Coordinator Thomas Gregory's presentation "Conducting Accessible Community Meetings - Disability Compliance Program - June 2025" to City staff.*

Only after BHU counsel spoke separately with Deputy City Attorney Christopher Jensen was her request granted as a "mutual agreement," not as an ADA accommodation request. **(Exhibit D)**

At this critical juncture, BHU also formally requested the documentation underlying the City's "fundamental alteration" determination for previous requests. Ms. Prado made this request to understand the specific scope and operational limitations of City programs, highlighting that such records should be readily available given the City's prior attempt to terminate the interactive process on October 31, 2025. Access to this documentation was essential for effective dialogue as it would allow BHU to craft accommodation requests in good faith that aligned with the City's stated constraints, thereby moving the process forward.

However, the City refused to produce any such documentation. Even formal Public Records Act requests filed by individual BHU members for each of their requests have yielded *no evidence* of the financial analyses, resource assessments, internal communications of City staff about program limits nor determinations by the "head of the entity" (City Manager Paul Buddenhagen) required to justify such a significant legal finding. The only records the City has produced are the basic email threads attached to this report—a clear failure to document its own decision-making process.

The refusal had a direct and damaging impact: it prevented a transparent, good-faith dialogue, forced BHU to negotiate in the dark, and allowed the City to invoke a major legal exemption ("fundamental alteration") without providing the accountability or factual basis the law requires.

TThe meetings primarily served to review and clarify pre-submitted requests as City staff asked questions. During the four in-person meetings held from December 15–19, 2025, accommodations for Yesica Prado, Erin Spencer, Austin White, Shareef Muwakkil and Merced Dominguez were discussed. Following these sessions, even City staff acknowledged that the in-person format was more effective for facilitating discussion, avoiding interruptions and obtaining real-time clarification.

Subsequent follow-up has occurred exclusively via email for the remaining two members, Eric Keiser and Ray Johnson, who could not get a time slot for an in-person meeting in December given the holiday break.

City Attorney Nybuia Scott informed BHU that each accommodation request would receive a detailed response, indicating the City would approve or provide alternative

modifications. This promised a continued dialogue to find solutions. Instead, BHU once again received only blanket denials as final determinations.

The City's last communication dated January 6, 2026 at 10:17 a.m, imposed a limited window for BHU to respond to each request, further constraining the process. This last-minute timeline directly impeded BHU's ability to complete the status report, as we were still awaiting substantive answers for our members' requests on the very day the report was due to the Court.

*City staff absent from the "interactive" meetings*

To prevent the repeated lack of clarity that has stalled the interactive process, BHU requested the attendance of key City staff with decision-making authority:

- Peter Radu (Homeless Response Team), whose team implements the encampment policies in question, and
- Paul Buddenhagen (City Manager), whom Mr. Gregory has been identified as the "head of the entity" under ADA Title II and who was consulted on the "fundamental alteration" determination.

The City failed to ensure their attendance despite generous time windows. This absence of necessary authority prevented any meaningful negotiation and real-time solution, resulting in unresolved meetings that were followed by flat denials via email issued unilaterally by City Manager Paul Buddenhagen.

Despite being deferred to HRT staff on accommodation requests and copying staff on the request of each member, BHU received no response in regards to interim or permanent housing availability.

Furthermore, City Manager Buddenhagen failed to acknowledge the accommodation requests from every member who had submitted one and was approved for a follow-up meeting by the City's own attorney, Iris Mattes. The City had already unilaterally narrowed the initial 19 ADA requests down to 8 people, and on January 6, 2026, the City Manager removed Ryan Johnson from consideration, deciding for itself which requests would even be considered.

As we stated in our prior email, we will send an email to the verified people to continue the interactive process discussion and propose an in-person meeting within the next two weeks. To the extent BHU maintains the non-verified folks are subject to Judge Chen's order, we reiterate our request for a signed declaration under penalty of perjury from each person that states they were living in the Harrison Corridor, as defined above, on June 10 or other documentation that evidences that statement.

1. Brenda Bolares
2. Erin Spencer Verified
3. Felicia Avelina - No written ADA request received
4. Frank Moore
5. Janet Bright
6. Jermaine White
7. Justin Wilson
8. Lewanda Parnell. Verified
9. Merced Dominguez Verified
10. Ray Johnson Verified
11. Rufuse White - Lives in a leased apartment at least as of 5/2024 but needs to remove his remaining belongings in the Harrison Corridor
12. Vanessa Bichard - Sheltered at Berkeley Inn as of 12/2024
13. William Baird
14. Yesica Prado Verified
15. Austin White Verified
16. Shareef Muwakkil Verified
17. Eric Kaiser Verified

Iris

*An excerpt of a June 24, 2025 email titled "RE: Tentative List of Camp Residents and Reasonable Accommodations Proposed Protocol" by City Attorney Iris Mattes.*

### City's uniform, non-individualized response pattern

Despite the distinct disabilities and medically documented needs of each BHU member—ranging from physical mobility restrictions to severe psychiatric conditions—the City's responses have been strikingly uniform. The City has not provided individualized assessments or tailored reasoning.

Instead, it has issued nearly identical denials to different BHU members, primarily relying on a single, misplaced "fundamental alteration" defense and deflecting housing assistance to the Homeless Response Team ("HRT"). This pattern demonstrates a failure to treat the interactive process as a case-by-case, person-specific inquiry as required by the ADA.

Additionally, no viable alternatives were suggested for any accommodation requests made to the City.

Our BHU members have the following disabilities that without proper accommodations will be aggravated:

## MERCED DOMINGUEZ

The full email thread documenting this request is provided in **(Exhibit E).**

**Physical disabilities:** Lives with degenerative spondylosis causes chronic pain and severe mobility limitations. She cannot walk long distances and sit for extended periods of time. The chronic stress from the abatement threat has also dangerously exacerbated her hypertension, leading to heart problems.

**Disability aggravation:** Ms. Dominguez will face a catastrophic and life-threatening aggravation of her disabilities. The loss of her RV—her sole shelter and medical equipment— would trigger an immediate physical and psychological crisis, dangerously spiking her blood pressure and trigger chronic pain. Forced into a cycle of traumatic displacement, each relocation would cause acute pain flare-ups, risk injury, emotional distress and accelerate her spondylosis.

## RAY JOHNSON

The full email thread documenting this request is provided in **(Exhibit F).**

**Mental health disabilities:** Mr. Johnson lives with PTSD, Bipolar Schizophrenia, depression and anxiety. His mental health disabilities substantially limit major life activities, including thinking, communicating, caring for oneself, and interacting with others. Stability and a

predictable environment are not merely preferences for Mr. Johnson, but they are medical necessities to prevent psychotic episodes, severe paranoia and emotional decompensation.

**Disability aggravation:** The City's enforcement actions—characterized by sudden displacement, loss of shelter, and punitive threats—are directly contraindicated by his psychiatric conditions. Chronic stress is worsened by the constant threat of losing one's last point of stability. For Mr. Johnson, the Harrison encampment has been his safe space, providing him with an environment surrounded by community and a semblance of routine that his disabilities require.

## *ERIC KEISER*

The full email thread documenting this request is provided in **(Exhibit G).**

**Physical disabilities:** Mr. Keiser was struck by a car several years ago while living at the Shellmound encampment off I-80. His leg bones healed improperly, resulting in significant mobility limitations and chronic pain that make walking, standing, and carrying items extremely difficult.

**Mental health disability**: Mr. Keiser has schizophrenia and has been experiencing auditory hallucinations for the past 6–7 years, impacting his executive functioning, including his ability to plan, organize, and navigate complex processes independently.

**Disability aggravation:** Exacerbation of chronic pain, high risk of falls or re-injury due to rushed, unsupported movement. Escalation of psychotic symptoms, increased auditory hallucinations, acute anxiety, and a high likelihood of trauma and disorientation. Inability to move essentials like medications, documents, survival gear that serves as medical equipment, leading to immediate health and safety risks for his life. Forcing him into a chaotic move without

support ensures he will be unable to secure or maintain future housing, perpetuating the very crisis the City claims to address.

## *SHAREEF MUWAKKIL*

The full email thread documenting this request is provided in **(Exhibit H).**

**Physical disabilities:** Experiences chronic swelling in both legs for the past three years, resulting in varying mobility limitations from day to day. An unhealed ankle injury that prevents him from standing and walking long distances. He also has a heart valve condition that limits his ability to lift, carry, or move personal belongings safely.

**Mental health disabilities:** Mr. Muwakkil has lived with bipolar disorder and psychosis for over fifteen years. These conditions contribute to executive functioning challenges, including difficulty scheduling, organizing, and coordinating complex tasks. His conditions also result in antisocial tendencies that may complicate direct interactions with City staff during enforcement activities.

**Disability aggravation:** Physically, forced moves without assistance risk cardiac strain, injury from his unhealed ankle, and worsened chronic leg swelling. Mentally, the stress of unstable shelter, complex rules, unexpected enforcement, and high-stimulation environments will overwhelm his executive functioning, intensify his psychosis and bipolar symptoms, and trigger antisocial withdrawal—crushing his ability to navigate housing systems and maintain stability. Denying these supports doesn't just ignore his disabilities; it actively deepens his crisis and prolongs his homelessness.

## *LEWANDA PARNELL*

The full email thread documenting this request is provided in **(Exhibit I).**

**Physical disabilities:** Lives with vertigo, which causes frequent loss of balance and necessitates the use of a stroller for stability to prevent falls. Her conditions significantly limit her ability to lift, carry and walk long distances. She uses a mobility device, a stroller, to maintain her balance when walking.

**Mental health disabilities:** She has difficulty completing tasks, handling stress, adapting to change and communicating with others. Isolation severely impacts her mental health, making the support of her encampment community vital. She depends on her neighbors for both practical assistance with daily tasks and emotional stability.

**Disability aggravation:** Her disabilities will be actively worsened by policies that ignore her need for stability, accessibility and community support. Ms. Parnell will be pushed into a cycle of medical crisis, trauma and life-threatening instability.

## *YESICA PRADO*

The full email thread documenting this request is provided in **(Exhibit J).**

**Mental health disabilities:** ADHD (Attention-Deficit/Hyperactivity Disorder) impacts her executive function, working memory, task initiation, organization, time management, emotional regulation (Rejection Sensitive Dysphoria), ability to process complex information. PTSD (Post-Traumatic Stress Disorder) produces hypervigilance, trauma responses (fight/flight/freeze), trust issues, emotional dysregulation, sensitivity to perceived threats, difficulty processing stressful or punitive communication.

**Disability aggravation:** Routine and structure are medical necessities. Removing stable parking for her RV dismantles the "scaffolding" that supports daily functioning, leading to cognitive overload, disorganization, and inability to plan or complete tasks. Sudden relocation re-triggers

trauma, creates chaos and destroys a sense of safety. The loss of a controlled environment, in this case her RV, where she regulates anxiety and sensory overload leads to increased flashbacks, hypervigilance and emotional dysregulation. Losing support systems at the encampment community also increases chronic stress and hypervigilance (worrying about theft, violence), removes visual cues and modeling that help with task initiation and leads to food insecurity, which consumes mental energy and destroys daily structure, worsening executive dysfunction.

## ERIN SPENCER

The full email thread documenting this request is provided in **(Exhibit K).**

**Physical disabilities:** His mobility issues including injuries to his right clavicle, sciatica, and displaced left hip. This combination creates debilitating pain with every step, severely limits his ability to lift or carry heavy objects, and makes him prone to falls and further injury.

**Mental health disabilities:** His PTSD and ADHD impair his executive functioning, making it difficult for him to organize, plan, and complete essential tasks without support. This means stress and chaos triggers trauma responses such as panic, hypervigilance and decision paralysis.

**Disability aggravation:** A forced relocation without accommodation actively weaponizes his conditions against him. The physical demand will guarantee injury and intensified pain, while the psychological trauma of displacement will trigger PTSD crises and completely shut down his ability to organize or comply with any orders.

## AUSTIN WHITE

The full email thread documenting this request is provided in **(Exhibit L).**

**Physical disabilities:** Mr. White has lived with esophageal varices since the age of three. Due to the fragility of his esophageal lining and risk of rupture, he is medically restricted from lifting objects heavier than 20 pounds. His right wrist was also broken and healed improperly, which severely limited mobility of that hand.

**Mental health disabilities:** Mr. White has lived with mental health conditions since the age of twelve, including symptoms affecting executive functioning such as difficulties with planning, scheduling, organizing tasks — and challenges with interpersonal trust, particularly with institutional staff. He relies on the companionship of his two emotional support and service dogs, which are essential to managing his mental health conditions. The presence of these dogs is necessary for his emotional stability and wellbeing.

**Disability aggravation:** Physically forcing him to pack and move his belongings endangers his life by risking a fatal hemorrhage. His limited mobility also means he can't quickly move and carry his personal property. Separating him from his dogs or placing him in an environment that doesn't allow them would trigger severe emotional destabilization, impairing his ability to function or cooperate.

The attached chart below provides a comprehensive record of this breakdown, cataloging each member's requested accommodation, the City's formulaic response, and how the denial would aggravate the member's disability if the request is denied.

*Figure One: Chart of Accommodations*

| BHU ADA Request | City Response | Impact of Denial |
|---|---|---|
| MERCED DOMINGUEZ | VIA CITY MANAGER (unless noted) | VIA BHU PRESIDENT |

| | | |
|---|---|---|
| 1. **To keep her RV:** A guarantee that her RV will not be towed from the encampment as it serves as medical equipment to manage disabilities. | 1. **To keep her RV:** Denied; "This request does not constitute reasonable accommodation under the ADA." | 1. **To keep her RV:** Without this medical equipment, she cannot manage her chronic pain in a stable, accessible environment. |
| 2. **Temporary exemption of towing:** Not to enforce 72-hour rule and expired registration laws. Pause the towing program until her RV is street legal. | 2. **Temporary exemption of towing:** Denied; "exempting a vehicle from citation for expired registration would constitute a fundamental alteration of the City's parking enforcement program." | 2. **Temporary exemption of towing:** Losing this life-sustaining equipment would be a threat to her survival and expose her to the elements—an event that would deteriorate her physical and mental health. |
| 3. **Temporary stability in location**: Permission for her RV to remain at the encampment. The case worker sets the timeframe based on availability. | 3. **Temporary stability in location**: Denied via ADA Coordinator as a fundamental alteration of abatement. | 3. **Temporary stability in location**: Forced into a perilous cycle of constant displacement, each move would cause acute pain flare-ups, risk injury, and deplete her energy, actively accelerating the degenerative impact of her spondylosis. |
| 4. **Relocation to an ADA-compliant parking location:** An alternative legal parking area without risk of citation and towing. | 4. **Relocation to an ADA-compliant parking location:** Deferred via ADA Coordinator. " It is my understanding that Ms. Dominguez's goal to remain in one location can be accomplished by using the disability placard." | 4. **Relocation to an ADA-compliant parking location:** Any move would only restart the countdown to the next catastrophic displacement, with no path to stability. |
| 5. **Parking permit system:** A permitting system for disabled residents living in vehicles, allowing them to remain in designated areas. | 5. **Parking permit system for long-term RV residents:** Denied via ADA Coordinator. "The City does | |
| 6. **Access to housing navigator without being in a shelter program:** Waive request of being | | |

part of a city shelter program to obtain a housing navigator.

7. **Increased sidewalk storage space:** An increase of sidewalk storage space from 9 square feet (3'x3' feet) to 21 square feet (7'x3' feet) to accommodate items outside her RV.

not have a 'disability parking permit system'."

6. **Access to housing navigator without being in a shelter program:** Deferred; " has a housing navigator through Abode Services." (County)

7. **Increased sidewalk storage space:** Denied; "would require the City to modify a fundamental element of how it regulates sidewalk use citywide."

5. **Parking permit system for long-term RV residents:** Her RV is an enforcement target. This keeps her in a state of perpetual insecurity and fear, where the constant threat of abatement itself becomes a disabling stressor.

6. **Access to housing navigator without being in a shelter program:** She is denied access from city programs designed to help her exit homelessness, leaving her indefinitely exposed to the threat of enforcement.

7. **Increased sidewalk storage space:** Forced to choose between storing critical supplies and maintaining a safe pathway inside her RV, she would face increased physical strain and risk of falling.

---

| RAY JOHNSON | VIA ADA COORDINATOR | VIA BHU PRESIDENT |
|---|---|---|
| 1. **To keep his vehicle as shelter:** His vehicle is his only stable shelter; displacement would trigger psychotic episodes and severe | *"The City further maintains that the interactive process concluded with the ADA Coordinator's prior written response dated July 21, 2025," wrote* | 1. **To keep his vehicle as shelter:** Forced removal would trigger acute psychotic episodes, severe paranoia and emotional |

mental health deterioration.

2. **Temporary exemption of towing:** The vehicle has no plates due to financial constraints; towing it would exacerbate his psychosis as it is his safe place from sensory overstimulation and unexpected daily triggers.

3. **Temporary exemption from relocation:** Frequent moves worsen his PTSD, bipolar schizophrenia, and anxiety; stability is medically necessary. To allow time to resolve vehicle registration issues and secure alternative shelter without immediate enforcement.

4. **Exemption from citation and arrest related to the abatement order:** His disabilities prevent compliance; penalizing him for non-compliance would constitute disability-based discrimination.

5. **Placement in an ADA-compliant shelter:** Quiet, private space to prevent sensory overload, storage for medications and personal

*City Manager Buddenhagen.*

1. **To keep his vehicle as shelter:** Denied; "would fundamentally alter the nature of the City's parking-enforcement activities."

2. **Temporary exemption of towing:** Denied; "would fundamentally alter the City's parking-enforcement activities, whose fundamental purpose is to discourage and prevent unlawful parking."

3. **Temporary exemption from relocation:** Denied; "would fundamentally alter the nature and purpose" of the abatement.

4. **Exemption from citation and arrest related to the abatement order:** Denied; "exposure to citation and/or arrest is a fundamental feature of the City's notice/order." Exemption is a fundamental alteration.

5. **Placement in an ADA-compliant shelter:** Denied; "Given that housing is not a form of

decompensation.

2. **Temporary exemption of towing:** Losing his refuge would heighten sensory overload, prevent him from regulating stress, and sever his connection to stability.

3. **Temporary exemption of relocation:** Each displacement resets trauma, deepens his sense of instability, and prevents psychiatric stabilization.

4. **Exemption from citation and arrest related to the abatement order:** The threat of punishment heightens anxiety, triggers flight-or-fight responses, and can provoke agitation, dissociation or aggression.

5. **Placement in an ADA-compliant shelter:** Separation from his partner would deepen isolation and depression, undermining his support system and capacity to cope.

6. **A designated ADA-compliant parking location:** Without a safe,

| | | |
|---|---|---|
| belongings. A place to park his vehicle to prevent towing. Permission to be with his partner, Vanessa Bichard, in the hotel shelter at the Berkeley Inn. | reasonable accommodation, the City directs Ms. Bichard/Mr. Johnson to speak with HRT staff." | predictable place to park, he faces constant anxiety about towing and loss of shelter. This chronic hypervigilance exhausts his mental reserves, worsens anxiety and paranoia. |
| **6. A designated ADA-compliant parking location:** To avoid towing and provide continued access to his vehicle as shelter and safety net. | **6. A designated ADA-compliant parking location:** Denied; "The City does not provide designated parking spaces to any of its residents or guests." | **7. Accessible communication and a single point of contact:** Without clear, consistent communication, he cannot meaningfully participate in processes or programs. |
| **7. Accessible communication and a single point of contact:** Due to schizophrenia and anxiety, he needs clear, written communication and consistent instructions to participate meaningfully. | **7. Accessible communication and a single point of contact:** No response from City Manager nor ADA Coordinator. | **8. Physical assistance with relocation:** Expecting him to plan and execute a move independently exploits his cognitive disabilities, leading to overwhelm, abandoned belongings and failed shelter transitions. |
| **8. Physical assistance with relocation:** His executive functioning impairments prevent him from planning and executing a move independently. | **8. Physical assistance with relocation:** No response from City Manager nor ADA Coordinator. | |
| <u>ERIC KEISER</u> | <u>VIA CITY MANAGER</u> | <u>VIA BHU PRESIDENT</u> |
| **1. ADA-compliant relocation option prior to enforcement:** He requires a non-congregate, low-stimulation shelter placement before any | **1. ADA-compliant relocation option prior to enforcement:** Denied; "encampment management efforts include | **1. ADA-compliant relocation option prior to enforcement:** Forcing Mr. Keiser into a congregate shelter or an unknown, unstable |

enforcement action.

2. **Shelter staff trained in mental health disabilities:** Staff must be trained in mental disabilities, especially in schizophrenia so that Mr. Keiser can be successful in the program.

3. **Temporary stability in current location with accessible guidance for any required relocation:** Remain stable in his current location without threat of citation, arrest and property destruction. Accessible information in the form of a map, list or document explaining where he can safely relocate on public streets and city-owned lots, which is an alternative to shelter.

4. **Physical assistance with lifting and moving:** Advance scheduled, hands-on assistance from City staff to transport his belongings. His leg injuries medically preclude lifting or moving heavy items.

5. **Pre-scheduled, clear communication:** A single,

referral to shelter and housing resources, the provision of a specific non-congregate placement as a precondition to enforcement would exceed the scope of a reasonable modification."

2. **Shelter staff trained in mental health disabilities:** Denied; "the ADA does not require a public entity to provide housing or guarantee placement in a particular type of shelter as a reasonable modification."

3. **Temporary stability in current location with accessible guidance for any required relocation:** Denied; "may remain on certain sidewalks with property not exceeding nine square feet, provided pedestrian access is maintained, facilities are not obstructed, and the location is not designated as a no lodging area."

4. **Physical assistance with lifting and moving:** Deferred; "The City will offer storage options, if any,

environment would aggravate his schizophrenia, which is marked by persistent auditory hallucinations, overwhelming him with chaos and noise.

2. **Shelter staff trained in mental health disabilities:** His symptoms—such as withdrawal or reacting to unheard voices—could be misinterpreted as defiance, leading to program expulsion and repeated trauma.

3. **Temporary stability in current location with accessible guidance for any required relocation:** His schizophrenia requires predictability; sudden displacement fractures his fragile sense of safety, flooding him with stress that worsens hallucinations and impairs his already-limited executive function. The looming threat of citation, arrest or property destruction would keep him in a state of hypervigilance. Rushing to avoid enforcement could cause a

| | | |
|---|---|---|
| consistent point of contact from the City. All instructions in simple, written, step-by-step format with at least two reminders. Pre-scheduled, low-stimulation meetings for any discussion. | based on public health guidance and operational capacity." <br><br> 5. **Pre-scheduled, clear communication**: Denied; "Encampment management and public health response activities involve multiple departments and staff responding to changing conditions, and such a requirement would impose an undue administrative burden." | fall, re-fracture or collapse from chronic pain. <br><br> 4. **Physical assistance with lifting and moving:** His improperly healed leg bones cannot bear weight or strain. Without hands-on help, he would lose essential items like medications, documents, survival gear, which are lifelines of support. <br><br> 5. **Pre-scheduled, clear communication:** His schizophrenia disrupts hearing, processing and memory, especially under stress. Verbal instructions will be distorted by hallucinations, forgotten or misunderstood. |
| <u>SHAREEF MUWAKKIL</u> <br><br> 1. **Accessible shelter placement**: If relocation becomes necessary, placement in a non-congregate, ADA-compliant shelter space that is private and low-stimulation. <br><br> 2. **Shelter policy modifications:** No curfew, no requirement for | <u>VIA CITY MANAGER</u> <br><br> 1. **Accessible shelter placement**: Denied; not considered a reasonable accommodation. Referred to Homeless Response Team (HRT) for shelter availability. <br><br> 2. **Shelter policy modifications**: | <u>VIA BHU PRESIDENT</u> <br><br> 1. **Accessible shelter placement**: Without stability, privacy and low-stimulation space, his mental health would deteriorate, reducing his ability to engage with services and survive on the streets while housing becomes available. |

consecutive overnight stays, visitor access (including BHU officers) for disability-related support and reduced staff check-ins to respect privacy and mental health needs.

3. **Temporary stability in location**: Permission to remain in place when no accessible shelter is available. HRT sets a timeframe based on shelter availability.

4. **Relocation to an ADA-compliant alternative site:** Relocation to an equivalent site that meets the safety standards of the city's shelter program.

5. **Visual aid of encampment policies:** The written policies are unclear. We request an accessible guide in the form of a map, list or document of sites where he will not face forced removal while awaiting shelter.

6. **Modification of TNC objects policy:** Expansion of the 9 square footprint to 10x12 ft on sidewalks to accommodate privacy needs and a

---

Deferred; accommodations would only be considered if and when a shelter placement is offered.

3. **Temporary stability in location**: Denied; ADA Coordinator offered 72-hour extension of abatement notice, but City Manager's final determination offered no additional time and no place where to safely relocate.

4. **Relocation to an ADA-compliant alternative site:** Denied; the City frames it as it will not 'sanction' any encampment set up larger than a 9 square footprint.

5. **Visual aid of encampment policies**: Denied; the City cannot provide a map of enforcement-free locations because City rules are complex, ever-changing, and prohibit lodging that occupies more than a 9 square feet footprint. No map exists and creating one would be an undue administrative burden.

6. **Modification of TNC objects**

---

2. **Shelter policy modifications:** Missing check-ins due to time-blindness (executive dysfunction and PTSD) leads to shelter expulsion, reinforcing housing instability and worsening bipolar episodes.

3. **Temporary stability in location:** Forced relocation without accessible shelter forces him into unsafe, unstable conditions.

4. **Relocation to an ADA-compliant alternative site:** Physically, he would be forced into unstable or hazardous environments—such as uneven ground, longer distances from services and unsafe structures—that would worsen his chronic leg swelling, risk re-injury to his unhealed ankle, and impose physical strain that could lead to a heart attack. Mentally, the lack of a stable, predictable place would induce severe anxiety and decision paralysis.

5. **Visual aid of encampment**

bicycle, which is used as a mobility device due to physical disability.

7. **Physical assistance with moving and lifting:** Assistance with lifting and transporting personal belongings—scheduled in advance of enforcement to avoid last-minute hardship.

8. **Executive functioning support:** Assistance with scheduling, coordination, and organization tasks related to relocation, shelter navigation and compliance with City enforcement orders.

9. **Support with interpersonal interactions:** Assignment of a consistent HRT point of contact (preferably Epsilon Galloway) to assist with communications, to prevent escalation, confusion or misunderstanding stemming from disability-related antisocial tendencies.

10. **Pre-scheduled, low-stimulation meetings**: All interactions with city staff scheduled ahead of time in

**policy:** Denied; as a "fundamental alteration" of the 9 square feet sidewalk policy.

7. **Physical assistance with moving and lifting**: Partly denied; limited to help with packing and using City storage services at the corporation yard. Transportation limited to shelter programs only.

8. **Executive functioning support:** Denied, no concrete support provided.

9. **Support with interpersonal interactions**: No response; City will not provide accessible information nor assign a direct point of contact with HRT.

10. **Pre-scheduled, low-stimulation meetings:** Denied as impracticable; offered to discuss alternatives, but no further conversation took place after "final determination."

**policies**: Without clear, visual guidance, he cannot navigate complex rules due to executive dysfunction. Confusion and fear of enforcement increase paranoia and avoidance.

6. **Modification of TNC objects policy:** A 9 square feet limit prevents securing his bicycle (mobility device) and denies private space needed for mental health coping, escalating sensory overload and psychotic symptoms.

7. **Physical assistance with moving and lifting**: Physical overexertion could trigger heart complications or worsen leg swelling, delaying recovery and increasing pain.

8. **Executive functioning support:** Verbal instructions, self-managed relocation, missed deadlines and lost documents increase stress and mental health decline.

9. **Support with interpersonal interactions**: Multiple or unfamiliar staff trigger antisocial

| | | |
|---|---|---|
| writing, in a calm environment, to avoid overwhelming his cognitive capacities. | | responses, miscommunication, and conflict. |
| | | 10. **Pre-scheduled, low-stimulation meetings:** Unannounced visits or high-stress environments overwhelm his sensory and emotional capacity. Sudden interactions can provoke panic, psychosis and aggressive responses. |

| <u>LEWANDA PARNELL</u> | <u>VIA CITY MANAGER</u> | <u>VIA BHU PRESIDENT</u> |
|---|---|---|
| 1. **To keep her tent:** Permission to keep her customized tents as her primary shelter, which serve as medical equipment, without risk of forced removal and destruction. | 1. **To keep her tent:** Approved; "willing to work with Ms. Parnell to retain her customized tents during an abatement action, provided that a mutually agreed upon relocation plan and timeline are established." | 1. **To keep her tent:** Her tents are private sound-buffered spaces, which shield her from chaotic noise, visual overstimulation and unpredictable interactions. Without them, she is exposed to constant environmental triggers and left in the rain, wind and cold, increasing risk of illness and hypothermia. |
| 2. **Temporary stability in location**: Permission for her two tents to remain at the 8th and Harrison encampment temporarily when no accessible housing is available. Remaining in place is tied to her mental health stability and physical safety. HRT sets the timeframe | 2. **Temporary stability in location**: Denied; "in light of newly confirmed public health conditions at the site, the City has determined that it cannot grant any further extensions." | 2. **Temporary stability in location**: Uprooting her from the community where she receives daily emotional and practical support for physical chores will deepen her depression |

based on ADA shelter availability that meets her needs.

3. **Designation of an ADA-compliant space:** An outdoor space where she could camp without being subject to frequent forced moves. An indoor, non-congregate shelter/housing space that meets her accessibility needs such as, grab bars, cooking facilities, visitor permissions, no curfews, stable and community-oriented.

4. **Temporary suspension of enforcement:** She needs more than 72-hour notices to relocate due to her disabilities and an alternative location to go. Requests are for longer time extensions and a pause on enforcement until a viable, accessible alternative is offered.

5. **Assistance with relocation:** Physical help with packing and moving belongings, given her vertigo and mobility limitations. Transportation assistance to a new accessible location.

3. **Designation of an ADA-compliant space:** Denied; "The City reiterates that it does not maintain sanctioned encampment areas and that its encampment regulations are reflected in municipal code provisions, administrative regulations, and resolutions that apply citywide and are subject to change."

4. **Temporary suspension of enforcement:** Denied; "An open-ended suspension of enforcement would prevent the City from carrying out its public health and safety responsibilities and would constitute a fundamental alteration of its programs."

5. **Assistance with relocation:** Partly denied; "The City offers assistance limited to packing, lifting, and transporting eligible items for purposes of utilizing the City's storage program."

6. **Visual aid of encampment policies:** Denied; No response.

and isolation, potentially leading to suicidal ideation and a psychiatric crisis.

3. **Designation of an ADA-compliant space:** Moving to an unknown location without community oversight increases her vulnerability to assault, theft, and being overlooked in a medical emergency. Without accessible shelter, she faces vertigo episodes, an inability to prepare safe food, and isolation from family support.

4. **Temporary suspension of enforcement:** 72-hour notices ignore her slow mobility and cognitive limitations, forcing a rushed process that will leave medical equipment behind, trigger vertigo episodes and panic attacks.

5. **Assistance with relocation:** Without help, she will risk falls or spinal injury. Leaving her belongings behind means losing disability aids and safe accessible shelter.

| | | |
|---|---|---|
| 6. **Visual aid of encampment policies:** A map, list or document of areas in Berkeley—public streets and city-owned lots—as the City does not have a blanket camping ban. where camping is permitted as the City does not have a blanket camping ban. | | 6. **Visual aid of encampment policies:** Not knowing where she can legally rest means every night is spent in fear of police contact, raids or eviction, inducing stress and anxiety. |
| <u>YESICA PRADO</u> | <u>VIA CITY MANAGER</u> (unless noted) | <u>VIA BHU PRESIDENT</u> |
| 1. **Permission to remain in place with my RV as shelter:** ADHD and PTSD make relocation extremely difficult. Disrupting stability worsens executive dysfunction and ability to perform daily life activities. | 1. **Permission to remain in place with my RV as shelter:** Denied; "The City's "no lodging" prohibitions do not apply to vehicles or RVs that are lawfully parked. Vehicles remain subject to standard parking enforcement rules applicable citywide." | 1. **Permission to remain in place with my RV as shelter:** Forced and sudden disruption of her only stable environment triggers a PTSD crisis: hypervigilance, panic and retraumatization. Simultaneously, it dismantles the routine her ADHD brain relies on to function, leaving her unable to plan, organize or complete daily tasks. |
| 2. **Designation of an ADA-compliant parking location:** An alternative location, on the street or city-owned lots, where disabled individuals who rely on their vehicles for shelter can remain. | 2. **Designation of an ADA-compliant parking location:** Denied; "The City's determination is based on the design and purpose of its parking and right-of-way management policies, not on isolated instances where enforcement may not have | 2. **Designation of an ADA-compliant parking location:** Condemns her to a perpetual, high-stakes search for parking, weaponizing her ADHD. The |
| 3. **Access to disability navigation support:** ADHD and PTSD severely impact the ability to plan, | | |

process information, and execute complex tasks like finding a new place to relocate the RV. Requires assistance in understanding relocation options and navigating city procedures.

4. **Exemption from citation or arrest:** Disabilities make it difficult to comply with constant relocation orders if permanently displaced from the encampment.

5. **Temporary moratorium on parking enforcement (4-hour time limits and 72-hour rule:** The City's enforcement is a cascade of impossible deadlines: 4-hour notices that cannot be met leading to tickets; and a 72-hour rule that in practice gives only 48 hours before towing. This constant disruption systematically destroys any routine & stability.

6. **Assisted transition to relocation with visual aid of legal parking areas:** The City's request of "find a new place to park your RV" is a

occurred or where temporary conditions were tolerated."

3. **Access to disability navigation support:** Denied; ADA Coordinator wrote: "we cannot offer this program or service because we do not have trained 'disability advocate' staff. As an alternative, I also encourage you to connect with HRT staff."

4. **Exemption from citation or arrest:** Denied; ADA Coordinator wrote: "would fundamentally alter the nature of the City's nuisance abatement activities and capacities."

5. **Temporary moratorium on parking enforcement (4-hour time limits and 72-hour rule):** Denied; "a disability-based exemption from time-limited parking rules would impose an undue administrative burden on the City."

6. **Assisted transition to relocation with visual aid of legal parking**

chronic stress keeps PTSD in a state of permanent activation, causing exhaustion, dissociation and total instability.

3. **Access to disability navigation support:** Abandoned in a bureaucratic maze with a brain that cannot sequence tasks, guaranteeing failure, missed deadlines and punitive outcomes.

4. **Exemption from citation or arrest:** Punishing her for disability symptoms weaponizes her conditions, intensifying trauma and fear of authority.

5. **Temporary moratorium on parking enforcement (4-hour time limits and 72-hour rule:** The tight deadlines ensure permanent fight-or-flight mode, exacerbating PTSD symptoms like insomnia and hypervigilance. This would overwhelm her executive function, ensuring a rapid accumulation of tickets, fines and ultimate vehicle loss, her only stable shelter.

| | | |
|---|---|---|
| catastrophic task for the ADHD brain. It involves countless unknown steps, endless variables and no clear endpoint (as moving once will not satisfy the City's policy.) | **areas:** Deferred; ADA Coordinator wrote: "any further extension would constitute a fundamental alteration of the City's operations." | 6. **Assisted transition to relocation with visual aid of legal parking areas:** "Find a new place to park" is a directive that weaponizes her ADHD. The unbounded variables and lack of structure guarantee cognitive overload and decision paralysis. Without a guide, the process is retraumatizing and inaccessible to navigate. |
| 7. **Request for a residential parking permit:** Modify the residential parking permit rules to waive the address requirement for Berkeley residents, allowing stable parking and preventing sudden displacements. | 7. **Request for a residential parking permit:** Denied; "granting the requested exemption would impose an undue administrative burden." | 7. **Request for a residential parking permit:** Trapped in a cruel cycle of displacement, each move will shatter the routine medically required, re-triggering trauma and wasting her limited mental energy on survival logistics. |
| 8. **Temporary exemption from towing:** Not to enforce automatic towing after not complying with the 72-hour rule. | 8. **Temporary exemption from towing:** Denied; no substantial response to this request but based on other responses, parking enforcement cannot be fundamentally altered. | 8. **Temporary exemption from towing:** The ever-present threat of her home being towed will create a state of constant psychological terror. This anticipatory trauma will preclude any chance of mental stability or recovery. |
| <u>ERIN SPENCER</u> | <u>VIA CITY MANAGER</u> | <u>VIA BHU PRESIDENT</u> |

1. **Visual aid of location of areas in line with City policies:** Provide a clear map and list of city-approved locations where Mr. Spencer may relocate without citation or arrest.

2. **Space Accommodations:** Request to expand permitted space from 3 ft. x 3 ft. (9 sq. feet) to 20 ft. × 30 ft. (600 sq. feet) due to his disabilities and crucial need for community support.

3. **Notice and communication protocol:** Provide advance notices at 30 days; 15 days and 3 days due to executive functioning challenges due to ADHD/PTSD. Communication through HRT staff Epsilon Galloway accompanied by a police liaison for accountability.

4. **Alternative Housing Request:** Due to PTSD, ADHD, and past trauma associated with indoor settings, Mr. Spencer cannot use traditional shelters. He requests a flatbed trailer or similar mobile living unit as an ADA accommodation to the City's brick-and-mortar shelter program.

1. **Visual aid of location of areas in line with City policies:** Denied; "not obligated to create individualized maps or pre-approved locations that guarantee immunity from enforcement."

2. **Space Accommodations:** Denied; "Granting this request would fundamentally alter the nature of the City's sidewalk management framework."

3. **Notice & Communication Protocol:** Denied; "The proposed indefinite or highly structured multi-step notice would interfere with timely enforcement of public health and safety rules and would constitute a fundamental alteration of the City's enforcement procedures."

4. **Alternative Housing Request:** Denied; "The City may offer access to existing shelter or storage programs but is not obligated to provide new vehicles, trailers, or other personal items for

1. **Visual aid of location of areas in line with City policies:** His ADHD and PTSD will trap him in constant, paralyzed anxiety. Every move risks arrest or a potential safety threat, with no path forward to stabilize.

2. **Space Accommodations:** Forcing him into a 9 sq. ft. box eliminates the private and community spaces that regulate his PTSD and provide essential ADHD structure. A jail cell is bigger than this inhumane footprint applied to the unhoused

3. **Notice & Communication Protocol:** His ADHD impairs time management, task initiation and working memory. He will be unable to logically sequence the massive project of moving, leading to frantic, failed attempts and the certain loss of vital possessions.

4. **Alternative Housing Request:** Offering only indoor shelter is medically harmful—it knowingly places him in an environment that directly provokes PTSD flashbacks,

5. **Infrastructure & public service access:** Restore street lighting in the area. Install solar panels, battery packs, or public USB charging ports to allow phone charging for emergencies, VA appointments and service access.

6. **Permission to remain in place until an ADA-compliant alternative is available:** Due to his mobility impairments, frequent relocation is physically dangerous and exacerbates his pain. The city has displaced him multiple times, despite his efforts to find locations that are "out of the way" and do not obstruct public use.

7. **Physical assistance with moving belongings and trash disposal:** Due to severe mobility restrictions, Mr. Spencer cannot independently transport his belongings or remove trash without significant physical strain.

8. **Exemption from citation and arrest:** Cannot independently relocate due to his disability, penalizing him

encampment residents."

5. **Infrastructure & Public Service Access:** Denied; "solar panels, personal charging access, or modifications to street lighting would require a fundamental alteration of the City's encampment management and shelter programs."

6. **Permission to remain in place until an ADA-compliant alternative is available:** Denied; "it would fundamentally alter the nature of the City's nuisance abatement efforts which are meant to prevent camping at sites deemed by council to be nuisances."

7. **Physical assistance with moving belongings and trash disposal:** Deferred; **"**The City will offer storage options, if any,  based on public health guidance and operational capacity."

8. **Exemption from citation and arrest:** Denied; ADA Coordinator wrote: "This request is denied

anxiety and feelings of being trapped. The flatbed trailer provides the mobility he needs to comply with relocation requests without the triggering confinement of walls.

5. **Infrastructure & Public Service Access:** Darkness fuels his PTSD hypervigilance, while a dead phone—his ADHD lifeline for reminders—cuts him off from VA care, social services and 911 during a health crisis.

6. **Permission to remain in place until an ADA-compliant alternative is available:** Each move worsens his physical pain and re-enact past traumas of loss and instability, destroying any progress toward safety and stability.

7. **Physical assistance with moving belongings and trash disposal:** Without help, it forces him to choose between abandoning his survival gear (serves as medical equipment) or causing debilitating pain and further injury. Piling trash

| | | |
|---|---|---|
| for his inability to comply would constitute disability-based discrimination. He has not been clearly informed of how his shelter violates city law, further complicating his ability to comply with the abatement order. | because satisfying it would fundamentally alter the nature of the City's nuisance-abatement effort." | creates a health hazard and deepens hopelessness and despair.<br><br>8. **Exemption from citation and arrest:** Citing him for what his disabilities prevent him from doing is the definition of discrimination. His ADHD and executive dysfunction impair his ability to navigate the complex legal requirements of the abatement order itself. |
| AUSTIN WHITE <br>1. **Stable relocation options:** Placement in an ADA-compliant, independent housing environment that minimizes stress and physical exertion risks.<br><br>2. **Accommodation for emotional support and service animals:** Permission for his two emotional support and service dogs to remain with him during and after relocation at all times.<br><br>3. **Temporary stability in location:** Remain in place or relocate to an | VIA ADA COORDINATOR <br>1. **Stable relocation options:** Deferred; "Given that housing is not a form of reasonable accommodation."<br><br>2. **Accommodation for emotional support and service animals:** Deferred; "all residents at all City shelters may have support animals so long as the resident provides documentation from a clinician that each/every animal involved is needed for mental health purposes."<br><br>3. **Temporary stability in location:** | VIA BHU PRESIDENT <br>1. **Stable relocation options:** Stress and physical strain can trigger life-threatening internal bleeding. He will be overwhelmed by chaotic noise, unpredictability, and lack of privacy, pushing him toward psychological destabilization.<br><br>2. **Accommodation for emotional support and service animals:** These animals are medical necessities. Without them, his anxiety would spike, his ability to regulate emotions would crumble, |

ADA-compliant alternative for a defined period of time set by his case worker while transitioning to appropriate housing.

4. **Physical assistance with moving and lifting:** Assistance with lifting and transporting personal belongings from City staff, during relocation.

5. **Executive functioning support:** Written, step-by-step guidance and advance scheduling of interactions related to relocation and enforcement.

6. **Designated communication support:** Assignment of an advocate, disability liaison or single point of contact via HRT to assist in communications due to his disability-related mistrust of City staff.

7. **Pause enforcement until housing is available:** A pause on forced displacement until an accessible housing unit becomes available for him and his dogs.

8. **Map or guidance on where**

Denied; "would be a fundamental alteration of the City's effort to enforce an abatement order."

4. **Physical assistance with moving and lifting:** Deferred; "can offer Mr. White assistance lifting, packing, and transporting qualifying items to the City's storage program…scheduled in advance with HRT."

5. **Executive functioning support:** Denied; No substantive response to this request.

6. **Designated communication support:** Denied; "The ADA does not require Cities to provide reasonable accommodations to support access to services that the City does not offer."

7. **Pause enforcement until housing is available:** Denied; No response to this request.

8. **Map or guidance on where camping is legally permitted:** Denied; "The City does not maintain a map of identified

and his isolation would deepen.

3. **Temporary stability in location:** His PTSD and mistrust of systems are compounded by the constant threat of displacement. Without stability, he cannot maintain the fragile connections of routine to medical providers, social workers and housing navigators.

4. **Physical assistance with moving and lifting:** His esophageal varices medically prohibit lifting over 20 pounds. Attempting to do so under enforcement pressure risks physical injury and fatal internal bleeding.

5. **Executive functioning support:** Without written, step-by-step instructions and advance scheduling, he will inevitably miss steps and deadlines—not from non-compliance, but because the City's standard communication is cognitively inaccessible to him.

6. **Designated communication support:** His deep-seated mistrust of institutional staff makes direct

**relocation is legally permitted:** A visual aid in the form of a map, list or document showing where he can legally relocate within the city, given the lack of clarity on permissible locations without facing imminent harm by the City.

9. **Expansion of the 9-square-foot sidewalk limit:** Expansion to a larger space (10 ft × 12 ft) to accommodate himself, his two service dogs, and essential medical and survival gear.

10. **Continued access to city programs post-enforcement:** Assurance that he will retain access to city services (restrooms, water fountains, trash services, housing outreach) even after the encampment closure.

11. **Updated list of city-owned lots, public restrooms and water fountains:** Information on publicly owned land where he might relocate temporarily. A map or list of functional public water sources and restrooms for hydration and

camping locations, nor do we have a program for providing 1:1 relocation guidance to unhoused citizens."

9. **Expansion of the 9-square-foot sidewalk limit:** Denied; City Manager wrote: "an individualized exemption to allow a fixed structure larger than nine square feet would constitute a fundamental alteration of the City's regulatory framework governing use of the public right-of-way."

10. **Continued access to city programs post-enforcement:** Denied; "after the closure of the Harrison Corridor encampment, Mr. White will maintain his access to City restrooms and facilities, the same as all other City residents and visitors."

11. **Updated list of city-owned lots, public restrooms and water fountains:** Denied; No response to this request on where these resources are located to use.

communication with city workers not just difficult, but re-traumatizing.

7. **Pause enforcement until housing is available:** Both shelter types have failed him: congregate shelters are medically unsuitable, and non-congregate shelters have lacked disability support.

8. **Map or guidance on where camping is legally permitted:** Without clarity on where he can legally exist is like blindfolding a driver and requesting to "just avoid the red zones." His executive functioning challenges make it nearly impossible to interpret shifting enforcement.

9. **Expansion of the 9-square-foot sidewalk limit:** Without adequate space, he cannot rest, care for his animals, or maintain hygiene. Forcing him to choose between his medical equipment and compliance criminalizes his disability.

10. **Continued access to city programs**

34

| | | |
|---|---|---|
| sanitation. | | **post-enforcement:** His cirrhosis and liver complications require constant hydration and sanitation to prevent infection and crisis. Losing access accelerates his physical decline and increases his risk of hospitalization.<br><br>11. **Updated list of city-owned lots, public restrooms and water fountains:** Forced into constant motion disrupts medical care, exhausts him physically, and prevents service providers from finding him to connect with permanent housing. |

## III. Detailed analysis of interactive process failures

After consistent efforts by BHU to engage in the interactive process, the City's final determination offers no accommodations for our members. In fact, the City's conduct throughout the whole process reveals a coordinated strategy to pay lip service to the ADA, while ensuring its core encampment enforcement policies remain unmodified and applied discriminatorily against its disabled unhoused residents. This result disregards what is meant to be a collaborative process entirely and leaves our BHU members with no pathway forward.

*A. Failure to acknowledge the City programs BHU members seek to accommodate*

BHU sought accommodation requests to the specific operations of the City's homeless encampment policies and programs outlined in the public notice issued to encampment residents on January 7, 2025. *[Docket: Document 13-1].* These policies and programs are administered by the Homeless Response Team ("HRT"), and the City itself touts as comprehensive, compassionate and "Housing First."

As referenced in the public notice, these policies and programs are the following:

A. **City Council Resolution No. 71,513-N.S**: established a new encampment policy that authorizes abatement under six broad health and safety exceptions, with no guaranteed shelter alternative. It enforces "re-encampment deterrence" through hardscaping, signage, citations, arrests and the creation of "no lodging" zones.

B. **City Council Ordinance 7,935-N.S:** adopted revisions to laws governing the use of streets and sidewalks. Specifically, it deleted key sections of the code to give the City Manager new authority to change the related Administrative Regulation (AR 10.2), so the City can immediately enforce rules against "temporary non-commercial objects"—which includes tents, bedding, and personal belongings—if they occupy less than nine square feet in a designated "no lodging" zone.

C. **Administrative Regulations AR 10.1:** "Unattended Property is defined as tangible personal property that has been left on City property or the public right of way ("Public Space") with no person claiming or asserting ownership, or that needs to be stored as the result of a law enforcement action or a medical situation. Unattended Property that is removed by City staff shall be held in safe-keeping for 14 days, unless it appears from visual observation to have resale value of $100 or more, in which case it shall be held for 90 days."

D. **Berkeley Municipal Code 14.48.120 — Temporary Noncommercial Objects and Administrative Regulations AR 10.2:** (1) "TNC Objects are prohibited on Sidewalks in Residential Districts, except Objects in Transit pursuant to BMC §14.48.030 or as otherwise specifically authorized by the BMC"; (2) In Commercial and Manufacturing Districts, TNC Objects shall not be "left unattended for more than 2 hours." (TNC objects govern the property of unhoused people as objects "Not offered for sale or exchange or involved in the solicitation of money for immediate payment." AND Administrative Regulation 10.2, requires "reducing the footprint of TNC Objects to a 9-square-foot footprint and/or requesting that the TNC Objects be moved to another location.")

E. **Berkeley Municipal Code 14.48.020 — Obstructions on streets and sidewalks:** "It is unlawful for any person to place or cause to be placed anywhere upon any Sidewalk, Parklet or roadway, any object which obstructs, restricts, or prevents the use of any portion of such Sidewalk, Parklet or roadway, except as set forth in this Chapter or in a regulation promulgated by the City Manager."

F. **California Penal Code Section 647(e):** defines squatting as anyone "who lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner of person entitled to the possession or control of it." Illegal squatting is classified as a misdemeanor and may result in a jail sentence of up to six (6) months.

G. **Berkeley Municipal Code 11.40.110 — City to perform abatement when:** "If the nuisance is not abated within the time specified in the notice of decision, the chief of environmental health shall have the power to abate such nuisance without further notice including the power to condemn and destroy any property constituting the nuisance if the nuisance cannot be abated without destruction of such property."

H. **Berkeley Municipal Code 14.48.160 — Removal of obstructions on streets and sidewalks:** "Anything placed or permitted to remain upon any sidewalk or roadway in

violation of this Chapter, is declared to constitute a nuisance and the City is authorized and empowered to abate such nuisance by removing the same to the custodian of lost property in the Police Department or the Corporation Yard of the City, or other location designated by the City."

I.  **California Vehicle Code 22651(o):** "grants law enforcement the authority to impound (tow) vehicles when their registration is expired by more than six months, allowing removal from highways, public land, or off-street parking if found or operated, often requiring a supervisor's approval unless waived, to enforce compliance and access for others."

J.  **California Vehicle Code (CVC) 22651(b):** "allows law enforcement to tow a vehicle if it's parked or left on a highway obstructing traffic or creating a hazard, such as blocking lanes or posing a danger due to reduced visibility."

K.  **California Vehicle Code 22669(d)**: "Motor vehicles which are parked, resting, or otherwise immobilized on any highway or public right-of-way and which lack an engine, transmission, wheels, tires, doors, windshield, or any other part or equipment necessary to operate safely on the highways of this state, are hereby declared a hazard to public health, safety, and welfare and may be removed immediately upon discovery by a peace officer or other designated employee of the state, county, or city."

L.  **Interim Housing:** "The City has a limited number of shelter beds available. Talk to a member of the Homeless Response Team (HRT) at any point during their regular outreach to this encampment."

M.  **Permanent Housing:** "The Homeless Response Team can assess people for eligibility and help connect anyone interested." On the city's website it highlights: "Shelter Plus Care is a housing subsidy program for individuals who are chronically homeless in Berkeley. Participants pay approximately 30% of their income towards rent, and receive

ongoing supportive services. Participants must also have a disability due to one or more of the following conditions: Severe mental illness, Drug/alcohol dependence, Physical disability and a Chronic medical condition."

In practice, the City has refused to engage with modifications to the policies and programs it controls. The City consistently mischaracterizes them as unreasonable demands on unrelated, broader city functions—such as parking enforcement or right-of-way management. This evasion allows the City to sidestep its legal duty of the interactive process to provide meaningful access to the policies and programs it specifically created to apply and serve its unhoused residents.

The City's own staff and officials have publicly detailed this system:

*"the non-congregate beds and those beds that are fully funded by the city where we don't draw down any county funding or county pass-through funding, we directly control those referrals."*— HRT lead Peter Radu's presentation on state of homelessness to Berkeley City Council - Sept. 16, 2025

*"In 2021, thanks to an annual investment of Measure P, the city created the homeless response team, which brings together nearly all wings of the city government to address and resolve encampments by connecting people to shelter and services, cleaning up the debris and waste they accumulate, providing basic hygiene through porta potty and wash stations, mitigating community impacts and impacts on city operations and infrastructure, and resolving the worst health, safety, and fire hazards."* — Homeless Coordinator Josh Jacobs' presentation on state of homelessness to Berkeley City Council - Sept. 16, 2025

*"68% of shelter placements made by the HRT were into private room shelters. This reflects our intentional strategy to resolve non-congregate beds for people living in encampments,"* — HRT

lead Peter Radu's presentation on state of homelessness to Berkeley City Council - Sept. 16, 2025

The non-congregate shelter program has been essential for disabled unhoused people:

*"They've been lifelines for some of our most vulnerable residents, especially seniors, people with disabilities and those who can't access traditional shelter."* — Homeless Coordinator *Josh Jacobs'* presentation on state of homelessness to Berkeley City Council - Sept. 16, 2025

The federal funding that is provided to the County constitutes only 30% of the total funds used in homeless services in Berkeley, according to Council member Ben Barlett at the Sept. 16, 2025 meeting. This means the City has the majority of the control on how they choose to address homelessness.

The City's commitment to "Housing First" is not just rhetoric but a binding policy. As HRT lead Peter Radu stated to the City Council on September 16, 2025: "Housing First is currently state law in California and um Berkeley policy in our contracts."

Now, in response to the city's shelter crisis and severe shortage of beds, on January 19, 2016, the Berkeley City Council unanimously approved Resolution No. 67,357-N.S., Declaring a Shelter Crisis in Berkeley. Originally set to expire on January 19, 2017, the Resolution has been extended multiple times. Most recently, Resolution No. 70,179 – N.S., extended it until January 17, 2029. This resolution effectively allows the City via California Government Code Section 8698.2 to "allow persons unable to obtain housing to occupy designated public facilities (including facilities leased by the city) during the duration of the crisis." This legal tool can and should be used to facilitate the 'temporary stability' accommodation disabled BHU members medically require.

*B. Failure to provide individualized consideration*

The ADA's interactive process requires a genuine consideration of how a specific individual's disability interacts with a given policy. Here, the City has used boilerplate language, denying requests for stability, assistance moving, accessible communication to name a few, with identical reasoning for BHU disabled members with wholly different conditions.

For example, the City cited the same "fundamental alteration" rationale in denying Austin White's request (based on esophageal varices and mental health disabilities) and Erin Spencer's request (based on mobility impairments and PTSD). The City systematically gave the same blanket denials to all BHU members. At no point did the City's responses analyze the unique functional limitations of each individual or explain why a specific accommodation was unreasonable in light of *that person's* documented medical needs.

*C. Failure to propose alternatives*

A cornerstone of the interactive process is the mutual obligation to explore alternatives when an initial request is deemed unworkable. The City has consistently rejected BHU's proposed accommodations without offering any viable substitutes.

When denying requests for stability or shelter modifications, the City's sole counter-proposal has been to refer individuals to HRT for shelter availability—a referral the City has simultaneously admitted is futile, as staff acknowledged in meetings that "[there are] no non-congregate shelter beds available" and that "[there are] no ADA shelter beds right now." This is not a good-faith exploration of alternatives; it is a deflection to a known dead end as BHU received no responses from HRT staff.

*D. Misapplication of the "fundamental alteration" defense*

41

The City's primary justification for denying accommodations has been that granting them would "fundamentally alter" the nature of its service, program, or activity. However, the City misidentifies the relevant encampment policies and programs.

BHU disabled members seek modifications to the *Homeless Encampment Policies*—specifically, the procedures for abatement, storage, transportation, housing referrals, parking and sidewalks.

The City, in its responses, asserts that accommodations would alter the "public right-of-way." This reframes a request for policy modification into a debate about real estate, improperly shifting the legal inquiry away from the discriminatory policy and toward the geographical location of its enforcement. The defense is therefore legally inappropriate and fails to address the actual discrimination alleged.

Furthermore, the City Manager Buddenhagen has acknowledged that City policies are flexible and subject to change at any time: "encampment regulations are reflected in municipal code provisions, administrative regulations, and resolutions that apply citywide and are subject to change." This authority was given to him by the Berkeley City Council via City Council Ordinance 7,935-N.S. Yet, the City is unwilling to modify them to prevent the aggravation of disabled BHU members.

### E. Failure to provide required written justifications

Federal regulations implementing Title II of the ADA require that a public entity justify a refusal to modify a policy. Specifically, 28 C.F.R. § 35.130(b)(7) mandates that such a determination must be made by "the head of the public entity or his or her designee after considering all resources available." The City's denial emails lack the requisite detail and authority. They do not

demonstrate consideration of resources, operational constraints and less restrictive alternatives. They are conclusory statements, not the reasoned, individualized justifications the law demands.

Even public records requests have not yielded the required documentation that demonstrates consideration of resources, operational constraints and less restrictive alternatives. The records custodian has simply released the same email threads of each accommodation request as responsive records.

## F. Failure to provide a meaningful and impartial appeal process to the ADA

The investigator hired by the City, Chris Evans, is not a neutral third party. Rather, he acts as an advocate hired to exonerate the City of fault, not to impartially investigate ADA failures.

Public records reveal that ADA Coordinator Thomas Gregory emails Evans before a grievance is even filed to signal a "problem will be surfacing," demonstrating a pattern of pre-emptive coordination to shield the City from accountability, even in cases of clear ADA violations.

Therefore, without judicial intervention, BHU members don't even have a fair process to appeal any wrong doing caused by the City.

## G. Admissions of unworkable and discriminatory policy

The City is enforcing a policy it knows is impossible to comply with, making enforcement inherently discriminatory against unhoused individuals and not viable for any human habitation.

- ADA Coordinator Thomas Gregory has admitted the 9-square-foot footprint is not feasible for any human.

43

- HRT Lead Peter Radu has told encampment residents and the media that there is not a
  tent that exists with those dimensions (3 ft. x 3 ft.).

This admission proves the City is not enforcing a reasonable public space regulation but
is using a known impossibility to justify the removal of people and property.

The City's own draft "Good Neighbor" policy and public statements reveal that its
enforcement strategy is disconnected from viable alternatives.

The City's draft of their "Good Neighbor" policy states: "Please try to stay to one
sidewalk side of the street. Our sidewalks are for everyone's use. Blocking sidewalks on both
sides of the street prevents people from safely walking to catch the bus or get to work, so please
try to keep one of the two sidewalks on every street clear. To help assist with this, the City can
work with you to schedule a clean-up in your area. For help with this or to discuss shelter
options, please call the Homeless Response Team at 510-529-5376."



*A diagram displaying how the Good Neighbor Policy works in Berkeley at Council member Terry Taplin's website:* [https://www.terrytaplin.com/priorities/homelessness/](https://www.terrytaplin.com/priorities/homelessness/)

HRT Lead Peter Radu conceded that permanent supportive housing ("Home Key") is the only proven solution, stating "I think with respect to Home Key, that's permanent supportive housing. And we've known through just decades of research that that is the most successful way to end homelessness for people who are chronically homeless with disabilities. So I think we knew going into that intervention that it was set up for success. With respect to the non-congregate interim, in other words, shelter motel that we've used." Sept. 16, 2025 presentation to Council - Peter Radu

Homelessness Coordinator Josh Jacobs, in the same presentation, acknowledged the systemic cause: "As more and more people land on our streets amidst the shortage of shelter and

affordable housing, many of them wind up in the encampments. These encampments, well-born of necessity, when people have nowhere else to go, nonetheless frequently pose very serious health and safety risks, both to the people living in them, as well as the surrounding community. And we know from research that simply living outside increases one's mortality by years." Sept. 16, 2025 presentation to Council - Josh Jacobs

Mayor Ishii concluded the September 16, 2025, special council meeting, with no opposition from any council members to accept the report on the state of homelessness, by affirming the fundamental problem:

*"It doesn't matter how you feel about the issue of homelessness, you know what is really important, I think what we can all agree on is that we need places for people to go."*

The City admits its shelter and housing resources are insufficient, that its 9-square-foot rule is physically unlivable, and that living outdoors is deadly. By continuing to enforce this impossible standard without providing the "places to go" it acknowledges are needed, the City is not managing public space—it is systematically discriminating against a disabled population by punishing them for circumstances it has helped create and cannot resolve.

## H. Unclean Hands: Creating a public health crisis to justify abatement

The City's plea to dissolve the injunction rests on an asserted "public health and safety crisis" at the Harrison Corridor. This argument is not merely exaggerated—it is a bad-faith fabrication. The evidence demonstrates that the conditions cited by the City are the direct and foreseeable result of its own deliberate actions and refusal to cooperate, undertaken to manufacture a pretext for abatement and avoid its ADA obligations.

1. The City Systematically Dismantled Sanitation Infrastructure and Sabotaged Clean-Up Efforts

Active Creation of Hazard: On June 4, 2025, the City removed the encampment's dumpster and has since refused to restore it. This action directly created concentrated waste piles and ideal rodent harborage, violating the City's own rodent abatement guidance.

Enforcement of Failure: HRT supervisor Okeya Vance instructed residents to place garbage on the road for pickup. The City then failed to collect it, allowing the sanitation crisis it engineered to visibly fester.

Impossible Compliance: The City reduced reliable, coordinated weekly clean-ups to random, unscheduled pickups once or twice a month, targeting only "illegal dumping" piles while refusing to disclose the schedule to BHU or residents. This policy makes coordinated community hygiene impossible, guaranteeing perpetual non-compliance.

2. The City Misattributes Public Health Risks to Evade Responsibility.

The Leptospirosis Case: The City has implied a public health threat from a dog infected with leptospirosis. However, that dog was lost for several days and returned sick. The City has no evidence the infection occurred at the encampment unless it tracked the dog by GPS for all his whereabouts. In a responsible, good-faith response, Berkeley Pawfund—not the City— vaccinated all camp dogs on December 11, 2025, and again on January 12, 2026, to contain potential spread of the disease.

Rodent Burrows: The rodent activity cited by the City occurs primarily on adjacent business property behind fences, areas covered by City-issued encroachment permits. The City has always had the authority and access to address this but has chosen not to.

3. The City Rendered Community Good Faith and Appeal Rights Meaningless

Despite residents' extraordinary efforts—including removing over 3,000 pounds of trash before a January 22, 2025 abatement appeal hearing—the City's process was a sham. The hearing officer's determination was preemptively conditional, stating abatement would proceed if any hazards were found, thereby nullifying the community's proven ability to remediate conditions.

This stands in stark contrast to BHU's successful partnership with Urban Compassion Project, which removed over 25,000 pounds of trash in four hours, proving that public health hazards are addressable through cooperation, not displacement. **(Exhibit M)**

*I. Evidence of discriminatory enforcement and criminalizing poverty*

The City's true, discriminatory enforcement strategy is using code enforcement as a tool to harass and remove unhoused people, not to address genuine nuisances.

The City of Berkeley has adopted a new Encampment Policy Resolution that:

1. Affirms a "Housing First" approach but creates six broad health/safety exceptions (fire hazard, imminent health hazard, public nuisance, traffic danger, construction zones, utility interference) under which encampments can be cleared without offering shelter.
2. Prioritizes two encampments (Harrison Corridor and Second/Cedar area) for immediate enforcement, declaring they meet all six exceptions.
3. Describes an implementation process led by the Homeless Response Team (HRT) that emphasizes outreach, notice, and collaboration with service providers, while reserving the right to use enforcement (citation, arrest, hardscaping) as a last resort.

Crucially, across 127 pages of policy, ordinance, and implementation memo, there is *no* detailed protocol, requirement, or dedicated resource for providing *reasonable modifications* or *accessible accommodations* for people with disabilities during any stage of this process.

In the aftermath, barriers to recovery are compounded.

Scenario: A resident with a mobility disability has their customized walker and bag of prescription medications stored per AR 10.1. To retrieve them, they must call 311, schedule an appointment during weekday business hours, and travel to the Corp Yard.

Policy Gap: AR 10.1 has no special provisions for medical equipment or medications. The retrieval process assumes a level of executive function, communication ability, and mobility that the person may not have.

Result and harm: The person cannot navigate the bureaucratic process. They lose their mobility aid and medications, which may be life-sustaining. Their disability is worsened, and their path back to stability is destroyed. This constructively denies them access to their own property due to their disability.

*Evidence of a large, vulnerable disabled unhoused population in Berkeley*

- City's Own Data: The report to the Alameda County Continuum of Care (pp. 71-72) includes a chart showing extremely high rates of self-reported disabling conditions among residents of the Harrison Street encampment compared to the broader Berkeley homeless count.

  - Mental Health Condition: 86.2% (Harrison) vs. 62.3% (Berkeley overall)

  - Chronic Health Condition: 82.8% vs. 30.6%

  - Substance Use Condition: 79.3% vs. 41.4%

  - Physical Health Condition: 65.5% vs. 33.1%

The City's own data proves it is dealing with a population with profound, co-occurring disabilities. Any policy applied to this population without embedded disability accommodations is, by design, discriminatory and will cause severe harm.

94% of HRT clients report having a disability, compared to just 60% of those in the Alameda County PIT count. • Mental health disorders are reported by over 80% of HRT participants, more than double the county rate (35%). • Substance use disorders affect 62% of HRT clients, compared to only 29% countywide.

1. <u>**HRT participants are far more vulnerable than Alameda County's homeless population overall**</u>

<u>*Figure 1:*</u>



Figure 2: Disabled people in Berkeley is higher than rest of Alameda County - from May 12, 2025 city report "New Homeless Response Team Mission and Performance Data Report" from City Manager Paul Buddenhagen to City Council

On September 16, 2025, during a presentation of the state of homelessness in Berkeley to City Council, city staff admitted there is a rising trend of people with disabilities on the street. Homeless Coordinator Josh Jacobs said:

*"We're also seeing rising rates of residents with acute disabilities, and these residents often wait the longest for supportive housing because of such limited accessible housing stock."*

Furthermore, Mr. Jacobs also emphasized Berkeley's commitment to Housing First approach:

*"And unlike many other localities who in the wake of the Supreme Court's ruling on grants pass have begun running a race to the bottom that pretends jail cells can substitute for permanent housing, Berkeley remains committed to resolving encampment homelessness at its root cause by bringing people off the street. That's why 80% of private interim shelter offers we make when coupled with an encampment closure that avoids citation and arrests are accepted and why two-thirds of the people served by the Homeless Response Team move into permanent or interim housing."*

But in practice, the City is not following its own guidance nor Housing First policy.

In essence, a policy that treats a population with a 50-70% disability rate as if disability is a rare exception is a policy that is almost guaranteed to discriminate. To be lawful and just, accommodations cannot be an afterthought; they must be the core operating system of the encampment response.

**IV. Conclusion and request for relief**

The documented exchanges reveal an interactive process in name only. What has occurred is not a good-faith dialogue but a one-sided formality in which the City presented predetermined denials, refused to grapple with individual medical needs and declined to propose feasible alternatives.

As a result, the process has failed to identify a single reasonable accommodation for any BHU member, leaving each at imminent risk of irreparable harm—including medical crisis, psychiatric decompensation and even death—from the City's planned enforcement actions.

Plaintiffs therefore respectfully request that the Court:

1. Find that the City has failed to engage in a lawful interactive process under Title II of the American Disabilities Act.

2. Order the City to immediately engage in a meaningful, good-faith interactive process that is supervised by the Court, which must include:

   a. A judge that oversees the interactive process meetings.

   b. Individualized, written assessments of each BHU member accommodation requests.

   c. Direct responses to the specific policy modifications sought, not deflections to other programs and misapplications of the "fundamental alteration" defense.

   d. Written counter-proposals for alternative accommodations if a request is denied.

3. Enjoin the City from conducting abatement actions against disabled BHU members at the encampment—including those beyond the City's narrow list of eight—until a lawful interactive process is complete and all granted accommodations are implemented.

Dated: January 13, 2026                              Respectfully Submitted

/s/ Anthony Prince