UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
                            --oOo--

BERKELEY HOMELESS UNION,    ) Docket No. 3:25-CV-01414-EMC
ET AL.,                     )
                            ) San Francisco, California
              Plaintiffs,   ) January 13, 2026
                            ) 2:45 p.m.
         v.                 )
                            )
CITY OF BERKELEY, ET AL.,   ) Re: Motion hearing
                            )
              Defendant.    )


          TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS
           BEFORE THE HONORABLE EDWARD M. CHEN
              UNITED STATES DISTRICT JUDGE

APPEARANCES (via Zoom):

For the Plaintiff:     LAW OFFICE OF ANTHONY D. PRINCE by
                       MR. ANTHONY DAVID PRINCE
                       2425 Prince Street, #100
                       Berkeley, CA 94705

For the Defendant:     CITY OF BERKELEY by
                       MR. MARC AARON SHAPP
                       MS. NUBYAAN SCOTT
                       2180 Milvia Street
                       Berkeley, CA 94704




Remotely Reported by:  JENNIFER COULTHARD, CSR, RMR, CRR, CRC
                       United States District Court
                       Official Court Stenographer
                       501 I Street, Suite 4-200
                       Sacramento, California 95814
                       Jennifer_Coulthard@Yahoo.com
                       (530)537-9312

Proceedings reported via mechanical steno - transcript produced
via computer-aided transcription.

PROCEEDINGS

P R O C E E D I N G S

--oOo--

(In open court via videoconference:)

THE CLERK: Court is now calling the case Berkeley Homeless Union, et al. versus City of Berkeley, et al., Case Number 25-1414.

Counsel, please state your appearance for the record beginning with the plaintiff.

MR. SHAPP: Your Honor, Marc Shapp for the City of Berkeley defendant.

MS. SCOTT: Your Honor, good afternoon. My name is Nubyaan Scott on behalf of the City of Berkeley.

THE COURT: All right. And what about for the plaintiffs?

MR. SHAPP: Your Honor, I received two emails, rather cryptic, from counsel for Berkeley Homeless Union that seem to suggest that the attorney and maybe his client are in the attorney lounge in the courthouse.

THE COURT: Okay. Well, that's a bit of a problem. Can you -- Vicky, can you email them and see whether they can -- is there a computer up there?

THE CLERK: Usually they bring their own. I don't know there's actually ones there.

THE COURT: I don't know if there is one.

PROCEEDINGS

Why don't you email them, and tell them we're on Zoom and --

Oh. We have a raised hand. Ms. Prado raised her hand.

THE CLERK: That case is not being heard today, Your Honor.

THE COURT: All right.

MR. SHAPP: Your Honor, Ms. Prado is the representative for Berkeley Homeless Union, so that may be the plaintiffs' attempt to --

THE COURT: All right. Well, we should admit her, Vicky, and then send an email to Mr. Prince. Oh. Here they are.

MR. PRINCE: Your Honor, can you hear me? This is Anthony Prince.

THE COURT: Yeah, I can hear you.

MR. PRINCE: I apologize. I was under the impression that we were going to be in the court, and so I'm here with Ms. Prado, and so we're up in the lounge and we're able to gain access so ...

THE COURT: Good. Good, good, good. I just asked Vicky to email you to see if you can get on Zoom, and here you are, so that's good.

MR. PRINCE: Can you see me, Your Honor?

THE COURT: Yeah, I can see you, and I can see

PROCEEDINGS

Ms. Prado. Thank you.

MR. PRINCE: Yeah. Take these other glasses off so you can see me again.

THE COURT: All right. All right. I don't want to get into, you know, each situation and who's responsible and who's less cooperative than the other.

It seems to me what we need to do now, now that we have the City's response and we have the requests that have been made -- I understand there's a little bit of unclarity perhaps on the edges, but I think I just have to adjudicate this whether or not the ADA requires certain accommodations or not. And there tend to be certain patterns. There's a question about, you know, being told where one could relocate, for instance, whether it's a map, whether it's a list, whether one could keep their RV in a 72-hour zone, whether one can get physical help in moving stuff, whether one can keep a tent that's bigger than the not -- so there are recurring issues, and I just need to resolve these and whether or not the refusal to accommodate those requests are consistent with or violate the ADA.

I think we've spent enough time now going back and forth. I was hoping something would get resolved, but apparently, you know, a little was resolved, and so I need to adjudicate this thing, and I think this is adjudicatable on a summary judgment, maybe a cross-motion for summary judgment.

PROCEEDINGS

So my proposal and what I'm going to suggest, I may well order, is that we set up cross-motions for summary judgment on the issues that you have raised in this very lengthy status report filing that should turn into legal briefing. Here's the City's willingness to X, here's what the plaintiffs require and I can -- I'll just adjudicate.

But if I do this, I'm also going to indicate in my order setting forth the schedule certain pieces of information I am interested in that I want the parties to address, some factual questions. So that's what I propose to do. I think we ought to do it sooner rather than later.

I will clarify -- I'm not sure I understand. You know, there's all this -- I understand there's this new disease and stuff that's going on. My injunction, as it exists, only protects the eight people at most, so I don't know what's going on with everybody else, but I did not enjoin the City with respect to other folks.

MR. SHAPP: Yes, Your Honor, but we cannot -- as the declaration from the public health officer sets out, we cannot address this disease outbreak unless everybody is required to leave the area. Any remaining tents, structures or RVs pose essentially a reservoir for these infected rats. And this is a brand-new issue. It's the issue that we were trying to protect against last year when we issued the notice to vacate last December -- last January, and now it has arisen. There is now

PROCEEDINGS

a disease outbreak among the rats --

THE COURT: Well, so you're saying that even if there's only two people left, it's just as dangerous if there were 30 people there?

MR. SHAPP: Well, just as dangerous -- Your Honor, yes. I mean, that is what the declaration from the health officer sets out. Unless the rat burrows can be entirely eradicated, this disease -- there's not an effective away to control the spread of this disease, and that requires the removal of all persons encamped in the area.

MR. PRINCE: Your Honor, could I address this?

THE COURT: Yeah.

MR. PRINCE: Yeah. Well, first of all, the City, itself, is the chief contributor to what they're now terming a health crisis because on June 4th they took the dumpster out of there the same day that they did the raid. They have refused to bring it back all these months, though we have repeatedly -- it's in the record, Your Honor. We have photographs. The residents had to put their stuff in plastic bags. The rats got at the plastic bags. We have repeatedly been -- they have refused to bring that back and they helped -- that is the chief reason. It's also my understanding that they're exaggerating -- that the burrows and where the rats are, are primarily on the other side. They're not actually in the area defined as the Eighth and Harrison encampment, but there's no

PROCEEDINGS

doubt that the failure -- the affirmative removal -- that that was part of their idea -- their attempt or successfully, for the most part, to clear people out of there on June 4th was to take that dumpster out of there.

We brought that up in the very first in-person interactive process meeting. We said can they bring the dumpster back, and they have refused.

We have numerous photographs over an extended period of time. People had to put up a sign. People had to contact different individual representatives of the City: Please come and pick up these bags. And in any event, in the past there has been remediation of those hazards without the displacement or at least the people can temporarily be out of the area if there has to be a cleaning. We've done that before. The union, itself, has done numerous cleanings, especially since June when the City has reduced its sanitation service and removed that dumpster without putting it back.

So if they're going to do that -- and we can -- the dogs, by the way, that they're also complaining about have been vaccinated. We have documents to show it, and Ms. Prado's status report that we got in -- and Ms. Prado was the chief author -- addresses that issue. We can provide documentation for that. So if they need to do a cleaning, maybe they do. They helped create this or substantially have exacerbated it to the degree it existed. And so, if they need to do that, we

PROCEEDINGS

want assurances that either people will be allowed to return or, as they said they would do -- as they said they had on June 10th at the hearing, there's other places in the City where they can be, where people can go and that apparently they've backed off of that position now claiming no such thing, even though there is no city-wide camping ban.

So either -- either -- we're not against whether it's keeping the area clean. We've been the ones impacted and trying to keep the area clean. It's a vastly reduced encampment -- there's only a handful of people left in there -- and the -- and so that's our position.

I agree that the issue of the accommodations ought to be adjudicated, and I think that the Court has indicated the path to go. But, as far as this situation that there are orders protecting the handful that are protected by the order that we want assurance that they're either going to be -- identify where we can go or where they can go and whether they return or not, they'll be allowed to return.

We said this from day one, Your Honor, when they sat in court and said we have places where people can go in response to your question. Give us the list. And they refused to give us the list. We got our own list. There's a hundred vacant properties, lots, buildings and other residential and commercial buildings, government buildings. 50 percent of the hundred or so properties that we found are simply vacant lots

PROCEEDINGS

that are just sitting there empty. So, I think the idea that our people need to be protected and that they -- if we have to have a cleanup, they ought to bring back that dumpster if people are going to return to that camp or they should be able to go someplace else where they can continue to get the medical and get the -- all the other things that they're getting there and have been getting there for years.

MR. SHAPP: Your Honor, if I may respond to some of the points that Mr. Prince raised.

THE COURT: Well, I'm not adjudicating this thing. I'm here --

MR. SHAPP: I understand, Your Honor.

THE COURT: No. No. We're going to set it. I'm the judge. We're going to set it. We're going to cross -- here's what we're going to do: We're going to resolve this by summary judgment. If you want to bring a motion to resolve the injunction, you can do that. You have to bring that by motion. But, I'm expediting summary judgment so we can get this thing closed one way or another.

MR. SHAPP: Your Honor, respectfully, that's not what the Court ordered when it ordered the injunction. The Court ordered that the injunction would continue until the interactive process was completed, absent further order.

We have presented evidence --

THE COURT: Well, it's not -- as far as I'm concerned,

it has not been completed. That's why I have to terminate this by adjudication, because it hasn't been completed.

MS. SCOTT: Your Honor, I just want to flag one issue that we haven't discussed yet.

I understand that the Court intends to move forward with motions for summary judgment, but I think the timeline needs to be adjusted to incorporate the fact that Mr. Prince has refused to participate in discovery, so if the -- at any -- in any fashion up to this point.

So, if the City is going to be severely disadvantaged by being required to move forward with the motion for summary judgment without having any access to discovery, that's going to cause quite an issue as far as justice.

THE COURT: Well, let me ask you. You've taken a final position on various things. You say it would represent a fundamental alteration of the program to, for instance, let somebody stay for more than 72 hours in an RV. What discovery do you need? It's your defense you're saying it would fundamentally alter. I don't care how big the need is. I don't care how disabled the person is. If it was fundamentally altered, you win.

MS. SCOTT: I can answer that question, Your Honor. So, Your Honor, I'd like to respond, Your Honor.

THE COURT: Go ahead.

MS. SCOTT: Thank you.

So, the ADA -- specifically, I can provide you the citation, but the ADA requires that a written statement be provided and that that written statement explain any operational issues, et cetera.

So, the discovery that would be connected to that is the discovery that Ms. Prado filed this morning when she was making allegations that the City hasn't provided any documentation that it actually did an evaluation, an assessment and actually assessed the operational impact, et cetera. So the City is not in a position to explain any of that. We would be constrained to the email record, which I don't think there's any precedent for. I don't think there's any precedent for --

THE COURT: Well, you can -- in support of your summary judgment motion, you can provide that operational plan and show why it's a fundamental alteration.

MS. SCOTT: Okay.

MR. SHAPP: Judge --

MS. SCOTT: Just to be clear -- I just have one follow-up question, Your Honor. Is it your position that the City should move forward with the motion for summary judgment with no discovery being -- we can't -- we can't demand any further discovery or any discovery?

THE COURT: Well --

MR. PRINCE: Judge, please.

THE COURT: -- part of your -- hold on. Let me talk.

PROCEEDINGS

MR. PRINCE: Okay.

THE COURT: Part of your response is a rule 56(f) or (e) or whatever it is, that you don't have sufficient discovery. Then you have to identify what the problem is, why you need that, why you can't respond to summary judgment.

MR. PRINCE: Could I now just quickly, Your Honor -- just a few minutes ago I responded to Chris Jensen, who is one of the Berkeley City attorneys, and he and I are talking about we were going to -- he seems amenable to having -- I suggested that we extend the discovery so that they could continue -- they can take the depositions of our people that we have been unable to pin down when they could be available and Ms. Prado was out of town. I couldn't get in there. I couldn't drive. I've been -- you know, our office is, you know, just restricted as you know and Mr. Jensen seems favorable to that. We're going to talk tomorrow morning about getting a limited extension of the February 5th cutoff and they can -- and we'll produce our people and we will take the depositions of theirs and the discovery issues can be resolved. And I would -- I would -- it's going to be a very short extension because -- so then we can, you know, conform to the requirements around a summary judgment, but this is simply not true that we've refused to engage in discovery. They know the reasons why that's -- why we haven't been able to do that, and there's a -- and we had a discussion with the Court and the discovery judge

just the other day who issued an order.  We're going to order you to respond to some of the discovery but it looks like we're going to have an agreed on order -- I thought we were -- to have a brief extension of it so the discovery can go forward.

THE COURT:  Well, I don't know what discovery remains, and I don't know how much is necessary for summary judgment. It seems to me, after reading this extensive briefing here, that you slotted in as part of your status conference, it's not evident to me what else you need, you know.  You've got the facts of the alleged limited participation by some of the plaintiffs, and then you've got the fact of why you can't do certain things like forward extended parking, why you can't help move certain things, why the tent is too large -- you can't accommodate a 10 by 12 -- why trying to find appropriate non-aggregate housing is beyond the scope and would fundamentally alter, why delaying the whole process even further would fundamentally alter the program.  You know, it seems to me you've briefed this.  You could almost take what you've just filed and make it into a summary judgment brief with some cites.  So, I'm puzzled, but, you know, we got to get this thing resolved and --

MR. SHAPP:  Your Honor, I don't have any more argument, but I do have a question, if I may --

THE COURT:  Yeah.

MR. SHAPP:  -- which is that the June 4th preliminary

injunction was based on a likelihood of success -- you know, showing of likelihood of success on the merits solely with regard to whether or not the interactive process had been completed.

The interactive process does not give rise to an independent cause of action, and it sounds like the Court is moving to the broader issue of the ADA compliance writ large and, in that sense, I'm asking if the Court intends to modify the preliminary injunction to go further than what was ruled on, on June 6th?

THE COURT: Well, it depends on how you construe it. I'm going to construe it to say that when I say completion of the ADA process -- of the interactive process, I mean a complete process to a complete resolution. And if it takes me ruling on summary judgment to resolve it, that's still within the ambit of the preliminary injunction.

So, the short answer, the preliminary injunction stays in place. If you want to dissolve it, move to dissolve it, go ahead and make your motion. Meanwhile, I'm setting forth a fairly expedited schedule, discovery or no discovery. The opening brief by defendant -- I'm going to do cross-briefing, not six briefs but four briefs, gang briefing.

Defendant's motion will be due January 29th. So, a word to the plaintiff. If there is some outstanding discovery to prevent any argument by the defendant that they are

PROCEEDINGS

hamstrung and can't fully brief this motion because of lack of discovery, you might want to obviate that and get your discovery going. You've still got a couple of weeks left.

The opposition brief by the plaintiff and its cross-motion will be due February 12th, two weeks thereafter. The defendant's reply in support of its motion in opposition to the plaintiffs' motion will be due the 26th of February. The reply to that will be due on the 5th. That's the plaintiffs' reply in support of its cross-motion. And we'll hold a hearing on March 20. I have to specially set that for -- we'll set that for 10:00.

MS. SCOTT: Is that in person or phone?

MR. PRINCE: Judge, are you going to issue a --

THE COURT: Yep.

MR. PRINCE: -- minute order?

THE COURT: I'm going to issue an order that sets this all forth and I know there are a lot of parties, but I want to comply with the limit, the 25-page limit. And the best way to handle that, frankly, is that there are like five recurring issues. You know, you don't have to go each one. I mean, they're similar issues, they repeat. So, the whole question about the vehicle, the whole question about helping people and finding -- giving some leads or some okay where to go, helping people physically move or not, finding non-congregant housing or not, those are the kinds of things that keep coming up, and

PROCEEDINGS

I'm going to have to rule whether that -- those kinds of accommodations are not reasonable or reasonable, whether they fundamentally alter the program or not.

MR. PRINCE:  Okay.

THE COURT:  We've got to come to a resolution one way or the other and then, you know, once that's decided, that's when the injunction will finish.  There may not be an injunction at that point or a very limited injunction saying:  Here are the four things you've got to do or whatever.  I don't know yet.  I have to see your briefs.

So, I'm going to set forth an order with this schedule with specific instructions, and I have some questions that I'm interested in.  If you have facts that you can set forth, it would be maybe helpful to the Court, but I'll be very specific about that.

MR. PRINCE:  Okay.

THE COURT:  All right?

MR. PRINCE:  All right.  Thank you, Judge.

THE COURT:  Then I will see you on March 20th.

MR. PRINCE:  Yes, sir.

THE COURT:  All right.  Thank you.

(Concluded at 3:06 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

_____                    January 16, 2026
JENNIFER L. COULTHARD, RMR, CRR                          DATE
Official Court Reporter