# Exhibit "A"

## Fw: REQUEST: Disability Accomodation for Lewanda Parnell

From:  Anthony Prince (princelawoffices@yahoo.com)

To:  yesica.prado13@gmail.com; robbiepowelson@gmail.com; mnunez@dralegal.org; ahenson@wdwg.org

Date:  Monday, January 5, 2026 at 11:29 PM PST

See below what I wrote to this hypocrite.

Yahoo Mail: Search, Organize, Conquer

----- Forwarded Message -----
**From:** "Anthony Prince" <princelawoffices@yahoo.com>
**To:** "Buddenhagen, Paul" <PBuddenhagen@berkeleyca.gov>

**Sent:** Mon, Jan 5, 2026 at 11:24 PM
**Subject:** RE: REQUEST: Disability Accomodation for Lewanda Parnell

The health and sanitation issues were not helped by the City's removal of the dumpster during the June 4 raid on the encampment and the refusal of the City to bring it back thereby forcing the residents to pile up plastic garbage bags that drew the rats who chewed through them. There's plenty of evidence already in the record on this and we are not going to let you forget it.

Yahoo Mail: Search, Organize, Conquer

On Mon, Jan 5, 2026 at 9:40 PM, Buddenhagen, Paul
<PBuddenhagen@berkeleyca.gov> wrote:

Dear Berkeley Homeless Union,

As of the date of this correspondence, the City has received no response to the ADA Coordinator's December 16 email and has not received any additional information clarifying Ms. Parnell's current needs or proposing a relocation timeline, despite the parties' agreement that BHU would follow up with such information. Based on the information provided during the December 8 interactive process meeting and in prior correspondence, the City has completed its review of Ms. Parnell's accommodation requests under Title II of the ADA. The determinations below reflect the City's good faith consideration of those requests in light of the City's obligation to provide reasonable modifications where required, while also maintaining public health, safety, and accessibility. The City has carefully considered the accommodation requests submitted on Ms. Parnell's behalf and has consulted with relevant staff across City departments to assess the feasibility of each request in light of her reported disabilities and the City's obligations under Title II of the ADA. As background, the interactive process concerning Ms. Parnell's requests has been ongoing since January 2025.

Before addressing the individual requests, we want to provide important recently discovered information regarding the public health conditions at the Harrison Street encampment. Alameda County recently trapped approximately 40 rats in the area and, after testing, advised the City that leptospirosis is present among the rat population and at

least one dog. Leptospirosis is a contagious disease that poses a significant risk to both human and animal health. According to the County and the City's Public Health Officer, the most effective method to eradicate leptospirosis is the complete abatement of the encampment so that Vector Control can fully access and eliminate rats and their burrows. This response requires clearing the encampment in its entirety, including RVs, which can also harbor rats and related conditions. The County has already posted public notices in the area regarding the presence of leptospirosis.

Based on this guidance, not only will the Harrison Corridor need to be cleared but encampments will not be permitted to reestablish within one-third of a mile of the existing site. The City intends to provide notice prior to undertaking this action. The City acknowledges that the Court may rule otherwise and the City intends to fully comply with all Court orders. The City considered possible alternative accommodations where practicable, consistent with its obligations under Title II of the ADA II and its responsibility to maintain public health, safety, and accessibility. Below are the City's responses to Ms. Parnell's requests:

### Request #1 Permission to Retain Customized Tents
The City has consistently stated that it is willing to work with Ms. Parnell to retain her customized tents during an abatement action, provided that a mutually agreed upon relocation plan and timeline are established. However, despite repeated requests, the City has not received a proposed relocation date or alternative timeline. Without such coordination, the City cannot operationalize this request.

Reasonable accommodation under the ADA does not require the City to indefinitely delay abatement activities or to implement accommodations that cannot be carried out due to the absence of logistical agreement. HRT remains willing to coordinate packing and storage of the tents once a relocation date is proposed, provided the tents do not present the health and safety hazards previously identified.

### Request #2 Ability to Remain at the Current Location
The City has carefully considered Ms. Parnell's request to remain at her current location, and through the interactive process has provided multiple extensions of time. After evaluating this continued request in light of newly confirmed public health conditions at the site, the City has determined that it cannot grant any further extensions. As explained above, Alameda County Vector Control has confirmed the presence of leptospirosis in the area, which requires a coordinated public health response that includes full clearance of the encampment so that City and County staff can access the site, eliminate rodent harborage, disinfect affected areas, and prevent further transmission. These procedures cannot be effectively or safely carried out if any individuals or structures remain in place.

Allowing continued occupancy under these conditions would fundamentally alter the City's encampment management and public health response programs, which are designed to enable timely, sitewide intervention when emergent health hazards are identified. The City's Public Health Officer believes that the health and safety risks associated with leptospirosis cannot be adequately mitigated through partial abatement or by permitting individual exceptions; the area must be fully cleared, cleaned, and maintained to address the hazard.

The City intends to provide notice prior to undertaking any abatement action and acknowledges that the Court may rule otherwise. The City will fully comply with all applicable court orders. This determination reflects the limits of what the City can provide

as a reasonable accommodation under the ADA and does not reflect a lack of consideration for Ms. Parnell's disability-related needs.

**Request #3 Designated ADA-Compliant Space (Outdoor or Indoor)**
Ms. Parnell requested that the City either identify a designated outdoor location where she may remain or provide access to an indoor, non-congregate space. The City reiterates that it does not maintain sanctioned encampment areas and that its encampment regulations are reflected in municipal code provisions, administrative regulations, and resolutions that apply citywide and are subject to change. The City's encampment-related requirements are established through a combination of municipal code provisions, administrative regulations, and City Council resolutions, all of which are subject to change based on public health conditions, safety concerns, and legal requirements. Park rules prohibit overnight camping and unattended property exceeding ten square feet without a permit. The Berkeley Municipal Code and Administrative Regulation 10.2 generally prohibit structures exceeding nine square feet on sidewalks and also prohibit lodging or storage of property on medians and within City building curtilage.

In limited circumstances, individuals may remain on certain sidewalks with property not exceeding nine square feet, provided pedestrian access is maintained, facilities are not obstructed, and the location is not designated as a no lodging area. Even in those circumstances, all individuals remain subject to enforcement based on health and safety impacts, nuisance conditions, and compliance with applicable law. Because enforcement determinations are location-specific, condition dependent, and responsive to changing circumstances, it is not possible for the City to identify locations where camping would be categorically free from enforcement.

With respect to indoor non-congregate space, the City maintains that housing is not a form of reasonable accommodation under the ADA. However, once a shelter or housing placement is offered through the City's Homeless Response Team, the City is obligated to consider reasonable accommodations related to the shelter environment itself. Ms. Parnell is encouraged to engage with HRT to clarify specific accessibility needs so that such modifications may be evaluated if a placement becomes available.

**Request #4 Temporary Suspension of Enforcement**
As discussed above, the City has already provided multiple extensions of time to relocate. An open-ended suspension of enforcement would prevent the City from carrying out its public health and safety responsibilities and would constitute a fundamental alteration of its programs. The City remains willing to coordinate packing assistance and storage once a relocation date is proposed, consistent with its existing practices.

To the extent the request seeks an indefinite pause on enforcement at the current location, the City cannot grant that request. Allowing an individual to remain in place notwithstanding the need to abate conditions associated with confirmed leptospirosis would require the City to suspend or override the need for a timely abatement to control vectors and prevent the spread of communicable disease, which is a fundamental part of its encampment management and public health response programs. Such a modification would fundamentally alter the nature of those programs, which are specifically designed to enable prompt intervention when encampments pose imminent risks to public health and safety.

An open-ended suspension of enforcement in these circumstances would also prevent the City from carrying out required vector control measures and would undermine its ability to

respond consistently to emergent health hazards across the public right-of-way. The City's actions are consistent with City Council Resolution No. 71,513-N.S., which authorizes enforcement and abatement where encampments present imminent health hazards, even when shelter is not immediately available. Any abatement will proceed with notice consistent with applicable court orders.

**Request #5 Physical Assistance with Relocation**
The City recognizes Ms. Parnell's physical limitations and the risk of injury associated with lifting and transporting belongings.  Under ordinary circumstances, and consistent with its existing practices, the City offers assistance limited to packing, lifting, and transporting eligible items for purposes of utilizing the City's storage program, provided such assistance is scheduled in advance through HRT. However, due to the confirmed presence of leptospirosis and related vector activity at the site, public health officials have advised that wet, muddy, or contaminated items should not be handled or stored, as doing so may create conditions that allow bacteria to persist and spread. As a result, the City may be required to limit storage to items that are dry and otherwise safe to handle, and certain items may not be eligible for storage during this abatement. Because this is a developing public health situation, the City encourages Ms. Parnell to contact HRT after a new abatement notice is provided to discuss what storage options, if any, may be safely available at that time based on public health guidance and operational capacity.

More broadly, the ADA does not require public entities to provide personal services or individualized assistance as a reasonable modification. Requiring City staff to provide hands-on assistance to pack, lift, and move belongings to an undetermined location that is not connected to a City program or service would constitute a personal service beyond the scope of Title II obligations and would fundamentally alter the nature of the City's encampment response by transforming it into an individualized moving service unrelated to access to a City program or benefit. For these reasons, the City cannot grant a request for staff-assisted relocation to a non-shelter location.

This constitutes the City's final determination regarding the accommodation requests submitted on Ms. Parnell's behalf. If Ms. Parnell disagrees with this determination, she may choose to file a grievance through the City's ADA grievance process : https://berkeleyca.gov/sites/default/files/documents/ADA%20Grievance%20Procedure%20and%20Form%20-%20updated%20Feb2024%20-%20WCAG-compliant.pdf

Sincerely,
Paul Buddenhagen



**Paul Buddenhagen** *(he, him)*
City Manager, City of Berkeley
pbuddenhagen@berkeleyca.gov | W: (510) 981-7016
berkeleyca.gov | 2180 Milvia St. Berkeley, CA 94704

*Follow the City of Berkeley: Web | BlueSky | Instagram | LinkedIn*

## RE: REQUEST: Disability Accommodation for Merced Dominguez

From: Buddenhagen, Paul (pbuddenhagen@berkeleyca.gov)

To:      berkeley.homeless.union@gmail.com; princelawoffices@yahoo.com; princeanthony1954@gmail.com

Cc:      CJensen@berkeleyca.gov; MShapp@berkeleyca.gov; LMattes@berkeleyca.gov; NScott@berkeleyca.gov;
         yesica.prado13@gmail.com; ggilmore462@gmail.com; robbiepowelson@gmail.com; ahenson@wdwg.org;
         TGregory@berkeleyca.gov

Date:   Tuesday, January 6, 2026 at 10:17 AM PST

Dear Ms. Prado and Mr. Powelson,

Thank you for meeting with the City's ADA Coordinator and Deputy City Attorneys on December
19, 2025, on behalf of Ms. Dominguez, who did not attend. As you are aware, the interactive
process regarding Ms. Dominguez's requests has been ongoing since January 2025. However,
the City has not communicated directly with Ms. Dominguez at any point during this period. Ms.
Prado has responded on her behalf to the numerous emails we have sent in this past 11 months.
Despite our repeated attempts to schedule an in-person meeting with Ms. Dominguez, she has
never attended. Instead, Ms. Prado and Mr. Powelson attended in her place. Nevertheless, the
City has carefully considered the requests submitted for Ms. Dominguez and has consulted with
relevant departments and staff across the City to assess the feasibility of each request in light of
her reported disabilities and the City's obligations under the ADA.

Before addressing the individual requests, we want to provide important recently discovered
information regarding the public health conditions at the Harrison Street encampment. Alameda
County recently trapped approximately 40 rats in the area and, after testing, advised the City that
leptospirosis is present among the rat population and at least one dog. Leptospirosis is a
contagious disease that poses a significant risk to both human and animal health. According to
the County and the City's Public Health Officer, the most effective method to eradicate
leptospirosis is the complete abatement of the encampment so that Vector Control can fully
access and eliminate rats and their burrows. This response requires clearing the encampment in
its entirety, including RVs, which can also harbor rats and related conditions. The County has
already posted public notices in the area regarding the presence of leptospirosis.

Based on this guidance, not only will the Harrison Corridor need to be cleared but encampments
will not be permitted to reestablish within one-third of a mile of the existing site. The City intends
to provide notice prior to undertaking this action. The City acknowledges that the Court may rule
otherwise and the City intends to fully comply with all Court orders.

The City considered possible alternative accommodations where practicable, consistent with its
obligations under Title II of the ADA. Below are the City's responses to each request submitted on
Ms. Dominguez's behalf:

1. **Request for an exemption from enforcement of the Vehicle Code provision allowing
   towing of vehicles more than six months past registration, to allow time to attempt to
   bring the RV into compliance, due to her financial constraints.**

   This request is based on financial limitations rather than a disability-related need. While the
   City sympathizes with Ms. Dominguez, this request does not constitute a reasonable
   accommodation under the ADA. Further, even if it were considered a disability-based
   request, granting an exemption from towing would result in a fundamental alteration of the
   City's parking enforcement program. The City's enforcement of California Vehicle Code
   provisions is designed to promote public safety, ensure access to limited on-street parking,
   facilitate street maintenance, and mitigate neighborhood impacts associated with long-term
   vehicle storage. In this instance, Ms. Dominguez's representative has indicated that the RV

has not been registered for over a year and requires a smog check to come into compliance. Exempting the RV from towing under these circumstances would undermine the purpose and application of these enforcement provisions and interfere with the City's ability to manage health, safety, and environmental impacts associated with unregistered and noncompliant vehicles.

2. **Request for an exemption from citation for expired registration due to financial limitations, to be considered concurrently with any towing exemption.**
This request is likewise based on financial hardship rather than a disability-related limitation and therefore is not a reasonable accommodation request. Even if analyzed as such, exempting a vehicle from citation for expired registration would constitute a fundamental alteration of the City's parking enforcement program. Registration requirements and related citations are essential tools for ensuring roadway safety, environmental compliance, equitable parking access, and neighborhood livability. Suspending citation enforcement for an individual vehicle would compromise these objectives and the City's ability to administer its parking and vehicle regulations in a consistent manner in the public's interest.

3. **Request to keep garbage cans outside the RV to maintain a clean area, potentially exceeding the 9-square-foot limitation under the Administrative Regulation 10.2.**
The City has considered the request for a reasonable accommodation from the Administrative Regulation 10.2 limitations on Temporary Noncommercial (TNC) Objects, including the request to allow a garbage container to remain on the sidewalk in excess of the 9-square-foot limit. Outside of designated TNC Prohibited Areas, Administrative Regulation 10.2 already permits individuals to maintain limited personal property on sidewalks, subject to uniform size, height, placement, and access requirements intended to preserve pedestrian accessibility, emergency access, and public safety. Those requirements, including the 9-square-foot footprint and related placement restrictions, are fundamental operational features of the City's sidewalk management policies and are designed to ensure that sidewalk use remains temporary and compatible with shared public access.

Granting an exemption from these limitations would require the City to modify a fundamental element of how it regulates sidewalk use citywide by authorizing a fixed or expanded use of the public right-of-way that is inconsistent with the design and nature of such policies. Such a modification would go beyond a reasonable adjustment to how a rule applies and would instead alter the fundamental nature of the City's sidewalk management framework, which relies on size-limited and easily movable objects to prevent obstruction, accumulation, and long-term storage in the public right-of-way. The ADA does not require a public entity to make modifications that would fundamentally alter the nature of a program or activity, and for this reason the City cannot grant the requested accommodation.
In addition, to the extent Ms. Dominguez chooses to remain within the Harrison Corridor, the City cannot permit garbage containers or other TNC Objects to remain on the sidewalk in that location. The Harrison Corridor has been designated as a TNC Prohibited Area to address documented public health, safety, and operational concerns in that corridor. The Harrison Corridor prohibition is intended to preserve accessible pedestrian travel, allow emergency and maintenance access, reduce accumulations that contribute to health hazards, and enable the City and County to address significant vector and sanitation issues.
Further, as explained previously, Alameda County has advised that leptospirosis is present among the rat population in the Harrison Corridor. The City's Public Health Officer has advised that effective mitigation requires complete clearance of the encampment and associated materials so that Vector Control can fully access and eliminate rats and their

burrows. Allowing the continued placement of garbage containers or other TNC Objects on the sidewalk in this corridor would directly interfere with those abatement efforts by reintroducing attractants and physical obstructions in an area that must be cleared to address an active public health risk.

To the extent Ms. Dominguez intends to remain in the Harrison Corridor, granting the requested accommodation would interfere with ongoing public health interventions directed by the City's Public Health Officer and would pose a significant risk to the health and safety of others. As described above, the presence of garbage and related accumulations in this area contributes to active vector conditions, including rat infestation and the spread of communicable disease. Allowing the requested modification would therefore perpetuate conditions that constitute a direct threat that cannot be eliminated through reasonable modifications. In addition, granting such an accommodation would fundamentally alter the City's ability to manage sidewalks and public rights-of-way in response to emergent health and safety conditions.

4. **Request for HRT assistance identifying programs through which Ms. Dominguez may access a housing navigator without entering shelter or transitional housing.**

    At BHU's request, the City attempted to identify housing navigation programs for which Ms. Dominguez may be eligible. The City has been advised that Ms. Dominguez already has a housing navigator through Abode Services. Her housing navigator provided the following information to the City, which differs materially from information shared by BHU:

    "Yes, I am Merced's Housing Navigator. My client doesn't have any housing voucher that I'm aware of. I just spoke with my client on December 22 and asked whether she told someone from the City of Berkeley that she has a housing voucher. She stated that she never told anybody that she has a housing voucher and does not know where that information came from. Regarding her housing status, my client has expressed very specific criteria. She wants to remain in the same area where she has lived for the past 10 years, which significantly narrows available housing options, but we continue to search and remain hopeful."

    Based on this information, Ms. Dominguez is already connected to housing navigation services, and the City does not have additional programs to offer beyond those services currently in place.

This constitutes the City's final determination regarding the accommodation requests submitted on Ms. Dominguez's behalf. If Ms. Dominguez disagrees with this determination, she may choose to file a grievance using the City's ADA grievance procedure:
https://berkeleyca.gov/sites/default/files/documents/ADA%20Grievance%20Procedure%20and%20Form%20-%20updated%20Feb2024%20-%20WCAG-compliant.pdf.

Please let us know if you would like confirmation once abatement notices are posted or if you have any procedural questions regarding the grievance process.

Sincerely,

Paul Buddenhagen



**Paul Buddenhagen** *(he, him)*
City Manager, City of Berkeley
pbuddenhagen@berkeleyca.gov | W: (510) 981-7016
berkeleyca.gov | 2180 Milvia St. Berkeley, CA 94704

*Follow the City of Berkeley: Web | BlueSky | Instagram | LinkedIn*

2/5/26, 1:46 PM

Case 3:25-cv-01414-EMC   Document 226   Filed 02/06/26   Page 10 of 29
Yahoo Mail - RE: REQUEST: Disability Accommodation for Ray Johnson & Vanessa Bichard

RE: REQUEST: Disability Accommodation for Ray Johnson & Vanessa Bichard

From: Buddenhagen, Paul (pbuddenhagen@berkeleyca.gov)

To: berkeley.homeless.union@gmail.com; princelawoffices@yahoo.com

Cc: MShapp@berkeleyca.gov; CJensen@berkeleyca.gov; LMattes@berkeleyca.gov; NScott@berkeleyca.gov; TGregory@berkeleyca.gov; sstephens@berkeleyca.gov; ACarter@berkeleyca.gov

Date: Monday, January 5, 2026 at 10:36 AM PST

Dear Berkeley Homeless Union,

I have reviewed the correspondence regarding Mr. Ray Johnson Jr., including the most recent email submitted on his behalf. As background, the interactive process concerning Mr. Johnson's requests has been ongoing since February 2025.

As an initial matter, the City notes that in its preliminary injunction briefing, the City expressly took the position that Mr. Ray Johnson was not among the individuals protected by the Court's injunction (Ms. Bichard was never included), and the Court agreed with the City's position. Accordingly, Mr. Johnson is not subject to the protections afforded by the preliminary injunction. The City further notes that, based on City records, and as appears to be consistent with information provided by Berkeley Homeless Union, Mr. Johnson no longer resides in the Harrison Corridor. To the extent he does not currently reside at that location, the accommodation issues discussed herein would not apply in any event. To the extent he does reside there, the City provides this information for completeness and clarity regarding the scope of applicable legal protections.

As an additional matter, to the extent the most recent communication raises requests that were not previously presented, the City will not accept or evaluate those requests. In both an in-person communication and your most recent email, BHU has expressly stated that it has not been in contact with Mr. Johnson, does not know his current circumstances, and cannot confirm whether he continues to seek accommodations related to the encampment. Under these circumstances, the City cannot meaningfully engage in an interactive process or assess disability-related needs based on speculation or outdated information. The ADA does not require the City to accept new or expanded accommodation requests from an advocate who has confirmed that they are not in communication with the individual on whose behalf the requests are made.

Accordingly, the City takes the position that no new requests are properly before it. Based on the record, the City further maintains that the interactive process concluded with the ADA Coordinator's prior written response dated July 21, 2025. That correspondence addressed the accommodation requests that had been presented at the time and reflected a good faith effort to engage in the interactive process based on the information available to the City. Because no further engagement occurred, and because BHU has confirmed that it lacks current information from Mr. Johnson, the City considers the interactive process closed as of that communication.

I have reviewed the ADA Coordinator's prior response and find it to be sufficient and compliant with Title II of the ADA. The City therefore incorporates that response in full and relies on it as the City's final position regarding the requests previously raised on Mr. Johnson's behalf. For clarity, the ADA Coordinator's response provided as follows:

The City has reviewed the letters provided by LifeLong's Ms. deBree regarding her professional opinion of, respectively, Mr. Johnson's disability-related limitations and Ms. Bichard's disability-related limitations. Ms. deBree stated that Ms. Bichard/Mr. Johnson would benefit from: (1) permission to keep their vehicle as shelter; (2) exemption from relocation requirements; (3) protection from vehicle towing or removal; (4) exemption from citation and arrest related to the abatement order; (5) placement in an ADA-compliant shelter; and (6) a designated ADA-compliant parking location.

With respect to permission to keep a vehicle as shelter, protection from vehicle towing or removal, exemption from relocation requirements, and exemption from citation or arrest, the City does not desire to cite or arrest anyone during its abatement actions and does not seek to take Mr. Johnson's vehicle away from him. The City does not tow vehicles that comply with posted parking restrictions and the California Vehicle Code, including requirements that vehicles be operable, not pose public health or safety violations, and have registration not more than six months out of date. Prior to any deep cleaning associated with an abatement action, the City posts signage identifying when temporary vehicle relocation may be required, and individuals must comply with that signage during the posted period.

With respect to a designated ADA-compliant parking location, the City does not provide designated parking spaces to residents or guests. Individuals with valid DMV-issued disability placards may park in ADA-designated spaces throughout the City, where time limits are not enforced. Parking time restrictions are not enforced for placard holders in those locations, although all vehicles must comply with applicable California Vehicle Code requirements regardless of disability status.

With respect to shelter options, housing itself is not a reasonable accommodation under the ADA. Individuals seeking shelter are directed to work with HRT staff, who can provide information regarding availability at City-sponsored motel rooms, non-congregate shelters, and congregate shelters, including ADA-compliant options. Once shelter is offered, individuals may request reasonable accommodations related to the shelter environment itself.

The City notes that it does not have current information confirming whether Mr. Johnson continues to reside at the Harrison Street encampment. However, to the extent that Mr. Johnson does still reside at or utilize that location, the City wishes to provide the following newly discovered and time-sensitive public health information, as it directly affects the City's obligations.

Alameda County recently conducted vector control operations in the Harrison Street area and trapped approximately 40 rats. Following testing, the County advised the City that leptospirosis is present among the rat population and at least one dog. Leptospirosis is a contagious disease that poses a significant risk to both human and animal health. According to Alameda County Vector Control and the City's Public Health Officer, the most effective

method to eradicate leptospirosis is complete abatement of the encampment so that vector control staff can fully access and eliminate rats, burrows, and associated environmental conditions. This response requires clearing the encampment in its entirety, including RVs and vehicles, which can also harbor rodents and related conditions. The County has already posted public health notices in the area advising of the presence of leptospirosis and associated risks.

Based on this guidance, the Harrison Street corridor will need to be cleared, and encampments will not be permitted to reestablish within one-third of a mile of the existing site. The City intends to provide notice prior to undertaking this action. The City acknowledges that the Court may issue orders affecting the timing or scope of this work and will fully comply with all applicable court orders.

This email constitutes the City's final determination on this matter. If Mr. Johnson disagrees with that determination, he may pursue the City's ADA grievance process in accordance with applicable procedures:
https://berkeleyca.gov/sites/default/files/documents/ADA%20Grievance%20Procedure%20and%20Form%20-%20updated%20Feb2024%20-%20WCAG-compliant.pdf.

Please let us know if you would like confirmation once abatement notices are posted or if you have questions regarding the grievance procedure.

Thank you,
Paul

**From:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
**Sent:** Friday, January 2, 2026 11:04 AM
**To:** Gregory, Thomas <TGregory@berkeleyca.gov>; Buddenhagen, Paul <PBuddenhagen@berkeleyca.gov>
**Cc:** Anthony Prince <princelawoffices@yahoo.com>; Shapp, Marc <MShapp@berkeleyca.gov>; Scott, Nubyaan <NScott@berkeleyca.gov>; Mattes, Laura Iris <LMattes@berkeleyca.gov>; Madagu, Ashley M. <ACarter@berkeleyca.gov>; Stephens, Sara <sstephens@berkeleyca.gov>
**Subject:** Re: REQUEST: Disability Accommodation for Ray Johnson & Vanessa Bichard

Hi Mr. Gregory and City Manager Buddenhagen,

I am writing to formally reiterate and elaborate on the request for reasonable accommodations under the Americans with Disabilities Act (ADA) for our union member, Ray Johnson Jr.

I am not in town at this moment to seek an update from Mr. Johnson or his partner, and I have not been successful in reaching them through other means. However, as I know we have a deadline, I wanted to ensure you receive this communication to continue his interactive process.

This request is made on the basis of his documented disabilities, which make compliance with standard abatement and relocation policies impossible without appropriate modifications.

Mr. Johnson lives with PTSD, Bipolar Schizophrenia, depression and anxiety. His mental health disabilities substantially limit major life activities, including thinking, communicating, caring for oneself, and interacting with others. Stability and a predictable environment are not merely preferences for Mr. Johnson, but they are medical necessities to prevent psychotic episodes, severe paranoia and emotional decompensation.

The City's enforcement actions—characterized by sudden displacement, loss of shelter, and punitive threats—are directly contraindicated by his psychiatric conditions. The stress of homelessness is exponentially worsened by the constant threat of losing one's last point of stability. For Mr. Johnson, the Harrison encampment has been his safe space, providing him with an environment surrounded by community and a semblance of routine that his disabilities require.

## RE: REQUEST: ADA Accommodation for Austin White

From:  Buddenhagen, Paul (pbuddenhagen@berkeleyca.gov)

To:    robbiepowelson@gmail.com; berkeley.homeless.union@gmail.com; princelawoffices@yahoo.com

Cc:    CJensen@berkeleyca.gov; NScott@berkeleyca.gov; LMattes@berkeleyca.gov; MShapp@berkeleyca.gov;
       sstephens@berkeleyca.gov; ACarter@berkeleyca.gov; TGregory@berkeleyca.gov

Date:  Friday, January 2, 2026 at 05:04 PM PST

Dear Ms. Prado and Mr. Powelson,

Thank you and Mr. White for meeting with the City's ADA Coordinator and Deputy City Attorneys
on December 17, 2025. We appreciate the considerable time, care, and thoughtfulness you
contributed to that meeting and your participation in the interactive process.

The City has carefully considered the accommodation requests submitted on Mr. White's behalf
and has consulted with relevant staff across City departments to assess the feasibility of each
request in light of his reported disabilities and the City's obligations under Title II of the ADA. As
background, the interactive process concerning Mr. White's requests has been ongoing since
April 2025.

Before addressing the individual requests, we want to provide important recently discovered
information regarding the public health conditions at the Harrison Street encampment. Alameda
County recently trapped approximately 40 rats in the area and, after testing, advised the City that
leptospirosis is present among the rat population and at least one dog. Leptospirosis is a
contagious disease that poses a significant risk to both human and animal health. According to
the County and the City's Public Health Officer, the most effective method to eradicate
leptospirosis is the complete abatement of the encampment so that Vector Control can fully
access and eliminate rats and their burrows. This response requires clearing the encampment in
its entirety, including RVs, which can also harbor rats and related conditions. The County has
already posted public notices in the area regarding the presence of leptospirosis.

Based on this guidance, not only will the Harrison Corridor need to be cleared but encampments
will not be permitted to reestablish within one-third of a mile of the existing site. The City intends
to provide notice prior to undertaking this action. The City acknowledges that the Court may rule
otherwise and the City intends to fully comply with all Court orders. The City considered possible
alternative accommodations where practicable, consistent with its obligations under Title II of the
ADA II and its responsibility to maintain public health, safety, and accessibility. Below are the
City's responses to your requests:

### Request: Exception to the 9-Square-Foot Sidewalk TNC Limit

Mr. White requested a modification of the Berkeley Municipal Code requirement that individuals
occupy no more than 9 square feet on the sidewalk, seeking permission to occupy a space
approximately 10x12 feet for himself and his two service dogs. The City also considered whether
a smaller space, modestly larger than nine square feet, could serve as a feasible alternative.
However, even a modest increase would still occupy a substantial portion of the sidewalk on
many City streets and could extend into the roadway, impairing ADA-required pedestrian
clearances, limiting emergency access, interfering with vehicle travel and parking, and
constraining the City's ability to manage public health and safety risks.

Granting an individualized exemption to allow a fixed structure larger than nine square feet would
constitute a fundamental alteration of the City's regulatory framework governing use of the public
right-of-way. Further, the ability to occupy a 9 sq ft area should not be understood as sanctioning
tents on City sidewalks.  The City's municipal codes and administrative regulations establish

citywide standards for sidewalk use that are designed to preserve accessible pedestrian travel, ensure emergency access, reduce health and safety hazards, and allow the City to manage competing uses of limited public space. These standards do not operate as a discretionary permitting system for sidewalk structures, such as tents, but as baseline rules that apply to all members of the public, regardless of housing status, and are implemented through a prioritization system focused on relative health and safety impacts.

Because granting this request would fundamentally alter the nature of the City's sidewalk management efforts and undermine its ability to maintain accessible, safe, and functional public rights-of-way, the City cannot grant this modification as a reasonable accommodation.

This constitutes the City's final determination regarding the accommodation requests submitted on Mr. White's behalf. If Mr. White disagrees with this determination, he may choose to file a grievance through the City's ADA grievance process https://berkeleyca.gov/sites/default/files/documents/ADA%20Grievance%20Procedure%20and%20Form%20-%20updated%20Feb2024%20-%20WCAG-compliant.pdflink.
Please let us know if you would like confirmation once abatement notices are posted or if you have questions regarding the grievance procedure.
Sincerely,
Paul Buddenhagen



**Paul Buddenhagen** *(he, him)*
City Manager, City of Berkeley
pbuddenhagen@berkeleyca.gov | W: (510) 981-7016
berkeleyca.gov | 2180 Milvia St. Berkeley, CA 94704

*Follow the City of Berkeley: Web | BlueSky | Instagram | LinkedIn*


**From:** Gregory, Thomas <TGregory@berkeleyca.gov>
**Sent:** Wednesday, July 30, 2025 9:27 PM
**To:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
**Cc:** princelawoffices@yahoo.com; Scott, Nubyaan <NScott@berkeleyca.gov>; Mattes, Laura Iris <LMattes@berkeleyca.gov>; Madagu, Ashley M. <ACarter@berkeleyca.gov>; Shapp, Marc <MShapp@berkeleyca.gov>; Stephens, Sara <sstephens@berkeleyca.gov>
**Subject:** Re: REQUEST: ADA Accommodation for Austin White

Hi BHU and Ms. Prado,

As there is a full video recording available to address the facts of what occurred during our in-person interactive process meeting with Mr. White, I will only state that you have mischaracterized the actions and conduct of City staff during the meeting. It is not productive to debate about what can be viewed on video, but I will say that City staff engaged in good faith with Mr. White and will continue to do so.

Next, I think it is important to address the most important part of the interactive process, which you left out—Mr. White's original requests. I appreciate that you have brought to my attention that several of the statements Mr. White made during the meeting were intended to be new

## RE: REQUEST: Disability Accommodation for Erin Spencer

From:  Buddenhagen, Paul (pbuddenhagen@berkeleyca.gov)

To:    berkeley.homeless.union@gmail.com; princeanthony1954@gmail.com; princelawoffices@yahoo.com

Cc:    MShapp@berkeleyca.gov; CJensen@berkeleyca.gov; LMattes@berkeleyca.gov; DWhite@berkeleyca.gov;
       NScott@berkeleyca.gov; ACarter@berkeleyca.gov; sstephens@berkeleyca.gov; TGregory@berkeleyca.gov

Date:  Tuesday, January 6, 2026 at 09:26 AM PST

Dear Ms. Prado and Mr. Powelson,

Thank you and Mr. Spencer for meeting with the City's ADA Coordinator and Deputy City
Attorneys on December 18, 2025. We appreciate the considerable time, care, and thoughtfulness
you contributed to that meeting and your participation in the interactive process. As you are
aware, the interactive process concerning Mr. Spencer began in February 2025 with an
accommodation request received via email authored by Mr. Gilmore purportedly on Mr. Spencer's
behalf. From April - October the City attempted to follow up on his request numerous times,
including by offering availability for in-person meetings in July, November, and December. We
received no responses to our offers for an in-person interactive process meeting with Mr. Spencer
until December when Mr. Spencer attended with Ms. Prado, Mr. Powelson, and others.

Before addressing the individual requests, we want to provide important recently discovered information regarding the
public health conditions at the Harrison Street encampment. Alameda County recently trapped approximately 40 rats in
the area and, after testing, advised the City that leptospirosis is present among the rat population and at least one dog.
Leptospirosis is a contagious disease that poses a significant risk to both human and animal health. According to the
County and the City's Public Health Officer, the most effective method to eradicate leptospirosis is the complete
abatement of the encampment so that Vector Control can fully access and eliminate rats and their burrows. This
response requires clearing the encampment in its entirety, including RVs, which can also harbor rats and related
conditions. The County has already posted public notices in the area regarding the presence of leptospirosis. Based on
this guidance, not only will the Harrison Corridor need to be cleared but encampments will not be permitted to
reestablish within one-third of a mile of the existing site. The City intends to provide notice prior to undertaking this
action. The City acknowledges that the Court may rule otherwise and the City intends to fully comply with all Court
orders.

During the interactive process meeting, the City discussed potential alternative accommodations with Mr. Spencer and
has offered those alternatives below where practicable, consistent with the City's obligations under Title II and its
responsibility to maintain public health, safety, and accessibility. Below are the City's responses to Mr. Spencer's
requests:

### 1. **Request for the City to Identify a Relocation Location**
It is important to note that during his interactive process meeting, Mr. Spencer explained that
he does not want to access any City shelters because he does not believe any would
accommodate his needs, even though the City explained that accommodations can be
made in City shelters to address disabilities. The ADA requires public entities to modify
policies and procedures when necessary to ensure that individuals with disabilities have
equal access to public programs. However, the City is not obligated to create individualized
maps or pre-approved locations that guarantee immunity from enforcement. As previously
explained, the City's encampment-related requirements are established through a
combination of municipal code provisions, administrative regulations, and City Council
resolutions, all of which are subject to change based on public health conditions, safety
concerns, and legal requirements. Park rules prohibit overnight camping and unattended
property exceeding ten square feet without a permit. The Berkeley Municipal Code and

Administrative Regulation 10.2 generally prohibit structures exceeding nine square feet on sidewalks and also prohibit lodging or storage of property on medians and within City building curtilage.

In limited circumstances, individuals may remain on certain sidewalks with property not exceeding nine square feet, provided pedestrian access is maintained, facilities are not obstructed, and the location is not designated as a no lodging area. Even in those circumstances, all individuals remain subject to enforcement based on health and safety impacts, nuisance conditions, and compliance with applicable law. Because enforcement determinations are location-specific, condition dependent, and responsive to changing circumstances, it is not possible for the City to identify locations where camping would be categorically free from enforcement.

Further, no map identifying enforcement-free locations exists in City records. Creating such a map would require extensive staff time, site-specific analysis, and physical measurement of sidewalks and public spaces throughout the City, and would therefore constitute an undue administrative burden under Title II. As a courtesy, the City has summarized the applicable regulatory framework to assist in understanding how enforcement decisions are made but cannot provide individualized guarantees regarding future enforcement outcomes.

2. **Request for a 20x30 Foot TNC Space for Community Gathering Needs**
Mr. Spencer requested a modification of the Berkeley Administrative Regulation 10.2 requirement that individuals occupy no more than 9 square feet on the sidewalk, seeking permission to occupy a space approximately 20x30 feet for himself and his need for social gatherings. The City also considered whether a smaller space, modestly larger than nine square feet, could serve as a feasible alternative. However, even a modest increase would still occupy a substantial portion of the sidewalk on many City streets and could extend into the roadway, impairing ADA-required pedestrian clearances, limiting emergency access, interfering with vehicle travel and parking, and constraining the City's ability to manage public health and safety risks.

The requested 20x30 space far exceeds the City's regulatory limits for temporary noncommercial objects on public sidewalks and streets, which generally restrict TNC Objects to 9 square feet and 5 feet in height A.R. 10.2. Occupying such a space would require a sidewalk at least 24 feet wide to prevent obstruction of the pedestrian path of travel, which is not available in most areas. Granting this request would fundamentally alter the nature of the City's sidewalk management framework. The ADA does not require a public entity to convert public sidewalks or streets into private, individualized spaces or to suspend citywide standards for public access. Allowing a 20x30 space for social gatherings would impair pedestrian mobility, block emergency access, interfere with vehicle travel and parking, and compromise the City's ability to respond to public health and safety concerns, including vector control.

However, granting an individualized exemption to allow a fixed structure of approximately 20x30 on City sidewalks would constitute a fundamental alteration of the City's regulatory framework governing the public right-of-way. The City's municipal codes and administrative regulations establish uniform, citywide standards for sidewalk use that are designed to preserve accessible pedestrian travel, ensure emergency access, reduce health and safety hazards, and allow the City to manage competing uses of limited public space. These standards do not operate as a discretionary permitting system for sidewalk structures but as baseline rules that apply to all members of the public, regardless of housing status, and are implemented through a prioritization rubric focused on relative health and safety impacts.

3. **Requests for Physical Assistance, Trash Disposal, Port-a-Potties, and Moving Assistance**
The City recognizes Mr. Spencer's physical limitations and the risk of injury associated with lifting and transporting belongings. Under ordinary circumstances, and consistent with its existing practices, the City offers assistance limited to packing, lifting, and transporting eligible items for purposes of utilizing the City's storage program, provided such assistance is scheduled in advance through HRT. However, due to the confirmed presence of leptospirosis and related vector activity at the site, public health officials have advised that wet, muddy, or contaminated items should not be handled or stored, as doing so may create conditions that allow bacteria to persist and spread. As a result, the City may be required to

limit assistance with moving and storing certain items. The City will offer storage options, if any, based on public health guidance and operational capacity.

Further, providing scheduled, hands-on assistance for relocation, trash collection, or installation of portable facilities constitutes a personal service rather than a reasonable accommodation under the ADA (28 C.F.R. § 35.130(b)(7), commentary). To provide such services for an individual encampment would require the City to dedicate staff to continuous, individualized support, including lifting and transporting personal property, coordinating and maintaining portable sanitation, and performing ongoing trash collection. It would also require advance scheduling, monitoring compliance, and potentially deploying specialized equipment or vehicles for relocation or storage. These demands go beyond the scope of the City's ordinary encampment management programs and would divert significant public resources from other health, safety, and maintenance responsibilities citywide. Because accommodating this request would fundamentally change how City programs operate and require ongoing, individualized staffing and resource allocation, it constitutes an undue administrative burden and is not required as a reasonable modification of City programs.

4. **Request for a Three-Step Notice Process (30/15/3 Days) for Enforcement**
The ADA requires public entities to ensure that enforcement policies are applied in a non-discriminatory manner, but it does not mandate extended or customized notice periods beyond what is necessary to allow a person to respond to enforcement (28 C.F.R. § 35.130(b)(7)). The proposed indefinite or highly structured multi-step notice would interfere with timely enforcement of public health and safety rules and would constitute a fundamental alteration of the City's enforcement procedures. The City can and will provide notice consistent with court orders and public health requirements, but it cannot offer a guarantee that multi-stage notice reminders will be issued in all circumstances as an accommodation.

5. **Request for the City to Purchase or Repurpose a Flatbed Trailer**
Providing or repurposing city property for individualized use constitutes a personal service or new program, which is not required under Title II of the ADA (28 C.F.R. § 35.130(b)(7); 28 C.F.R. § 35.135 — Personal devices and services.). The City may offer access to existing shelter or storage programs but is not obligated to provide new vehicles, trailers, or other personal items for encampment residents.

6. **Requests Regarding Law Enforcement Interactions ("Trauma-Informed" Approach, Designated Contacts)**
The ADA requires public entities to communicate effectively and to provide reasonable modifications to avoid discrimination, but it does not require a public entity to restructure its programs or assign personnel in a way that fundamentally changes how the program operates. The City will commit to using patient and respectful communication consistent with best practices and staff training. HRT will document this request and provide guidance to staff to promote consistency and sensitivity when interacting with Mr. Spencer.

Requiring specific HRT staff or police officers to always be present, or prohibiting certain staff from interacting with an individual, would mandate individualized staffing, scheduling, and resource allocation that the City cannot sustain without altering the core operation of its encampment management and law enforcement programs. Such a requirement would disrupt routine enforcement, impede timely responses to public health and safety issues, and interfere with the City's ability to deploy staff where they are most needed. Because Title II only obligates program accessibility and reasonable modifications, not the creation of individualized staffing assignments, granting such a request would constitute a fundamental alteration of the City's programs. The City can, however, document known triggers and make reasonable efforts to communicate concerns when feasible, but cannot guarantee individualized personnel assignments in every enforcement encounter without fundamentally altering the program.

7. **Requests for Solar Panels, Charging Access, and Other Infrastructure**
While Title II requires public entities to ensure program accessibility, it does not obligate them to provide individualized infrastructure that changes the fundamental nature of their programs. Granting requests for solar panels, personal charging access, or modifications to

street lighting would require a fundamental alteration of the City's encampment management and shelter programs, including creating new services, reallocating staff and resources, and redesigning operations in ways that go beyond ensuring access to the City's programs. Accommodating these requests would therefore constitute a fundamental alteration under Title II, which does not require public entities to create individualized infrastructure or to fundamentally restructure their existing programs.

This constitutes the City's final determination regarding the accommodation requests submitted on Mr. Muwakkil's behalf. If Mr. Muwakkil disagrees with this determination, he may choose to file a grievance through the City's ADA grievance: https://berkeleyca.gov/sites/default/files/documents/ADA%20Grievance%20Procedure%20and%20Form%20-%20updated%20Feb2024%20-%20WCAG-compliant.pdf.

Please let us know if you would like confirmation once abatement notices are posted or if you have questions regarding the grievance procedure.

Sincerely,

Paul Buddenhagen



**Paul Buddenhagen** *(he, him)*
City Manager, City of Berkeley
pbuddenhagen@berkeleyca.gov | W: (510) 981-7016
berkeleyca.gov | 2180 Milvia St. Berkeley, CA 94704

*Follow the City of Berkeley: Web | BlueSky | Instagram | LinkedIn*

**From:** Gregory, Thomas <TGregory@berkeleyca.gov>
**Sent:** Friday, October 10, 2025 8:04 PM
**To:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>; princelawoffices@yahoo.com
**Cc:** Scott, Nubyaan <NScott@berkeleyca.gov>; Mattes, Laura Iris <LMattes@berkeleyca.gov>; Madagu, Ashley M. <ACarter@berkeleyca.gov>; Shapp, Marc <MShapp@berkeleyca.gov>; Stephens, Sara <sstephens@berkeleyca.gov>; Jensen, Christopher <CJensen@berkeleyca.gov>
**Subject:** Re: REQUEST: Disability Accommodation for Erin Spencer

Dear Mr. Prince and Berkeley Homeless Union,

The City last communicated its reasonable accommodation offers for Mr. Spencer on February 4, 2025, April 29, 2025, June 26, 2025, and followed up again on July 22, 2025. To date, responses have not been received by the City regarding some of Mr. Spencer's accommodation requests. As summarized below, the City addressed Mr. Spencer's concerns related to his mobility impairments, PTSD and ADHD, and explained the options available to him:

- **Permission to remain in place with his current shelter until an ADA complaint alternative is available:** The request was denied because it would fundamentally alter the nature of the City's nuisance abatement efforts which are meant to prevent camping at sites



RE: REQUEST: ADA Accommodation for Shareef Muwakkil

From: Buddenhagen, Paul (pbuddenhagen@berkeleyca.gov)

To: robbiepowelson@gmail.com; berkeley.homeless.union@gmail.com; princelawoffices@yahoo.com

Cc: NScott@berkeleyca.gov; MShapp@berkeleyca.gov; CJensen@berkeleyca.gov; LMattes@berkeleyca.gov; TGregory@berkeleyca.gov; sstephens@berkeleyca.gov; ACarter@berkeleyca.gov

Date: Friday, January 2, 2026 at 05:00 PM PST

Dear Ms. Prado and Mr. Powelson,

Thank you for meeting with the City's ADA Coordinator and Deputy City Attorneys on December 19, 2025, on behalf of Mr. Muwakkil, who did not attend. As you are aware, the interactive process regarding Mr. Muwakkil's requests has been ongoing since April 2025. The City has carefully considered the requests submitted for Mr. Muwakkil and has consulted with relevant departments and staff across the City to assess the feasibility of each request in light of his reported disabilities and the City's obligations under the ADA.

Before addressing the individual requests, we want to provide important recently discovered information regarding the public health conditions at the Harrison Street encampment. Alameda County recently trapped approximately 40 rats in the area and, after testing, advised the City that leptospirosis is present among the rat population and at least one dog. Leptospirosis is a contagious disease that poses a significant risk to both human and animal health. According to the County and the City's Public Health Officer, the most effective method to eradicate leptospirosis is the complete abatement of the encampment so that Vector Control can fully access and eliminate rats and their burrows. This response requires clearing the encampment in its entirety, including RVs, which can also harbor rats and related conditions. The County has already posted public notices in the area regarding the presence of leptospirosis. Based on this guidance, not only will the Harrison Corridor need to be cleared but encampments will not be permitted to reestablish within one-third of a mile of the existing site. The City intends to provide notice prior to undertaking this action. The City acknowledges that the Court may rule otherwise and the City intends to fully comply with all Court orders.

Below are the City's responses to the requests made on Mr. Muwakkil's behalf. During the interactive process, the City discussed potential alternative accommodations with Mr. Muwakkil's representatives and has offered those alternatives below where practicable, consistent with the City's obligations under Title II and its responsibility to maintain public health, safety, and accessibility:

1. **Request for a temporary pause on abatement until shelter or housing is obtained. You informed the City that Mr. Muwakkil recently began engaging with HRT to identify shelter opportunities.**
   While the City recognizes the challenges Mr. Muwakkil has described and acknowledges his recent engagement with outreach providers, this request cannot be granted. The request is indefinite in duration and, in light of the confirmed presence of leptospirosis, would prevent the City from addressing a documented and significant public health hazard. Granting an indefinite pause would impose an undue administrative burden and constitute a fundamental alteration of the City's encampment management and public health response policies, which are designed to protect health and safety. The City's actions are consistent with City Council Resolution No. 71,513-N.S., which authorizes enforcement and abatement where encampments pose imminent health hazards, even when shelter is not immediately available. The encampment abatement will be noticed consistent with the Court's order.

2. **Request for a map or list of locations where Mr. Muwakkil could reside without risk of citation or arrest if abatement cannot be paused.**
   As previously explained, the City's encampment-related rules are reflected in its municipal code, administrative regulations, and resolutions, which are dynamic and subject to change. Park rules prohibit overnight camping and unattended property exceeding 10 square feet without a permit. The Berkeley Municipal Code and Administrative Regulation 10.2 generally prohibit structures exceeding 9 square feet on sidewalks and also prohibit lodging or storage of property on medians and in City building curtilage.
   In limited circumstances, individuals may remain on certain sidewalks with property not exceeding 9 square feet, provided it does not block pedestrian access, interfere with facilities, or violate other applicable rules, and provided the location is not designated as a "no lodging" area. However, all individuals remain subject to enforcement based on health and safety issues, nuisance conditions, and compliance with local, state, and federal law. For these reasons, it is not possible for the City to provide a map identifying locations where camping would be free from enforcement.
   Further, as you requested during the December 19 interactive process meeting, the City undertook diligent efforts to determine whether a map exists that would identify sidewalks capable of accommodating a 10-by-12-foot tent while maintaining ADA-required pedestrian clearance. No such map exists in City records. Creating one would require extensive staff time, review of records, and physical measurement of sidewalks citywide and would therefore constitute an undue administrative burden. As a courtesy, the City has again summarized the applicable regulations to assist advocates in understanding the current framework.

3. **Request to modify the 9-square-foot sidewalk limitation to allow a tent approximately 10 feet by 12 feet due to mental health disabilities, including the need for privacy and bicycle storage.**
   The City understands Mr. Muwakkil's assertion that a larger, private space assists him in managing mental health symptoms. However, granting an individualized exemption to allow a fixed structure of approximately 10 feet by 12 feet on City sidewalks would constitute a fundamental alteration of the City's regulatory framework governing the public right-of-way. The City's municipal codes and administrative regulations establish uniform, citywide standards for sidewalk use that are designed to preserve accessible pedestrian travel, ensure emergency access, reduce health and safety hazards, and allow the City to manage competing uses of limited public space. These standards do not operate as a discretionary permitting system for sidewalk structures but as baseline rules that apply to all members of the public, regardless of housing status, and are implemented through a prioritization rubric focused on relative health and safety impacts.
   In addition, a 10-by-12-foot structure would occupy a substantial portion of the sidewalk and, on the majority of sidewalks throughout the City, would necessarily extend into the roadway. This would impair ADA-required pedestrian clearances, interfere with mobility for people with disabilities, and create conflicts with vehicle travel, parking access, and emergency response. Allowing structures of this size would also limit the City's ability to respond to evolving public health and safety conditions by constraining the use and management of the public right-of-way. Because granting this request would fundamentally alter the nature of the City's sidewalk management efforts and undermine its ability to maintain accessible, safe, and functional public rights-of-way, the City cannot grant this modification as a reasonable accommodation.

4. **Request for a consistent HRT point of contact and use of non-aggressive, "trauma-informed" communication, including accompaniment during law enforcement interactions when feasible.**
   The City will commit to using patient and respectful communication consistent with best practices and staff training. HRT will document this request and provide guidance to staff to promote consistency and sensitivity when interacting with Mr. Muwakkil. While the City cannot guarantee that a specific outreach worker, including Epsalon, will always be available or that enforcement actions will be conditioned on his accompanying law enforcement, HRT will prioritize continuity of contact when feasible within operational and safety constraints.

5. **Requests related to future shelter placement accommodations (no curfew, visitor access, and related policies).**
   These requests concern potential future shelter placements. As we explained during out meeting and prior communications, Title II requires evaluation of reasonable accommodations if and when a specific placement is offered. Because shelter programs have differing rules and operational constraints, and no specific placement is currently available, the City cannot pre-approve accommodations in the abstract. HRT will document these requests, and they will be evaluated in accordance with ADA requirements if a shelter placement is offered.

This constitutes the City's final determination regarding the accommodation requests submitted on Mr. Muwakkil's behalf. If Mr. Muwakkil disagrees with this determination, he may choose to file a grievance through the City's ADA grievance process https://berkeleyca.gov/sites/default/files/documents/ADA%20Grievance%20Procedure%20and%20Form%20-%20updated%20Feb2024%20-%20WCAG-compliant.pdflink.
Please let us know if you would like confirmation once abatement notices are posted or if you have questions regarding the grievance procedure.
Sincerely,
Paul



**Paul Buddenhagen** *(he, him)*
City Manager, City of Berkeley
pbuddenhagen@berkeleyca.gov | W: (510) 981-7016
berkeleyca.gov | 2180 Milvia St. Berkeley, CA 94704

*Follow the City of Berkeley: Web | BlueSky | Instagram | LinkedIn*

On Monday, July 21, 2025 at 09:39:37 PM PDT, Gregory, Thomas <tgregory@berkeleyca.gov> wrote:

Hi BHU and Mr. Prince,

The City met with Mr. Muwakkil and his representatives last Friday. At the meeting, the City explained that shelter is not a form of reasonable accommodation but that Mr. Muwakkil can reach out to the Homeless Response Team regarding current shelter availability. If an offer of shelter is accepted, Mr. Muwakkil can thereafter submit an ADA request regarding the shelter environment.

Regarding his other requests, the City offered to (a) provide scheduled physical assistance with packing and lifting his belongings and availing himself of the City's storage service and (b) provide him with a 72-hour grace period re vacating the Harrison corridor. Both of these offers were offers of reasonable accommodations.

Mr. Muwakkil indicated that he did not need the City's physical assistance with packing and lifting. He also indicated that a 72-hour extension would likely not be useful to him but that, following the meeting, he would assess his circumstances and would inform City staff of what that length of extension he needs. **We request a response regarding his proposed extension length by Wednesday 7/23.**

Best,

**Thomas Gregory / ADA Program Coordinator**
City of Berkeley, Public Works Department
1947 Center Street, 5th Floor
Berkeley, CA 94704

(510) 981-6418

**From:** Gregory, Thomas <TGregory@berkeleyca.gov>
**Sent:** Thursday, June 26, 2025 5:51 PM
**To:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>; princelawoffices@yahoo.com <princelawoffices@yahoo.com>
**Cc:** Scott, Nubyaan <NScott@berkeleyca.gov>; Mattes, Laura Iris <LMattes@berkeleyca.gov>; Madagu, Ashley M. <ACarten@berkeleyca.gov>; Shapp, Marc <MShapp@berkeleyca.gov>; Stephens, Sara <sstephens@berkeleyca.gov>
**Subject:** Re: REQUEST: ADA Accommodation for Shareef Muwakkil

Hi BHU,

The City has reviewed the letter provided by Ms. deBree regarding her professional opinion of Mr. Muwakkil's disability-related limitations. Ms. deBree stated that Mr. Muwakkil would benefit from: 1) accessible shelter placement, 2) temporary stability in location, 3) physical assistance with moving and lifting, 4) executive functioning support, 5) support with interpersonal interactions, and 6) pre-scheduled, low-stimulation meetings.

1)   Accessible Shelter Placement
Given that housing is not a form of reasonable accommodation, the City directs Mr. Muwakkil to speak with HRT staff. HRT possesses information regarding current availability at City-sponsored motel rooms, non-congregate shelters, and congregate shelters, including options that are ADA-compliant. Shelter availability is subject to change; for the most current info on available options, please have Mr. Muwakkil contact HRT staff.

2)   Temporary Stability in Location
The City is unable to allow Mr. Muwakkil to remain in the Harrison Corridor for an indefinite amount of time. Doing so would be a fundamental alteration of the City's effort to enforce an abatement order to address significant public health and safety dangers. However, the City can extend Mr. Muwakkil additional time in which to relocate, as a reasonable accommodation. Please let us know if Mr. Muwakkil would accept an extension through July 16, 2025. For more information about available shelter, I encourage him to reach out to the City's Homeless Response Team ("HRT"). HRT staff has the most up to date information regarding shelter availability.

3)   Physical Assistance with Moving and Lifting

Regarding the request for assistance with relocation, at this time the City's offer to provide physical assistance remains limited to packing, lifting, and aiding campers in utilizing the City's storage service. That assistance can and should be scheduled in advance. City staff can provide such assistance at a time mutually convenient for staff and Mr. Muwakkil.

4)   Executive Functioning Support



## RE: REQUEST: ADA Accommodation for Eric Keiser

From: Buddenhagen, Paul (pbuddenhagen@berkeleyca.gov)

To: berkeley.homeless.union@gmail.com; princelawoffices@yahoo.com; princeanthony1954@gmail.com

Cc: MShapp@berkeleyca.gov; LMattes@berkeleyca.gov; FBrown@berkeleyca.gov; NScott@berkeleyca.gov; CJensen@berkeleyca.gov; pradu@berkeleyca.gov; DWhite@berkeleyca.gov; TGregory@berkeleyca.gov; sstephens@berkeleyca.gov; ACarter@berkeleyca.gov

Date: Tuesday, January 6, 2026 at 10:10 AM PST

Dear Berkeley Homeless Union,

As you are aware, the interactive process concerning Mr. Keiser began in April 2025 with an accommodation request received via email authored by Ms. Prado purportedly on Mr. Keiser's behalf. The City attempted to follow up on his request numerous times, including by offering availability for in-person meetings in July, November, and December. We received no responses to our email correspondence until December 31 and have never received responses to our multiple offers for an in-person meeting. Even so, the City has carefully considered the accommodation requests submitted on Mr. Keiser's behalf and has consulted with relevant staff across City departments to assess the feasibility of each request in light of his reported disabilities and the City's obligations under Title II of the ADA.

Before addressing the individual requests, we want to provide important recently discovered information regarding the public health conditions at the Harrison Street encampment. Alameda County recently trapped approximately 40 rats in the area and, after testing, advised the City that leptospirosis is present among the rat population and at least one dog. Leptospirosis is a contagious disease that poses a significant risk to both human and animal health. According to the County and the City's Public Health Officer, the most effective method to eradicate leptospirosis is the complete abatement of the encampment so that Vector Control can fully access and eliminate rats and their burrows. This response requires clearing the encampment in its entirety, including RVs, which can also harbor rats and related conditions. The County has already posted public notices in the area regarding the presence of leptospirosis.

Based on this guidance, not only will the Harrison Corridor need to be cleared but encampments will not be permitted to reestablish within one-third of a mile of the existing site. The City intends to provide notice prior to undertaking this action. The City acknowledges that the Court may rule otherwise and the City intends to fully comply with all Court orders. The City considered possible alternative accommodations where practicable, consistent with its obligations under Title II of the ADA II and its responsibility to maintain public health, safety, and accessibility. Below are the City's responses to Mr. Keiser's requests:

### 1. Request for a stable, non-congregate, ADA-compliant relocation option prior to enforcement

The City acknowledges the concerns raised regarding Mr. Keiser's psychiatric disability and the difficulties he has experienced. However, the ADA does not require a public entity to provide housing or guarantee placement in a particular type of shelter as a reasonable modification. Housing and shelter placement are services administered through separate programs that are subject to availability, eligibility criteria, and prioritization of limited resources. While the City's encampment management efforts include referral to shelter and housing resources, the provision

of a specific non-congregate placement as a precondition to enforcement would exceed the scope of a reasonable modification under Title II.

Consistent with its obligations, the City has identified HRT as the appropriate point of contact to provide information regarding current shelter availability, including options that are ADA-compliant. Shelter availability is dynamic and may change on a daily basis. For that reason, and because the City cannot reserve or guarantee specific placements, the City cannot grant a request to pause enforcement until a particular housing option becomes available. Requiring enforcement to be contingent on securing a specific form of shelter would fundamentally alter the nature of the City's encampment management program, which is designed to balance access to services with the City's independent obligations to maintain public health, safety, and accessibility in shared public spaces. This is especially the case in light of the City's imminent need to address the presence of leptospirosis in the encampment.

## 2. Request for temporary stability in the current location and for a map identifying enforcement-free relocation areas

As previously explained, the City's encampment-related requirements are established through a combination of municipal code provisions, administrative regulations, and City Council resolutions, all of which are subject to change based on public health conditions, safety concerns, and legal requirements. Park rules prohibit overnight camping and unattended property exceeding ten square feet without a permit. The Berkeley Municipal Code and Administrative Regulation 10.2 generally prohibit structures exceeding nine square feet on sidewalks and also prohibit lodging or storage of property on medians and within City building curtilage.

In limited circumstances, individuals may remain on certain sidewalks with property not exceeding nine square feet, provided pedestrian access is maintained, facilities are not obstructed, and the location is not designated as a no lodging area. Even in those circumstances, all individuals remain subject to enforcement based on health and safety impacts, nuisance conditions, and compliance with applicable law. Because enforcement determinations are location-specific, condition dependent, and responsive to changing circumstances, it is not possible for the City to identify locations where camping would be categorically free from enforcement.

Further, no map identifying enforcement-free locations exists in City records. Creating such a map would require extensive staff time, site-specific analysis, and physical measurement of sidewalks and public spaces throughout the City, and would therefore constitute an undue administrative burden under Title II. As a courtesy, the City has summarized the applicable regulatory framework to assist in understanding how enforcement decisions are made but cannot provide individualized guarantees regarding future enforcement outcomes.

With respect to the cited City Councilmember webpage and illustrative drawing, the City notes that the webpage predates significant changes in legal precedent and does not purport to establish City policy. The drawing referenced is not identified as an official representation of City standards nor is it intended to reflect the City's obligations under the ADA.

The City also acknowledges the reference to the ongoing Homeless Shelter Crisis declaration under Resolution No. 70,179-N.S. and Government Code section 8698.2. The City has exercised that authority by establishing and operating multiple shelter and housing programs during the declared emergency. Those programs are available to unhoused individuals subject to capacity, eligibility requirements, and prioritization of limited resources. Engagement with HRT remains the appropriate mechanism to determine whether the individual may qualify for any such program.

To the extent the request seeks an indefinite pause on enforcement at the current location, the City cannot grant that request. Allowing an individual to remain in place notwithstanding the need to abate conditions associated with confirmed leptospirosis would require the City to suspend or override the need for a timely abatement to control vectors and prevent the spread of communicable disease, which is a fundamental part of its encampment management and public health response programs. Such a modification would fundamentally alter the nature of those programs, which are specifically designed to enable prompt intervention when encampments pose imminent risks to public health and safety.

An open-ended suspension of enforcement in these circumstances would also prevent the City from carrying out required vector control measures and would undermine its ability to respond consistently to emergent health hazards across the public right-of-way. The City's actions are consistent with City Council Resolution No. 71,513-N.S., which authorizes enforcement and abatement where encampments present imminent health hazards, even when shelter is not immediately available. Any abatement will proceed with notice consistent with applicable court orders.

### 3. Request for physical assistance with lifting and moving belongings to a non-shelter location

The City recognizes Mr. Keiser's physical limitations and the risk of injury associated with lifting and transporting belongings. Under ordinary circumstances, and consistent with its existing practices, the City offers assistance limited to packing, lifting, and transporting eligible items for purposes of utilizing the City's storage program, provided such assistance is scheduled in advance through HRT. However, due to the confirmed presence of leptospirosis and related vector activity at the site, public health officials have advised that wet, muddy, or contaminated items should not be handled or stored, as doing so may create conditions that allow bacteria to persist and spread. As a result, the City may be required to limit assistance with moving and storing certain items. The City will offer storage options, if any,  based on public health guidance and operational capacity.

More broadly, the ADA does not require public entities to provide personal services or individualized assistance as a reasonable modification. Requiring City staff to provide hands-on assistance to pack, lift, and move belongings to an undetermined location that is not connected to a City program or service would constitute a personal service beyond the scope of Title II obligations and would fundamentally alter the nature of the City's encampment response by transforming it into an individualized moving service unrelated to access to a City program or benefit. For these reasons, the City cannot grant a request for staff-assisted relocation to a non-shelter location.

### 4. Request for executive functioning and communication modifications

The City acknowledges that Mr. Keiser's disability may affect how he processes information during stressful encounters. However, the City cannot guarantee that a single, consistent staff member will always be available to communicate with any particular individual. Encampment management and public health response activities involve multiple departments and staff responding to changing conditions, and such a requirement would impose an undue administrative burden.

Similarly, requiring that all instructions be provided exclusively in written, step-by-step form with multiple reminders would not be practicable in the context of encampment enforcement, where City staff and law enforcement must often provide directions that are responsive to immediate health, safety, and legal concerns and must ensure compliance with applicable laws and orders. As a reasonable alternative, HRT can document that Mr. Keiser may become overwhelmed during

2/5/26, 1:38 PM

Case 3:25-cv-01414-EMC     Document 226     Filed 02/06/26     Page 29 of 29
Yahoo Mail - RE: REQUEST: ADA Accommodation for Eric Keiser

enforcement encounters and may benefit from slower, repetitive communication when feasible. The City notes, however, that this approach cannot always be accommodated when conditions require prompt action to address public health or safety risks or when law enforcement must act to enforce the law.

With respect to meetings, the City's ADA Coordinator remains available to meet with Mr. Keiser on a pre-scheduled basis to discuss reasonable accommodation requests and can work to structure those meetings in a low-stimulation manner where possible. In the context of encampment enforcement, the City intends to provide notice prior to abatement and encourages Mr. Keiser to coordinate in advance with HRT regarding packing and storage. The City cannot guarantee that any enforcement-related interaction in an outdoor encampment setting will be low stimulation due to the inherent nature of those environments.

This constitutes the City's final determination regarding the accommodation requests submitted on Mr. Keiser's behalf. If Mr. Keiser disagrees with this determination, he may choose to file a grievance through the City's ADA grievance process https://berkeleyca.gov/sites/default/files/documents/ADA%20Grievance%20Procedure%20and%20Form%20-%20updated%20Feb2024%20-%20WCAG-compliant.pdf.

Please let us know if you would like confirmation once abatement notices are posted or if you have questions regarding the grievance procedure.

Sincerely,
Paul Buddenhagen



**Paul Buddenhagen** *(he, him)*
City Manager, City of Berkeley
pbuddenhagen@berkeleyca.gov | W: (510) 981-7016
berkeleyca.gov | 2180 Milvia St. Berkeley, CA 94704

*Follow the City of Berkeley: Web | BlueSky | Instagram | LinkedIn*

---

**From:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
**Sent:** Wednesday, December 31, 2025 5:04 PM
**To:** Gregory, Thomas <TGregory@berkeleyca.gov>; Buddenhagen, Paul <PBuddenhagen@berkeleyca.gov>
**Cc:** princelawoffices@yahoo.com; Scott, Nubyaan <NScott@berkeleyca.gov>; Mattes, Laura Iris <LMattes@berkeleyca.gov>; Madagu, Ashley M. <ACarter@berkeleyca.gov>; Shapp, Marc <MShapp@berkeleyca.gov>; Stephens, Sara <sstephens@berkeleyca.gov>
**Subject:** Re: REQUEST: ADA Accommodation for Eric Keiser

Mr. Gregory and City Manager Buddenhagen,
I am writing to formally reiterate and elaborate on the request for reasonable accommodations under the Americans with Disabilities Act (ADA) for our union member, Eric Keiser.

As previously communicated, Mr. Keiser's disabilities are severe and documented: