**Anthony D. Prince** (SBN # 202892)
General Counsel, California Homeless Union/Statewide Organizing Council
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Tel: 510-301-1472

# UNITED STATES COURT

# DISTRICT OF NORTHERN CALIFORNIA

|  |  |
|---|---|
| BERKELEY HOMELESS UNION<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF BERKELEY, et al<br><br>Defendant | Case No.: 4:25-cv-01414-EMC<br><br>**PLAINTIFF BERKELEY HOMELESS UNION'S OPPOSITION TO CITY OF BERKELEY'S MOTION FOR SUMMARY JUDGMENT RE INTERACTIVE PROCESS; PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT; DECLARATIONS OF YESICA PRADO, OLIVIA DeBREE and ANTHONY D. PRINCE IN SUPPORT OF PLAINTIFF'S OPPOSITION AND CROSS MOTION**<br><br>**Hearing: March 20, 2026**<br><br>**Judge: Hon. Edward M. Chen** |

1

**PLAINTIFF BERKELEY HOMELESS UNION'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON INTERACTIVE PROCESS**

## INTRODUCTION

This Court ordered the parties to address six specific questions about the City's failure to accommodate Plaintiffs' disabilities. *Id*. ECF No. 202. The City responded with a brief that largely ignores those questions, recycles arguments this Court has already considered, and asks the Court to dismiss this case on procedural grounds rather than confront the merits. The City's evasion is telling: it has no good answers to the Court's questions because its conduct cannot be reconciled with the requirements of the Americans with Disabilities Act ("ADA").

For nearly a year, the City engaged in what it calls an "interactive process." But the record reveals a process in name only—one marked by blanket denials, refusal to provide documentation, obstruction of in-person meetings and boilerplate "fundamental alteration" and "undue burden" defenses that were never substantiated with factual analysis. Meanwhile, the City's own actions undermine its claims of urgency: it sent volunteers and city staff into the same "public health crisis" zone with no PPE, admitted there are zero human cases of leptospirosis, and created the very unsanitary conditions it now uses to justify removal.

The stakes of this case are measured in human lives. As Olivia deBree, a board-certified Nurse Practitioner with a decade of experience treating unhoused patients in Berkeley, explains in her declaration, BHU members are not simply uncomfortable—they are medically fragile.

Ultimately, this case is about whether the City can force medically fragile individuals into a cycle of displacement that their own medical providers warn will cause "hypertensive emergencies, cardiac strain, physical injuries, psychotic breaks, suicidal and homicidal ideation,

and the loss of medically necessary equipment and community care." Declaration of Olivia deBree. ("DeBree Decl." ¶ 13.), who has treated these patients for years, warns that the harm from the City's proposed action "could be severe, irreversible, life-threatening." *Id.* ¶ 13 at 22. The City's motion asks this Court to ignore these medical realities. This Court should not.

The Chart of Accommodations on BHU's status report, provides a comprehensive record of this breakdown, cataloging each member's requested accommodation, the City's formulaic response, and how the denial would aggravate the member's disability if the request is denied. *See ECF 200-16.*

## B. The City's "Interactive Process"— A Timeline of Obstruction

Between January and April 2025, BHU submitted ADA accommodation requests on behalf of 19 disabled members. ECF No. 200. The City's brief on this Summary Judgement is a distortion of the truth. What followed was not a good-faith dialogue but a series of delays, cancellations and denials:

**January 22 to February 5, 2025**: ADA Coordinator Thomas Gregory denies all accommodation requests made on behalf of disabled BHU members facing abatement on February 10, 2025. The denials based on "fundamental alteration" and "undue burden" were made by the ADA Coordinator, and not the "head of the entity" as required by 28 CFR § 35.164. **(Exhibit A)**

**February 25 to July 7, 2025:** BHU repeatedly asked for clarification of the perimeters of the City's programs, services and activities under the encampment management policy to make accommodation requests that the City would accept. However, the ADA Coordinator would not provide clear answers. **(Exhibit B )**

The circular logic finally became explicit on July 7, when ADA Coordinator Thomas Gregory admitted the City would not—and perhaps could not—provide the requested guidance. His admission that "there is no fixed list" confirmed that BHU had been operating without a target, forced to guess at requirements the City refused to articulate.

**June 4, 2025:** The City violently sweeps the Harrison Corridor encampment without notice and uses non-lethal weapons to get people out in less than 20 minutes. This incident pushed out more than half of our BHU members that had pending ADA accommodation requests. ECF 87.

**July 11 to 18, 2025:** Three BHU members attended their interactive process meetings at City Hall that lacked any trauma-informed protocols. The result was not progress, but the aggravation of their disabilities. By ignoring the safety and accessibility needs of the participants, the City transformed a legal obligation into a traumatic experience. ECF Nos. 121, 123, 125.

**July 21, 2025:** City Attorney Iris Mattes unilaterally canceled five scheduled interactive process meetings, citing unsubstantiated threats. No evidence of such threats has ever been produced despite counsel's request and multiple public records requests ("PRAs"). The only record produced via PRAs in response for evidence is Iris Mattes' email of her complaint: **Exhibit C.**

**July 22 to July 24, 2025:** ADA Coordinator Thomas Gregory floods BHU's email inbox requesting the interactive process will continue via email due to unsubstantiated threats and sets arbitrary deadlines for responses to be due within days for each member. **(Exhibit D)**

**July 25, 2025:** BHU President Yesica Prado informs Mr. Gregory of her limitations answering via email with mixed deadlines, which pose a barrier for her disability. **(Exhibit E)** Counsel's request to continue in-person meetings to facilitate the interactive process are largely ignored.

**August 5, 2025:** BHU files a motion for contempt to compel compliance with the court-ordered interactive process. The Defendants refused to provide meaningful participation for each member. Because they have failed to engage as required, BHU asked this Court to issue an Order to Show Cause why they should not be held in contempt. EFC 118.

September 8, 2025: The City closes a section of the encampment on the East side of Harrison Street to Codornices Creek. The public notice doesn't inform encampment residents of their right to request an ADA accommodation. The City proceeds with the closure without offering any. ECF 135-1, pg. 7.

**December 9, 2025:** Despite documented disability-related needs of our BHU members such as ADHD, PTSD and schizophrenia, the City refused in-person meetings and insisted on Zoom, which exacerbated symptoms. **(Exhibit F)**

**December 15, 2025:** BHU requested the documentation underlying the City's "fundamental alteration" determinations—financial analyses, resource assessments and communications to better understand the City's operational boundaries. The City refused to produce any such documentation via the interactive process meetings and public records requests. **(Exhibit G)** BHU also requested the attendance of decision-makers, Peter Radu and Paul Buddenhagen. The City's counsel failed to ensure their attendance, rendering meetings incapable of producing real-time solutions for each ADA request. **(Exhibit H)**

**January 1 to January 6, 2026:** Despite individualized requests, the City issued nearly identical denials to different members, relying on the same "fundamental alteration" and "undue burden" language. **(Exhibit I)**

### C. The City's Admissions Undermine Its Defenses

Throughout this process, the City's own officials made statements that undercut its position. ADA Coordinator Thomas Gregory admitted the 9-square-foot rule is not feasible for any human, including a person with disabilities. ECF No. 200. This admission happened during the December interactive process meetings. HRT Lead Peter Radu admitted no tent exists that fits 9 square feet and that their current sidewalk policy is not feasible. ECF No. 200. HRT Lead Peter Radu admitted there are no non-congregate shelter beds available. ECF No. 200.

A recent census of the shelter beds in the City shows that as of February 4, 2026, there is only one congregate shelter bed available that is accessible to a person with disabilities. There are no non-congregate shelter beds available. **(Exhibit J)** Homeless Coordinator Josh Jacobs admitted the City has the majority control over homeless services funding and referrals at a City Council meeting on September 16, 2025. ECF No. 200.

### III. LEGAL STANDARD

Under Title II of the ADA, public entities must make reasonable modifications to policies and programs to avoid discrimination on the basis of disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7). The "fundamental alteration" defense requires the public entity to prove that a modification would change the essential nature of the program—a fact-intensive inquiry that rarely succeeds at summary judgment. *See Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003).

### IV. ARGUMENT

#### A. The City Failed to Answer the questions ordered by the Court.

The Court directed the parties to address six specific questions. ECF No. 202. The City's brief largely ignores them. Plaintiffs now provide the answers the Court sought.

#### Question 1: Moving Assistance, Portable Facilities, and Trash Disposal

**The Disability-Related Basis:**

**Eric Keiser:** Mr. Keiser suffers from schizophrenia with disorganized thinking and auditory hallucinations, as well as chronic pain from a traumatic leg deformity that limits his mobility. Forced displacement without accommodation would exacerbate his chronic pain, risk re-injury from falls, and escalate his psychotic symptoms. DeBree Decl. ¶ 8.

**Shareef Muwakkil:** Mr. Muwakkil suffered two myocardial infarctions in 2024 and has a heart valve condition that limits his ability to lift, carry, or move personal belongings safely. Forced relocation without assistance risks cardiac strain, physical injury, and could trigger a life-threatening cardiac event. DeBree Decl. ¶ 9.

**Lewanda Parnell:** Ms. Parnell, age 71, suffers from vertigo and uses a stroller as a mobility device to prevent falls. Her conditions significantly limit her ability to lift, carry, and walk long distances. Without assistance packing and moving, she faces increased fall risk, injury, and an inability to relocate her essential belongings. Displacement would jeopardize her ability to complete daily tasks for survival. DeBree Decl. ¶ 10.

**Erin Spencer:** Mr. Spencer suffers from chronic musculoskeletal pain, sciatica, and a displaced hip. These conditions make it impossible for him to lift or transport heavy items independently. Forced relocation without assistance would cause intensified pain, risk further injury, and trigger PTSD crises that render him unable to organize or comply with orders. DeBree Decl. ¶ 11.

**Austin White**: Mr. White suffers from esophageal varices and is medically restricted from lifting more than 20 pounds. A forced move without assistance risks a life-threatening esophageal hemorrhage. DeBree Decl. ¶ 12.

Reasonable Alternatives Proposed: The City could contract with a local nonprofit like Where Do We Go? or Urban Compassion Project, who have experience providing community clean ups with a trauma-informed approach to encampments for years.

The City could schedule advance-notice assistance through HRT and Public Works with staff trained in mental health first aid and trauma-informed communication. The City could restore portable sanitation services it previously provided and then removed.

### Why the City's Denial Was Unreasonable

The City provided these services before. Restoration is not a fundamental alteration.

The City's "direct threat" claim is undercut by its Point-In-Time count guidance: no PPE, no on-site health staff, no mandatory protocols for volunteers entering the same area. If volunteers during a national survey are safe, residents with accommodations are safe.The City offered no alternatives, violating the interactive process. *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000).

### The City's "Fundamental Alteration" Defense Is Unsupported by the evidence.

The City provided no documentation—no cost analyses, no resource assessments, no consideration of alternatives—to support its claim that providing moving assistance would fundamentally alter any program. Even multiple public records requests yielded no such records. The City cannot simply utter the phrase "fundamental alteration" like a magic incantation and expect to be excused from its ADA obligations. The burden is on the City to prove that the requested accommodations would fundamentally alter its programs. It has failed to do so. See 28 C.F.R. § 35.130(b)(7); Townsend v. Quasim, 328 F.3d 511, 518 (9th Cir. 2003).

### Question 2: Alternative Relocation Areas (Response to City's Claim)

The City claims it "never received a list" of alternative areas. ECF 219. This is false. At the interactive process meeting of Austin White on July 11, 2025, City staff were handed a list by BHU that was curated by the City on February 14, 2027. **(Exhibit K)** The document is an inventory of City-owned vacant properties that were evaluated for their potential for affordable housing development.

Additionally, at the January 13, 2026 status conference, Plaintiff confirmed the City's counsel shared an updated list via email. A copy of the email and list curated by City staff is attached as **Exhibit L.** The City's refusal to identify even three nearby areas where relocation is permitted—or explain why such identification is not a reasonable accommodation—demonstrates bad faith.

### Question 3: Why HRT Is an Inadequate Point of Contact

The Disability-Related Basis:

**Eric Keiser**: Mr. Keiser's schizophrenia causes disorganized thinking and auditory hallucinations that disrupt his hearing, processing, and memory—especially under stress. Verbal instructions are distorted by hallucinations, forgotten, or misunderstood. DeBree Decl. ¶ 8. He requires written, step-by-step guidance and pre-scheduled, low-stimulation meetings to participate meaningfully.

**Yesica Prado:** Ms. Prado's ADHD and PTSD require consistent, trauma-informed communication. HRT's non-responsiveness, rotating staff, and punitive conduct trigger anxiety, hypervigilance and prevent meaningful engagement. Prado Decl.

**Shareef Muwakkil:** Mr. Muwakkil's severe mood disorder with psychotic features causes him to withdraw from social interactions when overwhelmed. DeBree Decl. ¶ 9. He requires a

consistent point of contact to prevent escalation; multiple unfamiliar staff trigger withdrawal and hamper his ability to navigate housing systems.

**Austin White:** Mr. White has bipolar disorder, alcoholic cirrhosis, and peripheral neuropathy. His two service dogs are essential for his emotional stability. DeBree Decl. ¶ 12. For Mr. White, a consistent, trauma-informed point of contact is not a preference—it is a medical necessity. Unfamiliar staff, sudden changes, or confrontational encounters trigger severe emotional destabilization, overwhelm his executive functioning, and impair his ability to complete daily tasks for survival.

Why HRT Is Inadequate:

**No shelter beds:** HRT has admitted no non-congregate shelter beds are available. Referral to HRT is referral to a dead end.  ECF No. 200 at 12.

Non-responsive: HRT staff failed to respond to emails and requests, as documented in the record. ECF No. 200 at 8.

No decision-making authority: HRT staff lack authority to grant accommodations, as demonstrated by their absence from interactive meetings and by their own admissions. On February 5, 2026, when a resident asked HRT staff member Epsalon Galloway about how to make accommodation requests, he stated that was "not his job"—it was ADA Coordinator Thomas Gregory's job. Prado Decl. Unless Thomas Gregory actively conducts outreach in the encampment—which he has not as he doesn't even remember the names of campers—disabled residents have no pathway to request accommodations without BHU's assistance.

HRT Staff Engage in Misconduct: Far from providing a point of contact, HRT staff have actively traumatized the very residents they are supposed to serve.

On February 3, 2026, HRT staff posted notices throughout the encampment that included a resident's name. When the resident, whose disabilities were being aggravated by this conduct, asked them to stop, HRT staff Okeya Vance-Dozier and Epsalon Galloway falsely reported to police that they had been attacked. Prado Decl. The resident was not attacking anyone—he was experiencing a disability-related crisis triggered by HRT's own actions. Instead of de-escalating at the request of the resident and BHU officer, HRT escalated and weaponized police against a disabled resident.

On January 30, 2026, Okeya Vance-Dozier called police during a conflict between two residents with PTSD and other mental disabilities, after the situation had already de-escalated and both parties had separated. This resulted in approximately nine police units responding and criminal charges against both residents—instead of mental health crisis support. (Prado Decl.)

<u>No Accountability, No Checks and Balances:</u> When residents report misconduct to HRT's lead manager, Peter Radu, complaints are dismissed without investigation or disciplinary action. In response to detailed reports of Okeya's escalation and Monique's disrespectful conduct, Radu stated: "Respectfully, I will not be further addressing your statements ... The reports I have from my staff differ from yours. I am sorry you feel this way. That's that." **(Exhibit M)**

Since its inception in 2021, there have been no checks and balances for this team. HRT staff can be punitive, engage in misconduct, and traumatize disabled residents without facing any consequences. For residents like Mr. White and Mr. Muwakkil, whose medical conditions mean that stress can literally kill, the absence of accountability is not just a procedural failure—it is a direct threat to life.

**Reasonable Alternatives:**

1.  Designated, trained ADA liaisons within HRT with decision-making authority; **2.**Written, step-by-step guidance provided in advance; Pre-scheduled, low-stimulation meetings with consistent staff. An independent complaint process with real accountability, not dismissal by the same managers who supervise the offending staff; **3.**Clear protocols requiring HRT staff to call mental health crisis teams, not police, when residents experience disability-related crises.

### Question 4: Nexus for Increased Tent Dimensions

### The Disability-Related Basis:

**Austin White**: Mr. White requires space for two service dogs (essential for emotional stability), medical equipment, and supplies. DeBree Decl. ¶ 12. The 9 sq ft rule is insufficient to accommodate his needs without endangering his health.

**Lewanda Parnell:** Ms. Parnell requires space for her mobility device (stroller) and to maneuver safely. Cramped conditions exacerbate vertigo and increase fall risk. DeBree Decl. ¶ 10.

**Shareef Muwakkil:** Mr. Muwakkil requires privacy to manage psychosis. DeBree Decl. ¶ 9. The 9 sq ft rule forces exposure that triggers symptoms and impairs his ability to function.

Reasonable Alternatives Proposed:

**1**.Case-by-case review with medical documentation.**2**.Modified placement on wisidewalks (the City has the data on sidewalk widths but refused to provide it).**3**.Time-limited approvals tied to engagement with accessible services.

Why the City's Denial Was Unreasonable:

- The City admits no tent exists that fits 9 sq ft. Enforcing an impossible standard is discriminatory. See 28 C.F.R. § 35.130(b)(1)(i).

- The City's own "Good Neighbor" policy contemplates one side of the street remaining clear for ADA wheelchair access, not a 9 sq ft box. ECF No. 200 at 46.

- The City provided no factual data on sidewalk widths or alternatives considered, despite the Court's directive. ECF No. 202 at 2.

**Question 5: Nexus for Vehicle Accommodations**

The Disability-Related Basis:

- Merced Dominguez: Ms. Dominguez's RV is medical equipment. She lives with degenerative spondylosis causing chronic pain and severe mobility limitations. Loss of her RV would trigger a catastrophic health crisis. Her condition prevents compliance with 72-hour moves, as each relocation causes acute pain flare-ups, risk of injury, and accelerates her spondylosis. Prado Decl.

- Yesica Prado: Ms. Prado's RV is medical equipment as it provides her with a private space to cope with flashbacks and over stimulation. Ms. Prado's ADHD and PTSD prevent navigating complex moves, tracking 72-hour deadlines, and responding to enforcement. Vehicle loss would dismantle the routine her disabilities require, triggering cognitive overload, disorganization, and inability to plan or complete tasks. Prado Decl.

Why A Disability Placard Is Not Feasible:

13

- Placards do not address registration requirements (CVC §4000).

- Placards do not exempt from 72-hour rules (CVC §22651(k)).

Reasonable Alternatives Proposed:

- Temporary renewable permits with case-managed renewals.

- Modify the Parking Residential Program's address requirement to grant annual permits.

- Designated parking zones near services.

- Parking exemptions tied to engagement with housing navigation.

**Question 6: Leptospirosis Mitigation**

The City claims the leptospirosis outbreak cannot be mitigated if any residents remain. This claim is contradicted by the record.

- <u>Zero Human Cases:</u> The City admits no human has contracted leptospirosis at the encampment. ECF 219. Berkeley Pawfund confirms that "not one case of Lepto has been seen in the human residents of the camp." (**Exhibit Y**) The "crisis" is hypothetical—a public health emergency without a single human patient.

- <u>Vaccinated Dogs:</u> Berkeley Pawfund vaccinated dogs at the encampment on December 11, 2025 —a full month before the City issued its public health alert, and again on January 12, 2026. Prado Decl. The City's claim that vaccination is insufficient ignores that rats, not dogs, are the primary vector—and rat abatement can be done without full clearance.

- The County—Not the City—Is Actually Solving the Problem: While the City's Vector Control Program has been absent in doing rodent abatement since July 21, 2023 (Exhibit B, CO2 Treatment Log), Alameda County Vector Control stepped in to fill the gap. Dr. Adena Why confirmed that County staff recently trapped 27 rats from the encampment in a single week and are conducting weekly trapping to "knock the population of rats down." (**Exhibit Z**) They are also testing rats regularly for leptospirosis and inspecting businesses within a one-block radius.

- Critically, Dr. Why explained that the County is working with the City because Berkeley's Vector Control Program "do[es] not have the staff capacity to handle this situation." *Id.* The City's own program is absent, under-resourced, and unresponsive—yet the City now demands that residents be displaced for a problem it has proven incapable of addressing.

- The Source Is Private Property—Not the Encampment: BHU's extensive documentation shows that the rodent infestation originates on private commercial properties with City-issued encroachment permits: the Hathaway Dinwiddie Construction site at 1201 Eighth Street and the USPS facility at 1150 Eighth Street. **(Exhibit N).** These fenced, undisturbed parcels have become permanent rat refuges, with active burrows and overgrown vegetation left unaddressed for years.

- The City's own records show the last CO2 treatment in the area occurred on July 21, 2023—over two and a half years ago. **(Exhibit O)**. Since then, no documented professional abatement has occurred at these private properties. The City facilitated the deterioration of these sites by approving encroachment permits that sealed off these parcels, creating ideal rodent harborage. Despite receiving complaints and having actual

knowledge of the conditions, the City took no action to abate the nuisance its own permits helped create. The City bears the responsibility to ensure its permits do not create public nuisances by enforcing Berkeley Municipal Code Title 11.

- <u>The City's Own Actions Prove Mitigation Is Possible:</u> For the January 22, 2026 PIT count, the City sent volunteers into the "crisis zone" with: no PPE, no on-site public health staff, no mandatory safety protocols and simple guidance to "avoid standing water." **(Exhibit P)** If volunteers can enter safely with no protection, residents can remain safely with accommodations.

- <u>Partial Abatement Is Feasible:</u> The City could remove trash and debris, treat rodent burrows in unoccupied areas first and allow BHU members to safely relocate to a comparable site.

The City's claim that "even one person" prevents abatement is unsupported and contradicted by its own actions.

## B. BHU HAS STANDING TO BRING THIS SUIT

The City argues that BHU lacks associational standing. This argument fails under the *Hunt* test.

1. Members Would Have Standing in Their Own Right (Prong 1)

At summary judgment, BHU must identify specific members with specific injuries. It has done so. The record includes:

- Declarations from Muwakkil, White, Parnell, Prado detailing their disabilities and accommodation needs. ECF 121, 123, 125

- The Joint Status Report, ECF No. 200, includes a detailed chart linking each member to each requested accommodation and explaining the disability-related basis.

- Declaration from BHU member's medical provider, Olivia DeBree.

This is more than sufficient. *See Assoc. Gen. Contractors v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (association must identify affected members but need not produce exhaustive documentation at summary judgment).

2. Interests Are Germane to BHU's Purpose (Prong 2)

The City's demand for bylaws is a red herring. BHU is an organization of unhoused individuals advocating for safe, accessible treatment by the City. Protecting disabled members from discriminatory enforcement is core to its mission. The City itself recognized this by engaging in an 11-month interactive process with BHU as the representative of these individuals. It cannot now claim BHU has no role.

3. Individual Participation Is Not Required for Injunctive Relief (Prong 3)

The Ninth Circuit has held that associations may seek prospective, systemic relief without joining individual members. *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1113 (9th Cir. 2003). Here, Plaintiffs seek injunctive relief—an order requiring the City to engage in a proper interactive process and implement accommodations. Such relief does not require individual participation.

Moreover, Congress did not intend the third prong to bar associational standing in civil rights cases. *See United Food & Com. Workers Union v. Brown Grp.*, 517 U.S. 544, 557 (1996). The City's contrary reading would eviscerate the ability of small advocacy organizations to enforce the ADA.

## B. THE CITY FAILED TO ENGAGE IN A GOOD-FAITH INTERACTIVE PROCESS

The ADA requires public entities to engage in an "interactive process" to identify reasonable accommodations. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). The City's conduct fell far short.

### 1. The City Obstructed Meaningful Participation

- In-Person Meetings Denied: Despite Ms. Prado's documented ADHD and PTSD, which Zoom exacerbates, the City refused in-person meetings until counsel intervened. ECF No. 200 at 5-6.

- Media Observer Blocked: The City threatened to cancel meetings if a reporter attended as a neutral observer—a transparent effort to avoid documentation. ECF No. 200 at 4-5.

- Decision-Makers Absent: The City refused to ensure attendance of key staff (Radu, Buddenhagen), rendering meetings incapable of producing real-time solutions. ECF No. 200 at 8.

- Documentation Withheld: The City refused to provide the factual basis for its "fundamental alteration" determinations, forcing BHU to negotiate in the dark. ECF No. 200 at 6-7.

### 2. The City's Denials Were Boilerplate, Not Individualized

Despite distinct disabilities and needs, the City issued nearly identical denials to different members, relying on the same "fundamental alteration" language. ECF No. 200 at 9-10. This is the antithesis of the individualized assessment the ADA requires. *See McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).

### 3. The City Admitted Its Policies Are Unworkable

The City's own officials admitted:

- The 9 sq ft rule is unlivable. ECF No. 200 at 45.

- No tent exists that fits 9 sq ft. ECF No. 200 at 45.

- No non-congregate shelter beds are available. ECF No. 200 at 42.

Enforcing an impossible standard is discrimination. *See* 28 C.F.R. § 35.130(b)(1)(i).

The City's motion on ADA compliance should be denied, and Plaintiffs' cross-motion on this ground should be granted.

### D. THE CITY' FAILS TO NEGATE PLAINTIFF'S STATE-CREATED DANGER CLAIM

The City argues that any danger is inherent to homelessness. This argument fundamentally mischaracterizes the record. The dangers Plaintiffs face are not the inevitable result of life without permanent housing—they are the direct, foreseeable consequence of the City's own affirmative actions and deliberate choices. Constant displacement is not inherent to street life. It is the City's programs and services—the removal of sanitation infrastructure, the reduction of garbage pickups, the refusal to accommodate disabilities, the punitive enforcement actions, and the failure to address rodent harborage on private property—that have actively worsened conditions for our members. The City created the crisis, and now it blames the victims.

1. The City Affirmatively Created the Danger

The City's own actions transformed the Harrison Corridor from a community where residents could maintain basic sanitation into a public health crisis:

<u>Removed the dumpster:</u> On June 4, 2025, the City removed the encampment's secure metal dumpster and refused to restore it. Prado Decl. ¶ 15. This single action eliminated

residents' ability to contain waste, directly creating concentrated food sources that attract and sustain rodents.

    <u>Reduced garbage pickups:</u> Before June 2025, the encampment received pickups approximately three times per week. After the dumpster's removal, service was reduced to roughly once a month. Prado Decl. Residents who had followed City instructions to stage garbage on the roadway watched their piles sit uncollected for months, waterlogged and heavy.

    <u>Ignored the actual source:</u> Despite repeated formal complaints, the City's Vector Control Program took no action against the private properties where the rodent infestation originates—the Hathaway Dinwiddie Construction site and USPS facility, both operating under City-issued encroachment permits. Exhibit A2 shows the last documented treatment occurred on July 21, 2023. For over two and a half years, the City allowed these undisturbed rat refuges to fester.

    <u>Refused reasonable accommodations:</u> The City denied every substantive accommodation request that would have allowed disabled residents to maintain their dwellings and comply with City rules—moving assistance, written communication, consistent points of contact, increased tent dimensions, vehicle exemptions. Prado Decl.

    <u>Withdrew while demanding compliance:</u> The City instructed residents to stage garbage but stopped collecting it. It issued health alerts but provided faulty, unusable PPE. It demanded cooperation while its staff engaged in conduct that traumatized residents. Prado Decl.

    This is the definition of state-created danger: the City worsened conditions, then punishes residents for those conditions. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006).

    2. Constant Displacement Is a City Creation, Not an Inevitability

The City suggests that the instability Plaintiffs experience is simply part of being unhoused. This is false. Constant, traumatic displacement is the result of the City's enforcement choices, not an inherent feature of life without housing.

Before the City's campaign of sweeps and abatements, residents had established communities, routines, and support systems. The City's actions—posting notices, threatening removal, sending police instead of mental health crisis teams, refusing to identify alternative locations—have systematically dismantled the stability that disabled residents require to manage their conditions.

As Olivia DeBree explains, "stable housing and a predictable environment are not merely beneficial—they are medically necessary treatment modalities." DeBree Decl. ¶ 5. The City's programs and services, which should support stability, have instead been weaponized to destroy it.

### 3. The Danger Is Foreseeable

The City knew—or should have known—that its actions would create health hazards:Removing a dumpster from a community of over 50 people will predictably lead to accumulated waste; Reducing garbage pickups from three times weekly to once monthly will predictably create rodent attractants; Ignoring active burrows on private property for 2.5 years will predictably allow a rat population to explode; refusing accommodations for disabled residents will predictably leave them unable to comply with City rules.

The resulting leptospirosis risk was not an act of nature. It was the entirely foreseeable consequence of the City's choices.

### 4. The City Acted with Deliberate Indifference

The City's refusal to accommodate disabilities, despite knowing the consequences, constitutes deliberate indifference. *See Sinclair v. City of Seattle*, 61 F.4th 674, 680 (9th Cir. 2023).

Deliberate indifference requires (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood. Duvall v. County of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001).

Both elements are satisfied here:

<u>Knowledge:</u> The City knew of the rodent problem. It received formal complaints. It had its own $CO_2$ treatment logs showing years of inaction. It knew residents were disabled and needed accommodations. It knew removing the dumpster and reducing pickups would create hazards.

<u>Failure to act:</u> The City did nothing. It refused to restore the dumpster. It refused to provide regular pickups. It refused to enforce against the private property owners. It refused accommodations. When it finally acted, the action was performative—faulty PPE, deflections to HRT, dismissal of legitimate concerns.

The City's conduct is more than negligent. It "involves an element of deliberateness." Id. at 1139. The City made choices—deliberate choices—that created and sustained the conditions it now uses to justify displacing disabled residents.

**E. THE CITY HAS FAILED TO NEGATE PLAINTIFF'S PROPERTY SEIZURE CLAIMS**

The City argues its policies comply with the Fourth Amendment. The issue, however, is not past compliance but future risk. Plaintiffs seek injunctive relief to prevent unconstitutional seizures during the upcoming abatement.

1. The City's Policies Have No Disability Exception

AR 10.1 requires individuals to navigate a complex bureaucratic process to retrieve belongings—calling 311, scheduling appointments during business hours, traveling to the Corp Yard. This process is inaccessible to individuals with: Executive dysfunction (inability to plan, sequence tasks); PTSD (anxiety, avoidance of institutional contact); Mobility impairments (inability to travel); This constructively denies access to property. *See Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012).

## F. INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The City argues that individual defendants are entitled to qualified immunity because no clearly established right was violated. This is incorrect.

### The Right to Be Free from Disability Discrimination Is Clearly Established

The ADA's requirements for reasonable accommodation and interactive process have been settled law for decades. *Tennessee v. Lane*, 541 U.S. 509 (2004). Any reasonable official would know that refusing to engage in a good-faith interactive process and issuing boilerplate denials violates the ADA. *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006), clearly establishes that officials may be liable for affirmatively creating dangers. The individual defendants here participated in the decisions that created the conditions at the Harrison Corridor.

Here, the individual defendants were on notice and personally participated in canceling meetings, refusing in-person accommodations, issuing boilerplate denials and withholding documentation. Qualified immunity does not shield officials who engage in such conduct. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002)

Under Ninth Circuit precedent, a Title II claim may arise where police "fail to reasonably accommodate the [plaintiff's] disability in the course of investigation or arrest, ***causing the***

23

*[plaintiff] to suffer __greater injury__* or indignity in that process than other arrestees." *Sheehan v.*

*City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), rev'd in part on other

grounds, 575 U.S. 600 (2015) (Emphasis added.)

Similarly, Title II applies to other adverse actions taken against persons with disabilities

such as the clearing of a homeless encampment with no alternative locations provided. Here, the

City has failed to rebut plaintiff's medical evidence that not only would BHU members' existing

disabilities cause difficulties to those evicted from the Harrison Corridor encampment with no

alternative safe place to go, but the disabilities *themselves* will be aggravated, exacerbated,

compounded and irreversibly worsened. In this regard, the Union has provided extensive,

unchallenged documentation from Lifelong Director and Nurse Practitioner Olivia deBree and

which the City has not only not rebutted, but has accepted as demonstrating the nexus.

**City's Appeals to the Ninth Circuit have divested the District Court of Jurisdiction**

"A notice of appeal is an event of jurisdictional significance – it confers jurisdiction on

the court of appeals and divests the district court of its control over those aspects of the case

involved in the appeal." So said the Supreme Court in *Griggs v. Provident Consumer Discount*

*Co.*, 459 U.S. 56, 58, 1982. See also, *Acute Inc. v. ECI Pharmaceuticals LLC* Adv. Pro. No. 25-

01048 SMG, 2025 Bankr. LEXIS 1232, *3 (Bankr. S.D. Fla. May 21, 2025.) Here, Defendant

City of Berkeley, (hereafter "COB" or "City") has filed notices challenging the Court's

continuance(s) of the June 10, 2025 limited preliminary injunction and, more recently,

challenging the Court's order for cross motions for summary judgment on the issue of the

interactive process. Thus, while this Court has jurisdiction on other issues, it may be divested of

jurisdiction in the those "aspects of the case" now before the Ninth Circuit.

**CONCLUSION**

For the reasons discussed above, the evidence in the voluminous record of this case and the arguments that Plaintiff will make at the hearing on the cross motions for summary judgment, this Court should reject Defendant's Motion for Summary judgment. The record is replete with evidence showing that the City's official Homeless Encampment Program, as described in Asst. City Manager Peter Radu's letter of October, 2024, not only includes, but prioritizes relocation of the homeless to "safety", to shelter and to permanent housing.  The City itself not only directly manages these relocations but is itself a housing provider. (See, Prince Declaration.)

In *Where Do We Go Berkeley*, the Ninth Circuit made clear that Caltrans "does not provide people with housing solutions" and making it do so would "create new programs that provide for heretofore unprovided services" i.e, be a fundamental alteration of its mission as a transportation agency.

The same cannot be said for the City of Berkeley. This Court should reject the City's attempt to narrowly misrepresent its own program as no more than "get the people and their stuff out" of the camps, as Thomas Gregory repeatedly put it during the interactive process meetings. In *PGA Tour, Inc. v. Martin,* 532 U.S. 661 (2001) the Court found that a similar narrowing of the "program" under consideration would take it out of the reach of the ADA altogether. Plaintiffs urge this Court not to let the City of Berkeley do the same thing.

Dated: February 20, 2026                            Respectfully Submitted,
                                                     /s/ Anthony D. Prince
                                                     Law Offices of Anthony D. Prince