ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A Professional Law Corporation
Ruth M. Bond      (SBN 214582)
    Ruth.Bond@aalrr.com
Rahi Azizi        (SBN 274800)
    Rahi.Azizi@aalrr.com
3 Harbor Drive, Suite 200
Sausalito, California 94965-1491
Telephone:  (628) 234-6200
Fax:  (628) 234-6899

Farimah Faiz Brown, City Attorney  (SBN 201227)
Chris Jensen, Assistant City Attorney  (SBN 235108)
Laura Iris Mattes, Deputy City Attorney  (SBN 310594)
Nubyaan Scott, Deputy City Attorney (SBN 331584)
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile:  (510) 981-6960
Email:  CJensen@berkeleyca.gov
        LMattes@berkeleyca.gov

Attorneys for Defendant
CITY OF BERKELEY

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERKELEY HOMELESS UNION, ADRIEN BOUCHARD, NICHOLAS JOHNSON AD FRANK MOORE,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BERKELEY, THOMAS GREGORY, PAUL BUDDENHAGEN, PETER RADU, OKEYA VANCE-DOZIER, RASHI KESERWANI, DOES 1-10,<br><br>Defendants. | Case No.      3:25-CV-01414-EMC<br><br>**CITY OF BERKELEY'S SUR-REPLY IN SUPPORT OPPOSITION TO PLAINTIFF'S SECOND TEMPORARY RESTRAINING ORDER MOTION**<br><br>Judge:     Hon. Edward M. Chen<br>Dept.:     Courtroom 5 |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................... 4

II.   BACKGROUND ............................................................................................ 5

      A.    Plaintiff's Second Motion For TRO ..................................................... 5

      B.    The New Individuals Submitted Accommodation Requests That Were Nearly Identical To Each Other and To Past Requests, Thereby Requiring Similar Responses ..................................................................................... 6

      C.    Availability And Offers Of Shelter ..................................................... 14

III.  ARGUMENT ............................................................................................... 15

      A.    The City Complied With The ADA ..................................................... 16

            1.    The City Has Supported Its Position That Many of the Accommodation Requests Would Require Fundamental Alteration of City Programs ..................................................... 16

            2.    The City's Interactive Process was not a "sham" ................. 17

            3.    The City Has Met Its Burden to Show Fundamental Alteration .............. 17

            4.    Plaintiff's Evidence of Particularized Injury is Insufficient .................... 18

      B.    The City Has Not Created the Danger; Rather Plaintiff Ignores the Clear and Present Public Health Danger presented by Current Conditions at Harrison Encampment ..................................................... 19

IV.   CONCLUSION ............................................................................................ 20

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

TABLE OF CONTENTS                              SUR REPLY ISO OPP. TO 2ND TRO MOTION.
56412427.1/

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Alfred v. City of Vallejo*
2025 WL 435900 (E.D. Cal. Feb. 7, 2025, No. 2:24-cv-03317-DC-SCR)..................... 5,19,20

*McGary v. City of Portland*
386 F.3d 1259 (9th Cir. 2004)............................................................................... 16,17

*Sinclair v. City of Seatle*
61 F.4th 674, 680 (9th Cir. 2023) ............................................................................. 19

*Tennessee v. Lane*
541 U.S. 509 (2004)................................................................................................ 16

*Townsend v. Quasim*
328 F.3d 511 (9th Cir. 2003)................................................................................... 16

*Vinson v. Thomas*
288 F.3d 1154 (9th Cir. 2002).................................................................................. 17

*Winter v. Natural Resources Defense Council, Inc.*
555 U.S. 7 (2008)................................................................................................... 19

**FEDERAL CODES/STATUTES**

28 C.F.R. § 35.130(b)(7).......................................................................................... 16

42 U.S.C. § 12132 ................................................................................................... 16

**STATE CODES/STATUTES**

California Vehicle Code § 22651(o)........................................................................... 13

**OTHER AUTHORITIES**

Berkeley Municipal Code and Administrative Regulation 10.2 ...................................... 11

City Council Resolution No. 71,513-N.S.................................................................... 8,12

https://berkeleyca.gov/safety-health/homeless-services ............................................... 8,9

https://www.dorothydayhouse.org/services ................................................................. 12

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

TABLE OF AUTHORITIES                     SUR REPLY ISO OPP. TO 2ND TRO MOTION.
56412427.1/

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

# I.    INTRODUCTION

At the Court's request and to provide further evidence and argument demonstrating that BHU has not established a likelihood of prevailing on its claims or that it will suffer irreparable harm that exceeds the harm the City will suffer should a restraining order issue, the City submits this sur-reply in support of its Opposition to Plaintiff Berkeley Homeless Union's second Motion for a Temporary Restraining Order ("Second TRO Motion").

The evidence that Plaintiff Berkeley Homeless Union ("BHU") presents in its reply in support of its Second TRO Motion contradicts its argument that the City has issued "blanket" or "boilerplate" denials of unhoused individuals' requests for reasonable accommodation in connection with the City's efforts to abate hazardous health conditions at the Harrison Street encampment. In fact, Yesica Prado's declaration and attached exhibits (ECF 272-1-19) demonstrate that the 16-18 new individuals at issue submitted detailed information about their disabilities and numerous requests for accommodation that the City carefully considered. The City provided detailed explanations for why it could not provide many of the requested accommodations. Plaintiff's claim that these new requests are "highly individualized" is misleading at best, as the requests are nearly identical to each other and to other prior requests submitted by BHU and its members.

Because the requests were largely duplicative or identical to earlier requests, some of the City's responses may inevitably seem repetitive. However, they are neither boilerplate nor blanket denials. The evidence reflects that the City considered the specific disabilities of each individual and their specific accommodation requests. Moreover, the City provided detailed explanations for why certain accommodation requests could not be granted because they would require the City to fundamentally alter its programs or cause the City undue hardship. That the City did not hold in-person interactive meetings with every single requester does not prove that the City failed to meet its obligation. At the City's request the requesters provided exhaustive information regarding their disabilities and accommodation demands, both in forms they completed and emails sent by Ms. Prado. Plaintiff does not explain what additional information the individuals would have provided had they met in person with the ADA Coordinator. Moreover, in response to the City's detailed explanations for why it could not grant many of the requested accommodations, neither plaintiff nor

-4-

the individual requesters modified their accommodation requests. Their failure to do so precipitated any breakdown in the interactive process.

Plaintiff's claim that the City will put these individuals in imminent danger by requiring them to relocate so it can abate a severe health and safety hazard both for the residents and the public at large also distorts reality. Confirmed Leptospirosis conditions at the encampment, caused primarily by rat harborage, trash and sewage, poses an imminent risk of harm to the encampment's residents and the public at large. Preventing the City from abating this serious public health threat will only exacerbate this threat and subject the residents to even greater danger. These facts, as well as the number of individuals involved and the nature of their accommodation requests, distinguishes this case from *Alfred v. City of Vallejo* ("*Alfred*"), 2025 WL 435900 (E.D. Cal. Feb. 7, 2025, No. 2:24-cv-03317-DC-SCR). Plaintiff's claim that the abatement action will inevitably exacerbate their disabilities—supported by the declaration of Nurse Brizzolara—also is speculative. Moreover, other available services—including congregate shelter which the City has repeatedly offered—could prevent exacerbation of conditions, but the individual requesters have all rejected such offers. For this reason too, the case at bar differs from *Alfred*, as in the latter case it was undisputed that no shelter—congregate or otherwise—had been made available to the sole plaintiff in that proceeding.

The City has not displayed "deliberate indifference" towards any individual at issue. To the contrary, the City has repeatedly offered shelter and other accommodations to encampment dwellers. It also has considered the same requests repeatedly and explained to the requesters that it cannot grant many of the requests without fundamentally altering its programs or exacerbating a serious public health and safety hazard.

For these and other reasons the City has provided at various stages of this proceeding, the Court should deny BHU's Second TRO Motion

## II.    BACKGROUND

### A.    Plaintiff's Second Motion For TRO

On March 10, 2026, Plaintiff filed its Second TRO Motion on behalf of 18 new individuals who submitted accommodation requests in connection with the City's plan to clear the Harrison Corridor encampment on March 10. (ECF No. 264.) Plaintiff initially filed declarations of 7

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

-5-

individuals in support of its Second TRO Motion. On March 10, an individual identified as Jane Doe filed a claim and the assigned Judge referred the case to Judge Chen to determine whether the case should be related to this one. Judge Chen related the case, despite Jane Doe's failure to seek permission to proceed anonymously and without providing the City with an opportunity to respond.

On March 11, the City filed an Opposition to Plaintiff's Second TRO Motion, supported by an additional declaration from Thomas Gregory. (ECF. Nos. 261.) The Court held a hearing on March 11, 2026, whereupon it ordered Plaintiff to file a Reply to the City's Opposition to its Second TRO Motion and allowed the City file the instant Sur-Reply.

**B.**     **The New Individuals Submitted Accommodation Requests That Were Nearly Identical To Each Other and To Past Requests, Thereby Requiring Similar Responses**

The 18 individuals who have most recently submitted accommodation requests are: Alice Barbee, Erik Alexander Johnson Coon, Hector Navarro, Jacob Clakley, Jason Charette, Jonny Ruel Holder, Kevin Martinez, Lisa Saechao,y-chain, Monique Williams, Quinton Cocklereese, Robbie Peddycoart, Shawman, Robert Pearce, Thomas Barnett, Brenda Bolares, Jermaine Lee White, "Jane Doe," and Kittivut Patanapanich. (ECF No. 272; *see also* Declaration of Registered Nurse Megan Brizzolara In Support of BHU's Reply To City of Berkeley's Opposition to TRO ("Brizzolara Decl.") ¶¶ 5-72.) In response to the City's Opposition, Plaintiff filed a Reply with an additional declaration from Yesica Prado ("Prado Decl.") attaching exhibits A through S. (ECF No. 272-1-19.) Prado Decl. Exhibit B consists of ADA forms submitted by 16 individuals detailing their disabilities and accommodation requests. (ECF No. 272-2). Exhibits C through S of the Prado Declaration are email communications between Ms. Prado and ADA Coordinator Thomas Gregory regarding 16 of the 18 new requests. (ECF No. 272-3-19.)[1]

But even if the Court allows it, the evidence submitted by Plaintiff clearly shows that the City engaged in a detailed interactive process with each individual, considered each person's numerous accommodation requests, and set forth detailed responses regarding whether or not it could provide the accommodation. In instances where the City could not provide the

---

[1]   These exhibits contain hearsay statements that are not admissible for their truth.

-6-

accommodation, Mr. Gregory explained in detail why, including an explanation of how the request would require the City to fundamentally alter its programs.

The evidence relating to Alice Barbee is a representative example of BHU's interactive process with the City. Ms. Barbee's paperwork includes nearly every request that BHU members have submitted over the past few months. Ms. Barbee submitted a written accommodation request form on February 19, 2026. (ECF 272-2, p. 7.) On February 26, 2026, BHU emailed Mr. Gregory and the Homeless Response Team ("HRT") on behalf of Ms. Barbee in which BHU provided a "Disability Verification" explaining in detail Ms. Barbee's long-term disabilities including Herniated disk (C6-C7) for over 20 years; Congestive Heart Failure for 5 years, and Neuro damage. The email explained how her disabilities limit one or more major life activities, and the purported nexus between her disabilities and the City's encampment policies. (ECF No. 272-3, pp. 2-5.) Further, the email made 14 accommodation requests.

In a March 6th email response to Ms. Prado, Mr. Gregory provided detailed descriptions of his in-person conversations with Ms. Barbee, who conveyed to him that she did not necessarily have disabilities that would prevent her from vacating the encampment. (ECF. No. 272-3, p. 6.) He noted that Ms. Barbee's requests were "substantially similar" to those submitted on behalf of numerous individuals over the past several months, and that the City previously advised that such requests "would constitute a fundamental alteration of the City's operations, impose an undue burden, or, in the case of shelter, do not constitute a form of reasonable accommodation under the ADA, regardless of any particular individual's disabilities." (ECF 272-3 [Prado Decl. Exh. C], p. 6.) Mr. Gregory advised that he made his determinations "in consultation with the City Manager's Office and relevant City departments and staff." (Id., p. 7.)

Mr. Gregory then addressed each one of Ms. Barbee's 14 requests. (ECF. No. 272-3, pp. 7-10.) He also directed her to other resources, including Berkeley's safety-health homeless services, and advised her that she could request ADA modifications at any available shelter placement, should she be offered such placement. (Id.) Mr. Gregory then addressed each of Ms. Barbee's 14 requests, each of which were also included in several other individuals' accommodation requests as described below:

Case No.: 3:25-CV-01414-EMC                     SUR-REPLY ISO OPP TO 2ND TRO MOTION
56412427.1/

- Permanent/Interim Housing Placement (Barbee, Coon, Holder, White).

  **City's response**: [S]helter, permanent or otherwise, is not a form of reasonable accommodation but, rather, a service that the City provides when shelter opportunities are available. If Ms. Barbee is seeking assistance or services, she may contact HRT or visit https://berkeleyca.gov/safety-health/homeless-services for information about homeless services that may be available to her. If Ms. Barbee is offered an available shelter placement and that particular placement does not meet her access and functional needs, Ms. Barbee can request ADA modifications at that point. Additionally, the City does not operate nor control permanent supportive housing opportunities, but HRT can assist Ms. Barbee with updating records in the HMIS, if she would like to engage with them

- Temporary Stay-in-Place Pending Accessible Housing—Barbee, Navarro, Martinez, y-chain, Peddycoart, Pearce, Shawman, Barnett, Bolares, White, Clakley, Charette, Holder, Martinez, Williams, Cocklereese).

  **City's response:** [T]o the extent the request seeks an indefinite pause on enforcement at the current location, the City cannot grant that request. Allowing an individual to remain in place notwithstanding the need to abate conditions associated with confirmed leptospirosis would require the City to suspend or override the need for a timely abatement to control vectors and prevent the spread of communicable disease, which is a fundamental part of its encampment management and public health response programs. Such a modification would fundamentally alter the nature of those programs, which are specifically designed to enable prompt intervention when encampments pose imminent risks to public health and safety.

  An open-ended suspension of enforcement in these circumstances would also prevent the City from carrying out required vector control measures and would undermine its ability to respond consistently to emergent health hazards across the public right-of-way. The City's planned actions are consistent with City Council Resolution No. 71,513-N.S., which authorizes enforcement and abatement where encampments present imminent health hazards, even when shelter is not immediately available.

  As an alternative, the City will grant Ms. Barbee an accommodation to remain through March 10, 2026. The City cannot grant additional time without causing the fundamental alteration I have explained above

- Non-Congregate Shelter Placement (Barbee, Coon, Navarro, Clakley, Charette, Holder, Martinez, Cocklereese, Peddycoart, Pearce, Shawman, Barnett, White)

  **City's Response:** [S]helter is not a form of reasonable accommodation but, rather, a service that the City provides when shelter opportunities are available. If Ms. Barbee is seeking assistance or services, she may contact HRT or visit https://berkeleyca.gov/safety-health/homeless-services for

-8-

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

information about homeless services that may be available to her. If Ms. Barbee is offered an available shelter placement andthat particular placement does not meet her access and functional needs, Ms. Barbee can request ADA modifications at that point.

- <u>A Safe Location to Relocate</u> (Barbee, Coon, Navarro, Clakley, Charette [specific to RV placement]; Holder, Martinez, y-chain, Cocklereese, Peddycoart, Pearce [safe place to rest], Shawman [to City-owned lot], Barnett);

    **City's Response**: [N]o sanctioned campsite exists in Berkeley at this time. The City's encampment regulations generally prohibit structures exceeding nine square feet on sidewalks and prohibit lodging or storage of property in certain other locations, including medians and City building curtilage. Individuals may remain on certain sidewalks with property not exceeding nine square feet, provided pedestrian access is maintained and the area is not designated as a no-lodging zone. Even then, all individuals remain subject to enforcement based on health and safety conditions.

    Following posted signage and applicable codes and regulations when relocating will reduce the likelihood of enforcement in a subsequent location, although enforcement decisions remain condition dependent. If Ms. Barbee is seeking assistance or services, she may contact HRT or visit https://berkeleyca.gov/safety-health/homeless-services for information about homeless services that may be available to her.

- Physical Assistance with Relocation (Barbee, Navarro, Holder, Williams, Peddycoart, Pearce, Shawman, Barnett, White);

    **City's response**: [U]nder normal circumstances, City staff could help a disabled member of an encampment physically pack and transport safe and hygienic possessions if the individual is moving those possessions to a City-sponsored shelter. However, staff currently cannot sort, bag, or handle such items, even with personal protective equipment, because the City's Public Health Officer has determined that, based on recently observed conditions at the encampment, the belongings are highly likely to be contaminated with Leptospira through rat urine, rat carcasses, live rats, or mud. Handling such items would pose a significant public health risk to City staff, constituting an undue administrative burden.

- <u>Storage For Essential Belongings</u> (Barbee, Navarro, Williams, Peddycoart, Pearce, Barnett);

    **City's response**: [T]he City cannot store potentially contaminated items, as the Public Health Officer has advised that Leptospira can survive on contaminated materials for weeks. Requiring the City to accept such items into storage would impose an undue burden, given the substantial administrative effort that would be needed either to mitigate those risks or to decontaminate the storage facility after the items were kept there. This is consistent with the City's storage policy

-9-

that generally excludes the storage of items presenting a health or safety risk. The City has repeatedly conducted direct public health outreach at the encampment and provided several rounds of notices informing residents of its inability to handle or store belongings, and it has repeatedly communicated the same information to you, to try to minimize negative impacts on those remaining at the encampment.

- ADA Exempted Footprint (Barbee, Coon, Navarro, Charette, Holder, Martinez, y-chain, Peddycoart, Pearce, Shawman, Barnett, White)

  **City's response:** [T]he request for an indefinite or permanent footprint on any public sidewalk, even provided a four-foot pedestrian clearance is maintained, cannot be granted. Public sidewalks serve multiple legally protected purposes, including pedestrian travel (and associated accessibility compliance obligations), emergency access, commercial activity conducted under active City permits, and placement of utilities and public infrastructure. Sidewalk widths vary considerably, and in many locations a four-foot clearance would not satisfy accessibility requirements once curb ramps, turning radii, and other obstructions are considered. Granting Ms. Barbee an exemption from the nine-square-foot limitation would fundamentally alter the City's management of the public right-of-way and conflict with other legally protected uses. For those reasons, this request cannot be approved Accommodation of Emotional Support Animals (granted to Barbee, Holder, Peddycoart)

- Advance Written Notice of Any Enforcement—30 Days (Barbee, Navarro, Charette, Holder, Martinez, y-chain, Williams, Peddycoart, Shawman, Barnett, White);

  **City's response: [T]**he City is unable to grant a request for 30 days' additional notice to vacate the encampment. Providing that additional notice would constitute a fundamental alteration of the City's encampment management program because it would prevent the City from effectively addressing public health hazards, including the presence of Leptospira identified at the encampment. As part of its ongoing encampment management program, the City has repeatedly provided both written and verbal notices regarding the need to relocate since January 2025. Additionally, I personally spoke with Ms. Barbee on January 23, 2026, and February 19, 2026, to provide verbal notice. As such, Ms. Barbee has been provided with over 40 days' notice, and this accommodation has already been met.

- Visual Aid/Map of Permissible Locations [grant of immunity from enforcement] (Barbee, Navarro, Charette, Holder, Martinez, y-chain, Peddycoart, Shawman, Barnett);

  **City's response:** the ADA requires public entities to modify policies and procedures when necessary to ensure that individuals with disabilities have equal access to public programs. However, the City is not obligated to create individualized maps or pre-approved locations that guarantee immunity from enforcement. As previously explained, the City's encampment-related requirements are

-10-

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

established through a combination of municipal code provisions, administrative regulations, and City Council resolutions, all of which are subject to change based on public health conditions, safety concerns, and legal requirements. Park rules prohibit overnight camping and unattended property exceeding ten square feet without a permit. The Berkeley Municipal Code and Administrative Regulation 10.2 generally prohibit structures exceeding nine square feet on sidewalks and also prohibit lodging or storage of property on medians and within City building curtilage.

In limited circumstances, individuals may remain on certain sidewalks with property not exceeding nine square feet, provided pedestrian access is maintained, facilities are not obstructed, and the location is not designated as a no lodging area. Even in those circumstances, all individuals remain subject to enforcement based on health and safety impacts, nuisance conditions, and compliance with applicable law. Because enforcement determinations are location specific, condition dependent, and responsive to changing circumstances, it is not possible for the City to identify locations where camping would be categorically free from enforcement.

Further, no map identifying enforcement-free locations exists in City records. Creating a map that would illustrate areas less likely to draw enforcement would require extensive staff time, site-specific analysis, and physical measurement of sidewalks and public spaces throughout the City and would therefore constitute an undue administrative burden under Title II. As an alternative, the City has summarized the applicable regulatory framework to assist in understanding how enforcement decisions are made but cannot provide individualized guarantees regarding future enforcement outcomes.

- <u>Temporary Sanitation Services</u> (Barbee, Martinez, y-chain, Peddycoart, Shawman)

**City's response**: [T]he City has, in limited circumstances, provided portable restrooms, trash receptacles, and limited waste services at certain encampments as population-level public health measures. Decisions about whether to deploy these services depend on site conditions, public health guidance, operational feasibility, and broader encampment priorities, including the allocation of limited resources. These services are deployed as part of the City's encampment management program and are not provided on an individual basis. Also, when an encampment is cleared, associated sanitation and waste services are discontinued.

Providing sanitation services to an individual who remains outside following an encampment closure would require the City to fundamentally alter how its encampment management program operates. Under current practice, sanitation resources, such as portable restrooms, trash receptacles, and waste services, are deployed at certain active encampments as population-level public health measures based on the number of people present, site conditions, and available resources. These services are designed to address conditions at encampment sites, not to operate as individual services.

-11-

Extending those services to a single individual after an encampment has been cleared would shift the program from a site-based public health measure to an individualized service. Doing so would require the City to fundamentally alter the program and redirect limited sanitation resources in away that the program is not structured to support. For that reason, granting the request would fundamentally alter how the City's encampment management program functions.

In addition, providing on-demand individualized sanitation services would effectively create a new program or service. Title II of the ADA requires reasonable modifications to existing programs but does not require public entities to create entirely new programs.

The City does, however, contract with community partners that provide sanitation and related services to individuals in need. For example, Dorothy Day House operates a drop-in center at its main shelter in downtown Berkeley that is open seven days a week, year-round. The center offers meals, showers, laundry, clothing, lockers, mail services, internet access, respite space, housing support, ID and DMV assistance, workforce training, and referrals for medical and addiction services. More information about these services is available here: https://www.dorothydayhouse.org/services. The City also maintains public restroom facilities at various locations throughout the City that are available for public use.

- Indefinite Pause on Enforcement/Stay-in-Place (Barbee, Clakley, Charette, Holder, Martinez, Williams, Cocklereese);

**City's response**: [T]o the extent the request seeks an indefinite pause on enforcement at the current location, the City cannot grant that request. Allowing an individual to remain in place notwithstanding the need to abate conditions associated with confirmed leptospirosis would require the City to suspend or override the need fora timely abatement to control vectors and prevent the spread of communicable disease, which is a fundamental part of its encampment management and public health response programs. Such a modification would fundamentally alter the nature of those programs, which are specifically designed to enable prompt intervention when encampments pose imminent risks to public health and safety.

An open-ended suspension of enforcement in these circumstances would also prevent the City from carrying out required vector control measures and would undermine its ability to respond consistently to emergent health hazards across the public right-of-way. The City's planned actions are consistent with City Council Resolution No. 71,513-N.S., which authorizes enforcement and abatement where encampments present imminent health hazards, even when shelter is not immediately available.

- Low Stimulation Meetings (Barbee, Martinez, y-chain, Cocklereese, Peddycoart, Shawman)

**City's response: [**T]he City is not requiring Ms. Barbee to attend any meetings. Whenever Ms. Barbee arranges a meeting with a City staff

-12-

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

person, she is welcome to contact me to explain the specific requests she has to minimize the possibility that she will become overstimulated, and I will facilitate those accommodation requests as best as possible for each meeting, consistent with my duties as the City's ADA Coordinator

- Designated Point of Contact (Martinez, Barbee, y-chain, Cocklereese, Peddycoart, Shawman, Barnett [granted])

  **City's response**: City advised individuals to contact Mr. Gregory at (510) 981-6418 ada@cityofberkeley.info if they have questions.

- Exemption from RV/Vehicle Towing and Impoundment (Charette, Williams [van], Barnett)

  **City's response**: Gregory explained that vehicles may be towed if they are out of out of compliance with California registration requirements, including if registration has been expired for more than six months, as authorized under California Vehicle Code section 22651(o). Further, the basis for this request is financial, rather than related to a disability, and therefore does not qualify as a reasonable accommodation under the ADA. The California Vehicle Code permits law enforcement to tow vehicles with registration expired for more than six months, and the City enforces these requirements consistently to ensure public safety and compliance with state law. (ECF. 272-11, p. 6.) With respect to

- Step-by Step guidance (y-chain, Martinez, Cocklereese).

  **City's response**: Re up-to-date shelter opportunities, I recommend that BHU contact HRT for that info. Re step-by-step guidance re complying with the posted abatement order, the steps that Mr. Martinez takes to comply with the abatement order, as well as the sequence of such steps, are up to Mr. Martinez. If Mr. Martinez seeks step-by-step guidance, perhaps BHU can off er him such guidance. I recommend: (1) gather all possessions not being abandoned, then (2) remove self and unabandoned possessions from the posted abatement zone.

Some of the individuals asked for additional specific accomodations, which Mr. Gregory also addressed.  For example, Mr. Coon asked for "Modification of Enforcement Operations—Elimination of Noise Triggers." (ECF. No. 272-4, p. 6.) Mr. Gregory carefully considered his request and on March 5 explained in detail to him why the City could not provide the accommodation, namely because silencing sirens, alarms and other loud equipment would fundamentally alter City operations, would violate other laws and regulations, and would potentially put others in danger.  (*Id*.) Mr. Coon also asked for "Phased Relocation," which Mr. Gregory explained could not be provided because the City does not offer peer-support services and does not

-13-

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

operate a program to develop individualized, step-by-step relocation schedules for members of the public. Mr. Navarro asked for Language Access Accommodations. Although this does not appear to be a disability accommodation, Mr. Gregory expressly responded to this request on March 2 and in an email on March 6, in which he informed Mr. Navarro that the City will arrange for translation services as needed any time Mr. Navarro requests them. The City also posted a notice in Spanish. (ECF. No. 272-5, pp. 7-8.). Ms. Charette requested "Recognition of RV as Medical Equipment." (ECF No. 272-7, p. 3.) Mr. Gregory provided a specific response to that request. (*Id.*, p. 6.) Mr. Holder and Ms. Bolares asked for recognition of their tents as medical equipment and/or an accommodation. Mr. Gregory provided a specific response to this request. (ECF No. 272-8, p. 8; ECF No. 272-17, p. 4.) Holder, Cockleresse, and White also requested recognition of a dog as medical equipment. Mr. Gregory also provided a specific response to that request, noting that the City did not intend to separate them from their service animals, which is permitted consistent with applicable law. (*Id.*, p. 9; ECF No. 272-12, p. 4.; ECF No. 272-18, p. 15).

Ms. Williams asked for exemption from towing of her van and permission to park her van at the Campus Motel, where she resides, or a designated safe location. (ECF 272-11, p. 3.) The City noted that Williams actually resides at the Campus Motel, which Plaintiff does not dispute. The City also addressed this specific request. (*Id.*, p. 6.)

Mr. Cocklereese asked for "Executive Functioning Assistance". Mr Gregory advised that such a service does not exist, and Title II of the ADA does not require the City to create a new service. However, Mr. Gregory advised Mr. Cocklereese that he could contact the Center for Independent Living. (ECF. No. 272-12, p. 5.)

Regarding Mr. White, the City's response to his accommodation requests were clearly catered to his specific needs and requests. (ECF No. 272-18, pp. 3-15.)

C.    **Availability And Offers Of Shelter**

The City has offered ***all of the individual requesters*** in this matter shelter during outreach efforts by HRT staff. (Declaration of Peter Radu in Support of Defendant's Sur-Reply in Opposition to Second Motion for Temporary Restraining Order ("Radu Sur-Reply Decl."). Shelter resources available to individuals experiencing homelessness include both congregate and non-congregate

-14-

shelter programs. Congregate shelter generally involves shared sleeping or living areas. Non-congregate shelter programs include housing sites or similar programs that provide more private or semi-private accommodations. (*Id*. ¶¶ 4-5.)

The City's non-congregate shelter sites currently include the Campus Motel, the Berkeley Inn (also referred to as Beyond the Horizon), and the Capri Motel (also referred to as the Howard Johnson). These sites provide individual or shared rooms and are distinct from congregate shelter environments. (Radu Sur-Reply Decl. ¶6.) The City also operates additional motel-based sites, including the Golden Bear Inn and the Rodeway Inn; however, those sites function as permanent supportive housing and are not part of the City's interim shelter inventory available for general shelter placement. (Id. ¶7.)

During their outreach, HRT staff and partner providers offer available shelter placements to individuals when appropriate. Some individuals accept those placements, while others decline them. It is not uncommon for individuals to decline offers of congregate shelter even when such placements are available. As set forth in the Radu Declaration, the City offered most of the 18 individuals shelter on multiple occasions. (Radu Decl. ¶¶ 13 [Barbee], 15 [Bolares], 17 [Coon], 19 [Clakley], 20 [Charette], 21 [J.L. White], 22 [Holder], 23 [Martinez], 26 [Williams], 27 [Cocklereese], 28 [Peddycoart], 29 (Pearce), 30 [y-chain], 31 [Shawman], 33 [Barnett], 34 [Prado]. They either rejected it, accepted it and then voluntarily left because they did not want to follow the rules, or were asked to leave because they could not follow the rules. (*Id*.)

In sum, the City spent significant time and resources considering and responding to individual requests for accommodation.

## III.    ARGUMENT

Contrary to Plaintiff's claims, the City has complied with the ADA by notifying individuals they may request accommodation, mainly by in-person communication, and engaging in extensive interactive process with the individuals at issue here. Moreover, given the speculative nature of Nurse Brizzolara's assertions about imminent harm caused by encampment relocation, and the City's efforts to provide other available services to the individual requesters, including shelter placements, Plaintiff's state created danger theory fails.

Case No.: 3:25-CV-01414-EMC                    SUR-REPLY ISO OPP TO 2ND TRO MOTION
56412427.1/

## A.      The City Complied With The ADA

In its Reply in support of its Second TRO application, Plaintiff repeats its argument that the City failed to comply with the ADA because it did not conduct individualized assessments and instead used "identical boilerplate language for multiple individuals" in denying accommodation requests.  (Reply p. 6.)  This is incorrect. As explained at length above, the City reviewed and considered the detailed information submitted on their behalf about their disabilities.  (Gregory Decl. ¶¶ 10-135; Prado Decl. Exs. C through S.)  The individuals largely sought identical accommodations including, non-congregate shelter, temporary/indefinite stay-in-place, permanent housing placement, a safe location to relocate, exemption from footprint requirement, personalized sanitation, indefinite pause on enforcement, and others.  Because these accommodations would fundamentally alter City programs and/or cause undue hardship, the City explained that it could not provide the accommodations regardless of the person's disability.  This was an appropriate response.

### 1.      The City Has Supported Its Position That Many of the Accommodation Requests Would Require Fundamental Alteration of City Programs

Title II prohibits disability-based exclusion or discrimination, but it does not require public entities to provide new services or to restructure programs to accommodate an individual'. See 42 U.S.C. § 12132; *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003). Public entities need only make modifications necessary to avoid discrimination that do not fundamentally alter the nature of the service, program, or activity or impose undue fiscal or administrative burdens. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004); 28 C.F.R. § 35.130(b)(7). In its summary judgment briefing, the City explained at length why many of the requested accommodations would fundamentally alter its encampment management programs and related services. (See, e.g., ECF. No. 219, pp. 11-19) Thus, the City will not repeat those here.

In its Reply, Plaintiff cites *McGary v. City of Portland*, 386 F.3d 1259 (9th Cir. 2004) in support of its allegation that the City did not conduct individualized assessments.  That case involved a homeowner who sued the City for disability discrimination in violation of the ADA and other laws when it denied his request for additional time to clean his yard in order to comply with the City's nuisance abatement ordinance.  The Ninth Circuit reversed the District's court's dismissal of the

-16-

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

complaint, finding that plaintiff adequately plead his ADA claim. *Id*., 386 F.3d at 1264-1265. The Court found that plaintiff sufficiently alleged that he was discriminated against "by reasons of" his disability for the purposes of overcoming a Rule 12(b)(6) motion to dismiss. (*Id*. at 1265.) *McGrary* has little bearing on the situation here, where there is extensive evidence of the City's interactive process and its particularized reasons for denying each person's accommodation request.

### 2.    The City's Interactive Process was not a "sham"

Despite the detailed information provided by the City in response to each person's reasonable accommodation request, Plaintiff claims that the Brizzolara Declaration—which merely describes the individual's disabilities much the same way they are described in Prado's emails to Thomas Gregory—demonstrates that the City should have held in-person meetings with each person.  However, Plaintiff does not explain what additional information they would have provided that was not included in their detailed requests or how that information might overcome the fact that the City cannot fundamentally alter its programs; nor does it acknowledge that the City has offered affected unhoused individuals shelter and other services on multiple occasions.  (Radu Sur-Reply Decl. ¶¶ 13-36.)

Plaintiff notes that the interactive process is "dynamic," yet they ignore the fact that BHU and numerous individuals have submitted the same, exact requests over and over (permanent or temporary shelter, indefinite stay-in-place, individualized sanitation, larger footprint, non-congregate shelter)—without variation—despite the City's detailed explanations regarding why the City cannot provide them.  Moreover, where feasible, the City has offered accommodations. Plaintiff cannot blame the City for providing consistent responses to the same requests for accommodation that are unreasonable, regardless of the requester's particular disability. The City is not required to engage in the charade of discussing the same requests with the same Plaintiff over and over again when it is clear those requests are not required by law.

### 3.    The City Has Met Its Burden to Show Fundamental Alteration

The City met its burden to show that many of the accommodation requests are unreasonable and would require the City to fundamentally alter its programs.  *See Vinson v. Thomas*, 288 F.3d 1154 (9th Cir. 2002) (Plaintiff has initial burden to produce evidence that reasonable

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

accommodation was possible; burden then shifts to City to produce rebuttal evidence that requested accommodation was not reasonable.) Plaintiff is incorrect that the City misstates *Vinson*'s holding. Plaintiff has not met its initial burden to show the accommodations at issue are reasonable. By contrast, the City has met its burden of producing rebuttal evidence to show that the accommodations are not reasonable. (See Gregory Declaration in support of Summary Judgment Motion; Radu Declaration in support of Summary Judgment Motion; Radu Decl. in Opposition to Second TRO Motion.) Plaintiff's evidence, which includes detailed explanations from Mr. Gregory, also demonstrates that the requests are unreasonable. Repeating the same requests ad nauseum does not change the fact that they are unreasonable and/or would impose undue burdens on the City.

### 4. Plaintiff's Evidence of Particularized Injury is Insufficient

In their reply in support of the Second Motion for TRO, Plaintiff submits a Declaration from Nurse Megan Brizzolara. (ECF 282-1.) While her declaration provides particularized descriptions of the individual requesters' medical conditions and associated symptoms, and explains what might aggravate those symptoms, the declaration does not establish a sufficient nexus between these conditions and the City's abatement action, which is designed to remedy a serious health and safety hazard at the Harrison Encampment. The City does not dispute that Ms. Barbee and other "[i]ndividuals with neurological (spinal) injuries and cardiac concerns require stable living conditions, consistent access to rest, and the ability to control their environment." (Brizzolara Decl. ¶ 6.) However, it does not follow that the abatement action will exacerbate whatever challenging or precarious circumstances Ms. Barbee may already be experiencing. Being unhoused is inherently unstable, unpredictable, stressful and dangerous. If anything, Ms. Barbee's continued residence at the encampment may subject her to even greater health risks, given the presence of Leptospirosis caused by sewage, trash and rat harborage. The same is true of the encampment's other residents.

Brizzolara's claim that the abatement action would expose Mr. Coon to loud noises and chaotic activity also does not show particularized injury caused by relocation. Coon already is exposed to such things given the location of the encampment and the inherent noise and activity associated with living outdoors on a public street or sidewalk in a high-density, urban city like Berkeley. Brizzolara repeatedly speculates that various consequences *may* arise if the City proceeds

-18-

with its cleanup operation at the Harrison encampment, but her declaration does not establish any reasonable likelihood that they will arise or that one can reasonably attribute these consequences to the City's abatement action. These speculative assertions of harm are not sufficient to support injunctive relief that would prevent the City from abating known and undisputed dangers to public health and safety that exist at the Harrison Street encampment. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. . . . Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

**B.** **The City Has Not Created the Danger; Rather Plaintiff Ignores the Clear and Present Public Health Danger presented by Current Conditions at Harrison Encampment.**

"To succeed on a state-created danger claim, a plaintiff must establish that (1) a state actor's affirmative actions created or exposed him to an actual, particularized danger [that he] would not otherwise have faced, (2) that the injury he suffered was foreseeable, and (3) that the state actor was deliberately indifferent to the known danger." *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (9th Cir. 2023) (quotation marks omitted). The City has addressed at length in previous briefing why Plaintiff cannot establish this claim.

Plaintiff relies primarily on *Alfred v. City of Vallejo*, 2025 WL 435900, to support its state-created-danger claim. However, that case is factually distinguishable on several grounds. For one, the encampment in *Vallejo* did not pose an imminent public health crisis stemming from the presence of Leptospirosis or other highly transmissible pathogens. Additionally, and most critically, in that case, which involved a single Plaintiff rather than the various requesters asserting claims here, "there [wa]s no dispute that there [wa]s no alternative shelter, housing, or camping option currently available to [the] Plaintiff." *Id.* at *8, whereas here, as discussed and as the Radu declaration demonstrates, the City has offered *all of the individual requesters* some form of shelter. Furthermore, the Plaintiff in that case requested an additional 30 days' time to pack and moving assistance, and later asked for an interactive process to address changes to her disability. (*Alfred* at

-19-

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

*2.) Unlike instant case, in *Alfred* the record did not demonstrate the City of Vallejo had a made a good-faith attempt to connect the plaintiff with housing resources, and the City had failed to show that "there [were] weighty public safety, health, and welfare concerns that expeditious removal of Plaintiff's shelter w[ould] serve." *Id.* at *10, 12.  While the City of Vallejo granted the plaintiff's request for assistance with packing and moving her belongings, the City did not offer her any shelter or housing alternatives. The district court found the plaintiff had raised serious questions on whether the City's actions "would create an actual, particularized danger to her safety and welfare," because, "there is no dispute that there is no alternative shelter, housing, or camping option currently available to Plaintiff." (*Id.* at *8.)  By contrast here, numerous BHU members have repeatedly been offered shelter and other services. (Radu Sur-Reply Decl.)

## IV.    CONCLUSION

For the foregoing reasons, and those stated in the City's Opposition, Summary Judgment Motion, and other briefs in this matter, the Court should deny Plaintiff's request for a preliminary injunction prohibiting the City from proceeding with a critical abatement action at the Harrison Street Encampment.

Dated: March 17, 2026          ATKINSON, ANDELSON, LOYA, RUUD & ROMO

By:   */s/ Ruth M. Bond*
          Ruth M. Bond
          Rahi Azizi

          Attorneys for Defendant
          CITY OF BERKELEY

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

# CERTIFICATE OF SERVICE

## FRCP 5(B)

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

On March 17, 2026, I served the following document described as: **CITY OF BERKELEY'S SUR-REPLY IN SUPPORT OPPOSITION TO PLAINTIFF'S SECOND TEMPORARY RESTRAINING ORDER MOTION** on the interested parties in this action as follows:

| | |
|---|---|
| Anthony David Prince<br>Law Offices of Anthony D. Prince<br>2425 Prince Street, #100<br>Berkeley, CA 94705<br><br>*(served electronically)* | **Attorneys for Plaintiff**<br>**BERKELEY HOMELESS UNION**<br><br>Telephone:     510-845-5475<br>Facsimile:<br>Email: princelawoffices@yahoo.com |
| Frank Moore<br>349 Hearst Avenue<br>Berkeley, CA 94702<br><br>*(served via U.S. First Class Mail)* | **Attorneys for Plaintiff (Pro Se)**<br>**FRANK MOORE**<br><br>Telephone:     (510) 575-0563<br>Facsimile:     Unknown<br>Email: Unknown |
| Gavrilov Law Corporation<br>2315 Capitol Avenue<br>Sacramento, CA 95816<br><br>*(served electronically)* | **Attorneys for Amicus**<br>**ATTORNEY OGNIAN GAVRILOV**<br><br>Telephone:     916-504-0529<br>Facsimile:     916-473-5870<br>Email: ognian@gavrilovlaw.com |

☑  **BY EMAIL:** My business email address is kaila.simoneit@aalrr.com. I sent such document(s) to the email addresses listed above or on the attached Service List. Such document(s) was scanned and emailed to such recipients and email confirmations will be maintained with the original document in this office indicating the recipients' email addresses and time of receipt pursuant to FRCP 5(B).

☑  **BY MAIL**: I deposited such envelope in the mail at Pasadena, California. The envelope(s) was mailed with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 17, 2026, at Pasadena, California.

*/s/ Kaila Simoneit*
Kaila Simoneit

- 21 -

ATKINSON, ANDELSON, LOYA, RUUD & ROMO<br>A PROFESSIONAL CORPORATION<br>ATTORNEYS AT LAW<br>3 HARBOR DRIVE, SUITE 200<br>SAUSALITO, CALIFORNIA 94965-1491<br>TELEPHONE: (628) 234-6200<br>FAX: (628) 234-6899