UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERKELEY HOMELESS UNION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BERKELEY, et al.,<br><br>Defendants. | Case No. 25-cv-01414-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Docket Nos. 219, 247, 255, 256, 278 |

### I.    <u>INTRODUCTION</u>

This case concerns Defendant City of Berkeley's efforts to close the encampment of unhoused residents located around Harrison Street & 8th Street in Berkeley, California ("Harrison Encampment" or "Encampment").  Plaintiffs are Frank Moore, an allegedly disabled individual who resides in the Encampment, and Berkeley Homeless Union ("BHU"), an organization that "provides direct support, organizes community defense efforts, and advocates for policy changes to protect unhoused individuals from displacement and discrimination."[1]  First Amended Complaint ("FAC") (Dkt. 62) ¶¶ 40–41.  BHU sued the City for injunctive relief, claiming that the City is discriminating against persons with disabilities in violation of the Americans with Disabilities Act ("ADA"), unlawfully seizing property in violation of the Fourth Amendment and Fourteenth Amendments, and violating the state-created danger doctrine.  FAC ¶¶ 98–145.

Defendants are the City of Berkeley, as well as several City officials, including Paul Buddenhagen (the City Manager), Thomas Gregory (the City's ADA Program Coordinator), Peter

---

[1] Individual Plaintiff Frank Moore is hereby **DISMISSED** from the action for failure to prosecute as he has neither filed with, nor appeared before the Court since the filing of the Complaint and application for a TRO.  See Fed. R. Civ. P. 41(b).  Moreover, Mr. Moore is not one of the seven individuals whose requested relief is at issue in these cross-motions for summary judgment.

United States District Court<br>Northern District of California

Radu (the Assistant to the City Manager for Neighborhood Services), and Okeya Vance-Dozier (field supervisor for the Berkeley Homeless Response Team). *Id.* ¶¶ 42–46. Defendants have taken action to abate the Encampment, citing, *inter alia*, a documented outbreak of leptospirosis bacteria within the Encampment. Doohan Declaration (Dkts. 194-3; 207-2).

This matter comes before the Court on parties' cross-motions for summary judgment. Defendants' SJ Motion (Dkt. 219); BHU's SJ Motion (Dkt. 247). The cross-motions concern the merits of: (1) seven BHU members' disability discrimination claims under the ADA, and (2) the constitutional property seizure and state-created danger claims asserted on behalf of all BHU members residing in the Encampment. For the reasons set forth below, the Court finds that the City failed as a matter of law to provide reasonable accommodations to certain disabled Encampment residents in connection with its planned abatement operations in violation of Title II of the ADA. In addition, the City's proposed abatement of certain vehicles used as primary shelter and enforcement of sidewalk space limitations would, absent compliance with the framework or protections set forth in this order, violate the Fourth and Fourteenth Amendment rights of BHU members. The Court otherwise rejects BHU's remaining claims.

Accordingly, BHU's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**, and Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## II. BACKGROUND

### A. Factual & Procedural Background

The following facts are undisputed except where otherwise noted.

The Harrison Encampment has been a fixture of Berkeley's urban environment for years, but the facts giving rise to this dispute appear to crystallize around 2023, when Berkeley's Environmental Health Division documented escalating hazards in the Harrison Encampment, including used syringes, raw sewage, and extensive rat burrows. Torres Declaration (Dkt. 56-4) ¶¶ 6–8. An April 22, 2025 inspection confirmed that the same conditions persisted and "constitute[d] an imminent hazard" to City workers and residents. *Id.* ¶ 8. In addition to these findings, Mr. Radu documented significant difficulties in maintaining the Encampment's

hospitability: "Put simply, no single encampment area has received more time and attention from the City than the Harrison Corridor." Radu Declaration, Ex. A (Dkt. 15). Defendants note that the City spent roughly five million dollars to fund a master lease of the Campus Motel to operate as a low-barrier non-congregate shelter for residents of the Harrison Corridor, that the Harrison Corridor was responsible for one in five total shelter offers to encampment residents throughout Berkeley, and that the Encampment was the source of hundreds of calls to the Berkeley Police and Fire Departments.[2] *Id.*; Defendants' Opposition to Motion for Preliminary Injunction (Dkt. 56) at 18.[3] Over the course of this litigation, the Court has received numerous declarations from surrounding community members and businesses complaining about hazardous conditions at the Harrison Encampment, including aggressive behavior and fights, thefts, uncontained fires, blocked roads and public rights of way, unleashed dogs, gun discharges, hazardous waste and debris including drug paraphernalia, and break-ins.[4] *See e.g.*, Dkts. 194, 198, 201.

On December 18, 2024, City Manager Paul Buddenhagen ordered a full closure of the Harrison Encampment. Radu Decl. (Dkt. 15) ¶ 6. The City posted notices around the Encampment in January 2025 directing all residents to leave within about one month, warning that the Encampment would be permanently closed, and that vehicles left behind "may be subject to tow and impounding" under California Vehicle Code §§ 22651 and 22669. City's January 7, 2025 Public Notice (Dkt. 13-1). A second identical notice was posted on January 31, 2025. City's Second Public Notice (Dkt. 13-3).

BHU subsequently sued Defendants to halt the City's scheduled abatement actions. Complaint (Dkt. 1). On February 14, 2025, Judge Gilliam granted a temporary restraining order ("TRO") enjoining Defendants from clearing and evicting the Encampment. Order Granting TRO

---

[2] The City represents that all Plaintiffs in this action were offered a unit at the Campus Motel and declined. Plaintiffs do not dispute this characterization.

[3] The City has, at various times, supplied dumpsters and trash pickup, portable toilets, and mobile shower and laundry services to the Encampment. Radu Decl., Ex. A at 3.

[4] Plaintiffs respond that the Encampment conditions were exacerbated by the City's "own deliberate actions and refusal to cooperate," including the removal of a dumpster and the reduction of weekly garbage pickups to "random, unscheduled pickups once or twice a month." BHU Status Report (Dkt. 200) at 46–47.

(Dkt. 18). BHU later moved for a preliminary injunction to block the abatement, which was initially set for hearing on June 10, 2025. Order re Motion to Shorten Time (Dkt. 80).

On the morning of June 4, 2025, without notice or warning to BHU members or the Court, and just six days before the scheduled hearing on the preliminary injunction motion, the City began its abatement of the Harrison Encampment. Order Ceasing Abatement (Dkt. 89). BHU filed an *ex parte* application for an order to halt abatement, which the Court granted after an emergency hearing on the matter. *Id.* The Court emphasized the City's failure to provide adequate notice prior to commencing abatement operations against residents. Explanatory Order (Dkt. 90). And on June 10, 2025, the Court granted in part and denied in part BHU's motion for a preliminary injunction. Minute Entry, June 10, 2025 (Dkt. 104).

In so ruling, the Court found that BHU had associational standing. *Id.* at 2. It also found that BHU was "unlikely to succeed on its Fourteenth Amendment claim because it fails to demonstrate that the City's action will place its members residing in the Harrison Corridor in a state-created danger related to a loss of 1) 'bathrooms,' 2) 'access to food and water' such as from the 'Dorothy Day House,' 3) 'mutual protection' from 'community watch groups and buddy systems,' and 4) medical and case management services' from 'Lifelong Medical and Bay Area Community Services.'" *Id.* (citing Prado Declaration (Dkt. 72-2) ¶ 7). With respect to BHU's ADA claim, the Court held that BHU was "likely to succeed on its ADA claim that the City has not completed the interactive process to identify a reasonable accommodation for its members living in the Harrison Corridor for whom BHU has submitted accommodation requests." *Id.* The Court noted that "BHU's argument that the City has failed to provide a reasonable accommodation by refusing to allow BHU members to continue residing in the Harrison Corridor indefinitely or by failing to obtain interim permanent housing for these individuals is less certain because such accommodations could well constitute a fundamental alteration of the city's program to abate and close the encampment or place a burden on the City which cannot be met (there currently is limited housing availability)." *Id.*

The Court granted limited injunctive relief for residents on whose behalf BHU had submitted ADA accommodation requests. *Id.* Specifically, the Court provided the parties with

4

"60 days" to complete the interactive process for those BHU members residing in the Harrison Encampment who had submitted accommodation requests.  *Id.*  The Court ordered the parties to file a joint status report on the ADA interactive process within 60 days of the order.  *Id.*  No other residents were afforded such protection under the preliminary injunction.  *Id.*; *see also* Order Reaffirming Preliminary Injunction (Dkt. 210).  With respect to individuals falling outside the scope of the preliminary injunction, the Court ordered the City to provide "at least one week's notice before moving on [those residents] property."  Minute Entry (Dkt. 104).

The interactive process was not completed within the 60-day timeline ordered by the Court.  The parties have since engaged in bilateral discussions, including written correspondence and remote or in-person meetings.  BHU does not dispute that the interactive process took place, but it argues that the process was not conducted in good faith, and that the City failed to adequately accommodate Plaintiffs.  BHU's SJ Motion at 18–19.

After the June 10, 2025 preliminary injunction order, the City identified the existence and spread of leptospirosis around the Harrison Encampment.  Leptospirosis is a bacterial disease generally spread by rat urine, which can diffuse through soil, mud, or standing water to contaminate the wider environment.  Doohan Declaration (Dkt. 194-3) ¶ 4.  It can cause high fever, headache, and, without treatment, kidney damage, meningitis, liver failure, trouble breathing, and death.  *Id.* ¶ 5.  It is particularly dangerous for pregnant persons and fetuses, and there have been several confirmed and suspected cases of leptospirosis in dogs in and around the Harrison Encampment, with one dog "strongly suspected to have died from" leptospirosis.  *Id.* ¶¶ 6, 14.  Tests on rats have proven the overwhelming prevalence of leptospirosis within the Encampment.  *Id.* ¶¶ 12, 15.  The presence of leptospirosis in the Encampment is a significant threat to the health and safety of Encampment residents and surrounding community members, including nearby businesses, an urban community farm, restaurants, and residential properties like the University Village which serves U.C. Berkeley students with families.  17, 22.  Due to the Encampment's proximity to a creek, the risk is even more widespread.  *Id.*  Even prior to the discovery of leptospirosis in the Encampment, the Court noted in relation to the preliminary injunction order that as "health and safety hazards persist, the government's interest in closure

increases." Minute Entry (Dkt. 104).

This order resolves the cross-motions for summary judgment filed by BHU and the City. See Dkt. Nos. 219, 247. The Court's analysis is limited to the claims raised in the cross-motions, which concern the accommodation requests of the seven disabled individuals falling under the scope of the June 2025 preliminary injunction and the Court-ordered interactive process.[5] To the extent the Court's rulings extend to non-disabled BHU members in the Harrison Encampment, the order so specifies.

B.　　ADA Interactive Process

The City received ADA accommodation requests from seven Harrison Encampment residents prior to the Court's June 4, 2025 preliminary injunction order. The requests laid out specific disabilities experienced by each plaintiff, and their requested accommodations. The requests were submitted in early 2025, and they triggered the initiation of the interactive process with the City which, because of interruptions and impasses, has persisted for nearly 14 months. *See* Dkt. 253, Exs. A–K; Thomas Gregory Declaration (Dkt. 219-3), Ex. A. The City sent its final determinations on accommodation requests in early-January, 2026, denying almost all accommodation requests. Dkt. 253, Ex. I. The claimants' accommodation requests and City's responses to each are summarized below.

---

[5] These individuals are: Merced Dominguez, Eric Keiser, Shareef Muwakkil, Lewanda Parnell, Yesica Prado, Erin Spencer, and Austin White.

At the March 6, 2026 hearing in the related case *Prado v. City of Berkeley*, No. 23-cv-04537-EMC, Plaintiffs informed the Court that 16 additional Harrison Encampment residents had submitted ADA accommodation requests related to the abatement. Dkt. 187. The Court declines to resolve the ADA accommodation claims of the 16 additional claimants as part of this ruling on summary judgment, as their claims were not briefed by the parties in relation to the cross-motions for summary judgment.

The 16 additional claimants are: Alice Barbee, Erik Alexander Johnson Coon, Hector Navarro, Jacob Clakley, Jason Charette, Jonny Ruel Holder, Kevin Martinez, Lisa Saechao-y-chain, Monique Williams, Quinton Cocklereese, Robbie Peddycoart, Robert Pearce, "Shawman," Thomas Barnett, Brenda Bolares, and Jermaine Lee White. Prado Declaration (Dkt. 272), Exs. A-C.

As noted elsewhere, the rights of these 16 individuals and other similarly situated will be informed by the analysis herein.

6

### 1. Merced Dominguez

Merced Dominguez lives with degenerative spondylosis, which causes pain and limits mobility. Dkt. 253, Ex. A at 10. She relies on her RV as a form of shelter. *Id.* Because of her disability-related needs, Ms. Dominguez requested: (1) permission for her RV to stay at the Encampment and an exemption from towing despite her expired registration, because she has been unable to renew it "due to financial hardships"; (2) exemption from parking citations; (3) an exemption allowing her to keep garbage cans outside the RV on roadways or sidewalks; and (4) assistance in identifying programs through which she could access housing navigators without needing to enter shelter or transitional housing.

On January 6, 2026, the City Manager, Paul Buddenhagen, communicated the City's final determination regarding Ms. Dominguez's accommodation requests. Dkt. 253, Ex. I at 13. Mr. Buddenhagen noted that an in-person meeting had taken place in December 2025 with individuals representing Ms. Dominguez. *Id.*

With respect to the accommodation requests, the City denied her request for an exemption from towing because the request was based on financial limitations rather than disability-related needs. *Id.* The City also noted that the request was not for a reasonable accommodation because it would entail a fundamental alteration of the City's parking enforcement program, which was designed to promote public safety, access to public on-street parking, street maintenance, and the mitigation of impacts arising from long-term vehicle storage. *Id.* The City also denied her request for an exemption from citation for similar reasons, noting that the request is based on financial hardship rather than disability, and that individualized exemptions would constitute a fundamental alteration to the City's parking enforcement program which is designed to promote roadway safety, environmental compliance, and equitable parking access. *Id.*

Third, the City denied Ms. Dominguez's request for an exemption permitting her to store garbage cans outside her RV in violation of regulations limiting the placement of personal property on public rights-of-way. *Id.* at 14. The City explained that the limited footprint is a "fundamental operational feature[] of the City's sidewalk management policies" and that granting an exemption would constitute a fundamental alteration by authorizing use of a public right-of-

7

way inconsistent with the nature of the policy.  *Id.*  The City also explained that the leptospirosis outbreak makes the continued placement of garbage containers on the sidewalk a health hazard that interferes with City and County abatement efforts to mitigate rodent harborages.  As part of this litigation, the City's Public Health Officer has explained that idle vehicles may act as rodent burrows, thereby exacerbating the leptospirosis outbreak, and the City represents that Ms. Dominguez's RV has not moved from its location for at least four years.  Doohan Declaration (Dkt. 194) ¶ 21; Vance-Dozier Declaration (Dkt. 219-6) ¶¶ 3–4.

Finally, in response to her request for assistance with accessing a housing navigator, the City responded that it already "attempted to identify housing navigation programs for which Ms. Dominguez may be eligible" and that "[t]he City has been advised that Ms. Dominguez already has a housing navigator through Abode Services," but that her housing navigator has expressed that Ms. Dominguez insists on remaining in the Harrison Encampment "where she has lived for the past 10 years, which significantly narrows available housing options."  *Id.*

### 2.    Eric Keiser

Eric Keiser lives with schizophrenia, disorganized thinking, and chronic pain from a leg deformity that limits his mobility.  BHU's SJ Motion at 7.  Mr. Keiser requested (1) a stable, non-congregate ADA-compliant relocation option; (2) temporary permission to stay in the Encampment and an exemption from sidewalk space limitations; (3) a map identifying enforcement-free locations in the City; (4) physical assistance with lifting and moving his belongings; and (5) a single point of contact in the City.  On January 6, 2026, the City Manager, Paul Buddenhagen, communicated the City's final determination regarding Mr. Keiser's accommodation requests.  Dkt. 253, Ex. I at 2.  According to the City's final determination email, he requested accommodations in April 2025, but BHU did not respond to the City's requests to meet until late-December 2025.  *Id.*

The City determined that a guarantee of non-congregate shelter was not a reasonable accommodation, because such housing is distributed subject to availability, eligibility criteria, and prioritization of limited resources.  *Id.*  The City directed Mr. Keiser to work with the City's Homeless Response Team ("HRT") to discuss available shelter options.  *Id.*  The City also

United States District Court
Northern District of California

specified that it could not pause abatement until non-congregate shelter became available, because doing so would constitute a fundamental alteration to the City's encampment management program, which balances access to services along with the City's obligations to maintain public health, safety, and accessibility of publicly shared spaces. *Id.* The City similarly denied Mr. Keiser's request for temporary exemption from abatement, because its encampment abatement decisions are based on public health conditions, hazard severity, and community impacts, rather than availability of alternative shelter placements. *Id.* The City explained that a pause of enforcement pending the allocation of housing would constitute a fundamental alteration to the encampment management program, which is "designed to enable prompt intervention when encampments pose imminent risks to public health and safety." *Id.*

With respect to Mr. Keiser's request to stay in place without enforcement of sidewalk space regulations, the City explained that the municipal code, administrative regulations, City Council resolutions, public health and safety conditions, and legal requirements generally prohibit oversized structures along sidewalks. *Id.* While individuals may, under "limited circumstances" remain on sidewalks, they are not permitted to obstruct pedestrian access and may be subject to enforcement of health and safety regulations. *Id.* at 2–3. The City also explained that it could not pause enforcement at the Encampment, because such a pause would be a fundamental alteration to the City's response to the leptospirosis outbreak or other health and safety hazards. *See id.* at 3.

In response to Mr. Keiser's request for a map of enforcement-free zones, the City explained that "no map identifying enforcement-free locations exists in City records," and that creation of such a map would be an undue administrative burden requiring "extensive staff time, site-specific analysis, and physical measurement of sidewalks and public spaces throughout the City." *Id.* at 3. As an alternative, the City provided a summary of applicable regulations "to assist in understanding how enforcement decisions are made" but admitted that it could not provide any individualized guarantees regarding future enforcement actions. *Id.*

In response to Mr. Keiser's request for physical assistance with lifting and moving personal belongings, the City explained that it would ordinarily offer such assistance, but that the leptospirosis outbreak would render any such aid an undue administrative or financial burden,

because of the additional resources and risk borne by City departments and staff to keep personnel safe. The City also explained that the City does not require the provision of personalized or individualized assistance as a reasonable modification, and that such services would fundamentally alter the City's encampment management programs. *Id.* In other words, any such assistance provided in the past was voluntary and not mandatory under the ADA.

Finally, the City acknowledged that it could not "guarantee that a single, consistent staff member will always be available to communicate" and that such a guarantee would impose an undue administrative burden, but that the Homeless Response Team could "document that Mr. Keiser may become overwhelmed during enforcement encounters and may benefit from slower, repetitive communication when feasible. The City noted, however, that this approach cannot always be accommodated when conditions require prompt action to address public health or safety risks or when law enforcement must act to enforce the law." *Id.* at 3. The City's ADA Coordinator, Thomas Gregory, offered to meet with Mr. Keiser to discuss his requests in a low-stimulation setting, and stated that it "intends to provide notice prior to abatement and encourages Mr. Keiser to coordinate in advance with HRT regarding packing and storage. The City cannot guarantee that any enforcement related interaction in an outdoor encampment setting will be low stimulation due to the inherent nature of those environments." *Id.* at 4.

### 3. Shareef Muwakkil

Shareef Muwakkil lives with PTSD, chronic pain, and a history of heart attacks that impair his mobility. DeBree Declaration (Dkt. 120) ¶ 15–16. He benefits from "having a stable location to store survival items and maintain contact with his service providers." *Id.* ¶ 16.

In April 2025, Mr. Muwakkil requested (1) a pause on abatement until shelter or housing could be secured, (2) a map or list of locations to relocate to without risk of citation or abatement, (3) exemption from the nine-square-foot sidewalk limitation to allow a 10x12 foot tent due to his need for privacy and bicycle storage, (4) a consistent HRT point of contact trained in trauma-informed communication who would accompany any law enforcement encounter, and (5) exemptions from rules in any future shelter placement, including exemptions from curfews and restrictions on visitor access. Gregory Declaration (Dkt. 219-3), Ex. A.

10

United States District Court
Northern District of California

On January 2, 2026, the City Manager, Paul Buddenhagen, communicated the City's final determination regarding Mr. Muwakkil's accommodation requests. Dkt. 253, Ex. I at 21. Regarding a pause on enforcement, the City stated that the accommodation would pose both an undue administrative burden and cause a fundamental alteration to City programs, because the requested indefinite pause would hamstring the City's handling of the public health hazard. *Id.* The City denied Mr. Muwakkil's request for a map for the same reasons discussed in the above summary of Mr. Keiser's accommodations. *Id.* With respect to the sidewalk size limits, the City explained that City rules generally prohibit oversized structures, and that an exemption would constitute a fundamental alteration to the City's "regulatory framework governing the public right-of-way" which aim to facilitate pedestrian travel, emergency access, and general health and safety. *Id.* at 22. The City explained that the rules apply to the general public equally regardless of housing status, that there is no discretionary permit system for sidewalk structures, and that Mr. Muwakkil's specific request for a 10x12 foot structure would "occupy a substantial portion of the sidewalk and, on the majority of sidewalks throughout the City, would necessarily extend into the roadway," thereby impairing both access and ADA accessibility for pedestrians, but also public and emergency vehicle access and parking. *Id.*

The City committed to using "patient and respectful communication consistent with best practices and staff training," and to documenting Mr. Muwakkil's request for consistency in staff communications, but acknowledged that it could not "guarantee that a specific outreach worker, . . . will always be available." *Id.* Finally, the City determined that it could not ensure non-enforcement of shelter policies in future accommodations because shelter programs "have differing rules and operational constraints, and no specific placement is currently available," and "the City cannot pre-approve accommodations in the abstract." *Id.* The email stated that HRT would document the request however, which would be evaluated once shelter placement was offered. *Id.*

4.    Lewanda Parnell

Lewanda Parnell experiences vertigo and uses a stroller as a mobility device to prevent falls. BHU's SJ Motion at 7. Because of her increased risk of falling, she requires assistance

11

packing and relocating her belongings. *Id.* Ms. Parnell requested the following accommodations: (1) permission to keep her customized tents without risk of removal; (2) the ability to remain in place, where she has access to community support and stability; (3) a designated ADA-compliant encampment area or indoor non-congregate living space; (4) temporary suspension of enforcement; and (5) physical assistance with relocation. Dkt. 253, Ex. A at 2; Gregory Declaration (Dkt. 219-3), Ex. A.

On January 2, 2026, the City Manager, Paul Buddenhagen, communicated the City's final determination regarding Mr. Keiser's accommodation requests. Dkt. 253, Ex. I at 5. With respect to the first accommodation request, the City explained that it had "consistently stated that it is willing to work with Ms. Parnell to retain her customized tents during an abatement action, provided that a mutually agreed upon relocation plan and timeline are established," but that the City had not received a proposed relocation timeline. *Id.* The City stated that it could not indefinitely delay abatement activities due to "the absence of logistical agreement," but that HRT "remains willing to coordinate packing and storage of the tents once a relocation date is proposed, provided the tents do not present the health and safety hazards previously identified." *Id.*

The City denied Ms. Parnell's request to stay in place because such an exemption would impede public health management efforts and fundamentally alter the City's "encampment management and public health response programs," which rely on timely interventions against emerging risks. *Id.* at 6.

The City denied the request for an ADA-compliant encampment area because the City does not maintain a sanctioned encampment area and is not obligated to do so under the ADA. *Id.* The City stated that its encampment-related rules reflect balanced considerations of local rules and laws, public health conditions, and safety concerns. The City reiterated that Ms. Parnell could relocate, so long as she complied with sidewalk space limits and other rules concerning health and safety and nuisance conditions. *Id.* With respect to her request for an indoor non-congregate space, the City concluded that the provision of housing is not a reasonable accommodation under the ADA, but that the City would — as it must — consider reasonable accommodation requests once a shelter space for Ms. Parnell was made available. *Id.*

12

United States District Court
Northern District of California

The City denied Ms. Parnell's request for a suspension of enforcement or abatement operations for the same reasons described above with respect to Mr. Muwakkil. *Id.* at 6–7. Finally, the City stated that it could offer some physical relocation or storage assistance to Ms. Parnell, but that the City's ability to assist was contingent on the public health situation and the relative safety of Ms. Parnell's specific items. *Id.* at 7. The City, however, reiterated that it was not required to provide personal relocation assistance "to an undetermined location that is not connected to a City program or service. *Id.*

5.    Yesica Prado

Yesica Prado lives with ADHD and PTSD which both impact her executive functioning, emotional regulation, sensory processing, and the ability to handle sudden changes, including relocation. Dkt. 253, Ex. A at 17. As accommodations, Ms. Prado requested (1) permission to remain in her RV in its current location at the Encampment; (2) designation of an ADA parking zone for her RV; (3) access to a disability advocate to assist with executive dysfunction and logistics planning; and (4) exemption from citation and arrest due to disability-related limitations. *Id.*

On July 23, 2025, the City denied Ms. Prado's request for a disability advocate, stating that the City does not have "trained 'disability advocate' staff," referring her instead to the Center for Independent Living or the City's HRT staff to assist with the relocation process. Dkt. 253, Ex. D at 8. The City also denied Ms. Prado's request for exemption from law enforcement, stating that the RV must comply with California Vehicle Code requirements, local parking rules, and other regulations about storing personal items on sidewalks. *Id.* On January 5, 2026, the City Manager, Paul Buddenhagen, communicated the City's final determination regarding Ms. Prado's other accommodation requests. The City stated that exemption from parking enforcement rules would pose an undue administrative burden because the City's parking enforcement program relies on automated license plate recognition technology, and an individualized exemption requiring manual parking tracking for Ms. Prado would be a significant departure from norms and expense of resources: "Specifically, parking enforcement staff would be required to rely on manual and labor-intensive methods, such as maintaining paper logs of protected vehicles, physically marking

13

United States District Court
Northern District of California

vehicles, returning to inspect those markings, and resolving disputes regarding whether a vehicle has moved.  These manual methods lack the permanence, reliability, and data integrity of [automation-based] enforcement and in other contexts have led to increased disputes with members of the public regarding compliance."  Dkt. 253, Ex. I at 19.  The City also explained that the exemption would fundamentally alter the City's public right-of-way and parking management programs, turning a uniform, generally administrable set of standards into one focused on "individualized administration" focused on "authorizing prolonged use of the public right-of-way tied to personal circumstances.  That shift would impair the City's ability to manage curbside access consistently, respond to changing conditions, and maintain fair and predictable access to limited public parking."  *Id.*  The City explained that the 72-hour parking limit is a "core component" of that program designed to enhance parking availability, emergency access, public health and safety, neighborhood impacts, and the City's ability to perform routine street maintenance.  *Id.* at 20.  The program is also intended to promote vehicle turnover, and "is not designed to accommodate extended or semi-permanent vehicle placement, even on an individualized basis, because doing so would undermine space turnover and the City's ability to address cumulative neighborhood, safety, and operational impacts."  *Id.*

   6. Erin Spencer

   Erin Spencer experiences mobility impairments, PTSD, and ADHD, making compliance with abatement policies "impossible without direct assistance," in part due to his difficulties moving independently and with executive functioning, planning, and completing tasks.  Dkt. 253, Ex. A at 13.  Mr. Spencer requested the following accommodations: (1) City-identified relocation areas immune from abatement or law enforcement; (2) an exemption to the nine-square-foot sidewalk limit to allow his 20x30 tent for community gathering needs; (3) requests for physical assistance relocating, trash disposal, and portable toilets; (4) a three-step notice process, with notice given 30 days, 15, days, and three days before any law enforcement action; (5) a City-purchased or repurposed flatbed trailer; (6) trauma-informed law enforcement interactions; and (7) solar panels, charging access, and infrastructure modifications.  *See id.*; Gregory Declaration, Ex. A.  Mr. Spencer met with City staff in December 2025 as part of the interactive process.  Dkt. 253,

14

Ex. I at 16.

On January 5, 2026, the City Manager, Paul Buddenhagen, sent the City's final determination regarding Mr. Spencer's other accommodation requests. *Id.* With respect to the first request, the City explained that during the interactive process meeting, Mr. Spencer "explained that he does not want to access any City shelters because he does not believe any would accommodate his needs, even though the City explained that accommodations can be made in City shelters to address disabilities." *Id.* The City then reiterated its basis for not providing maps of areas immune from enforcement, as described above in relation to Mr. Keiser. *Id.*

The City denied Mr. Spencer's request for an exemption from sidewalk space limits, explaining that the City had considered whether a smaller space could serve as a feasible alternative, but that "even a modest increase would still occupy a substantial portion of the sidewalk," impairing pedestrian access and ADA compliance, emergency access, vehicle travel and parking, and the City's ability to manage public health and safety risks. The City stated that a 20x30 space would require "a sidewalk at least 24 feet wide to prevent obstruction of the pedestrian path of travel, which is not available in most areas." *Id.* at 17. The City described the accommodation as a fundamental alteration to sidewalk management programs, and described the accommodation as a conversion of public streets and sidewalks into private, individualized spaces. *Id.* The City also explained that it imposes uniform citywide standards governing sidewalk use based on a balancing of various considerations, and that the City would not operate a "discretionary permitting system for sidewalk structures." *Id.*

The City neither granted nor denied Mr. Spencer's request for physical relocation assistance and storage, stating that it ordinarily provides such services but that the public health situation may result in limited assistance in moving and storing certain items. *Id.* The City explained that it is Mr. Spencer's responsibility to schedule any such assistance in advance through HRT. *Id.*

The City denied the request for trash collection or installation of portable restrooms, stating that such accommodations would constitute "a personal service rather than a reasonable accommodation," and that the services would be an undue administrative and financial burden

because the City would be required to dedicate staff to continuous, individualized support. *Id.*

The City denied Mr. Spencer's three-step notice request, stating that the ADA requires non-discrimination rather than extended or customized notice periods beyond what is necessary to allow a person to respond to enforcement. *Id.* The City explained that the proposal would constitute a fundamental alteration of enforcement procedures. *Id.* The City, however, explained that it would provide notice consistent with legal requirements, but that it could not guarantee multi-stage notice reminders as requested.

The City denied Mr. Spencer's request for a flatbed trailer, stating that this would require the creation of a new service or program, which is not required under the ADA. *Id.* The City instead stated that it "may offer access to existing shelter or storage programs, but is not obligated to provide new vehicles, trailers, or other personal items for encampment residents." *Id.*

The City stated that it could not guarantee trauma-informed interactions with law enforcement, and that the City was not required to restructure programs or assign personnel in a way that "fundamentally changes how the program operates." The City, however, committed to using patient and respectful communication consistent with training, and that HRT would document the request and known triggers to guide future interactions. *Id.* at 18. The City also stated that it could not guarantee that certain HRT staff or police officers would always be present, and that it could not prohibit certain staff from interacting with individuals, as that request "would mandate individualized staffing, scheduling, and resource allocation that the City cannot sustain without altering the core operation of its encampment management and law enforcement programs. . . . interfere[ing] with the City's ability to deploy staff where they are most needed." *Id.*

Finally, the City denied Mr. Spencer's request for solar panels, charging access, and other infrastructure, stating that this would be a fundamental alteration of City programs which do not guarantee any such resources. The City explained that granting this request would require the creation of new services, reallocation of staff and resources, and public redesign operations that extend beyond the scope of a reasonable accommodation. *Id.*

7.      Austin White

Austin White experiences esophageal varices and is medically restricted from lifting more than 20 pounds.  BHU's SJ Motion at 7.  Plaintiffs explain that abatement and relocation without assistance would risk a life-threatening hemorrhage.  *Id.*  Mr. White appears to have only requested one accommodation: exemption from sidewalk space limitations to allow occupation of a 10x12 foot space.  *See* Gregory Declaration (Dkt. 219-3), Ex. A; Dkt. 253, Ex. I at 11.  It appears the request was premised on the need to accommodate his two service dogs.  *See* Dkt. 253, Ex. I at 11.

The parties held an in-person meeting in July 2025, and the City responded to the request that month stating that it could provide physical assistance with packing, lifting, and storing Mr. White's belongings.  Dkt. 253, Ex. D at 2.  This offer does not appear to have been accepted or rejected by BHU or Mr. White.  *See id.*  Mr. White also met with City staff in December 2025 as part of the interactive process.

On January 2, 2026, the City Manager, Paul Buddenhagen, communicated the City's final determination regarding Mr. White's other accommodation requests.  *Id.*  The City denied Mr. White's request, stating that it considered whether an alternative, "modestly larger than nine square feet" could be feasible, but that any increase would be a fundamental alteration for the same reasons stated above, with respect to Mr. Keiser.

### III.      LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alteration and internal quotation marks omitted).  Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  *Id.* (quoting Wright, et al., Federal Practice and Procedure § 2720, at 335–36 (3d ed. 1998)).  However, the court must consider the evidence proffered by both sets of motions before ruling on either one.  *Riverside Two*, 249 F.3d at 1135–36;

17

*Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011) ("Because the parties filed cross-motions for summary judgment, we consider each party's evidence to evaluate whether summary judgment was appropriate.").

As a general matter, where the party moving for summary judgment would bear the burden of proof at trial, that moving party bears the initial burden of proof at summary judgment as to each material fact to be established in the complaint and must show that no reasonable jury could find other than for the moving party. *See S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citing William W Schwarzer, et al., California Practice Guide: Federal Civil Procedure Before Trial (Rutter Group) § 14:124–127 (2001)). Where the moving party would not bear the burden at trial, the motion need only specify the basis for summary judgment and identify those portions of the record, if any, which it believes demonstrate the absence of a genuine issue of material fact on some essential element of the claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party to establish the existence of material disputes of fact that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.    DISCUSSION

A.    Associational Standing

Defendants argue that BHU lacks Article III standing.  Defendants' SJ Motion (Dkt. 219) at 7–11.  The Court previously held that BHU has associational standing:

> As an initial matter, regarding associational standing, BHU easily satisfies the first two prongs of the *Hunt* associational standing test. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344–45 (1977). Because BHU's Americans with Disabilities Act ("ADA") claim requires substantial individualized evidence, BHU does not clearly satisfy the third prong of the *Hunt* test. However, because the third prong is prudential, the Court allows BHU to bring its claims on behalf of its members.

Minute Entry, June 10, 2025 (Dkt. 104) at 2.

The Court sees no reason to revisit that holding, particularly as the issue of standing is on appeal before the Ninth Circuit, and the City has not requested an indicative ruling under Federal Rule of Civil Procedure ("FRCP") 62.1.  *See* Defendant's SJ Motion; Defendant's Opposition

Brief; *see also* No. 26-842, DE 10 (City's Opening Brief).[6]

Accordingly, the Court maintains its prior ruling that claimants seeking relief are BHU members and that BHU has associational standing to bring legal claims on behalf of its members. Minute Entry, June 10, 2025 at 2.

B.    ADA Legal Standard

BHU brings ADA claims on behalf of seven of its disabled members, and constitutional claims under the Fourth and Fourteenth Amendments on behalf of all of its members residing in the Harrison Encampment. The Court addresses each of the asserted claims organized by category of requested relief. First, the Court summarizes the applicable legal standards.

1.    ADA Interactive Process

Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prove that a public entity violated the ADA, a plaintiff must show "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against by the public entity; [and] (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003). Importantly, where there is a threatened exclusion or denial by reason of disability, a public entity must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination based on disability." 28 C.F.R. § 35.130(b)(7); *see Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859–60 (9th Cir. 2022); *Ind. Living Ctr. Of*

_____

[6] The Court notes that BHU alleges that each claimant is a member of BHU. *See* BHU SJ Motion at 3, 16–17; *see also* BHU Status Report (Dkt. 200) at 1–4, 11–35; Dkt. 253, Ex. C at 3 (City referring to "the eight BHU members who the City had identified as falling under the ambit of Judge Chen's preliminary injunction order."). The City has not submitted evidence contesting that the claimants in this action are BHU members, nor has the City filed an affidavit or declaration under FRCP 56(d) showing that it cannot present facts essential to justify its opposition on that point. *See* Defendants' SJ Motion (Dkt. 219); Defendants' Opposition Brief (Dkt. 256).

*S. Cal. v. City of L.A.*, 973 F. Supp. 2d 1139, 1149 (C.D. Cal. 2013) (stating that public entities have "the affirmative duty" to 'make reasonable modifications . . . necessary to avoid discrimination on the basis of disability'").

To trigger the City's obligation to accommodate, a person must first satisfy the prima facie requirements: they must be a qualified individual with a disability, excluded from participation in or denied the benefits of a City program or service, by reason of that disability. *Where Do We Go Berkeley*, 32 F.4th at 860. As to the second element, the exclusion from participation need not be complete; a partial exclusion from participating in a part of the program may suffice. *See, e.g,* *Alexander v. Choate*, 469 U.S. 287, 300–01 (1985) (recognizing in Rehabilitation Act context that a benefit cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the "meaningful access to which they are entitled," and that reasonable accommodations within a program may be required to assure such access); *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021) (recognizing Title II claims based on inaccessibility of specific components of a college's educational program, including textbooks and education technology); *Cal. Found. For Ind. Living Ctrs. v. Cnty. of Sac.*, 142 F. Supp. 3d 1035, 1058, 1063–64 (E.D. Cal. 2015) (holding that exclusion from certain aspects of airport services, including inadequate gate counter accommodations and emergency evacuation procedures constituted violations of the ADA); *Lieber v. Macy's West, Inc.*, 80 F. Supp. 2d 1065, 1075, 1080 (N.D. Cal. 1999) (holding that failure to maintain sufficiently wide pathways for fitting rooms and checkout areas violated Title III of the ADA); *Cohen v. City of Culver City*, 754 F.3d 690, 698–99 (reversing summary judgment for city and finding genuine dispute of material fact as to Title II violation where city permitted a vendor to block a curb ramp, preventing a disabled individual from accessing a sidewalk).[7]

Once those threshold elements are met, the City must engage in a fact-specific,

---

[7] That a complete exclusion from a program is not necessary is obvious from the conventional ADA jurisprudence. An ADA discrimination claim applies where, *e.g.*, only some areas of a store are not accessible because of lack of a compliant counter height or where there are steps without an accessible ramp to some portion of the store. A claim may lie where some but not all rooms in an office or courthouse are inaccessible.

United States District Court
Northern District of California

United States District Court
Northern District of California

individualized assessment to determine what accommodation, if any, is reasonable in order to ensure non-exclusion or denial of benefits. *McGary v. City of Portland*, 386 F.3d 1259, 1265–66 (9th Cir. 2004). This process requires the City to gather sufficient information from the individual requesting accommodations, as well as relevant City personnel, experts, or other sources of information sufficient to determine whether the requested accommodation would be reasonable. *See Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999). In assessing the reasonableness of a requested accommodation, the City must consider the particular needs of the person making the request. *See Duvall v. Kitsap*, 260 F.3d 1124, 1139–40 (9th Cir. 2001). The City may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process.[8] *See id.* The assessment of the legal sufficiency of the entity's response to a request for accommodation under the ADA is discussed in greater detail below.

Before addressing the merits of the accommodation requests, the Court addresses BHU's threshold argument that the interactive process was procedurally deficient and the City failed to fulfill its obligations under the ADA. BHU's SJ Motion at 3–5, 18–19; BHU's Opposition Brief at 4–9. BHU raises three principal arguments: (1) the interactive process was not conducted in good faith, (2) final determinations were not rendered by an authorized official, and (3) the City's assessments were not sufficiently individualized. None of these arguments is ultimately availing. The Court then turns to the key substantive matters central to evaluating the merits of ADA accommodation requests.

####     a.    Good Faith

The Court's June 10, 2025 preliminary injunction order directed the parties to complete the interactive process within sixty days. Minute Entry (Dkt. 104). That deadline was not met, though the record reflects that both parties bear some responsibility for the delay.

In any event, the Court has reviewed the correspondence between the parties and, although

---

[8] Because the Plaintiffs all submitted requests for accommodations in specific and direct terms, the Court does not need to determine whether claimants' disabilities were sufficiently open, obvious, and apparent that the City would be on notice of the need for reasonable accommodations even in the absence of concrete requests.

there are instances in which the City's conduct and written responses should have been more forthcoming and patient, the record as a whole reflects that the City engaged in written exchanges, conducted or offered live meetings (either in person or by telephone or video conference), solicited information from multiple City departments, and issued formal written determinations signed by the City Manager. *See* Dkt. 253, Exs. A–F, I–P. Although the interactive process was imperfect, the Court finds the interactive process was sufficiently complete.

Furthermore, as a legal matter, BHU's arguments as to bad faith cannot themselves sustain an ADA claim absent a showing that a reasonable accommodation was available and denied. The Ninth Circuit has held that failure to engage in the interactive process in good faith does not, by itself, give rise to liability — rather, the Court must first determine whether the public entity failed to provide a reasonable accommodation. *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018). The Court is aware that *Snapp* arose under Title I of the ADA, and that Title II's regulatory framework does not perfectly mirror Title I's interactive process requirements, but the central principle applies with equal force here: process deficiencies do not independently supply a basis for liability where no reasonable accommodation was improperly denied. *See id.*; *see also Howard v. HMK Holdings, LLC*, 2018 WL 3642131, at *9 (C.D. Cal. June 11, 2018) (Gee, J.) (holding in the FHAA context that "failure to engage in the interactive process is not an independent basis for liability under the FHAA, although such failure may be considered when determining whether the landlord denied a reasonable accommodation request in the first place"); *McClure v. Nat'l R.R. Passenger Corp.*, 2021 WL 4395812, at *9 (C.D. Cal. June 10, 2021) (ruling in the FEHA context that "FEHA does not impose liability for failure to engage in the interactive process when no reasonable accommodation is available").

Thus, the critical question for the Court is whether any reasonable accommodation requests were denied by the City. The Court addresses that question below, in its discussion of the merits of the ADA accommodation requests. Any process deficiencies are likewise resolved in conjunction with the merits of the accommodation requests.

               b.       <u>Authority to Issue Final Determinations</u>

BHU argues that some accommodation denials issued by Thomas Gregory, the City's

ADA Program Coordinator, were beyond the scope of his authority because 28 C.F.R. § 35.164 requires final decisions to be "made by the head of the public entity or his or her designee." BHU's SJ Motion at 3, BHU's Opposition Brief at 7. BHU is correct about the regulatory requirement, but not in its application to the facts here.

The final, operative determinations challenged in this action were each issued by Paul Buddenhagen, the City Manager. Dkt. 253, Ex. I. BHU appears to concede that Mr. Buddenhagen is the head of the public entity or a proper designee. *See* BHU's Opposition Brief at 7. And although earlier responses to some requests were sent by Mr. Gregory, he has declared under penalty of perjury that he regularly evaluates ADA accommodation requests and is "authorized by the City of Berkeley to make determinations as to whether requests for accommodations are reasonable under the ADA." Gregory Declaration (Dkt. 261) ¶ 4. As an official authorized to evaluate and decide ADA accommodation requests, Mr. Gregory is an appropriate "designee" for purposes of 28 C.F.R. § 35.164. Even assuming that determinations by Mr. Gregory were procedurally deficient, any such deficiency appears to have been cured by the issuance of final determinations by the Mr. Buddenhagen. Dkt. 253, Ex. I. BHU does not adequately explain why a subsequent, final determination by the undisputed proper official fails to satisfy applicable requirements.

c.     The Individualized Assessments

BHU's final procedural argument is that the City's determinations were not sufficiently individualized. In other words, that the City applied uniform "boilerplate" denial reasoning and language regardless of the claimant's specific disabilities or needs in relation to the Encampment and the City's abatement. BHU's SJ Motion at 18–19. BHU's reasoning is that the City frequently relied on vague "fundamental alteration" or "undue administrative burden" rationales for denying accommodation requests, and Mr. Gregory stated that "impacts to the City are the same, regardless of the individual's disability or the nexus" in response to requests. *See id.*; BHU's Opposition Brief at 4–5.

The Court takes BHU's argument seriously, because an individualized inquiry is required under the ADA. *Weldeyohannes v. Wash.*, 162 F.4th 972, 976 (9th Cir. 2025). The record,

23

however, does not show anything akin to BHU's implication that the City mechanistically denied each request without review of the requester's individual circumstances. The City's final determinations identify the specific claimant's disabilities and accommodation requests, and explain in sufficient detail why each denied request would fundamentally alter or unduly burden a particular city program. Dkt. 253, Ex. I. The determinations are not identical – they address the various disabilities, programs impacted, and the specific requested modifications. For certain accommodations, like exemptions from sidewalk space limits, the City explained why a 10x20 foot or 20x30 foot space would impede pedestrian access, spill into the roadway, and pose a fundamental alteration to city programs. *Id.* With respect to accommodations concerning housing, shelter, designated staff persons, and related requests, the City referred to specific interactions with each requester, agreed to document each request to guide future interactions, and committed to future consideration of accommodation requests. *Id.*

Nor are the determinations improperly identical. The fact that several denials invoke the same legal defense, such as fundamental alteration of sidewalk management programs, is not dispositive in this context. Because multiple individuals requested the same type of accommodation (a pause on abatement or a map of enforcement-free zones), and because those requests would produce the same consequences for City programs regardless the identity of the requester or their disabilities, it is not improper or surprising that the City's fundamental alteration analysis reaches the same conclusion across the array of claimants and requests.

The Court finds that the City's determinations were, generally, sufficiently individualized. Where the same denial rationale applies across multiple claimants, that is not evidence of boilerplate reasoning, but rather a reflection of the fact that the same requested accommodation would produce the same programmatic consequences regardless of the identity of the person asking for it. The Court, however, evaluates each denied request on the merits below, and where the City's stated rationale is found to lack a sufficient basis as applied to a particular claimant's circumstances, the Court so notes.

2.      Assessment of the Merits of ADA Accommodation Requests

Having now concluded that the interactive process was procedurally completed as a matter

24

of law, the Court turns to the legal standard governing the assessment of whether the City improperly denied requests for reasonable accommodations.

Plaintiffs must demonstrate that they have a disability, that the City is excluding them from participating in or denying benefits of a program as a result of their disability, and that they have requested an accommodation. *See Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999) (holding in the Title II context that the plaintiff "bears the initial burden of producing evidence that she is otherwise qualified. . . . The burden then shifts to the educational institution to produce evidence that the requested accommodation would require a fundamental or substantial modification of its program or standards. The school may also meet its burden by producing evidence that the requested accommodations, regardless of whether they are reasonable, would not enable the student to meet its academic standards"); *Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1232–33 (9th Cir. 2014). The burden then shifts to the City to prove that the requested accommodation is unreasonable, or if reasonable, that the accommodation would nonetheless constitute a fundamental alteration to relevant programs or impose an undue administrative burden. *See, e.g.*, 28 C.F.R. § 35.164; *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 673 (2001); *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008).

A plaintiff's requests for accommodations must be reasonable and must allow the plaintiff meaningful access to City services and programs. *See Updike v. Multnomah Cnty.*, 870 F.3d 939, 954 (9th Cir. 2017). If a requested modification is unreasonable the requested accommodation may be denied; if the request is reasonable the governmental entity may nonetheless deny the request if granting the request would fundamentally alter the nature of a given program, or pose an undue administrative or financial burden. Public entities need not "create new programs that provide heretofore unprovided services to assist disabled persons." *Townsend*, 328 F.3d at 518. The inquiries into reasonableness and fundamental alteration are distinct. *See* 28 C.F.R. §§ 35.130(b)(7) & 35.164 (stating that a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability" unless the public entity can demonstrate that the modification would fundamentally alter the nature of the service, program, or activity, or post an undue financial or

administrative burden); *Tenn. v. Lane*, 541 U.S. 509, 532 (2004); ("[I]n no event is the entity required to undertake measures that would impose an undue financial or administrative burden . . . or effect a fundamental alteration in the nature of the service."); *PGA Tour*, 532 U.S. 661, 673 (2001) (distinguishing between reasonableness inquiry and fundamental alteration analysis).

Evaluating the merits of a requested accommodation is a generally fact-intensive inquiry. *See Mayfield v. Mesa*, 131 F.4th 1100, 1110 (9th Cir. 2025); *Stephenson v. United Airlines*, 9 F. App'x 760, 763 (9th Cir. 2001) (mem.). The Court evaluates the claimants' needs and requests in light of the City's information-gathering efforts and coordination among experts and City departments to determine whether requests were reasonable and unlawfully denied. *See Updike*, 870 F.3d at 954.

Critical to the summary judgment motions herein are: (1) the correct definition of the City's relevant "program," (2) the analysis of the reasonableness of particular accommodation requests, and (3) the parameters of a "fundamental alteration" to that City program. Here, the Court provides clarity as to these disputed questions.

a.     Relevant "Program"

A threshold issue must be resolved before addressing the merits of each request: what is the relevant City "program" against which the reasonableness of a proposed modification must be measured? *See Where Do We Go Berkeley*, 32 F.4th at 862. A stated program must be tethered to the actual activities the public entity performs. *Id.* at 861. Relatedly, the Court must assess whether the denial of a requested accommodation threatens to exclude a qualified individual with a disability from participation in, or the benefits of, that program. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

The City proposes to define "program" narrowly on a program-by-program approach, with "encampment management" or abatement as separate programs from discrete City services like the specific tasks of providing parking enforcement, sidewalk management, law enforcement, parking management, and housing and shelter provision. *See* Defendants' SJ Motion at 11–12; Gregory Declaration (Dkt. 219-3) ¶¶ 12, 16, 19–20 (defining the encampment management program as "intended to mitigate hazards efficiently and equitably for the public, not to provide

continuous personal services or enable indefinite use of public land," and distinguishing the encampment management program from the "sidewalk management program," parking enforcement programs shelter programs, and parking enforcement programs).

BHU and the *Prado* putative class, as amici, frame the relevant program broadly as the City's general response to and services for unhoused persons, and argue that under that broader program, the City's fundamental alteration defense is ineffectual.  *See* BHU's SJ Motion at 25 (describing the City's Homeless Encampment Program as including the provision of shelter and permanent housing); Amicus Brief of *Prado* Plaintiffs (Dkt. 255) at 3–7 (describing the relevant program as the City's "homeless response program," which includes shelter and other services and benefits).  Under this framing, accommodations for disabled unhoused individuals would only modestly modify the City's existing programs, rather than forcing additional services that would fundamentally alter them.

In a case such as this, the definition of "program" for purposes of the ADA turns in large part upon the actual uses and activities of the governmental agency's properties in question over time and the nature of the agency's mission.  Thus, for instance, in *Where Do We Go Berkeley*, the Ninth Circuit defined Caltrans's relevant program narrowly, and in direct proportion to the limits of Caltrans's institutional mandate. 32 F.4th at 861–62.  California law charges Caltrans with "full possession and control" of state highways and property acquired for state highway purposes, Cal. Sts. & High. Code § 90, and authorizes it to do "any act necessary, convenient or proper for the . . . maintenance or use of all highways." *Id.* § 92; *Where Do We Go Berkeley*, 32 F.4th at 855.  Its properties are owned and maintained for transportation purposes, not for the provision of housing or social services.  *See Where Do We Go Berkeley*, 32 F.4th at 855, 861  Consistent with that mission, the Ninth Circuit defined Caltrans's program for level 1 encampments as providing "72 hours' notice before clearing and possible coordination with local partners." *Id.* at 862.  Critically, the court drew a firm outer limit — while Caltrans "collaborates with local partners to help people at the encampments connect with critical services and housing solutions," Caltrans itself "does not provide those services; it 'is not the appropriate entity to provide social services or relocation assistance.'" *Id.* at 861.  Because those social and housing services fell outside

27

Caltrans's mission and the historic use of its properties, imposing a six-month delay in clearing high-risk encampments, while effectively requiring Caltrans to house people on its freeway-adjacent land until they found alternative housing, was construed as "creat[ing] new programs that provide heretofore unprovided services" and therefore constituted a fundamental alteration. *Id.* at 862 (quoting *Townsend*, 328 F.3d at 518).

In contrast to *Where Do We Go Berkeley*, the Ninth Circuit in *L.A. Alliance for Human Rights v. County of L.A.* which dealt with the unhoused, defined the applicable municipal programs more broadly: "Skid Row area sidewalks are a service, program, or activity of the City within the meaning of Title II of the ADA." 14 F.4th 947, 959 (9th Cir. 2021). This broader framework makes sense in the context of a city, as opposed to an agency singularly charged with providing transportation. In the context of a municipality, the Court focuses its inquiry on the range of services traditionally offered by the public entity: "The focus of the inquiry . . . is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity." *Where Do We Go Berkeley*, 32 F.4th at 861. The municipality's mission is a broad one.

The case at bar is more akin to *L.A. Alliance* than *Where Do We Go Berkeley.* The City of Berkeley is not an agency with a singular mission such as Caltrans, but a municipality that provides wide-ranging services to the public, including provision of housing, social services, and the maintenance of public property, streets, and sidewalks which have long functioned to serve numerous purposes (*e.g.*, facilitating transit and movement, permitting speech and protests, enhancing urban aesthetics, serving as places of abode for the unhoused, etc.).

The Court thus adopts a formulation which reflects the City's broad ranging activities and mission and which encompasses the concerns fairly raised by both parties herein. The relevant program is: **the City's maintenance of public roadways and sidewalks to ensure their functionality, orderly, use, and public health and safety. This includes use of roadways and sidewalks which serve as locations of abode for the unhoused**. The parameters of this program, so defined, account for the City's interest in abatement — including the provision of publicly accessible rights-of-way (one basic function of sidewalks and streets) and, *e.g.,* the mitigation of

28

the leptospirosis outbreak in the interest of maintaining health and safety on the streets and sidewalks.  The definition also encompasses the fact that City streets and sidewalks have long been used as places of abode for the unhoused.  The City's management of the program thus must consider, *inter alia*, not only the need for abatement to protect public health and allowing for transit and passage, but also the effects on unhoused disabled residents who, lacking access to available or accessible housing or shelter, seek to occupy portions of the public right-of-way.

The Court evaluates the requested accommodations against this broader definition of the City's roadway and sidewalk management program.  The Court assesses the merits of each request in light of this program framework, with the City bearing the burden of demonstrating, with specificity, that the requested modification is unreasonable or would fundamentally alter or unduly burden that specific program.

b.      Reasonable Accommodation

A reasonable accommodation is one that meaningfully resolves the disabled person's inability to access a program or service without undue practical difficulty for the entity providing the program or service.  *See, e.g.*, *Choate*, 469 U.S. at 301 ("[T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."); *Clark v. Cal.*, 739 F. Supp. 2d 1168, 1177 (N.D. Cal. 2010) (Breyer, J.) (holding in the state prison and Title II context that "[t]o be 'reasonable' the accommodation or modification must give disabled prisoners 'meaningful access' to the service, program, or activity in question.").  Weighed against the efficacy of the requested accommodation is the cost and burden of providing that accommodation.  *See Martin v. PGA Tour, Inc.*, 204 F.3d 994, 999 (9th Cir. 2000) (holding in the Title III context that a reasonable accommodation "solves the problem of [plaintiff's] access to the competition . . . and is not a difficult practical matter"); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1084 (9th Cir. 2004) (accommodation is reasonable under Title III where it does not impose "excessive financial costs nor an extensive administrative burden"); "'Reasonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce.  This requires an inquiry not only into the benefits of the accommodation but into its costs as well." *Borkowski v. Valley Cent. Sch. Dist.*, 63

29

United States District Court
Northern District of California

F.3d 131, 138 (2d Cir. 1995)

Critically, there must be a sufficient nexus between the claimant's disability and the accommodation sought: an accommodation that does not meaningfully address the disability-related limitation does not satisfy that standard. *See* 28 C.F.R. § 35.130(b)(7) (requiring accommodations "necessary to avoid discrimination on the basis of disability"); *Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 748 (7th Cir. 2006) ("Rehabilitation Act helps disabled individuals obtain access to benefits only when they would have difficulty obtaining those benefits 'by reason of' their disabilities, and not because of some quality that they share generally with the public."). A reasonable accommodation is one that meaningfully resolves the disabled person's inability to access a program or service without undue practical difficulty for the entity providing the program or service. *Martin*, 204 F.3d at 999; *Fortyune*, 364 F.3d at 1084.

A qualified individual with a disability need not show that an accommodation would be the *most* effective accommodation, but merely that the accommodation would be effective. *See Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 626 (9th Cir. 2024) ("We find instructive the Fifth Circuit's decision . . . 'plaintiffs are not entitled to their preferred accommodation, but only a reasonable accommodation.'"); *Wade v. Solis*, 2009 WL 1186638, at *17 (N.D. Cal. May 4, 2009) ("Wade is not entitled to the accommodation of his choice, but rather, one that is reasonable.").

In sum, where the requested accommodation does not meaningfully resolve the impediment to accessing a program or service, or where the practical or financial costs of a requested accommodation outweigh the benefits of increased access, the requested accommodation is unreasonable. *See PGA Tour*, 204 F.3d at 999; *Fortyune*, 364 F.3d at 1084; *see also Borkowski*, 63 F.3d at 138.

Reasonableness is analytically distinct from the question of fundamental alteration, which the Court addresses next. *See PGA Tour*, 532 U.S. at 673 (noting first that there was no dispute that the requested accommodation was reasonable, then proceeding to determine whether the accommodation "would 'fundamentally alter' the nature of" the competition); *Pierce*, 526 F.3d at 1217 (holding that after the plaintiff establishes "the existence of a reasonable accommodation," the burden shifts to the public entity to "show that the requested accommodation would require a

30

fundamental alteration . . . .").

Even if a request is reasonable, where the defendant asserts that the accommodation would nonetheless constitute a fundamental alteration of the program or undue burden, the Court proceeds to the inquiry of whether the requested accommodation would in fact fundamentally alter the City's program or impose an undue burden.

c.      Elements of a Fundamental Alteration

Another threshold matter that must be resolved before addressing the merits of the particular accommodation requests and the City's responses herein is the determination of when requested accommodations would fundamentally alter the City's program.  The Court thus turns to the factors that must be evaluated in determining whether an accommodation in fact would pose a fundamental alteration to a program.

The central inquiry of the fundamental alteration analysis is whether the requested accommodation would "compromise[] the essential nature" of the program.  *Choate*, 469 U.S. at 300; *see also PGA Tour*, 532 U.S. at 683 (defining an accommodation as a fundamental alteration if it "alter[s] such an essential aspect of the game of golf that it would be unacceptable even if it affected all competitors equally"); *Reed v. City of Emeryville*, 568 F. Supp.3d 1029, 1043 (N.D. Cal. 2021) (Orrick, J.) ("An alteration is fundamental if it would alter 'the essential nature' of the program."); *Smith v. City of Oakland*, 612 F. Supp. 3d 951, 962 (N.D. Cal. 2020) (Tigar, J.) (same).  The question is not whether *any* disruption would result, but whether the accommodation would genuinely and substantially obstruct an entity's ability to deliver the program at issue.  *See id.*  The following five factor framework, derived from ADA precedent, guides the Court's analysis.

***First***, the analysis evaluates whether the proposed accommodation implicates a core or merely peripheral aspect of the challenged program.  An accommodation that is "at best peripheral to the nature" of a program "might be waived in individual cases without working a fundamental alteration," while waiver of a truly essential rule, service, or function risks altering the essential nature of a program.  *See PGA Tour*, 532 U.S. 661, 689 (2001) (holding that the PGA Tour was required to permit a disabled golfer to use a cart during competition because walking the course,

31

though a condition of tournament play, was peripheral to the essential nature of golf and its waiver therefore did not fundamentally alter the character of the competition). If an accommodation implicates only a peripheral aspect of the public entity's program, the accommodation cannot be deemed a fundamental alteration.

**Second**, the inquiry assesses the realistic impact of the specific claimant's individual request on the program, rather than the theoretical cumulative effect of the accommodation if it were applied generally. *See Martin*, 204 F.3d at 1001 ("The issue here is not whether use of carts generally would fundamentally alter the competition, but whether the use of a cart *by Martin* would do so. The evidence must 'focus [ ] on the *specifics* of the plaintiff's or defendant's circumstances and not on the general nature of the accommodation.") (emphases added); *see also Birdwell v. Avalon*, 742 F. Supp. 3d 1024, 1041-42 (N.D. Cal. 2024) (Tigar, J.) (ruling in the ADA and FHAA context that a $150 rent waiver for a disabled resident would not constitute a fundamental burden in part because "receiving approximately $150 less in rent per month due to the accommodation would not interfere with AvalonBay's ability to turn a profit").

**Third**, the Court must examine how realistic the purported impact on the public entity's program would be. The Court will not entertain purely theoretical impacts without an adequate basis in concrete evidence. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1486 n.2 (9th Cir. 1996) (stating in a case concerning alleged disability discrimination from a Hawai'i dog quarantine law that, in addition to the existence of reasonable alternatives to quarantining, "there is evidence that the risk of rabies being imported by guide dogs is low" and "the quarantine has not once in over 75 years detected a single case of rabies among imported dogs"); *see also Where Do We Go Berkeley*, 32 F.4th at 862 (ruling in the context of a program designed to "address risks to the public" that the fundamental alteration analysis also considers "the *probability* of worsening the risk if the agency is forced to alter its program") (emphasis added).

**Fourth**, as a related inquiry, a public entity must determine how substantial the impact of the accommodation would be. In other words, it must be clear that the requested accommodation would be significant enough to obstruct the entity's ability to carry out the program. *See Crowder*, 81 F.3d at 1486 n.2; *Choate*, 469 U.S. at 300 (the central inquiry of the fundamental alteration

32

analysis is whether the accommodation would "compromise[] the essential nature" of a program"); *Where Do We Go Berkeley*, 32 F.4th at 862.

***Fifth***, relatedly, the public entity must consider the availability of alternatives, and the likelihood that such alternatives could reasonably mitigate the obstructive impact of the accommodation while still serving the disabled individual.  *See Crowder*, 81 F.3d at 1486 n.2 (stating that, in addition to the low risk of rabies being imported by guide dogs, "vaccine-based alternatives may be equally or more effective in preventing the importation of rabies"); *Duvall*, 260 F.3d at 1136 ("Mere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; the [ADA] creates a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary.").

With a clear definition of the relevant City program and a framework against which to weigh the City's assertions of "fundamental alteration" in mind, the Court may proceed to evaluate the merits of each requested accommodation.

Because BHU asserts constitutional claims in addition to ADA claims, the Court addresses the applicable legal standards therefor.

C.    Property Seizure Constitutional Standard

Plaintiffs assert that the City's abatement operations constitute an unlawful seizure and destruction of personal property in violation of the Fourth Amendment and the Fourteenth Amendment's Due Process Clause.  The Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures,'" with a seizure of property occurring when there is "some meaningful interference with an individual's possessory interests in that property." *Lavan v. City of L.A.*, 693 F.3d 1022, 1027 (9th Cir. 2012).  At issue in the case at bar are seizures of property raised by the proposed abatement action.

The Ninth Circuit has held that even property temporarily left unattended on a public sidewalk is entitled to Fourth Amendment protection, and that a city may not seize and summarily destroy such property without first demonstrating an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, or constitutes evidence of a

crime. *See id.* at 1024, 1030–31. The lawfulness of a seizure is also informed by the manner of execution, including whether the government summarily destroys property that could have instead been returned or whether intermediate measures could have been taken other than seizure and destruction. *See Lavan*, 693 F.3d at 1031 (concluding that even if seizure of unabandoned property would have been reasonable, summary destruction of that property would not be reasonable under the Fourth Amendment); *U.S. v. Jacobsen*, 466 U.S. 109, 124–25 (1984) ("[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'"); *U.S. v. James Daniel Good Real Prop.*, 510 U.S. 43, 62 (1993) (holding that the government must demonstrate that less restrictive measures, including a lis pendens, restraining order, or bond, would be inadequate to protect its interests before seizing real property without prior notice and a hearing); *U.S. v. Hyde*, 287 F. Supp. 2d 1095, 1099 (N.D. Cal. 2003) (Chen, J.) (holding that where a less drastic alternative would fully preserve the government's stated interest, due process principles counsel in favor of pursuing the alternative over a more burdensome restraint).

The Fourteenth Amendment further affords procedural protections: the government "may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Id.* at 1032 (quoting *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008)).

D.    State-Created Danger Constitutional Standard

Plaintiffs argue that abatement of the Harrison Encampment will expose them to dangers they do not currently face by, *inter alia*, depriving them of access to restrooms, food, water, and basic sanitation services; dismantling the mutual protection and community support of the Encampment; removing medical and case management access; and displacing residents into unfamiliar environments without community support structures. BHU's SJ Motion at 19–22; FAC at 25–29.

The state-created danger doctrine, affording constitutional protection under the Due Process Clause of the Fourteenth Amendment, applies when a public entity engages in affirmative

34

conduct in placing the plaintiff in danger, and acts with deliberate indifference to a known or obvious danger. *Murguia v. Langdon*, 61 F.4th 1096, 1111 (9th Cir. 2023) (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011)). Plaintiffs must also show that they face a particularized and foreseeable danger that they would not have otherwise faced. *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (9th Cir. 2023).

The state-created danger doctrine applies narrowly to encampment abatements. Courts in this district have consistently held that the generalized dangers of homelessness preexist the state's actions in abating an encampment, and the state thus cannot be liable for "creating" dangers that it merely fails to resolve. *See, e.g.*, *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) (White, J.) ("In the absence of particular allegations that the state action put the Plaintiffs in an inherently dangerous situation, the Court is bound to find that the generalized dangers of living on the street preexisted Plaintiffs' relocation . . . . Without allegations of intentional eviction during precarious weather or other facts indicating deliberate indifference to the safety and welfare of the population, the Court must dismiss the claim."); *Jensen v. Johnson*, 2025 WL 2443218, at *6 (N.D. Cal. July 28, 2025) (Thompson, J.) (holding that dangers preexisted state actions); *Scwarz v. Town of Fairfax*, 2025 WL 2410522, at *2–3 (N.D. Cal. Aug. 19, 2025) (Seeborg, J.) ("Plaintiffs fail to show actual, particularized dangers that they would not otherwise confront. The risks of camping outside and having little to no access to clean bathroom and vital services are certainly severe, but the state's action to abate the campsite in one particular location is not creating those risks."). The Ninth Circuit has, in recent non-binding statements, similarly been reluctant to apply state-created danger in the encampment context post-*Grants Pass*. *See Sacramento Homeless Union v. City of Sacramento*, 115 F.4th 1149, 1151–52 (9th Cir. 2024) (mem.) (Nelson, J., joined by Bumatay and VanDyke, JJ., respecting the denial of rehearing en banc) (stating that district court erred in finding state-created danger arising from sweeps during extreme heat); *cf. Penilla v. City of Huntington Park*, 115 F.3d 707, 708 (9th Cir. 1997) (officers finding decedent in emergency situation, canceling the request for paramedics to appear on the scene, and moving decedent into locked home); *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 191 (1989) (social workers failing to remove boy from abusive father's

35

custody); *Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir. 1989) (officers arresting intoxicated husband but leaving wife stranded in unfamiliar location without keys to the car).

On the other hand, affirmative state conduct which places unhoused individuals in a worse condition in their unhoused state, such as removal of their protective belongings and shelters or placing them in locations which increase their exposure to the elements can constitute state-created dangers. *See, e.g.*, *Janosko v. City of Oakland*, 2023 WL 187499, at *3 (N.D. Cal. Jan. 13, 2023) (holding that removal of shelter "affirmatively expose[s] [unhoused plaintiffs] to harsher, more dangerous conditions"); *Prado*, No. 23-cv-04537-EMC, Order re Motion to Dismiss (Dkt. 87) at 50 ("When Plaintiffs' shelter and personal belongings are destroyed, and they have no safe shelter alternative nor means to protect themselves from the elements, the state has made plaintiffs' conditions worse."); *Alfred v. City of Vallejo*, 2025 WL 435900, at *9 (E.D. Cal. Feb. 7, 2025) ("Removing Plaintiff's shelter while knowing Plaintiff has no alternatives is likely to expose her to more dangerous conditions than she currently faces by depriving her of protection rom the elements, . . . creating a known and particularized danger to Plaintiff's safety and welfare.").

The Court now turns to evaluating the merits of each category of relief sought by BHU members. The Court examines each request for relief under the ADA, property seizure, and state-created danger claims where appropriate. The facts relied upon herein are not genuinely disputed except as noted otherwise.

E.    Merits of BHU's Claims for Accommodations/Relief

    1.    Relief Category #1: Indefinite Pause on Abatement, Right to Remain in Place, and Guarantee of Non-Congregate Housing or Specific Shelter Placements

        a.    Merits of ADA Accommodation Requests

Eric Keiser, Shareef Muwakkil, Lewanda Parnell, and Erin Spencer each request either that abatement be suspended until non-congregate shelter placements become available, or a guarantee from the City of non-congregate housing or specific shelter placements. Dkt. 253, Exs. A–B, I; Gregory Declaration (Dkt. 217-3), Ex. A; BHU Status Report (Dkt. 200).

Mr. Keiser cites mobility limitations and chronic pain from a car collision, and

schizophrenia impacting his executive functioning and ability to navigate the relocation process. *See* Dkt. 200 at 12. Mr. Muwakkil experiences mobility limitations from leg swelling and an ankle injury, and psychosis that contributes to executive functioning challenges limiting his ability to relocate without exacerbating symptoms. *See id.* Ms. Parnell cites physical limitations including vertigo and mental health impediments requiring community support to support her request. *Id.*, Ex. A at 2. And Mr. Spencer cites cognitive and mobility challenges, including sciatica and a displaced left hip, and PTSD and ADHD as necessitating this accommodation. *Id.* at 13.

The claimants' requests are both unreasonable and would pose a fundamental alteration to the relevant City program. Accordingly, for the reasons stated below, the Court **GRANTS** summary judgment in favor of the City with respect to this category of accommodations and **DENIES** BHU's cross-motion for summary judgment with respect to the same category of accommodations.

***First***, regarding the requests for an indefinite pause on abatement, the Court finds such an accommodation unreasonable. The reasonableness of a requested accommodation is assessed, in part, by weighing its practical costs against its expected benefits. *See Martin*, 204 F.3d at 999; *Fortyune*, 364 F.3d at 1084; *Borkowski*, 63 F.3d at 138. The costs of the requested accommodation are concrete, immediate, and severe. The City's Public Health Officer has documented confirmed instances of leptospirosis in the Encampment, multiple suspected and confirmed cases in dogs, and contamination risks in surrounding soil and water, with proximity to a creek amplifying the potential range of exposure. Doohan Declaration (Dkt. 194-3). The Court noted in the June 2025 preliminary injunction order that "as health and safety hazards persist, the government's interest in closure increases." Minute Entry (Dkt. 104) at 2. Although BHU responds that the leptospirosis justification is largely pretextual, as no human has been confirmed to have contracted leptospirosis at the Encampment, BHU's SJ Motion at 14, BHU's attorneys at the hearing on BHU's motion did not appear to dispute the seriousness of the public health threat. The documented conditions — the prevalence of rats, contaminated soil, instances of standing water, creek drainage, and rodent harborage sites — establish a plausible and serious human health

United States District Court
Northern District of California

risk exacerbated by encampment conditions.  The finding of leptospirosis infections in rats and dogs is highly unusual and indicative of a serious health problem.  *See* Doohan Declaration (Dkt. 194-3) ¶¶ 9, 16 (describing leptospirosis as a "neglected tropical disease" and explaining that "the presence of Lepto[spirosis] in dogs at the encampment demonstrates the imminent risk to human health because the method of transmission from infected rats to humans is essentially the same as for dogs").  The City is justified in addressing this public health concern with urgency.

BHU argues that targeted rat abatement and partial clearance could address the leptospirosis outbreak without displacing residents.  *Id.* at 14–16.  The Court requested briefing and the production of evidence on this very question.  *See* Order Setting Briefing Schedule (Dkt. 202).  While the availability of alternatives is one factor which informs the analysis, the ADA does not categorically require the City to adopt the *least restrictive* encampment management approach possible, and the City has submitted declarations from competent experts explaining that total abatement of the Encampment is necessary in order to effectuate eradication of the contagion. Doohan Declaration (Dkt. 194-3) ¶¶ 22, 24 (stating that eradication is necessary to mitigate the risk to Encampment residents and that alternatives short of total eradication "cannot adequately address the risks to human health posed by the presence of Lepto[spirosis] in the Harrison Street encampment"); Doohan Declaration (Dkt. 207-2) ¶¶ 6–7 (stating that "even successful partial measures . . . cannot adequately address the risks to human and dog health posed by the presence of Leptospirosis in the Harrison Street encampment" and that "even if it were theoretically possible to effectively abate the Leptospirosis contagion in the encampment while allowing some encampment residents to remain in place, it would not be safe or responsible to do so.  This is because eradication usually involves laying poison bait for the rats.  The poison itself is a potential hazard to humans and their pets, as are the rat carcasses after they have eaten the poison. Additionally, infected rat carcasses can spread Leptospirosis if not properly collected and disposed of"); Torres Declaration (Dkt. 219-7) ¶¶ 5–13.  BHU has not countered this public health evidence sufficiently to create a factual doubt about the need for widespread abatement.

In sum, the City has made a substantial and competent public health judgment that full Encampment closure is well-advised if not absolutely required as a public health measure;  BHU

has offered no expert evidence to the contrary sufficient to raise a genuine issue of fact.  Where the costs of the accommodation include direct, documented risk of harm to public health, the balance tips in favor of the City's abatement.  A proposed accommodation of an indefinite pause on abatement realistically threatens the health and safety of not only the individual claimants herein, but the surrounding community as well.  The proposed accommodation is not a reasonable one.

*Second*, the requests for non-congregate housing or guaranteed shelter placement as a precondition to abatement are both a fundamental alteration to the City's program and an unreasonable accommodation.

The accommodation request would constitute a fundamental alteration of the City's program and would require the city to create a new program.  First, the request implicates a core, rather than peripheral, aspect of the City's program.  Requiring that the City guarantee non-congregate placements before proceeding with abatement could delay abatement indefinitely and for a long period, and this strikes at the heart of the how the program of maintaining the streets operates, by effectively enjoining its ability to maintain streets and sidewalks consistent with public health until it can provide a kind of housing which is currently in scarce supply.  An order postponing the needed abatement would work a substantial non-speculative obstruction of the City's effort to maintain public health and safety in this case.  And the record facts establish beyond genuine dispute that such postponement would leave the City little or no effective alternative courses of action to address the health and safety problem posed by the leptospirosis outbreak.  *See, e.g.*, Doohan Declaration (Dkts. 194-3; 207-2); Torres Declaration (Dkt. 219-7).

Moreover, requiring the City to allocate funds to provide new and additional non-congregate housing, while ideal, would effectively require the City to fund a new or different housing program.  *Townsend*, 328 F.3d at 518 ("[P]ublic entities are not required to create new programs that provide heretofore unprovided services to assist disabled persons.").  The declarations of City personnel confirm that shelter placements are governed by eligibility, availability, prioritization criteria, and operational considerations, and that the City already makes shelter and housing programs available to BHU members on the same terms as other unhoused

United States District Court
Northern District of California

Berkeley residents. Radu Declaration (Dkt. 219-4) ¶ 13; Defendants' SJ Motion at 15–16. Granting guaranteed placements to Encampment residents would necessarily displace other individuals awaiting shelter through the same system, would impose preferential treatment of some over others not in line with the City's priority process, thus interfering with the City's provision of housing as part of its relevant program. *See* Defendants' Opposition Brief at 2–3 (describing the requested accommodation as "a pass to jump ahead in line and receive non-congregate shelter placement at the City's expense, outside the Coordinated Entry System administered by Alameda County and governed by federal Housing and Urban Development Department regulations").

The record also establishes that non-congregate shelter is presently unavailable in sufficient quantity to satisfy the requests, and that the City is operating under a $32 million budget deficit and hiring freeze. Radu Declaration (Dkt. 219-4) ¶ 11; Radu Declaration (Dkt. 56-3) ¶ 5. Fiscal constraints are a serious factor that the Court must consider when evaluating the merits of a requested accommodation. *See Fortyune*, 364 F.3d at 1084. The City's prior expenditure of $5 million to fund a master lease of the Campus Motel, dedicated exclusively to Harrison Encampment residents, illustrates that scale of investment that even a single housing-adjacent accommodation would necessitate. *See* Radu Declaration, Ex. A (Dkt. 15-1) at 1. The ADA does not compel a public entity to guarantee a benefit it lacks the capacity to provide. *See Townsend*, 328 F.3d at 518; *Scwarz*, 2025 WL 2410522, at *4 ("[P]roviding new housing or the full slate of services Plaintiffs request would be an entirely new program.").

Even if not a fundamental alteration, these requests for accommodation are unreasonable. *See Fortyune*, 364 F.3d at 1084 (accommodation unreasonable where it imposes costs disproportionate to the access benefit it delivers); *Borkowski*, 63 F.3d at 138 ("'Reasonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires an inquiry not only into the benefits of the accommodation but into its costs as well."). The City is operating under a significant budget deficit, and the ADA does not require a financially constrained public entity to undertake an open-ended expenditure in pursuit of a benefit which may or may not actually benefit

40

United States District Court
Northern District of California

particular individual claimants. *See id.*

For the foregoing reasons, given the facts not genuinely in dispute, the Court **GRANTS** summary judgment for the City on all claims seeking as an accommodation an indefinite pause on abatement or guarantees of housing or shelter placement. The Court **DENIES** BHU's cross-motion with respect to the same relief.

b.  State-Created Danger Claim

BHU argues that repeated displacement constitutes state-created danger actionable under the Fourteenth Amendment.

In the June 10, 2025 minute entry on the preliminary injunction, the Court found that BHU was "unlikely to succeed on its Fourteenth Amendment [state-created danger] claim because it fails to demonstrate that the City's action will place its members residing in the Harrison Corridor in a state-created danger related to a loss of 1) "bathrooms," 2) "access to food and water" such as from the "Dorothy Day House," 3) "mutual protection" from "community watch groups and buddy systems," and 4) "medical and case management services" from "Lifelong Medical and Bay Area Community Services." Minute Entry (Dkt. 104) at 2. The factual record has not materially changed with respect to these theories. The summary judgment record reinforces the Court's prior assessment instead.

The fundamental problem with BHU's argument on state-created danger arising from abatement is that it conflates dangers inherent in living without shelter with dangers created by the City. The residents of the Harrison Encampment were unsheltered and thus subject to exposure, instability, lack of privacy, inadequate sanitation services, and distance from essential services — all before the City even announced its closure. The abatement does not transform housed individuals into unhoused ones; it displaces individuals who are already unsheltered from one location to others. *See Scwarz*, 2025 WL 2410522, at *3. The loss of a particular community arrangement could constitute a genuine hardship and is undeniably traumatic for many members of the Encampment. But it is not a danger for which the City can be held liable under the Fourteenth Amendment. Unlike situations where unhoused individuals have been displaced and stripped of their belongings during inclement weather, the abatement here was delayed due to

41

rainy weather, and Plaintiffs do not identify a particular risk of injury deliberately imposed by the defendants that would otherwise be absent but for the abatement options. *See* Defendants' Opposition to Second Ex Parte Application (Dkt. 273) at 4; *c.f. Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012) (city endangering unhoused residents by planning to demolish a shelter during "the winter months that would brin cold and freezing temperatures, rain, and other difficult physical conditions"); *Alfred v. City of Vallejo*, 2025 WL 435900, at *9 (E.D. Cal. Feb. 7, 2025) ("Removal of Plaintiff's shelter at this time also imposes an especially increased risk in light of the winter season when the temperature drops and rainfall increases.").

For the foregoing reasons, the Court **GRANTS** summary judgment in favor of the City on all claims related to an indefinite pause on abatement, right to remain in place, and a guarantee of non-congregate housing or specific shelter placements. The Court **DENIES** BHU's cross-motion for such relief.

2.    Relief Category #2: Enforcement-Free Zones, City-Sanctioned or City-Owned Campsite, and Map or List of Enforcement-Free Areas

a.    Merits of ADA Accommodation Requests

Eric Keiser, Shareef Muwakkil, Lewanda Parnell, and Erin Spencer request that the City (1) identify certain enforcement-free locations where they may relocate following abatement, (2) designate City-owned or City-sanctioned campsites for use after abatement, or (3) provide a map or list of areas within Berkeley where displaced Encampment residents may lawfully reside without fear of enforcement. *See* Dkt. 253, Exs. A–B, I; Gregory Declaration (Dkt. 219-3), Ex. A; BHU Status Report (Dkt. 200).

The claimants articulate the following disability-related bases for these requests. Mr. Keiser suffers from mobility impairments and schizophrenia which require predictability. BHU Status Report (Dkt. 200) at 21. "[S]udden displacement fractures his fragile sense of safety, flooding him with stress that worsens hallucinations . . . . The looming threat of citation, arrest or property destruction would keep him in a state of hypervigilance." *Id.* With respect to Mr. Muwakkil, his physical and mental disabilities make it a challenge to exist in "hazardous environments — such as uneven ground, longer distances from services and unsafe structures —

42

United States District Court
Northern District of California

that would worsen his chronic leg swelling, risk re-injury to his unhealed ankle, and impose physical strain that could lead to a heart attack. Mentally, the lack of a stable, predictable place would induce severe anxiety and decision paralysis." *Id.* at 23. He also requires clear visual guidance and an enforcement-free zone because "he cannot navigate complex rules due to executive dysfunction." *Id.* at 24. Ms. Parnell lives with vertigo and difficulty balancing, as well as mental disabilities that impact her ability to complete tasks. *Id.* at 14. She requests a City-sanctioned camp and visual aid of permissible encampment sites because she relies on community for safety and is at risk of vertigo episodes or anxiety from repeated displacement. Finally, Mr. Spencer cites his mobility impairments, PTSD, and ADHD as reasons why he cannot independently relocate or comply with City laws in any future relocation site. Dkt. 253, Ex. A at 13.

These requests fail because claimants have not demonstrated a sufficient nexus between their asserted disabilities and the specific accommodations requested. To establish entitlement to a reasonable accommodation under Title II, a claimant must demonstrate not only that they are a qualified individual with a disability, but that the requested modification would meaningfully provide access to City services or programs otherwise unattainable. *See, e.g.*, *Choate*, 469 U.S. at 301 (a "reasonable accommodation" is one that gives a qualified plaintiff with disabilities "meaningful access" to the program or service); *Martin*, 204 F.3d at 999 ("Here, it is clear that permitting Martin to use a golf-cart is 'reasonable' in the sense that is *solves the problem of Martin's access to the competition*.") (emphasis added).

The Court does not take lightly the claimants' need for stability and predictability. Those needs are understandable. The disabilities at issue here may well bear on a person's capacity to navigate uncertainty, comply with regulatory requirements, and manage the logistics of relocation. The problem here is that the nexus between these disabilities and a pre-commitment to non-enforcement is not readily apparent. The risk of future enforcement against these individuals who move to a new location is speculative at this juncture. The City's enforcement criteria, which by the City's own account, are activated only by hazardous or obstructive conditions rather than the mere presence of unhoused campers. *See* Radu Declaration (Dkt. 219-4) ¶¶ 6–12. The City does

43

United States District Court
Northern District of California

not categorically prohibit camping outdoors;  it manages the public right-of-way by assessing specific risks posed to pedestrian access, public health, fire safety, and community welfare.  *Id.* Compliance with those standards is not beyond reach solely by virtue of the disabilities described in the record.  This is particularly so in view of the City's imposition of enforcement of overly restrictive limits on space occupied by unhoused individuals discussed below.

The Court acknowledges BHU's additional assertion that community proximity is itself a disability-related need — *i.e.*, that individuals with disabilities may depend on established mutual support networks for their day-to-day stability and safety.  But the abatement order does not prohibit Encampment residents from relocating in proximity to one another or from reconstituting certain community arrangements elsewhere, in compliance with the City's balancing framework for enforcement.  The City is not mandating isolation.  *Cf. Boyd v. City of San Rafael*, 2023 WL 6960368 (N.D. Cal. Oct. 19, 2023) (municipal ordinance prohibiting clustering of unhoused residents).  On this record, the need for community proximity does not translate into a disability-related necessity for advance designation of enforcement-free zones or City-sanctioned encampments at this juncture.

The request for a map or list of permissible relocation fares no better, for many of the same reasons.  The City's enforcement program does not operate by categorizing locations as universally permissible or impermissible — it operates by assessing conditions on the ground and responding to hazardous or obstructive conditions as they arise.  Radu Declaration (Dkt. 219-4) ¶¶ 6–12.  And the Court takes the City at its word regarding enforcement — there is no city-wide ban on unhoused individuals, as many such individuals have been left to sleep on City sidewalks without disruption.

Given the City's stated policy that it does not have a City-wide ban on camping by the unhoused, the need for a map of "safe zones" is not substantially tied to the asserted disabilities.  This is particularly so in light of the Court's holding, as noted, that the City may not enforce overly-restrictive space limitations on its sidewalks.  To be sure, should the City engage in serial evictions after residents move from the Encampment, that could, at some point, give rise to a legal claim.  But at this juncture, as noted below, such a claim is not ripe.

Accordingly, the Court **GRANTS** summary judgment in favor of the City on ADA claims related to non-enforcement, City-sanctioned or City-owned campsites, and a map of enforcement-free zones.  The Court **DENIES** BHU's motion for such relief.

b.      State-Created Danger Claim

BHU argues that failure to designate enforcement-free zones and consequent displacement of BHU members from the areas to which they relocate constitutes state-created danger actionable under the Fourteenth Amendment.

Again, much like the above analysis of BHU's state-created danger claim, the fundamental flaw with this argument is that it conflates dangers inherent in living without shelter with dangers created by the City.

However, at the March 11, 2026 hearing on BHU's request for a TRO, BHU argued that the City's *repeated* displacement of unhoused individuals constitutes a state-created danger by preventing the formation of stable community arrangements and forcing residents into recurring cycles of disruption.  BHU's position, drawing on the minority's dissent in *Grants Pass*, is that the Due Process Clause may constrain cities from enacting anti-homelessness ordinances even after *Grants Pass* foreclosed Eighth Amendment challenges.  *See Grants Pass*, 603 U.S. 520, 589 (Sotomayor, J., dissenting) ("Finally, the Court does not decide whether the Ordinances violate the Due Process Clause. . . . The Due Process Clause may well place constitutional limits on anti-homelessness ordinances.").  The Court agrees with Justice Sotomayor's dissent that due process is a valid basis for future challenges to municipal anti-homelessness ordinances.  However, in the case at bar, closing the Harrison Encampment because of the urgency of the leptospirosis outbreak does not necessarily foreclose residents from moving to other parts of the City where some degree of congregation may occur.  While the City refuses to establish a sanctioned encampment elsewhere, as noted, it represents that it does not have a general policy barring residents from sleeping in public places, and there is no apparent policy limiting the number of unhoused persons from sleeping in any given area.  *Cf. Boyd*, 2024 WL 3748334, at *4–5 (N.D. Cal. Aug. 7, 2024) ("The amended ordinance allows for clustering of individuals and campsites in a manner which mitigates the dangers potentially facing isolated unhoused individuals. . . . This addresses the due

process concerns identified by the Court."). Thus, this particular constitutional claim is not ripe at this juncture.

For the foregoing reasons, the Court **GRANTS** summary judgment in favor of the City on BHU's state-created danger claim related to enforcement-free relocation areas, City-sanctioned or City-owned campsites, and maps or lists of permissible relocation zones as a fundamental alteration to the City's existing program. The Court **DENIES** BHU's cross-motion for such relief. Again, the Court reserves judgment on whether a pattern of repeated displacement of unhoused disabled individuals across multiple locations could, on a more developed record, give rise to a viable ADA or constitutional claim. Nothing in this ruling necessarily forecloses future claims under different circumstances.

3.     Relief Category #3: Safe Location to Relocate Vehicles, Towing Exemption, and Parking Relief

a.     Merits of ADA Accommodation Requests

Merced Dominguez and Yesica Prado request certain ADA accommodations with respect to City enforcement of laws and regulations governing vehicle registration, operability, timed parking limits, and cleanliness standards. Eight of the fifteen total vehicles at the Encampment appear to be at risk of imminent enforcement action.[9] The Court first evaluates the merits of the ADA accommodation requests; the constitutional property seizure and state-created danger implications are subsequently addressed.

The Court first acknowledges the significant risk attached to the loss of a physical, movable shelter for persons with disabilities. "Those individuals face disproportionate harm if they are forced to move into public shelters or if they are too far from their medical providers and

_____

[9] Six of the eight vehicles at risk of enforcement action are listed by license plates: (1) 202JYV, (2) 393967, (3) 6HML454, (4) 7PDU606, (5) BMJ499, (6) 9DVV381. *See Prado v. City of Berkeley*, No. 23-cv-04537-EMC, Radu Declaration (Dkt. 193); Response to Radu Declaration (Dkt. 199); Nicoletti Declaration (Dkt. 200); City Reply Brief (Dkt. 205). The remaining two are a gray station wagon and silver four-door vehicle unidentified by a license plate number. *Id.* The remaining vehicles were either not determined to be a public safety threat or were not subject to removal because they are parked outside the designated "No Parking" zone. *Id.* Accordingly, the Court does not issue a ruling with regard to the vehicles not at risk of imminent enforcement action because summary judgment would be premature.

46

social support networks. Individuals with mental health disabilities also risk serious exacerbation of their conditions if they lose their private, safe spaces." *Navarro v. City of Mountain View*, 2021 WL 5205598, at *2 (N.D. Cal. Nov. 9, 2021). In response, the City identifies potential public health and safety concerns associated with specific vehicles. *Prado*, No. 23-cv-04537-EMC, Radu Declaration (Dkt. 193); City Reply Brief (Dkt. 205). For example, rodent droppings and rodent burrows found near vehicles, vehicles serving as potential rodent harborage sites, and accumulation of sewage or personal property around vehicles. *Id.*

As a threshold matter, Ms. Prado's ADA claim is not viable. The Court previously dismissed Ms. Prado's challenge to the 72-hour parking enforcement rule in the related *Prado* action. No. 23-cv-04537-EMC, Order re Motion to Dismiss (Dkt. 139) at 14–16 (holding that Ms. Prado did not demonstrate a sufficient nexus between her disabilities and the requested accommodation). Although Plaintiffs in that case subsequently filed a Third Amended Complaint, that complaint did not re-allege disability discrimination with respect to enforcement against Ms. Prado's RV. *See* No. 23-cv-04537-EMC, Third Amended Complaint (Dkt. 150). Any such claim is therefore waived, and the Court declines to revisit its prior holding.

The Court now proceeds to evaluate the merits of the accommodation request made by Ms. Dominguez.[10] Ms. Dominguez establishes a sufficient nexus between her respective disabilities and the inability to comply with the vehicle-related requirements at issue. Ms. Dominguez's degenerative spondylosis causes chronic pain and limits her mobility and ability to relocate her RV. Dkt. 253, Ex. A at 10. Further, the record reflects that Ms. Dominguez relies on her RV as shelter to "manage her chronic pain in a stable, accessible environment," and that the fear of

---

[10] The City partially denied Ms. Dominguez's accommodation request on the grounds that she advanced financial needs for accommodation, rather than disability-related bases. Dkt. 253, Ex. I at 13; Prado Declaration (Dkt. 272), Ex. G at 5. The Court does not find this rationale convincing. Ms. Dominguez's accommodation request explained how her disabilities impact her ability to comply with rules and regulations governing their vehicles. Dkt. 253, Ex. I at 10; Prado Declaration (Dkt. 272), Ex. G at 2–4. In any event, her disabilities are sufficiently open, obvious, and apparent as a result of her requests and the interactive process. *See, e.g.*, *Rimes v. Claire's Stores, Inc.*, 2024 WL 1461355, at *1 (9th Cir. Apr. 4, 2024) (mem.); *Carter v. Shreveport*, 144 F.4th 809, 814 (5th Cir. 2025) (knowledge of disability is satisfied where "the disability, resulting limitation[s], and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents") (brackets in original) (internal quotation marks omitted); *Martinez v. Cnty. of Alameda*, 2025 WL 1556410, at *10 (N.D. Cal. June 2, 2025).

47

parking enforcement and loss of her vehicle "keeps her in a state of perpetual insecurity of fear," exacerbating symptoms because she is incapable of walking long distances. BHU Status Report (Dkt. 200) at 11, 17–18. Ms. Dominguez's RV serves as her sole source of shelter, and being required to "relocate her RV, [and] repeatedly travel in search of alternative places to park" would "place significant strain on her spine" and exacerbate her pain and mobility limitations. *Id.* at 11; Brizzolara Declaration (Dkt. 279) ¶ 6. Ms. Dominguez requests an exemption from parking enforcement and towing, temporary stability in her current location, relocation to an ADA-compliant parking location, and a parking permit system allowing her to remain in a designated area.

There is a clear nexus between Ms. Dominguez's disabilities and the requested accommodations. Ms. Dominguez has stressed the centrality of her RV to her physical and mental wellbeing, and has expressed willingness to cooperate with the City by voluntarily relocating to a "legal parking area without risk of citation and towing." *Id.* at 17. Having established a nexus between Ms. Dominguez's disabilities and the threatened exclusion from a portion of the City's program (the streets), the burden shifts to the City to demonstrate that the requested modifications are unreasonable, would constitute a fundamental alteration of the relevant program, or would impose an undue burden. The City has not made that showing.

The requested accommodations, including temporary parking exemptions or renewable permits and assistance with vehicle relocation, may indeed implicate core aspects of the City's relevant program of maintaining public health and safety on public roadways. However, the City's submissions do not demonstrate that temporary, individualized exemptions and accommodations for an individual — or even a handful of disabled claimants — would substantially obstruct the City's management of the program. Again, the fundamental alteration inquiry must focus on the specific impact of accommodation the particular individuals seeking the accommodation, not the theoretical effect of granting such exemptions on a broader basis or city-wide. *Martin*, 204 F.3d at 1001; *see also Birdwell*, 742 F. Supp. 3d at 1041. The City has not established on this record a real and substantial obstruction of the City's program would result from granting the individual accommodations request of Ms. Dominguez.

United States District Court
Northern District of California

The City's principal objection to exempting Ms. Dominguez from parking regulations is that doing so would undermine vehicle turnover, emergency access, and equitable curb use, and thus constitute a fundamental alteration. White Declaration (Dkt. 219-5) ¶¶ 14–19; Defendants' SJ Motion at 18–19. That concern is unpersuasive as applied to Ms. Dominguez's specific circumstances. The fundamental alteration inquiry must focus on the actual, concrete impact of accommodating Ms. Dominguez. *Martin*, 204 F.3d at 1001; *Birdwell*, 742 F. Supp. 3d at 1041. The record does not support a finding that Ms. Dominguez's stationary RV meaningfully disrupts parking turnover or emergency access. The City's own submissions acknowledge that the RV has remained in its current location for several years, without any accompanying showing of interference with traffic flow or emergency vehicle access. *See* Vance-Dozier Declaration (Dkt. 219-6) ¶¶ 3–6. The City enforces parking in a balanced, priority-based manner and concedes that not every violation triggers enforcement. Defendants' SJ Motion at 18 n.5. The City offers no evidence that Ms. Dominguez's continued presence at her current location has, in practice, impeded access. The fact that parking regulations serve important purposes does not mean that deviation from it for a handful of disabled individuals constitutes a fundamental alteration. *See Crowder*, 81 F.3d at 1486 n.2.

The City also opposes the accommodation request on operational grounds. The City contends that: "Parking enforcement relies on automated systems; manual tracking would be labor-intensive, less reliable, and increase disputes. Staff would need to manually monitor vehicles and make repeated, case-specific determinations, diverting personnel from broader police and public safety responsibilities, resulting [in] an undue administrative burden under Title II." Defendants' SJ Motion at 18. But, as noted above, in that same motion, the City states that it enforces parking in a measured, priority-based manner and concedes that not every violation triggers enforcement. *Id.* at 18 n.5. Moreover, the City points to nothing in the record which explains why it would not be feasible to input Ms. Dominguez's license plate into its existing automated system to flag her for exemption. *See Crowder*, 81 F.3d at 1486 n.2 (requiring a realistic, not merely theoretical showing of harm and consideration of alternatives); *Duvall*, 260 F.3d at 1139 (duty to consider claimant's specific needs in light of their disability). The City's

United States District Court
Northern District of California

factual submissions fall short of the specificity required to sustain a fundamental alteration or undue burden defense.

Because the City has not, as a matter of law, demonstrated that the requested accommodations are unreasonable or would constitute a fundamental alteration or undue burden, the City's motion for summary judgment on Ms. Dominguez's vehicle-related disability accommodations is **DENIED** with respect to vehicle-related disability accommodations. BHU's cross-motion for summary judgment is **GRANTED** with respect to Ms. Dominguez's request for accommodations related to her vehicle.

b.    Property Seizure Claim

Ms. Dominguez and Ms. Prado use their vehicles as shelter, dkt. 253, Ex. A at 10, 17, and as such their vehicles occupy a distinct status by virtue of this Court's prior holding in *Prado* that the City must concretely demonstrate that a vehicle obstructs traffic or presents a concrete threat to public health or safety before invoking the community caretaker doctrine. No. 23-cv-04537-EMC, Order re Motion to Dismiss (Dkt. 87) at 23–27. Mere noncompliance with parking or operability requirements do not suffice to justify seizure or destruction of vehicles. *Id.* at 27; *see also Lavan*, 693 F.3d at 1025, 1029 ("Violation of a City ordinance does not vitiate the Fourth Amendment's protection of one's property. Were it otherwise, the government could seize and destroy any illegally parked car or unlawfully unattended dog without implicating the Fourth Amendment."). The Court's prior ruling remains controlling here and bears emphasis, as the City now appears poised to tow, impound, and destroy a large number of cars within a wide "No Parking" zone in and around the Harrison Encampment. *See* No. 23-cv-04537-EMC, Radu Declaration (Dkt. 193); City Reply Brief (Dkt. 205).

To be sure, the City does have a substantial and legitimate interest and right to move, impound, and possibly destroy (under certain circumstances) vehicles which pose a demonstrable threat to public health. But the City's burden is to demonstrate such on an individual vehicle-by-vehicle basis. *Prado*, No. 23-cv-04537-EMC, Order re Motion to Dismiss (Dkt. 87) at 26 ("The City has the burden to establish that the taking was warranted on a fact-specific basis.") (citing *U.S. v. Cervantes*, 703 F.3d 1135, 1144 (9th Cir. 2012)). Although the City has documented the

50

surrounding circumstances of individual vehicles which appear to pose a risk of harboring rats and the Leptospirosis bacteria, it has not demonstrated impoundment is warranted. Specifically, it has not demonstrated the health risk concerns as to each vehicle cannot be addressed by readily available less intrusive alternatives, such as: issuing nuisance abatement orders with compliance deadlines, prescribing specific remediation requirements such as targeted rodent treatments, sealing open engine compartments or other potential rodent harborage sites, removing debris or vegetation surrounding vehicles, permitting and facilitating voluntary relocation of vehicles out of the abatement zone, and assisting occupants with other means of bringing vehicles into compliance with health and safety standards.

The failure to consider available alternatives before taking the drastic step of impounding vehicles that serve as shelter is problematic. Numerous courts have considered the availability of less onerous alternatives in their constitutional analysis of this question. In *United States v. James Daniel Good Real Property*, the Supreme Court held that to establish the exigent circumstances necessary to justify seizure of real property without notice and an opportunity to be heard, the government must demonstrate that less restrictive measures — such as a lis pendens, restraining order, or bond — would not suffice to protect its interests in preventing the sale, destruction, or continued unlawful use of real property. 510 U.S. 43, 62 (1993). In *United States v. Hyde*, this district applied similar reasoning in ordering the substitution of one property subject to a government lis pendens for another, holding that where a less drastic alternative would fully preserve the government's stated interest, due process concerns counsel in favor of that alternative over a more burdensome restraint. 287 F. Supp. 2d 1095, 1099 (N.D. Cal. 2003) (Chen, J.).

In *Douglas v. Kriegsfeld Corp.*, the D.C. Court of Appeals held that under the Fair Housing Act, the "direct threat to health and safety" exception permitting denial of accommodations "does not come into play until after the trial court has evaluated the landlord's response to a requested accommodation and has determined, after a factual inquiry, that no reasonable accommodation could ameliorate the situation sufficiently to protect the health, safety, and property of others." 884 A.2d 1109, 1125 (D.C. 2005). The court there emphasized that a tenant asking for an accommodation to address a public health concern "seeks only time to clean

51

the apartment and show that she can keep it clean with government help — and thus to show that she can protect, no longer threat, the 'health' and 'safety' of others." *Id.* at 1127–28. Though *Douglas* rises in a different legal context, its structural logic applies to the immediate context too: property seized for threatening the health and safety of others. The mere existence of such concerns does not automatically authorize the most severe enforcement action available — the City must first determine whether intermediate remediation efforts could adequately address the identified hazards and, if not, explain why, before resorting to outright seizure and destruction. And in a prior order concerning abatement of the same Encampment, this Court denied BHU's motion for preliminary injunction but clarified that a resident's RV "shall not be moved or destroyed but may be cleaned and/or treated for pests." *Prado v. City of Berkeley*, No. 23-cv-04537-EMC, Order Denying Preliminary Injunction (Dkt. 26) at 17.

Residents here have expressed willingness to cooperate and assist the City in remediating health and safety risks. *See* BHU Status Report (Dkt. 200) at 17, 27 (Ms. Dominguez and Ms. Prado expressing willingness to relocate to an alternative parking location). It is incumbent on the City to explore these intermediate alternatives before defaulting to the most extreme option of impoundment and potential destruction.

The foregoing framework rests on the Fourth and Fourteenth Amendment's protection of property interests against unreasonable seizure; it does not depend on a disability-specific statute or accommodation doctrine thereunder. The constitutional requirement that the City make a specific, fact-based determination of a concrete threat to public health or safety and pursue reasonable, less restrictive alternatives before seizing a vehicle used as shelter applies to all BHU members residing in vehicles in the Harrison Encampment; the constitutional principle is not limited to those with documented disabilities.

Accordingly, the Court **GRANTS** BHU's motion for summary judgment on property seizure claims insofar as they relate to seizure, impoundment, and/or destruction of Ms. Dominguez or Ms. Prado's vehicles. The Court **DENIES** the City's motion with respect to the same claims. Before proceeding to impound or destroy any BHU member's vehicle without consent, the City must: (1) make a specific, fact-based determination — beyond mere parking

52

violations, inoperability, or expired registration — that the particular vehicle obstructs traffic or poses a concrete, individualized public health or safety threat; (2) provide the vehicle's owner with written notice of the specific findings, an opportunity to respond, and a reasonable opportunity to remediate the identified condition or voluntarily relocate the vehicle; (3) consider and pursue reasonable, less restrictive alternatives, including targeted cleaning, pest treatment, containment orders, and assisted relocation, or demonstrate with particularity why such alternatives are ineffective for the given vehicle and occupant.  Only upon satisfaction of all three requirements may the City proceed to more drastic measures such as impoundment.  Moreover, prior to the destruction of any vehicle, the City must further demonstrate that no alternative remedy can adequately mitigate the health or safety risk presented by the vehicle.  The Court retains jurisdiction to evaluate whether the City has satisfied this framework on a vehicle-by-vehicle basis if a dispute arises.

c.     State-Created Danger Claim

The Court has already explained that most of BHU's state-created danger arguments conflate dangers inherent in living without shelter with dangers created by the City, and thus the doctrine of state-created danger does not lie.  The calculus materially shifts, however, for unhoused individuals who rely on their vehicles as primary shelter.  For these individuals — including Ms. Dominguez, Ms. Prado, and other BHU members in the Harrison Encampment — the City's impoundment or destruction of their vehicles would not merely displace them from one outdoor location to another.  It would transform them from persons who are *unhoused but sheltered* into persons who are *unhoused and unsheltered*, exposing them to the elements, the cold, and the absence of any private, secure space.  That distinction is substantial and legally significant.  *See Navarro*, 2021 WL 5205598, at *2 (recognizing significant harms to unhoused disabled individuals from seizure of vehicles).  The affirmative act of seizing or destroying a vehicle that serves as a person's shelter is precisely the kind of specific, particularized government action that is subject to the state-created danger doctrine.  *See Sinclair v. City of Seattle*, 61 F.4th 674, 682–83 (9th Cir. 2023) (distinguishing generalized from particularized dangers).  And unlike the generalized dangers of displacement that pre-exist general Encampment abatement, the loss of

United States District Court
Northern District of California

vehicular shelter is a foreseeable and concrete danger that would not exist but for the City's abatement action. *See, e.g., Janosko v. City of Oakland*, 2023 WL 187499, at *3 (N.D. Cal. Jan. 13, 2023) (holding that removal of shelter "affirmatively expose[s] [unhoused plaintiffs] to harsher, more dangerous conditions"); *Prado*, No. 23-cv-04537-EMC, Order re Motion to Dismiss (Dkt. 87) at 50 ("When Plaintiffs' shelter and personal belongings are destroyed, and they have no safe shelter alternative nor means to protect themselves from the elements, the state has made plaintiffs' conditions worse."); *Alfred v. City of Vallejo*, 2025 WL 435900, at *9 (E.D. Cal. Feb. 7, 2025).

The state-created danger analysis reinforces the graduated framework this Court adopts with respect to the seizure of vehicles under the Fourth Amendment and procedural due process. The Court has outlined a path through this dilemma: the City may address the public health hazards associated with vehicles through intermediate remediation steps: nuisance abatement orders, pest treatment, debris and vegetation, and assisted relocation, among many other options as noted above. If a claimant refuses to cooperate with those intermediate measures despite adequate notice and opportunity to do so, the analysis shifts. At that point, the City's interest in abating a genuine, persistent public health hazard — including the risks to the plaintiffs themselves of continuing to live in a contaminated environment — may outweigh the state-created danger arising from displacement. *See Penilla*, 115 F.3d at 710 (finding state-created danger where officers' conduct "placed [plaintiff] in a more dangerous position than the one in which they found him"). But absent such non-compliance following good-faith remediation efforts, the City may not proceed to the extreme step of vehicle seizure and destruction under the Fourth and Fourteenth Amendments.

Accordingly, the City's motion for summary judgment is **DENIED** on this claim and BHU's cross-motion for summary judgment is **GRANTED** as to the vehicular state-created danger claim.

4.    Relief Category #4: Exemptions from Sidewalk and Street Space Limitations

a.    Merits of ADA Accommodation Requests

Merced Dominguez, Shareef Muwakkil, Erin Spencer, Lewanda Parnell, and Austin White

54

request accommodations from the City's enforcement of Administrative Regulation 10.2 ("AR 10.2") and other code provisions that limit personal property on City rights-of-way to no more than a nine square feet area (the "3x3 rule") and require a path of travel of at least six feet on sidewalks under 14 feet wide, and a path of travel of 10 feet on wider sidewalks.[11]  Dkt. 253, Exs. A–B; Gregory Declaration (Dkt. 219-3), Ex. A; White Declaration (Dkt. 219-5), Ex. A; BHU Status Report (Dkt. 200) at 36–39 (listing Ordinance 7,935-N.S., Municipal Code 14.48.020, and Municipal Code 14.48.160 as additional authorities limiting use of the sidewalk by Plaintiffs).  For the reasons set forth below, the Court finds that the City has failed to carry its burden of demonstrating that reasonable modifications to the 3x3 rule is an unreasonable accommodation, would constitute a fundamental alteration to the relevant program, or would pose an undue burden.  Accordingly, the Court **GRANTS** summary judgment in favor of Plaintiffs and **DENIES** Defendants' summary judgment motion insofar as it relates to exemptions from the 3x3 rule, subject to the parameters described below.

BHU submitted evidence establishing that most of the above claimants require a tent to manage their disability-related needs.  *See* Gregory Declaration (Dkt. 219-3), Ex. A; Dkt. 253, Exs. A–B, I; BHU Status Report (Dkt. 200); BHU SJ Motion at 12.  These individualized needs vary in degree, and the record does not support a blanket entitlement to any particular tent dimension.  Mr. White relies on two service and emotional support dogs to manage his mental health conditions, and BHU submits without contradiction that the 3x3 rule does not allow sufficient space for Mr. White to accommodate his dogs, medical equipment, and supplies necessary for his health.  BHU's SJ Motion at 12; Brizzolara Declaration (Dkt. 279) ¶ 34.  Ms. Parnell relies on a stroller as a mobility device to reduce her risk of falls arising from vertigo, and BHU submits that the 3x3 rule is insufficient to accommodate her necessary mobility device and allow her to maneuver safely.  *Id.*; Brizzolara Declaration (Dkt. 279) ¶ 20.  Mr. Muwakkil lives

[11] Ms. Dominguez requests an increase of sidewalk storage space of 21 square feet to keep garbage cans outside her RV.  *See* Dkt. 253, Ex. I at 14; BHU Status Update (Dkt. 200) at 18.  The record does not establish a nexus between her spondylosis and a need for additional sidewalk or road space.  *See id.*, Exs. A–B, I; Gregory Declaration (Dkt. 219-3); deBree Declaration (Dkt. 120); Brizzolara Declaration (Dkt. 279); BHU Status Update (Dkt. 200).  Accordingly, the request was properly denied.

with PTSD, psychosis, and chronic physical conditions that require a stable and enclosed environment. BHU's SJ Motion at 12; Brizzolara Declaration (Dkt. 279) ¶¶ 17–19. According to BHU, the 3x3 rule forces Mr. Muwakkil to be exposed to surrounding conditions that trigger symptoms and impair his ability to function. *Id.* Finally, Mr. Spencer lives with mobility impairments, PTSD, and ADHD, all of which require a stable and predictable environment to maintain daily functioning.[12] Brizzolara Declaration (Dkt. 279) ¶¶ 29–30.

BHU represents that no tent can fit within a 3x3 feet space, and the City does not dispute this characterization. Accordingly, blanket enforcement of the 3x3 rule would compromise BHU members' ability to use tents in a fashion that accounts for their disabilities. *See* BHU's SJ Motion at 6 (stating that 3x3 feet living area is not feasible and that no tent can fit within a nine-square-foot area).

AR 10.2 is the City's universally applicable framework for managing personal property placed on public sidewalks and parklets. White Declaration (Dkt. 219-5), Ex. A. Its stated purpose is to protect pedestrian access, disability access, and aesthetically pleasing streetscapes. *Id.* The regulation applies citywide to all users of the public right-of-way. *See id.* As the Court has defined it, the relevant program is the City's maintenance of public roadways and sidewalks to ensure functionality, orderly use, and public health and safety — a program that accounts both for the City's interest in maintaining accessible rights-of-way and for the effects of abatement on unhoused disabled residents who, lacking access to available or accessible housing or shelter, seek to occupy portions of that public right-of-way.

As an initial matter, the Court finds that the request for an accommodation in the form of a reasonable modification to the 3x3 rule to accommodate individual claimants' shelter is reasonable and not an undue burden. The accommodations sought required the City to engage in one of several options, including case-by-case review with medical documentation or modified placement

_____

[12] Mr. Spencer also maintains that he requires a 20x30 foot tent for "community support." As noted in this order, the record does not establish entitlement to any particular tent size, and the City must instead undergo an individualized analysis to determine a reasonable occupation of space.

on wider sidewalks to avoid blocking access. *See* BHU SJ Motion at 12; Dkt. 253, Exs. A–B; Gregory Declaration (Dkt. 219-3), BHU Status Report (Dkt. 200). Each option could have conceivably resolved the access problem faced by claimants (namely, the inability of disabled individuals to occupy a livable space on a public right-of-way) without undue practical difficulty. *See Martin*, 204 F.3d at 999; *Fortyune*, 364 F.3d at 1084. The request is modest and reasonable. As BHU represents, it is virtually impossible for a person to sleep within a 3x3 foot square. BHU's SJ Motion at 6. And there is no evidence that any tent providing shelter can fit within such a 3x3 space. *See id.* The City could have provided some modification of allowable space and still allow for safe passage on at least some sidewalks. But the City has refused to make any such accommodation, even though it has not demonstrated that such an accommodation would constitute a fundamental alteration or impose an undue burden on the City.

Providing for some flexibility in enforcing the rigid adherence to an unfeasible size limit in order to accommodate the needs of these individuals would not have required new infrastructure, dedicated staffing, or systemic change to operations. The City does not point to any concrete financial cost associated with this requested accommodation, and its undue burden arguments are limited to generalized assertions of administrative complexity, including individualized monitoring, repeated assessments, and location-specific exemptions. *See* Defendants' SJ Motion at 16; Defendants' Opposition Brief at 12–13; Gregory Declaration (Dkt. 219-3) ¶¶ 14–17. These are the same operations that the City already performs in managing public rights-of-way. Radu Declaration (Dkt. 219-4) ¶ 6. As to the fundamental alteration analysis, the City has not shown that the purported impacts, where relief is afforded to the individuals at issue, are realistic and substantial. *See Crowder*, 81 F.3d at 1486 n.2; *Martin*, 204 F.3d at 1001.

The City's fundamental alteration defense rests principally on a theoretical fear rather than a demonstrated operational reality. When pressed at the hearing on the cross-motions, the City was unable to represent definitively whether a reasonable modification of the 3x3 rule would necessarily obstruct passage on the sidewalks. Given that most sidewalks are 12 feet or more in width, the City does not demonstrate that a modest increase to 3x3 feet cannot be accommodated without obstructing reasonably safe passage on sidewalks (*e.g.*, the six-foot path that the City's

57

ordinance now provides for most sidewalks).  *See* White Declaration (Dkt. 219-5) ¶¶ 3–13, Ex. A; *cf. Crowder*, 81 F.3d at 1486 n.2 (declining to accept theoretical impacts unsupported by concrete evidence); *Martin*, 204 F.3d at 1001 (the inquiry must focus on specific circumstances, not generalized concerns.).

Specific record evidence highlights the deficiencies in the City's reasoning.  The White Declaration asserts that a 10x12 foot tent would occupy the full six-foot walkway on a typical 12-foot residential sidewalk, leaving only two feet of clearance (assuming a four-foot offset).  White Declaration (Dkt. 219-5) ¶¶ 8, 10.  A 10x12 foot tent is a legitimate concern on a 12-foot sidewalk.  But the White Declaration also knowledges that commercial district sidewalks sometimes exceed 12 feet in width.  *Id.* ¶ 11.  The City's response to this fact — that commercial sidewalks contain trees, waste receptacles, bicycle racks, and other infrastructure at higher density — is asserted without supporting data on actual available clearances on specific sidewalks.  *See id.* The Gregory Declaration likewise offers only a conclusory statement that no feasible alternatives exist, without any documented analysis of whether certain sidewalk segments in the City could accommodate tents larger than three feet in width, while maintaining the required path of travel (*e.g.*, six feet).  Gregory Declaration (Dkt. 219-3) ¶¶ 14–17.  Generalized assertions of infeasibility, unaccompanied by analysis of particular locations or modest size increases fall short of the concrete, realistic showing required to sustain a fundamental alteration defense.

The record does not establish that a modification would genuinely obstruct the City's ability to carry out its right-of-way management program.  The City already employs a balanced, priority-based enforcement framework that permits it to assess conditions on a case-by-case basis.  Radu Declaration (Dkt. 219-4) ¶ 6.  Applying that same flexible framework to accommodate disabled individuals (by allowing tents wider than three feet) asks the City to do nothing more than what it already does.  *Cf. Townsend*, 328 F.3d at 518 (holding that public entity need not create *new* programs as a disability accommodation).

Hence, the Court concludes that the City has failed to comply with the ADA in denying the reasonable accommodation needed by the individuals involved herein.  The Court's ruling does not require the City categorically to allow all 10x12 or 20x30 foot tents.  The ADA does require

an effective and reasonable accommodation based on specific individual needs and circumstances. The City may choose to proceed with the interactive process and identify sidewalk segments within the City where existing widths permit a larger tent footprint while maintaining a reasonably required path of travel (*e.g.*, six feet). Alternatively, the City may choose to provide compliant tents that meet the claimants' disability-related needs. The City retains authority, of course, to enforce AR 10.2 and other rules governing use of sidewalks where an individual's belongings actually obstruct pedestrian passage or emergency access, or present a concrete public health or safety hazard. But the City's categoric refusal, as it has done here, to grant variances from, and modifications of, the 3x3 rule without regard to individual needs related to discrete disabilities constitutes a denial of reasonable accommodation in violation of the ADA.

For the foregoing reasons, the Court **GRANTS** BHU's motion for summary judgment with respect to sidewalk space accommodation requests, and **DENIES** the City's motion for summary judgment on the same issue. The Court's ruling on the 3x3 rule does not, however, relieve BHU members of all space-related constraints, nor does it necessarily displace the path of travel requirements set forth in A.R. 10.2. Those requirements serve legitimate purposes, including pedestrian safety and accessibility. The Court concludes that the path of travel requirements under A.R. 10.2 are part of the individualized assessment that the City must conduct for each claimant. When evaluating what modified space allocation is reasonable for a given claimant at a given location, the City must account for the claimant's disability-related needs, the actual width and physical characteristics of the sidewalk in question, and the public interest in maintaining a reasonable path of travel. The City retains authority to deny a proposed placement that, on the specific facts of a given location, would obstruct pedestrian passage or emergency access — but it may not invoke those concerns categorically and without individualized analysis.

#### b.    State-Created Danger

The state-created danger doctrine also has force to the extent the City removes tents from unhoused individuals by operation of the 3x3 rule. Where the net effect of the abatement and application of other City laws, rules, or policy, through no fault of the resident, is the removal of shelter, the City through its affirmative conduct, would be placing residents in a greater position of

danger than they had previously faced. *See, e.g., Janosko v. City of Oakland*, 2023 WL 187499, at *3 (N.D. Cal. Jan. 13, 2023); *Prado*, No. 23-cv-04537-EMC, Order re Motion to Dismiss (Dkt. 87) at 50; *Alfred v. City of Vallejo*, 2025 WL 435900, at *9 (E.D. Cal. Feb. 7, 2025). Thus, enforcement of the 3x3 rule, by effectively prohibiting tents, would place those residents currently enjoying shelter of a tent in a position of increased danger. Hence, under this constitutional doctrine, the City is restrained from enforcing the space limitation in a manner that prevents BHU members from maintaining a tent so long as the tent does not unreasonably interfere with sidewalk passage. This ruling concerns a constitutional minimum governing abatement and therefore applies to all BHU members who reside in the Harrison Encampment, regardless of disability status.

For the foregoing reasons, the Court **GRANTS** BHU's motion for summary judgment with respect to the state-created danger as it relates to enforcement of the 3x3 rule, and **DENIES** the City's cross-motion as to the same claim.

### 5. Relief Category #5: Physical Relocation Assistance, Storage, and Non-Destruction of Property

#### a. Merits of ADA Accommodation Requests

Erin Spencer, Lewanda Parnell, Shareef Muwakkil, Eric Keiser, and Austin White — claimants with physical disabilities impairing mobility, or cognitive and psychiatric disabilities impairing executive functioning — request that the City provide physical assistance in packing and moving their belongings and store their personal property. *See* Gregory Declaration (Dkt. 219-3), Ex. A; Dkt. 253, Exs. A–B; BHU Status Update (Dkt. 200); BHU SJ Motion at 7.

All five claimants live with physical disabilities that limit mobility and/or the ability to lift, carry, or move their personal belongings. *Id.* Mr. Keiser has permanent mobility limitations and chronic pain from a vehicle collision, as well as schizophrenia which limits his executive functioning and ability to plan and organize, all of which make it unlikely that he could "safely transport essential items such as medications, personal documents, and survival equipment necessary for his health and safety." Brizzolara Declaration (Dkt. 279) ¶¶ 13–16. Mr. Muwakkil experiences swelling in his legs, a heart valve condition restricting his ability to lift and carry

United States District Court
Northern District of California

objects safely, and mental conditions that impact his executive functioning and ability to plan, organize, or manage tasks including relocation. *Id.* ¶¶ 17–18. Without physical assistance, he is at risk of "cardiac strain, falls, and worsening mobility impairments, as well as significant psychological stress, intensified by bipolar disorder and psychosis. *Id.* ¶ 19. Ms. Parnell lives with vertigo and loss of balance, impacting her ability to lift or carry heavy objects without assistance and putting her at increased "risk of falls and injury." *Id.* ¶ 22. Mr. Spencer has several physical injuries limiting his ability to walk or carry objects. *Id.* ¶ 30. Thus, being forced to move his belongings alone would create "a substantial likelihood of intensified pain, falls, and other injury." *Id.* ¶ 31. Finally, Mr. White lives with esophageal varices and the risk of a life-threatening hemorrhage, as well as a wrist injury that all limit his ability to lift and move personal belongings. *Id.* ¶¶ 33–34. He is "medically restricted from lifting objects heavier than approximately twenty pounds." *Id.*

As a result of their disabilities, all the claimants request similar accommodations: Mr. Keiser, Mr. Spencer, and Mr. White request physical assistance with lifting and moving to a new location. *Id.* Mr. Muwakkil requests assistance with lifting and transporting personal belongings in a manner scheduled in advance to avoid "last-minute hardship." *Id.* And Ms. Parnell requests physical assistance with packing and transportation assistance to a new location. Mr. Spencer, Ms. Parnell, and Mr. Keiser also request storage of their personal belongings. Dkt. 253, Exs. A–B, I.

The City represents that it already offers limited moving assistance and 90-day storage as an accommodation, conditioned on public health guidance. Gregory Declaration (Dkt. 219-3) ¶ 10–12; Radu Declaration (Dkt. 219-4) ¶ 4. But the City further states that, in light of the leptospirosis outbreak and risk that items are contaminated with rat urine or mud, it cannot assist with physical relocation or storage of personal property. Defendants' SJ Motion at 13 ("[M]oving or sorting items that constitute rodent harborages present an undue risk to City staff."); Torres Declaration (Dkt. 219-7) ¶ 14. For the reasons set forth below, the Court finds that certain accommodations are reasonable, do not constitute a fundamental alteration to the relevant City program, and do not impose an undue burden — subject to public health guidance. Accordingly,

61

the Court **GRANTS** summary judgment in favor of Plaintiffs and **DENIES** Defendants' cross-motion with respect to this category of accommodation requests.

The accommodations requested here are modest. Claimants are not asking for ongoing personal services, but rather assistance in the context of a one-time abatement action. Claimants have submitted evidence documenting how their specific physical and mental disabilities bear directly on their inability to comply with standard abatement notices and procedures. These are not generalized disability allegations, but specific, medically grounded claims establishing that a standard order for Encampment residents to self-pack and self-relocate within a defined temporal window is simply not achievable by particular individuals without accommodation. The nexus to disability is clear, and the following claimants have satisfied their initial burden of identifying a reasonable accommodation.

The City already provides limited moving assistance, including packing, lifting, and transport, as part of standard abatement operations, and stores non-hazardous property. *See* Defendants' SJ Motion at 23–24; Gregory Declaration (Dkt. 219-3) ¶¶ 8–11. Extending those same services to a small number of claimants whose disabilities have been specifically documented through the interactive process is reasonable because it would allow those individuals to access City services and programs. 28 C.F.R. § 35.130(b)(7). The services would involve no new programs or infrastructure, as such services have been offered in the past. Indeed, the City offered exactly this assistance to Mr. White in 2025, and represented to Ms. Parnell that it was willing to coordinate packing and storage once a relocation timeline was proposed. Dkt. 253, Ex. D at 2; Ex. I at 5, 7. The fact that the City already provides this service as a matter of standard practice diminishes any argument that extending it to a small number of specifically identified disabled claimants would constitute a fundamental alteration. And extending an existing service to additional eligible individuals is a modification of a program, not the creation of a new one. *Cf. Townsend*, 328 F.3d at 518.

The Court acknowledges that the leptospirosis outbreak imposes real constraints on both the moving assistance and storage options. The Torres Declaration explains that personal items contaminated with rat urine may harbor dangerous bacteria for up to 30 days, and that sorting or

storing such items creates contamination risks for City personnel and facilities that standard PPE is not designed to address. Torres Declaration (Dkt. 219-7) ¶¶ 7, 14. The Gregory Declaration likewise notes that wet or muddy items may be hazardous. Gregory Declaration (Dkt. 219-3) ¶ 11. The Court accepts this argument and agrees that the City is not required to put its own staff at unreasonable risk. *See* 28 C.F.R. § 35.139(a) ("This part does not require a public entity to permit an individual to participate in any benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others."). While the leptospirosis outbreak complicates the situation, it does not eliminate the City's obligation in full. Accordingly, the City is not required to physically handle or store items that are observably wet, waterlogged, muddy, or porous in a manner that could render them likely carriers of biological contamination. Dry and intact items that are not observably contaminated shall be moved with assistance and/or stored. Generalized assertions that the Encampment as a whole presents leptospirosis risks do not satisfy the City's burden of demonstrating, as a matter of law, that all physical assistance is impossible for any of these individuals.

With respect to storage, the City's administrative regulations already provide a framework for storage of personal property: property removed during encampment operations must be held for at least 14 days; items with a resale value of $100 or more must be held for 90 days; and items used for shelter must be retained for 45 days regardless of value. Radu Declaration (Dkt. 219-4), Ex. A (Administrative Regulation 10.1). The City further represents that it sorts and inventories non-hazardous property and provides residents with notice and contact information for retrieval. Radu Declaration (Dkt. 219-4) ¶ 14 ("Residents are given notice of what property the City is able to store prior to or at the time of an abatement. . . . Non-hazardous and storable property (e.g. not wet or moldy) is sorted and stored, and staff complete Property Inventory Forms detailing what has been stored or discarded, including photographs. If property is stored, City staff leave a Notice of Stored Belongings where property was removed and stored. The City only discards property that is comingled with hazards such as feces, rodents, and needles, or otherwise cannot be stored under our policy (e.g. wet or moldy items)."); *see also* Dkt. 253, Ex. A at 15 (City offering storage services to Mr. Spencer before leptospirosis outbreak). Like packing assistance, storage is

therefore an existing service, not a new program.

Of course, the leptospirosis constraints apply here as well. The City does not need to store items that are observably at risk of contamination. But the City has not demonstrated that the entirety of each claimant's property — such as medical equipment and mobility devices which are not wet or soggy — is likely contaminated, and the record reflects that the City has in the past been able to sort, document, and store non-hazardous items during abatement operations, even when it is intermingled with potentially hazardous materials. *Id.* On this record, the City has not shown as a matter of law that storage of non-contaminated personal property is infeasible for these particular claimants.

With respect to property that appears to be at risk of leptospirosis contamination and thus cannot be moved or stored by City workers, such property will be destroyed under the City's abatement program. However, a reasonable accommodation under those circumstances would be to replace destroyed property that is essential to survival: *i.e.* tents, sleeping gear (such as sleeping bags), and basic clothing. Providing such minimal but essential property would permit disabled residents to move in compliance with the abatement order while preserving their basic health and safety. This substantial benefit easily outweighs the relatively modest cost of providing a few basic necessities to those residents who need them and thus would not be an unreasonable administrative burden. Nor given the relatively modest cost, would such fundamental alter the City's program of administering safe and healthy streets in their use by the unhoused. It would be a far cry from, *e.g.*, having to establish a large city-sanctioned encampment or providing non-aggregate shelter.

Accordingly, the City is required to replace essential survival equipment — including tents, sleeping gear, and clothing — belonging to a qualified claimant and destroyed pursuant to an abatement.

The City argued at the March 20, 2026 hearing that providing replacement tents or sleeping bags is the equivalent of sanctioning camping on public property. This position is not persuasive. A tent furnished individually as a replacement for destroyed or unrecoverable essential gear does not establish or inevitably lead to the establishment of a large encampment.

64

This accommodation is merely a replacement for property lost as a practical consequence of a disability-related inability to comply with the abatement process.

Accordingly, the Court **GRANTS** summary judgment in favor of BHU with respect to physical assistance and storage claims and **DENIES** Defendants' cross-motion for the same. This ruling applies only to claimants who have established, through the interactive process, an inability to independently pack and relocate their belongings during abatement due to physical or cognitive disabilities. For such individuals, the City must (1) provide physical packing and moving assistance to the extent permissible under public health guidance and (2) store non-contaminated personal property for 90 days. The City retains full discretion to decline to handle or store items that are observably wet, muddy, or plausibly contaminated with leptospirosis, and to fashion safety mechanisms to ensure the health and wellness of its personnel. But any essential survival property not moved or stored subject to destruction must be replaced.

b.        Property Seizure Claim

The Court's ADA analysis above largely resolves the property seizure claims of the claimants who have established disability-related inabilities to independently pack and relocate their belongings. The constitutional analysis tracks the ADA analysis: the City may not summarily destroy property that a disabled claimant was unable to self-remove by reason of their disability without first providing moving assistance and storage for non-contaminated items, or replacement of essential survival property destroyed as a result of the abatement. The framework and requirements set forth above in the Court's ADA ruling govern this claim as well, and the Court incorporates that analysis by reference here.

For the general population of Encampment residents who have not submitted disability accommodation requests, the Court finds that the City's procedures generally satisfy constitutional requirements. This is not a case of abatement without warning. The City posted public notices of encampment closure throughout the Harrison Encampment beginning in January 2025, directing residents to vacate within one month, specifying the consequences for property left behind, and providing contact information, storage retrieval procedures, disability accommodation processes, and appeal procedures. City's First Public Notice (Dkt. 13-1) (posted on January 7, 2025 and

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

notifying residents of compliance deadline of February 10); City's Second Public Notice (Dkt. 13-3) (reminder of compliance deadline posted on January 31, 2025). The more recent February 2026 notices similarly provided more than one month of advance warning with similar information, though the abatement notices state that property storage is not possible due to public health concerns. Ex Parte Application for Emergency Hearing (Dkt. 248), Ex. A. From this record, it is clear that this is not a case of abatement without warning. *Cf. Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 982 (N.D. Cal. 2019) (Alsup, J.) (holding that 72-hour notice, and even less notice when health and safety was at stake, was adequate).

The leptospirosis outbreak creates a legitimate basis for the City to treat certain contaminated items as posing an immediate threat to public health and the health of City personnel, which *Lavan* recognized as valid grounds for destruction without extended storage. *See Lavan*, 693 F.3d at 1027, 1033; Doohan Declaration (Dkt. 194-3) ¶¶ 4–5, 21; Doohan Declaration (Dkt. 207-2) ¶ 3; Torres Declaration (Dkt. 219-7) ¶ 14. And for those individuals who do not have a disability preventing them from moving their supplies, they do not suffer the same risk as those with disabilities of having their survival property destroyed because of their inability to move it.

Accordingly, for the remainder of the Encampment's residents, BHU's motion for summary judgment on the property seizure claim is **DENIED** and the City's cross-motion on the same claim is **GRANTED**.

### c.    State-Created Danger Claim

For the reasons set forth above, in section IV(B)(7)(b), the state-created danger doctrine also has force as applied to the City forcing residents to move because of the abatement and refusing them the ability to take their tents to another site within the City because of the 3x3 rule. *See, e.g.*, *Janosko v. City of Oakland*, 2023 WL 187499, at *3 (N.D. Cal. Jan. 13, 2023); *Prado*, No. 23-cv-04537-EMC, Order re Motion to Dismiss (Dkt. 87) at 50; *Alfred v. City of Vallejo*, 2025 WL 435900, at *9 (E.D. Cal. Feb. 7, 2025). Unless the City allows for the retention of existing tents or shelter, considers reasonable accommodations allowing for continued shelter, or provides a replacement tent or shelter that allows for shelter while maintaining sufficient sidewalk passage (*e.g.*, six feet), the City would violate that BHU members' due process right under the state-

66

created danger doctrine.

6.    Relief Category #6: Requests for Sanitation Services and Infrastructure

a.    Merits of ADA Accommodation Requests

Erin Spencer and Austin White request that the City provide ongoing individualized services as a disability accommodation, including access to portable restrooms, trash receptacles, regular waste collection, clean water, solar panels, and battery packs or public USB charging ports wherever they relocate.  *See* Gregory Declaration (Dkt. 219-3), Ex. A; BHU Status Report (Dkt. 200); Dkt. 253, Exs. A–B, I.  The Court finds that these requests are unreasonable and accordingly **GRANTS** summary judgment in favor of the City on this category of accommodation requests.

The principal problem is that of nexus: Mr. Spencer's mobility impairments, PTSD, and ADHD, and Mr. White's esophageal varices and wrist injury bear directly on their ability to lift, carry, and navigate the logistics of relocation.  But neither disability has a clear relationship to an ongoing need for the City to install and maintain infrastructure for their individualized use.  The ADA requires accommodations that are necessary to avoid discrimination on the basis of disability, 28 C.F.R. § 35.130(b)(7), and the connection between these claimants' specific disabilities and the requested infrastructure is too attenuated to satisfy the standard.  Moreover, even if a nexus could be adequately established, the practical burden of the accommodation would substantially outweigh any access benefit it delivers.  Providing ongoing, individualized sanitation and utility infrastructure at an undetermined future location — wherever the claimant may relocate — would require the City to dedicate significant staff and material resources on a continuous and open-ended basis.

Accordingly, the requested accommodation is unreasonable and summary judgment is **GRANTED** for the City on these claims and **DENIED** with respect to BHU's cross-motion for the same relief.

b.    State-Created Danger Claim

BHU raises the distinct argument that the City's removal of dumpsters and reduction of sanitation services at the Encampment affirmatively worsened conditions.  BHU's SJ Motion at 20–22.  The Court rejects this theory.  Any prior provision of sanitation services to the Harrison

United States District Court
Northern District of California

Encampment was voluntary and is not part of the status quo for purposes of applying the state-created danger doctrine. *See Sampson v. Fresno Police Officers*, 2021 WL 1060506, at \*7 (E.D. Cal. Mar. 19, 2021) ("[A] state actor cannot be held liable for failing to mitigate an already existing dangerous situation *not instigated by state action*.") (emphasis added).

7.    Relief Category # 7: Cognitive and Communication Accommodations and Navigation Services

a.    Merits of ADA Accommodation Requests

Eric Keiser, Shareef Muwakkil, and Austin White request accommodations related to cognitive and communication needs arising from psychiatric and cognitive disabilities. The specific requests include assignment of a designated staff person, step-by-step relocation instructions, and low-stimulation meetings. *See* Gregory Declaration (Dkt. 219-3), Ex. A; Dkt. 253, Exs. A–B, I; BHU Status Report (Dkt. 200).

The Court finds that the City has reasonably accommodated these claimants through the interactive process and accordingly **GRANTS** summary judgment in favor of the City on this category of accommodation requests and **DENIES** BHU's cross-motion.

Most of these accommodations involve modifications to how the City communicates with individuals, rather than to substantive program outcomes. With respect to communication accommodations, including written instructions, low-stimulation meeting formats, and consistency in City staff points of contact, the City's final determinations represent meaningful engagement. The City committed to documenting each claimant's communication needs and known triggers in HRT records and to use patient and respectful communication consistent with best practices and staff training. Dkt. 253, Ex. I. For claimants whose psychiatric conditions are demonstrably affected by unfamiliar or high-stimulation official interactions, the documentation and commitment to proceed accordingly is a reasonable accommodation, as it addresses the disability-related barrier. The denial of *guaranteed* assignment of specific staff members is also reasonable — requiring the City to ensure a designated individual is always available for a given claimant's interactions would require individualized staffing that field operations cannot reasonably accommodate. Moreover, such an accommodation would prevent deployment of staff where

68

needed in exigent circumstances. Dkt. 253, Ex. I at 18. Given the steps to which the City already committed, comparing the incremental benefit of this request against the cost and burden of providing individually dedicated staff, the Court concludes that the City has demonstrated an undue administrative burden.

Finally, Ms. Dominguez requested connection to a housing navigator. The City represents, without contradiction from BHU, that she is already served by a housing navigator through Abode Services. Dkt. 253, Ex. I at 14. Thus, this claim is moot.

For the foregoing reasons, summary judgment is **GRANTED** for the City and **DENIED** for Plaintiffs on communication accommodation claims, subject to the expectation that documented commitments to certain communication accommodations and protocols are honored.

8.    Relief Category #8: Advance Written Notice Before Abatement

Erin Spencer requests a multi-step notice process, including notice thirty, fifteen, and then three days before any enforcement action is taken against him. *See* Gregory Declaration (Dkt. 219-3), Ex. A; Dkt. 253, Exs. A–B, I; BHU Status Report (Dkt. 200). BHU explains that due to his PTSD and ADHD, his executive functioning and ability to organize, plan, and complete tasks independently is impaired. Brizzolara Declaration (Dkt. 279) ¶ 30.

The Court finds that the proposed phased notice requirement is unreasonable. The City has already provided over a month's notice of abatement. Given the legitimate and urgent health concerns of the City and the process already afforded residents by way of advance notice, the request is not reasonable. The leptospirosis outbreak at the Harrison Encampment requires an urgent public health response, as do subsequent health and safety risks that arise after abatement. *See* Doohan Declaration (Dkts. 194-3; 207-2). The essential nature of the City's program is the ability to respond flexibly and with appropriate speed to evolving hazards.

The foregoing does not relieve the City of its existing constitutional obligations with respect to notice and opportunity to be heard. Courts in this circuit have applied a minimum 72-hour written advance notice requirement and meaningful opportunity to be heard before their possessions may be taken or destroyed. *See, e.g.*, *Lavan*, 693 F.3d at 1032; *Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 981–83 (N.D. Cal. 2019).

United States District Court
Northern District of California

For the foregoing reasons, the Court **GRANTS** summary judgment in favor of the City on BHU's request for a mandatory 30-day or multi-step advance notice requirement as an ADA accommodation, and **DENIES** BHU's cross-motion with respect to that request. The City's constitutional obligations remain fully in effect and are not disturbed by this ruling.

9.    Relief Category #9: Permission to Retain Emotional Support and Service Animals

Austin White requests permission for his two "emotional support and service dogs" to remain with him during and after relocation. BHU Status Report (Dkt. 200). Mr. White has mental health conditions that "impair executive functioning, including difficulties . . . maintaining trust in institutional interactions. . . . Mr. White relies on the companionship of his two emotional support and service dogs, which are critical to managing his mental health symptoms and maintaining emotional stability. The presence of these animals provides essential psychological support and helps him regulate anxiety and stress." Brizzolara Declaration (Dkt. 279) ¶ 34.

The record does not reflect whether the City granted or denied this accommodation request. And there is no indication that the City plans to separate Mr. White from his emotional support or service dogs.

Accordingly, this matter is not ripe for resolution and the Court does not rule on the cross-motions for summary judgment with respect to this claim.

F.    Qualified Immunity of Individual Defendants

The City contends that individual defendants are entitled to qualified immunity with respect to the property seizure and state-created danger claims. Defendants' SJ Motion at 24–25. Specifically, the City argues that qualified immunity is available because no individual defendants' conduct violated a "clearly established right." *Id.*

BHU's complaint seeks only injunctive relief, and not damages. *See* FAC. Accordingly, individual Defendants are not entitled to qualified immunity in this action. *See, e.g.*, *Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012) ("Qualified immunity is only an immunity from a suit for money damages, and does not provide immunity from a suit seeking declaratory or injunctive relief."); *Ctr. For Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 794 (9th Cir. 2008) ("The individual defendants, however, have qualified immunity from a

70

damages action.  As this immunity does not extend to injunctive relief, we remand for the district court to consider Plaintiffs' request for injunctive relief . . . .") (internal citation omitted).

Accordingly, the doctrine of qualified immunity does not apply to the case at bar.

### V.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** and BHU's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** consistent with the above analysis.  The Court directs the parties as follows, with respect to each category of requested relief:

**1.    Indefinite pause on abatement, right to remain in place, and guarantee of non-congregate housing or specific shelter placements**

Summary judgment is **GRANTED** for the City and **DENIED** for BHU on the ADA and state-created danger claims.  The City may proceed with abatement without first securing non-congregate housing or shelter placements for BHU members.  BHU members are not entitled to remain in place pending housing availability.

**2.    Enforcement-free zones, city-sanctioned or city-owned campsites, and maps or lists of permissible relocation areas**

Summary judgment is **GRANTED** for the City and **DENIED** for BHU on the ADA and state-created danger claims.  The City is not required to designate, create, or identify, enforcement-free relocation zones or City-sanctioned campsites.  BHU members may relocate to permissible locations of their choosing subject to the City's existing conditions-based enforcement framework.  This ruling is without prejudice to any future legal challenge, should the City engage in a pattern of serial enforcement actions against relocated residents in a manner that effectively denies them any lawful location to seek shelter.  The Court reserves judgment on whether a pattern of such displacement across multiple locations could, on a more developed record, give rise to a viable ADA or constitutional claim.

**3.    Safe location to relocate vehicles, towing exemptions, and parking relief**

Summary judgment is **GRANTED** for BHU with respect to Ms. Dominguez's requested accommodation and **DENIED** for the City for the same relief.  The City may not tow, impound, or

destroy Ms. Dominguez's RV without first re-engaging her through the interactive process and providing reasonable accommodations with respect to her RV.

Summary judgment is also **GRANTED** for BHU and **DENIED** for the City with respect to the property seizure and state-created danger claims as they relate to BHU members' vehicles. Before impounding or destroying any vehicle used by a BHU member as primary shelter in the Harrison Encampment, the City must make a specific, fact-based determination that a particular vehicle obstructs traffic or poses a concrete, individualized health or safety threat; provide that vehicle's owner with written notice of those findings and provide a reasonable opportunity to remediate the identified condition or voluntarily relocate the vehicle; and consider and pursue less restrictive alternatives, including targeted cleaning, pest treatment, assisted relocation of the vehicle, or other reasonably available mitigating measures. Outright destruction requires the additional showing that no reasonable alternative remedies other than destruction could mitigate the identified hazard. Should the City pursue mitigating measures in compliance with this order, but encounter demonstrated non-compliance by a vehicle resident which prevents the pursuit of less intrusive alternatives, the City may be found to have met its obligations hereunder. The Court retains jurisdiction to evaluate compliance with this framework on a vehicle-by-vehicle basis.

### 4. Exemptions from sidewalk and street space limitations

Summary judgment is **GRANTED** for BHU and **DENIED** for the City with respect to the categorical enforcement of the 3x3 rule as applied to Mr. Muwakkil, Mr. Spencer, Ms. Parnell, and Mr. White. The City must conduct an individualized assessment for each claimant that accounts for the claimant's specific disability-related shelter needs; the actual dimensions and physical characteristics of the sidewalk or right-of-way in question; and the public interest in maintaining a regulatorily-mandated path of travel. In this regard, the ordinance's prescribed six-foot minimum path for most sidewalks is presumptively reasonable and sufficient. The City may deny a proposed tent placement that would, on the specific facts, obstruct pedestrian passage or emergency access, but may not invoke such concerns categorically and without individualized analysis of the disabled claimant's needs. This ruling does not entitle any claimant to any particular tent dimension.

With respect to non-disabled BHU members in the Harrison Encampment, where the net effect of abatement and application of other City laws, rules, or policies — through no fault of the resident —  results in the loss of shelter (*e.g.*, loss of their tent), the City's acts constitute a state-created danger unless the City allows for the retention of existing tents or shelter, considers reasonable accommodations allowing for continued shelter, or provides a replacement tent or shelter that does not obstruct reasonable sidewalk passage (*e.g.*, six feet).

### 5.    Physical relocation assistance, storage, and non-destruction of property

Summary judgment is **GRANTED** for BHU and **DENIED** for the City with respect to the ADA claims of Mr. Keiser, Mr. Muwakkil, Ms. Parnell, Mr. Spencer, and Mr. White.  For each disabled claimant, the City must provide physical packing and moving assistance to the extent permissible under applicable public health guidance; sort and store non-contaminated property for a minimum of 90 days consistent with the City's existing regulations; and replace any essential survival property (*e.g.*, tent, sleeping equipment, and basic clothing) that is destroyed pursuant to abatement because such property could not be safely moved or stored.  The City retains full discretion to decline to handle or store items that are observably wet, muddy, or plausibly contaminated with leptospirosis, and to implement appropriate safety protocols to protect City personnel.

Summary judgment is also **DENIED** for BHU and **GRANTED** for the City with respect to constitutional property seizure claims of non-disabled BHU members except as otherwise provided herein.  BHU has not established as a matter of law that the City's notice and storage procedures are constitutionally deficient for residents capable of self-relocating and that their property is subject to unconstitutional destruction given their ability to move it except as provided herein with respect to, *e.g.*, the destruction of tents required by the abatement.

With respect to non-disabled residents, the City may not enforce the 3x3 rule in a manner that prevents BHU members from maintaining a tent, so long as the tent does not unreasonably interfere with sidewalk passage (*e.g.*, less than six feet).

### 6.    Requests for sanitation services and infrastructure

Summary judgment is **GRANTED** for the City and **DENIED** for BHU on both the ADA

73

*United States District Court*
*Northern District of California*

and state-created danger claims.  The City is not required to install or maintain any individualized sanitation or utility infrastructure.

### 7.   Cognitive and communication accommodations and navigation services

Summary judgment is **GRANTED** for the City and **DENIED** for BHU.  The City must honor its documented commitments made during the interactive process: documenting each claimant's communication needs and known triggers and employing patient, low-stimulation communication consistent with staff training.  The City is not required to take further action with respect to these requests.  Ms. Dominguez's request for a housing navigator is moot.

### 8.   Advance written notice before abatement

Summary judgment is **GRANTED** for the City and **DENIED** for BHU with respect to Mr. Spencer's request for a phased notice requirement as an ADA accommodation.  The City has already provided extensive advance notice.  The City must, however, comply with existing constitutional minimums governing abatement.

### 9.   Permission to retain emotional support and service animals

The claim is not yet ripe.  There is no indication that the City intends to separate Mr. White from his animals.  The Court reserves jurisdiction to address this claim if a ripe dispute arises.

**IT IS SO ORDERED**.

Dated: April 3, 2026

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

74