ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A Professional Law Corporation
Ruth M. Bond (SBN 214582)
Ruth.Bond@aalrr.com
Rahi Azizi (SBN 274800)
Rahi.Azizi@aalrr.com
Jonathan A. McMahon (SBN 239370)
Jon.McMahon@aalrr.com
3 Harbor Drive, Suite 200
Sausalito, California 94965-1491
Telephone: (628) 234-6200
Fax: (628) 234-6899

Farimah Faiz Brown, City Attorney (SBN 201227)
Laura Iris Mattes, Deputy City Attorney (SBN 310594)
Katrina Eiland, Deputy City Attorney (SBN 275701)
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile: (510) 981-6960
Email: LMattes@berkeleyca.gov
Keiland@berkeleyca.gov

Attorneys for Defendants
CITY OF BERKELEY, ET AL.

**EXEMPT FROM FEES (PER GOV. CODE § 6103)**

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BERKELEY HOMELESS UNION, ADRIEN BOUCHARD, NICHOLAS JOHNSON AND FRANK MOORE,

Plaintiffs,

v.

CITY OF BERKELEY, THOMAS GREGORY, PAUL BUDDENHAGEN, PETER RADU, OKEYA VANCE-DOZIER, RASHI KESERWANI, DOES 1-10,

Defendants.

Case No. 3:25-CV-01414-EMC

**DEFENDANT CITY OF BERKELEY'S OPPOSITION TO PLAINTIFF BERKELEY HOMELESS UNION'S EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER**

Judge: Hon. Edward M. Chen

Place: Courtroom 5

Complaint Filed: February 11, 2025

Hearing Date: August 13, 2026

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

## TABLE OF CONTENTS

Page

I. INTRODUCTION ... 6

II. FACTUAL AND PROCEDURAL BACKGROUND ... 8

A. The MSJ Order ... 8

B. Conditions at the Harrison Encampment Remain Dire and Necessitate Immediate Intervention. ... 9

C. The City Has Met and Conferred With BHU, Provided Ample Notice of Its Planned Abatement, Fully Engaged in the Interactive Process, and Offered Reasonable Accommodations in Accordance with the MSJ Order. ... 11

1. The City's Extensive Meet-and-Confer Discussions With BHU ... 11

2. Initial Notice of the Abatement and Efforts by the City to Furnish Replacement Tents, Survival Gear, Packing Assistance, and Related Accommodations to Campers ... 13

3. Abatement Notice Posted on July 27, 2026, and the City's Additional Accommodation Efforts ... 15

4. Interactive Process Discussions With Individual BHU Members and Accommodations to the 3x3 Rule and Moving Assistance ... 16

5. BHU Interference with the City's Efforts to Assist Encampment Residents ... 18

III. ARGUMENT ... 19

A. A New Preliminary Injunction Would Be Procedurally Improper. ... 19

B. Conditions at the Harrison Encampment Continue to Pose a Significant Risk of Leptospirosis and Otherwise Endanger Public Health and Safety. ... 23

C. The City Has Satisfied Its Interactive Process Obligations and BHU Does Not Establish That the City Has Denied Any Member a Reasonable Accommodation. ... 25

1. Despite BHU's Refusal to Identify New Accommodations Requested by Its Members, City Engaged in Numerous Interactive Process Discussions ... 25

2. The City's Advisement to BHU and Its Members to Identify Relocation Cites Comports With the ADA and the MSJ Order. ... 27

3. The City's Abatement Notice Does Not Expand the Closure Beyond the Court's Order or Misstate the City's Obligations ... 29

D. BHU Does Not Demonstrate a Likelihood of Success or Irreparable Harm, or That the Equities or Hardships Weigh in Its Favor. ... 31

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

**TABLE OF CONTENTS
(CONTINUED)**

**Page**

E. As to the "Narrower" Points Raised in the Court's July 30th Order, the City Has Complied With the MSJ Order. .......... 33

IV. CONCLUSION .......... 34

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

## TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Ahmed v. Regents of Univ. of California*
No. 17-cv-0709-MMA (NLS), 2018 WL 3969699 (S.D. Cal. Aug. 20, 2018) ..................... 32

*Aitken v. City of Aberdeen*
393 F.Supp.3d 1075 (W.D. Wash. 2019) ..................... 32

*Berkeley Homeless Union, et al. v. City of Berkeley, et al.*
Ninth Circuit Case No. 26-2755 ..................... 21

*Bhd. of Maint. of Way Employes Div./IBT v. BNSF Ry., Inc.*
834 F.3d 1071 (9th Cir. 2016) ..................... 21

*Burbank-Glendale-Pasadena Airport Auth. v. City of Los Angeles*
979 F.2d 1338 (9th Cir. 1992) ..................... 19,20

*City of Grants Pass v. Oregon v. Johnson*
603 U.S. 520 (2022) ..................... 31

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*
10 F.3d 693 (9th Cir. 1993) ..................... 22

*Duvall v. County of Kitsap*
260 F.3d 1124 (9th Cir. 2001) ..................... 26

*Masalosalo by Masalosalo v. Stonewall Ins. Co.*
718 F.2d 955 (9th Cir. 1983) ..................... 21

*Mayfield v. City of Mesa*
131 F.4th 1100 (9th Cir. 2025) ..................... 29,32

*McClatchy Newspapers v. Central Valley Typographical Union 46, Int'l Typographical Union*
686 F.2d 731 (9th Cir. 1982) ..................... 21,22

*Nationwide Biweekly Admin., Inc. v. Owen*
873 F.3d 716 (9th Cir. 2017) ..................... 21

*SEC v. Mount Vernon Memorial Park*
664 F.2d 1358 (9th Cir. 1982) ..................... 21

*Snapp v. United Transportation Union*
889 F.3d 1088 (9th Cir. 2018) ..................... 31

*Taylor v. United States*
181 F.3d 1017 (9th Cir. 1999) ..................... 21

*University of Tex. v. Camenisch*
451 U.S. 390 (1981) ..................... 19

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

## TABLE OF AUTHORITIES (CONTINUED)

**Page**

**OTHER AUTHORITIES**

Fed. Rules Civ. Proc., rule 62(c) ........ 22

Fed. Rules Civ. Proc., rule 65 ........ 20

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

## I. **INTRODUCTION**

On July 29, 2026, shortly before midnight, Plaintiff Berkeley Homeless Union ("BHU" or "Plaintiff") filed a motion for a temporary restraining order ("Motion") seeking to enjoin Defendant the City of Berkeley (the "City") from proceeding with a long planned and duly noticed abatement operation at the Harrison Corridor encampment (or "Harrison Corridor"). This is BHU's fifth such request to this Court to block the City from addressing the extremely hazardous conditions in the Harrison Corridor that have continued to worsen since this Court first halted abatement more than a year ago.

On July 30, before the City could respond, this Court issued an order construing BHU's motion as one for a preliminary injunction, setting a briefing schedule, and temporarily restraining the City's enforcement operation for the maximum TRO length, until August 13, 2026, at which time the Court would hear BHU's motion. For several compelling reasons, the Court should reject any further injunctive relief.

The Court's summary judgment order ("MSJ Order") explicitly authorizes the City to proceed with abatement of the Harrison Corridor subject to certain limitations and conditions, which the City has either satisfied or will satisfy when it commences the abatement. BHU has provided no evidence to the contrary, nor can it. Indeed, the City has not denied a single pre-existing or new accommodation request for packing or moving assistance, or a 3x3-foot variance where someone has proposed a potential location on public property. And the City has offered packing assistance, replacement gear, and clothing to everyone in the encampment, regardless of disability status or whether their items are ultimately destroyed in any abatement action.

Moreover, as a threshold matter, issuing a new preliminary injunction protecting any additional non-party BHU members would be procedurally improper, as those claims are not before the Court. Additionally, the Court fully adjudicated the underlying case on the merits in its MSJ Order. A preliminary injunction is an interim remedy, which a party may seek prior to final judgment or disposition of the case. But here, the Court has already issued a final dispositive order, both granting and denying Plaintiff permanent relief.

Instead, BHU may obtain relief only on a showing that the City has violated the express

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

provisions of the Court's *existing injunction*, which is limited as to ADA claims to the individuals expressly identified therein, and that it will likely suffer irreparable harm that outweighs the harm to the City and the public by being blocked from addressing serious, documented public health concerns. Such relief is generally available only on a properly noticed motion for civil contempt, based on a clear and convincing showing of *substantive* violations of the Court's order.

BHU cannot meet this high burden. First, the City has not failed to engage with or denied a single accommodation request required by the Court's orders. BHU's core contention is that the City has violated the order because it has not identified designated alternative spaces for its members with disabilities to camp on the sidewalk. But the Court expressly rejected imposing such an obligation on the City. *See* Dkt. 288 at 45:1-3 (granting summary judgment "in favor of the City on ADA claims related to non-enforcement, City-sanctioned or City owned-campsites, and a map of enforcement free zones"). And BHU has failed to explain how the City could possibly re-engage in the interactive process with the identified individuals without knowing their requested tent size or desired location, as available path of travel is a function of both campsite footprint and sidewalk width/features. In any event, the City has offered replacement tents in residents' preferred sizes to everyone, regardless of disability status or formal request.

BHU's other complaints are likewise baseless and, even if true, would by no means justify the extraordinary relief it requests, especially in light of the serious public health hazards the City seeks to address. Although the City disputes that offering gift cards to purchase replacement items would violate the Court's order, the City had already decided on July 28 to provide all replacement goods directly to affected residents—before BHU filed its motion. BHU's other allegation that the City might violate the Court's directives regarding storage is highly speculative. In fact, the City's handling and storage of items will be tailored to the documented public health risks that this Court's MSJ Order recognized. The City will not categorically decline to store any type of item but will instead accept non-hazardous, non-soiled or wet items that are safely contained or, if loose, can be effectively disinfected.

Second, BHU makes a slew of misrepresentations about the City's meet-and-confer discussions and interactive process engagement with purported BHU members that are contradicted

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

by even its own submissions. The City has not "exclude[ed] BHU representatives from conversations with disabled residents" or ignored the Court's directives regarding individualizing assessments, property storage, or replacement survival gear; quite the contrary. The City has solicited and obtained information relating to replacement clothing, tents, sleeping bags, and packing assistance, and abatement-related accommodations from BHU and by surveying residents of the encampment, and it has made extensive arrangements to furnish these materials and other assistance to BHU members.

BHU, by contrast, has obstructed the City's efforts by refusing to provide requested information or otherwise cooperate with the City. It has deliberately interfered with the City's efforts to communicate with residents, misled residents by posting flyers with incorrect information, and encouraged them not to engage with the City, informing them that they will not be subject to abatement if they do not provide the City with information required to accommodate their disabilities. The Court must refuse to reward BHU for its interference with the vindication of the rights of the individuals whose interests it claims to represent.

For these reasons and those discussed below, the Court should deny BHU's motion in full.

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

### A. <u>The MSJ Order</u>

On April 3, 2026, the Court issued its MSJ Order, addressing and resolving BHU's claims category by category. Notably, as to BHU's ADA claims, the Court held the City may proceed with abatement without first securing non-congregate housing or shelter placements for BHU members, and that BHU members are not entitled to remain in place pending housing availability. Dkt. 288 at 71:9-14. The Court further held the City is not required to create enforcement-free zones, City-sanctioned or City-owned campsites, or identify permissible relocation areas. Dkt. 288 at 71:15–25.

The Court granted summary judgment for BHU in part on certain sidewalk space limitations under the ADA. (Dkt. 288 at 72:17-28.) With respect to the City's enforcement of the so-called 3x3 rule under A.R. 10.2 as to specific BHU requesters, the Court held that the City must conduct an individualized assessment for each claimant that accounts for their specific disability-related shelter

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

needs; the actual dimensions and physical characteristics of the sidewalk or right-of-way in question; and the public interest in maintaining a regulatorily-mandated path of travel. (Dkt. 288 at 72:17-28.) But the Court also recognized that A.R. 10.2's "prescribed six-foot minimum path for most sidewalks is presumptively reasonable and sufficient," and declared that the City "may deny a proposed tent placement that would, on the specific facts, obstruct pedestrian passage or emergency access, but may not invoke such concerns categorically and without individualized analysis of the disabled claimant's needs." (*Ibid.*) The Court also granted summary judgment for BHU on its ADA claims concerning packing and physical relocation assistance, and replacement of certain items like clothing. (Dkt. 288 at 73:7-17.)

As to non-disabled BHU members, the Court held that, where the net effect of abatement and application of other City laws, rules, or policies—through no fault of the resident—results in the loss of shelter (e.g., the loss of their tent), the City's conduct constitutes a state-created danger unless the City allows retention of existing tents or shelter, considers reasonable accommodations allowing for continued shelter, or provides a replacement tent or shelter. (Dkt. 288 at 73:1-6; 18-26.).

Finally, the Court granted relief to BHU as to its vehicle-related Fourth and Fourteenth Amendment claims, prescribing a multi-step process that the City must follow before towing any vehicles used as shelter. This aspect of the Court's ruling is not at issue here. As explained below, the City has notified encampment residents that vehicles used as shelter will not be subject to tow during the forthcoming abatement. *See infra* at Section C.iii.

**B. <u>Conditions at the Harrison Encampment Remain Dire and Necessitate Immediate Intervention.</u>**

Conditions at the Harrison encampment continue to imperil the health and safety of the encampment's residents and the surrounding community and require urgent remediation. According to the City's Community Services Specialist Okeya Vance-Dozier, who has visited or driven by the encampment on hundreds of occasions, "conditions in the Harrison Corridor have deteriorated" recently. Concurrently Filed Declaration of Okeya Vance-Dozier ("Vance-Dozier Decl.") ¶ 4. Vance-Dozier has "personally seen dead rats all over the streets, including rats hit by car, dead rats

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

with no apparent cause of death," and "dead rats with birds picking at their carcasses." *Id.* ¶ 4. She has observed "visible bodily fluids and feces" on the ground at the encampment, and notes that the sidewalks there "are entirely blocked and cars have to swerve around campsites to drive down the road." *Ibid.* Encampment residents have told Social Services Specialist Monique McClendon that they hear rats screaming at night and "people with unsecured tents have had rats run over them while they are sleeping." Concurrently Filed Declaration of Monique McClendon ("McClendon Decl.") ¶ 3.

With respect to the ongoing risk of Leptospirosis transmission,[1] as the City's Public Health Officer Dr. Noemi Doohan attests in her concurrently filed declaration ("Doohan Decl."), conditions at the encampment "continue to materially elevate the risk of Leptospirosis transmission because they support rodent populations and increase potential contact between humans and contaminated water, surfaces, or materials." Doohan Decl. ¶¶ 7-8. According to Dr. Doohan, this risk "has only increased, not decreased," considering two recent confirmed human cases of Leptospirosis, one of which resulted in the death of an unhoused person near the Harrison Corridor. *Id.* ¶¶ 9-12.

This increased risk is also "due in part to ongoing conditions at the encampment that have not improved since that time, including unsanitary conditions at the site and the volume of trash, food waste, long-term vehicles, and makeshift structures that provide rodent harborage and facilitate rodent persistence." *Id.* ¶ 8. To mitigate the risk, Dr. Doohan attests that the City must completely eradicate rodent harborage and exposure pathways at the encampment, because "any rats remaining in and around the encampment are likely to be continually infected by residual bacteria," and those "remaining infected rats will then produce more contagion through their urine, starting the cycle of infection all over again, creating elevated risk of human and animal transmission." *Id.* ¶¶ 14-15. In her judgment, "complete clearance of an encampment is the most reliable way to eliminate harborage and Leptospirosis exposure risks at a specific site." *Id.* ¶¶ 16-18.

Dr. Doohan also confirms that City has "never indicated that the risk to the Harrison Corridor encampment had lessened in any way," and explains that the retiring of the geographic risk zones

[1] The City's motion for summary judgment recounted this risk at length.

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

was not related to any reduced risk in the Harrison Corridor but rather reflected a shift in focus to high-risk environments like the Harrison Corridor throughout the City. *Id.* ¶¶ 21-25.

The encampment also remains a serious fire hazard that has resulted in multiple nearly catastrophic fires. This year alone, the fire department "has responded to fifty-five calls for service in the Harrison Corridor." Concurrently Filed Declaration of Shannon Shaffer-Killey ("Shaffer-Killey Decl.") ¶ 4. Twenty-six of those calls were for fires, ten calls were for smoke, and nineteen were for medical assistance. *Id.* Last month, the City's Deputy Fire Marshal visited the site and observed "accumulations of combustible waste materials present in and around multiple structures and the adjacent encampment areas." *Id.* ¶ 9. She further observed that the makes-shift structures there "do not have adequate safety features, fire resistive construction, or adequate fire separation from adjacent property lines and structures." *Id.* On July 27, 2026, the Officer of the Fire Marshal posted a Notice of Fire Hazard and Order to Vacate, Correct, and Demolish throughout the corridor, declaring the fire hazard to be a public nuisance and listing several violations of the City's Fire Code that necessitate immediate correction. *Id.* ¶ 10.

**C. <u>The City Has Met and Conferred With BHU, Provided Ample Notice of Its Planned Abatement, Fully Engaged in the Interactive Process, and Offered Reasonable Accommodations in Accordance with the MSJ Order.</u>**

**1. The City's Extensive Meet-and-Confer Discussions With BHU**

The City, through its legal counsel, has engaged in extensive meet-and-confer discussions with BHU and its counsel, Anthony Prince. After the MSJ Order was issued, the City met with BHU representatives and Mr. Prince on April 24 to discuss the City's forthcoming abatement operations that would be executed consistent with the Court's orders. Concurrently Filed Declaration of Sara Stephens ("Stephens Decl.") ¶ 2. During the meeting, the City asked BHU to provide information about its members' needs and other input so the City could use this information to inform a plan to provide all reasonable accommodations in advance of any abatement. BHU agreed to provide this information to the City. The following week, however, Mr. Prince changed course. In a follow-up email, he acknowledged that the City had "requested that the Union prepare a report of sorts on our concerns regarding the abatement of 8th and Harrison," but he refused to

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

provide any information until BHU could "see in advance what the City has in mind" and receive other assurances from the City. *Ibid.*

During the next month, the City received no information from BHU or Mr. Prince about the needs of BHU's members, despite following up. *Id.* ¶ 3. Therefore, the City developed a proposed plan and timeline for considering and providing accommodations in advance of a proposed abatement date and sent this proposal to BHU on May 29, 2026. *Ibid.*

The City explained that it would consider accommodation requests made between June 29 through July 17, and that City staff would be onsite to receive packed items, assist members who had received accommodations, and transport items to storage or other right-of-way locations. *Id.* ¶ 5. The City also proposed dates in June for BHU to provide each category of information for its members to facilitate the City's provision of replacement gear and needed accommodations to residents. *Id.*

Even though BHU has insisted that it represents all members in the Harrison Corridor and that the City should only communicate with the organization concerning its members' needs, during subsequent meetings and communications BHU refused to provide any requested information, including tent and sleeping bag size information and proposed relocation spots for individuals seeking accommodations to the 3x3 rule; or the names of any additional individuals who needed assistance with packing, storage, or relocation. *Id.* ¶ 4.

BHU refused to provide the requested information on the City's proposed timeline without suggesting alternative dates or providing any disability-related reasons that would require extending the City's dates. *Id.* ¶¶ 6-10. Ultimately, BHU made only five additional accommodation requests directly to the City's ADA Coordinator, several weeks after the City requested this information be provided. Gregory Decl. ¶ 5.

Because of BHU's unwillingness to engage, the City notified BHU and Mr. Prince that the City intended to conduct outreach efforts at the encampment and directly offer residents an opportunity to request accommodations.

As explained above, BHU never asked the City to extend any of the proposed dates by which the City requested BHU provide information on its members' disability-related needs, even though

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

the City gave BHU an opportunity to do so. *Id.* ¶¶ 10-11. On July 24, BHU did ask for an extension of the August 3rd deadline the City had publicly noticed to vacate the encampment, but again BHU did not explain its long delay in making such a request or give any disability-related reasons for seeking such an extension. Stephens Decl. Exhibit B at 3.

Lastly, BHU did not request an advance copy of the abatement notices the City posted at the Harrison Corridor, nor did the City promise to provide advance copies. *Id.* ¶ 11.

**2. Initial Notice of the Abatement and Efforts by the City to Furnish Replacement Tents, Survival Gear, Packing Assistance, and Related Accommodations to Campers**

The City has made exhaustive efforts to comply with the MSJ Order as it strives to address an ongoing public health and safety threat. On June 26, 2026, the City posted a Public Notice to residents of the Harrison Corridor "informing them of the upcoming abatement activities and the services and disability accommodations available to them ("Services Notice")." Concurrently Filed Declaration of David White ("White Decl.") ¶ 8. The Services Notice informed residents that the City would provide the following goods and services to everyone who requested them:

- Replacement tents;
- Replacement clothing items (shirt, pants, and socks);
- One $100 Target gift card to replace any other survival gear like sleeping bags; and
- Two storage tubs for packing belongings in preparation for moving and/or storage, along with packing assistance.

*Id.* ¶ 9. Going beyond what the Court has required, the City plans to provide this gear and assistance to any camper who asks for it, without requiring the camper to submit a disability accommodation request or show that their tent, sleeping bag, or essential clothing items cannot be safely returned to them. *Id.* ¶ 10. The Services Notice also informed campers about how to submit other disability accommodations requests. *Id.* ¶ 11; Vance-Dozier Decl. ¶ 5.

After it posted the Services Notice mentioning gift cards, the City decided to provide replacement sleeping bags to everyone during abatement operations instead of distributing gift cards as an alternative. White Decl. ¶ 12. The decision to provide all gear directly rather than in part

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

through gift cards was made on July 28, in response to feedback from BHU and for operational cost and efficiency reasons. *Id.* The City will instead have a supply of sleeping bags on hand to distribute during the abatement operation. *Id.* ¶ 13. The City will similarly "have replacement clothing and tents for those who requested them in advance" and provided their desired sizes. It will "have vouchers available that can be redeemed for these supplies if the City does not have adequate options available" to meet new requestors' needs. *Ibid.*

As explained above, the City first attempted to obtain information about campers' needs directly from BHU, so that the City could adequately prepare for staffing, equipment, and supplies. *Id.* ¶ 14. Because of BHU's intransigence, the City was forced to survey Harrison Encampment residents about their needs directly. *Id.* ¶ 15. Beginning on June 26, 2026, the City conducted extensive outreach efforts to assess Harrison campers' needs for the foregoing goods and services. Since June 26, City staff members have frequented the area daily, engaging with campers and informing them of the goods and services the City is offering to everyone, as well as disability accommodations that may be available to them. *Id.* Due to BHU's failure to provide information regarding campers' needs, the City's outreach included gathering specific information from each person about their needs and preferences for replacement goods and packing assistance. *Id.* ¶ 21.

<u>Replacement Tents</u>

The City reached out to campers to determine their need for a replacement tent and, if so, the desired size of the tent. *Id.* ¶ 22. The City collected this information in advance so that it could ensure that it had appropriate sizes on hand. Of the 82 individuals surveyed, 40 of 82 responded affirmatively and requested various tent sizes. *Id.*

<u>Replacement Clothing</u>

To ensure the City is prepared to offer suitable replacement clothing to those who need it, City staff also collected clothing sizes from individuals who indicated a desire for replacement clothing in the event their clothing may be destroyed. *Id.* ¶ 23. During its operation, the City will distribute this clothing to those who requested it or provide a voucher. *Id.* ¶ 24.

<u>Storage Bins</u>

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

The City is also prepared to provide packing assistance to anyone who requests it. *Id.* ¶ 25. Because of significant rodent harborage and Leptospirosis risk, City staff cannot safely sort through personal items or rummage through debris piles. *Id.*; Doohan Decl. ¶¶ 26-27. During outreach, the City has instructed campers that they must identify and point City staff to items they wish to store so that the staff may help them pack those items. Staff will assist these individuals with packing any dry and intact items that are not observably contaminated by placing items into tubs and other receptacles—which the City will likewise furnish—that can be securely transported. White Decl. ¶ 26.

During its outreach, the City also asked residents whether they would like plastic tubs to assist them with packing and safely moving or storing their non-contaminated belongings. *Id.* ¶ 29. Twenty-two individuals requested such tubs, and the City began distributing these items on July 30, 2026. *Id.* The City plans to distribute additional tubs in advance of any abatement action. *Id.* Campers who did not request bins or who need more storage volume will be provided with the means to pack additional belongings so that they can be safely stored in accordance with the City's public health guidance. *Id.* ¶ 30; Doohan Decl. ¶¶ 26-36.

In addition to these extensive outreach efforts, the City has continued to provide services to the encampment in the leadup to the compliance deadline. It has continued garbage collection throughout the Harrison Corridor and has encouraged residents to place items they wish to discard at a designated location for safe retrieval to limit the amount of refuse that will need to be discarded during the abatement. White Decl. ¶ 31. A portable toilet has also been maintained onsite and regularly serviced during this period. *Id.*

**3. Abatement Notice Posted on July 27, 2026, and the City's Additional Accommodation Efforts**

On July 27, 2026, the City posted a Notice of Encampment Abatement throughout the Harrison Corridor, consistent with the initial Services Notice the City posted on June 26, 2026, as well as the February 2026 partial abatement notices issued in response to rising Leptospirosis risk. *Id.* ¶ 32. The July 27th notice provided a July 29th recommended date by which to submit any ADA accommodation requests and a final deadline of August 3, 2026, by which such requests should be

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

submitted, giving individuals more than a month after the Services Notice was posted, and two months after the City informed BHU of its planned timeline for abatement, to seek accommodations. *Id.* ¶ 33.

The notice reiterated that vehicles used as shelter would not be subject to tow and impoundment during the operation, although the abatement would address refuse and other materials around such vehicles. *Id.* ¶ 34. Staff also repeatedly communicated this information to encampment residents beginning on June 26 during outreach encounters. *Id.* The City also previously communicated this information directly to BHU on May 29, 2026. *Id.*

While the City plans to clear the area of tent campers and refuse, at this time, it will not tow any inhabited vehicles that fail to relocate voluntarily. *Id.* ¶ 35.

During the City's abatement operations, City staff will set up distribution tables from which the City will provide replacement tents, clothing, and sleeping bags, as well as additional packing bags, to residents present during the abatement should they so request, and redeemable vouchers to those who did not previously communicate size information to the City as requested. *Id.* ¶¶ 35-37. Residents may redeem these vouchers at any point following the abatement. *Id.* ¶ 37.

The City will also be prepared to move campers' non-contaminated belongings, packed in storage bins or trash bags, and store them for 90 days in accordance with the City's AR 10.1and the MSJ Order, which permit the City to accept for storage only non-hazardous, non-contaminated items. *Id.* ¶¶ 40-42. The City will assess these items on a case-by-case basis, considering whether larger items that cannot be securely packed can be effectively disinfected prior to storage. *Id.* ¶¶ 40-43; Doohan Decl. ¶¶ 26-36. For individuals granted moving assistance as a disability accommodation, the City will also assist with moving these individuals' non-contaminated belongings to a safe alternative location on the public right-of-way identified in advance. White Decl. ¶¶ 44-45.

#### 4. Interactive Process Discussions With Individual BHU Members and Accommodations to the 3x3 Rule and Moving Assistance

During the City's outreach efforts in June and July, the City's ADA Program Coordinator Thomas Gregory repeatedly apprised campers of their right to request disability-related

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

accommodations. Concurrently Filed Declaration of Thomas Gregory ("Gregory Decl.") ¶¶ 3-56. Mr. Gregory also informed residents that, if they wished to move to another public right-of-way location and needed more than nine square feet of space on account of their disability, the City would work with them to facilitate their relocation to such a space. *Id.* ¶ 8. In accordance with the MSJ Order requiring the City to consider variances to the 3x3 rule (Dkt. 288 at 56:26-56:10), Mr. Gregory asked campers to propose relocation sites and the footprint of the tent they desired to use at the new site so that the City could assess whether a sufficient path of travel could be maintained. Gregory Decl. ¶¶ 8, 12, 18 21, 25, 27-28, 33, 35-37, 41, 43-47-49. While the City offered relocation assistance to campers, it indicated to them that if they wanted the City to conduct a footprint assessment they would need to identify proposed alternative sites on a public space or within the public right-of-way. *Ibid*. As discussed below, only one requester, Lewanda Parnell, identified a proposed alternative site on a public location. *Id.* ¶¶ 44-49

In total, the City has received non-vehicle related accommodation requests from 25 individuals, all of which came through Yesica Prado on behalf of BHU members. *Id.* ¶ 5. Of these 25 requests, 20 were received prior to the Court's MSJ Order. *Id.* Since the Court's orders were issued, Ms. Prado has only attempted to follow up on the accommodation requests for one of those 20 individuals. *Id.* ¶¶ 5-6.

Ms. Prado made accommodation requests on behalf of the other five individuals after the Court's April 3 orders. *Id.* ¶ 5. The City has completed the interactive process with all five individuals and granted the requested accommodations required by the Court's orders. *Id.* ¶¶ 5-6.

The City has explained that implementation of the 3x3 accommodation is subject to determining a public location that will allow for a sufficient path of travel. Although 23 individuals have been granted accommodation from the 3x3-foot rule, consistent with this Court's order, to date only one person, BHU member Lewanda Parnell, has identified an alternative public location, and the City granted her request subject to certain restrictions. *Id.* ¶¶ 5-6, 39-42. Two other locations proposed by BHU members for encampment were found to be located on private

property. *Id.* ¶ 49. To date, apart from Ms. Parnell no other member of the Harrison encampment has proposed an area to relocate to that is within the public right-of-way. *Id.*

The City has informed Ms. Prado and all individuals encountered during the City's outreach that the City's ADA Coordinator remain available to assess the feasibility of any planned relocation areas, based on the proposed location and campsite footprint. *Id.* ¶ 5.

Twenty-four individuals have requested packing assistance through Ms. Prado to the City's ADA Coordinator. White Dec. ¶ 28. The City has granted all of these requests for packing assistance and instructed those granted this accommodation to follow up with the City's HRT to scheduling packing assistance; however, no one has followed up to schedule this assistance. *Id.*; Vance-Dozier Decl. ¶ 16. The City remains prepared to assist these individuals with packing their non-contaminated belongings, as described above. White Decl. ¶¶ 27-29.

BHU representative Yesica Prado was present during many of Mr. Gregory's onsite meetings with BHU members. *Id.* ¶¶ 8-33. Most of these residents—including those on whose behalf Ms. Prado had previously submitted requests—expressly declined to seek accommodations. Only three requesters specifically sought accommodations to the 3x3 rule during outreach: Bradford Raymer, Erin Spencer, and Lewanda Parnell. *Id.* ¶¶ 18, 41, 49. And, as explained above, only Ms. Parnell identified a relocation site within the public right-of-way. *Id.* ¶¶ 44-47. The City asked Mr. Spencer and Mr. Raymer to identify a similar site, and to date neither individual nor BHU has provided this information. *Id.* ¶¶ 18, 40-49.

#### 5. BHU Interference with the City's Efforts to Assist Encampment Residents

When City staff began conducting daily outreach in the Harrison Corridor in late June, encampment residents seemed to be unaware of the City's planned abatement, even though BHU knew of the City's planned timeline for abatement since May 29. McClendon Decl. ¶ 4.

Not only did BHU apparently fail to communicate key information to its members, but it also repeatedly attempted to interfere with the City's efforts to accommodate its members. For example, City staff witnessed Ms. Prado tell one camper that if he didn't find a relocation spot by



ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

the City's compliance deadline, he would not need to leave the Harrison Corridor. McClendon Decl. ¶ 7. In another instance, Ms. Prado insisted that an encampment resident give the City incorrect information and retract his statement that he did not live in his vehicle, telling him that he would not have to leave the encampment if he lives in his vehicle. Vance-Dozier Decl. ¶ 11. Ms. Prado also interfered with City efforts to connect residents with shelter options. *Id.* ¶ 12. Very few people have indicated they want Ms. Prado to speak on their behalf; in fact, they have been more inclined to tell City staff that they do not want her to interfere. McClendon Decl. ¶ 8-9; Vance-Dozier Decl. ¶ 12.

In addition to interrupting and derailing conversations between City staff and encampment residents, BHU disseminated misleading "Know Your Rights" flyers throughout the encampment. Vance-Dozier Decl. ¶ 10, Exhibit B. These flyers communicated that the City could not remove any tents in the encampment violating the 3x3 rule that do not block the path of travel. *Id.* This is misleading because the City is closing the Harrison Corridor for other reasons, including public health hazards, in addition to violations of the 3x3 rule. These flyers gave campers false assurance that they could remain in place if their tents did not completely block the sidewalk, discouraging them from seeking accommodations that might allow them to relocate. Indeed, the encampment has grown from approximately 37 people to more than 80 since these flyers were posted. *Id.* ¶ 15.

There is very little evidence that encampment residents had begun packing or otherwise preparing to move in the leadup to the compliance deadline. Many appear to believe that the abatement will not happen in part because Ms. Prado has repeatedly communicated that, if they do not cooperate with the City in facilitating evaluation of their accommodation request, they will not be required to leave. McClendon Decl. ¶ 10.

## III. <u>ARGUMENT</u>

### A. <u>A New Preliminary Injunction Would Be Procedurally Improper.</u>

A preliminary injunction serves a limited purpose: "to preserve the relative positions of the parties until a trial on the merits can be held." (*University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).) That purpose ends when the Court adjudicates the merits. Hence, "[t]he validity of [a] preliminary injunction is mooted . . . by the subsequent granting of summary judgment." (*Burbank-*

*Glendale-Pasadena Airport Auth. v. City of Los Angeles*, 979 F.2d 1338, 1340 n.1 (9th Cir. 1992).) Once permanent injunctive relief is entered, the preliminary injunction merges into that relief. (*Id.*)

This principle governs the procedural posture here. As noted, on April 3, 2026, the Court adjudicated the parties' cross-motions for summary judgment and determined, category by category, which of BHU's claims succeeded and which failed, and what prospective relief was warranted. Dkt. 288 at 70:1-74:28. The Court held inter alia that the City may proceed with abatement without first securing housing or shelter placements; that BHU members are not entitled to remain at the Harrison encampment pending housing availability; and that the City is not required to designate, create, or identify enforcement-free relocation zones or City-sanctioned campsites. (*Id.* at 71.) The Court also prescribed the accommodations required for qualifying requesters, including individualized tent assessments, specified moving and storage assistance, and replacement of essential survival property destroyed under the circumstances identified in the MSJ Order. (*Id.* at 72–73.)

The Court itself recognized the consequence of that merits determination. In its contemporaneous order denying the City's motion to dissolve the prior preliminary injunction, the Court held that "by the ruling on the parties' cross-motions for summary judgment, the effect of the First Preliminary Injunction has effectively been rendered moot." Dkt. 289 at 2:16-19 (citing *Burbank-Glendale-Pasadena Airport Authority*, 979 F.2d at 1340 n.1).

BHU nevertheless asks the Court to revisit the provisional framework Federal Rule of Civil Procedure 65 and decide whether there are "serious questions" concerning the claims and categories of relief this Court has already adjudicate. Dkt. 312 at 25:11-29:27. That framework no longer applies. How can the Court determine BHU's likelihood of success on its claims when it has fully adjudicated those claims on summary judgment? The Court's summary judgment ruling forecloses a renewed likelihood-of-success inquiry, unless and until that ruling is reconsidered or reversed. In either circumstance, Rule 65 supplies no basis for a second provisional adjudication of the same claims.

As explained in the City's pending motion for entry of final judgment, Dkt. 301 ("Rule 58 Motion"), the MSJ Order resolved BHU's claims and prescribed the parties' prospective rights and



ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

obligations. The City has accordingly requested entry of a separate judgment under Rules 54 and 58 or, alternatively, entry of a permanent injunction and final judgment. (*Id.*) The absence of a ruling on the City's Rule 58 Motion does not vacate the merits determinations in the MSJ Order or revert the action to its pre-merits posture.

The Court has construed BHU's latest motion as one for a preliminary injunction. Dkt. 313 at 3:26. But the MSJ Order established judicial finality on the merits of BHU's claims, and another preliminary injunction at this stage granting any new relief to BHU would be procedurally improper. (See *Bhd. of Maint. of Way Employes Div./IBT v. BNSF Ry., Inc.*, 834 F.3d 1071, 1076 (9th Cir. 2016) (explaining that final judgment moots questions about preliminary injunction procedural propriety, as the final judgment ends the life of preliminary injunctions and they no longer have binding effect on the parties); *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 730-31 (9th Cir. 2017) (citing *SEC v. Mount Vernon Memorial Park*, 664 F.2d 1358, 1361–62 (9th Cir. 1982), in explaining that attempting to "review a district court's advance assessment of probabilities" when the court has already found in favor of one party on the merits is a "futile exercise"); *Taylor v. United States*, 181 F.3d 1017, 1022 n.9 (9th Cir. 1999) (citing the "'long recognized'" doctrine that the propriety of preliminary relief merges into a decision on the merits", and that "'with the entry of final judgment, the life of preliminary injunctions comes to an end'") (citations omitted).)

Issuance of another preliminary injunction would also frustrate appellate review. As the City explained in its Rule 58 Motion, the City has appealed the Court's earlier preliminary injunctions and the MSJ Order, and those appeals—which the Ninth Circuit has since consolidated—remain pending. *Berkeley Homeless Union, et al. v. City of Berkeley, et al.*, Ninth Circuit Case No. 26-2755 (lead case). Any new preliminary injunction would undermine the finality of the MSJ Order, raise confusion concerning the disposition or status of BHU's claims, and violate the divesture rule. See *Masalosalo by Masalosalo v. Stonewall Ins. Co.*, 718 F.2d 955, 956 (9th Cir. 1983) ("The effective filing of a notice of appeal transfers jurisdiction from the district court to the court of appeals with respect to all matters involved in the appeal"). The Court may not at this stage impose new obligations on the City or substantively adjudicate—or re-adjudicate—the rights of the parties with respect to the Harrison encampment. (See *McClatchy Newspapers v. Central Valley*

*Typographical Union 46, Int'l Typographical Union,* 686 F.2d 731, 735 (9th Cir. 1982) ("(A)fter appeal a trial court may, if the purposes of justice require, preserve the status quo until decision by the appellate court. . . . But it may not finally adjudicate substantial rights directly involved in the appeal." *McClatchy Newspapers v. Central Valley Typographical Union 46, Int'l Typographical Union,* 686 F.2d 731, 735 (9th Cir. 1982) (internal quotation marks and citation omitted)).[2]

To the extent BHU seeks to enforce the MSJ Order or accompanying preliminary injunction order (Dkt. 289), it must demonstrate that the City has violated the terms of those orders "based on *clear and convincing evidence*, not merely a preponderance of the evidence," and that the violation was substantive rather than technical. *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993) (indicating showing that must be made to establish violation of injunction on a motion for civil contempt). As discussed below, BHU makes no such showing here.

Because BHU as a matter of law is no longer entitled to any new substantive relief, the Court should deny the motion.[3]

---

[2] Courts have recognized limited exceptions to the divesture rule. The most commonly recognized one is set forth in Federal Rule of Civil Procedure 62(c). That rule "codifies the 'long established' and narrowly limited right of a trial court 'to make orders appropriate to preserve the status quo while the case is pending in (an) appellate court.'" *McClatchy*, 686 F.2d at 734. Rule 62(c) provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction **on terms for bond or other terms that secure the opposing party's rights**." Here, BHU seeks a preliminary injunction that will further enjoin the City and substantively constrain its rights as the opposing party. Furthermore, Rule 62 "does not restore jurisdiction to the district court to adjudicate anew the merits of the case after either party has invoked its right of appeal and jurisdiction has passed to an appellate court." *McClatchy*, 686 F.2d at 734. This Court has construed BHU's request as one for a preliminary injunction rather than modification of the MSJ Order. But even if the Court were to construe BHU's request as a motion for modification, any substantive modification of the MSJ Order would be improper under Rule 62(c).

[3] On a related note, the City also objects to the issuance of a 14-day order staying the abatement operation, as the City was not given any opportunity to oppose the TRO. On July 30, 2026, at 12:18 p.m., the City emailed the Court's clerk, requesting that it be allowed to file an opposition to BHU's Motion by 5:00 p.m. on Monday, August 3. The City indicated that if the Court could issue a decision by August 6, the City would not oppose the Court's issuance of a temporary administrative stay pending the decision. That same day, at 6:06 p.m. the City received an ECF notification of the Court's order, converting the Motion into a preliminary injunction hearing, setting a briefing schedule, and staying the City's enforcement pending the August 13th hearing on the Motion.

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

**B. Conditions at the Harrison Encampment Continue to Pose a Significant Risk of Leptospirosis and Otherwise Endanger Public Health and Safety.**

Turning to the merits of Plaintiff's arguments, much of BHU's Motion rests on denying that the Harrison encampment poses any risk of Leptospirosis transmission based almost exclusively on its tortured reading of a public health update the City issued on July 10, 2026. Mot. at 11:4-11:28. BHU argues that "no genuine emergency" exists at the Harrison encampment, and "[t]here is no reason for this rush to close the camp." Mot. at 3:13-14, 17:8-20. The Court has seemingly rejected this argument. In its July 30th order, the Court declared it would "not at this stage credit BHU's broader contention that the City's public-health justification for abatement has been abandoned." Dkt. 313 at 2:3-6. The Court's skepticism is warranted.

As Dr. Doohan's declaration demonstrates, unsanitary conditions at the Harrison encampment—including trash accumulation, food waste, chronically stationary vehicles, and makeshift structures that provide rodent harborage and facilitate rodent persistence—constitute serious risk factors for Leptospirosis, and over the last several months the risk has only increased. Doohan Decl. ¶¶ 7-8. Testing conducted in the Harrison Corridor "has continued to show a high prevalence of Leptospirosis in the rats tested, above expected baseline levels in California urban rat populations." *Id.* ¶ 19. BHU cites the June 10th update's assessment that "[n]o human cases have been associated with encampments on and around Harrison Street, and no new canine infections have been reported to public health since the first two in late 2025." Dkt. 313 at 12:13-16. But the update does not indicate that the risk of Leptospirosis transmission has diminished.

The City need not wait until a potentially fatal disease strikes more people in the community before taking preventative action on the sound advice of its public health experts. Apart from selectively excerpting the City's June 10th health update, BHU makes no evidentiary showing to negate the public health threat identified by Dr. Doohan. BHU acknowledges that two unhoused individuals living within proximity of the Harrison encampment tested positive for leptospirosis in May 2026, a little over two months ago, and one of those individuals died. These two cases have only "strengthen[ed]" Dr. Doohan's conclusion that "eradication of the rats in the Harrison Corridor encampment as opposed to suppression or control, remains necessary to control Leptospirosis

spread." Doohan Decl. ¶ 13. And the most reliable method for eliminating the rats is through clearance of the encampment. *Id.* ¶¶ 14-18.

The Court has also recognized the danger. Citing Dr. Doohan's prior testimony in this case, the Court has observed:

> Leptospirosis is a bacterial disease generally spread by rat urine, which can diffuse through soil, mud, or standing water to contaminate the wider environment. Doohan Declaration. It can cause high fever, headache, and, without treatment, kidney damage, meningitis, liver failure, trouble breathing, and death. Id. ¶ 5. It is particularly dangerous for pregnant persons and fetuses, and there have been several confirmed and suspected cases of leptospirosis in dogs in and around the Harrison Encampment, with one dog "strongly suspected to have died from" leptospirosis. Tests on rats have proven the overwhelming prevalence of leptospirosis within the Encampment. **The presence of leptospirosis in the Encampment is a significant threat to the health and safety of Encampment residents and surrounding community members, including nearby businesses, an urban community farm, restaurants, and residential properties like the University Village which serves U.C. Berkeley students with families.**

Dkt. 288 at 13:26-14:1 (internal citations omitted).

It bears noting that the MSJ Order does not require the City to make a particularized showing of Leptospirosis. Rather, it requires the City to "make a specific, fact-based determination that a particular vehicle obstructs traffic or poses a concrete, individualized health or safety threat" before it may impound or destroy any vehicle used by a BHU member as a primary form of shelter, and it must also give the vehicle owner notice and an opportunity to cure, and consider less restrictive alternatives. Dkt. 288 at 72:3-15. But the City has notified residents that it does not intend to tow any vehicles used for shelter in the Harrison Corridor at this time, and BHU does not show otherwise. White Decl. ¶¶ 32-34.

Separate and apart from Leptospirosis, conditions at the Harrison encampment have rapidly deteriorated and necessitate immediate corrective action. Vance-Dozier Decl. ¶ 4. As noted, City officials have "personally seen dead rats all over the streets, including rats hit by cars, dead rats with no apparent cause of death," and "dead rats with birds picking at their carcasses." And in addition to the decaying rats, "visible bodily fluids and feces" are present at the encampment. The sidewalks are also "entirely blocked and cars have to swerve around campsites to drive down the road." *Ibid.* The encampment also constitutes a serious fire hazard, and multiple Fire Code violations have been documented there. Shaffer-Killey Dec. ¶¶, 4, 9-10.

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

BHU maintains the City's "approach of fire assessment at the encampment has become more punitive, shifting from a targeted surgical removal of a single unpermitted structure to a mass, area-wide eviction of an entire encampment." Mot. 20:3-5. But BHU provides no support for this assertion. As noted, the City's Deputy Fire Marshal has observed "accumulations of combustible waste materials present in and around multiple structures and the adjacent encampment areas"—not just at a single unpermitted structure or site. Shaffer-Killey Dec., ¶ 9.

For these reasons, BHU's efforts to downplay the public health and safety exigency is unavailing.

### C. The City Has Satisfied Its Interactive Process Obligations and BHU Does Not Establish That the City Has Denied Any Member a Reasonable Accommodation.

BHU contends that the City's "conduct of the interactive process has been in bad faith." Mot. at 15:4. This contention is belied not only by the City's supporting declarations, but also by BHU's own Motion.

#### 1. Despite BHU's Refusal to Identify New Accommodations Requested by Its Members, City Engaged in Numerous Interactive Process Discussions

BHU concedes that throughout June, the City repeatedly asked BHU to identify any new accommodation requests for its members and related information sufficient to enable the City to conduct individualized assessments for preexisting requests. Mot. at 13:13-28. The City sought this information both from BHU, and from the organization's members directly during near-daily outreach operations conducted by City staff at the Harrison Corridor between June and July. BHU admits that instead of providing the requested information, it broadly objected to the City's proposed implementation plan and insisted the City "provide assurance against serial evictions," even though the MSJ Order explicitly authorizes the City to proceed with its abatement consistent with the limitations set forth therein. Mot. at 12:25-13:28; *see* Dkt. 288 at 71:9-14 ("The City may proceed with abatement without first securing non-congregate housing or shelter placements for BHU members. BHU members are not entitled to remain in place pending housing availability.").

The record establishes that rather than interacting with the City in good faith, BHU sought



ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

to delay and sabotage the City's efforts to comply with the MSJ Order, so that it could rush to Court and, based on a host of misrepresentations, seek yet another restraining order and preliminary injunction barring the City from clearing the encampment. BHU contends the City "unilaterally imposed a June 6, 2026 deadline for new accommodation requests." Mot. 15:1-9. Not so. As discussed, on May 29, 2026, the City proposed a timeline to BHU and requested that BHU submit information in a phased manner on certain proposed dates, to afford the City adequate time to consider new requests and conduct any necessary individualized assessments.

At no point did BHU request an extension of any of the interim dates proposed by the City, and BHU waited until days before the original compliance deadline to request that it be extended. White Decl. ¶ 4; Stephens Decl. ¶ 2. To the extent the City "unilaterally" proposed and adopted its own implementation plan, it did so because BHU refused to agree to provide information on any timeline at all. BHU also cites no authority for the proposition that it is entitled to act as a bottleneck by prohibiting the City from engaging in the interactive process with BHU members directly, particularly when it has produced no evidence that all BHU members at the encampment have designated BHU as their exclusive representative. Under these circumstances, any such requirement would likely contravene Title II. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("Accordingly, a public entity does not 'act' by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable").

Additionally, BHU argues the City offered only the standard "two-person tents" to all residents, "regardless of disability status." Mot. 14:19-28. BHU cites Ms. Prado's declaration for this assertion, but the declaration offers no such testimony—rather, it vaguely states the City's Homelessness Response Team "conducted 'tent size' inquiries without BHU participation and without adequate training on disability recognition." Dkt. 312-1 at 6:22-7:4. And in any event, BHU's assertion is incorrect. The City surveyed encampment residents directly and collected individualized information directly from them regarding their preferred tent size, White Decl. ¶ 22, and these individuals are presumably able to assess their own disability-related needs. The City initiated this process so that it could obtain customized tents in advance for distribution.

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

In short, the City has exhaustively engaged in interactive process discussions with BHU and its individual members and offered a host of accommodations to residents with disabilities. And BHU cites no evidence indicating the City has refused to grant a reasonable accommodation to anyone. The City has satisfied its obligations under the ADA and the Court's MJS Order.

**2. The City's Advisement to BHU and Its Members to Identify Relocation Cites Comports With the ADA and the MSJ Order.**

The MSJ Order is unequivocal: the City may abate the Harrison encampment without securing housing or shelter for the campers there. Dkt. 288 at 71:9-14. And the City "is not required to designate, create, or identify, enforcement-free relocation zones or City-sanctioned campsites. BHU members may relocate to permissible locations of their choosing subject to the City's existing conditions-based enforcement framework." *Id.* at 71:15-21.

BHU argues the City violated the Court's order because it "required residents to propose specific relocation locations, including shape and size of their footprints" to assess their 3x3-foot policy accommodation requests. Mot. 16:11-12. This statement, of course, contravenes BHU's other contentions that the City failed to engage in the interactive process. Rather, it shows that the City attempted to re-engage with BHU members and even solicited individualized information from BHU members to conduct the tent footprint assessment contemplated by the MSJ Order. Dkt. 288 at 58:26-59:10.

The City's current policies require maintaining a six-foot path of travel on most sidewalks, balancing the decriminalization of being "homeless in public" with the need to keep sidewalks accessible for public travel, disability access, and other purposes. *Id.* ¶ 47. The Court has acknowledged the importance of maintaining a sufficient path of travel, including for individuals with disabilities. See Dkt. 288 at 59:13-16 ("The Court's ruling on the 3x3 rule does not, however, relieve BHU members of all space-related constraints, nor does it necessarily displace the path of travel requirements set forth in A.R. 10.2. Those requirements serve legitimate purposes, including pedestrian safety and accessibility.").

As the City has previously explained, tents sized 20 by 30 (600 square feet) or even 10 by 12 (120 square feet) may not allow an adequate path of travel on sidewalks in most parts of the City.

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

*Id.* Thus, to the extent any campers seek approval to maintain tents of that size or larger as a disability accommodation, they will likely struggle to find a location that can accommodate them while ensuring sufficient pedestrian and disability access. White Decl. ¶ 50.

Nevertheless, BHU maintains "relocation locations are practically impossible to find with the current criteria, and the City knows it." Mot. 16:10-12. There are two problems with this statement. First, it ignores that the availability of suitable relocation sites is in part a function of the individual's requested footprint size—something that individual controls, not the City.

Second, BHU does not explain how the City can assess whether a requested footprint will satisfy the path of travel requirement without knowing both the proposed tent size and the location. As a practical matter, the City cannot anticipate any person's disability-related need for a particular tent size; the person must inform the City of the requested size and the disability-related need for it. Without this information, the City cannot evaluate the sufficiency of the nexus between the disability-related needs and the requested size. Similarly, it cannot determine whether any particular location can safely and legally accommodate a tent and a sufficient path of travel without knowing the dimensions the person is requesting.

As a legal manner, compelling the City to designate particular public right-of-way spaces for BHU members' exclusive use would be tantamount to mandating the creation of a sanctioned encampment and/or enforcement-free zones, and the Court explicitly rejected this imposition, including most recently in its July 30th order. Dkt. 313 at 2:3-6 (affirming the Court's earlier holding "that the City may proceed with its abatement "without first securing relocation for every member").

The MSJ Order states that the "City *may* choose to proceed with the interactive process and identify sidewalk segments within the City where existing widths permit a larger tent footprint while maintaining a reasonably required path of travel (e.g., six feet)"—it does not require the City to identify a sidewalk where all BHU members can camp, regardless of the tent size they have chosen to request. Dkt. 288 at 59:2-4. Alternatively, "the City may choose to provide compliant tents that meet the claimants' disability-related needs." *Id.* at 59:4-5. The City cannot simply purchase or provide a "compliant" tent without knowing both the size the requester needs and the specific site

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

where the tent would be placed, since compliance with the necessary path of travel depends on the interaction between tent size and the proposed space. To the extent the Court means "compliant" to refer only to the individual's stated disability-related need, the City has also satisfied this option by supplying replacement tents in the size of residents' choosing, even without the need to submit an accommodation request.

Thus, BHU cannot show the City has denied any member a replacement tent needed to meet their disability-related needs. *See Mayfield v. City of Mesa,* 131 F.4th 1100, 1110 (9th Cir. 2025) ("A plaintiff asserting a reasonable-accommodation claim under Title II 'bears the initial burden of producing evidence of the existence of a reasonable accommodation' that was 'denied or . . . not provided'" (internal citations omitted)).

**3. The City's Abatement Notice Does Not Expand the Closure Beyond the Court's Order or Misstate the City's Obligations**

BHU makes various kitchen-sink arguments regarding the alleged defects in the City's public abatement notice. None has any merit.

BHU contends the City's public notice of the abatement "expands the closure to a much larger geographic area: 'the geographic area of Berkeley bounded by San Pablo Avenue to the East, the Railroad tracks to the West Codornices Creek to the North, and Gilman St to the South ('Harrison Corridor').'" Mot. at 19:21-26. This contention is meritless. The geographic scope specified in the July 27th Notice of Encampment Abatement is the same as that set forth in the City's June 26th public notice, and the February 2026 partial abatement notices issued in response to rising Leptospirosis risk. White Decl. ¶ 32. At no previous point has BHU objected to the geographic scope of the abatement, and it never raised this issue during the parties' meet-and-confer discussions. BHU presents no evidence demonstrating that the City expanded the abatement's scope, or that it did so over BHU's objection.

BHU also argues that the July 27th notice imposed a two-day deadline for the submission of accommodation requests. Mot. at 20:6-10. BHU again misrepresents the record. As Plaintiff itself admits (Mot. at 13:13-14:3), on May 29, 2026, the City asked BHU to submit any new (i.e., non-pending) accommodation requests on behalf of its members by June 6. In its May 29th

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

correspondence, the City also asked BHU to provide tent and sleeping bag size information and proposed relocation sites by June 12. And as discussed in Section C.iii, the City considered all such requests, and in the case of Ms. Parnell it granted her a relocation site as a variance to the 3x3 rule because she is the only requester who has identified an alternative location on public property. Gregory Decl. ¶¶ 18, 41-49. The locations proposed by the two other requesters—Mr. Spencer and Mr. Raymer—who identified alternative relocation sites were located on public property. And the City's June 26th public notice identified the goods and services the City intended to offer campers irrespective of whether they had previously made a disability request, and it instructed campers on how they could go about submitting *additional* disability requests to the extent they needed any further accommodations or assistance. White Decl. ¶¶ 8-12. And throughout June and July, the City conducted multiple outreach operations at the encampment and directly engaged with residents there, apprising them of the City's process for considering accommodation requests and inviting them to make such requests. Gregory Decl. ¶¶ 8-44. The City's ADA Program Coordinator conducted these discussions often in the presence of BHU representative Yesica Prado, and Mr. Gregory separately communicated with her regarding these requests. *Ibid*. By contrast, BHU makes no showing that the City refused to interact in good faith or denied a requested accommodation in contravention of the MSJ Order.

BHU also maintains the City's notice "misstates the City's obligation to replace property," because it indicates that the City will not store "soiled or moldy," "wet or damp clothing, bedding, or sleeping bags," and "any item that may attract rodents or insects." But the Court expressly held that the City is *not* required to collect and store these items. Dkt. 288 at 63:9-11 ("Accordingly, the City is not required to physically handle or store items that are observably wet, waterlogged, muddy, or porous in a manner that could render them likely carriers of biological contamination"). BHU disregards this carveout in the MSJ Order. Requiring the collection and storage of wet or soiled items will imperil the health and safety of City staff and encampment residents alike. Doohan Decl. ¶¶ 25-29.

Lastly, BHU indicates that the notice's warning that "Failure to comply with this notice may result in citation or arrest," and that "[t]his threat of arrest puts individuals with disabilities at a

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

heightened risk of adverse interactions with law enforcement." Mot. at 21:1-4. This assertion is conclusory and defies common sense. The City has provided notice of the *potential* consequences of the campers' failure to comply with a lawful administrative order, because that is what due process requires. And it issued the warning to afford residents adequate time to make arrangements to vacate the encampment and thereby *avoid* any adverse or undesired encounters with law enforcement. For this reason too, the City developed and proposed its phased implementation plan to BHU months in advance, on May 29, 2026. Would BHU prefer that the City provide no such notice? BHU does not argue the City lacks the power to enforce violations of its abatement orders. *See generally City of Grants Pass v. Oregon v. Johnson*, 603 U.S. 520, 543-545 (2022) (holding that enforcement of camping restrictions through civil fines and criminal prosecution does not violate the Eighth Amendment's prohibition on cruel and unusual punishment).

BHU's challenge to the City's public notices is unfounded.

### D. BHU Does Not Demonstrate a Likelihood of Success or Irreparable Harm, or That the Equities or Hardships Weigh in Its Favor.

As explained, the legal analysis governing preliminary injunction requests—including the claimant's likelihood of success, likelihood of irreparable harm, and hardship balancing—does not apply at this stage of the proceeding, as BHU's claims have been fully adjudicated.[4] But even assuming it applied, BHU cannot satisfy those elements.

With respect to likelihood of success, BHU's Motion rests solely on its ADA claims. Mot. 22:17-27. And as to those claims, apart from generalized and unsubstantiated assertions BHU does not demonstrate that the City refused or failed to engage in the interactive process, and the record definitively shows otherwise. Moreover, even if true, a failure to interact does not constitute a standalone claim under Title II of the ADA. *See Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("[T]here exists no stand-alone claim for failing to engage in the

---

[4] BHU again tries to have its cake and eat it too. It asserts that "BHU has demonstrated—*and this Court has already found*—a likelihood of success on its ADA claims." This contradictory argument lays bare BHU's "Groundhog Day" strategy—to use the ultimate findings in the MSJ Order for res judicata effect to justify new relief, while simultaneously refusing to concede that the MSJ Order constitutes a final merits determination that forecloses new relief.

interactive process"); *Ahmed v. Regents of Univ. of California*, No. 17-cv-0709-MMA (NLS), 2018 WL 3969699, at *5 (S.D. Cal. Aug. 20, 2018) ("[T]his conclusion—that if a defendant fails to engage in the interactive process, at trial a plaintiff still must establish the existence of a reasonable accommodation—is consistent with virtually every single other Circuit"). As this Court has acknowledged: "process deficiencies do not independently supply a basis for liability where no reasonable accommodation was improperly denied." Dkt. 288 at 22:14-15. To establish a likelihood of success, BHU must "produc[e] evidence of the existence of a reasonable accommodation' that was 'denied or . . . not provided.'" *Mayfield*, 131 F.4th at 1110.

BHU fails to carry its burden. The City's supporting declarations unequivocally establish that the City has offered to furnish replacement clothing, tents, and other survival gear; solicited and obtained size information relating to these items; offered to store campers' non-soiled and non-contaminated personal belongings for 90 days; and invited BHU members to identify relocation sites within the public right-of-way and agreed to assist them with moving and conduct individualized tent footprint assessments to ensure the sites can accommodate them. BHU's claims to the contrary lack any evidentiary support.[5]

BHU has also failed to establish cognizable irreparable harm. As noted, the City has offered to replace campers' tents, clothing, and survival gear and store their belongings, and based on information provided by requesters conduct individualized tent footprint assessments. Given these accommodations, any risk of harm disabled BHU members face stems from the unfortunate fact that they are chronically unhoused, rather than any unlawful actions attributable to the City. See *Aitken v. City of Aberdeen*, 393 F.Supp.3d 1075, 1085 (W.D. Wash. 2019) ("Many of the Plaintiffs will certainly be sad to depart the place they have called home for years, but this effect of the City's decision [to clear an encampment] does not rise to the level of irreparable harm").

Finally, the balance of equities and hardships weighs in favor of denying the motion.

---

[5] BHU argues the City has violate the ADA by "offering gift cards instead of actual replacements for destroyed essential property." Mot. at 22:21-22. Because the Court identified this arguments as one of "three narrower, independent" points meriting further discussion in its July 30th order (Dkt 313 at 2:3-6), the City separately addresses this issue and the two other points raised in the Court's order below.

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

Throughout the proceedings and in its concurrently submitted declarations, the City has extensively documented the significant public health and safety hazards posed by the Harrison encampment, particularly the risks associated with leptospirosis. Doohan Decl. ¶¶ 20-24. Any further delay will exacerbate the danger to the encampment's residents and the community. On this count too, BHU fails to meet its burden.

**E. <u>As to the "Narrower" Points Raised in the Court's July 30th Order, the City Has Complied With the MSJ Order.</u>**

In its July 30th order, the Court declined to credit BHU's broader challenge to the City's health-based justifications or revisit its earlier holding that the City may proceed with its abatement "without first securing relocation for every member." Dkt. 313 at 2:3-6. But the Court found that BHU had "raised serious questions as to the merits of three narrower, independent points: (1) whether a $100 gift card, offered in lieu of in-kind replacement of sleeping bags and clothing, satisfies the Order's requirement that the City replace essential survival property destroyed during abatement, particularly in light of open questions concerning whether affected claimants can realistically use such a card during an active abatement; (2) whether requiring residents to pre-designate a specific relocation site before the individualized tent-footprint assessment that the Order requires is consistent with that requirement, and whether displacement from a site identified due to lack of City pre-clearance satisfies the requisites of this Court's prior orders; and (3) whether the City's stated policy of declining to store property unrelated to contamination or moisture, including for example, "loose or scattered papers" and "bike carcasses and parts" exceeds the storage-related discretion the Court's Summary Judgment Order afforded the City as to items that are "observably wet, muddy, or plausibly contaminated with leptospirosis." *Id.* at 2:6-18. The City addresses these points below.

With respect to the provision of gift cards, while the City initially made this offer in its June 26th public notice, the City has since decided to provide replacement sleeping bags and clothing instead of distributing gift cards. White Decl. ¶ 12. The decision to provide gear rather than gift cards was made on July 28, in response to feedback from BHU and for operational reasons relating to cost and efficiency. The City did not have a chance to convey this change to BHU before Plaintiff

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899

filed its motion. *Ibid.*

With respect to the individualized tent footprint assessments, the City has addressed this issue in Section C.ii, *ante*. The City has offered to conduct these assessments provided that BHU or its members identify relocation sites within the public right-of-way. To date, only one BHU member has identified such a site. Gregory Decl., ¶¶ 42-43, 45. The MSJ Order does not require the City to designate enforcement-free spaces or relocate campers to alternative sites, and Court's July 30th order reaffirms this holding. Dkt. 313 at 2:3-6.

As to loose or scattered papers that residents leave at the encampment, the City does not intend to collect or store these items because "even dry-appearing loose items made of porous materials can carry invisible contamination from soil, dust, or organic matter that may harbor Leptospirosis." Doohan Decl., ¶ 29. Because it is "impossible to verify cleanliness item by item, allowing uncontained loose materials into storage creates uncontrolled exposure risks." *Id.* However, the City will provide receptacles that can be packed and sealed so that these items can be stored. *Id.* The City has offered this additional assistance with packing and securing items so that it can also store this property on the residents' behalf if they so request. With respect to bicycle parts, BHU does not argue in its motion that the City has refused to collect and store these parts. Moreover, the City intends to accept these and other large, non-porous items "that cannot fit in a box or bin for storage" so long as they are "clean and not caked with mud or soil," consistent with the MSJ Order. *Id.* at ¶ 35.

The evidence thus shows that the City has complied and will comply with the MSJ Order as to the three points raised in the July 30th order.

## IV. CONCLUSION

For the foregoing reasons and those set forth in its moving papers, the City respectfully requests that the Court deny BHU's Motion. But the City would like to add one final note: based on BHU's failure to provide information sought by the City relating to its members' accommodation requests, to the extent the Court is inclined grant the Motion or otherwise postpone the abatement to allow the parties to engage in further discussions, the City urges the Court to impose a reciprocal obligation on BHU to cooperate with the City and impose deadlines by which BHU must provide

information relating to any accommodation requests on behalf of its disabled members.

/ / /

/ / /

/ / /

Dated: August 5, 2026

ATKINSON, ANDELSON, LOYA, RUUD & ROMO

By: */s/ Rahi Azizi*
Ruth M. Bond
Rahi Azizi

Attorneys for Defendants
CITY OF BERKELEY, THOMAS GREGORY, PAUL BUDDENHAGEN, PETER RADU, and OKEYA VANCE-DOZIER

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
3 HARBOR DRIVE, SUITE 200
SAUSALITO, CALIFORNIA 94965-1491
TELEPHONE: (628) 234-6200
FAX: (628) 234-6899