Farimah Faiz Brown, City Attorney (State Bar No. 201227)
Katrina Eiland, Deputy City Attorney (State Bar No. 275701)
Laura Iris Mattes, Deputy City Attorney (State Bar No. 310594)
Nubyaan Scott, Deputy City Attorney (State Bar No. 331584)
Sara Stephens, Deputy City Attorney (State Bar No. 300589)
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile: (510) 981-6960
Email: FBrown@berkeleyca.gov
KEiland@berkeleyca.gov
LMattes@berkeleyca.gov
NScott@berkeleyca.gov
SStephens@berkeleyca.gov

Attorneys for Defendant
CITY OF BERKELEY

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

BERKELEY HOMELESS UNION,

Plaintiff,

v.

CITY OF BERKELEY, et al.

Defendants.

**Case No. 3:25-CV-01414-EMC**

**DEFENDANT CITY OF BERKELEY'S STATUS REPORT**

Status Conference
Date: August 28, 2026
Time: 9:00 AM
Judge: Hon. Edward M. Chen

On August 13, 2026, the Court issued an Order Clarifying Injunctive Relief and denying Plaintiff's preliminary injunction motion. The Order directed the parties to "meet and confer in good faith, and in person on the Berkeley streets, before Thursday, August 27, 2026" to determine potential suitable locations for Berkeley Homeless Union ("BHU") members granted 3x3-foot rule accommodations. The Order also required the parties to appear for a status conference on August 28, 2026. Defendant City of Berkeley (the "City") submits this Status Report in advance of that hearing to summarize the City's extensive efforts to comply with the Court's Order and to provide important factual updates.

In short, the City and BHU completed the in-person, onsite review contemplated by the Court's Order. The parties assessed five locations concerning eleven individuals and discussed the legal, property, zoning, fire safety, pedestrian access, emergency access, utility access, and other considerations affecting each location.

Of the five locations reviewed, the proposed location at Fourth and Camelia Streets is the only potentially suitable location for a 3x3 accommodation under the Court's order. The City has not yet approved the precise footprint for the location yet because: (1) the BHU member(s) have not yet confirmed whether the smaller footprint dimensions needed to fit on the site are acceptable; (2) the City must further assess which portions of the proposed location, if any, are privately owned; and (3) the City must assess applicable pedestrian, emergency, utility, and other access requirements in light of the final footprint and PROW size. The City has agreed to provide BHU with additional site-specific information identified during the walkthrough and to continue coordinating with BHU in good faith concerning the potential use of that location for the identified individual(s).

The City respectfully requests that the Court set a deadline of September 1 for BHU to provide any outstanding information, to the extent that the Court would order the City to complete the final Fourth and Camelia Street location assessment prior to the forthcoming

abatement, with a noticed compliance deadline of September 8, 2026.[1]

As directed by the Court, the City's most recent abatement notice again notified individuals of their right to request accommodations. The notice requests that individuals do so by September 1, to give the City sufficient time to evaluate them. The City also respectfully requests that, to the extent the Court would order the City to resolve these requests prior to abatement, the Court set a deadline of September 1 for any additional accommodation requests from BHU. This deadline is necessary to allow the City sufficient time to provide any requested 3x3 accommodation assessments and relocation assistance and proceed with abatement in short order, as contemplated by this Court's August 13 Order.

## I. THE CITY'S AND BHU'S CORRESPONDENCE

On August 13, 2026 at 11pm, BHU emailed the City to request the list of 23 people seeking 3x3 accommodations, despite the Court's order clearly stating that "*BHU* shall endeavor to furnish *the City* with a list identifying these individuals." (Dkt. No. 322 at 1 (emphasis added); Declaration of Sara Stephens ("Stephens Decl.") ¶¶ 1-2.) Nevertheless, as a courtesy, the City provided the list of 23 names within 24 hours. (Id. ¶ 2.) The list represented all of the individuals who had submitted requests for an accommodation to the City's rule that property on the sidewalk must be confined to nine square feet ("3x3 rule"), which had been approved either

[1] The City strongly objects to any further order requiring the City to complete this process prior to abatement. As the Court has previously recognized, there is no freestanding claim for failure to complete the interactive process. Dkt. No. 288 at 22. Moreover, under the Court's order, BHU members may request an accommodation from the 3x3 rule if they identify a potentially viable location even after leaving the area—that is, they do not lose the opportunity once abatement happens. Moreover, as explained below it appears that the relevant BHU member(s) had already relocated to this new area.

through written or verbal accommodation requests or the Court's April 2, 2026, orders. (Id. ¶ 3.)[2]

On August 20, BHU responded by requesting site assessments for only 9 of the 23 individuals at five different locations. (Id. ¶¶ 4-6.) Several of the locations were City-owned lots. Only two sites were in the public right-of-way and one of those two sites is in a No Lodging / TNC Prohibited Area. (Id. ¶ 6.)

BHU provided proposed site locations for only 9 out of the 23 individuals, because according to BHU, the remaining 14 individuals: (1) now live in a vehicle; (2) have found alternative living arrangements; (3) have already been accommodated; (4) are incarcerated; or (5) felt sick and so did not choose a site. (Id. ¶ 4.)

In its communications with BHU, the City made clear that the Court's orders regarding accommodations to the 3x3 rule applied only to the public right-of-way and that the Court did not order the City to authorize encampments on its real estate, where camping is currently prohibited. See Id. ¶ 7. Specifically, the Court's Summary Judgment order stated:

> The City may choose to proceed with the interactive process and **identify sidewalk segments** within the City where existing widths permit a larger tent footprint while maintaining a reasonably required path of travel (*e.g.*, six feet). Alternatively, the City may choose to provide compliant tents that meet the claimants' disability-related needs. The City **retains authority, of course, to enforce AR 10.2 and other rules governing use of sidewalks** where an individual's belongings actually obstruct pedestrian passage or emergency access, or present a concrete public health or safety hazard." Dkt. No. 288 at 58-59 (emphasis added)

The Court's Order Clarifying Injunctive Relief provided that the"City must comply with requirements to engage in individualized assessments to assess disable claimants' **accommodation needs and conditions on public rights-of-way**". (Dkt. No. 322 at 2, emphasis added.) In contrast, the Court emphasized in its final injunctive relief that "[t]he City is not

[2] BHU repeatedly claimed that the City had omitted people from its list of people who had requested the accommodation, but failed to identify any additional names, despite the City making multiple requests for them to do so. (Id. ¶ 3.)

required, as a matter of ADA accommodation, to: . . . (2) designate enforcement-free zones and City-sanctioned or City-owned encampments, or create maps or lists of permissible relocation areas (for encampments).” (Dkt. No. 326 at 5; *see also* Dkt. No. 288 at 71.)

Despite communicating that both City real estate, including vacant lots, and areas within a No Lodging / TNC Prohibited Area prohibit camping, BHU insisted that the City visit and evaluate all of its newly proposed sites, and declined to propose any alternative right-of-way locations. (Stephens Decl. ¶¶ 7-8, 10.) Instead, BHU insisted that the City consider allowing relocation on City-owned lots, citing an email from confidential settlement discussions earlier this year and claiming that the City provided BHU with a list of places where people at the encampment could relocate. (Id. ¶ 8)

This is a gross mischaracterization: the list comes from a publicly-available informational item to the City Council listing vacant City properties, without making a recommendation as to whether they would be appropriate for shelter or an encampment. (Id.). The parties never reached a settlement and the City never represented that any of those properties were available for camping. (Id.) Indeed, the City continues to prohibit camping on such sites.

As for the in-person meet and confer, the City offered to meet at any time during three full days—August 24, 25, and 26—in order to comply with the Court’s directive to meet prior to August 27. (Id. ¶ 9.) Initially, BHU proposed to meet on August 27, supposedly to allow BHU’s counsel to focus on a Ninth Circuit filing. (Id.) The City responded, however, that meeting *on* August 27 would not comply with the Court’s order to meet *before* that date. (Id.) Once BHU’s Ninth Circuit filing date was rescheduled, BHU proposed an in-person meeting at 1pm on August 26, to which the City agreed. (Id.) This allowed only a few business hours in which to evaluate the five sites prior to the deadline set by the Court.

## II. MEET AND CONFER IN PERSON

On August 26, 2026, representatives of the City of Berkeley (“City”) and Berkeley Homeless Union (“BHU”) met in person on the Berkeley streets to confer and conduct the location assessments contemplated by the Court’s August 13, 2026 Order. Declaration of

Nubyaan Scott ("Scott Decl.") ¶¶ 1-3.) The parties met from approximately 1:00 p.m. until shortly after 3:30 p.m. and assessed five locations concerning eleven individuals identified by BHU. (Id. ¶ 3.) Mr. Prince, counsel for BHU, was notably absent from the Court-ordered meet and confer despite appearing at a press conference in the Harrison Corridor the day before. *See infra*.; Id. ¶ 4.

The BHU representatives participating in the walkthrough included Yesica Prado, Robbie Powelson, a member of the press, a videographer, and two photographers, invited by BHU. Id. The City representatives included Joshua Jacobs, Homeless Services Coordinator; Okeya Vance-Dozier, Community Services Specialist; Epsalon Galloway, Social Services Specialist; Shannon Shaffer-Killey, Deputy Fire Marshal; Thomas Gregory, ADA Program Coordinator; Wahid Amiri, Director of Public Works; Nubyaan Scott, Deputy City Attorney; Gabriel Martinez, Deputy City Attorney; and Andrea Sutherland, Code Enforcement Officer. (Id. ¶ 5.)

The City came prepared to evaluate the locations proposed by BHU for the 23 individuals described in the Court's August 13 order. The City understood the meeting to be intended to allow the parties to determine which locations would be suitable for relocation under the terms of the Court's April 3, 2026 orders.

Before and during the onsite meeting, the City advised BHU of several threshold considerations applicable to the locations it had proposed. (Id. ¶ 7.) First, the City advised that vacant lots and other locations that are not part of the public right-of-way ("PROW") are not viable locations for purposes of the Court-ordered 3x3 accommodation process, which is an accommodation to the City's policy limiting personal property *on the PROW*. Id. The City had communicated this to BHU before the walkthroughs and did so again during the onsite assessments. Id. Second, the City advised that locations on City lots and within "No Lodging" areas where overnight camping is entirely prohibited, are also not viable locations for accommodations to the 3x3 rule. (Id. ¶ 8.) In these locations, camping is entirely prohibited—the restrictions are not based on the size of personal property in the PROW. The City had likewise communicated this to BHU before the onsite assessments. Id. Third, the City advised BHU that

no makeshift structures could be placed at any relocation site and that only tents could be used because of fire safety concerns. (Id. ¶ 9.)The parties then assessed the following locations:

**1. 1281 University Avenue – Alice Barbee (City-Owned Lot)**

BHU proposed an 11-by-30-foot footprint for Ms. Barbee. (Id. ¶ 10.) The location is a vacant lot that was locked at the time of the assessment. (Id. ¶ 11.) The parties, therefore, could not take precise measurements, although the City estimated from outside the gate that the lot was approximately 36 feet wide by 72 feet long. Id. The City again advised BHU that the location is a vacant lot, not part of the PROW, and camping is not permitted. (Id. ¶ 12.) As such, it is not a viable 3x3 accommodation location under the Court's orders.

**2. 1901 Henry Street – Hector Navarro and Caregiver (City-Owned Lot)**

BHU proposed a 10-by-25-foot footprint before the onsite meeting and an 11-by-30-foot footprint during the assessment. (Id. ¶ 13.)

The location, presented as an alternative to the previously identified privately-owned lot, is also a vacant City-owned parcel that is not part of the PROW. (Id. ¶ 14.) The City explained that the Court ordered accommodation process concerning the "3x3 rule" applies to the PROW and does not itself authorize camping on City owned parcels. Id. The location also contains a "No Lodging" sign and is within a residential zoning district. (Id. ¶ 13.) Thus, even if the location were part of the PROW, the City advised BHU that the site's "No Lodging" designation and residential zoning would present independent barriers to camping. (Id. ¶ 16.) The City agreed to follow up regarding the parcel's zoning, ownership, and applicable restrictions. (Id. ¶ 17.)

**3. 701 Harrison Street – Robbie Peddycoart, Robert Pearce, and Alexander Wilson (City-owned lot)**

BHU proposed 11-by-30-foot footprints for Mr. Peddycoart and Mr. Wilson and a 10-by-30-foot footprint for Mr. Pearce. (Id. ¶ 18.)

The property is a City-owned parcel that previously served as a parking lot and is adjacent to a family shelter. (Id. ¶ 20.) The City advised BHU that the location is a City-owned

parcel rather than PROW, making the location unsuitable as a 3x3 accommodation location. In addition, a "No Lodging" sign is also located immediately outside the lot. (Id. ¶ 19.)

In addition to these two barriers, the City believes that an existing lease agreement with the shelter operator affects the City's ability to authorize use of the parcel for camping. (Id. ¶ 20.) The location also presents significant fire safety considerations. (Id. ¶ 21.) During the assessment, the parties discussed the need for separation between tents ("fire breaks") and setbacks from adjacent buildings and fencing. Id. The site contains substantial foliage and vegetation that would require mitigation if the policy were to be used for camping due to the fire hazards they present. Id.

Thus, although the physical dimensions of the lot could accommodate the proposed footprints, the location presents significant issues even apart from the fact that it is a City lot in a no camping zone, which makes it unsuitable for relocation at this time.

**4. 1499 Second Street – Shawman, Jermaine Lee White, and Gregory Grove**

1499 Second Street –Shawman, Jermaine Lee White, and Gregory Grove

BHU proposed an 11-by-20-foot footprint for Mr. Shawman, an 11-by-30-foot footprint for Mr. White, and a 10-by-25-foot footprint for Mr. Grove. (Id. ¶ 24.) The City advised BHU that this location is within a "No Lodging"/TNC prohibited area and that overnight camping therefore is not permitted at this location regardless of camp size. (Id. ¶ 25.) The City had specifically communicated this information to BHU before the walkthrough but nevertheless participated in the onsite assessment at BHU's request. (Id. ¶ 26.)

In addition to the fact that camping is entirely prohibited in this location, the parties also identified several practical constraints, including utility access, power lines, property line setbacks, and large K-rails located throughout the area. (Id. ¶ 27.) BHU asked whether the K-rails could be removed or whether the proposed camping area could extend into the roadway. (Id. ¶ 29.) The City advised that it would need to confirm ownership of the K-rails and evaluate whether any use of the roadway could be accommodated while preserving necessary parking,

utility access, and other access requirements. (Id. ¶ 29.) Since that time, the City has identified that an additional constraint is that two different companies own parts of the area. (Id. ¶ 28.)

**5. Fourth Street and Camelia Street (Formerly Cited as Third Street and Camelia Street) – Bradford Raymer and Jackie Mendoza**

BHU proposed an 11-by-30-foot footprint for both individuals. (Id. ¶ 30.) This was the only location reviewed during the onsite assessment that the City identified as viable for further consideration. (Id. ¶ 31.) The location is on a dead-end street adjacent to a fenced railroad track and an active construction site. (Id. ¶ 32.) The parties identified two potential areas for placement and took measurements at both. Id. Although there is sufficient sidewalk length to potentially accommodate 2 individuals, final viability remains subject to confirmation of the precise dimensions and applicable pedestrian, emergency access, utility access, and other requirements. (Id. ¶ 33.) The Fire Department and Code Enforcement identified no immediate disqualifying concerns during the assessment. (Id. ¶ 35.)

The parties also observed that Mr. Raymer had already relocated 2 tents to the dead-end area that abuts the railroad fence. (Id. ¶ 36.) The tents were present when the parties arrived, and BHU representative Ms. Prado informed City representatives during the walkthrough that the tents belonged to Mr. Raymer and that he had relocated them to that location. (Id. ¶ 37.) The City offered to measure the two tents present at the site so that their dimensions could be considered as part of the assessment. (Id. ¶ 38.) Ms. Prado declined the offer, explaining that Mr. Raymer desired a larger tent. Id. The parties identified a second potential placement area that appeared to provide greater sidewalk depth while accounting for pedestrian access and vehicle ingress and egress. (Id. ¶ 39.) Additional review is necessary to confirm the measurements and determine the maximum footprint and number of tents that could be accommodated while maintaining required access, and to confirm which portions of the area are private property. (Id. ¶ 39-40.)

Further, the site would not accommodate the requested footprint of either BHU member because the depth of the sidewalk does not allow for 30 feet, plus 6 feet of pedestrian access, plus 18 inches of space for those entering and exiting vehicles (the largest section of the sidewalk

is directly next to street parking). (Id. ¶ 33.) For instance, the City informed BHU that in the largest area of the sidewalk, which is next to street parking, the maximum depth that could be accommodated is 4.5 feet. Id. BHU has not yet expressed whether Mr. Raymer would be willing to decrease the requested footprint to facilitate access for pedestrians and those entering or exiting parked vehicles. (Id. ¶ 34.) Ms. Prado asked why pedestrian access was necessary for a dead-end street and City staff informed her that the City has a Title II responsibility to preserve pedestrian access and there is no "dead-end street carveout." (Id. ¶ 39.)

The parties identified a second viable placement area that provided greater sidewalk depth due to the fact that it was in a section of the sidewalk where parking is prohibited. Id. The length of the sidewalk is limited in that area due to it being directly next to the only direct entrance for emergency access by the Fire Department. Id. Additional review is necessary to confirm the measurements and determine the maximum footprint that could be accommodated while maintaining required emergency and utility access. Id.

**Completeness of BHU's Identification of Individuals**

The Court's August 13th, 2026 Order directed BHU to provide the City with a list identifying the 23 individuals, the tent sizes necessary to accommodate their respective disabilities, and proposed areas within Berkeley to which they would relocate. However, despite the parties compiling this list of the 23 individuals, BHU has continued to insist, without evidence or providing additional names, that additional individuals not encompassed in the 23 previously requested a 3x3 accommodation.

For the first time, BHU identified Ms. Jackie Mendoza during the August 26th on site assessment at 4th and Camellia. (Id. ¶ 42.) BHU representative Ms. Prado advised City representatives that Ms. Mendoza had previously made a verbal request for an assessment. (Id. ¶ 43.) Although the City has no record of such a request, it nevertheless agreed to conduct the assessment for Ms. Mendoza during the walkthrough. Id.

The City notes that the addition of an individual *during* the onsite assessment, after the deadline for BHU to provide information required by the Court's August 13 Order, goes beyond

the Court's order. It also presents a significant practical problem for the City's ability to complete the individualized assessment and relocation process. The City needs to know the identities of individuals for whom an accommodation is being sought, as well as their proposed accommodation needs, in order to assess locations and determine what measures would be necessary to accommodate those individuals. The continued addition of individuals at or immediately before the time of an assessment makes it difficult for the City to complete that process and to determine when the assessment and relocation process can be completed.

## III. ABATEMENT PLANS AND OBSERVATIONS FROM THE HARRISON CORRIDOR

In accordance with the Court's clarification of its order, the City has moved forward with plans to abate the Harrison Encampment "in short order." (*See* Dkt. No. 322 at 2.) On August 25, 2026, the Homeless Response Team ("HRT") posted new abatement notices with a compliance deadline of September 8. The notices comply with the Court's direction to provide information on the City's storage practices, including availability and storage of City-provided bins, as well as the City's offer to provide replacement survival gear. Declaration of Okeya Vance-Dozier ("Vance-Dozier Decl.") ¶ 4. The notice further explains how accommodation requests can be made and lists the accommodations the City is prepared to offer, in compliance with the Court's orders. (Id.)

While HRT staff were in the Harrison Corridor on August 25, they witnessed BHU members and their attorney Anthony Prince placing orange cones across the street and otherwise blocking traffic to prepare for a press conference, despite not having a required permit to do so. (Vance-Dozier Decl. ¶¶ 5, 7). As captured by video, during this time, Mr. Prince improperly attempted to communicate with Ms. Vance-Dozier, a represented party, about an issue of active litigation. (Id. ¶¶ 8-9). He spoke with Ms. Vance-Dozier directly, even after she announced herself as City staff, following her as she attempted to walk away to address the blocked streets, asking her if she had "the right to violate a court order." (Id. ¶¶ 6, 8-9). Once they reached the

Docusign Envelope ID: 81FE48A4-D981-871F-81C3-D3DF0B1C11D1


area that was blocked off, Mr. Prince stood in the lane of traffic and told Ms. Vance-Dozier that he wouldn't move unless she moved, "so I can talk to you." (Id. ¶ 9.)

Respectfully Submitted,

Dated: August 27, 2026

CITY ATTORNEY'S OFFICE

Signed by:
Nubyaan Scott
27C52BAC41F849C...

Nubyaan Scott
Attorneys for Defendants