**Anthony D. Prince (SBN # 202892)**
General Counsel, California Homeless Union/Statewide Organizing Council
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Tel: 510-301-1472

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BERKELEY HOMELESS UNION,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF BERKELEY, THOMAS GREGORY, PAUL BUDDENHAGEN, PETER RADU, OKEYA VANCE-DOZIER, RASHI KESERWANI, DOES 1-10<br><br>Defendant. | Case No.: 4:25-cv-01414-EMC<br><br>**DECLARATION OF YESICA PRADO** |

**DECLARATION OF YESICA PRADO**

I, Yesica Prado, declare:

1. I am over 18 years of age and competent to testify to the matters set forth herein. I make this declaration based on my personal knowledge, and if called as a witness, I could and would testify competently to the facts stated below.

2. I am the President of the Berkeley Homeless Union and a resident of the encampment at 8th and Harrison Streets in Berkeley, California.

3. I submit this declaration to provide the Court with information regarding three matters arising since the Court's August 20, 2026 Final Judgment Order:

4. First, I provide context regarding the site assessments conducted on August 26, as ordered by this Court.

5. Second, I document the City's non-compliance with the Court's Final Judgment Order, specifically that the City abated the encampment of a BHU member without providing the required accommodations granted by this Court.

6. Third, I address the City's new notice to close the Harrison Encampment on Sept. 8, 2026

**I. The Site Inspections**

7. On August 26, 2026, I participated in a joint site inspection with City representatives to assess five candidate locations for the relocation of BHU members. The list BHU provided to the City on August 20, is attached as **Exhibit A.**

8. I co-wrote a detailed memo to summarize our findings and the City’s response, attached here for review as **Exhibit B.**

9. BHU representatives present this day included myself and Robbie Powelson.

10. City representatives present included:

- Nubyaan Scott, Deputy City Attorney
- Thomas Gregory, ADA Program Coordinator
- Shannon Shaffer-Killey, Deputy Fire Marshal
- Andrea Sutherland, Code Enforcement
- Okeya Vance, Homeless Response Team

- Epsalon Galloway, Homeless Response Team
- Josh Jacobs, Berkeley Homeless Coordinator
- Two representatives from Public Works

11. During the site inspection, City representatives raised multiple restrictions that do not appear in Administrative Regulation 10.2 and were unknown to BHU. For example:

a. <u>18-Inch Car-Door Clearance:</u> Thomas Gregory asserted that the standard six-foot sidewalk clearance must be extended by an additional 18 inches to allow for car doors to open. I have reviewed AR 10.2 and confirmed it contains no mention of car doors, door clearance, or any 18-inch allowance.

b. <u>Corner "Daylighting" Prohibition:</u> The Fire Marshal objected to placement at the corner of Fourth and Camelia on "daylighting" grounds (visibility for traffic). However, an existing fence already occupies the relevant sight line.

c. <u>Residential Zones Excluded:</u> Code Enforcement stated that AR 10.2 does not apply to residential districts. When asked for the zoning basis for this position, the City had no immediate answer. The City later confirmed this position in its August 27, 2026 email.

d. <u>Vacant Lots Excluded:</u> The City Attorney asserted that vacant lots are not viable because they are "not part of the public right-of-way." The City later confirmed this position in its August 27, 2026 email.

e. <u>PG&E Setbacks:</u> City representatives stated that proximity to telephone and utility poles requires consultation with PG&E regarding required setbacks. No specific setback standard was provided.

12. Across all five sites, physical space is generally available, but constraints are being generated by restrictions the City announced on site—not by anything on the ground or in published regulations.

13. The City's August 27 formal response confirms a pattern of categorical exclusions, rather than individualized assessments. Attached here as **<u>Exhibit C.</u>**

14. For each site the City rejected, it offered no alternative locations for BHU members.

15. BHU is ready and willing to continue working with the City to identify feasible locations. In fact, BHU has measured more than 120 sidewalks documented in a survey employed around the City to identify viable locations. A sample of this online form is attached as **Exhibit D.**

16. From this sidewalk survey, we have identified at least 3 more potential viable locations where a tent could physically fit in a sidewalk. However, we have noticed that many sidewalks are not wide enough to accommodate a tent and a 6 foot path of travel.

17. More locations would be available if campers were allowed to follow Berkeley's "Good Neighbor" guidelines and take up the whole sidewalk, leaving one side of the street open for pedestrians to travel.

18. The City's prior representations to BHU suggested it had a list of city-owned properties where people could relocate. On January 16, 2026, Assistant City Attorney Chris Jensen provided BHU counsel with a link to a 20-page letter from City Manager Buddenhagen with a list of city-owned properties. The email chain between counsel and the list of city-owned properties is attached here as **Exhibit E.**

**II. The City's Non-Compliance with Accommodation Requests for BHU members**

19. On July 28, 2026, I submitted a comprehensive ADA accommodation request on behalf of Ms. Yow, a disabled member of BHU residing in a tent/structure on Murray Street near 9th Street. Ms. Yow has been diagnosed with Post-Traumatic Stress Disorder (PTSD), which she has had since the age of eight. Her condition has compounded in severity and range of triggers after experiencing multiple encampment sweeps. Her disabilities substantially limit her ability to handle stress, make decisions, communicate effectively, and comply with abatement orders.

20. Ms. Yow requested the following accommodations, among others: (1) a pause on enforcement pending completion of the interactive process; (2) designation of a stable location; (3) physical relocation assistance; (4) an exemption from the 3x3 rule to accommodate a 10' x 35' footprint for her tent, art supplies, emotional support dog and

essential belongings; (5) extended time to move; (6) replacement of essential property if destroyed; and (7) cognitive and communication accommodations.

21. On July 29, 2026, Thomas Gregory said that due to operational constrains, the City would not proceed with the abatement. He stated a new notice would be issued, and I would need to re-submit the accommodation request until then.

22. On August 17, 2026, the City issued a new public notice for abatement for the encampment. The notice looked identical to the last one, except this time, the City added that the "area is temporarily designated a TNC Prohibited Area and no-lodging area. The City intends to perform street and sidewalk cleanings in this area, which must be free of both people and possessions between August 21 and 28." I did not know what this meant, as this is the first time I see the City use such temporary provisions for abatements. A copy of this new notice and the old notice for comparison are attached as **Exhibit F.**

23. On August 20, 2026, the City, through ADA Coordinator Thomas Gregory, issued a determination on Ms. Yow's request. While the City identified a site on the south side of Murray Street, about 80-100 feet west of her current location, where her requested 10' x 35' footprint "could fit," the City required Ms. Yow to vacate the area for cleaning and stated she "may return after August 28." However, the City did not provide any clarity on where she could relocate in the meantime and no guarantee that she could return.

24. On August 25, 2026, I sent an email to Mr. Gregory responding to his determination. I raised concerns that the City was requiring Ms. Yow to vacate without an approved disability accommodation, which violated the Court's orders requiring individualized assessments and accommodations before abatement actions. I requested written confirmation that no abatement would occur until the interactive process was complete and requested a meeting to finalize Ms. Yow's accommodations. To date, I have not received a response from Mr. Gregory.

25. Throughout the interactive process, the City repeatedly claimed the interactive process was "complete" while simultaneously requesting additional information about Ms. Yow's art supplies and workspace to assess her footprint to accommodate her.

26. On August 26, 2026, despite the *ongoing* interactive process, the City proceeded with the abatement of Ms. Yow's encampment.

27. To carry out the abatement, on the morning of August 26, Ms. Yow was arrested by Berkeley Police Officers for public lodging. Her dogs were taken to the animal shelter.

28. A police officer on site, Sergeant Kevin Kleppe S-4, informed us that Ms. Yow had been taken to Santa Rita Jail and may be arraigned the following day.

29. During the abatement, City personnel summarily destroyed all of Ms. Yow's property. Nothing was stored. I repeatedly asked the Homeless Response Team whether they were going to follow the City's property storage policy. They ignored my questions.

30. Ms. Yow's possessions were not soiled and were storable, yet the team did not engage at all and just stood across the street for hours watching everything be destroyed. Pictures of her belongings are attached as **Exhibit G.**

31. At one point, I was able to save at least a bag of clothes for Ms. Yow. Another advocate saved a bike, a backpack full of clothing, and her guitars. The rest of her property including her tent, bed, pet supplies, mobility devices, art supplies, essential survival equipment, medical supplies, family heirlooms and personal belongings were destroyed.

32. The City's destruction of Ms. Yow's property occurred without the individualized assessment required by the Court's orders. The City did not first determine whether her property was contaminated or posed a health hazard. It simply destroyed everything.

**How The City Violated Court's Orders**

33. I believe the City's actions violate this Court's Summary Judgment Order (Dkt. 288) and Final Judgment (Dkt. 326) in the following ways:

a. Failure to complete the interactive process: The City continued to request information about Ms. Yow's art supplies to assess her footprint while simultaneously claiming the interactive process was "complete." This is inconsistent with the Court's holding that the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." (Dkt. 288 at 21).

<u>b. Failure to provide a written determination:</u> The City identified a site where Ms. Yow's 10' x 35' footprint "could fit" but did not issue a final written determination approving that site, providing clear boundaries, or guaranteeing her return after the cleaning of Murray Street. The Court's order and 28 C.F.R. § 35.164 require a written statement of the reasons for any denial or limitation.

<u>c. Failure to provide accommodations before abatement:</u> The Court's orders require the City to provide accommodations as part of the abatement process, not as an afterthought. Forcing Ms. Yow to vacate without approved accommodations, then destroying her property, violates the Court's orders.

<u>d. Destruction of property without individualized assessment:</u> The City destroyed Ms. Yow's property without conducting the individualized assessment required by the Court. The Final Judgment requires that the City "shall not enforce Administrative Regulation 10.2 or any other sidewalk-space limitation in a manner resulting in the destruction of a BHU member's tent or shelter unless the City first conducts an individualized assessment accounting for the member's disability-related needs." (Dkt. 326 at 4; Dkt. 288 at 72-73). No such assessment was conducted.

<u>e. Failure to store property:</u> The Court's order requires the City to "sort and store non-contaminated property for a minimum of 90 days." (Dkt. 326 at 4; Dkt. 288 at 65). The City ignored this requirement and destroyed all of Ms. Yow's property, despite my repeated questions about storage.

34. <u>f. Failure to replace essential property:</u> The Final Judgment requires replacement of "essential survival property — including tents, sleeping gear, and basic clothing." (Dkt. 326 at 4). The City has not provided any replacement property to Ms. Yow. She was left with nothing, other than the few items saved by me and another advocate.

35. The City's actions demonstrate a pattern of non-compliance with this Court's orders. The City is ignoring the protections the Court has granted to disabled BHU members and is summarily destroying their property without providing the required accommodations.

36. Ms. Yow is now unsheltered, has lost all of her belongings, her emotional support animals are in custody, and she has been arrested. This is precisely the kind of harm the Court's orders were designed to prevent.

37. BHU respectfully requests that the Court take appropriate action, including holding the City in contempt and ordering the City to provide the accommodations Ms. Yow was entitled to, including replacement of her destroyed property and location for the exemption of the 3x3 rule.

**III. New Encampment Closure Notice**

38. On August 25, the Homeless Response Team posted a new notice at the encampment requesting "all tents, structures, or other items on the streets and sidewalks must be removed by September 8, 2026. Vehicles are not required to relocate, but property left on the streets or sidewalks around vehicles must be brought inside vehicles or otherwise removed." A copy of this public notice is attached as **Exhibit H.**

39. The new notice requires people to submit accommodation requests by September 1.

40. The combination of a September 8 closure deadline and the absence of approved relocation sites creates an imminent threat of chaos and summary abatement. Without approved locations to move to, residents have no viable option to comply with the City's order. They cannot remove their belongings if they have nowhere to place them. They cannot relocate their tents if they have no location to relocate to. They cannot protect their property if the City provides no alternative.

41. I am deeply concerned that the City will use the September 8 deadline to summarily abate the entire encampment—especially after witnessing how the City handled Ms. Yow's accommodation request.

42. The City's pattern of conduct throughout this litigation—imposing arbitrary deadlines, rejecting proposed locations without offering alternatives, and raising unwritten restrictions—suggests that the September 8 closure will result in the wholesale

//

//

destruction of property and displacement of disabled residents, rather than a planned and accommodated transition.

43. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. This declaration was executed on the 27th day of August, 2026, at Berkeley, California.

Respectfully submitted,

/s/ Yesica Prado

YESICA PRADO