# Exhibit A

## BHU's list of locations

| Name | Tent Size | Footprint | Location |
|---|---|---|---|
| Alice Barbee | 10 person tent | 11’ x 30’ | 1281 University Avenue (lot) |
| Hector Navarro | 8 person tent | 10’ x 25’ | 1631 Fifth Street (lot) |
| Robbie Peddycoart | 10 person tent | 11’ x 30’ | 1100 Fourth Street (Harrison House lot) |
| Shawman | 6 person tent | 11’ x 20’ | 1499-1451 Second Street (behind K-rails) |
| Robert Pearce | 8 person tent | 10’ x 30’ | 1100 Fourth Street (Harrison House lot) |
| Thomas Barnett | Vehicle | n/a | n/a |
| Jermaine Lee White | 10 person tent | 11’ x 30’ | 1499-1451 Second Street (sidewalk behind K-rails) |
| Shareef Muwakkil | In a hotel room | n/a | n/a |
| Erin Spencer | Vehicle | n/a | n/a |
| Lewanda Parnell | 8 person tent | 10’ 1” x 45’ | 9th and Camelia; approved |
| Erik Alexander Coon | 8 person tent | 10’ x 25’ | Undecided; feeling sick |
| Alexander Wilson | 10 person tent | 11’ x 30’ | 1100 Fourth Street (Harrison House lot) |
| Jeremy Casimir | Found a place | n/a | n/a |
| Gregory Grove | 8 person tent | 10’ x 25’ | 1499-1451 Second Street (sidewalk behind K-rails) |
| Bradford Raymer | 10 person tent | 11’ x 30’ | 3rd and Camelia (sidewalk) |
| Lisa Saechao,y-chain | Going back with family | n/a | n/a |
| Jacob Clakley | In a hotel room | n/a | n/a |
| Austin White | In Housing | n/a | n/a |
| Jonny Ruel Holder | Vehicle | n/a | n/a |
| Monique Williams | Vehicle | n/a | n/a |
| Kevin Martinez | 6 person tent | 10’ x 20’ | Undecided; In custody |
| Whitney Chappelle | In a hotel room | n/a | n/a |
| Patrick Ford | 10 person tent | 11’ x 30’ | Undecided; In custody |

# Exhibit B

## Memo on the site inspections

The following Status Report is presented to the Court in the form of a Memorandum prepared by Berkeley Homeless Union President Yesica Prado who, along with Robbie Powelson, an officer of the California Homeless Union, met in person with representatives of the City of Berkeley on Wednesday, August 26, 2026 in order to assess previously identified areas of the City to which BHU members soon to be displaced from 8th and Harrison may relocate.

Concurrently filed are the Declarations of Yesica Prado and Robbie Powelson.

# Memo from Yesica Prado

**DATE:** Thursday, August 27, 2026

**RE:** Joint site inspection with City of Berkeley — five candidate sites; City's newly asserted siting restrictions under Administrative Regulation 10.2

**MATTER:** Berkeley Homeless Union v. City of Berkeley, N.D. Cal. No. 3:25-cv-01414-EMC

## I. <u>PURPOSE</u>

Contemporaneous notes from the August 26 site visit with City representatives, documenting candidate sites for BHU members identified in the Court's August 20 report, prepared by Yesica Prado and Robbie Powelson. The City raised multiple new restrictions during the inspection—none of which appear in Administrative Regulation 10.2.

## II. <u>EXECUTIVE SUMMARY</u>

The City inspected five sites with BHU officers on August 26, 2026. Across all sites, physical space is generally available, but the City raised multiple new restrictions not found in Administrative Regulation 10.2—including an 18-inch car-door clearance, daylighting restrictions, residential zone exclusions and vacant lot exclusions. The cumulative effect of these rules effectively covers more than 75% of the City’s area. The City offered no alternative locations.

//

//

## III. SITES INSPECTED

### Site 1 — 1110 Fourth Street

The location is intended for three BHU members, with footprints of 11x30 feet in size.

We measured the vacant lot area adjacent to 701 Harrison Street, a homeless shelter, with a length of more than 161 feet and a width of 30 feet. There is ample space for tents with proper setbacks from the adjacent buildings and from the brush.

**Fire Marshal (Shannon Shaffer-Killey):** stated tents should have a 12-foot buffer between each tent because once a tent reaches 700 square feet, it requires a permit and special anchoring. If tents are directly next to each other, she considers that a single tent. She was unsure if a 3-foot buffer would prevent it from being considered one tent. Would get back about legal authority for the position.

**Code enforcement (Andrea Sutherland):** Code enforcement found no issue with location.

**City Attorney (Nubyaan Scott):** The City's attorneys were legal rather than physical: representatives said they were not sure whether the parcel is a right-of-way, and asserted that vacant lots "do not apply," meaning that Administrative Regulation 10.2 does not reach them. (AR 10.2 is the City of Berkeley's policy governing "Temporary Non-Commercial Objects on Sidewalks and in Parklets," which dictates how unhoused individuals can store personal property in public spaces.) Meanwhile, the sidewalk adjacent to the lot, located on Harrison Street at the cul-de-sac, bears a no-lodging designation.

Follow Up:

□ Confirm whether parcel is subject to AR 10.2

□ Confirm fire setback requirements and legal authority

□ Confirm whether multiple tents count as one for permitting (700 sq ft threshold)



***A photo of the vacant lot, next to the family homeless shelter at 701 Harrison Street.***

**Site 2 — 1499-1451 Second Street** (Second and Page Streets).

The location is intended for three BHU members, with footprints of 11x30 and 10x20 feet in size. Large concrete blocks have been pushed outward from the adjacent business's fence line. We measured approximately 13 feet (varying along the stretch) from the fence line to the blocks, and roughly 101 feet of usable frontage overall, which we assessed as likely sufficient for the site.

**City Objections** — City Attorney Nubyaan Scott raised two primary objections:

(a) proximity of telephone and utility poles—one representative stated they needed to consult PG&E regarding required setbacks from both overhead and underground connections; and

(b) uncertainty over ownership of the concrete blocks. The City did not know whether the concrete blocks were City property.

**Ownership & Dumping Concerns:** It appears the concrete blocks—and additional large pipes—may have been illegally dumped, as they are blocking the sidewalk area there. Based on their positioning, it was clear to us that they were not City-made improvements. When we asked whether space constraints could be addressed by moving or abating them, all City employees confirmed they did not know who owned the blocks. If the blocks are indeed illegally dumped material, they are neither a City improvement nor a lawful obstruction, and therefore should not constrain the usable width.

**Fire Marshal (Shannon Shaffer-Killey):** Fire safety concerns require a 12-foot clearance between tents and a setback from the property line. Additionally, our width measurements did not account for a required 3-foot setback, meaning the actual usable width may be shorter. However, it may be possible to extend into the roadway using K-rails. People would need to remain behind the K-rails for safety.

**Code enforcement (Andrea Sutherland):** There are no code enforcement issues with this location.

<u>Follow Up:</u>

□ Confirm ownership of concrete blocks; they are presumptively illegally dumped

□ Obtain PG&E setback standard (or confirmation none applies)



***A photo of the site behind the k-rails, with a view towards Jones Street.***

---

## Site 3 — Camelia Street

This site is for two BHU members, each with an individual footprint of 11x30 feet. Located at the end of a cul-de-sac terminating at the train tracks. The entire usable area is sidewalk.

This is the site where the City raised the most new ground:

**Thomas Gregory:** He stated that the standard six-foot sidewalk clearance would be extended by an additional 18 inches to allow for car doors to open. We have reviewed Administrative Regulation 10.2 and confirmed that it contains no mention of car doors, door clearance, or any 18-inch allowance for that purpose. The basis for his assertion remains unclear.

The City will follow up on the legal authority for this requirement and clarify whether it is part of the six-foot clearance or an additional one.

**Fire Marshal (Shannon Shaffer-Killey):** The Fire Marshal objected to placement at the corners of the block on “daylighting” grounds (visibility for traffic). However, a fence already occupies the relevant sight line, so a tent would not block anything that is not already obstructed. The City showed no interest in engaging with that point. We need further clarity on the authority and purpose of this rule, especially given the existing fence.

On fire lanes, the City’s position actually gives us more space than a normal parking zone, because it does not impose the extra 18-inch clearance. The combined effect of the City’s stacked restrictions leaves roughly four feet of usable width across the entire sidewalk.



**Code enforcement (Andrea Sutherland):** There are no code enforcement issues with this location.

Follow Up:

□ Identify written authority for 18-inch car-door clearance (or confirm City withdraws the requirement)

□ Identify "daylighting" authority and explain application where existing fence already blocks sight line

□ Confirm whether 18-inch clearance is in addition to or part of the 6-foot requirement

***A photo of the sidewalk with a view towards the train tracks — dead end.***




***A photo of the sidewalk with a view towards adjacent street — Fourth Street.***

## Site 4 — 1281 University Avenue

This site is for one BHU member and is currently gated and locked, but both parties agreed there is ample space for the proposed spot.

Measurements (approximate): The length of the lot is 36 feet, the width is about 75 feet.

**City Objections:** City Attorney Nubyaan Scott raised the issue that this is a vacant lot, not a public right-of-way, and therefore averred it is not open to camping under the judge's order.

**Fire Marshal (Shannon Shaffer-Killey): S**he noted that three-foot setbacks from buildings on either side of the lot are required. But we will need to confirm the exact length of the required setbacks. Additionally, if more than one person is present, set breaks (clearances between tents or occupants) are needed and must be at least 12 inches wide.

**Utilities:** There are no utility poles on the lot, and no further utility access is needed.

**Code enforcement (Andrea Sutherland):** There are no code enforcement issues at this site.

Follow-Up**:**

□ Provide access to lot for proper measurement

□ State City's position on whether vacant lots fall within Court's order (with legal basis)

□ Confirm precise setback dimensions from buildings

//

//

//

//



***A photo of the vacant lot on University Avenue, next to apartment buildings.***

---

## Site 5 — 1904 Henry Street

This site is for two BHU members, with a footprint measuring approximately 11 x 30 feet for tents. With a 3-foot setback, the usable width would be 21 feet 3 inches, and the length is approximately 43 feet (including setbacks from the fence).

**Code enforcement (Andrea Sutherland)**: The parcel is zoned residential. Code Enforcement stated that any camping in this area would be a code violation, because AR 10.2 applies only to non-residential districts and does not permit TNC Objects on sidewalks in residential areas. When asked for the zoning basis for that position, she had no immediate answer.

BHU also asked whether there are any other zoning categories where AR 10.2 likewise does not apply; she had no answer and said she would get back to us. Melissa from Parks and Recreation will also follow up on whether camping is permitted in residential areas at all, and whether there are specific zones where camping is allowed.

**Fire Marshal (Shannon Shaffer-Killey):** Requires a setback away from the building of about 3 feet. The utility box on site requires 36 inches of clearance around it for access. There may be a sprinkler system on site, but it is believed to be old and unused.

**City Objections:**

- The City Attorney Nubyann Scott raised whether there may be a presence of underground cables around the utility box.
- The City asserted that the parcel is probably a park, and would confirm in a follow-up.
- A no-lodging sign was found lying on the ground. The City took the position that the sign was supposed to be there and that the area was therefore designated as a no-lodging area.
- If the area is determined to be a public right-of-way, a 6-foot clearance would be required. However, that issue is contingent on the zoning and ownership determinations.

<u>Follow-Up:</u>

□ Identify zoning basis for excluding residential areas from AR 10.2

□ Confirm whether any other zones are similarly excluded

□ Confirm whether camping is permitted in residential zones

□ Verify ownership and whether the parcel is a park (Melissa from Parks to follow up)

□ Confirm status of no-lodging sign (when posted, authority, when it fell)

□ Confirm required setback from building and sprinkler system status



*A photo of the vacant lot on Henry Street, next to apartment buildings. A full park with five blocks of length, Ohlone Park, is a two-minute walk on the next block.*

---

## IV. ISSUES SUMMARY

*1. New Assertions Raised at Walk-Throughs (Potential Unwritten Rules)*

Each of the following was asserted for the first time during these walk-throughs and should be treated as a potential unwritten rule requiring a formal demand for authority:

- 18-inch car-door clearance – An additional 18 inches of sidewalk clearance beyond the six-foot requirement, purportedly to allow for car doors to open.

- Corner "daylighting" prohibition – A restriction on placement at block corners, applied without regard to whether the sight line is already obstructed by existing structures (e.g., a fence).
- Vacant lots excluded – A claim that Administrative Regulation 10.2 does not apply to vacant lots.
- Residential districts excluded – A claim that AR 10.2 does not apply to residential districts, and that camping in such districts constitutes a code violation. It remains unclear which districts are affected.
- No-lodging sign – The City treated a no-lodging sign found lying on the ground as establishing a valid no-lodging designation at the Henry Street site.
- PG&E setbacks – Undefined setback requirements from telephone and utility poles, purportedly to be consulted with PG&E.

*2. Follow-up Questions That City Will Clarify*

A. <u>18-inch clearance:</u> Identify the written authority for this requirement. If it exists, cite the regulation, standard, or administrative memorandum; if it does not, confirm that the City withdraws the requirement.

B. <u>Daylighting:</u> Identify the authority and standard for the corner restriction, and explain its application where an existing fence already obstructs the sight line.

C. <u>Residential districts:</u> Produce the Administrator's written ruling that AR 10.2 does not apply to residential areas, including its date and issuing authority.

D. <u>Other excluded zones</u>: Confirm whether the City contends that AR 10.2 does not apply in any other zoning districts. (Ms. Sutherland committed to following up.)

E. <u>Vacant lots:</u> State the City's position on whether AR 10.2 applies to vacant lots, and provide the legal basis for that position.

F. Harrison Street right-of-way: Confirm whether the Harrison Street parcel is a right-of-way, and produce the record on which that determination rests.

G. Concrete blocks (Second Street): Confirm ownership of the concrete blocks. If the City does not own them and cannot identify an owner, they are presumptively illegally dumped material and should not reduce usable width.

H. PG&E setbacks: Produce the PG&E setback standard the City intends to rely on for telephone and utility poles, or confirm that no such setback applies.

I. University Avenue access: Provide access to the University Avenue lot so it can be walked and measured, or state the City's position on access.

J. Henry Street no-lodging sign: Produce the posting record for the sign—when it was installed, under what authority, and when it fell.

K. Henry Street park classification: Confirm whether the City contends the Henry Street parcel is a park, and produce the basis for that classification.

*3. Field Observations*

The pattern across all five sites is consistent: physical space is generally available, but the constraints are being generated by restrictions the City announces on site, rather than by anything on the ground or in the published regulation.

The City's formal response confirms that only one site (Third and Camelia) may be viable, but even that site is subject to further conditions and private ownership concerns. The cumulative effect at Camelia Street—six feet of path travel, plus 18 inches for car doors, plus corner exclusions, plus fire lane width—reduces a full sidewalk to roughly four feet. This illustrates clearly how the stacked unwritten requirements operate in practice.

The City has effectively rejected four of the five sites based on categorical exclusions. The Court required individualized assessments. The City is applying blanket prohibitions instead.

## V. CITY'S RESPONSE

City Attorney Nubyaan Scott provided BHU with the City's determinations on each site in an email on August 27 at 3:44 p.m. Her response doesn't include all the follow-up items discussed during inspection.

**<u>City's Formal Assessment for Site One:</u>** "Although physically large enough to contain the proposed tents, the site is not viable because it is a City-owned lot rather than the PROW. Additionally, the lot may not be available because it may be subject to an existing lease agreement with the shelter operator. Fire Department spacing requirements would require significant fire breaks and setbacks. There is also a 'no lodging' sign directly outside the lot. The site contains significant vegetation and foliage that would require mitigation... and BHU has indicated that open flames may be used for cooking which would further elevate fire risk."

*<u>Follow-Up:</u>*

□ Confirm whether lease actually exists and whether it would preclude camping

□ Request specific fire break and setback requirements with legal authority

□ Confirm whether "no lodging" sign outside the lot applies to the lot itself

□ Request mitigation plan for vegetation if needed

**<u>City's Formal Assessment for Site Two:</u>** "This location has a 'no lodging' sign and is in a temporary non-commercial ('TNC') (e.g., tents) prohibited area, so overnight camping is not allowed here regardless of campsite size. There are multiple utility access needs, power lines, and large k-rails that restrict usable areas. Expansion into the roadway would require verification of k-rail ownership and consideration of parking and utility access requirements. Additionally, portions of this site are privately owned by East Bay Municipal Utility District and Jones Development Co."

*<u>Follow-Up:</u>*

□ Confirm ownership of concrete blocks; if City doesn't own them, they are presumptively illegally dumped

□ Obtain PG&E setback standard (or confirmation none applies)

□ Confirm which portions are privately owned and by whom

□ Confirm whether utility access can be maintained with tents in place

**City's Formal Assessment for Site Three:** "This is the only potentially viable location reviewed during the assessment... There is sufficient sidewalk length to potentially support two individuals. The location is on a dead-end street adjacent to a fenced railroad track and an active construction site with intermittent dust and heavy equipment operation. Across the street is a commercial brewery. Measurements were taken at two possible locations for placement. Fire Department and Code Enforcement indicated no immediate disqualifying concerns, though final viability depends on confirmation of precise sidewalk dimensions, pedestrian access requirements, Fire Department emergency ingress needs, and utility access considerations. Additionally, I have been informed that portions of this area are privately owned, so further assessment must be done to confirm which areas are privately owned."

*Follow-Up:*

□ Confirm which portions are privately owned and by whom

□ Provide precise sidewalk dimensions and access requirements

□ Confirm whether Brad Raymer's existing tents can remain

□ Process Jackie Mendoza's accommodation request (made a verbal request to Thomas Gregory)

**City's Formal Assessment for Site Four:** "This site is a vacant lot owned by the City. Under the current Court orders and City policy, vacant lots are not viable for TNC overnight camping. The lot was locked and could only be approximately measured from the exterior. This lot approximately measures 36 feet wide and 72 inches long."

*Follow-Up:*

□ Provide access to lot for proper measurement

□ State City's position on whether vacant lots fall within Court's order (with legal basis)

□ Confirm whether City Council has ever considered authorizing camping on this lot

**City's Formal Assessment for Site Five:** "This site is a City-owned vacant parcel that is not part of the PROW. Accommodations from Administrative Regulation 10.2, as ordered by the court, do not apply to vacant parcels. Only City Council can authorize camping on City owned land and it has taken no such action. This site also contained a 'No Lodging' Sign and is zoned residential. Camping is prohibited in residential areas even if it were within the public right of way."

*Follow-Up:*

□ Identify zoning basis for excluding residential areas from AR 10.2

□ Confirm whether any other zones are similarly excluded

□ Confirm whether "No Lodging" sign was lawfully posted (it was on the ground)

□ Confirm required setback from building and sprinkler system status

## IV. CITY'S ZONING AND LOCATION RESTRICTIONS

A. Zoning Restrictions Asserted by the City

The City's August 27 response provides the following framework for where camping is permitted:

| Zone Type | Label | Camping Permitted? |
|---|---|---|
| Residential Districts | R-1, R-2, ES-R, R-SMU, etc. | NO — AR 10.2 prohibits TNC objects |
| Commercial Districts | C-C, C-U, C-W, C-DMU, etc. | YES — subject to 3x3 rule and other restrictions |
| Manufacturing Districts | M, MM, MU-LI, etc. | YES — subject to 3x3 rule and other restrictions |
| BART Access | Within 25 feet of BART entrance | NO — AR 10.2 prohibits TNC objects |

| | | | |
|---|---|---|---|
| Corridor | | | |

B. "No Lodging" Areas Asserted by the City

The City identified the additional "No Lodging" and TNC Prohibited Areas in Commercial and Manufacturing Districts.

- Harrison Street: from 4th Street to San Pablo, Gilman to Codornices Creek
- Second Street: from Gilman to Cedar and down all side streets
- Former Here/There Encampment: median area MLK to Adeline, 63rd to 62nd
- Ohlone Park: camping already prohibited; additional "no lodging" signs

C. Vacant Lots

The City's position: Vacant lots are not viable because they are "not part of the PROW" and "only City Council can authorize camping on City-owned land."

Dated: August 27, 2026

Respectfully submitted,
/s/ Anthony D. Prince
Attorney for Berkeley Homeless Union

# Exhibit C

## City's Response on sites

Gmail Berkeley Homeless Union <berkeley.homeless.union@gmail.com>

# Re BHU, et al. v. City of Berkeley, et al. - City's proposed implementation plan re Harrison encampment [AALRR-CERRITOS.006547.00033.FID1555468]

**Scott, Nubyaan** <NScott@berkeleyca.gov> Thu, Aug 27, 2026 at 3:44 PM
To: Anthony Prince <princelawoffices@yahoo.com>
Cc: Rahi Azizi <rahi.azizi@aalrr.com>, "Stephens, Sara" <sstephens@berkeleyca.gov>, "Brown, Farimah F." <FBrown@berkeleyca.gov>, "Eiland, Katrina" <KEiland@berkeleyca.gov>, "Ruth M. Bond" <ruth.bond@aalrr.com>, Berkeley Homeless Union <berkeley.homeless.union@gmail.com>, "Radu, Peter" <pradu@berkeleyca.gov>, "Gregory, Thomas" <TGregory@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>, "Mattes, Laura Iris" <LMattes@berkeleyca.gov>, "White, David" <DWhite@berkeleyca.gov>, "Jacobs, Joshua \"Josh\"" <JJacobs@berkeleyca.gov>, "Martinez, Gabriel" <GMartinez@berkeleyca.gov>

Dear BHU representatives,

Thank you for meeting onsite yesterday for the required assessments. This email summarizes the advisories and information we provided as well as the City's assessment of each location that was reviewed.

**General Notes**

- The City informed BHU both by email prior to the walkthroughs and during the walkthroughs that vacant lots are not viable options because they are not part of the PROW as ordered by the court and as discussed in Administrative Regulation 10.2's "3x3 rule."
- "No Lodging" Signs Which Prohibit Overnight Camping Were Present at Several Location, As Noted Below the City informed BHU both by email prior to the walkthroughs and during the walkthroughs that "No Lodging Areas" are not viable options because camping is prohibited in that area, in the same way it is prohibited in the Harrison Corridor which also has "No Lodging" signs.
- The City informed BHU that no makeshift structures of any kind can be placed at any location and that only tents are allowable due to fire risk concerns.
- The City requested a final list of individuals consistent with the Court order.
- BHU requested clarification on which zones currently prohibit temporary non-commercial ("TNC") items such as tents. I am providing the following clarification; please let me know if you need additional information:
  - Harrison Street from 4th street to San Pablo and from Gilman to Codornices Creek
  - Second Street from Gilman to Cedar and down all the side streets
  - The former Here/There encampment area which is a median area east/west MLK to Adeline and south/north 63rd to 62nd (there's a prominent HERE THERE sculpture and this should be familiar to BHU)
  - Ohlone Park (camping is already prohibited in all parks overnight but this park also has signs prohibited lodging/TNCs at all times)
- Additionally, here is additional information regarding zoning limitations:
  - BMC 14.48.020 prohibits all obstructions on sidewalks except as set forth in Chapter 14.48 or in a regulation promulgated by the City Manager. AR 10.2 is the regulation that governs personal property and allows it in some circumstances, carving out an exception to the general prohibition of sidewalk obstructions.
  - AR 10.2 states that TNC Objects (e.g., tents) are prohibited in Residential Districts. On the City's zoning map, Residential districts are listed in BMC 23.202 and can be viewed on the City's zoning map. These zones all include "R" in the label (e.g. R-1, R-2, ES-R, R-SMU).
  - AR 10.2 provides rules for TNC Objects (e.g., tents) in Commercial and Manufacturing Districts, including the 3x3 rule and other restrictions.
  - Commercial districts are listed in BMC 23.204 and can be viewed on the City's zoning map. These zones all include "C" in the label (e.g. C-C, C-U, C-W, C-DMU, etc.)
  - Manufacturing districts are listed in BMC 23.206 and can be viewed on the City's zoning map. These zones all include "M" in the label (e.g. M, MM, MU-LI, etc.).
  - AR 10.2 prohibits TNCs (e.g., tents) within a BART Access Corridor, defined as "a wide plaza area, on the same side of the street as a BART Station entrance, within 25 feet of such entrance. In the downtown area,

the BART Access Corridor includes all sidewalk and plaza areas on the west side of Shattuck Avenue from Addison Street to Allston Way."

**Location Specific Assessments**

**1281 University Avenue**
**Individual: Alice Barbee**

- BHU proposed footprint: 11x30
- City assessment: This site is a vacant lot owned by the City. Under the current Court orders and City policy, vacant lots are not viable for TNC overnight camping. The lot was locked and could only be approximately measured from the exterior. This lot approximately measures 36 feet wide and 72 inches long.

**1901 Henry Street**
**Individuals: Hector Navarro and Caregiver**

- BHU proposed footprint: 10x25 (previously requested by email) and 11x30 (requested during walkthrough)
- City assessment: This site is a City-owned vacant parcel that is not part of the PROW. Accommodations from Administrative Regulation 10.2, as ordered by the court, do not apply to vacant parcels. Only City Council can authorize camping on City owned land and it has taken no such action. This site also contained a "No Lodging" Sign and is zoned residential. Camping is prohibited in residential areas even if it were within the public right of way.

**701 Harrison Street**
**Individuals: Robbie Peddycoart, Robert Pearce, Alexander Wilson**

- BHU proposed footprints: Peddycoart 11x30, Pearce 10x30, Wilson 11x30
- City assessment: This parking lot is a City-owned parcel adjacent to a family shelter and youth sports field. Although physically large enough to contain the proposed tents, the site is not viable because it is a City-owned lot rather than the PROW. Additionally, the lot may not be available because it may be subject to an existing lease agreement with the shelter operator. Fire Department spacing requirements would require significant fire breaks and setbacks. There is also a "no lodging" sign directly outside the lot. The site contains significant vegetation and foliage that would require mitigation if the Court were to order use of the lot and BHU has indicated that open flames may be used for cooking which would further elevate fire risk.

**1499 Second Street**
**Individuals: Shawman, Jermaine Lee White, Gregory Grove**
**BHU proposed footprints: Shawman 11x20, White 11x30, Grove 10x25**

- City assessment: This location has a "no lodging" sign and is in a temporary non-commercial ("TNC") (e.g., tents) prohibited area, so overnight camping is not allowed here regardless of campsite size. There are multiple utility access needs, power lines, and large k-rails that restrict usable areas. Expansion into the roadway would require verification of k-rail ownership and consideration of parking and utility access requirements. Additionally, portions of this site are privately owned by East Bay Municipal Utility District and Jones Development Co.

**Fourth and Camelia (Previously Identified as Third and Camelia)**
**Individuals: Bradford Raymer and Jackie Mendoza**
**BHU Proposed Footprints: Both Individuals 11x30**

- City assessment: This is the only potentially viable location reviewed during the assessment for the reasons explained above. There is sufficient sidewalk length to potentially support two individuals. The location is on a dead-end street adjacent to a fenced railroad track and an active construction site with intermittent dust and heavy equipment operation. Across the street is a commercial brewery. Measurements were taken at two possible locations for placement. Fire Department and Code Enforcement indicated no immediate disqualifying concerns, though final viability depends on confirmation of precise sidewalk dimensions, pedestrian access requirements, Fire Department emergency ingress needs, and utility access considerations. Additionally, I have been informed

that portions of this area are privately owned, so further assessment must be done to confirm which areas are privately owned.

- BHU informed staff that Bradford Raymer relocated two tents to the dead-end directly against the railroad fence.

The City will provide the requested follow up information regarding pedestrian, emergency, and vehicle access requirements when available and will continue to coordinate relocation to this site with BHU in good faith consistent with the Court Order. The City's final assessment of the Fourth and Camelia location, and any other locations, does not amount to a sanctioned encampment and any overnight camping will remain subject to the City's enforcement of all encampment policies consistent with the Court's Order. Further, the City has conducted these accommodation assessments consistent with the Court's Order and this accommodation request/location placement is subject to reassessment if caselaw changes.

Further, I agreed to follow up regarding Ms. Mendoza, as Ms. Prado stated onsite that she made a verbal request for a 3x3 assessment during Mr. Gregory's outreach. Mr. Gregory's outreach notes from June 29 reflect that when she was offered accommodations, she reported the following disabilities: experiencing ADHD and PTSD and stated that her anxiety prevents her from independently relocating. The only noted response Ms. Mendoza provided to the offered accommodations was "nobody touching my shit," indicating that she was not interested in packing or moving assistance. Neither Ms. Prado nor Ms. Mendoza identified her as a BHU member during outreach, and she was not identified as such until we arrived at the Fourth and Camelia site yesterday. Additionally, BHU has not provided a nexus for why Ms. Mendoza's ADHD and PTSD require an 11x30 footprint.

Please let me know if you require any clarifications.

**Nubyaan Scott**

Deputy City Attorney

**City of Berkeley**

---

**From:** Stephens, Sara <sstephens@berkeleyca.gov>
**Sent:** Tuesday, August 25, 2026 3:54 PM
**To:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
**Cc:** Scott, Nubyaan <NScott@berkeleyca.gov>; Anthony Prince <princelawoffices@yahoo.com>; Rahi Azizi <rahi.azizi@aalrr.com>; Brown, Farimah F. <FBrown@berkeleyca.gov>; Eiland, Katrina <KEiland@berkeleyca.gov>; Ruth M. Bond <ruth.bond@aalrr.com>; Radu, Peter <pradu@berkeleyca.gov>; Gregory, Thomas <TGregory@berkeleyca.gov>; Vance-Dozier, Okeya <OVance-Dozier@berkeleyca.gov>; Mattes, Laura Iris <LMattes@berkeleyca.gov>; White, David <DWhite@berkeleyca.gov>; Jacobs, Joshua "Josh" <JJacobs@berkeleyca.gov>; Martinez, Gabriel <GMartinez@berkeleyca.gov>
**Subject:** RE: Re BHU, et al. v. City of Berkeley, et al. - City's proposed implementation plan re Harrison encampment [AALRR-CERRITOS.006547.00033.FID1555468]

Ms. Prado,

Please see my response below in blue. City staff will be there at 1pm tomorrow.

Best,

Sara

# Exhibit D

## BHU sidewalk survey

# Sidewalk Survey

Thank you for volunteering your time to document sidewalk conditions in Berkeley.

Your work will directly inform an ongoing federal court case where a judge has ordered the City to find viable relocation sites for disabled unhoused residents. [8]

You are not here to judge whether someone *should* camp somewhere—you are here to document whether someone *physically could*, while keeping a 6-foot path clear for pedestrians and wheelchairs.

**yesica.prado13@gmail.com** Switch account

The name, email, and photo associated with your Google account will be recorded when you upload files and submit this form

* Indicates required question

Name of street *

Your answer

Cross streets (start and end of block) *

Your answer

Side of street (check one) *

- [ ] Even numbers
- [ ] Odd numbers
- [ ] Other:

**Photo 1: Street view** (Stand at one corner, shoot down the entire block) *

Upload 1 supported file. Max 10 MB.

Add file

**GPS coordinates** (Use Google Maps and put a pin on the middle of block. Copy and paste coordinates here.) *

Your answer

Clear path of travel (check one) *

- [ ] 6 feet
- [ ] 4 feet
- [ ] Other:

Available space remaining (after clear path) *

Your answer

Total width of sidewalk (in feet) *

Your answer

**Photo 2: Measurement close-up** (Tape measure on the ground showing total width) *

Upload 1 supported file. Max 10 MB.

Add file

Is the surface suitable for a tent? (Select all that apply) *

- [ ] Yes, flat pavement
- [ ] Yes, flat dirt/gravel
- [ ] No, on a slope
- [ ] No, uneven/broken
- [ ] No, water pools here
- [ ] Other:

Obstacles blocking camping (Select all that apply) *

- [ ] None
- [ ] "No Camping" sign
- [ ] "No Trespassing" sign
- [ ] Planters
- [ ] Tree well/roots
- [ ] Bus stop
- [ ] Fence
- [ ] Boulders/rocks
- [ ] Signage
- [ ] Driveway/curb cut
- [ ] Other:

Adjacent property type (Select all that apply) *

- [ ] Single-family home
- [ ] Apartment
- [ ] Active business
- [ ] Vacant/empty building
- [ ] Empty lot
- [ ] Park
- [ ] Church
- [ ] School
- [ ] City building
- [ ] Other

Resources nearby (Select all that apply) *

- [ ] None
- [ ] Public restroom
- [ ] Water spigot
- [ ] Food/grocery
- [ ] Public wifi
- [ ] Bus stop
- [ ] Other:

Is there enough space for a vehicle to park parallel to the curb? (Check one) *

- [ ] Yes, full vehicle length available (including an RV)
- [ ] Yes, but only for a small car/van
- [ ] No, too short
- [ ] No, driveway cuts interrupt the block
- [ ] Other:

Parking restrictions on this block (Select all that apply) *

- [ ] No restrictions (open parking)
- [ ] Residential permit required
- [ ] Metered parking
- [ ] 2-hour time limit
- [ ] 4-hour time limit
- [ ] 15-minute parking
- [ ] Street sweeping
- [ ] Commercial loading yellow zone
- [ ] Red zone / no parking
- [ ] Overnight parking restriction
- [ ] Size restriction (no vehicles over 22 ft)
- [ ] Bike lane
- [ ] Other:

Any other characteristics of this sidewalk to document?

Your answer

# Exhibit E

## Communications Re: City-own lots list and list attachment

Christopher D. Jensen
Assistant City Attorney
City Attorney's Office
2180 Milvia Street, 4th floor
Berkeley, CA 94704
(510) 981-6964
cjensen@berkeleyca.gov

**From:** Anthony Prince <princelawoffices@yahoo.com>
**Sent:** Friday, January 16, 2026 8:59 AM
**To:** Jensen, Christopher <CJensen@berkeleyca.gov>
**Subject:** 8th and Harrison encampment health situation

WARNING: This is not a City of Berkeley email. Do not click links or attachments unless you trust the sender and know the content is safe.

Chris: Here is the Union's position:

The City needs to issue, no later than close of business today, January 16, 2026, an official notice listing the locations to which 8th and Harrison encampment residents can immediately relocate and remain with their possessions, at least until the leptospirosis situation has been completely abated. The notice must be provided to the Union for its review and, assuming agreement on its content, posted today on the City website, at the 8th and Harrison encampment and included in an official press release.

Thanks.

---

RE: 8th and Harrison encampment health situation

From: Jensen, Christopher (cjensen@berkeleyca.gov)
To: princelawoffices@yahoo.com
Cc: fbrown@berkeleyca.gov
Date: Friday, January 16, 2026 at 09:16 AM PST

Hi Anthony:

Receipt acknowledged. Farimah and I are discussing the request with responsible City officials.

Regards,
Chris

---

----- Forwarded Message -----
**From:** Jensen, Christopher <cjensen@berkeleyca.gov>
**To:** Anthony Prince <princelawoffices@yahoo.com>
**Sent:** Friday, January 16, 2026 at 10:13:45 AM PST
**Subject:** RE: 8th and Harrison encampment health situation

Hi Anthony:

Following up on your request. Here is the list of properties provided to the City Council last fall:

https://berkeleyca.gov/sites/default/files/documents/2025-10-14%20Item%2015%20Referral%20Response%20%20Alternative%20Housing%20Options.pdf

Regards,

Chris

Office of the City Manager

INFORMATION CALENDAR
OCTOBER 14, 2025

To: Honorable Mayor and Members of the City Council

From: Paul Buddenhagen, City Manager

Submitted by: Peter Radu, Assistant to the City Manager

Subject: Referral Response: Alternative Housing Options for People Experiencing Homelessness

## INTRODUCTION

This report responds in part to the City Council's May 20, 2025 referral, "Alternative Housing Options for People Experiencing Homelessness," referring to the City Manager "a request for staff to identify a list of potential locations of City-owned and private properties (to be leased or acquired) – for the purpose of establishing 24/7 staffed shelter sites, including but not limited to indoor/outdoor camping areas, safe RV and car park zones, and/or congregate or non-congregate shelters for people experiencing homelessness based on the model used at Grayson Street and other models deemed successful by the City Manager."

## CURRENT SITUATION AND ITS EFFECTS

City Council's May 20 referral to the City Manager requested a list of sites, both owned by the City and available for purchase or lease on the private market, that could be used to identify additional shelter sites for people experiencing unsheltered homelessness in Berkeley. The Council's direction in that referral was to identify sites that could be feasible for replicating the Horizon Transitional Village Program shelter and SPARK safe parking model (previously co-located on Grayson St.), as well as sites that could host other models deemed successful by staff.

With this in mind, staff have compiled the following information in this report:

- Attachment 1 is a compilation of private market listings of all commercial and industrial properties that offer a minimum of 5,000 sq ft.
- Attachment 2 is a compilation of motels/hotels currently available for lease or purchase;

- Attachment 3 is a compilation of vacant city-owned land and city-owned properties, excluding the following types of property:
    - o City parks, as these were removed from the Council referral;
    - o City facilities actively used by staff (e.g., fire stations, the Animal Shelter, the Civic Center building at 2180 Milvia St, the Public Safety Building, etc.);
    - o Any housing owned by the City or BHA that is currently occupied.

Absent further direction from Council as to appropriate property types, locations, and preferred programs, staff are not in a position to provide any recommendations as to any potentially viable individual properties. With that said:

- If Council's desire is to replicate a Grayson-style shelter program, then staff would recommend initially performing due diligence at properties that are designated as "warehouses" in Attachment 2 before expanding to consider other property types, such as retail properties.
- In addition, if the desire is to replicate other models deemed particularly successful by the City Manager, staff would recommend performing due diligence at both of the motel/hotel properties in Attachment 2, as these properties are most immediately amenable to noncongregate shelter.

In the Homeless Response Team's experience, these two program types have been more successful than traditional congregate shelter and safe parking in resolving encampments and connecting people living in them to permanent housing.

## POSSIBLE FUTURE ACTION

The City Council could use this list to provide staff with further direction as to acceptable locations for new programs and program types that should be prioritized for consideration. In addition, Council could direct staff to pursue one or more new homeless programs at any of the sites listed above, and/or direct staff to return with more or different sites.

At this time, staff is pursuing two sites for noncongregate interim housing, and both would be funded by external grants: the Sather Motel, a 32-room motel at 1820 University Ave. which would be leased by County Measure W funds, , as well as another motel to be leased by the City's recently awarded Prop 47 grant. More information on these opportunities is provided immediately below. If these funding applications are successful, staff will return to Council as soon as possible for all necessary approvals.

## FISCAL IMPACTS OF POSSIBLE FUTURE ACTION

Pursuing new program(s) entails capital acquisition and/or ongoing program-related expenses (rent, services contracts, etc.). The development of budgets for these programs is highly dependent on a number of factors including the layout and amenities

of the physical site itself as well as the scope and duration of the program. With additional direction from Council as to which site(s) to pursue, staff can begin to develop estimated program expenses.

However, and as previously reported to Council in staff's July 29 worksession report, "Comprehensive Summary of Berkeley's Homeless Response," the City is currently facing a significant and structural fiscal challenge, with ongoing general fund deficits projected at over $20M annually, and state and federal sources that currently support Berkeley's existing programs are at risk under the current federal administration and economic environment. Absent new sources of external funding, including and possibly Alameda County Measure W, staff do not recommend opening new programs when several existing shelter programs face imminent risk of closure in the coming years.

Staff continue to aggressively pursue all available opportunities for external funding. As mentioned above, these include the following two opportunities, neither of which would impact the City's General Fund as neither would require local match funding:

1. In June 2025, City staff applied for an $8M grant through the State of California's Proposition 47 Grant Program. This is a no-match grant. Council voted to accept the funds on Sept 30, 2025. Proposition 47 provides funding for public agencies to provide mental health services, substance use disorder treatment, and diversion programs for individuals in the criminal justice system. The City's award will create three years of the Berkeley CareBridge Program, providing post-arrest supportive transitional housing and wraparound services for homeless, justice-involved individuals. The housing component would be provided through a master lease of a motel facility. The grant also requires establishment of a Local Advisory Committee that will meet publicly on a quarterly basis to provide program updates, hear from the community, and address needs.

2. In August, 2025, Alameda County released a notice of contract opportunity to nonprofit partners in the County's homeless system vendor pool, announcing an initiative to rapidly increase new interim housing units that can be used to support encampment resolution. City staff worked with Episcopal Community Services (ECS), a San Francisco-based nonprofit with extensive experience in homeless services, to sponsor ECS' application for this funding which, if awarded, would fund the master-lease of another motel (the Sather Motel, at 1820 University Avenue) to create a noncongregate shelter. Staff and ECS proposed that this shelter be used to target the large RV encampments in West Berkeley along Dwight and Grayson, using existing Measure P allocations for an expanded RV buy-back program. Importantly, the City would not be a direct recipient of these grant funds, nor would it hold/be party to any motel leases or services contracts, all of which will be handled directly by Alameda County.

Page 4 of 20



On Sept 17, City staff learned that ECS' application had not been selected for funding. ECS subsequently asked for feedback as to why they had not been selected for funding, but were told by the County, "These contracts are currently under negotiation and, therefore, the procurement is considered confidential. Alameda County Health is not able to discuss the procurement process nor provide feedback about this specific opportunity." Staff are open to working with ECS to revise and resubmit this application if an opportunity to do so presents itself.

## BACKGROUND

On May 20, 2025, the City Council passed a referral to the City Manager, "Alternative Housing Options for People Experiencing Homelessness." This referral had multiple parts, and the current report is responsive to one part of this referral. Staff actions in response to other aspects of this referral include:

- On May 28, the City Manager sent a letter on behalf of the Council to the Alameda County Board of Supervisors, affirming the four policy principles outlined in the May 20, 2025 referral.

- On July 24, 2025, Council voted to support staff recommendations in the report, "Recommendations for County Measure W Funding." The adoptions of these recommendations resulted in a letter sent to the Alameda County Board of Supervisors outlining Berkeley's priorities for County Measure W sales tax funding.

- On July 29, 2025, at a special meeting, Council received a report from staff, "Comprehensive Summary of Berkeley's Homeless Response System." This report responded to several aspects of Council's May 20, 2025 referral, including an overview of ongoing efforts to address homelessness; a resource needs and gaps analysis of the homeless system; a feasibility and cost analysis to support new homeless programs; and a geographic assessment of homeless service locations in the city. Due to technical difficulties, that special meeting was adjourned prior to the conclusion of staff's presentation on the report. The presentation was concluded during a special meeting on September 16, 2025.

- On October 28, 2025, the Council will consider a recommendation from the City Manager to send a letter to Alameda County Supervisor Fortunato Bas regarding opportunities to partner on regional solutions to unsheltered homelessness.

ENVIRONMENTAL SUSTAINABILITY AND CLIMATE IMPACTS

There are no immediate environmental nor climate impacts associated with the present report. The creation of new homeless programs in Berkeley may have future impacts, but those are unknown at this time.

CONTACT PERSON

Peter Radu, Assistant to the City Manager, Neighborhood Services, (510) 981-7045

ATTACHMENTS

1. Compilation of private market retail, manufacturing, and warehouse properties for sale and/or lease
2. Compilation of motels and hotels for sale and/or lease
3. Compilation of publicly owned sites, excluding parks, actively used city facilities, and occupied housing.

# Property Map & List Report




## Property Summary Statistics

| Property Attributes | Low | Average | Median | High |
|---|---|---|---|---|
| Building SF | 5,000 SF | 13,802 SF | 10,935 SF | 54,208 SF |
| Year Built | 1918 | 1955 | 1959 | 2008 |
| Available SF | 5,000 SF | 13,032 SF | 10,000 SF | 52,097 SF |
| Asking Rent Per SF/YR | $1.50 | $26.99 | $26.88 | $42.00 |
| Availability % | 45.9% | 94.4% | 100% | 100% |
| Vacancy % | 45.9% | 94.4% | 100% | 100% |
| Asking Price Per SF | $287.94 | $321.36 | $320.00 | $379.80 |
| Cap Rate | - | - | - | - |
| Star Rating | ★★☆☆☆ 2 | ★★☆☆☆ 2.2 | ★★☆☆☆ 2 | ★★★☆☆ 3 |

## Property List

| | Property Name/ Address | Type | Built/ Renovated | Size (% Leased) | SF Available | Asking Rent | Asking Price (Cap Rate) |
|---|---|---|---|---|---|---|---|
| 1 | 2911 Shattuck Ave<br>Berkeley, California 94705 | Retail<br>★★★☆☆ | 1930/1991 | 5,000 SF | 5,000 | $19.20 SF/Year/TBD | $1,899,000 |

CITY OF BERKELEY
© 2025 CoStar Group - Licensed to City of Berkeley - 1560002

## Property List (Continued)

| | Property Name/ Address | Type | Rating | Built/ Renovated | Size (% Leased) | SF Available | Asking Rent | Asking Price (Cap Rate) |
|---|---|---|---|---|---|---|---|---|
| 2 | 2524 Shattuck Ave<br>Berkeley, California 94704 | Retail | ★★☆☆☆ | 1928 | 5,200 SF | 5,200 | $36.00 SF/Year/NNN | Not For Sale |
| 3 | 2009 San Pablo Ave<br>Berkeley, California 94702 | Retail | ★★★☆☆ | 1925 | 6,396 SF (13.5%) | 5,535 | $19.80 SF/Year/IG | Not For Sale |
| 4 | 1101-1109 University Ave<br>Berkeley, California 94702 | Retail | ★★★☆☆ | 1995 | 8,367 SF (27.9%) | 514 - 6,030 | $30.00 - 42.00 SF/Year/NNN | Not For Sale |
| 5 | 1491-1495 Shattuck Ave<br>Berkeley, California 94709 | Retail | ★★☆☆☆ | 1979 | 6,750 SF (2.4%) | 2,655 - 6,585 | Withheld | Not For Sale |
| 6 | 2286 Shattuck Ave<br>Berkeley, California 94704 | Retail | ★★★☆☆ | 1972 | 6,800 SF | 6,800 | $33.00 SF/Year/NNN | Not For Sale |
| 7 | 3031-3051 Adeline St<br>Berkeley, California 94703 | Retail | ★★☆☆☆ | 1934 | 15,260 SF (54.1%) | 7,000 | $30.00 SF/Year/NNN | Not For Sale |
| 8 | 1230 5th St<br>Berkeley, California 94710 | Warehouse | ★★☆☆☆ | 2008 | 7,235 SF (100%) | 7,235 | $1.50 SF/Year/NNN | Not For Sale |
| 9 | 2450 Shattuck Ave<br>Berkeley, California 94704 | Retail | ★★☆☆☆ | 1918 | 11,557 SF (35.1%) | 7,500 | $36.00 SF/Year/NNN | Not For Sale |
| 10 | 2277 Shattuck Ave<br>Berkeley, California 94704 | Retail | ★★☆☆☆ | 1920/1996 | 8,335 SF | 2,538 - 8,335 | Withheld | $2,400,000 |
| 11 | 2000-2006 San Pablo Ave<br>Berkeley, California 94702 | Retail | ★★☆☆☆ | 1969/2013 | 9,325 SF (49.6%) | 4,700 - 9,400 | $27.96 SF/Year/NNN | Not For Sale |
| 12 | 1805-1807 Eastshore Hwy<br>Berkeley, California 94705 | Warehouse | ★★☆☆☆ | 1966 | 10,000 SF | 10,000 | $22.80 SF/Year/MG | $3,200,000 |
| 13 | 1095 University Ave<br>Berkeley, California 94710 | Retail | ★★☆☆☆ | 1923 | 10,563 SF | 5,281 - 10,563 | Withheld | Price Not Disclosed |
| 14 | 2454-2464 Telegraph Ave<br>Berkeley, California 94704 | Retail | ★★☆☆☆ | 1966 | 10,935 SF | 10,935 | Withheld | Not For Sale |
| 15 | 710 Bancroft Way<br>Berkeley, California 94710 | Warehouse | ★★☆☆☆ | 1991 | 11,000 SF | 11,000 | $25.80 SF/Year/IG | Not For Sale |

## Property List (Continued)

| | Property Name/ Address | Type | Built/ Renovated | Size (% Leased) | SF Available | Asking Rent | Asking Price (Cap Rate) |
|---|---|---|---|---|---|---|---|
| 16 | 1536 Shattuck Ave<br>Berkeley, California 94709 | Retail<br>★★☆☆☆ | 1980 | 11,340 SF | 11,340 | Withheld | Price Not Disclosed |
| 17 | Bldgs 6<br>1360 5th St<br>Berkeley, California 94710 | Warehouse<br>★★☆☆☆ | 1930 | 11,748 SF (100%) | 2,000 - 11,748 | $24.00 SF/Year/NNN | Not For Sale |
| 18 | 620 Hearst Ave<br>Berkeley, California 94710 | Manufacturing<br>★★☆☆☆ | 1978 | 12,000 SF | 12,000 | $22.80 SF/Year/MG | Not For Sale |
| 19 | 1931-1941 San Pablo Ave<br>Berkeley, California 94702 | Retail<br>★★☆☆☆ | 1925 | 18,728 SF | 18,728 | Withheld | Price Not Disclosed |
| 20 | 2700 Shattuck Ave<br>Berkeley, California 94705 | Retail<br>★★☆☆☆ | 1946 | 22,689 SF (100%) | 8,462 - 22,689 | Withheld | Not For Sale |

*Property #21 has been removed by staff, as this property is no longer on the market.*

| | Property Name/ Address | Type | Built/ Renovated | Size (% Leased) | SF Available | Asking Rent | Asking Price (Cap Rate) |
|---|---|---|---|---|---|---|---|
| 22 | 641 Gilman St<br>Berkeley, California 94710 | Warehouse<br>★★☆☆☆ | 1950 | 29,019 SF | 10,998 - 29,019 | Withheld | Not For Sale |
| 23 | 2630 8th St<br>Berkeley, California 94710 | Manufacturing<br>★★☆☆☆ | 1959 | 54,208 SF (3.9%) | 8,000 - 52,097 | Withheld | Not For Sale |


© 2025 CoStar Group - Licensed to City of Berkeley - 1560002

# SenS Hotel & Bistro Berkeley - 1538-1540 Shattuck Ave

**Midscale**

Berkeley, California 94709 (Alameda County) - Oakland/Berkeley/Hayward Submarket

Hotel

## Property Summary

| | |
|---|---|
| Rooms | 18 |
| Built | 1962 |
| Stories | 3 |
| Operation Type | Independent |
| Parking Spaces | 25 (1.39/Room) |
| Commercial Asking Rent | Withheld |



## Property Details

| | | | |
|---|---|---|---|
| Land Area | 0.09 AC (3,920 SF) | Construction Type | Masonry |
| Building FAR | 3.35 | Zoning | C-NS |
| Primary Corridors | Interior | Parcel | 059-2263-009-00 |
| Hotel Location Type | Urban | | |

## Transportation

| | | |
|---|---|---|
| Parking Details | 25 Surface Spaces; Ratio of 1.39/Room | |
| Traffic Volume | 13,654 on Vine St (2025); 9,862 on Henry St (2025); 10,095 on Walnut St (2025); 13,654 on Rose St (2025); 14,509 on Lincoln St (2025); 10,379 on Cedar St (2025); 5,714 on Vine St (2025); 3,751 on Henry St (2025); 3,692 on Walnut St (2025); 11,024 on Bonita Ave (2025) | |
| Transit/Subway | Downtown Berkeley | 13 min walk |
| | Downtown Berkeley Station | 13 min walk |
| | North Berkeley Station | 19 min walk |
| | North Berkeley | 19 min walk |
| Commuter Rail | Berkeley | 7 min drive |
| | Emeryville | 11 min drive |
| Airport | Metro Oakland International | 27 min drive |
| | San Francisco International | 42 min drive |
| Walk Score ® | Walker's Paradise (98) | |
| Transit Score ® | Good Transit (64) | |


© 2025 CoStar Group - Licensed to City of Berkeley - 1560002

# University Inn and Suites - 920 University Ave

**Upper Midscale**

Berkeley, California 94710 (Alameda County) - Oakland/Berkeley/Hayward Submarket

Hotel

## Property Summary

| | |
|---|---|
| Rooms | 113 |
| Built/Renovated | 1967/2004 |
| Stories | 3 |
| Operation Type | Independent |
| Meeting Space | 4,944 SF |
| Parking Spaces | 95 (0.84/Room) |
| Commercial Asking Rent | Withheld |



## Property Details

| | | | |
|---|---|---|---|
| Land Area | 1.54 AC (67,082 SF) | Construction Type | Wood Frame |
| Building FAR | 1.40 | Zoning | HOTEL |
| Primary Corridors | Interior | Parcel | 056-1967-016-01 |
| Hotel Location Type | Urban | | |

## Transportation

| | | |
|---|---|---|
| Parking Details | 95 Surface Spaces; Ratio of 0.84/Room | |
| Traffic Volume | 18,624 on 7th St (2025); 9,312 on University Ave (2025); 7,987 on University Ave (2025); 3,787 on Addison St (2025); 3,451 on 5th St (2025); 21,258 on 10th St (2025); 5,040 on 5th St (2025); 17,558 on San Pablo Ave (2025) | |
| Transit/Subway | North Berkeley | 19 min walk |
| | North Berkeley Station | 19 min walk |
| Commuter Rail | Berkeley | 5 min walk |
| | Emeryville | 6 min drive |
| Airport | Metro Oakland International | 23 min drive |
| | San Francisco International | 36 min drive |
| Walk Score ® | Walker's Paradise (96) | |
| Transit Score ® | Good Transit (60) | |

© 2025 CoStar Group - Licensed to City of Berkeley - 1560002

| LOCATION NAME | | IMAGE | STREETNUM | STREETNAME | STREETSUFX | BLDGSQFT | LOTSQFT | OWNERNAME |
|---|---|---|---|---|---|---|---|---|
| AFRICAN AMERICAN HOLLISTIC CENTER (PLANNED) | 1890 Alcatraz, initially planned to be renovated, is now planned for demolition and replaced with a new structure. The current structure has been red tagged and therefore cannot be used due to significant structural issues. Construction to begin late 2026 with anticipated completion in 2028. |   | 1890 | ALCATRAZ | AVE | 4425 | 9403 | CITY OF BERKELEY |
| PARKING LOT ON NORTH EASTERLY CORNER OF ADELINE AND ALCATRAZ | Currently used by SAHA for parking. No formal lease or license agreement for SAHA's use has been issued. |   | 2931 | ALCATRAZ | AVE | | 5831 | CITY OF BERKELEY |
| PERFORMING ARTS FACILITY PARCEL 3 (aka BLACK REPERTORY GROUP THEATER) | Berkeley Cultural Arts Center, parcel 3 of 3, was built and constructed by City. The Black Repertory Group has used and occupied the building since construction was completed in 1986. New agreement between City and BRG is currently being negotiated. |   | 3209 | ADELINE | ST | 0 | 5936 | CITY OF BERKELEY |
| PERFORMING ARTS FACILITY PARCEL 2 (aka BLACK REPERTORY GROUP THEATER) | Berkeley Cultural Arts Center, parcel 2 of 3, was built and constructed by City. The Black Repertory Group has used and occupied the building since construction was completed in 1986. New agreement between City and BRG is currently being negotiated. |   | 3205 | ADELINE | ST | 0 | 5355 | CITY OF BERKELEY |

Source: Public Works Real Property

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PERFORMING ARTS FACILITY PARCEL 1 (aka BLACK REPERTORY GROUP THEATER) | Berkeley Cultural Arts Center, parcel 1 of 3, was built and constructed by City. The Black Repertory Group has used and occupied the building since construction was completed in 1986. New agreement between City and BRG is currently being negotiated. |  | 3201 | ADELINE | ST | 24150 | 5806 | CITY OF BERKELEY |
| BART ROW (ADELINE AT ALCATRAZ) | Parcel where BART trains enter and exit underground tunnel south of Ashby BART Station. |  | 3012 | ADELINE | ST | | 5553 | CITY OF BERKELEY |
| FIRE WAREHOUSE STORAGE LOT | Vacant lot next to the 9th Street Bike Trail currently used by Berkeley Fire Department for training and storage of special firehoses to bring water directly from the Bay to the Berkeley Hills. |  | 2642 | ASHBY | AVE | | 8725 | CITY OF BERKELEY |
| SPIRAL GARDENS (SFROW PROPERTIES) | Spiral Gardens is a community food security nonprofit organization that offers food, herbs, and other beneficial plants at affordable prices to the community. They have an agreement through PRW for use of the land. |  | 2850 | SACRAMENTO | ST | | 12423 | CITY OF BERKELEY |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| TELEGRAGH CHANNING GARAGE AND SHOPS | Formerly known as Sather Gate Garage, this City garage with ground floor retail space was seismically upgraded in 1997. The garage currently has one vacant 1400 sf storefront space that could be utilized for homeless programming, whereas other city garages currently do not. |  | 2431 | CHANNING | WAY | 189867 | 32685 | CITY OF BERKELEY |
| COMMUNITY GARDEN (SFROW) | This parcel of the City's Santa Fe Right of Way properties is currently used as a community garden. This lot is NOT planned to be part of the new Santa Fe ROW park, a state grant funded project. |  | 2442 | BANCROFT | WAY | | 38526 | CITY OF BERKELEY |
| ANN CHANDLER PUBLIC HEALTH CENTER (Leased) | 830 University is leased to Lifelong Medical and Berkeley Free Clinic. Lease expires in late 2028. |  | 830 | UNIVERSITY | AVE | | 14821 | CITY OF BERKELEY |
| VACANT LAND | Small vacant lot acquired by City in 1968. |  | 1901 | HENRY | ST | | 1552 | CITY OF BERKELEY |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| VACANT LAND | Small vacant lot where historic Kenney Cottage was stored. It was used for housing trailers during COVID and is currently being used to store City vehicles. |  | 1281 | UNIVERSITY AVE | | 0 | 3611 | CITY OF BERKELEY |
| UNIVERSITY AVENUE CENTER (RETAIL OFFICE BUILDING) | 1011 University is a retail and office space building purchased in 2017. Retail space fronting on University (4,000 sqft) is currently empty. The rear first floor is Meals on Wheels current location. The Public Heath Officer Unit is on the second floor. This building is roughly 13,000 square feet. |   | 1011 | UNIVERSITY AVE | | 18094 | 10400 | CITY OF BERKELEY |
| UNIVERSITY AVENUE CENTER (WAREHOUSE AND HISTORIC MOBILIZED WOMEN OF BERKELEY BUILDING) - 1001 WAREHOUSE, 1007 COMMUNITY CENTER | This parcel has two buildings. 1001 University is a warehouse previously approved by Council for use as a shelter. Currently Berkeley Food Network occupies the building. 1007 University is a historic building built by the Mobilized Women of Berkeley for use as a community center. Beginning in 2010 it was Bauman College, a cooking and nutrition school. 1007 is currently used and occupied by Fire Training until Summer 2026. Currently |   | 1001 | UNIVERSITY AVE | | 16470 | 20804 | CITY OF BERKELEY |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| UNIVERSITY AVENUE CENTER CITY PARKING LOT | This parcel includes the ADA accessible ramp for UAC and surface parking lot adjacent to 1001, 1007, and 1011 University Avenue. |  | 1925 | 9TH ST | | | 0 | 6500 | CITY OF BERKELEY |
| OLD RDA LEASED LAND | One of two parcels leased to Abrams, Millikan & Kent for 65 years (1986-2051) for $1 per year. Tenants have right of first refusal should the City decide to sell the property. This is a land only lease. |  | 1819 | FOURTH | ST | | | 3750 | CITY OF BERKELEY |
| OLD RDA LEASED LAND | One of two parcels leased to Abrams, Millikan & Kent for 65 years (1986-2051) for $1 per year. Tenants have right of first refusal should the City decide to sell the property. This is a land only lease. |  | 1817 | FOURTH | ST | | 10070 | 8750 | CITY OF BERKELEY |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| RDA LAND with house | This single family house is currently housing program location for Insight Housing. |   | 1654 | FIFTH | ST | 1500 | 5300 | CITY OF BERKELEY |
| RDA VACANT LAND | This location was previously approved by City Council for use as a Housing development site primarily to benefit people experiencing homelessness. The community gardern formerly on the site has been inactive for more than five years. |   | 1631 | FIFTH | ST | 0 | 5525 | CITY OF BERKELEY |
| PARCEL | Southeasterly corner of Le Conte Avenue and La Loma Avenue. Parcel appears to be partially occupied by a neighboring privately owned apartment building. |   | 0 | LE CONTE | AVE | | 2498 | CITY OF BERKELEY |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| HARRISON HOUSE | Ursula Sherman Village, commonly known as Harrison House Shelter, is operated by Building Opportunities for Self-Sufficiency (BOSS) on behalf of the City of Berkeley. Housing and services are made available to eligible applicants for up to 6 months. |  | 701 | HARRISON | ST | 6486 | 6000 | CITY OF BERKELEY |
| HARRISON HOUSE (711 HARRISON USED) | Ursula Sherman Village, aka Harrison House |  | 1100 | FOURTH | ST | 3158 | 18276 | CITY OF BERKELEY |
| HARRISON HOUSE (711 HARRISON USED) | Ursula Sherman Village, aka Harrison House. This parcel also includes a parking lot next to the railroad tracks that was used for trailers during COVID. |  | 1100 | FOURTH | ST | | 24622 | CITY OF BERKELEY |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| KARL LINN COMMUNITY GARDEN | Community garden dedicated to Karl Linn in 1993. Linn is credited with establishing the EcoHouse next to the garden, conceptualizing the transformation of the Ohlone Greenway into an interpretive exhibit of the natural and cultural history of Berkeley. |  | 1305 | HOPKINS | ST | 0 | 1349 | CITY OF BERKELEY |
| KARL LINN COMMUNITY GARDEN | Parcel of Linn garden adjacent to the EcoHouse. |  | 0 | HOPKINS | ST | 0 | 2155 | CITY OF BERKELEY |
| VACANT LAND | Parcel is essentially a landscaped median at a hard curve in Tamalpais Road across from Tamalpais Path. A neighboring home may be partially located on this parcel. |  | 0 | TAMALPAIS | RD | 0 | 3011 | CITY OF BERKELEY |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| VACANT LAND (SUTTER BETWEEN YOLO AND EUNICE) | Parcel is a large landscaped area adjacent to large single family houses in the Berkeley Hills. |  | 0 | SUTTER | ST | | 8260 | CITY OF BERKELEY | |
| NORTHBRAE TUNNEL APPROACH | Parcel includes landscaped area and right of way approach to Northbrae Tunnel. |  | | HOPKINS | ST | | 9831 | CITY OF BERKELEY | |
| VACANT LAND | Parcel is very large landscaped area adjacent to 1138 Sterling where large single family home and its garage with living unit on neighboring lot in the Berkeley Hills. Lot appears to be maintained as an expansion of private properties' rear yard. |  | 0 | TWAIN | AVE | | 2820 | CITY OF BERKELEY | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| VACANT LAND (THE UPLANDS) | Commonly known as Round Park, this area is not a public park but rather a landscape area at the terminus of Parkside Drive in The Uplands, a wealthy historic neighborhood. |  | 0 | PARKSIDE | DR | | 16767 | CITY OF BERKELEY | |
| PUBLIC RIGHT OF WAY | Landscaped wide median separating different legs of Hillcrest Road |  | 0 | HILLCREST | RD | | 4427 | CITY OF BERKELEY | |
| VACANT LAND | 20,000+ square foot lot between 686 and 660 Euclid Ave, partially fenced in by one or more private homeowners. Located on a steep slope surrounded by private residences. |  | 0 | EUCLID | AVE | | 20861 | CITY OF BERKELEY | |

# Exhibit F

## Murray Street public notices for abatement (and Email Request to Accommodate BHU member Sunny Yow)

City of Berkeley
City Manager's Office

# PUBLIC NOTICE

Posted date: August 17, 2026

To: Persons Encamped at Murray Street between 9th and 7th Streets

From: City of Berkeley

Subject: **Notice of Encampment Closure and Street Cleaning**

Please be advised that the City of Berkeley is requiring closure of all encampments located on Murray Street between 9th and 7th Streets. This area is temporarily designated a TNC Prohibited Area and no-lodging area. The City intends to perform street and sidewalk cleanings in this area, which must be free of both people and possessions between August 21 and 28. **You are hereby ordered to vacate the encampment closure area and remove all personal belongings by or before the Compliance Deadline of August 21, 2026.**

## PERSONAL PROPERTY

Please keep with you all necessary personal belongings and shelter items. The City will discard items you no longer wish to keep at your request. During the operation, the City will be removing debris and belongings left on the sidewalk or street in the above noticed area. **Personal property left in this area may be collected and stored pursuant to the City's policy if it meets certain requirements, described in more detail below.** Personal property that is storable pursuant to City policy will be held for 90 days.

**Pursuant to Administrative Regulation 10.1, the City will not store items that are hazardous to store. If they are not removed at the time of the operation, they will be discarded.** Examples of items the City will not store include:

- Soiled or moldy items
- Wet or damp clothing, bedding, or sleeping bags if storing it would cause it to mold
- Perishable food or personal products that will spoil in storage
- Personal hygiene products such as toothbrushes, hairbrushes
- Mattresses, futons, upholstered furniture
- Shopping carts (shopping carts will be returned to the identified stores where possible and clearly identifiable valuables in the carts will be stored).

- Broken or disassembled items or those stripped of parts (i.e. flat tires, electronics, torn up clothes)
- Weapons – weapons will be turned over to the Berkeley Police Department
- Any item that may attract rodents or insects (containers for recycling or food storage)
- Hazardous or explosive items such as gasoline cans propane tanks, batteries

The City will not attempt to retrieve and store any personal property interspersed with health or safety hazards (e.g., presence of syringes, human or animal waste, rodents or other disease vectors, etc.) due to the dangers this poses to City workers.

Unattended property will be handled in accordance with City policy. Individuals who wish to reclaim their property may call "311" to contact the City's Customer Service Center during regular business hours (Monday – Friday, 9:00 AM to 3:00 PM), or call (510) 981-2489 or (510) 981-CITY. Alternatively, information regarding retrieval of unattended and stored property is available in the lobby of the Berkeley Civic Center, 2180 Milvia Street, Berkeley, during regular business hours.

**The City prefers not to cite or arrest to gain your compliance with this notice. However, absent voluntary compliance, any person found to be encamped in this area after the Compliance Deadline of AUGUST 21, 2026, may be subject to citations and/or arrest.**

**DISABILITIES AND REASONABLE ACCOMMODATIONS**
You have the right under the Americans with Disabilities Act to request a reasonable accommodation (i.e., a modification of standard City policy, procedure, and/or practice) if your disability prevents you from complying with this notice. To request a reasonable accommodation, please contact the City's ADA Coordinator (email: ada@berkeleyca.gov, phone: 510-981-6418, TTY/TDD: 510-981-6347, and street address: 1947 Center St., 4th Floor, Berkeley 94704). The City may request verification from a qualified professional that your disability impedes compliance with the terms of this notice. The City will work with you to identify mutually agreeable accommodations based on your needs and the goals of this notice but it may determine that the requested accommodation cannot be provided if it would fundamentally alter the nature of a City service or is an unreasonable accommodation. **Please make any accommodation requests as soon as possible so there is enough time to discuss possible solutions. In order to ensure enough time for the City to discuss solutions with you, you are encouraged to submit your request no later than AUGUST 19, 2026.**

---

**LODGING WITHOUT PERMISSION PROHIBITED**
You are hereby notified that Penal Code 647(e) provides that a person "[w]ho lodges in a building, structure, vehicle, or place, whether public or private, without the permission

of the owner or person entitled to the possession or in control of it" is guilty of a misdemeanor.

Lodging is prohibited between August 14 and 21 at Murray Street between 9th and 7th Streets

**SIDEWALK NUISANCE CONDITIONS**
You are hereby notified that pursuant to **Berkeley Municipal Code 14.48.020**, "It is unlawful for any person to place or cause to be placed anywhere upon any sidewalk or roadway, any object which obstructs, restricts, or prevents the use of any portion of such sidewalk or roadway."

You are further notified that pursuant to **Berkeley Municipal Code 14.48.120 and Administrative Regulation 10.2**, In Commercial and Manufacturing Districts, TNC Objects "may not be placed in TNC Prohibited Areas." TNC Objects are defined as personal belongings: 1) in the immediate custody and control of a person or persons at substantially all times; 2) not offered for sale or exchange or involved in the solicitation of money for immediate payment; 3) not otherwise prohibited and of a size, weight and quantity that can be easily moved by the owner; 4) not furniture.

**INTERFERENCE WITH CITY WORK PROHIBITED**
You are further notified that pursuant to **Berkeley Municipal Code 13.36.045**, "It is unlawful for any person to knowingly interfere with, disrupt, or obstruct a public officer or other person who is performing authorized work, maintenance, or a public service on public property or private property adjacent to the public right of way."

**ATTACHMENT 1**

The City of Berkeley's primary goal is to end unsheltered homelessness by connecting those living in this encampment to interim and permanent housing.

*Interim Housing*

The City has a limited number of shelter beds available. Those interested in shelter can:

- Talk to a member of the Homeless Response Team (HRT) at any point during their regular outreach to this encampment.
- Call **211** or 1-800-799-7233 or 1-800-787-3224 (TTY) for services, shelter and housing information. 211 Alameda County is available 24 hours a day, seven days a week.
- Visit in person:
  - North County Housing Resource Center (homeless adults only):
    - Bay Area Community Services
      **In person drop-in hours:** Mon., Wed., Fri., 9:00 am – 12:00 pm
      **Call-in hours:** Mon. – Fri. 8:30 am – 4:30 pm
      **Address:** 2809 Telegraph Avenue Suite 202, Berkeley, CA 94705
      **(510) 495-0131**
  - North County Housing Resource Center (homeless families only):
    - Women's Daytime Drop-in Center
      **Food and hygiene services:** Monday – Friday 9:00 am – 2:00 pm
      **All other services:** Monday – Friday 8:00 am – 4:00 pm
      **Address:** 2218 Acton Street, Berkeley, CA 94702
      **(510) 548-2884**

*Permanent Housing*

By Federal regulation, the City of Berkeley does not control access/referrals to permanent supportive housing for people experiencing homelessness, even for those housing programs located within the City. Alameda County, through its Coordinated Entry process, oversees these referrals. However, the Homeless Response Team can assess people for eligibility and help connect anyone interested. During the Coordinated Entry assessment, the HRT will ask you about your:

- History of homelessness
- Barriers to housing (prior evictions, length of time since last lease)
- Disability and vulnerability

Providing full and honest answers will help ensure you are matched to the most appropriate services for your needs.

Anyone interested in a Coordinated Entry Assessment should:

- Talk to a member of the Homeless Response Team (HRT) at any point during their regular outreach to this encampment.
- Email homelessresponseteam@berkeleyca.gov to request a housing assessment. Please provide a phone number and/or a location and date/time the team can use to locate you.

Police on scene *

26 - Ludavico

Gaspar - 64

5-4 - Kleppe

CITY OF BERKELEY

City Manager's Office

# PUBLIC NOTICE

Posted date: July 22, 2026

To: Persons Encamped and/or Living on Murray St between Seventh St and San Pablo Ave

From: City of Berkeley

Subject: **Notice of Encampment Closure and Street Cleaning**

Please be advised that the City of Berkeley is requiring closure of all encampments located on Murry at Ninth. After closing the encampment, the city will be performing street and sidewalk cleanings in the area. **You are hereby ordered to vacate the encampment closure area and remove all personal belongings by or before the Compliance Deadline of JULY 29, 2026.** Pursuant to BMC 14.48.020, 14.48.120, and AR 10.2, this area will be temporarily designated a TNC Prohibited Area. All personal property must be removed from the public right-of-way by this date, and lodging in this area is not permitted. Pursuant to California Vehicle Code Section 22651(l) and BMC 14.36.030G, all vehicles remaining in this area after the compliance date are subject to immediate towing and impounding.

**You are hereby notified that pursuant to Berkeley Municipal Code 14.48.020, "It is unlawful for any person to place or cause to be placed anywhere upon any sidewalk or roadway, any object which obstructs, restricts, or prevents the use of any portion of such sidewalk or roadway."**

**You are further notified that pursuant to Berkeley Municipal Code 14.48.120 and Administrative Regulation 10.2, In Commercial and Manufacturing Districts, TNC Objects "may not be placed in TNC Prohibited Areas." TNC Objects are defined as personal belongings: 1) in the immediate custody and control of a person or persons at substantially all times; 2) not offered for sale or exchange or involved in the solicitation of money for immediate payment; 3) not otherwise prohibited and of a size, weight and quantity that can be easily moved by the owner; 4) not furniture.**

- Shopping carts (shopping carts will be returned to the identified stores where possible and clearly identifiable valuables in the carts will be stored).
- Broken or disassembled items or those stripped of parts (i.e. flat tires, electronics, torn up clothes)
- Weapons – weapons will be turned over to the Berkeley Police Department
- Any item that may attract rodents or insects (containers for recycling or food storage)
- Hazardous or explosive items such as gasoline cans propane tanks, batteries

**Please take this opportunity to remove any such items from the encampment closure area.**

The city will discard items you no longer wish to keep at your request. **Please ensure that you keep with you all necessary personal belongings (medications, identification, electronics, wallets), items of value, shelter items, and items of special importance to you**. Personal property left unattended in the encampment closure area may be collected and stored pursuant to the City's policy, if it meets certain requirements, described in more detail below.

**Personal property that may be stored up to 90 days** includes identification documents; photos/photo albums; tents, sleeping bags, bedding (which is deemed to be in serviceable condition); luggage, backpacks, purses; clothing; documents (together in a packet bound or secured in some way); jewelry; medication; eyewear; electronic equipment; tools; bicycles and other non-motorized methods of transportation which are in working order. **The City will not attempt to retrieve and store any personal property interspersed with health or safety hazards (e.g., presence of syringes, human or animal waste, rodents or other disease vectors, etc.) due to the dangers this poses to City workers.**

Unattended property will be handled in accordance with City policy. Individuals who wish to reclaim their property may call "311" to contact the City's Customer Service Center during regular business hours (Monday – Friday, 9:00 AM to 3:00 PM), or call (510) 981-2489 or (510) 981-CITY. Alternatively, information regarding retrieval of unattended and stored property is available in the lobby of the Berkeley Civic Center, 2180 Milvia Street, Berkeley, during regular business hours.

**The city prefers not to cite or arrest to gain your compliance with this notice. However, absent voluntary compliance, any person found to be encamped in this area after the Compliance Deadline of JULY 29, 2026, may be subject to citations and/or arrest.**

**DISABILITIES AND REASONABLE ACCOMMODATIONS**
You have the right under the Americans with Disabilities Act to request a reasonable accommodation (i.e., a modification of standard City policy, procedure, and/or practice) if your disability prevents you from complying with this notice. To request a reasonable accommodation, please contact the City's ADA Coordinator (email: ada@berkeleyca.gov, phone: 510-981-6418, TTY/TDD: 510-981-6347, and street

**You are further notified that pursuant to Berkeley Municipal Code 13.36.045, "It is unlawful for any person to knowingly interfere with, disrupt, or obstruct a public officer or other person who is performing authorized work, maintenance, or a public service on public property or private property adjacent to the public right of way."**

**You are further notified that pursuant to California Penal Code Section 647(e), it is unlawful for anyone "[lodge] in a building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it."**

**You are further notified that pursuant to California Vehicle Code Section 22651(l), vehicles may be towed and impounded if they are "illegally parked on a highway in violation of a local ordinance forbidding standing or parking and the use of a highway, or a portion thereof, is necessary for the cleaning, repair, or construction of the highway, or for the installation of underground utilities, and signs giving notice that the vehicle may be removed are erected or placed at least 24 hours prior to the removal by a local authority pursuant to the ordinance."**

**You are further notified that pursuant to BMC 14.36.030G, "It is unlawful for the operator of any vehicle to stop, stand, park, or leave standing such vehicle in any of the following places, except when necessary to avoid conflict with other traffic or in compliance with the direction of a police officer or other authorized officer, or traffic sign or signal: ... On any street or highway where the use of such street or highway or a portion thereof is necessary for the cleaning, repair or construction of the street or highway or the installation of underground utilities or where the use of the street or highway or any portion thereof is authorized for a purpose other than the normal flow of traffic or where the use of the street or highway or any portion thereof is necessary for the movement of equipment, articles or structures of unusual size, and the parking of such vehicle would prohibit or interfere with such use or movement; provided that signs giving notice of such no parking are erected or placed at least twenty-four hours prior to the effective time of such no parking."**

## PERSONAL PROPERTY

During the operation, the city will be removing debris and belongings left on the sidewalk or street in the above noticed area. **Pursuant to Administrative Regulation 10.1, the City will not store the following items. If they are not removed at the time of the operation, they will be discarded:**

- Soiled or moldy items
- Loose or scattered papers
- Wet or damp clothing, bedding, or sleeping bags if storing it would cause it to mold
- Perishable food or personal products that will spoil in storage
- Personal hygiene products such as toothbrushes, hairbrushes
- Bike carcasses and parts
- Mattresses, futons, furniture

address: 1947 Center St., 4th Floor, Berkeley 94704). The City may request verification from a qualified professional that your disability impedes compliance with the terms of this notice. The City will work with you to identify mutually agreeable accommodations based on your needs and the goals of this notice but it may determine that the requested accommodation cannot be provided if it would fundamentally alter the nature of a City service or is an unreasonable accommodation. **Please make any accommodation requests as soon as possible so there is enough time to discuss possible solutions.**

**ATTACHMENT 1**

The City of Berkeley's primary goal is to end unsheltered homelessness by connecting those living in this encampment to interim and permanent housing.

*Interim Housing*

The City has a limited number of shelter beds available. Those interested in shelter can:

- Talk to a member of the Homeless Response Team (HRT) at any point during their regular outreach to this encampment.
- Call **211** or 1-800-799-7233 or 1-800-787-3224 (TTY) for services, shelter and housing information. 211 Alameda County is available 24 hours a day, seven days a week.
- Visit in person:
  - North County Housing Resource Center (homeless adults only):
    - **Bay Area Community Services**
      **In person drop-in hours:** Mon., Wed., Fri., 9:00 am – 12:00 pm
      **Call-in hours:** Mon. – Fri. 8:30 am – 4:30 pm
      **Address:** 2809 Telegraph Avenue Suite 202, Berkeley, CA 94705
      **(510) 495-0131**
  - North County Housing Resource Center (homeless families only):
    - **Women's Daytime Drop-in Center**
      **Food and hygiene services:** Monday – Friday 9:00 am – 2:00 pm
      **All other services:** Monday – Friday 8:00 am – 4:00 pm
      **Address:** 2218 Acton Street, Berkeley, CA 94702
      **(510) 548-2884**

*Permanent Housing*

By Federal regulation, the City of Berkeley does not control access/referrals to permanent supportive housing for people experiencing homelessness, even for those housing programs located within the City. Alameda County, through its Coordinated Entry process, oversees these referrals. However, the Homeless Response Team can assess people for eligibility and help connect anyone interested. During the Coordinated Entry assessment, the HRT will ask you about your:

- History of homelessness
- Barriers to housing (prior evictions, length of time since last lease)
- Disability and vulnerability

Providing full and honest answers will help ensure you are matched to the most appropriate services for your needs.

Anyone interested in a Coordinated Entry Assessment should:

- Talk to a member of the Homeless Response Team (HRT) at any point during their regular outreach to this encampment.
- Email homelessresponseteam@berkeleyca.gov to request a housing assessment. Please provide a phone number and/or a location and date/time the team can use to locate you.

Gmail Berkeley Homeless Union <berkeley.homeless.union@gmail.com>

# REQUEST: ADA Accommodation for Sunny Jean Yow

10 messages

**Berkeley Homeless Union** <berkeley.homeless.union@gmail.com> Tue, Jul 28, 2026 at 3:08 PM
To: "Gregory, Thomas" <tgregory@berkeleyca.gov>, "Radu, Peter" <pradu@berkeleyca.gov>, ovance-dozier@berkeleyca.gov
Cc: advocacy@wdwg.org

Mr. Gregory and Homeless Response Team,

I am writing on behalf of Sunny Jean Yow, a disabled member of the Berkeley Homeless Union currently residing in a tent/structure on Murray Street near 9th Street, to formally submit a request for reasonable accommodations under the Americans with Disabilities Act (ADA) in connection with the City's planned abatement at that location.

Please find below the information required to initiate this request:

**I. Nature, Extent and Duration of Disability**

Ms. Yow has been diagnosed with Post-Traumatic Stress Disorder (PTSD), which she has had since the age of 8-years-old. Her condition has compounded in severity and range of triggers after experiencing multiple encampment sweeps.

Her disabilities substantially limit one or more major life activities in the following ways:

- <u>Heightened stress and anxiety:</u> Repeated trauma from losing personal valuables, her vehicular home, and repeated separation from community is triggered by the threat of or ongoing abatement actions. This causes anxiety, acute panic and tunnel vision.
- <u>Dissociation and disorientation:</u> When experiencing intense anxiety, Ms. Yow dissociates and becomes disoriented, which prevents her from performing essential tasks like prioritizing, interferes with decision-making, and impairs her ability to communicate effectively.
- <u>Exhaustion:</u> Long periods of intense anxiety result in exhaustion, further limiting her ability to comply with abatement orders.

**II. Nexus Between Ms. Yow's Disabilities and the Enforcement Action**

The City's standard encampment management policies—if applied to Ms. Yow without modification—will foreseeably aggravate her disabilities in the following ways:

A. <u>Sudden displacement:</u> Her PTSD requires predictability and stability. Sudden displacement triggers panic, emotional dysregulation, dissociation, and physical stress responses that exacerbate her symptoms.
B. <u>Inability to pack and transport belongings:</u> Panic and tunnel vision cause difficulty maintaining orientation in the present moment and sense of direction. This prevents her from effectively packing and transporting her emotional support dog, survival gear, artworks and other valuables without assistance.
C. <u>The 3x3 rule is unworkable:</u> Compliance is physically impossible without abandoning her tent (her only accessible shelter), artworks (which are essential to her emotional stability), essential belongings and her dog. A 3'x3' footprint space is too small for her to store her necessities, protect her body from the elements, or maintain the stability necessary to manage her PTSD.
D. <u>Property loss:</u> If the City abates her area without providing accommodations, Ms. Yow will be unable to remove her tent and essential belongings due to her disability-related limitations. The destruction of her survival equipment and artwork would render her completely unsheltered and destabilize her mental health.

**III. Requested Accommodations**

Ms. Yow respectfully requests the following reasonable accommodations under Title II of the Americans with Disabilities Act:

1. Pause on Enforcement Pending Interactive Process
Consistent with the Court's hearing last week, accommodation sought by BHU applies citywide. Therefore, Ms. Yow requests that the City pause any abatement or enforcement action against her until the interactive process is sufficiently completed and the City issues a written determination on her accommodation requests. As the Court held, the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." (Dkt. 288 at 21).

2. Designation of a Stable Location
We request that the City assess a place where Ms. Yow will not be subject to eviction. Per Judge Chen's Summary Judgment Order (Dkt. 288), the City has an obligation to consider alternate viable locations for encampment residents to relocate. A stable location would allow Ms. Yow to maintain a consistent setup, continue her artwork, limit disruptions to her daily life, and avoid re-triggering and worsening her PTSD. She needs a stable spot where she can consistently return to, as managing her PTSD symptoms allows her to communicate effectively with outreach workers—with whom she is eager to connect. She has expressed a desire to connect to work-related programs and housing.

3. Physical Relocation Assistance
City-provided physical assistance with scheduling, planning, and transporting her personal belongings to a lawful location, consistent with the Court's Summary Judgment Order (Dkt. 288). Panic and tunnel vision prevent Ms. Yow from effectively packing and transporting her artworks and other valuables without assistance. She can specify what she most needs to keep.

4. Exemption from the 3x3 Rule
Permission to maintain a tent and living space larger than nine square feet, subject to an individualized assessment that accounts for her disability-related needs.

Ms. Yow's artwork is not merely personal property—it is an essential tool for managing her PTSD. The act of creating art provides emotional regulation, stability, and a sense of purpose that helps her manage anxiety and avoid dissociation. She requires a space where she can stand and work on her art, store her supplies and completed works, and maintain a stable living environment for herself and emotional support animal. A cramped 3'x3' footprint cannot accommodate these needs.

Proposed location and footprint: Ms. Yow is requesting an accommodation at her current location on Murray Street and 9th Street (near 1000 Murray St, Berkeley, CA 94710). She proposes a footprint of at least 10 feet wide by 35 feet long, which would allow her to maintain a small tent or structure and a workspace for her art. If this exact footprint is not feasible at her current location or anywhere on that street, we request that the City identify the largest footprint that could be accommodated at this site, consistent with the ADA's requirement for individualized assessments.

We also request that the City not take or destroy her artworks, which are essential supplies for managing her disabilities, and that the City provide her with a written determination on the approved footprint and location.

5. Extended Time to Move
Ms. Yow requests additional time to move while the City works to direct her to a viable living space that accommodates her disabilities.

6. Replacement of Essential Property
If any essential survival equipment (tent, sleeping gear, basic clothing, blankets) is destroyed during abatement, the City shall provide comparable replacements or take measures not to destroy any of her property.

7. Cognitive and Communication Accommodations
Trauma-informed communication consistent with best practices for individuals with complex trauma and mental disabilities. If any requests are not granted in full, the opportunity to meet with city personnel to discuss options in a low-

stimulation environment. We also request permission to have a BHU representative or advocate present during all interactions with City staff.

**IV. Medical Verification and Disability Status**

Ms. Yow receives care from healthcare providers who can verify her diagnoses and functional limitations. We can obtain medical documentation upon request. However, given the urgency of the enforcement timeline, we respectfully request that the City initiate the interactive process based on the disabilities identified in this request, pending receipt of formal verification.

**V. Next Steps**

We respectfully request that your office:

- Acknowledge receipt of this request;
- Pause enforcement against Ms. Yow pending completion of the interactive process;
- Provide a written determination on each requested accommodation and/or suggest alternatives, consistent with 28 C.F.R. § 35.164.

If any requested accommodation is denied, please provide a written justification specifying why the accommodation would constitute a fundamental alteration or undue burden, supported by concrete evidence rather than generalized assertions, as required by the Court's orders.

Thank you for your prompt attention to this urgent matter. We look forward to working together to ensure Ms. Yow receives the protections she is entitled to under the ADA.

Sincerely,

**Yesica Prado**
Berkeley Homeless Union Representative

---

**Gregory, Thomas** <TGregory@berkeleyca.gov> Wed, Jul 29, 2026 at 8:35 PM
To: Berkeley Homeless Union <berkeley.homeless.union@gmail.com>, "Radu, Peter" <pradu@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>
Cc: "advocacy@wdwg.org" <advocacy@wdwg.org>

Hi Yesica,

Due to current operational constraints, the City will not proceed with the previously planned abatement reflected in the notice Ms. Yow received. Ms. Yow will be provided with a new notice once the abatement is rescheduled and you are welcome to make a reasonable accommodation request at that time. It is important to note that your assertion re: #2 is incorrect. As a reminder, you previously made substantially similar requests on behalf of several other BHU members and the Court explicitly denied BHU's requests for the following: "Relief Category #2: Enforcement-Free Zones, City-Sanctioned or City-Owned Campsite, and Map or List of Enforcement-Free Areas." In

addition, the City has informed you multiple times that no “enforcement free zones” exist. Therefore, your request “that the City assess a place where Ms. Yow will not be subject to eviction” has already been addressed by the Court, and denied as a form of relief to BHU, in contradiction of your interpretation.

Best,

**Thomas Gregory / ADA Program Coordinator**
City of Berkeley, Public Works Department
1947 Center Street, 5th Floor
Berkeley, CA 94704

(510) 981-6418

---

**From:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
**Sent:** Tuesday, July 28, 2026 3:08 PM
**To:** Gregory, Thomas <TGregory@berkeleyca.gov>; Radu, Peter <pradu@berkeleyca.gov>; Vance-Dozier, Okeya <OVance-Dozier@berkeleyca.gov>
**Cc:** advocacy@wdwg.org <advocacy@wdwg.org>
**Subject:** REQUEST: ADA Accommodation for Sunny Jean Yow

**WARNING:** This is not a City of Berkeley email. Do not click links or attachments unless you trust the sender and know the content is safe.

[Quoted text hidden]

---

**Berkeley Homeless Union** <berkeley.homeless.union@gmail.com> Mon, Aug 10, 2026 at 4:45 PM
To: "Gregory, Thomas" <TGregory@berkeleyca.gov>
Cc: "Radu, Peter" <pradu@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>, "advocacy@wdwg.org" <advocacy@wdwg.org>

Hi Mr. Gregory,
I am reaching out to let you know that Ms. Yow would like to request ADA accommodations for the new public notice that was posted at her encampment. Please let me know if you need additional information to consider it.

Thank you,

**Yesica Prado**
Berkeley Homeless Union Representative

[Quoted text hidden]

---

**Berkeley Homeless Union** <berkeley.homeless.union@gmail.com> Fri, Aug 14, 2026 at 3:29 PM
To: "Gregory, Thomas" <TGregory@berkeleyca.gov>
Cc: "Radu, Peter" <pradu@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>, "advocacy@wdwg.org" <advocacy@wdwg.org>

Hi Mr. Gregory,
I am following up on this request for Ms. Yow. Could you please let me know whether you'll be engaging in the interactive process for this accommodation?

Thank you,

**Yesica Prado**
Berkeley Homeless Union Representative

[Quoted text hidden]

---

**Gregory, Thomas** <TGregory@berkeleyca.gov> Fri, Aug 14, 2026 at 3:34 PM
To: Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
Cc: "Radu, Peter" <pradu@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>, "advocacy@wdwg.org" <advocacy@wdwg.org>

Ms. Prado,

We are still considering your accommodation requests for Ms. Yow. In the meantime, we agree to provide an extension as an accommodation and to allow sufficient time for the interactive process. The new compliance deadline is now August 21. We will follow up as soon as possible to your other requests.

Best,

**Thomas Gregory / ADA Program Coordinator**
City of Berkeley, Public Works Department
1947 Center Street, 5th Floor
Berkeley, CA 94704

(510) 981-6418

---

**From:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
**Sent:** Friday, August 14, 2026 3:29 PM
**To:** Gregory, Thomas <TGregory@berkeleyca.gov>
**Cc:** Radu, Peter <pradu@berkeleyca.gov>; Vance-Dozier, Okeya <OVance-Dozier@berkeleyca.gov>; advocacy@wdwg.org <advocacy@wdwg.org>
**Subject:** Re: REQUEST: ADA Accommodation for Sunny Jean Yow

[Quoted text hidden]

---

**Gregory, Thomas** <TGregory@berkeleyca.gov> Thu, Aug 20, 2026 at 2:08 PM
To: Berkeley Homeless Union <berkeley.homeless.union@gmail.com>

Cc: "Radu, Peter" <pradu@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>, "advocacy@wdwg.org" <advocacy@wdwg.org>

Yesica,

I have considered your requests on behalf of Ms. Yow, and the following decisions were made in consultation with the City Manager's Office and other relevant staff. Alternatives were considered and offered where feasible. The following analysis and accommodations are made in light of the summary judgment order in *BHU* and will be re-evaluated if caselaw changes.

**Regarding "1. Pause on Enforcement Pending Interactive Process,"** the City is confident that it can complete the interactive process vis a vis Ms. Yow's requests prior to any abatement actions impacting Ms. Yow's current campsite.

**Regarding "2. Designation of a Stable Location**," the identification of sites suitable for camping is not a service the City provides, nor is it a service that the ADA or any court ruling requires the City to provide. As previously explained, the City's encampment related requirements are established through a combination of municipal code provisions, administrative regulations, and City Council resolutions, all of which are subject to change based on public health conditions, safety concerns, and legal requirements.

Because enforcement determinations are location-specific, condition dependent, and responsive to changing circumstances, it is not possible for the City to identify locations where camping would be categorically free from enforcement. As an alternative, the City has summarized the applicable regulatory framework to assist in understanding how enforcement decisions are made but cannot provide individualized guarantees regarding future enforcement outcomes. Further, as explained below, the City has agreed to conduct an individualized assessment of a space on the public-right-of-way that is larger than 9 square feet, consistent with the Judge Chen's summary judgment order in the *BHU* matter.

**Regarding "3. Physical Relocation Assistance,"** this request is approved to the extent that Ms. Yow needs such support due to disability. Please contact HRT's Okeya, copied here, asap to schedule this assistance. Please note that the City will only assist with transporting non-hazardous items.

**Regarding "4. Exemption from the 3x3 Rule,"** the City is unable to grant an exemption from this rule at Ms. Yow's proposed location at this time. Ms. Yow is requesting to remain at her current location, but the City has designated Murray Street between 9th and 7th Streets as a TNC Prohibited Area and no-lodging area from August 14-21. Thus, even if the 3x3 rule was suspended for this location, Ms. Yow would still need to relocate during those dates. It is necessary for the City to clean the streets and sidewalk as soon as operationally feasible due to multiple recent community member reports involving accumulating trash, dumped furniture and other unwanted items, and rotting food, which all contribute to potential rodent harborage. There are also reports of oversized items blocking pedestrian access in an area where pedestrians frequent. Multiple voluntary cleanups of this area have been conducted, and the conditions still remain, as shown in the attached photo. As such, the City needs full access to the area to adequately address the various sanitation and obstruction issues explained above.

For these reasons, it would be a fundamental alteration to allow a 10 foot by 35 foot encampment to remain in the area scheduled for cleaning. Ms. Yow is invited to propose an alternative location outside of the noticed area, or the City can evaluate the Murray and 9th location for a potential 3x3 accommodation after August 21. For any proposed location, the City requests that Ms. Yow provide further explanation regarding why Ms. Yow is requesting 350 square feet. I understand that she needs extra space for an art workspace to help her manage her disabilities, but it is unclear why this much space is needed or whether there are alternatives available to her that would not necessitate the creation of an art studio in the public

right of way. Absent this information the City cannot grant an accommodation to the City's 3x3 policy at this time. Please provide this requested information so we can assess a proposed accommodation.

**Regarding "5. Extended Time to Move,"** the City agrees to an extension, with a new compliance deadline for Ms. Yow of August 25. An extension beyond that date, however, would constitute a fundamental alteration because the City needs full access to the area to conduct necessary cleaning and address the recurring sanitation, potential rodent harborage, and pedestrian access concerns described above. Allowing the 10-by-35-foot encampment to remain would prevent the City from adequately accessing and cleaning the area and therefore would interfere with the City's ability to carry out this necessary operation.

**Regarding "6. Replacement of Essential Property,"** while the City hopes that Ms. Yow will relocate all of her possessions in time, including by scheduling assistance, the City agrees to provide replacements of survival gear that must be discarded during the abatement consistent with Judge Chen's order.

**Regarding "7. Cognitive and Communication Accommodations,"** yes, Ms. Yow may choose whom she wants to be present as an advocate in any conversation or interaction with staff. Ms. Yow should note that City staff may not always be able to wait for an advocate to participate when there is a need to communicate with her related to emergencies, health, or safety, and further written consent may be required due to confidentiality requirements applicable to certain City programs.

The City is unable to approve or deny the request for trauma-informed communication "consistent with best practices for individuals with complex trauma and mental disabilities" as submitted because it does not identify a specific communication modification or accommodation being requested. The phrase "trauma-informed communication" is a broad concept that may encompass a variety of communication practices rather than a single, objectively defined accommodation. As a result, the City cannot agree to provide an unspecified accommodation.

If you are requesting a particular communication modification that is related to Ms. Yow's disability, please identify the specific practice or practices you are requesting so that the City can evaluate whether they are reasonable accommodations under the ADA. In the meantime, as an alternative, City staff will agree to communicate needed information as clearly, calmly, and straightforwardly as practicable, with the aim of minimizing unnecessary stimulation while still carrying out their official duties and communicating information necessary for City operations.

I already met with Ms. Yow once, on 8/11/26. At that time I conducted an initial assessment of the block on which she has proposed to remain and discussed a potential location I identified where it appears that a future placement of her proposed footprint would not pose accessibility issues. I would like to note that when I first approached Ms. Yow's campsite there were two off-leash dogs in her area that acted quite menacingly toward me, which was alarming. I understand that at least one of these dogs has a documented bite history. I will only conduct future meetings with Ms. Yow if she first puts the dogs on a leash or otherwise restrains them.

Under these conditions and on a pre-schedule basis, I am available to meet with Ms. Yow again, if needed, to discuss reasonable accommodation requests and can work to structure those meetings in a low-stimulation manner where possible. In the context of encampment enforcement, the City intends to provide further notice prior to abatement and encourages Ms. Yow to coordinate in advance with HRT regarding packing, moving, and/or storage. The City cannot guarantee that any enforcement-related interaction in an outdoor encampment setting will be low stimulation due to the inherent nature of those environments.

If you are unsatisfied with this determination, you are free to submit an ADA Grievance. Instructions for

lodging ADA Grievances can be found here: https://berkeleyca.gov/your-government/our-work/disability-compliance-program.

Best,

**Thomas Gregory / ADA Program Coordinator**
City of Berkeley, Public Works Department
1947 Center Street, 5th Floor
Berkeley, CA 94704

(510) 981-6418

---

**From:** Gregory, Thomas <TGregory@berkeleyca.gov>
**Sent:** Friday, August 14, 2026 3:34 PM
**To:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
[Quoted text hidden]

[Quoted text hidden]

---

**Gregory, Thomas** <TGregory@berkeleyca.gov> Thu, Aug 20, 2026 at 2:23 PM
To: Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
Cc: "Radu, Peter" <pradu@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>, "advocacy@wdwg.org" <advocacy@wdwg.org>

Yesica, I typed two errors in my message immediately below...apologies.

Both errors fall under the rubric of "**Regarding "4. Exemption from the 3x3 Rule**":

- Where I typed "August 14-21" I should have typed: August 21-28, and
- Where I typed "August 21" I should have typed: August 28.

If this correction is unclear, please do not hesitate to ask me for any further clarification you might desire.

Best,

**Thomas Gregory / ADA Program Coordinator**
City of Berkeley, Public Works Department
1947 Center Street, 5th Floor
Berkeley, CA 94704

(510) 981-6418

---

**From:** Gregory, Thomas <TGregory@berkeleyca.gov>
**Sent:** Thursday, August 20, 2026 2:08 PM
[Quoted text hidden]

[Quoted text hidden]

---

**Berkeley Homeless Union** <berkeley.homeless.union@gmail.com> Tue, Aug 25, 2026 at 4:10 PM
To: "Gregory, Thomas" <TGregory@berkeleyca.gov>
Cc: "Radu, Peter" <pradu@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>, "advocacy@wdwg.org" <advocacy@wdwg.org>

Hi Mr. Gregory,

Thank you for your email regarding Ms. Yow's accommodation request, and for your correction regarding the dates. I write to respond to several points raised in your determination and to provide additional information as requested.

**1. Pause on Enforcement Pending Interactive Process:** You stated that the City "is confident that it can complete the interactive process vis a vis Ms. Yow's requests prior to any abatement actions impacting Ms. Yow's current campsite."

Response: We appreciate this assurance. However, we request that the City provide a written confirmation that no abatement action will occur against Ms. Yow until the interactive process is complete and the City issues a written determination on all her accommodation requests, including the exemption of the 3'x3' rule.

**2. Designation of a Stable Location:** You denied this request, stating that "the identification of sites suitable for camping is not a service the City provides, nor is it a service that the ADA or any court ruling requires the City to provide."

Response: We respectfully note that Ms. Yow's request is not for a "camping map" or "enforcement-free zone"—it is for the City to engage in the interactive process to identify a lawful location where she can relocate and be exempted from the 3x3 rule. We expect that she will not be subject to serial evictions on her new location, as noted by the Court, and can establish some stability.

**3. Exemption from the 3x3 Rule:** You denied Ms. Yow's requested exemption at her current location, citing the City's need to clean the area from August 21-28.

Response: You noted in your determination that you "conducted an initial assessment of the block on which she has proposed to remain and discussed a potential location I identified where it appears that a future placement of her proposed footprint would not pose accessibility issues." We would like to discuss this potential location with you further.

**Could you please provide more detail about where this location is and what footprint could be accommodated there? Is this location ready for her to move into today?**

Please let us know so we can schedule the relocation assistance with Okeya.

You also requested further explanation regarding why Ms. Yow is requesting 350 square feet. Ms. Yow is requesting a footprint of 10 feet wide by 35 feet long to accommodate: (1) a tent large enough for her to stand in, with room for her emotional support dog, belongings and space to sleep and rest; (2) space to store her art projects and keep her supplies, which is essential to managing her PTSD by providing emotional regulation, stability and a sense of purpose; (3) storage for essential survival equipment, clothing, and personal items; (4) sufficient space to move within her footprint without feeling cramped or tripping over her belongings, which is important for managing her anxiety and PTSD symptoms; and (5) adequate space for her emotional support dog to rest and move comfortably.

If the City is not willing to approve the full 10' x 35' footprint, we request that the City propose the maximum footprint available, consistent with the methods of previous location assessments for our members. Please provide a written determination on the approved footprint and location.

**4. Extended Time to Move:** You granted an extension to August 25, but stated that “an extension beyond that date would constitute a fundamental alteration.”

Response: We appreciate the extension to August 25. However, given that Ms. Yow has not yet received a final determination on her 3x3 exemption, we respectfully request a further extension so that Ms. Yow can receive a full determination on her accommodations before being required to move. This would ensure that the interactive process has concluded before any abatement actions occur.

**5. Replacement of Essential Property:** You stated that the City "agrees to provide replacements of survival gear that must be discarded during the abatement consistent with Judge Chen's order."

Response: We appreciate this confirmation. We ask that the City provide Ms. Yow with the largest tent it can provide, as well as replacements for any other essential survival equipment that is destroyed. The Final Judgment requires replacement of "essential survival property — including tents, sleeping gear, and basic clothing." (Dkt. 326 at 4).

**6. Cognitive and Communication Accommodations:** You approved Ms. Yow's request to have a BHU advocate present, but denied "trauma-informed communication" as vague.

Response: Thank you for the clarification. We request that the City honor “its documented commitments to accommodate communication-related disabilities during the interactive process and other discussions with disabled BHU members, including documenting a member’s known communication needs and triggers and employing patient, low-stimulation communication consistent with City staff training and claimants’ individual needs.” (Dkt. 326 at 3-7).

**7. Meeting Conditions Regarding Dogs:** You stated that you will only conduct future meetings with Ms. Yow if she first puts her dogs on a leash or otherwise restrains them.

Response: We understand your concern and will inform Ms. Yow of this requirement. Please note that it is important to take precautions as you would with any dog you encounter on the street—the dogs are very protective of Ms. Yow and have barked at me as well. Her dogs are her emotional support animals and are essential to managing her PTSD.

We also note that you have already met with Ms. Yow once (on August 11, 2026) and conducted an initial assessment of the block. We would like to follow up on that discussion and would welcome another meeting at the location you identified. Please let us know your availability.

We look forward to continuing the interactive process and receiving your written determination on Ms. Yow's requested accommodations.

Thank you,

**Yesica Prado**
Berkeley Homeless Union Representative

[Quoted text hidden]

---

**Gregory, Thomas** <TGregory@berkeleyca.gov> Tue, Aug 25, 2026 at 6:56 PM
To: Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
Cc: "Radu, Peter" <pradu@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>, "advocacy@wdwg.org" <advocacy@wdwg.org>

Hi Yesica,

Below, I am clarifying the areas of my email that you have misinterpreted.

Regarding your first enumerated item, as I previously explained, the City has completed the interactive process regarding Ms. Yow's requests. While further discussion can be had regarding the size of footprint she would like to maintain, that is separate from the accommodations related to the abatement, which you have been provided final determinations for.

Regarding your second enumerated item, while the City is open to specific requests for non-enforcement of the 3'x3' rule as an ADA accommodation at specific sites, the City does not identify sites suitable for camping, nor has it been ordered to do so.

Regarding your third enumerated item, you are incorrect. I have not "denied Ms. Yow's requested exemption at her current location." I evaluated a site on the south side of Murray, about 80-100 feet west of the site you identified below in this thread as Ms. Yow's current campsite ("Murray Street and 9th Street (near 1000 Murray St, Berkeley, CA 94710)"). I have already informed Ms. Yow that her requested 10' x 35' footprint could fit, and I have informed you that she may return to the location after the City obtains full access to the area to clean and address hazards. No further assessment is possible or necessary at this time as the City first needs to clean the area and address the hazards present. Ms. Yow may return after August 28, once the City has had an opportunity to clean the streets and sidewalk as soon as operationally feasible due to multiple recent community member reports involving accumulating trash, dumped furniture and other unwanted items, and rotting food, which all contribute to potential rodent harborage. There are also reports of oversized items blocking pedestrian access in an area where pedestrians frequent. Further assessment would only benefit from the area being cleared of these hazardous conditions. Multiple voluntary cleanups of this area have been conducted, and the conditions still remain, as shown in the attached photo. As such, the City needs full access to the area to adequately address the various sanitation and hazardous obstruction issues explained above.

While the City expects Ms. Yow to temporarily relocate so it can address the issues explained above, I am glad to continue discussing the requested footprint. I would like to better understand why Ms. Yow's disabilities necessitate a footprint of 350 square feet. Specific info that I'm seeking includes: how much surface space do her art supplies occupy? How much surface space do her completed art works occupy? How much space is required for her to work on new art works?

I do not need to meet with BHU or Ms. Yow. If BHU and/or Ms. Yow would like to meet with me, on

Murray Street or elsewhere, please propose a time slot or three, after August 28. I hope that you will share this email chain with Ms. Yow, as you have not provided me with direct contact information for her.

Best,

**Thomas Gregory / ADA Program Coordinator**
City of Berkeley, Public Works Department
1947 Center Street, 5th Floor
Berkeley, CA 94704

(510) 981-6418

---

**From:** Berkeley Homeless Union <berkeley.homeless.union@gmail.com>
**Sent:** Tuesday, August 25, 2026 4:10 PM
[Quoted text hidden]

[Quoted text hidden]

---



**Murray.jpg**
169K

---

**Berkeley Homeless Union** <berkeley.homeless.union@gmail.com> Tue, Aug 25, 2026 at 11:05 PM
To: "Gregory, Thomas" <TGregory@berkeleyca.gov>
Cc: "Radu, Peter" <pradu@berkeleyca.gov>, "Vance-Dozier, Okeya" <OVance-Dozier@berkeleyca.gov>, "advocacy@wdwg.org" <advocacy@wdwg.org>

Mr. Gregory,

I appreciate the clarifications you provided, though I must respectfully disagree with your characterizations. Despite the Court's clear directives, the City appears to be engaging in a pattern of non-compliance that we believe requires immediate attention. Please see below:

**1. The interactive process is not concluded**

You state that the City has "completed the interactive process" regarding Ms. Yow's requests.

Response: The interactive process cannot be considered complete when *the City is still requesting additional information* regarding the size of Ms. Yow's footprint and has not issued a final written determination of the location for this exemption that Ms. Yow can accept or appeal.

As the Court held, the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." (Dkt. 288 at 21).

The City's ongoing request for information and continued evaluation of the proposed location demonstrates that the interactive process is, in fact, ongoing. We are willing to continue providing information, as this is part of "undergoing this investigative process."

We request that the City provide a written confirmation that no abatement action will occur against Ms. Yow until the interactive process is complete and her accommodations are provided.

**2. Exemption from the 3x3 rule**

You stated that you have not denied Ms. Yow's requested exemption and that you identified a site on the south side of Murray, about 80-100 feet west of her current location, where her requested 10' x 35' footprint "could fit." However, you also require Ms. Yow to vacate the area for cleaning and state that she "may return after August 28."

Response: Please note that these instructions do not make sense in light of the Court's order, which requires:

*"The City shall not enforce Administrative Regulation 10.2 or any other sidewalk-space limitation in a manner resulting in the destruction of a BHU member's tent or shelter unless the City first conducts an individualized assessment accounting for the member's disability-related needs."* (Dkt. 326 at 4; Dkt. 288 at 72-73)

We appreciate that you have identified an alternative location, but we are concerned that Ms. Yow's property *will be destroyed during the abatement* before she receives her accommodations. As you pointed out, Ms. Yow needs to relocate, but you are not approving her relocation before the abatement. This is problematic because you will be enforcing against her while ignoring the ADA.

The Court's orders require the City to provide accommodations as part of the abatement process, not as an afterthought. Forcing members to vacate without approved accommodations violates the Court's orders.

We also note that the cleaning dates have shifted multiple times, which creates further uncertainty for Ms. Yow and demonstrates that the City can be flexible in conducting this abatement. The City has also not engaged in targeted solutions to mitigate the problems you raised.

**3. Additional measurements**

You requested specific information about Ms. Yow's art supplies and workspace to better understand why she requires 350 square feet.

Response: I do not understand why you need this information. It has not been required of me to measure the belongings of our members to request a footprint assessment. I have already provided you with the information on why her footprint is needed as it relates to her disability, as the Court required.

Could you please clarify why you need additional measurements?

**4. Replacement survival gear and moving assistance**

You have not addressed these two accommodation requests.

Response: Could you provide clarification on when these will be provided?

**5. Meeting in-person**

You stated that you do not need to meet with BHU or Ms. Yow.

Response: While we respect your preference, we believe an in-person meeting would be beneficial to ensure Ms. Yow's needs are fully understood and to finalize the details of her accommodation. We request that a meeting be scheduled tomorrow (8am to noon) or Thursday (anytime) at the location you identified, if possible, so that Ms. Yow can see the site and discuss any remaining concerns directly.

If you are unwilling to meet, we respectfully ask that you provide a written determination on the approved footprint and location, including written confirmation that Ms. Yow may relocate to the site before the abatement operations.

Please note, if we do not receive this confirmation, we will have no choice but to bring this matter to the Court's attention. We are not seeking to escalate this matter unnecessarily, but the Court's orders are clear, and BHU members are entitled to the protections that have been granted before any abatement actions occur.

Thank you for your attention to this matter.

Sincerely,

**Yesica Prado**
Berkeley Homeless Union Representative

[Quoted text hidden]

# Exhibit G

## Picture of Ms. Yow's destroyed property on August 26, 2026












core






ABSOLUTELY ALMOND POUND CAKE MIX
TASTEFULLY SIMPLE
Just add butter and water
NET WT 16 OZ (1 LB) 453g
SANGARIA
Ramune
Naturally Flavored
ORANGE
SunX30
THE TIRE HOUSE BOOK
ED PASCHICH and PAULA HENDRICKS
FIRST PARTNER


YOGURT
KOLIOS
FETA


DEERE
2039


HOKA


BICYCLE BOULEVARD
NINTH STREET
Emeryville 0.1
Station 0.9
ECOLAB






FROZEN BEST BY 2026
STRAUS
ORGANIC
ORGANIC
ICE CREAM
BASE
Item # 2245
15% Ice Cream
Base
Other

# Exhibit H

## Harrison Street Closure Public Notice for Sept. 8, 2026

CITY OF BERKELEY

City Manager's Office

# PUBLIC NOTICE

Date Posted: August 25, 2026

To: Persons encamped and/or parked in the geographic area of Berkeley bounded by San Pablo Avenue to the East, the Railroad tracks to the West, Codornices Creek to the North, and Gilman St to the South ("Harrison Corridor")

From: City of Berkeley

Subject: **Notice of Encampment Closure**

Please be advised that this location is within a no-lodging area and Temporary Non-Commercial Item (TNC) Prohibited Area. You are not permitted to lodge here or store personal property here, pursuant to California Penal Code Section 647(e) and City of Berkeley Administrative Regulation 10.2. The Berkeley Fire Marshal has declared this area a fire hazard and public nuisance, as described in the July 27, 2026 Notice of Fire Hazard and Order to Vacate, Correct, and Demolish. Additionally, the City of Berkeley's Public Health Officer has advised that rodent abatement is necessary to prevent further spread of Leptospirosis which is present in this area. As such, **all tents, structures, or other items on the streets and sidewalks must be removed by September 8, 2026. Vehicles are not required to relocate, but property left on the streets or sidewalks around vehicles must be brought inside vehicles or otherwise removed.**

**Please clear all property from the TNC Prohibited Area described above and in Attachment 3 by SEPTEMBER 8, 2026.** All personal property in the above location will be subject to removal on or after this date. **The City will store property that is not plausibly contaminated and is storable pursuant to the conditions described below.** Everyone living in this area must either vacate the area or remain inside their vehicles during the City's abatement work. Failure to comply with this notice may result in citation or arrest.

The City's primary goal is to end encampments by moving all people indoors. Those interested in shelter or permanent housing should refer to Attachment 2.

**PROPERTY STORAGE AND RETRIEVAL**

Please keep with you all necessary personal belongings and shelter items; the City will not prevent you from retaining your tent or any other property. The City will discard items you no longer wish to keep at your request. **Personal property left in this area may be collected and stored pursuant to the City's policy, if it meets certain requirements, described below. Property remaining at this location after September 8, 2026, which is not storable will be discarded.**

In this instance, the Public Health Officer has advised that it is hazardous for City staff to sort through items from this encampment, due to the presence of Leptospirosis. As such, City staff will not sort through items; you must present non-hazardous items in bins, bags or other containers provided by the City to City staff for storage. The City will also store individual, non-porous items that are clean and dry, if they are presented to City staff separately from other wet, muddy, or hazardous items. **The City will not store property that is plausibly contaminated with Leptospirosis or otherwise hazardous to store.**

If you have not already received bins from the City, you can request two 20-gallon bins per person to pack your belongings. Please speak to HRT staff who regularly visit the encampment, or Josh Jacobs (email: jjacobs@berkeleyca.gov, phone: 510-225-8035).

Property that is storable pursuant to City policy will be held for 90 days. **Individuals who wish to reclaim their property may call "311" to contact the City's Customer Service Center during regular business hours (Monday – Friday, 9:00 AM to 3:00 PM), or call (510) 981-2489 or (510) 981-CITY.** Alternatively, information regarding retrieval of unattended and stored property is available in the lobby of the Berkeley Civic Center, 2180 Milvia Street, Berkeley, during regular business hours.

**REPLACEMENT OF DISCARDED SURVIVAL GEAR**

In compliance with the summary judgment order in *BHU v. City of Berkeley*, the City will replace tents, sleeping bags, and clothing ("survival gear") that it must discard as part of the abatement. To request specific tent and clothing sizes, please speak to HRT staff who regularly visit the encampment, or Josh Jacobs (email: jjacobs@berkeleyca.gov, phone: 510-225-8035). If the City does not have sufficient tents, sleeping bags, or clothing in your size on the day of the abatement, you will receive a voucher that you can present to the City for these items on a later date.

**While the City hopes that residents will relocate their property prior to the abatement, Homeless Response Team staff will be on site to facilitate replacement of any survival gear that is destroyed.** Please reach out to them if you are impacted. HRT staff will be on site throughout the day of the abatement and can be identified by their City of Berkeley branded clothing. Because the team will move with the work as it progresses, they will not be stationed at a single fixed location.

**DISABILITIES AND REASONABLE ACCOMMODATIONS**

You have the right under the Americans with Disabilities Act to request a reasonable accommodation (i.e., a modification of standard City policy, procedure, and/or practice) if your disability prevents you from complying with this notice. To request a reasonable accommodation, please contact the City's ADA Coordinator (email: ada@berkeleyca.gov, phone: 510-981-6418, TTY/TDD: 510-981-6347, and street address: 1947 Center St., 4th Floor, Berkeley 94704). The City will work with you to identify a mutually agreeable accommodation based on your needs and the goals of this notice but may determine that the requested accommodation cannot be provided if it would fundamentally alter the nature of a City service or is an unreasonable accommodation. **Please make any accommodation requests as soon as possible so there is enough time to discuss possible solutions. In order to ensure enough time for the City to discuss solutions with you, you are encouraged to submit your request no later than SEPTEMBER 1, 2026.**

**For individuals with disabilities that require the following accommodations, the City will provide, at your request:**

- Limited packing assistance, for any items that the City determines are safe to be handled by staff
- Storage of bins and any other items City determines are safe to be handled by staff
- Relocation assistance, for any items that the City determines are safe to be handled by staff
- Accommodation to the "9-square-foot" rule, provided your new campsite does not obstruct pedestrian passage, property access, emergency access, or present a concrete public health or safety hazard. Please request this by September 1, so the City has time to review your request.
- A tent size larger than a 2-person tent

---

**LODGING WITHOUT PERMISSION PROHIBITED**

You are hereby notified that Penal Code 647(e) provides that a person "[w]ho lodges in a building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it" is guilty of a misdemeanor.

**Lodging is prohibited on all streets, sidewalks, and other public rights-of-way in the geographic area north of Gilman St, West of San Pablo Ave, East of the railroad tracks, and south of Codornices Creek. Lodging is also prohibited in the creek bed of Codornices Creek.**

**SIDEWALK NUISANCE CONDITIONS**

You are hereby notified that pursuant to **Berkeley Municipal Code 14.48.020**, "It is unlawful for any person to place or cause to be placed anywhere upon any sidewalk or roadway, any object which obstructs, restricts, or prevents the use of any portion of such sidewalk or roadway."

You are further notified that pursuant to **Berkeley Municipal Code 14.48.120 and Administrative Regulation 10.2**:

- "TNC Objects are prohibited on Sidewalks in Residential Districts, except Objects in Transit pursuant to BMC §14.48.030 or as otherwise specifically authorized by the BMC."
- "TNC Objects may not be placed in TNC Prohibited Areas." A TNC Prohibited Area is defined as "a public location where notices have been posted in reasonably visible locations delineating a geographic area where TNC Objects are prohibited."

You are further notified that pursuant to **Berkeley Municipal Code 14.48.160**, "Anything placed or permitted to remain upon any sidewalk or roadway in violation of this Chapter, is declared to constitute a nuisance and the City is authorized and empowered to abate such nuisance by removing the same to the custodian of lost property in the Police Department or the Corporation Yard of the City, or other location designated by the City."

ATTACHMENT 1

# FACT SHEET

- This area has been declared a no-lodging area and a TNC Prohibited Area.
  - Lodging is prohibited on all streets, sidewalks, and other public rights-of-way in the geographic area north of Gilman St, West of San Pablo Ave, East of the railroad tracks, and south of Codornices Creek. Lodging is also prohibited in the creek bed of Codornices Creek.
  - Personal property cannot be stored on the streets, sidewalks, or other public rights-of-way in TNC Prohibited Areas.
- Leptospirosis is present in this area and relocation is necessary for your own safety and to allow for rodent abatement.
- **Vehicles are not required to relocate at this time.**
- You have until SEPTEMBER 8, 2026 to find another location for yourself and your belongings. By this date, you must leave the encampment and take anything with you that you want to keep. The City may come to clean up and permanently close this encampment at any time after SEPTEMBER 8, 2026 without further notice.
- The City will not store any property left in this area after SEPTEMBER 8, 2026 that is wet, moldy, otherwise hazardous to store, or plausibly contaminated with Leptospirosis. You can collect items stored by the City for 90 days.
- The City will replace survival gear that is discarded by the City; reach out to HRT staff if you are impacted. HRT staff will be on site during the abatement and can be identified by their City of Berkeley branded clothing.
- You can request tubs, specific replacement tent and clothing sizes by contacting HRT staff on site, or by emailing or calling Josh Jacobs (email: jjacobs@berkeleyca.gov, phone: 510-225-8035).
- The City's primary goal is to end encampments by moving all people indoors. Those interested in shelter or permanent housing should refer to Attachment 2.

## ATTACHMENT 2

The City of Berkeley's primary goal is to end unsheltered homelessness by connecting those living in this encampment to interim and permanent housing.

*Interim Housing*

The City has a limited number of shelter beds available. Those interested in shelter can:

- Talk to a member of the Homeless Response Team (HRT) at any point during their regular outreach to this encampment.
- Call **211** or 1-800-799-7233 or 1-800-787-3224 (TTY) for services, shelter and housing information. 211 Alameda County is available 24 hours a day, seven days a week.
- Visit in person:
  - North County Housing Resource Center (homeless adults only):
    - **Bay Area Community Services**
      **Drop-in hours:** Monday, Friday, Saturday: 9:00 am – 5:00 pm
      Tuesday, Wednesday, Thursday: 9:00 am – 6:00 pm
      **Address:** 2809 Telegraph Avenue Suite 202, Berkeley, CA 94705
      **(510) 495-0131**
  - North County Housing Resource Center (homeless families only):
    - **Women's Daytime Drop-in Center**
      **Food and hygiene services:** Monday – Friday 9:00 am – 2:00 pm
      **All other services:** Monday – Friday 8:00 am – 4:00 pm
      **Address:** 2218 Acton Street, Berkeley, CA 94702
      **(510) 548-2884**

*Permanent Housing*

By Federal regulation, the City of Berkeley does not control access/referrals to permanent supportive housing for people experiencing homelessness, even for those housing programs located within the City. Alameda County, through its Coordinated Entry process, oversees these referrals. However, the Homeless Response Team can assess people for eligibility and help connect anyone interested. During the Coordinated Entry assessment, the HRT will ask you about your:

- History of homelessness
- Barriers to housing (prior evictions, length of time since last lease)
- Disability and vulnerability

Providing full and honest answers will help ensure you are matched to the most appropriate services for your needs.

Anyone interested in a Coordinated Entry Assessment should:

- Talk to a member of the Homeless Response Team (HRT) at any point during their regular outreach to this encampment.
- Email homelessresponseteam@berkeleyca.gov to request a housing assessment. Please provide a phone number and/or a location and date/time the team can use to locate you.

## ATTACHMENT 3



CITY OF BERKELEY

Health, Housing, and Community Services Department

**Noemi Doohan, MD, PhD, MPH**
Public Health Officer – Director

**Scott Gilman**
HHCS Director

# CITY OF BERKELEY PUBLIC HEALTH UPDATE

## Addressing Leptospirosis at Harrison Street Encampment

June 10, 2026

**ALERT –** conveys the highest level of importance; warrants immediate action or attention.

**ADVISORY –** provides important information for a specific incident or situation; may not require immediate action.

**UPDATE –** provides updated information regarding an incident or situation; unlikely to require immediate action.

### I. KEY MESSAGES

- **Risk to the General Public Remains Extremely Low:** as an update to the January 12, 2026, Health Alert[1], risk of contracting leptospirosis from rats remains very low for the vast majority of Berkeley residents and business owners.
- **Risk to people living in encampments, RVs, or other locations with a high burden of rats infected with Leptospirosis:** people who have had exposure to rats and show symptoms of illnesses should seek medical care and treatment quickly.
- **The best way to protect dogs** Vaccination for dogs against Leptospirosis is considered a core annual vaccine by the Animal Hospital Association – a respected industry standard
- **Harrison Street Status & Mitigation Data:** No human cases have been associated with encampments on and around Harrison Street, and no new canine infections have been reported to public health since the first two in late 2025.
- **Recent Human Cases Identified**: Two human Leptospirosis cases were identified in May 2026 in the City of Berkeley. Both individuals had been living in a severely rat-infested RV about one mile from the Harrison Street encampment. Tragically, one of the patients died and one recovered after a lengthy

[1] https://berkeleyca.gov/sites/default/files/2026-01/January 12%2C 2026 Lepto Health Alert Final.pdf

hospitalization. Both patients had delayed access to medical care which is thought to have contributed to the severity of their disease. These are the first human cases of Leptospirosis in Berkeley in more than a decade. These human cases highlight the potentially serious health risk to humans living in environments with rat infestations. Exposure to rats infected with Leptospirosis poses a potentially serious health risk to humans and dogs.

- **Based on environmental and clinical data, the City is retiring the Harrison street encampment geographic risk zones** ("Red" and "Yellow" zones) established in this January 12th Public Health Alert. Given this new evidence that high-Leptospirosis-positive rat populations are not limited to the Harrison Corridor, the city is now shifting to a broader citywide prevention strategy focused on high-risk environments including RVs and encampments with rat infestations. The Berkeley Public Health response is pivoting away from localized geographic containment to citywide sanitation, vector suppression, and targeted hygiene outreach for individuals experiencing unsheltered homelessness, vehicle residency or who are otherwise living in heavily rodent infested environments.
- **Vector Control, in conjunction with Commercial Pest Control services, should exterminate rats in areas with a high rate of Leptospirosis in rats**. The general public should not attempt to exterminate rats: If the public suspects rat infestation in an area with risk of Leptospirosis, they should contact their pest control vendor or Alameda County Vector Control Services at (510) 567-6800.
- **What has the City of Berkeley done to mitigate the risk of Leptospirosis in humans and dogs at the Harrison Street encampment?**
    - Environmental testing conducted by UC Davis researchers in February 2026 detected no Leptospirosis in Codornices Creek. A total of 11 water samples and 11 mud samples were collected from the creek.
    - 14 Dogs at the Harrison street encampment were tested by UC Davis researchers and all were negative for Leptospirosis. Owners were also offered free vaccination to protect their dogs against future exposure to Leptospirosis.
    - Debris Removal: The City has removed 40 tons of garbage since February 2026 from the Harrison Street encampment in an attempt to minimize environmental conditions that attract rats.
    - Direct Community Outreach: Public health staff conducted 5 educational outreach events directly with occupants of the Harrison Street encampment to provide housing resources, clean clothing, personal protective equipment (PPE), and clear guidance on minimizing exposure risks. Ongoing efforts, including distribution of educational material directly to homeless individuals, are underway (see attached informational flyer).
    - **Ongoing Surveillance:** The City of Berkeley, in partnership with Alameda County Vector Control, have been continuously trapping and testing rats for Leptospirosis at the Harrison street encampment and in the area where the RV was parked with the two human cases (1 mile from Harrison Street encampment). This new testing has continued to show a high prevalence of Leptospirosis in the rats tested, which is above expected baseline levels in California urban rat populations.

**Public Health Contact Information**

For community questions on leptospirosis please contact the City of Berkeley Lepto Information Line: (510) 981-5460 or Email: leptoinformation@berkeleyca.gov.

To request Vector Control Services please contact Alameda County Vector Control Services. (510) 567-6800.

HEALTH, HOUSING & COMMUNITY SERVICES
Public Health

CITY OF BERKELEY

June 10, 2026

# RV and Encampment Occupants: Rat Advisory

## *Keep food and water in closed containers; avoid exposure to wild rats; seek treatment quickly*

Wild rats carry a variety of diseases. People and dogs can get infected through contact with wild rats and their urine, feces, saliva, bites or scratches. Rats can also carry ticks, mites, or fleas that can spread diseases. Do not poison rats as they often wander into open areas before dying. These Carcasses can be deadly to pets or wildlife.

Rat-borne diseases are monitored around encampments in the City of Berkeley by Alameda County Vector Control and include the following:

- Leptospirosis
- Flea borne typhus
- Salmonellosis

## TAKE STEPS TO LOWER RISK

The best way to prevent transmission of disease by rats in your area is to:

- Keep food and water in closed containers
- Minimize trash and items that could create rat nests
- Avoid exposure to rats or their body fluids

## IF YOU DO NOT FEEL WELL, SEEK TREATMENT QUICKLY

If you have been around or in contact with rats AND you feel sick, get medical help quickly and inform your medical provider that you have been exposed to wild rats.

If you do not have a Primary Care Provider or are a LifeLong Medical Care Patient:

- Call: Berkeley Trust Health Center (510) 486-3463
- Operating Hours:
  - Monday-Friday 8:30am -4:30pm, except Tuesday when hours are 10:00am-4:30pm
  - 830 University Ave, Berkeley, CA (Near the corner of University Ave and Sixth Street)

For questions contact the City of Berkeley Lepto information line: (510) 981-5460

CITY OF BERKELEY

# Leptospirosis: Recommendations for the general public

**Leptospirosis is a sickness caused by bacteria that lives in water that can spread to people and dogs. You can get it from water, dirt, or food that was infected by the urine of infected rats or dogs**



**Wear protective clothing**



**Cover scratches or cuts with waterproof bandages**



**Don't wade or swim in potentially contaminated water**



**Wash or shower after potential exposure**



**Clean your wounds**



**Don't touch sick or dead animals**



**Consume clear, clean, drinking-water**



**Wash fruits and vegetables picked from gardens or farms in this area**

**Leptospirosis is treatable. The disease is transmitted to humans and animals when the contaminated water touches mucous membranes – such as eyes, nose, mouth, or cuts to the skin. Most people have no symptoms. However, if you think you were exposed in this area and have flu-like symptoms – fever, chills, headache, red eyes, and muscle aches – contact your primary care provider, such as the one listed on your Medi-Cal card for an urgent appointment.**

**If you do not have a medical provider, contact Lifelong Trust Health Center for screening and treatment**
**830 University Ave., Berkeley, CA 94710**

**Berkeley Public Health Leptospirosis voicemail to leave tips, questions: 510.981.5460, leptoinformation@berkeleyca.gov**

Updated June 5, 2026