Farimah Faiz Brown, City Attorney (State Bar No. 201227)
Katrina Eiland, Assistant City Attorney (State Bar No. 275701)
Laura Iris Mattes, Deputy City Attorney (State Bar No. 310594)
Nubyaan Scott, Deputy City Attorney (State Bar No. 331584)
Sara Stephens, Deputy City Attorney (State Bar No. 300589)
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile: (510) 981-6960
Email: FBrown@berkeleyca.gov
KEiland@berkeleyca.gov
LMattes@berkeleyca.gov
NScott@berkeleyca.gov
SStephens@berkeleyca.gov

Attorneys for Defendant
CITY OF BERKELEY

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BERKELEY HOMELESS UNION,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BERKELEY, et al.<br><br>Defendants. | **Case No. 3:25-CV-01414-EMC**<br><br>**JOINT STATUS REPORT**<br><br>Status Conference<br>Date: September 8, 2026<br>Time: 1:30 PM<br>Judge: Hon. Edward M. Chen |

Pursuant to the Standing Order for All Judges of the Northern District of California and Civil L. R. 16-9, and the Court's August 28, 2026, Order, Dkt. No. 331 ("Order"), Defendant City of Berkeley (the "City") and Plaintiff Berkeley Homeless Union ("BHU") submit this Joint Status Report.

## DEFENDANT CITY OF BERKELEY'S STATEMENT

### EXECUTIVE SUMMARY[1]

| Name | Pending Accommodation Request | City of Berkeley's position | BHU's position[2] |
|---|---|---|---|
| **1.** Alice Barbee | 11' x 30' at 1281 University Avenue (City-owned lot) | Not a reasonable accommodation of 3x3 policy: camping on City real estate is outside scope of Court order and AR 10.2; would require creation of new program; constitute an undue burden and fundamental alteration. | Reasonable. Space for shelter, survival gear, medical supplies, and three emotional support animals. |
| **2.** Hector Navarro | 10' x 25' at 1901 Henry Street (City-owned lot) | See #1 (City-owned lot) | Reasonable. Space for shelter, survival gear, medical supplies, and his caretaker. |
| **3.** Robbie Peddycoart | 11' x 30' at 1100 Fourth Street (City-owned Harrison House lot) | See #1 (City-owned lot) | Reasonable. Space for shelter, survival gear, mobility aids, medical supplies, and two emotional support animals. |
| **4.** Shawman | 11' x 20' at 1499-1451 Second Street (behind K-rails) | Not a reasonable accommodation of 3x3 policy: lodging prohibited here; fundamental alteration. | Reasonable. Space for shelter, survival gear and medical supplies. |
| **5.** Robert Pearce | 10' x 20' at 1100 Fourth Street (City-owned Harrison House lot) | See #1 (City-owned lot) | Reasonable. Space for shelter, survival gear and medical supplies. |
| 6. Thomas Barnett | 11' x 25' next to his car he uses for shelter, at 8th and Harrison St | Not a reasonable accommodation: no nexus provided; outside scope of court order (not a relocation request); personal property | Reasonable. Space for shelter, survival gear, mobility aids, and medical supplies. |

[1] This table has not been reviewed and approved by BHU. Plaintiff's Position includes Plaintiff's chart.

[2] This column is copied from Plaintiff's position.

| | | | |
|---|---|---|---|
| | | storage prohibited here; abatement planned; fundamental alteration | |
| 7. Jermaine Lee White | 11' x 30' at 1499-1451 Second Street (sidewalk behind K-rails) | See #4 (No lodging area) | Reasonable. Space for shelter, survival gear, medical supplies, and his emotional support animal. |
| 8. Erin Spencer | 11' x 30' next to his trailer he uses for shelter, at 8th and Harrison St | See #6 (request to store property outside vehicle in abatement area) | Reasonable. Space for survival gear, mobility aids, emotional support animals, art and medical supplies. |
| 9. Lewanda Parnell | 10' 1" x 45' at 9th and Camelia; approved | City already confirmed that this site meets minimum requirements as required by City policy and the Court's order regarding sufficient path of travel. | Reasonable. Space for shelter, survival gear, mobility aids, and medical supplies. |
| 10. Erik Alexander Coon | 10' x 20'; undecided location | N/A; no proposed location to assess. | Reasonable. Space for shelter, survival gear, mobility aids, and medical supplies. |
| 11. Alexander Wilson | 11' x 20' at 1100 Fourth Street (City-owned Harrison House lot) | See #1 (City-owned lot) | Reasonable. Space for shelter, survival gear, mobility aids, medical supplies, and his emotional support animal. |
| 12. Gregory Grove | 10' x 20' at 1499-1451 Second Street (sidewalk behind K-rails) | See #4 (No lodging area) | Reasonable. Space for shelter, survival gear, art and medical supplies. |
| 13. Bradford Raymer | 11' x 20' at 4th and Camelia St | Pending final footprint size, appears to meet minimum requirements as required by City policy and the Court's order regarding sufficient path of travel. | Reasonable. Space for shelter, survival gear, bicycle, medical supplies, and his emotional support animal. |
| 14. Lisa Saechao,y-chain | 10' x 20' at 2nd and Page St | See #4 (No lodging area) | Reasonable. Space for shelter, survival gear and medical supplies. |
| 15. Monique Williams | 3' x 8' outside her van, at 8th and Harrison St | Ms. Williams currently resides in shelter and uses the vehicle for storage. *See Prado v. COB* Dkt. No. 201. See #6 (request to store property outside vehicle in abatement area) | Reasonable. Space for survival gear and recycling materials. |
| 16. Kevin Martinez | 10' x 20' at undecided location | N/A; no proposed location to assess. | Reasonable. Space for shelter, survival gear and medical supplies. |
| 17. Patrick Ford | 11' x 30' at undecided | N/A; currently incarcerated; | Reasonable. Space for |

| | | | |
|---|---|---|---|
| | location | no location to assess | shelter, survival gear, mobility aids, medical supplies, and his two emotional support animals. |
| 18. Quinton Cocklereese | 11’ x 20’ at 2nd and Page St | See #4 (No lodging area) | Reasonable. Space for shelter, survival gear, mobility aids, medical supplies, and his emotional support animal. |
| 19. Jason Charette | 3’ x 8’ outside his RV at 8th and Harrison St | See #6 (request to store property outside vehicle in abatement area) | Reasonable. Space for survival gear |
| 20. Jackeline Mendoza | 11’ x 20’ at 4th and Camelia | No BHU authorization provided; denied the City’s offer for a 3x3 assessment during direct outreach, and no nexus provided. | Reasonable. Space for shelter, survival gear, bicycle, medical supplies, and her emotional support animal. |
| 21. Kittivutt Patanapanich | 3’ x 8’ outside their truck at 9th and Harrison St | See #6 (request to store property outside vehicle in abatement area); no BHU authorization provided; no nexus provided. | Reasonable. Space for survival gear and his emotional support animal. |
| 22. Erik Keiser | 10’ x 20’ at undecided location | N/A; no proposed location to assess; no nexus provided. | Reasonable. Space for shelter, survival gear, mobility aids, art and medical supplies. |
| 23. Merced Dominguez | 3’ x 8’ outside her RV at 8th and Harrison St | Request previously considered and denied in Court’s MSJ ruling at Dkt. No. 288. | Reasonable. Space for survival gear and supplies for her emotional support animals. |
| 24. Yesica Prado | 3’ x 8’ outside her RV at 8th and Harrison St | See #6 (request to store property outside vehicle in abatement area) | Reasonable. Space for survival gear, plants and a cat tree for her emotional support animal. |
| 25. Charles Dye | 10’ x 20’ at undecided location | N/A; no proposed location to assess; no BHU authorization provided. | Reasonable. Space for shelter, survival gear and medical supplies. |
| 26. Andrew Vanderzyl | 11’ x 25’ at undecided location | N/A; no proposed location to assess; no BHU authorization provided. | Reasonable. Space for shelter, survival gear, mobility aids, medical supplies, and his two emotional support animals. |
| 27. Ramondo Mackey | 11’ x 25’ at undecided location | N/A; no proposed location to assess; no BHU authorization provided. | Reasonable. Space for shelter, survival gear, medical supplies, and caretaker. |

| | | | |
|---|---|---|---|
| 28. Jonny Ruel Holder | 3' x 8' outside his SUV at 8th and Harrison St | See #6 (request to store property outside vehicle in abatement area) | Reasonable. Space for survival gear and his emotional support animal. |
| 29. Ray Johnson | 3' x 6' outside his car at 8th and Harrison St | See #6 (request to store property outside vehicle in abatement area) | Reasonable. Space for his bicycle, which cannot fit in the car while sleeping. |

## I. FACTUAL UPDATE

### A. BHU's Accommodation List

On August 28, the Court issued an Order Re Planned Abatement specifying that "[t]he abatement of the Harrison Encampment will proceed on or around September 8, 2026" and requiring BHU to submit any additional reasonable accommodation requests to the sidewalk space limitations (the "3x3 Rule") by September 1, 2026 at 5pm. The Court directed that BHU provide requests that describe the proposed footprint, reason why the individual's disability warrants the accommodation (or "nexus"), and encouraged requestors to list at least one to three preferred relocation areas.

BHU's September 1 list includes a total of 29 people, which encompasses the prior set of 23 individuals. Declaration of Nubyaan Scott ("Scott Decl.") ¶ 6. The 29 requesters fall into the following categories: (1) Seven people, most whom were previously on the list of 23 individuals, have provided no preferred location for the City to assess at all (listed as "undecided"); (2) Ten people have requested only a location on City-owned property or in an area designated as a No Lodging and/or No TNC Zone; (3) Three people have requested a location in the public right-of-way that the City has assessed and found to meet the minimum requirements in the Court's order and City policies; (4) Nine people's requests do not fall within the Court's August 28 order at all. *Id.* Indeed, they are not "preferred relocation areas" but are instead requests from people who purportedly live in vehicles in the Harrison Corridor, to store more than nine square feet of property outside their vehicles at their current location within the abatement area—an

accommodation this Court has already rejected.[3] *Id.*

No one identified more than one preferred relocation area, as the Court urged them to do. The sites identified for assessment, their status, and proposed sizes, are summarized below[4]: *Id.*

| LOCATION | STATUS | NAMES AND PROPOSED SIZES |
|---|---|---|
| 1281 University Ave. | City-owned lot | Alice Barbee (11x30) |
| 1901 Henry St. | City-owned lot | Hector Navarro (10x25) |
| 1100 Fourth St.<br>(Harrison House lot) | City-owned lot | Robbie Peddycoart (11x30)<br>Robert Pearce (10x20)<br>Alexander Wilson (11x20) |
| 1499-1451 Second St. | Right-of-way within a No-Lodging / TNC Prohibited Area | Shawman (11x20)<br>Jermaine Lee White (11x25)<br>Gregory Grove (10x20) |
| 4th and Camelia | Right-of-way | Bradford Raymer (11x20)<br>Jackeline Mendoza (11x20) |
| 2nd and Page St. | Right-of-way within a No-Lodging / TNC Prohibited Area | Lisa Saechao,y-chain (10x20)<br>Quinton Cocklereese (11x20) |
| 8th and Harrison St. | Right-of-way within a No-Lodging / TNC Prohibited Area | Thomas Barnett (Uses Car for Shelter) (11x25)<br>Erin Spencer (Uses Trailer for |

[3] Notably, the Court has already adjudicated and denied Ms. Dominguez's identical request, and Ray Johnson, who has also requested this accommodation, was previously omitted from the Court's ruling because of, among other things, BHU's lack of contact with him and information suggesting that he no longer resides in the Harrison Corridor.

[4] This table does not include the site already approved for Lewanda Parnell, nor does it include the seven individuals with "undecided" or unlisted locations.

| | | |
|---|---|---|
| | | Shelter) (11x30)<br>Monique Williams (Uses Van for Storage) (3x8)<br>Jason Charette (Uses RV for Shelter) (3x8)<br>Merced Dominguez (Uses RV for Shelter) (3x8)<br>Yesica Prado (Uses RV for Shelter) (3x8)<br>Jonny Ruel Holder (Uses SUV for Shelter) (3x8)<br>Ray Johnson (Uses Car for Shelter) (3x6) |
| 9th and Harrison St. | Right-of-way within a No-Lodging / TNC Prohibited Area | Kittivutt Patanapanich (truck) (3x8) |

**B. Meet and Confer**

On September 1, 2026, representatives of the City and BHU met telephonically to discuss compliance with the Court's Order. *Id.* ¶ 4. The City asked that BHU provide 1-3 sites per person on the public right of way, consistent with the Order. *Id*. The City stated that it would provide additional information regarding the only site requested on the public right of way at that time, at 4th and Camelia St, which it thereafter did. *Id.* ¶ ¶ 4, 11.

The City also asked BHU to provide signed authorizations for any new individuals requesting accommodations, as BHU had done for others, to confirm that they would like BHU to represent them in the interactive process. *Id.* ¶ 4. BHU provided a list later that day but failed to provide evidence that a number of the purported members authorized BHU to engage in the

interactive process on their behalf. *Id.* This omission is important because BHU representatives have provided materially incorrect information about its alleged members on prior occasions, including attesting in a declaration that a BHU member was living on the "outskirts" of the encampment, when in fact she had died months before. Dkt. No. 155. Furthermore, City staff have repeatedly received information directly from BHU members that conflicts with what BHU representatives have conveyed. Dkt No. 261 (explaining that the City received several accommodations requests from BHU on behalf of campers that denied having any disabilities when speaking directly with the City's ADA Coordinator). This leaves the City without a reliable basis to determine which account of an individual's disability-related needs is accurate or complete, particularly where the conflicting information could materially affect the accommodation provided.

## II. CITY'S POSITION ON PROPOSED RELOCATION SITES

### A. City-owned lots: 1281 University Ave., 1901 Henry St., and 1100 Fourth St.

The City cannot grant a 3x3 Rule accommodation to permit camping on the three proposed City-owned lots where overnight lodging is currently strictly prohibited, for numerous reasons. *First*, sanctioning camping on City-owned real estate was not contemplated in the Court's analysis of 3x3 Rule modifications. Requiring the City to grant an accommodation, not to the City's 3x3 policy, but rather to a strict prohibition on camping, would constitute a significant expansion of the Court's orders and present an entirely different claim for adjudication—one that the Court already decided against BHU on a related claim in its summary judgment order. Alternatively, if the Court believes there is daylight between its prior rejection of BHU's request for City-owned or City-sanctioned camping areas and its current request to require the City to permit certain BHU members to camp on City-owned lots, it would be a new claim that cannot be freshly adjudicated after judgment.

Indeed, the policies at issue in this case have been limited to the public right of way ("PROW"). Administrative Regulation 10.2 ("AR 10.2") regulates property kept on the PROW; it does not authorize or regulate storing such items on City-owned property. The 3x3 Rule within

AR 10.2 simply limits the space that property in the PROW can occupy.

In granting summary judgment for BHU, the Court's analysis was limited to BHU's requests for a modification of the 3x3 Rule, which applies only *on sidewalks*. Indeed, the Court defined the relevant program as "the City's maintenance of public roadways and sidewalks to ensure their functionality, orderly, use, and public health and safety. This includes use of roadways and sidewalks which serve as locations of abode for the unhoused . . . The definition also encompasses the fact that City streets and sidewalks have long been used as places of abode for the unhoused." Dkt. No. 288 at 28-29. Specifically, the Court found that the City must "proceed with the interactive process and identify **sidewalk segments** within the City where existing widths permit a larger tent footprint while maintaining a reasonably required path of travel (e.g., six feet). Alternatively, the City may choose to provide compliant tents that meet the claimants' disability-related needs." *Id.* at 59 (emphasis added).

By contrast, the City does not allow overnight camping at all on its real estate. Declaration of Paul Buddenhagen ("Buddenhagen Decl.") ¶ 4. The Court's order mentions nothing about requiring the City to alter any policies that prohibit camping in certain locations, and doing so would have required a wholly different program and undue burden/fundamental alteration analysis. While the Court has the authority to clarify and enforce its prior rulings, directing the City to allow camping on City-owned lots where it is currently prohibited would go far beyond what the Court has ordered in this case, and it is prohibited from expanding its rulings after the fact.

Specifically, the Court already rejected BHU's demand that the City provide "City-sanctioned or City-owned campsites" and found that providing such locations was not required under the ADA. Dkt. Nos. 288 at 45 (granting "summary judgment in favor of the City on ADA claims related to . . . City-sanctioned or City-owned campsites"), 71. Instead, the Court ruled, "BHU members may relocate to permissible locations of their choosing **subject to the City's existing conditions-based enforcement framework**." *Id.* (emphasis added). The Court did not require the City to overhaul its existing policies or create new locations that permit camping. In

sum, ordering the City to allow camping in places where it is currently entirely prohibited would contravene the Court's prior order.

*Second*, as explained above, an accommodation that allows encampments on City-owned property would create a new program, which the ADA does not require. *See Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003). The Court reasoned that the individualized 3x3 assessment it ordered would not mandate the City to create a new program. Rather, in its view, doing so simply required the City to make a modest modification to AR 10.2 to accommodate a person's disability-related needs. The Court reasoned that a categoric refusal to allow more than nine square feet on the sidewalk violated the ADA; instead, under the Court's order, the City must conduct an individualized assessment and allow for a larger footprint on the sidewalk if it does not impede the path of travel or create other specified impacts. Dkt. No. 288 at 59. The Court noted that the City already assesses encampments for impacts on a case-by-case basis, and therefore, "[a]pplying that same flexible framework to accommodate disabled individuals (by allowing tents wider than three feet) **asks the City to do nothing more than what it already does**." Dkt. No. 288 at 58 (emphasis added). Allowing people to set up camp on City real estate would instead amount to creating a new program and obliterate the City's geography-based camping restrictions, undermining the City's ability to make critical decisions about property uses within its own borders. *See* Dkt. No. 288 at 57.

*Third*, permitting encampments onto City real estate would create both an undue administrative and financial burden, and a fundamental alteration of a City program, and the City may lawfully refuse such a request on those bases. Requiring the City to open those lots for encampments would not merely modify the application of an existing rule to accommodate a disability; it would require the City to affirmatively convert otherwise unavailable City-owned property into sites for overnight habitation, including assuming the attendant operational, maintenance, health, safety, and management responsibilities. Such a change would fundamentally alter the nature of the City's property management program and therefore is not a required reasonable modification under 28 C.F.R. § 35.130(b)(7).

The administrative and financial barriers posed by such an accommodation would be immense. The City would need to prepare the lot in question for residential occupancy, which might involve soil testing and remediation as well as obtaining relevant approvals or permits. Buddenhagen Decl. ¶ 5. To ensure the safety of such a location, the City would likely need to provide sewer and garbage services as well as security. *Id*. Staff would need to design and implement a system for ensuring that only individuals with approved accommodations occupied the property. *Id*. This would result in substantial costs in terms of staff time and other financial expenses. *Id*. ¶ 5-6. In rejecting BHU's claim that the City must provide a "sanctioned encampment" or "enforcement-free zone," the Court did not address whether the ADA requires the City to affirmatively make its own real property available for overnight encampments. This analysis would implicate additional factual and legal issues, including the City's undue burden and fundamental alteration defenses, that the City has not yet had an opportunity to brief. The City would therefore be prejudiced were the Court to order such relief without first considering the significant evidence and applicable legal authorities relevant to those defenses.

The requested accommodation would also fundamentally alter the nature of the City's existing property use policies. Allowing camping on City property would fundamentally alter the City's policies that prohibit camping and, as explained above, would constitute an entirely new program. The policy establishes that City property is not available for overnight habitation or encampments. Requiring the City to open vacant lots for encampments would therefore do more than create an exception to an otherwise applicable prohibition. It would transform property that the City has determined is not appropriate for camping into property affirmatively made available for overnight camping. In other words, the requested modification would require the City to change the underlying purpose and operation of its property use policies—from regulating when and where camping is prohibited to providing City property as a place for camping. That is a fundamental alteration of the City's existing program or activity, rather than a reasonable modification of its policies under 28 C.F.R. § 35.130(b)(7).

And even if analyzed as an accommodation to the 3x3 policy, which it cannot be, it

would be a fundamental alteration of any road and sidewalk maintenance program. It would expand the City's generous policy of allowing limited amounts of personal property on the public sidewalk, to require camping, including large tent footprints, in its non-public right-of-way real estate holdings. This would impede the core purpose of the City's 3x3 policy, which is to facilitate shared use of public space by all members of the community. In sum, requiring City property to be used exclusively by encampment residents as an accommodation to one element of AR 10.2 is an exceedingly unreasonable modification of the policy, which is designed precisely to prevent monopolization of publicly owned spaces.

Finally, if the Court were inclined to grant BHU this new relief, the City would seek to provide additional evidence and make site-specific arguments as to additional burdens and ways that permitting camping on those sites would fundamentally alter the City's programs. It has not been given the opportunity to do so, however, as these issues were not briefed on summary judgment and the City was given just days to submit this report.

For the reasons described above, allowing camping on 1281 University Ave., 1901 Henry St., or 1100 Fourth St. is not required under either the Court's order or the ADA.

**A. No Lodging / TNC Prohibited Areas: 1499-1451 Second St., Second and Page St.**

The two above-listed locations are within a geographic area that contains longstanding posted signage designating it as a No Lodging / TNC Prohibited Area. Buddenhagen Decl. ¶ 23. Under AR 10.2, no personal property is allowed to be stored in a TNC Prohibited Area, regardless of footprint size. As with City-owned lots, camping is entirely prohibited in these areas. Under Penal Code 647(e), it is a misdemeanor to "lodge[] in a building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it." The signs provide notice that the City does not grant permission for people to lodge in that location.

Thus, even if the City were to grant an accommodation to the 3x3 Rule, exempting an individual from the 9 square foot limitation where personal property is allowed, the TNC

Prohibited Area / No Lodging designations would present independent barriers, as both camping and storing any personal property would still be prohibited.

BHU has not requested an accommodation to be exempt from the general prohibition against camping in this location, or the prohibition against storing any property on the sidewalk. Nor would the City grant one, because the prohibition reflects the City's determination that this area is not an appropriate location for lodging or encampments at all. The requested accommodation would therefore not merely modify the application of an otherwise applicable camping restriction; it would require the City to reverse the underlying policy determination that lodging is prohibited at this location and affirmatively authorize a use that the City has determined is not appropriate.

In effect, it would transform a location designated for public use without overnight lodging into a location where overnight lodging is affirmatively permitted for purposes of the accommodation. That would fundamentally change the nature of the City's policy governing the use of the area, rather than modify its application to provide nondiscriminatory access to an existing program or service. The City's determination that this area is unavailable for lodging is based on its policy judgments, which balance access to services with its obligations to maintain the public health, safety, and accessibility of publicly shared spaces.

Moreover, as with City-owned lots, the Court's Summary Judgment Order did not address the TNC Prohibited Area / No Lodging designation nor indicate that the City was required to provide exemptions from these independent elements of AR 10.2 and City public space management policy. In fact, it explicitly stated the opposite. *Id.* at 59 (finding that, notwithstanding 3x3 accommodation, the City "retains authority, of course, to enforce AR 10.2").

Finally, as with City-owned lots, if the Court were inclined to grant BHU this new relief, the City would also seek to make site-specific arguments as to additional burdens and ways that permitting camping in these areas would fundamentally alter the City's programs. It has not been given the opportunity to do so, however, as these issues were not briefed on summary

judgment.

**B. Fourth and Camelia Streets**

This is the only potentially viable location proposed by BHU where a larger footprint could exist on the right-of-way and not block pedestrian path of travel or violate other provisions of AR 10.2. Two individuals (Bradford Raymer and Jackeline Mendoza) have requested to relocate here, and they are now requesting 220 sq ft (11-by-20-foot) each, for a total of 440 sq feet. This is roughly equivalent to the size of many studio apartments. While potentially viable, this area poses a number of serious restrictions and considerations.

*Size restrictions*: As described in the City's August 27 status report, this location is on a dead-end street adjacent to a fenced railroad track and an active construction site. Based on the City's measurements, the first area, adjacent to the railroad fence, can potentially accommodate a rectangular footprint of up to approximately 32 feet by 6.25 feet (200 square feet), while the second area, along the non-red curb, can accommodate a footprint no wider than 4.5 feet. *See* Scott Decl. ¶ 12. These measurements account for the required pedestrian, emergency, and vehicle access and applicable clearances. Accordingly, an 11-by-20-foot footprint cannot fit within either measured area.

*Fire hazards*: The Deputy Fire Marshal has also identified additional requirements applicable to the site. Under CFC 315.4, combustible items are generally required to remain 10 feet from the property line, although the Fire Department will allow three feet of clearance where items remain under six feet in height. *Id*. ¶ 13. The Fire Department also requests a 12-foot fire break between encampments when the footprint reaches 700 square feet (CFC 3103.7.6). *Id*. Encampments must remain limited to tents only, and no makeshift structures can be built. *Id*. Although no specific clearance from utility poles is required, the Fire Department has cautioned that they can present a danger should they catch fire or a power drop break due to items hung on them, and utility companies may need access to them for maintenance. *Id*. ¶ 14. All red curbs must remain clear of obstructions, and the dead end cannot be occupied because it provides access to the tracks and serves as a vehicle turnaround. *Id*.

*Community impacts*: The City Manager's and City Attorney's Offices have received dozens of emails and phone calls from concerned family members of children who attend Duck's Nest Preschool adjacent to this location, which serves over 90 families. *See* Buddenhagen Decl. ¶¶ 9-22. These family members have expressed unanimous and grave concern about the potential relocation of unhoused residents to this location, citing the proximity of young children who are more vulnerable if exposed to leptospirosis or other hazards, the location of the preschool outdoor play yard in relation to the proposed encampment, the high volume of vehicle and pedestrian traffic (including toddlers and strollers) in the area during preschool drop-off and pickup times, and concerns for limited emergency vehicle access in an already constricted road. *Id.* ¶ 10, 12-22. Concerns such as these highlight the complexity of assessing whether camping at a particular location is feasible due to its impacts. Indeed, even if a larger than 3x3 ft footprint here would not technically obstruct the minimum path of travel required under City policy and this Court's order, an encampment may create other impacts that make the site unsuitable for relocation. Yet the Court's order suggests that it would limit the City to solely evaluating whether an encampment footprint at a location proposed by BHU would block the path of travel or create emergency access issues, tying its hands from considering other community or operational concerns that it would ordinarily evaluate as part of its enforcement discretion.

## III. CITY'S POSITION ON REQUESTS TO STORE PROPERTY IN THE ABATEMENT AREA

Nine BHU members, who are among the 23 original individuals, have now made 3x3 Rule accommodation requests, not to relocate somewhere on the public right-of-way but to store additional property on the sidewalk outside their vehicles, where they purportedly live within the Harrison Corridor abatement area. These requests are problematic for several reasons.

*First*, the Harrison Corridor has been designated as a No Lodging / TNC Prohibited Area. Buddenhagen Decl. ¶ 23. As explained above with respect to other identically designated areas, camping and maintaining personal property on the sidewalk is prohibited entirely here, regardless of footprint size. Even if the 3x3 Rule were modified, the No Lodging /No TNC

designation would separately prohibit individuals from maintaining property on the sidewalks. Accordingly, allowing individuals and their items to remain in the abatement area would constitute the right to remain in place, which the Court has already denied. Dkt. 288 at 37.

*Second*, the Court has denied similar requests to maintain belongings on sidewalks for vehicle dwellers where doing so is otherwise prohibited. In its summary judgment order, the Court rejected BHU's request to allow more than 9 square feet of property to be stored outside a vehicle, finding that the City "properly denied" the request as due to the lack of nexus to a disability need. Dkt. 288 at 55, fn 11.

*Third*, the relevant portion of Court's order on summary judgment was limited to finding that the City must allow for consideration of ADA accommodation requests to the 3x3 Rule for disabled individuals who require a larger tent. Specifically, the Court stated that "blanket enforcement of the 3x3 rule would compromise BHU members' ability to use tents in a fashion that accounts for their disabilities." Dkt. No. 288 at 56. It further held that "the City may choose to proceed with the interactive process and identify sidewalk segments within the City where existing widths permit a larger *tent* footprint while maintaining a reasonably required path of travel." *Id*. at 59. Because none of these individuals are requesting a larger tent, their accommodation requests fall outside the court's orders and, as with their requests to reside on City-owned property and in No Lodging/No TNC Areas, would constitute new claims that would be improperly adjudicated after judgment.

## IV. THE CITY SHOULD BE PERMITTED TO CONDUCT THE ABATEMENT AS TO ALL NOTICED CAMPERS IN THE HARRISON CORRIDOR, ON OR AROUND SEPTEMBER 8.

The City has fully complied with the Court's orders and must be permitted to conduct the abatement as to all items on the streets and sidewalks, as the Court contemplated in its August 28 order. Dkt. No. 331 ("The abatement of the Harrison Encampment will proceed on or around September 8, 2026."). The Court's summary judgment order explicitly authorized the City to proceed with abatement of the Harrison Corridor subject to certain limitations and conditions,

which the City has either satisfied or will satisfy when it commences abatement.

As relevant here, the City has agreed to allow modifications of the 3x3 Rule to anyone who has requested it and will not enforce on that basis where someone relocates to a location that complies with the Court's order and AR 10.2. The City also has not denied a single accommodation request for packing or moving assistance. And the City has offered packing assistance, replacement gear, and clothing to everyone in the encampment, regardless of disability status or whether their items are ultimately destroyed in any abatement action. BHU has not, and cannot, show that the City has violated the provisions of the Court's existing injunction. The City has offered the Court-ordered accommodations since May 29, 2026, and has not received a single appointment request for packing or relocation assistance.

The City cannot force BHU members to accept offered accommodations, nor should the City be prevented from abating public health hazards when accommodations are not accepted. BHU's attempts to expand the Court's orders to request camping in locations where camping is prohibited should not result in additional delays, as such requests are outside the scope of disputes the Court has adjudicated in this now-closed matter.

To the extent additional conversations may be needed to further assess certain proposed locations, it should not prevent the City from performing the abatement, nor would it justify the Court exempting certain individuals from the upcoming operation. Indeed, the City has not denied a reasonable accommodation, nor has the City failed to engage in the interactive process with anyone. Even if the interactive process were insufficient, as this Court has acknowledged: "process deficiencies do not independently supply a basis for liability where no reasonable accommodation was improperly denied." Dkt. No. 288 at 22. Even failure to interact is not a standalone claim under Title II of the ADA. *See Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("[T]here exists no stand-alone claim for failing to engage in the interactive process"); *Ahmed v. Regents of Univ. of California*, No. 17-cv-0709-MMA (NLS), 2018 WL 3969699, at *5 (S.D. Cal. Aug. 20, 2018) ("[T]his conclusion—that if a defendant fails to engage in the interactive process, at trial a plaintiff still must establish the existence of a

reasonable accommodation—is consistent with virtually every single other Circuit").

Here, BHU has not identified a reasonable accommodation that the City has denied. Instead, BHU's list of proposed relocation sites incudes a large number of "undecided" locations in which there is nothing for the City to assess. As for others, they have provided no alternative to sites proposed on City-owned property and/or in No Lodging/No TNC Areas. Given that individuals have had months in which to locate suitable sites, it is likely that no reasonable accommodation exists that would allow all requestors to occupy their desired campsite size on City sidewalks.

The nonexistence of an accommodation is not a justification to hold up a necessary public health hazard abatement. Indeed, the City is not required under the ADA or this Court's summary judgment order to ensure pre-assessed campsite locations for every Harrison Encampment resident prior to addressing public health concerns and fire dangers.

Based on the City's past experiences and guidance from experts on eradication of Leptospirosis, a partial abatement of the Harrison Corridor will not be effective at resolving the public health concerns or fire dangers. According to the City's Public Health officer, "partial measures" that allow the encampment to remain "cannot adequately address the risks to human and dog health posed by the presence of Leptospirosis in the Harrison Street encampment." Dkt. No. 207-2 ¶ 6. Additionally, abatement while allowing some residents to remain "would not be safe or responsible" as remaining residents would potentially be exposed to rat poison either directly or through contact with the carcasses of dead rats. *Id.* ¶ 7.

As a practical matter, it is also nearly impossible to conduct a partial abatement under circumstances like these, where it is not feasible to distinguish where one resident's property ends and another's begins. Buddenhagen Decl. ¶ 7. City staff have witnessed residents claiming ownership of property that belonged to someone else, to prevent the City from removing it. *Id.* As a result, if restricted to abating the property of only certain people, the City will only be able to abate a very limited portion of the encampment area that very likely will not fully address the pressing health and safety issues the City has identified.

Clearing only certain spaces and not others will also lead to rapid re-encampment in the area and prevent the City from enforcing its stated policy of banning camping entirely in this area. *Id*. ¶ 7. An encampment abatement requires substantial coordination and activation of multiple City departments, including Public Works, Police, Fire, and other members of the Homeless Response Team. *Id*. ¶ 8. As a result, the City will be forced to expend significant staff resources for limited practical benefit to those most impacted by the conditions in the area. *Id*.

Should the Court nonetheless find that the City must delay abatement as to certain individuals, the City respectfully requests that the Court set a deadline by which these BHU members must relocate so the City can achieve full abatement of the area. Given the urgency of the need to address the hazards in the area, and the months that BHU has already had to prepare, the City requests that the Court require relocation within 48 hours of the Court's order.

**PLAINTIFF BERKELEY HOMELESS UNION'S STATEMENT**

Below is a chart identifying each BHU member who has requested an exemption to the 3'x3' rule as an accommodation, along with BHU's position on each request. The City did not provide its position to BHU before this joint report was prepared. Accordingly, the City's position is not reflected in this chart. BHU has not had the opportunity to provide input on the City's position.

BHU has submitted approximate footprint estimates, with the understanding that ADA Coordinator Thomas Gregory will conduct site-specific assessments to determine the maximum allowable footprint at each location. BHU remains prepared to collaborate on identifying viable footprints for its members.

| **Name** | **Accommodation Request** | **BHU's position** | **City's position** |
|---|---|---|---|
| Alice Barbee | 11' x 30' footprint at 1281 University Avenue (lot) | Reasonable. Space for shelter, survival gear, medical supplies, and three emotional support animals. | |
| Hector Navarro | 10' x 25' footprint at 1901 Henry Street | Reasonable. Space for shelter, survival gear, medical supplies, and his caretaker. | |

| | | | |
|---|---|---|---|
| Robbie Peddycoart | 11’ x 30’ footprint at 1100 Fourth Street (Harrison House lot) | Reasonable. Space for shelter, survival gear, mobility aids, medical supplies, and two emotional support animals. | |
| Shawman | 11’ x 20’ footprint at 1499-1451 Second Street (behind K-rails) | Reasonable. Space for shelter, survival gear and medical supplies. | |
| Robert Pearce | 10’ x 20’ footprint at 1100 Fourth Street (Harrison House lot) | Reasonable. Space for shelter, survival gear and medical supplies. | |
| Thomas Barnett | 11’ x 25' footprint at 8th and Harrison St | Reasonable. Space for shelter, survival gear, mobility aids, and medical supplies. | |
| Jermaine Lee White | 11’ x 30’ footprint at 1499-1451 Second Street (sidewalk behind K-rails) | Reasonable. Space for shelter, survival gear, medical supplies, and his emotional support animal. | |
| Erin Spencer | 11’ x 30’ footprint at 8th and Harrison St | Reasonable. Space for survival gear, mobility aids, emotional support animals, art and medical supplies. | |
| Lewanda Parnell | 10’ 1” x 45’ footprint at 9th and Camelia; approved | Reasonable. Space for shelter, survival gear, mobility aids, and medical supplies. | |
| Erik Alexander Coon | 10’ x 20’ footprint. Location undecided | Reasonable. Space for shelter, survival gear, mobility aids, and medical supplies. | |
| Alexander Wilson | 11’ x 20’ footprint at 1100 Fourth Street (Harrison House lot) | Reasonable. Space for shelter, survival gear, mobility aids, medical supplies, and his emotional support animal. | |
| Gregory Grove | 10’ x 20’ footprint at 1499-1451 Second Street (sidewalk behind K-rails) | Reasonable. Space for shelter, survival gear, art and medical supplies. | |
| Bradford Raymer | 11’ x 20’ footprint at 4th and Camelia St | Reasonable. Space for shelter, survival gear, bicycle, medical supplies, and his emotional support animal. | |
| Lisa Saechao,y- | 10’ x 20’ footprint at | Reasonable. Space for shelter, survival | |

| | | | |
|---|---|---|---|
| chain | 2nd and Page St | gear and medical supplies. | |
| Monique Williams | 3' x 8' footprint at 8th and Harrison St | Reasonable. Space for survival gear and recycling materials. | |
| Kevin Martinez | 10' x 20' footprint. Location undecided | Reasonable. Space for shelter, survival gear and medical supplies. | |
| Patrick Ford | 11' x 30' footprint. Location undecided | Reasonable. Space for shelter, survival gear, mobility aids, medical supplies, and his two emotional support animals. | |
| Quinton Clockreese | 11' x 20' footprint at 2nd and Page St | Reasonable. Space for shelter, survival gear, mobility aids, medical supplies, and his emotional support animal. | |
| Jason Charette | 3' x 8' footprint at 8th and Harrison St | Reasonable. Space for survival gear | |
| Jackeline Mendoza | 11' x 20' footprint at 4th and Camelia | Reasonable. Space for shelter, survival gear, bicycle, medical supplies, and her emotional support animal. | |
| Kittivutt Patanapanich | 3' x 8' footprint at 9th and Harrison St | Reasonable. Space for survival gear and his emotional support animal. | |
| Erik Kaiser | 10' x 20' footprint. Location undecided | Reasonable. Space for shelter, survival gear, mobility aids, art and medical supplies. | |
| Merced Dominguez | 3' x 8' footprint at 8th and Harrison St. | Reasonable. Space for survival gear and supplies for her emotional support animals. | |
| Yesica Prado | 3' x 8' footprint at 8th and Harrison St | Reasonable. Space for survival gear, plants and a cat tree for her emotional support animal. | |
| Charles Dye | 10' x 20' footprint. Location undecided | Reasonable. Space for shelter, survival gear and medical supplies. | |
| Andrew Vanderzyl | 11' x 25' footprint. Location undecided | Reasonable. Space for shelter, survival gear, mobility aids, medical supplies, and his two emotional support animals. | |
| Ramondo Mackey | 11' x 25' footprint. Location undecided | Reasonable. Space for shelter, survival gear, medical supplies, and caretaker. | |
| Jonny Ruel | 3' x 8' footprint at 8th | Reasonable. Space for survival gear and | |

| | | | |
|---|---|---|---|
| Holder | and Harrison St | his emotional support animal. | |
| Ray Johnson | 3’ x 6’ footprint at 8th and Harrison St | Reasonable. Space for his bicycle, which cannot fit in the car while sleeping. | |

## SUMMARY

In addition to the pending 3’x3’ accommodation requests identified in the table above, BHU respectfully submits the following observations for the Court's consideration:

**1. Limited Availability of Camping Areas and Piecemeal Approach**

BHU has been systematically surveying sidewalks throughout Berkeley to identify viable locations where tents can be placed while maintaining a six-foot path of travel. BHU's analysis shows that only approximately 25% of the City's sidewalks are legally available due to zoning restrictions to accommodate a tent and the required path of travel. See ECF 329-2; Declaration of Robbie Powelson at ¶ 11.

Within the available zoning areas, Manufacturing and Commercial districts, where camping could otherwise be feasible, the City has posted "No Lodging" signs that categorically prohibit camping. The City has identified the following areas where former encampments used to exist as permanent "No Lodging" zones:

- Harrison Street: from 4th Street to San Pablo, Gilman to Codornices Creek
- Second Street: from Gilman to Cedar and down all side streets
- Former Here/There Encampment: median area MLK to Adeline, 63rd to 62nd
- Ohlone Park: camping already prohibited; additional "no lodging" signs

After removing these "No Lodging" zones, the share of city sidewalks available for camping drops from 25% to just 15%. (See updated map from Powelson Declaration here: http://robbiepowelson-code.github.io/berkeley-rule-10-2).

BHU is committed to measuring these remaining sidewalks, so we can provide the Court with a concrete number of how many sidewalks are actually available for camping in Berkeley.

The City is implementing a piecemeal approach to encampment management—

designating one area as a "No Lodging" zone after another where unhoused people used to reside, without any comprehensive citywide assessment. This approach effectively creates a patchwork of prohibited areas that, when viewed together, function as a de facto citywide ban on camping.

BHU respectfully submits that the City's approach raises concerns about discriminatory zoning. The cumulative effect of individual "No Lodging" designations is to eliminate nearly all viable camping locations in Berkeley.

**2. The City's List of Vacant Lots**

On January 16, the City provided BHU with a list of City-owned vacant properties via a 20-page letter from City Manager Buddenhagen. See ECF 330, Exhibit E; Declaration of Yesica Prado at ¶ 15. The email chain reflects that the City had compiled a list of city-owned properties where people could relocate.

BHU has been using this list to identify potential relocation sites in city owned lots and the public right away. However, the process of evaluating each site—measuring dimensions, checking for utility access, and assessing feasibility—is time-consuming and resource-intensive.

To date, BHU has not completed its review of all the properties on the list. BHU asks the Court to consider whether the City should be required to assist in identifying viable locations, rather than leaving BHU to conduct this work alone.

**3. City Interference with BHU Representation**

The City's outreach team has been conducting individual interactions with BHU members without BHU representation present. This practice interferes with BHU's ability to represent its members, in violation of the Court's recognition of BHU's associational standing. See Minute Entry, June 10, 2025 (ECF 104 at 2).

BHU has submitted signed authorization forms from its members, authorizing the Berkeley Homeless Union to represent them in all matters related to this litigation and accommodation requests. The City has been made aware of these authorizations. The City's practice of

conducting individual outreach without BHU representation undermines the integrity of the interactive process.

The City's characterization of outreach interactions differs from sworn declarations provided by BHU members. Take in for example BHU member Patrick Ford. The Union has filed a sworn declaration from Mr. Ford (ECF 314) documenting his disabilities and the City's failure to provide accommodations. The City's account of its interactions with Mr. Ford is not supported by any direct evidence from him.

BHU requests that the Court clarify that the City must include BHU representatives in all outreach and accommodation discussions with BHU members.

**4. The City Has Not Filed Declarations from Camp Residents**

Throughout this litigation, BHU has filed sworn declarations from its members documenting their disabilities, their accommodation needs, and their interactions with the City. See, for example, Ford Decl. (ECF 314); Peddycoart Decl. (ECF 314-1, 267); Barbee Decl. (ECF 265); Barnett Decl. (ECF 268); Ruel Decl. (ECF 266).

The City, by contrast, has not filed a single declaration from any resident of the Harrison Encampment. The City's account of events has not been directly corroborated by any camp resident. BHU respectfully requests that the Court consider the lack of direct evidentiary support for the City's positions.

The City's statements about residents' preferences or conduct are not supported by declarations from those residents. BHU has spent significant time including its members' medical providers and other evidence to support documenting their disabilities. The City has not.

BHU requests that the Court require the City to provide direct evidentiary support for its factual claims, including declarations from camp residents where the City asserts facts about residents' conduct or preferences.

**5. The City’s Single Viable Location Was Abated Without Proper Notice**

At the August 26 site inspection, the City identified Fourth and Camelia as the only potentially viable relocation site for BHU members. See City's August 27, 2026 Response ("This

is the only potentially viable location reviewed during the assessment"). However, shortly after identifying this location, the City abated the area, displacing two Harison residents who had relocated there.

BHU members were not provided with 72-hours notice before this abatement. Instead, Berkeley Police Officers forced residents out in less than 48 hours. The Court's Final Judgment Order requires the City to provide "at least 72-hours written notice before any enforcement action resulting in the seizure or destruction of a BHU member's property." (ECF 326 at 4-5). The City failed to provide this notice, among other accommodations ordered by this Court. As a result, BHU members who had relocated there had to return once again to the Harrison Encampment because they had nowhere else to go.

The City's actions demonstrate that even when a site is deemed "viable," the City is willing to abate it without providing the protections required by the Court's orders. BHU requests that the Court order the City to provide the required notice before any future abatement of sites it identifies as viable.

**6. The City's Single Approved Location Has Surrounding Residents and Businesses Complaining**

On September 2, BHU rented a U-Haul truck to assist Ms. Lewanda Parnell in relocating to the sidewalk at 9th and Camelia Streets—the only location the ADA Coordinator Thomas Gregory has approved as a 3'x3' rule accommodation. Ms. Parnell had not been at this site for more than two hours before surrounding neighborhood residents approached her campsite, began taking photographs of her, and told her she would be made to leave.

The aggressive and confrontational behavior has left Ms. Parnell scared and uncertain whether she can remain at her approved location. This experience raises serious concerns about the viability of the City's approved accommodations and the City's obligation to ensure that approved sites can be used.

BHU requests clarity on how approved accommodations will be protected and enforced. Specifically:

- Will the City issue some form of permit or authorization for approved accommodation sites, so that residents have documentation to present to neighbors, business owners, or law enforcement?
- What is the City's process for handling complaints from surrounding residents or businesses about approved accommodation sites?
- How will the City ensure that BHU members with approved accommodations can actually remain at their approved sites without facing harassment, confrontation, or threats of removal?

Without clear guidance from the City, BHU members like Ms. Parnell are left to navigate hostility on their own. While BHU can provide members with copies of Thomas Gregory's emails confirming their approved accommodations, these emails may not carry the weight of an official City permit or authorization, and residents remain vulnerable to harassment and threats.

BHU requests that the Court direct the City to provide clear guidance on how approved accommodations will be protected and enforced, including whether the City will issue formal documentation for approved sites.

**7. Vehicle Residents Need Space Outside Their Vehicles**

Many BHU members use vehicles as shelter. The City has stated that it is "not requiring vehicles to move" but has also stated that "all property outside of vehicles must be removed from the right-of-way." (See ECF 330 - Exhibit C.)

For vehicle residents, it is not feasible to keep all of their essential belongings inside their vehicles. Vehicles contain living quarters and, in many cases, are too small to accommodate survival gear, mobility aids and other essential property. As a result, vehicle residents need a limited space outside their vehicles for these essential items.

The City has stated that accommodations for vehicle residents have not been processed because vehicle residents have not requested 3x3 exemptions. However, BHU had previously submitted 3x3 requests on behalf of vehicle residents, such as Merced Dominguez, who requested 3x3 exemption for items stored outside her RV.

The City's position that vehicle residents do not need 3x3 exemptions contradicts the reality that these residents will still be living on Berkeley streets and they also need to store property. BHU requests that the City clarify how it intends to accommodate vehicle residents who need to store essential property outside their vehicles.

**8. The City's Non-compliance with Court's Orders**

Despite this Court's Summary Judgment and Final Orders, the City has failed to comply and has not provided the accommodations granted to BHU members. The August 26 abatement on Murray Street illustrates this failure: the interactive process was not concluded, there was no provision of accommodations for BHU members, and their belongings were summarily destroyed.

<u>A. Sunny Jean Yow</u>

Ms. Yow is a disabled BHU member. On July 28, BHU submitted a comprehensive ADA accommodation request on her behalf, requesting, among other things, an exemption from the 3x3 rule to accommodate a 10' x 35' footprint for her tent, art supplies, emotional support dogs, and essential belongings.

On August 25, BHU sent a follow-up email to Mr. Gregory raising concerns that the City was requiring Ms. Yow to vacate the area without an approved disability accommodation, which violated the Court's orders requiring individualized assessments and accommodations before abatement actions. BHU requested written confirmation that no abatement would occur until the interactive process was complete. The City did not respond.

Despite the ongoing interactive process and the City's own acknowledgment that Ms. Yow's footprint "could fit" at a nearby location on Murray Street, the City abated Ms. Yow's encampment on August 26.

To carry out the abatement, Ms. Yow was arrested by Berkeley Police Officers for public lodging. Her two emotional support dogs were taken to the Berkeley Animal Shelter. During the abatement, City personnel summarily destroyed all of Ms. Yow's property—including her tent,

bed, pet supplies, mobility devices, art supplies, essential survival equipment, medical supplies, family heirlooms, and personal belongings. Nothing was stored.

BHU representatives on site repeatedly asked the Homeless Response Team whether they were going to follow the City's property storage policy. They ignored these questions and stood across the street for hours watching everything be destroyed.

On September 2, the City informed BHU that Ms. Yow has until September 5 to retrieve her dogs from the shelter. The City further stated that one of the dogs has been deemed "vicious and dangerous," requiring proof of insurance for release. The City warned that failure to comply may result in euthanasia. BHU is working to secure the necessary documentation, but this is an additional burden on Ms. Yow, who is currently unsheltered and without any of her belongings.

To date, the City has not communicated about replacement of Ms. Yow's destroyed property or resolved her still-pending accommodation request.

<u>B. Darrin Webster</u>

Mr. Webster is a disabled BHU member. On July 28, BHU submitted a comprehensive ADA accommodation request on his behalf, requesting, among other things, an exemption from the 3x3 rule to accommodate a footprint for his tent, medical supplies, and essential belongings.

On August 25, BHU informed the City that Mr. Webster had relocated to the next street over, outside the noticed abatement area, and requested clarification on whether the abatement applied to his new location and whether the City would assess his new location for a footprint exemption. The City did not respond.

On August 26, Mr. Webster returned from school to find his tent and all belongings gone. His property—including his tent, sleeping gear, medical supplies and essential survival equipment—was removed without any notice and without providing the accommodations required by the Court's orders.

To date, the City has not communicated about replacement property for Mr. Webster, who is now unsheltered and without any of his belongings. He has received no response to his accommodation request and no clarity on whether his new location will be assessed.

Respectfully Submitted,

Dated: September 3, 2026

CITY ATTORNEY'S OFFICE

Sara Stephens
Attorney for Defendants

Dated: September 3, 2026

/s/

Anthony Prince
Attorney for Plaintiff

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3) regarding signatures, I, Sara Stephens, attest that I have obtained concurrence from all signatories to file this document.