Farimah Faiz Brown, City Attorney (State Bar No. 201227)
Katrina Eiland, Assistant City Attorney (State Bar No. 275701)
Laura Iris Mattes, Deputy City Attorney (State Bar No. 310594)
Nubyaan Scott, Deputy City Attorney (State Bar No. 331584)
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile: (510) 981-6960
Email: LMattes@berkeleyca.gov
KEiland@berkeleyca.gov

Attorneys for Defendant
CITY OF BERKELEY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERKELEY HOMELESS UNION.<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BERKELEY, et al.<br><br>Defendants. | **Case No. 3:25-CV-01414-EMC**<br><br>**DEFENDANT CITY OF BERKELEY'S OPPOSITION TO PLAINTIFF'S EX PARTE RESTRAINING ORDER MOTION**<br><br>Judge: Hon. Edward M. Chen |

## I. INTRODUCTION

The Court should decline to intervene in this matter and deny the requested Temporary Restraining Order ("TRO"). The TRO motion is wholly unrelated to the encampment abatement policies at issue in the underlying case in which judgment has been entered and the case closed. Rather, it relates to a routine animal dangerousness hearing initiated by Berkeley Animal Services ("BACS") after it seized a dangerous animal left abandoned on the street. In fact, the only connection between this litigation and the TRO motion is that it was filed by the same counsel, who purports to represent the dog's owner in this wholly unrelated matter, apparently solely because she is an alleged BHU member. The City's own evidence shows that the animal's owner did not consent to representation on these separate claims prior to the TRO's filing.

While the Court has retained jurisdiction to enforce its prior orders, this matter has nothing to do with the City's encampment management or abatement policies. There are no claims in the case or Court orders that mention BACS's seizure or dangerousness hearing policies or practices. Even if the animal had been seized during an encampment abatement operation—which it was not—it would not transform this wholly unrelated claim into one that could be litigated in this case. The Court is limited by Article III to granting relief where it directly relates to the claims asserted in the underlying operative complaint. And, critically, BHU cannot amend the complaint at this late stage after judgment. If this Court were to exercise jurisdiction over this matter, there would be no logical limit. Would it also have jurisdiction over claims not pled in the complaint related to, e.g., BHU members' access to City libraries or pools?

Moreover, counsel's contentions are meritless, and the equities here strongly favor the City. The City provided ample notice of the dangerousness hearing, attempting to reach the owner through various means over several weeks. And the owner had actual notice of the hearing. Indeed, she came to BACS yesterday and spoke to employees where she confirmed that she would attend the hearing at the noticed time, even though BHU's representative failed to

notify her. She did not request any accommodation related to the hearing. She also confirmed that she had not spoken to counsel about representation in this separate matter.

As for the equities, the animal has a long history of violent behavior, including biting, and has not been appropriately contained or restrained given the risk that it poses to the public, despite repeated admonishments to its owner. There is also significant ongoing risk to BACS employees, as the dog snaps and growls and cannot be handled in the facility without strong sedation. For all of these reasons, the TRO must be denied.

## II. BACKGROUND

Sunny Yow's dog Griz has a long history of problematic behavior that has been well-documented by the City of Berkeley, including a bite history, reports of aggressive behavior including growling at people passing by on the sidewalk, and repeated instances of the dog being unrestrained by its owner in public locations. Declaration of London Rivera ("Rivera Decl.") ¶¶ 4-9. The dog has been impounded at least three times. *Id.* ¶ 6. For years, the City has had difficulty getting Ms. Yow to comply with ordinances regulating dog ownership in the City. BACS staff have repeatedly tried to persuade Ms. Yow to keep Griz restrained, by advising her of this requirement and providing her with free leashes and crates. *Id.* However, they continue to witness her refusing to use a leash and field complaints about the dog being unrestrained on the sidewalks and elsewhere. *Id.* ¶¶ 6-7

Unrelated to any encampment action, on Friday, August 21, 2026[1] BACS received a call that Griz was tied up in the parking lot of the Mi Tierra grocery store, possibly for multiple hours. *Id.* ¶ 4 BACS Manager Mike St. Pierre and Animal Control Officer Winter responded to the call and were able to capture and impound the animal after significant struggle and administration of a sedative. *Id.*

---

[1] Ms. Yow's encampment was cleared on August 26, 2026, five days after Griz was impounded, pursuant to a duly noticed abatement action, and after the completion of the interactive process. Ms. Yow's encampment is not part of the Harrison Corridor and Griz was not seized during the encampment closure.

After BACS impounded Griz, it proceeded to reach out to Ms. Yow with the only contact information it had on file for Ms. Yow: a text-only phone number. *Id.* ¶ 10. The City sent multiple text messages informing Ms. Yow of her dog's whereabouts. The text messages appeared to go through, but there was no response. *Id.* Because Griz has been impounded multiple times and Ms. Yow has retrieved him each time, she is familiar with how to contact and locate the shelter. However, Ms. Yow made no attempt to visit BACS or contact the City for over two weeks after her dog was impounded.

Instead, on August 22, someone associated with Ms. Yow named Christopher Macy came to the shelter to ask about Griz. *Id*. ¶10. He said he had been watching the dog for Sunny, but shelter staff explained that they can only release the dog to the owner, and that the City intended to designate the dog vicious and dangerous, which Ms. Yow could contest. *Id*. Although City staff had already attempted to contact Ms. Yow telephonically several times, City staff took further measures to reach her by driving by the location she was last seen. *Id*. Unfortunately, they did not encounter her there. Instead, City staff asked Mr. Macy to tell Ms. Yow to come to the shelter to discuss the dog. *Id*.

On August 26, City staff specifically told Mr. Macy that it was Ms. Yow's last day to request a hearing on the vicious and dangerous determination, which must be done within five days. Id. No hearing was requested. *Id*.

On August 31, even though the original deadline to request a hearing had passed, the City further attempted to provide Ms. Yow notice of the hearing through an additional route by communicating with Ms. Prado, representative of Berkeley Homeless Union ("BHU"). Declaration of Peter Radu ("Radu Decl.") ¶ 6. Unrelated to the impoundment of Griz, Ms. Prado had submitted an accommodation request regarding encampment size on Ms. Yow's behalf, and so the City believed she may be in contact with her or have knowledge of Ms. Yow's whereabouts. *Id*.

The City's ADA Program Coordinator, who had been in contact with BHU about Ms. Yow's ADA request, provided Ms. Prado a notice from Animal Care Services about how Ms. Yow could retrieve two dogs impounded at the time, and how to request a hearing for Griz. *Id*.

¶¶ 6-7. Although there was no legal obligation to do so, the notice provided an additional five days to request a hearing. *Id.* ¶ 7 and Exhibit B.

On Thursday, September 3, Ms. Prado requested a hearing on behalf of Ms. Yow to contest the vicious and dangerous determination. Declaration of Sara Stephens ("Stephens Decl.") ¶ 2. and Exhibit A. Anthony Prince, BHU's legal counsel, was cc'ed on this request. *Id.*

On Friday, September 4, the City granted the hearing request and set the hearing for Wednesday, September 9, at 1:45 p.m. *Id*. On September 5, Mr. St. Pierre provided the hearing packet by email to both Mr. Prince and Ms. Prado. *Id.* ¶ 3. Also on September 5, Ms. Yow accompanied Ms. Prado to the Animal Care Services and retrieved her other dog, "Kitty." Rivera Decl. ¶ 11. Both Ms. Yow and Ms. Prado spoke with an Animal Control Officer on site at that time about why Griz could not be released immediately, the reasons for the vicious and dangerous determination, and the upcoming hearing. *Id*.

Several days passed without any communication from BHU or Ms. Yow. However, with less than 24 hours before the hearing was scheduled to proceed, BHU's attorney stated that "we will not be able to go forward with tomorrow's hearing" because he had been out of town, had not had enough time to review the materials, and had not been able to be in touch with Ms. Yow. Stephens Decl. ¶ 4. He did not request additional time as an accommodation, either for himself or Ms. Yow. *Id*.

The following morning, the day the hearing was to take place, the City communicated that it was considering the request for an extension but that there were safety and operational concerns with delaying the hearing. *Id.* ¶ 5. Indeed, City staff and management continue to be extremely concerned about continuing to expose staff to risks of injury from the dog. Rivera Decl. ¶¶ 4-6. The City has already extended its impoundment of the dangerous animal far longer than is typical, to ensure adequate notice was provided to Ms. Yow. The dog's aggressive behavior presents real safety risks to City staff, who cannot interact with the dog at all without sedating it. *Id.*

While City leadership was deciding whether a further extension would be feasible given the significant safety concerns Griz presents and the several week delay that City had already

granted, the City communicated to BHU's attorney the hearing was still on schedule for 1:45pm. Stephens Decl. ¶ 6. BHU's attorney objected, stating, in part, that Ms. Yow is a person with a disability who required a reasonable accommodation, but without stating what accommodation she would need, the nexus between the request and the disability, or how BHU's attorney knew Ms. Yow needed an accommodation since he had admittedly not spoken with her about the hearing. *Id*. ¶ 7. BHU thereafter filed the TRO at issue.

The City subsequently determined that it could extend the hearing date by one day but no longer, and communicated this at approximately 1:00pm, setting the new hearing date of September 10, 2026, at 10am. *Id*. ¶ 9. BHU's attorney responded that he had already filed the TRO and was not available on September 10.

Shortly thereafter, Ms. Yow appeared at BACS. Rivera Decl. ¶ 13. She told staff that she was not aware of the hearing date and time. Id. She insisted that she would attend and was not aware of any extension request made on her behalf. Id. Ms. Yow told staff that Ms. Prado had never given her the hearing packet and she was not sure whether BHU's attorney represented her in this matter or not, as she had not spoken with him about the topic. *Id*.; Radu Decl. ¶¶ 8-9. Peter Radu asked if she would be willing to sign a statement confirming that she was representing herself in this matter, to provide clarity to staff as to who they should communicate with. Radu Decl. ¶9. She declined to do so, saying she first needed to talk with Mr. Prince. Id. Mr. Radu made it clear he would not pressure her to sign anything and did not press the matter further. Id.

On September 10, the City proceeded with the hearing at 10:00am. Rivera Decl. ¶ 14. Despite BHU attorney claiming he was unavailable, he along with Ms. Prado and Ms. Yow attended the hearing. *Id*. Ms. Yow attempted to speak about the dog, explaining that she would be more responsible with its care, but BHU's attorney repeatedly yelled over her, put his hands on her, and tried to make her leave the room. *Id*. His aggressive behavior and anger made BACS staff very uncomfortable. *Id*. BHU's attorney insisted that they would not participate in the hearing, and they all left the room, including Ms. Yow, who was in tears. *Id*.

If the City's hearing officer upholds the vicious and dangerous dog determination, Griz will be euthanized no earlier than the morning of September 11, 2026. Radu Decl. ¶ 11.

## III. LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In the Ninth Circuit, the same standard governs requests for temporary restraining orders and preliminary injunctions. See *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

Under *Winter*, a plaintiff seeking a TRO must establish all four of the following:

(1) a likelihood of success on the merits;

(2) a likelihood of irreparable harm absent relief;

(3) that the balance of equities tips in the plaintiff's favor; and

(4) that an injunction is in the public interest.

555 U.S. at 20; *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (reaffirming *Winter's* "demanding" four-factor test).

## IV. ARGUMENT

### A. The Court Should Decline to Consider Plaintiff's Motion Which is Wholly Unrelated to the Closed *BHU vs. City of Berkeley* Case

The Court must deny BHU's unlawful attempt to bypass the appropriate procedural mechanism for filing a new lawsuit and request for temporary restraining. The dog impoundment dispute with Ms. Yow is an animal control action—plainly not related to the encampment abatement at issue in the *Berkeley Homeless Union v. City of Berkeley, No. 25-cv-01414-EMC* litigation. Retaining jurisdiction over this matter would contravene Article III limitations and clear Ninth Circuit precedent.

#### 1. The Dog Impoundment Is Unrelated to the Claims Adjudicated in *BHU.*

Ms. Yow's dog, Griz, was not impounded pursuant to any abatement. Instead, BACs impounded the dog in response to an independent animal control call. On August 21, 2026, BACS received a call from a member of the public about a tethered and unattended dog in the

Mi Tierra grocery parking lot that had been left at the location for several hours with no owner or responsible person present. BACS, familiar with Griz's dangerous history, then impounded the dog, who attempted to bite staff and required sedation.

Ms. Yow's non-Harrison Corridor encampment was abated five days later, on August 26, 2026, in a separately planned and duly noticed abatement. The chronology establishes that the two events were separate: Griz was impounded five days before the City's abatement of Ms. Yow's encampment and resulted from an independent animal control call, not from any abatement activity.[2]

**2. The Judgment Did Not Adjudicate or Enjoin Animal-Control Actions Involving Ms. Yow or Griz.**

The relief granted in *BHU v. City of Berkeley* concerned ADA accommodations and other relief arising from the City's planned abatement of the Harrison Corridor encampment. The Court's April 3, 2026, summary judgment order addressed, among other things, accommodations concerning the City's 3x3 sidewalk space rule, physical relocation assistance, storage of property, and other measures connected to the City's enforcement and abatement operations. *See* Dkt. No. 288. The Court did not adjudicate a general right of BHU members to prevent animal control officers from impounding animals pursuant to independent animal control authority. [3]Nor could it have because no BHU member had alleged any relevant facts nor plead any remotely related claims. [4]

The Court thereafter entered final judgment in the BHU action on August 20, 2026. Dkt. No. 326. The judgment expressly states that it resolves the claims pleaded in BHU's First Amended Complaint and directs the Clerk to enter judgment pursuant to Federal Rule of Civil

---

[2] Ms. Yow's other dog was impounded during the August 26, 2026 abatement after Ms. Yow was arrested. That dog is not the subject of this dispute as Ms. Yow has since retrieved it, but this serves as an example of the distinction between an impoundment due to animal control and an impoundment related to abatement. This dispute arises from the former.

[4] In its April 3, 2026 Order, the Court did discuss an animal-related ADA claim related to Mr. White, but did so in the context of a Harrison Encampment resident's request to keep his dogs after abatement. The Court found that the City had no plans to separate Mr. White from his dogs and held that the matter was not yet ripe. ECF 288 at 55.

Procedure 58. Dkt. 326 at 6. *Id*.[5] Ms. Yow is not a member of the individuals granted injunctive relief from the planned Harrison encampment abatement, nor is she one of the individuals denied injunctive relief. Dkt. No. 342. She has no claims related to the Harrison encampment before this Court. Even if she had, the Court's final judgment also does not address dog impoundment nor retain jurisdiction to resolve such wholly separate claims. Dkt. No. 326.

**3. The BHU Action Is Not the Proper Procedural Vehicle for This Separate Dog Impoundment Dispute.**

Both the Ninth Circuit and the Supreme Court have made clear that federal courts retain limited ancillary jurisdiction to enforce their own decrees, but they do not possess subject matter jurisdiction to adjudicate entirely new disputes raised after closure. Federal courts are courts of limited jurisdiction, constrained by the "case or controversy" requirement of Article III of the Constitution which cannot be expanded by judicial decree. *See Kokkonen v. Guardian Life Ins. Co. of Am*., 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, [], which is not to be expanded by judicial decree.") (cleaned up). While a district court retains authority to manage its proceedings and effectuate its decrees, it cannot issue temporary or preliminary injunctive relief unless the relief sought directly relates to the claims asserted in the underlying operative complaint. *See Id*. at 379-380. In *Pacific Radiation Oncology, LLC v. Queen's Medical Center*, 810 F.3d 631 (9th Cir. 2015), the Ninth Circuit affirmed the denial of a similar request to issue an injunction that was unrelated to the underlying complaint. *Id*. at 638. In so holding, the Ninth Circuit explained that "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint. This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself." *Id*. at 636. Where the requested injunction relies on new assertions

---

[5] If BHU is seeking to amend its claims, it must first file a motion to reopen. "Once judgment has been entered in a case, a motion to amend the complaint can only be entertained if the judgment is first reopened under a motion brought under Rule 59 or 60." *Lindauer v. Rogers*, 91 F.3d 1355, 1357 (9th Cir. 1996). BHU has not brought a motion to reopen or to amend the complaint.

or facts not contained in the complaint, the district court lacks the authority to grant relief. *Id.* Here, BHU's TRO motion asserts entirely distinct facts regarding that were never raised in the underlying litigation. Under well-established constitutional limitations and judicial precedent, this Court lacks the legal authority to grant the requested relief.

BHU may point to the judgment's reservation of certain individual accommodation claims and claims concerning other encampments. But that reservation does not convert the BHU action into a general purpose vehicle for litigating every subsequent dispute involving a person who identifies as a BHU member. The present dispute concerns a separate animal control incident, at a different location, occurring before the abatement of Ms. Yow's encampment, and based on facts that were not part of the claims adjudicated by the Court. Furthermore, Ms. Yow is not a Harrison Corridor camper nor is she one of the individuals that the court has retained authority over.

In short, the question is not whether BHU or Ms. Yow may ever bring a claim concerning Griz. The question is whether this new dispute belongs in the already-adjudicated BHU action. It does not. Allowing BHU to litigate this dispute through the BHU docket would contravene fundamental limitations on jurisdiction power. It also conflicts with well-established procedural mechanisms including the filing of a proper compliant that complies with Federal Rule of Civil Procedure ("FRCP") 3, service of process under FRCP 4, and the random case assignment procedures mandated by Local Rule 3-3. If any alleged injury to any person affiliated with BHU could be presented through this action merely because that person was affected by some City action, the judgment would cease to define the scope of the litigation. This litigation would instead become the forum for successive, unrelated disputes involving different people, different City programs, different factual circumstances, and different legal theories.

The Court should therefore decline to consider BHU's TRO Motion as part of the BHU litigation. This conclusion would not prevent Ms. Yow or BHU from pursuing an independent claim concerning Griz if they have a legally cognizable claim to do so. It simply recognizes that an independent dog-impoundment dispute should not be litigated through a case whose pleaded

claims have been adjudicated and whose judgment and permanent injunction concern a different controversy.

**B. BHU Cannot Prevail on the Merits of Its Claims**

**a. BHU's Attorney Did not Make an Accommodation Request on Behalf of Ms. Yow, and Ms. Yow Confirmed to the City that no Extension was Necessary.**

BHU's motion significantly misrepresents the facts. The interactive process that began in July 2026 was regarding a request for more than nine square feet on the public right-of-way. Radu Decl. The City granted the request but denied the request that she stay at her existing location during the week the City planned to clean the area to address mounting public health hazards that had not been sufficiently mitigated through multiple voluntary cleanup efforts. The City granted other requests such as an extension of time to relocate and assistance with relocating. Radu Decl. After the extension expired, and after multiple rounds of posted notice, the City abated the encampment, storing items consistent with its policies. Radu Decl. The City impounded Kitty as a result of that closure, given that Ms. Yow was arrested. Ms. Yow has since retrieved Kitty, and the City did *not* impound Griz during that closure; this impound took place five days earlier, as described above.

There is no pending accommodation request related to her impounded dog. A plaintiff must identify "specific reasonable" and "necessary" accommodations that the public entity failed to provide; merely identifying a disability and a general need for accommodation does not satisfy that requirement. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

Ms. Prado requested "additional time to prepare for the hearing" prior to the City even scheduling the hearing. Radu Decl. The City subsequently scheduled the hearing for five days later, and noted that "this date includes additional time as an accommodation for Ms. Yow, as the City typically holds these hearings much sooner after a potentially dangerous dog is seized." Radu Decl. The City thus granted this request and did not receive additional communication about the proposed date until Mr. Prince emailed the afternoon before the scheduled hearing. Radu Decl. In Mr. Prince's email communications, he admitted that he had not had contact with Ms. Yow, and his request for more time was due to his being out of town, inability to reach Ms.

Yow, and need for more time to review the hearing packet. Radu Decl. This was despite Ms. Prado meeting with Ms. Yow in person that weekend, and Mr. Prince demonstrating sufficient time and capacity to prepare a restraining order application.

Mr. Prince subsequently stated that "as a person with a disability, Ms. Yow is entitled to reasonable accommodations and before this hearing can go forward, the interactive process must be completed." He did not explain what accommodation Ms. Yow would need, nor why the originally scheduled date, 19 days after the dog was first impounded, was not a sufficient amount of time. Moreover, by his own admission Mr. Prince had no contact with Ms. Yow, so the City could not engage in an interactive process with someone he could not reach, nor could Mr. Prince have discussed which accommodations, if any, Ms. Yow would need during the hearing. Nonetheless, as a professional courtesy, the City extended the hearing date to the next day. Mr. Prince indicated this was unacceptable because he was not available that day (without explaining what would prevent his attendance).

In direct contradiction with BHU's attorney's assertion, Ms. Yow showed up at Animal Care Services on the originally scheduled day of her hearing, and communicated that she would be able to attend the hearing the following day. She did not ask staff for a further extension. Concerningly, she expressed that neither Ms. Prado nor Mr. Prince had informed her about the hearing, the extension, or this restraining order motion. She also told staff that she had not been provided with the hearing packet Ms. Prado retrieved on her behalf, and that she did not know if Mr. Prince was representing her in this matter.

In short, the City has already granted the unrelated accommodation request made on Ms. Yow's behalf, as well as provided a one day extension as a reasonable accommodation in response to Ms. Prado's accommodation request, purportedly on Ms. Yow's behalf. However, the City has not received or denied any specific reasonable and necessary accommodation request from Mr. Prince. Even so, given the significant danger that Griz presents to Animal Control staff, the impact on the shelter program operations, and the risk Griz has presented to the public, including Ms. Yow's continued practice of leaving him alone or unleashed, the City would have several defenses including undue administrative burden, direct threat, and

fundamental alteration. The City would request further briefing on this matter and its defenses if the Court determines it has jurisdiction to resolve this dispute, and that the City must allow Ms. Yow's counsel additional time to make a specific reasonable accommodation request on Ms. Yow's behalf.

**b. The City Provided Adequate Notice and Hearing Rights under the Fourth and Fourteenth Amendment**

The traditional test for due process claims is set forth in *Mathews v. Eldridge,* 424 U.S. 319 (1976), which is a flexible test that takes into account the government's interest with respect to burdens imposed by additional due process. Under *Mathews*, the "identification of the specific dictates of due process generally requires consideration of three distinct factors." 424 U.S. at 334–35. "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

The City does not dispute that Ms. Yow has a property interest in her dog Grizz, which is why the City has gone to such lengths to ensure she received proper notice, through all the avenues available to the City. Not only did the City reach out multiple times to the contact info on file, City staff also did drive-bys to her last known location, provided information to the individual close to her who claimed to be taking care of the dog, and started over the five day "clock" on the day the City provided notice by email to Ms. Yow's BHU representative, Ms. Prado. The notice sent to Ms. Prado, with BHU's attorney included on the email, informed Ms. Yow where her dogs were being kept, how she could retrieve them, and gave her a right to a hearing as to the vicious and dangerous determination. Notice proved to be adequate because Ms. Yow retrieved her dog Kitty before the deadline, requested a hearing as to Grizz before the deadline, and communicated to the City that she was able to attend the hearing scheduled for September 10.

BHU has failed to point to any caselaw holding that a pre-deprivation process violation occurs when a public agency merely fails to accommodate an attorney's request for additional time to prepare. BHU was aware since at least August 31 that a hearing would be required to contest the vicious and dangerous determination, but did not ask for an extension until the day before the scheduled hearing. Providing additional delay at the request of Ms. Yow's attorney, apparently without her knowledge, would result in unacceptable safety risks to City staff and increased burdens on the City and its animal shelter. The City's interest in ending its caretaking obligations of a dangerous and vicious dog, and keeping the general public safe from the animal, outweighs the marginal benefit that Ms. Yow may receive from an additional week of attorney preparation.

In sum, the City met its constitutional obligations to provide Ms. Yow opportunity to retrieve her animals before they were destroyed, and the right to notice and a hearing prior to any destruction.

**c. The City's ordinance and state law allow for euthanasia under these circumstances.**

State law allows a city to euthanize a dog that has not been picked up during the holding period, "if it has a history of vicious or dangerous behavior documented by the agency charged with enforcing state and local animal laws." California Food and Agricultural Code § 31108, 31108.5(b). The required holding period for a stray dog such as Griz is six business days, but for shelters like the City's there is an exception: because the shelter is open on a weekend day, the holding period is four business days, not including the day of impoundment. F&A Code § 31108(a)(1)(A). Thus, under state law, a dog with vicious and dangerous behavior can be euthanized if not retrieved in four business days.

The City of Berkeley has established its own process for handling vicious and dangerous dogs, as authorized by state law. "Nothing in this chapter shall be construed to prevent a city or county from adopting or enforcing its own program for the control of potentially dangerous or vicious dogs that may incorporate all, part, or none of this chapter, or that may punish a violation of this chapter as a misdemeanor or may impose a more restrictive program to control potentially

dangerous or vicious dogs." F&A Code § 31683. The City's program is codified in Berkeley Municipal Code ("BMC") 10.04.170 – 10.04.172. This program provides the right to a hearing to dispute a City finding that a dog is vicious or dangerous, "within five working days" following the City investigation and notification of such a finding. With respect to an impoundment of a vicious and dangerous dog, "any dog not reclaimed within a reasonable time after such impoundment shall be subject to adoption or destruction, as appropriate." BMC 10.04.172.D.

A person can keep a vicious and dangerous dog under certain circumstances. The minimum requirements are that they must maintain a $50,000 insurance policy against any claim of loss, damage or injury resulting from the dog, and they must keep the dog securely confined, keep the dog muzzled and restrained with a chain outside of the confined area, and not be kept for dog fighting, breeding, or other prohibited activities. BMC 10.04.171. However, the City Manager also has discretion to impose other conditions. If a dog is determined to be vicious or dangerous after a hearing, "the City Manager or their designee may order the owner/guardian or harborer of the dog to keep the animal confined as provided in this section and/or make such other and further orders reasonable under the circumstances." BMC 10.04.172.C.1.

Taken together, state law and the BMC clearly allow the City to euthanize a vicious and dangerous dog after such a determination is made at a hearing, and also if such a dog was not reclaimed after being impounded for four business days.

The City went beyond the requirements in state law and the BMC and gave Ms. Yow until September 5 to retrieve her dog under the conditions applicable to vicious and dangerous dogs, restarting the "holding period" clock when the City provided notice to BHU on August 31. The September 5 deadline was 15 days after it was first impounded. Ms. Yow chose to keep the dog impounded and challenge the vicious and dangerous finding. Should the City find, after a hearing, that the dog indeed meets the criteria as vicious and dangerous, it is well within its rights under both state and local law, to humanely euthanize the dog.

**C. The Equities Weigh in Favor of Denying this Application, Plaintiff had Notice and Opportunity to Address Irreparable Harm, and Denial is in the Public Interest.**

The balance of equities weighs heavily against BHU's requested relief. BHU seeks to use this action to obtain relief concerning an independent animal-control incident that occurred five days before the City's abatement of Ms. Yow's encampment and that was not part of the claims adjudicated in this case. The impoundment arose from significant safety concerns for city staff and the public, with a dog that has a long history of aggressive behavior. See Decl. of Rivera ¶ 7. The City has a legitimate interest in allowing its animal control process to proceed.

Ms. Yow has had many opportunities to challenge the impoundment and determination of dangerousness to address concerns about irreparable harm, including potential euthanasia. The City left messages for Ms. Yow, gave information to her friend, and sent information to her counsel. She was present at the hearing today, September 10, 2026, with counsel, and chose not to make any argument through counsel. See Rivera Decl. ¶14. The City has already greatly exceeded the requirements in state law by providing far more than five-days notice to retrieve her dog or challenge the determination—it has now been 20 days since impoundment and 10 days since notice was provided to BHU.

The equities favor neither expanding this action to encompass a separate animal-control dispute, nor disturbing the City's animal-control process through a post-judgment motion.

## V. <u>CONCLUSION</u>

The City respectfully requests that the Court decline to exercise jurisdiction over BHU's TRO motion and otherwise deny the motion.

Respectfully Submitted,

CITY ATTORNEY'S OFFICE

Dated: September 10, 2026

/s/ Sara Stephens

SARA STEPHENS

Attorneys for Defendant City of Berkeley