Farimah Faiz Brown, City Attorney (State Bar No. 201227)
Laura Iris Mattes, Deputy City Attorney (State Bar No. 310594)
Nubyaan Scott, Deputy City Attorney (State Bar No. 331584)
Sara Stephens, Deputy City Attorney (State Bar No. 300589)
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile: (510) 981-6960
Email: FBrown@berkeleyca.gov
KEiland@berkeleyca.gov
LMattes@berkeleyca.gov
NScott@berkeleyca.gov
SStephens@berkeleyca.gov

Attorneys for Defendant
CITY OF BERKELEY

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BERKELEY HOMELESS UNION,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BERKELEY, et al.<br><br>Defendants. | **Case No. 3:25-CV-01414-EMC**<br><br>**JOINT STATUS REPORT** |

Pursuant to the Court's September 9, 2026 order, the parties submit this Joint Status Update regarding the interactive process concerning the reasonable accommodation requests of Bradford Raymer and Jackeline Mendoza and their potential relocation to Fourth and Camelia Street.

## DEFENDANT CITY OF BERKELEY'S STATEMENT

### I. FACTUAL UPDATE

Following the Court's direction to assess the potential relocation site at Fourth and Camelia Street, on September 3, 2026, the City provided BHU with its complete site measurements for two possible tent locations. ECF No. 338-3 at 21. The City measured the first location at 32 feet in length and 75 inches (or 6.25 feet) in width, and the second location at 161 feet in length and 4.5 feet in width. *Id*. The City explained that these measurements reflected requirements for maintaining emergency access, pedestrian access, and vehicle ingress and egress. *Id.* The City also conveyed guidance from the Deputy Fire Marshal, including fire safety clearances from property lines, fire break requirements for larger encampments, and the prohibition on constructing any structures at the site other than tents. *Id*.

On the afternoon of September 9, BHU emailed the City and provided the tent dimensions requested for Mr. Raymer and Ms. Mendoza. Declaration of Nubyaan Scott ("Scott Decl.") ¶ 5. BHU stated that both individuals were requesting Coleman tents measuring 16 feet by 7 feet. *Id*. BHU asked the City to confirm whether these tents could be accommodated at the site and, if modifications were required, to identify the largest tent size that could fit there, including manufacturer and model. Scott Decl. ¶ 6.

Later that day, the City responded and reiterated that the measurements provided on September 3 constituted the maximum allowable dimensions based on the City's complete assessment and applicable fire and safety requirements. Scott Decl. ¶ 7. The City informed BHU that both available sidewalk spaces were smaller than the tent dimensions BHU submitted for

Mr. Raymer and Ms. Mendoza. Scott Decl. ¶ 8[1]. The City further clarified that it did not require a particular tent brand and does not possess specialized knowledge about tent models; instead, as its best offer of 3x3 accommodation, the City provided BHU with the largest possible footprint dimensions available at the site. Scott Decl. ¶ 9. The City requested that BHU inform the City and the Court whether its two members could maintain tents within the smaller available footprints. Scott Decl. ¶ 8.

**Importantly, BHU maintain that Mr. Raymer and Ms. Mendoza require a combined footprint size of 660 sq ft, 11ft by 30 ft each. *Id*. This footprint is the size of many 1-2 bedroom apartment and is significantly larger than the allowable dimensions at 4th and Camelia**. The distinction between tent size and footprint size is highly relevant. Earlier phases of this litigation—including the Court-ordered walkthrough—evaluated the space required for an individual's full "footprint," meaning the tent together with any belongings or items maintained outside the tent. ECF No. 338-3 ¶ 13; ECF No. 338-3 at 7-10. Although the Court's most recent order directed BHU to submit tent sizes, the City has continued to assess footprint dimensions because the original assessments conducted under Court supervision were based on total usable space, inclusive of belongings. *Id*. At the time of the assessment, the City informed BHU that the measurements provided represented the maximum allowable footprints at each location consistent with the Court's criteria, the California Fire Code, and other applicable ordinances. *Id*.; ECF No. 288 at 59. As such, the City requests that any resulting Court order specify the maximum footprint size, tent and belongings, that either Mr. Raymer or Ms. Mendoza can occupy. [2]

---

[1] It is not clear whether the individuals intend to camp side by side in one location, or each in their own location, but in either scenario the proposed footprint exceeds the allowable sidewalk capacity.

[2] BHU remains free to select any tent size allowed by the Court, provided that the tent and any belongings—whether stored inside or outside the tent—do not exceed the total allowable footprint established through the City's site assessment.

## II. CITY'S POSITION ON PROPOSED RELOCATION SITES AT 4TH AND CAMELIA

The City has fully complied with the Court's summary judgment order which determined that the City's prior application of the "3x3 rule" was overly categorical and required individualized assessment. ECF No. 288 at 56–59. The Court stated that "this ruling does not entitle any claimant to any particular tent dimension." ECF No. 288 at 72. The Court further stated that "the City may deny a proposed tent placement that, on the specific facts of a given location, would obstruct pedestrian passage or emergency access." ECF No. 288 at 59. The City has acted consistent with this direction.

The City's assessment of Fourth and Camelia Street was undertaken in response to BHU's identification of the site pursuant to the Court's order directing BHU to propose potential locations for its members that the City must then assess using the Court's enumerated criteria. ECF No. 288 at 59. In accordance with that directive, the City has evaluated the site BHU selected, including the physical feasibility and safety considerations the Court has deemed relevant to potential placement at Fourth and Camelia Street. Scott Decl. ¶ 3.

The City has completed its assessment of the Fourth and Camelia Street location identified by BHU pursuant to the Court's orders. Scott Decl. ¶ 3. Given BHU's position that the smallest footprint these members can maintain is 330 square feet (or 11x30) each, for a total of 660 square foot total, the measured physical space available at this location is significantly smaller than this footprint size. Even the tents alone, 12 ft by 7ft, do not fit within the measured area. *Id.*

The City notes that the physical characteristics of Fourth and Camelia Street may prevent maintaining the required pedestrian and emergency access described in the Court's order. ECF No. 338-2. The Court stated that the City "retains authority… to enforce AR 10.2 and other rules governing use of sidewalks where an individual's belongings actually obstruct pedestrian passage or emergency access, or present a concrete public health or safety hazard." ECF No. 288 at 59. The Court emphasized that any accommodation must preserve the required path of travel,

generally six feet on most sidewalks, and must not impair emergency vehicle access. ECF No. 288 at 56–57, 59. This location specific characteristics -- including narrow sidewalk widths, adjacent construction staging, and limited turning radius at the dead-end -- requires careful monitoring in order to ensure that the City maintains the required pedestrian and emergency access, as well as the ability manage other concerns provided for in AR 10.2.

Furthermore, the specific circumstances of this location may lead to potentially foreseeable health and safety impacts. *Id*. As described in detail in the previously filed Declaration of City Manager Paul Buddenhagen and its accompanying exhibits, the City has received more than seventy emails and phone calls from parents and caregivers whose children attend local preschools near the proposed Fourth and Camelia Street relocation area. ECF No. 338-1; ECF No. 338-2. The communications consistently express that they do not believe the Fourth and Camelia location is appropriate for an encampment of any size. ECF No. 338-2. Their concerns include narrow and congested pedestrian pathways, stroller and wheelchair accessibility limitations, impacts on emergency vehicle access, rodent activity and leptospirosis exposure, sidewalk debris, and risks associated with off-leash animals. *Id*. Parents further explained that toddlers and preschool-aged children traverse this sidewalk daily and are especially vulnerable because they move at ground level and cannot reliably avoid hazards. *Id*. The correspondence also surfaces potential issues that were unable to be observed during the parties' assessment of the site including vehicle congestion during preschool drop-off and pick-up hours and personal accounts of witnessing multiple fires at the proposed location. Scott Decl. ¶12.

These concerns correspond to the same safety criteria—pedestrian access, emergency access, and public health hazards—that the Court identified as permissible considerations when determining whether an accommodation is feasible. ECF No. 288 at 57–59. In fact, these observations are crucial as they reflect the lived experiences of the only individuals before the Court who actually reside near, work near, or regularly walk with very young children through the proposed relocation area. *Id*. The City respectfully submits that these firsthand accounts merit

significant deference because they provide concrete, real-world insight into foreseeable pedestrian safety, emergency access, and child health impacts unique to this particular location. *Id*.

Accordingly, the City requests that any Court order regarding the space Mr. Raymer and Ms. Mendoza are allowed to occupy specify the entire footprint size, tent and any belongings, in order to allow for appropriate City management.

## III. OBJECTIONS TO SECOND STREET STATEMENT

The City objects to BHU's inclusion of information regarding Second Street. The City was not provided notice of BHU's position on this issue until it received a copy of BHU's statement past 4:00pm on September 11, 2026. This information exceeds the scope of this filing and the City requests that the Court decline to consider this information until the City has an adequate opportunity to respond.

**PLAINTIFF BERKELEY HOMELESS UNION'S STATEMENT**

Pursuant to the Court's September 9, 2026 Order (ECF 342), Plaintiff Berkeley Homeless Union ("BHU") submits its portion of the joint status report regarding the interactive process for Bradford Raymer and Jackeline Mendoza's relocation to Fourth and Camelia Street.

**I. BHU'S FINAL REASONABLE ACCOMMODATION REQUEST**

On September 9, 2026 at 4:29 PM, BHU provided the City with the final tent dimensions requested by Mr. Raymer and Ms. Mendoza, as required by the Court's order:

| **Name** | **Tent Model** | **Tent Floor Dimensions** |
|---|---|---|
| Bradford Raymer | Coleman | 16 feet x 7 feet |
| Jackeline Mendoza | Coleman | 16 feet x 7 feet |

BHU also requested that the City either:

- Confirm that these dimensions can be accommodated at Fourth and Camelia Street; or
- Identify the largest tent size that can be accommodated, including the specific manufacturer and model, so that the parties could continue the interactive process in good faith.

BHU has researched commercially available tents—the tents that a person can actually purchase at a store and use for shelter. The smallest tent BHU could locate is still 7 feet wide. BHU has not been able to find any commercially available tent that is smaller, because a tent narrower than 7 feet would not allow a person to lie down to sleep properly, let alone stand up, store essential belongings, or shelter themselves from the elements.

The City's measurements at Fourth and Camelia are approximately 4.5 feet wide in one spot and approximately 6.25 feet wide in the other. See ECF 338 at 14 (City's portion of the Joint Status Report, citing Scott Declaration ¶ 12)

Neither measurements given by the City can accommodate even the smallest commercially available tent. A 4.5-foot-wide space is narrower than a standard twin bed. A 6.25-foot-wide space is only slightly wider than a twin bed and leaves no room for a person to stand, store belongings, or move around. These are not hypothetical concerns. They are the basic physical requirements of human shelter.

These functions—lying down to sleep, standing up, and sheltering oneself from the elements—are vital to human life. A tent that cannot accommodate these functions is not a shelter. It is a denial of shelter.

The City's measurements therefore do not provide a reasonable accommodation. They provide no accommodation at all. The City cannot satisfy its obligation under the ADA by offering a footprint that no manufactured tent can fit into.

Please see image below of the smallest tents available at retailers in the vicinity:

Walmart - 1400 Hilltop Mall Rd, Richmond, CA 94806



REI - 1338 San Pablo Ave, Berkeley, CA 94702




The City's current offer is not the first time the City has attempted to force residents into undersized tents. On October 4, 2022, during an abatement at 8th and Harrison Streets, the City issued two-person tents to residents and discarded any property that did not fit inside them. [*See* news article: *'Everything Is Gone, and You Become More Lost': 12 Hours of Chaos as Berkeley Clears Encampment* https://www.sfpublicpress.org/everything-is-gone-and-you-become-more-lost-12-hours-of-chaos-as-berkeley-clears-encampment/ ]

Residents lost the majority of their belongings because a two-person tent cannot accommodate a person's essential property and their emotional support animals. The City is now attempting to repeat this pattern by offering a footprint that cannot accommodate any standard tent available for purchase.



*Alice Barbee squeezes inside her tent to put away her property at the 8th and Harrison encampment on October 4, 2022. She hunches over sorting the remaining items that she could save. Her pit bull, Compass, lies outside in the concrete. The tent is too small for both of them. Photo credit: Yesica Prado / San Francisco Public Press*



*A row of two-person tents issued by the City of Berkeley to encampment residents at 8th and Harrison Streets, pictured after a 12-hour abatement operation on October 4, 2022. Residents were forced to fit their belongings inside these tents or lose them.*

*Photo credit: Yesica Prado / San Francisco Public Press*

**II. THE CITY'S RESPONSE**

A. The City's September 3 Email

On September 3, 2026, the City provided additional information regarding the Fourth and Camelia location. The City stated:

"The City's measurements for the two sites assessed at this location were: 32 feet in length and 75 inches in width for the first location closest to the railroad fence and next to a red

curb, to allow for both emergency access and pedestrian access; and 161 feet in length and 4.5 feet in width in the area of the curb that is not red, to allow for both pedestrian access and vehicle ingress and egress."

The City also provided the following additional restrictions:

- Combustible items must remain 10 feet from the property line (CFC 315.4), or 3 feet if under 6 feet tall;
- A 12-foot fire break is required between encampments when the footprint reaches 700 square feet (CFC 3103.7.6);
- Encampments must remain tents only and no structures can be built;
- All red curbs must remain clear of obstructions; and
- The dead end cannot be occupied because it provides access to the tracks and serves as a vehicle turnaround.

B. The City's Measurements Cannot Accommodate Any Standard Tent

The City's measurements are as follows:

First spot (near railroad fence, next to red curb) — 32 feet long / 75 inches wide (6.25 feet)

Second spot (non-red curb) — 161 feet long / 4.5 feet wide

BHU has researched commercially available tents. The smallest tent BHU could locate is 7 feet wide. Neither of the City's measurements can accommodate even the smallest commercially available tent.

C. The City Did Not Engage in Providing a "Best Offer of Accommodation"

The Court's order requires the joint report to include "the City's best offer of an accommodation." ECF 342 at 3. The City's September 3 email provides measurements and restrictions. It does not provide a specific tent size that the City will accept or a statement that no tent can fit.

The City's September 11 email states that its "best offer" is "the largest possible footprint dimensions available at the site." But the City does not translate those dimensions into a tent size

that Mr. Raymer and Ms. Mendoza can actually use. The City does not identify a manufactured tent that fits within its measurements. The City does not state whether any tent can fit at either location.

D. The City's September 11 Email Contradicts Its September 3 Email

The City's September 11 email states that the City "has never stated that the City's position is that no tent can fit in the location." But the City's September 3 email provides measurements—6.25 feet wide in one spot and 4.5 feet wide in the other—that cannot accommodate any commercially available tent. The smallest commercially available tent is 7 feet wide. The City's own measurements therefore establish that no tent can fit at either location.

The City cannot avoid this conclusion by saying it has never stated it explicitly. The City's measurements speak for themselves.

**III. THE INTERACTIVE PROCESS DID NOT RESULT IN A REASONABLE ACCOMMODATION**

A. The City Has Not Provided a "Best Offer of Accommodation"

The Court's order requires the joint report to include "the City's best offer of an accommodation." ECF 342 at 3. The City states that its best offer is "the largest possible footprint dimensions available at the site." But the City has not translated those dimensions into a tent size that can actually be purchased and used.

The City's position is that BHU should "inform the City and the Court whether its two members believe they can maintain the smaller footprints available." But this shifts the burden onto BHU and Mr. Raymer and Ms. Mendoza. The City is the party with the obligation to provide a reasonable accommodation. The City cannot satisfy that obligation by providing raw measurements and asking the disabled individuals to determine whether they can make it work.

Therefore, the City is not engaging in the investigative process that the interactive process requires, in violation of this Court's orders. The interactive process requires the City to gather sufficient information to determine whether a reasonable accommodation exists. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). The City cannot satisfy that obligation by

providing raw measurements and asking BHU to determine whether its members can make them work. The City must engage with what actually exists in the world—what tents are manufactured, what tents are available for purchase, and what tents can actually shelter a human being.

If the City's response is not grounded in what exists in the world and what is realistic, a fair analysis has not taken place. The ADA does not require a disabled individual to accept a theoretical space that no manufactured tent can fit into. It requires the City to provide a reasonable accommodation—one that actually works in practice, not just on paper.

The City's September 11 email states that the City "has never stated that the City's position is that no tent can fit in the location." But the City's own measurements establish that no tent can fit. The smallest commercially available tent is 7 feet wide. The City's measurements are 6.25 feet and 4.5 feet. The math is not complicated. The City cannot avoid this conclusion by saying it has never stated it explicitly.

The City's failure to engage with the real-world implications of its measurements is not a technical deficiency. It is a failure to engage in the interactive process at all. The Court's order requires the City to offer a reasonable accommodation. The City has not done so.

<u>B. The City Has Refused to Engage in a Real-World Discussion of Available Tents</u>

BHU asked the City to identify the largest tent size that can be accommodated, including the specific manufacturer and model. This request was made in good faith so that the parties could determine whether a manufactured tent exists that would fit the City's footprint dimensions.

The City declined. The City stated it "does not possess specialized knowledge about tent models" and does not "require a particular tent brand or model." But this misses the point. BHU is not asking the City to recommend a brand. BHU is asking the City to confirm whether any standard, commercially available tent can fit within the City's measurements. If no such tent exists, then the City's offer is not a reasonable accommodation—it is a denial dressed up as an offer.

The Court found that Fourth and Camelia is "potentially viable" for relocation. ECF 342 at 3. If the City's measurements are accurate, then the location is not viable at all, and the Court's finding was based on incomplete information. BHU requests that the Court resolve this contradiction.

**IV. BHU'S POSITION**

BHU has complied with the Court's order. BHU provided the tent dimensions by the September 9 deadline. BHU members even considered downsizing their footprint from 11'x 30' to 11' x 20' to work out a reasonable accommodation.

BHU requested the City's best offer and asked the City to identify a tent size that could be accommodated. BHU has been ready and willing to meet and confer. The City's counsel declined to do so without Mr. Prince. The City would not allow ADA Coordinator Thomas Gregory complete the interactive process with BHU's President Yesica Prado, despite that BHU made this offer in good faith to resolve these accommodation requests.

The City has not provided a best offer that would allow Mr. Raymer and Ms. Mendoza to shelter themselves. The City has provided measurements that cannot accommodate any standard tent. The City has declined to identify a tent size that would fit.

The injunction should remain in place. The Court's order provides that "the injunction shall remain in place until this Court has determined that the City has offered a reasonable accommodation." ECF 342 at 3. The City has not offered a reasonable accommodation. It has offered measurements that do not work.

BHU remains ready and willing to meet and confer with the City—through counsel or through Mr. Gregory, as appropriate—to resolve this matter. BHU asks that the City engage in a real-world discussion of what tent can actually be purchased and used at this location.

**VI. EMERGING ISSUES FOR THE NEXT STATUS REPORT: OBSTRUCTION AT SECOND STREET**

BHU writes to alert the Court to an emerging issue that will affect the interactive process for the five individuals seeking relocation to the Second Street area (Shawman, Jermaine Lee

White, Gregory Grove, Lisa Saechao-y-chain, and Quinton Cocklereese). See ECF 342 at 3-4 (ordering a joint report by September 18, 2026, regarding these individuals).

The locations at Second Street that BHU identified for relocation are now being blocked off by large piles of dirt. These piles are not natural accumulations—they appear to be hardscaping or construction materials placed in the area. As a result, the physical space that was previously available for tents is now obstructed. See picture attached below.



*Large piles of dirt obstructing the sidewalk and street area at Second Street,*

*photographed on September 11, 2026. These piles were placed in the area after BHU identified these locations as potential relocation sites for BHU members.*

The City is permitting these obstructions to remain. If the City allows the hardscaping of these sites to continue, no reasonable accommodation can be issued at these locations. BHU anticipates that when the parties return to the Court for the September 18 joint report, the City will claim—just as it has at Fourth and Camelia—that no tent can fit at Second Street. But this outcome will be the result of the City's own actions in allowing the sites to be obstructed, not of any inherent limitation of the locations.

BHU requests that the Court be aware of this issue and that the City be directed not to take actions that would foreclose the possibility of a reasonable accommodation at Second Street before the interactive process for these five individuals is complete.

Respectfully Submitted,

Dated: September 11, 2026

CITY ATTORNEY'S OFFICE

__/s/ Nubyaan Scott__________________________

Nubyaan Scott
Attorney for Defendants

Dated: September 11, 2026

__/s/ Anthony Prince__________________________

Anthony Prince
Attorney for Plaintiff

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3) regarding signatures, I, Nubyaan Scott, attest that I have obtained concurrence from all signatories to file this document.