**Anthony D. Prince (SBN # 202892)**
General Counsel, California Homeless Union/Statewide Organizing Council
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Tel: 510-301-1472

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BERKELEY HOMELESS UNION,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF BERKELEY, THOMAS GREGORY, PAUL BUDDENHAGEN, PETER RADU, OKEYA VANCE-DOZIER, RASHI KESERWANI, DOES 1-10<br><br>Defendant. | Case No.: 3:25-cv-01414-EMC<br><br>**STATUS REPORT** |

BHU's counsel, Anthony Prince, experienced a medical emergency involving his wife on the afternoon of September 18, 2026, and spent the remainder of the day and evening in the emergency room. Throughout Friday night and Saturday, September 19, as he explains in his Declaration filed concurrently with this report, Mr. Prince had to attend to his wife. As a result, BHU was unable to transmit its portion of this joint report to the City before the City began its filing process. BHU submits its portion of the report now and requests that the Court consider it in full. BHU apologizes for any inconvenience to the Court and to the City. (Declaration of Anthony Prince.)

**BERKELEY HOMELESS UNION'S PORTION OF THE JOINT STATUS REPORT**

Pursuant to the Court's September 9, 2026 Order (Dkt. 342), Plaintiff Berkeley Homeless Union ("BHU") submits its portion of the joint status report regarding the conclusion of the interactive process for the five individuals seeking relocation to areas the City has deemed "No Lodging/TNC Prohibited": Shawman, Jermaine Lee White, Gregory Grove, Lisa Saecha-y-chain, and Quinton Cocklereese.

BHU has attempted in good faith to complete the interactive process with the City to include our results on this joint report. However, the City has declined to engage in the interactive process, has failed to respond to BHU's clarifying questions, and has never issued written determinations on any of the five individuals' accommodation requests. (Declaration of Yesica Prado ("Prado Decl.") ¶¶ 12, 15, 33.)

**I. PLAINTIFF'S FINAL REASONABLE ACCOMMODATION REQUEST**

Pursuant to the Court's order, BHU submits the following final reasonable accommodation requests for the five individuals covered by this report. These requests were submitted to the City on September 14, 2026, along with nexus statements for each individual. (Prado Decl. ¶¶ 4–5 & Ex. A.)

***1. Shawman***

<u>Tent size:</u> 6-person tent (10' x 10')

<u>Requested footprint:</u> 11' x 20'

<u>Proposed location:</u> 1499-1451 Second Street (behind K-rails)

<u>Disability-related need:</u> Space for shelter, survival gear, and medical supplies

Nexus: Shawman requires space for a tent large enough to shelter herself and store her survival gear and medical supplies. A 3x3 footprint is 9 square feet—roughly the size of a small closet—and no tent can fit within that space. Without a tent, Shawman would be forced to sleep on the ground, exposed to the elements, with no protection from cold, rain, heat, or insects. She would also be unable to store her medications safely, prepare food, change clothes, or perform basic daily functions. For a person with a disability, the inability to perform these functions directly aggravates her condition, causing sleep deprivation, worsening pain and increased risk of medical crisis.

***2. Jermaine Lee White***

Tent size: 10-person tent (17' x 9')

Requested footprint: 11' x 30'

Proposed location: 1499-1451 Second Street (sidewalk behind K-rails)

Disability-related need: Space for shelter, survival gear, medical supplies, and his emotional support animal

Nexus: Mr. White requires space for a tent large enough to shelter himself, store his medical supplies and survival gear, and keep his emotional support animal. A 3x3 footprint is 9 square feet and no tent can fit within that space. Without a tent, Mr. White would be forced to sleep on the ground, exposed to the elements. He would be unable to store his medications safely, prepare food, or perform basic daily functions. He would also be separated from his emotional support animal, which is essential to managing his disability. For a person with a disability, the inability to perform these functions and the loss of an emotional support animal directly aggravates his condition, causing psychiatric decompensation, sleep deprivation and worsening physical health.

***3. Gregory Grove***

Tent size: 8-person tent (7' x 16')

Requested footprint: 10' x 20'

Proposed location: 1499-1451 Second Street (sidewalk behind K-rails)

Disability-related need: Space for shelter, survival gear, art supplies, and medical supplies

Nexus: Mr. Grove lives with OCD, ADHD, and a heart condition. A 3x3 footprint is 9 square feet—roughly the size of a refrigerator—and no tent can fit within that space. Without a tent, Mr. Grove

would be forced to sleep on the ground, exposed to the elements, with no protection from cold, rain, heat, or insects. He would be unable to maintain the stable, organized environment that his disabilities require. For a person with OCD and ADHD, the loss of routine and the inability to organize belongings causes decompensation. For a person with a heart condition, the inability to rest and sleep properly increases cardiac strain and the risk of a cardiac event. The requested footprint is the minimum necessary to accommodate a tent large enough to shelter himself, store his art supplies, and maintain the stability essential to managing his disabilities.

***4. Lisa Saecha-y-chain***

Tent size: 6-person tent (10' x 10')

Requested footprint: 10' x 20'

Proposed location: Second and Page Street

Disability-related need: Space for shelter, survival gear, and medical supplies

Nexus: Ms. Saecha-y-chain requires space for a tent large enough to shelter herself and store her survival gear and medical supplies. A 3x3 footprint is 9 square feet—roughly the size of a small closet—and no tent can fit within that space. Without a tent, Ms. Saecha-y-chain would be forced to sleep on the ground, exposed to the elements, with no protection from cold, rain, heat, or insects. She would be unable to store her medications safely, prepare food, change clothes, or perform basic daily functions. For a person with a disability, the inability to perform these functions directly aggravates her condition, causing sleep deprivation, worsening pain, and increased risk of medical crisis.

***5. Quinton Cocklereese***

Tent size: 8-person tent (7' x 16')

Requested footprint: 11' x 20'

Proposed location: Second and Page Street

Disability-related need: Space for shelter, survival gear, mobility aids, medical supplies, and his emotional support animal

Nexus: Mr. Cocklereese requires space for a tent, his mobility aids, his medical supplies, and his emotional support animal. A 3x3 footprint is 9 square feet and no tent or large dog kennel can fit within that space. Without a tent, Mr. Cocklereese would be forced to sleep on the ground with his

animal companion, both exposed to the elements. He would be unable to store his medications safely or perform basic daily functions like cooking and sleeping. He would also be separated from his emotional support animal, which is essential to managing his disability. For a person with a disability, the inability to perform these human life functions and the loss of an emotional support animal directly aggravates his condition.

The diagrams below show, to scale, how the requested footprints may be actually used. Figure 1 illustrates a 10' x 20' footprint with a 10' x 10' (6-person) tent and a full range of daily life functions—sleeping, walking, cooking, hygiene, changing clothes, storing medications, and storing survival gear. Figure 2 illustrates an 11' x 20' footprint with a 16' x 7' (8-person) tent, an emotional support animal, and a bicycle used as a mobility aid. Every square foot is assigned to a basic life function that is essential for managing a person's disability.

**Figure 1. Example: 10′ × 20′ footprint with a 10′ × 10′ (6-person) tent, survival gear, and medical supplies — drawn to scale**




Tent (100 sq ft): 1 Sleeping 24 · 2 Medical/clothing storage 16 · 3 Interior walkway 30 · 4 Changing 9 · 5 Food & belongings 12 · 6 Toilet 9

Outside tent (100 sq ft): 7 Entry path 30 · 8–9 Cooking 35 · 10 Survival gear, recycling & cart 25 · 11 Water 10

**Total: 200 sq ft — every square foot is assigned to a basic life function (toilet clearance is counted within the walkway).**

*Cooking is outside the tent wall for fire safety. Medications and food are kept inside the tent.*

Minimums from Section I: sleeping 6′×4′; walkway ≥ 3′ wide; cooking surface 3′×3′ with 4′×4′ standing room; toilet 3′×3′ + 2′ clearance; changing 3′×3′. Dashed outer line = requested footprint boundary; heavy line = tent wall.

*Figure 1 is a footprint diagram that visualizes how the space may be used for a single person.*

**Figure 2. Example: 11′ × 20′ footprint with a 16′ × 7′ (8-person) tent, an emotional support animal, and a bicycle used as a mobility aid — drawn to scale**




Inside the tent (112 sq ft): 1 Sleeping 24 · 2 Animal (indoor) 20 · 3 Hygiene 20 · 4 Medical supplies & clothing 9 · 5 Walkway 39

Outside the tent (108 sq ft): 6 Stove & prep 12 · 7 Cooking standing 16 · 8 Entry path 16 · 9 Animal (outdoor) 28 · 10 Bicycle 28 · 11 Gear 8

**Total: 220 sq ft — every square foot is assigned to a basic life function (toilet clearance is counted within the walkway).**

*The animal needs a resting place beside its handler inside the tent and room to stand, turn and move outside. The outdoor strip is only 4′ deep, so the 5′×5′ (25 sq ft) minimum is laid out as 7′×4′. Cooking is outside the tent for fire safety; the 83″ bicycle is parked along the front of the tent.*

Minimums from Section I: sleeping 6′×4′; walkway ≥ 3′ wide; cooking surface 3′×3′ with 4′×4′ standing room; toilet 3′×3′ + 2′ clearance; changing 3′×3′; large dog 5′×5′. Dashed outer line = requested footprint boundary; heavy line = tent wall.

*Figure 2 is a footprint diagram that visualizes how the space may be used for a single person with one emotional support animal.*

The City characterizes the requested footprints as "large." They are not. A standard parking space is 9' x 18'—162 square feet. And unlike a parking space, these footprints are not a temporary accommodation—they are where these individuals live.

Consider what a person actually requires. A sleeping area of at least 6' x 4'—24 square feet—is the minimum for a person to lie down, stretch out, and turn over during the night without cramping or muscle spasms. A clear path of at least 3 feet is required to move through the living space without colliding with belongings. Cooking requires a surface of at least 3' x 3' with 4' x 4' of standing room in front of it. Hygiene requires a toilet area of at least 3' x 3' with 2 feet of clearance, and a changing area of at least 3' x 3' where a person can stand, bend, and reach. Storage for

clothing, medications, survival gear, and—for some—art supplies or mobility aids to manage their disabilities requires additional space. And for individuals with a large emotional support animal, the animal needs at least 5' x 5'—25 square feet—to lie down, stand, turn around and move comfortably.

These functions—sleeping, moving, cooking, hygiene, organizing belongings and caring for an emotional support animal—must all occur inside the footprint. A 10' x 20' footprint is 200 square feet. It sounds large as a number. But when you account for a tent, a sleeping area, a cooking area, a hygiene area, storage for medical supplies and survival gear, and for some individuals, space for a large dog to move, 200 square feet is not "large." It is the minimum a person needs to live with dignity—and for a person with a disability, the minimum they need to avoid further harm.

The City cannot measure these footprints against an abstract standard and call them "large." It must measure them against what a human being actually requires to shelter themselves and live—and then ask whether the City has provided it.

## II. THE CITY'S LAST BEST OFFER OF ACCOMMODATION

The City has not provided a last best offer of accommodation. It did not respond to BHU's recent emails about these requests, and its portion of the joint report does not identify a specific location, footprint, or tent size for any of the five individuals. The City's only responses in the record are described below.

The City's only response to these five individuals' requests in the record was its September 3, 2026 assessment, (ECF 338 at 11–12; Prado Decl. ¶ 31), which stated:

"1499 Second Street — Individuals: Shawman, Jermaine Lee White, Gregory Grove. BHU proposed footprints: Shawman 11x20, White 11x30, Grove 10x25. City assessment: This location has a 'no lodging' sign and is in a temporary non-commercial ('TNC') (e.g., tents) prohibited area, so overnight camping is not allowed here regardless of campsite size. There are multiple utility access needs, power lines, and large k-rails that restrict usable areas. Expansion into the roadway would require verification of k-rail ownership and consideration of parking and utility access requirements. Additionally, portions of this site are privately owned by East Bay Municipal Utility District and Jones Development Co."

That assessment is not a "last best offer of accommodation." It is a statement that camping is prohibited at the location, without any identification of a tent size that can be accommodated, any measurement of usable space, or any alternative accommodation.

The City's September 11, 2026 email stated that its "best offer" was "the largest possible footprint dimensions available at the site." But the City never provided those dimensions to BHU, and it has provided none at all for 1499-1451 Second Street. The City has not identified a manufactured tent that fits within its measurements. The City has not stated whether any tent can fit at either location. (Prado Decl. ¶ 32 & Ex. B.)

BHU requested that the City provide the assessments for the Second Street locations and if the ADA Coordinator had any questions to follow-up via email. (Prado Decl. ¶ 32)

On September 16, 2026, Ms. Prado found Mr. Gregory at the Second and Page location, measuring the sidewalks. Ms. Prado approached him and asked if he would reply to her multiple emails. Mr. Gregory stated that he had already drafted his response but was waiting for review by the City Attorney's office. During the conversation, Ms. Prado identified which sidewalks would be appropriate for camping to assist Mr. Gregory's assessment. He stated that he would follow up via email to confirm the locations Ms. Prado had shown him. No email with that confirmation, and no written determination, was ever sent. (Prado Decl. ¶ 33.)

## III. THE INTERACTIVE PROCESS DID NOT RESULT IN A REASONABLE ACCOMMODATION

The Court's order requires the joint report to describe "the conclusion of the interactive process." The conclusion is this: the City did not engage in the interactive process for any of the five individuals covered by this report.

### A. The City Never Responded to BHU's Requests

On September 14, 2026, BHU submitted a list of accommodation requests on behalf of 26 BHU members—including the five individuals covered by this report—in response to the City's September 11, 2026 Notice of Encampment Closure. The list identified each member's disability-related needs, requested tent sizes and footprints, and preferred relocation locations. (Prado Decl. ¶¶ 4–5 & Ex. A.)

BHU asked the City to refrain from abating these members' encampments until the interactive process was complete. Instead of engaging in that process, the City escalated its demands. (Prado Decl. ¶ 6.)

The same day after business hours, ADA Coordinator Thomas Gregory responded that the nexus information was insufficient and demanded individualized descriptions for 19 members who were not among the individuals covered by the Court’s September 9, 2026 Order. BHU complied that same night, submitting detailed nexus statements for each member. (Prado Decl. ¶¶ 7–9.)

The next morning, the City escalated its demands further—requesting an itemized inventory of belongings, a justification for each exact square footage requested and a statement on whether members would accept smaller footprints. These categories of information had never before been required by the City, including for Ms. Lewanda Parnell, whose 3x3 exemption was approved earlier this year with far less documentation. (Prado Decl. ¶¶ 10–11 & Ex. C)

B. The City Refused to Engage in the Interactive Process on the Ground

Despite BHU providing the information requested by ADA Coordinator Thomas Gregory in good faith, the City did not engage in the interactive process at all. (Prado Decl. ¶ 12.) Ms. Prado made many attempts to engage and complete the interactive process with the City for the 26 accommodation requests made on behalf of its members. For instance, during the abatement, Assistant to the City Manager Peter Radu informed BHU representatives that City staff on the ground would not engage in disability accommodations during the abatement. Mr. Radu stated that if BHU wanted these accommodations addressed, BHU needed to call the City Attorney's office. (Prado Decl. ¶¶ 13–14.)

BHU President Yesica Prado called the City Attorney's office and followed up via email multiple times. The City did not respond. (Prado Decl. ¶ 15 & Ex. B.)

As a result of the City conducting the abatement without providing reasonable accommodations, our disabled members' shelter and personal property were destroyed. Many members did not receive a replacement tent, sleeping gear or clothing. No member received packing or transportation assistance, despite written and verbal requests made on the field during the abatement. The City ignored BHU's requests for moving and transportation assistance, refused to

clarify the status of replacement tents and clothing, and never provided the written confirmation BHU demanded that abatement would pause for members with pending requests. (Prado Decl. ¶¶ 16–19.)

Many of our disabled members are now unsheltered and exposed to the elements all day and night. On the first day of the abatement, it rained, and many of their belongings got wet. Our members' disabilities have been aggravated and have required people to call 911 for medical attention. Our members have had to decline medical care because they are too afraid to leave their belongings on the street and be dispossessed of their remaining livelihood, and because they fear leaving their emotional support animals behind to be impounded at the animal shelter. (Prado Decl. ¶¶ 20–23.)

The following photographs document the harm to one of those members, Mr. Thomas Barnett. Mr. Barnett submitted an accommodation request. He was abated anyway.



*BHU disabled member, Thomas Barnett, sleeps at the corner of 8th and Harrison Streets on Friday, September 18, 2026. Mr. Barnett was not provided with moving and transportation assistance, despite his accommodation request. He was given no replacement items, so he has been sleeping exposed to the elements and has no clothing to wear, except for what he was wearing the day of the abatement. Photo credit: Yesica Prado/BHU. (Prado Decl. ¶¶ 24–25.)*



*Berkeley Fire Department paramedics respond to a 911 call that was made around 11:53 a.m. by a bystander. Mr. Barnett was found laying on the couch unable to get up and being exposed to direct sunlight at the peak of the day. Paramedics check his vitals and recommend that he is taken to the emergency room for a check up and pain medication. He declines as he does not want to get his stuff stolen and needs to move his belongings to Second and Camelia Streets. A paramedic asked him how he would get all his personal belongings to his new encampment if he cannot walk. Mr. Barnett*

*responded that he doesn't know how, but he needs to get there to avoid arrest. Photo credit: Yesica Prado/BHU. (Prado Decl. ¶¶ 24, 26–28.)*




*BHU President Yesica Prado helps Mr. Barnett move his belongings across the street into the shade at Eighth and Harrison Streets on September 18, 2026. Despite repeated requests from BHU officers Robbie Powelson and Ms. Prado for tents, sleeping bags, and clothing, City Homeless Response Team staff—Peter Radu, Okeya Vance, Epsilon Galloway, and Monique—refused to provide these items, leaving members exposed to the elements and suffering health complications. (Prado Decl. ¶¶ 24, 30.)*

Mr. Barnett is not an isolated case. He is one of many disabled BHU members with pending accommodation requests who faced the abatement without the protections the Court ordered. The City abated first and answered later—or not at all. If that pattern continues, Mr. Barnett's unfortunate outcome will become the outcome for every remaining member with a pending request:

displacement without accommodation, property destroyed without replacement, and disabilities aggravated without remedy. We ask the Court to intervene before that outcome becomes irreversible.

C. The City Has Permitted the Second Street Locations to Be Obstructed

The locations at Second Street that BHU identified for relocation are now being blocked off by large piles of dirt and construction materials. These piles appeared after BHU identified the locations and after the City issued a construction permit for the area. (Prado Decl. ¶¶ 34–35.)




*Concrete K-rails fill the vacant space requested for the exemption of the 3x3 rule on September 16, 2026. On or about September 11, the City issued a construction permit to the construction company along 1499-1451 Second Street to hardscape this section off the street. Camp residents that had already relocated to this area said they were paid about $200 to move out of the k-rail into a nearby sidewalk, so the hardscaping could proceed. Photo credit: Yesica Prado/BHU. (Prado Decl. ¶¶ 34–36.)*



*Piles of dirt and concrete k-rails fill the vacant space at the whole block of 1499-1451 Second Street on September 16, 2026. As a result, the entire vicinity that BHU had measured for potential accommodations for three members has been blocked off. The City did not respond to the pending follow-up items identified in BHU's inspection of the site, including the illegal dumping of the K-rails on the street by the business owner. These k-rails were placed after a former encampment of RVs was closed in January 2025. Photo credit: Yesica Prado/BHU. (Prado Decl. ¶¶ 34, 37–38.)*

The City is permitting these obstructions to remain. If the City allows the hardscaping of these sites to continue, no reasonable accommodation can be issued at these locations. BHU anticipates that when the parties return to the Court for this report, the City will claim—just as it has

at Fourth and Camelia—that no tent can fit at Second Street. But this outcome will be the result of the City's own actions in allowing the sites to be obstructed, not of any inherent limitation of the locations.

## IV. RESPONSE TO THE CITY'S ARGUMENTS

The City's portion of this report raises several arguments that BHU addresses below.

A. BHU Is Not Raising a "New Claim"

The Court's September 9 Order (Dkt. 342) expressly ordered this joint report and directed the parties to continue the interactive process for these five individuals. The Court found that these individuals 'have demonstrated a likelihood of success on the merits' and that the City had 'not shown that relocation... is unreasonable, or that the accommodations... would constitute a fundamental alteration.' (Dkt. 342 at 4.)

BHU is complying with the Court's order. It is not raising a new claim. The City's reliance on *Kokkonen and Pacific Radiation Oncology* is misplaced—those cases address new, independent claims, not the enforcement of an existing order. The Court retains ancillary jurisdiction to enforce its own orders. (*Kokkonen*, 511 U.S. at 379-380.)

The City's own portion of the report concedes the point. It acknowledges that the final judgment "preserved continuing jurisdiction over individualized accommodation disputes." (ECF 381 at 14.) That is precisely what this is. These five individuals are not challenging the City's No Lodging/TNC Prohibited designations as a policy, and they do not seek a City-wide order invalidating them. Each is asking for an individualized modification of the 3x3 rule at a specific location—the same individualized process the summary judgment order and final judgment require. (Dkt. 288 at 71-73; Dkt. 326.) Title II requires reasonable modifications to a public entity's "policies, practices, or procedures." 28 C.F.R. § 35.130(b)(7). A No Lodging designation is one of those policies. An accommodation request does not become a "new claim" simply because the location an individual needs falls within an area the City has designated administratively.

Nor does the pending appeal divest the Court of authority. While an appeal from an order or judgment granting an injunction is pending, the district court retains authority to supervise compliance with its injunction and to preserve the status quo. Fed. R. Civ. P. 62(d); *Nat. Res. Def.*

*Council, Inc. v. Sw. Marine Inc.,* 242 F.3d 1163, 1166 (9th Cir. 2001). Resolving individualized accommodation requests under the procedure the Court established is exactly that kind of supervision.

The City's due process argument is also misplaced. The City has had notice since August. It has conducted site visits, submitted declarations, and filed a 27-page portion of this report. It has had every opportunity to develop its record. Due process does not require the Court to give the City more process than the City has chosen to use.

B. The City's "No Lodging/TNC Prohibited" Designations Remain Unexplained

The City's report asserts that the "No Lodging/TNC Prohibited" designations were based on "location-specific considerations," including fire hazards, health hazards, prior police and fire calls, and site-specific constraints. But the City's report does not explain why these specific locations were designated, or why the designations must apply to these five individuals' disability-related needs. The Court found that the record on the City's rationale is "thin—indeed non-existent." (Dkt. 342 at 4.) The City's report does not cure that deficiency. It cites declarations from Peter Radu and Shannon Shaffer-Killey, but those declarations describe the broader Second and Cedar area—not the specific locations at 1499-1451 Second Street or Second and Page Street.

The City bears the burden of justifying its "No Lodging" designations. (Dkt. 342 at 4.) ***It has not met that burden.***

The City also argues that granting these accommodations at these sites would "risk producing the functional equivalent of an enforcement-free or City-sanctioned location." That is incorrect. BHU is not asking the City to designate a permanent encampment, to create a sanctioned campsite, or to commit to non-enforcement in perpetuity.

BHU is asking the City to provide an individualized accommodation to five disabled individuals—precisely the process the Court's summary judgment order requires. (Dkt. 288 at 72-73.) The Court distinguished between (1) a City-created enforcement-free zone and (2) an individualized accommodation to a specific disabled person. (Dkt. 288 at 42-45, 71-72.) These requests fall into the second category.

The City cannot avoid its obligation to provide an individualized accommodation by characterizing every accommodation as an "enforcement-free zone."

C. The City Has Not Provided a "Last Best Offer of Accommodation"

The City's report states that it "has offered these five individuals an accommodation to Administrative Regulation 10.2's 3x3 rule on the City's Public Right of Way ('PROW') that is not in a No Lodging/TNC Prohibited area or otherwise prohibited zone." (See ECF 381 at 2)

But the City does not identify what that offer is. It does not provide a specific location, a specific footprint, or a specific tent size. It does not provide measurements. It does not state whether any tent can fit.

The Court's order required the City to provide its "last best offer of accommodation." (Dkt. 342 at 3, 5.) The City has not done so. (See Prado Decl. ¶¶ 31–32.)

D. The City's Measurements Cannot Accommodate Any Standard Tent

The City's report states that the Second Street locations have "constrained pedestrian areas, utility infrastructure, barriers, parking, driveways and egresses, and adjoining private property and active construction." But the City does not provide measurements to support this claim.

The City provided measurements for the Second and Page Street locations in the Declaration of Thomas Gregory (ECF 381-1). Those measurements were not shared with BHU before they were filed. (Prado Decl. ¶ 33.) Those stacked measurements confirm BHU's position: the City has applied criteria under which no tent can fit at any of the four corners of Second and Page Street.

Gregory's measurements are as follows:

| Location | Maximum Width |
|---|---|
| Northwest corner, Second Street side | 2.5 feet |
| Northwest corner, Page Street side | 1 foot, 1 inch |
| Northeast corner, Page Street side | 2.5 feet |
| Southeast corner, Second Street side | 2.5 feet |
| Southeast corner, Page Street side | 3 feet |
| Southwest corner, Second Street side | 2 feet |
| Southwest corner, Page Street side | Not measured |

The smallest commercially available tent is 7 feet wide. As established in the September 11, 2026 Joint Status Report (ECF 352), no tent narrower than 7 feet is manufactured and available for purchase because a tent narrower than 7 feet would not allow a person to lie down to sleep properly, store essential belongings, and shelter themselves from the elements.

Every measurement provided by the City is less than half the width of the smallest tent available for purchase. The maximum width at any location is 3 feet—less than half of the 7 feet required for even the smallest tent. At the northwest corner on the Page Street side, the maximum width is 1 foot, 1 inch—roughly the width of a standard doorway.

The City's own measurements therefore establish that no tent can fit at any of the four corners of Second and Page Street. The City has not offered a reasonable accommodation. It has offered measurements that cannot accommodate any tent currently manufactured and available for purchase.

The significance of these measurements extends well beyond Second and Page Street. The City's method subtracts a six-foot pedestrian path, adjacent parking, and a fire clearance from the width of the sidewalk. Under that method, any Berkeley sidewalk narrower than 13 feet leaves less than 7 feet of usable width, before parking or fire clearance is even considered. If this is the standard the City applies everywhere, then its general statement that it has offered an accommodation somewhere else on the public right-of-way is not an offer that any manufactured tent can satisfy. An accommodation that no tent used as shelter can fit is not an accommodation.

<u>E. The City's Measurements Assume a Fire Clearance That Is Not Required</u>

Gregory states that the pedestrian path of travel "must be adjacent to the property line to allow for the Fire Marshall's required 5-foot clearance between an encampment and the building." But the Fire Marshal's own declaration states that combustible materials must remain 10 feet from a property line under CFC § 315.4, subject to a 3-foot clearance where items remain under 6 feet in height.

Gregory's 5-foot figure does not match the Fire Marshal's stated requirement. BHU requests that the City clarify which figure applies and recalculate its measurements accordingly.

F. The City's Measurements Do Not Address the Locations at 1499-1451 Second Street or the Obstruction the City permitted

Gregory's declaration addresses only the Second and Page Street locations. It does not address 1499-1451 Second Street, the location requested by Shawman, Jermaine Lee White, and Gregory Grove. The City has still not provided measurements for that location. (Prado Decl. ¶¶ 39–40.) BHU requests that the City provide those measurements, or confirm that none exist.

The City's report also does not address the construction permit issued on or about September 11, 2026, to hardscape the 1499-1451 Second Street area, or the payment of approximately $200 given to camp residents that had already established themselves there to move out of the K-rail so that the hardscaping could proceed. As a result of the City's actions, the entire vicinity that BHU had measured for potential accommodations for three members has been blocked off by piles of dirt and K-rail stacked to fill vacant space. (Prado Decl. ¶¶ 35–37.)

G. The City's "Fundamental Alteration" and "Undue Burden" Arguments Were Already Rejected

The City argues that requiring it to permit camping in No Lodging areas would "fundamentally alter" its encampment and PROW management programs and impose an "undue burden." But the Court already rejected this argument:

"The City has not shown that relocation of BHU members to these 'No Lodging/TNC Prohibited' locations pursuant to AR 10.2 is unreasonable, or that the accommodations to those locations would constitute a 'fundamental alteration' to a City program." (Dkt. 342 at 4.)

But the Court left the door open for the City to explain itself. The Court found the record "thin—indeed non-existent" and directed the parties to continue the interactive process. The City was given an opportunity to provide the explanation the Court found missing. It did not.

What the City provided instead was a recitation of the same arguments—fundamental alteration, undue burden, community opposition, site-specific constraints—without ever answering the essential question: ***why can no one camp at these locations now, when people camped there for the past decade?***

The Second Street corridor served as shelter for dozens of unhoused Berkeley residents for years. The City has not explained what changed. It has not explained why a location that was habitable for a decade has suddenly become uninhabitable.

The City's silence is telling. If there were a genuine, location-specific reason why no one can camp at Second Street, the City would have stated it plainly. Instead, it repeated the same generalized concerns—fire hazards, pedestrian access, utility infrastructure—that apply to virtually every sidewalk in Berkeley.

The City cannot meet its burden under the ADA by asserting that a location is unsuitable when its own history shows that it was suitable. The City cannot claim an "undue burden" when the burden it describes is the ordinary work of managing an encampment—work the City already has staff, procedures, and a program in place to perform.

H. Grants Pass Does Not Excuse the City's ADA Obligations

The City cites *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024), for the proposition that it has "substantial authority to regulate the use of its public rights-of-way and other public property." But *Grants Pass* addressed the Eighth Amendment's prohibition on cruel and unusual punishment. It did not address the ADA. The ADA imposes independent obligations on the City—including the obligation to provide reasonable accommodations to disabled individuals—that *Grants Pass* does not eliminate.

The Court's summary judgment order already held that the City violated Title II of the ADA by failing to provide reasonable accommodations. (Dkt. 288.) *Grants Pass* does not change that holding.

I. The City's "Necessity" Argument Misapplies the Law

The City argues that BHU has not established that the particular No Lodging locations are "necessary." But the City misapplies the standard. The question is not whether these locations are the only locations where the individuals' disability-related needs can be met. The question is whether the requested accommodation is reasonable and necessary to avoid discrimination on the basis of disability. (28 C.F.R. § 35.130(b)(7).)

The Court has already held that BHU members have demonstrated a likelihood of success on the merits that their accommodation requests are reasonable. (Dkt. 342 at 4.) The City cannot now argue that the requests are not "necessary" when the Court has already found them reasonable. Moreover, the City has not identified any alternative locations. The City cannot claim that alternatives exist without identifying them.

Nor is the City correct that the record contains no disability-related reason for these locations. Each of these five individuals was displaced from the Harrison Encampment and identified the Second Street corridor because it is a nearby location with space for a tent on the public right-of-way that keeps them close to the community, services, and support they rely on to manage their disabilities. For a person whose disability limits how far they can travel with their belongings, the location of the accommodation is not a preference; it is part of the accommodation itself.

The City also faults these individuals for identifying only one location, citing the Court's recommendation that BHU provide one to three potential locations. (ECF 381 at 1, citing ECF 331 at 1.) But as shown in Section IV.D above, the City's own measurement method would leave less than 7 feet of usable width on any sidewalk narrower than 13 feet. Under the City's criteria, the alternatives the City faults these individuals for not proposing would be disqualified too. The City cannot require the identification of alternatives while applying a standard that eliminates them.

To the extent the Court finds the record on location-specific necessity insufficient, BHU requests that the Court direct the City to identify, for each of the five individuals, a specific alternative location—with measurements—where that individual's tent and belongings can be placed. That would allow the interactive process to conclude with an actual offer, rather than a general statement that some unidentified location may exist.

J. Community Opposition Does Not Excuse the City's ADA Obligations

The City's report notes that "more than 70 letters from local community members" have been submitted opposing the accommodations. Community opposition does not excuse the City's obligations under the ADA. The Court has already held that the City must provide reasonable

accommodations to disabled individuals. The views of community members do not override that obligation.

K. The City's Conduct During Abatement Violated the Court's Orders

The City's report does not address its conduct during the abatement. BHU's report documents that (Prado Decl. ¶¶ 12–19):

- The City abated without providing accommodations.
- The City destroyed property without providing replacement gear.
- The City refused to provide relocation assistance.
- The City refused to engage in the interactive process on the ground.
- Peter Radu told BHU to call the City Attorney's office; the City did not respond.

These are direct violations of the Court's orders. (Dkt. 326 at 4; Dkt. 288 at 65-67.) The City cannot ignore its conduct and expect the Court to do the same.

L. The City's Conduct Is the Serial Enforcement the Court Warned About

The Court preserved the possibility of a future claim if the City "engage[s] in a pattern of serial enforcement actions that effectively denie[s] relocated residents any lawful location to seek shelter." (Dkt. 342 at 26-27.)

That is exactly what is happening. The City abated the Harrison Encampment. BHU members relocated along Second Street. The City then issued a construction permit to obstruct the Second Street locations and is now claiming—based on its own measurements—that no tent can fit at Second and Page Street. The City is systematically closing off every location where these individuals could relocate. (See Prado Decl. ¶¶ 34–38, 41.)

The City cannot defeat an accommodation request by obstructing every location where the accommodation could be provided and then claiming that no location is available.

## V. REQUESTED RELIEF

BHU respectfully requests that the Court:

- Find that the City has not offered a reasonable accommodation to Shawman, Jermaine Lee White, Gregory Grove, Lisa Saecha-y-chain, or Quinton Cocklereese;
- Find that the City's own measurements confirm that no tent can fit at any of the four corners of Second and Page Street, which is not a reasonable accommodation. The maximum width at any location is 3 feet—less than half the width of the smallest commercially available tent (7 feet);
- Find that the City has not provided measurements for 1499-1451 Second Street; and
- Find that the City has not provided a "last best offer of accommodation" as required by the Court's September 9, 2026 Order (Dkt. 342).

BHU respectfully requests that the Court order the City to:

- Engage in the interactive process in good faith, including by responding to BHU's clarifying questions and providing written determinations on each request;
- Identify a manufactured tent that fits within the City's measurements at each proposed location, or confirm that no such tent exists;
- Refrain from taking actions that would foreclose the possibility of a reasonable accommodation at Second Street, including by permitting the continued obstruction of the site by construction materials; and
- Pause abatement for any member with a pending accommodation request until the interactive process is complete and a written determination has been issued.

Dated: September 20, 2026

Respectfully submitted,

/s/ Anthony Prince
Anthony Prince
*Attorney for Plaintiff*
*Berkeley Homeless Union*