Anthony D. Prince (SBN # 202892)
General Counsel, California Homeless Union/Statewide Organizing Council
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Tel: 510-301-1472
Attorney for Plaintiff Berkeley Homeless Union

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

BERKELEY HOMELESS UNION,

Plaintiff,

vs.

CITY OF BERKELEY, THOMAS GREGORY, PAUL BUDDENHAGEN, PETER RADU, OKEYA VANCE-DOZIER, RASHI KESERWANI, DOES 1-10,

Defendants.

Case No.: 3:25-cv-01414-EMC(ASK)

**PLAINTIFF BERKELEY HOMELESS UNION'S NOTICE OF MOTION AND MOTION FOR ORDER TO SHOW CAUSE RE: CIVIL CONTEMPT; MEMORANDUM OF POINTS AND AUTHORITIES**

Date November 12, 2026
Time: 1:30
Courtroom: Court Room 5, 17th floor
Judge: Hon. Edward M. Chen

## NOTICE OF MOTION AND MOTION

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on November 12, 2026, at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Edward M. Chen, Plaintiff Berkeley Homeless Union ("BHU") will and hereby does move for an order directing Defendant City of Berkeley ("the City") to show cause why it should not be held in civil contempt for violating the Court's Order Granting in Part Cross-Motions for Summary Judgment (Dkt. 288), the Final Judgment and permanent injunction (Dkt. 326), and the Court's August 28, 2026 Order (Dkt. 331).

Plaintiff requests that the City be held in contempt and coercive sanctions be imposed against the City to stop the unnoticed summary destruction of people's survival gear, to provide reasonable relocation assistance, to provide replacements for destroyed property, and to otherwise comply with this Court's orders.

The motion is based on this Notice, the Memorandum of Points and Authorities, the Declarations of Yesica Prado, Robbie Powelson, Erin Spencer, Amy Jonas, and Thomas Barnett, the exhibits thereto, the record in this action, and any argument presented at the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the City violated the specific and definite requirements of Dkts. 288, 289, 326, and 331 by failing to provide packing and moving assistance to disabled BHU members who had requested it.

2. Whether the City violated its obligation in this Court's orders, Dkts. 288, 289, 326, and 331 by refusing to store non-hazardous, unabandoned personal property of BHU members during encampment abatements.

3. Whether the City violated its obligation in this Court's orders, Dkts. 288, 289, 326, and 331 by refusing to provide any relocation assistance to any BHU member, including those whom this Court specifically required, such as Robbie Peddycoart, Shareef Muwakkil, Erin Spencer, and others.

4. Whether the City violated its communication-related obligations under Dkts. 288, 289, and 326.

5. Whether the City violated this Court's order in Dkt. 342 by seizing and destroying the dwelling of Shawman on Eighth and Harrison without completing the interactive process.

6. Whether the City should be subject to coercive penalties to ensure compliance, such as compensating victims of the City's violation of this Court's order.

**I. INTRODUCTION**

This Court has already found that the City of Berkeley violated Title II of the ADA and the Fourth and Fourteenth Amendments when it abated encampments without providing reasonable accommodations to disabled residents. (Dkt. 288; Dkt. 326.) The Court entered a permanent injunction requiring the City to conduct individualized assessments, provide physical relocation assistance, store non-contaminated property for 90 days, replace essential survival property that is destroyed, provide at least 72 hours' written notice before seizing property, and honor its commitments to accommodate communication-related disabilities. The City has violated that injunction — not occasionally, not inadvertently, but deliberately and repeatedly.

The evidence of intentional non-compliance is direct. On September 15, 2026, Assistant to the City Manager Peter Radu told BHU officer Robbie Powelson that "the only people talking are lawyers to lawyers," that he was "not going to work with" BHU because "that ship sailed when you all decided to be litigious," and that he had designated BHU members' property — including the property of members the Court had specifically ordered the City to assist — as biohazard that staff would not be permitted to handle. (Powelson Decl.) Mr. Radu never discussed any disability accommodation with Mr. Powelson nor Ms. Prado. (*Id.*; Prado Decl.) He directed City staff not to sort or store the belongings of people the Court had ordered the City to store. (*Id.*)

The City's conduct during and after the September 15–17 abatement of the Harrison Corridor confirms the point. The City abated encampments whose residents had pending accommodation requests, in violation of this Court's order that the "City shall not enforce Administrative Regulation 10.2 or any other sidewalk-space limitation in a manner resulting in the destruction of a BHU member's tent or shelter unless the City first conducts an individualized assessment." (Dkt. 326 at 4.)

The City also destroyed the dwelling of Shawman, one of the seven individuals the Court had expressly protected. (Prado Decl.) It failed to provide packing and moving assistance to any disabled

BHU member. (*Id.*) It failed to sort or store any property. (*Id.*) It failed to replace the tents, sleeping gear, and clothing it destroyed. (*Id.*) And it failed to provide 72 hours' written notice before seizing property. (*Id.*)

The City's conduct was not a matter of good-faith interpretation or substantial compliance. It was a decision not to comply — made by a senior City official, communicated to City staff, and carried out over three days of enforcement operations. BHU respectfully requests that the Court hold the City in civil contempt and order the relief requested below.

## II. STANDARD OF REVIEW

Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). A party should not be held in contempt if his action "'appears to be based on a good faith and reasonable interpretation of the [court's order].'" *Id.* (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir.1982)). "Substantial compliance with the court order is a defense to civil contempt, and is not vitiated by a few technical violations where every reasonable effort has been made to comply." *Id.* (citation omitted). The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by clear and convincing evidence. *Id.*

## III. ARGUMENT

### A. City Violated Court's Order On Storage, Sorting and Moving Assistance

The Court ordered in Dkt. 288 that "the City must (1) provide physical packing and moving assistance to the extent permissible under applicable public health guidance and (2) sort and store non-contaminated property for a minimum of 90 days consistent with the City's existing regulations; and replace any essential survival property (*e.g.*, tent, sleeping equipment, and basic clothing) that is destroyed pursuant to abatement because such property could not be safely moved or stored. The City retains full discretion to decline to handle or store items that are observably wet, muddy, or plausibly contaminated with leptospirosis, and to implement appropriate safety protocols to protect City personnel." Dkt. 288 at 65. This was expanded to all BHU members with disabilities that interfere with the ability to move. Dkt. 326.

The leptospirosis exception reaches only items that are "observably wet, waterlogged, muddy, or porous"; dry, intact items "shall be moved with assistance and/or stored." (Dkt. 288 at 63, 65.) Where abatement results in the loss of a tent, the City creates a state-created danger "unless the City allows for the retention of existing tents or shelter, considers reasonable accommodations allowing for continued shelter, or provides a replacement tent or shelter." (*Id.* at 73; *see id.* at 66.)

**1) On September 23, City Deliberately Violated Dkt. 342 As Applied To Shawman**

For example, one person named Shawman was protected from the abatement under this Court's September 9 order (Dkt. 342). Her dwelling was clearly marked with chalk. On the day her tent was abated, Yesica Prado was present notifying and telling the police that Shawman's dwelling was protected (Prado Decl.). The City ignored it and destroyed the dwelling. *Id.* HRT failed to provide any replacement gear to Shawman. *Id.*

**2) On September 23, City and Peter Radu Deliberately Violated Dkt. 288 as applied to Shareef Muwakkil**

In the same stroke in that tent, Shareef Muwakkil — who was specifically identified in this Court's order Dkt. 289 to be provided moving assistance and storage at 60-65. Yesica Prado was present and observed that nothing was produced (Prado Decl.). HRT failed to provide any replacement gear to Mr. Muwakkil. *Id.*

**3) On September 23, City and Peter Radu Deliberately Violated Dkt. 288 as applied to Amy Jonas**

Ms. Jonas is a disabled BHU member with diabetes and a related wound that requires ongoing care. Her tent was bulldozed on September 15, 2026, during the first day of the Harrison Corridor abatement. She obtained a new tent and set it up in the northern section of the corridor. Around September 21, 2026, a City officer verbally told her she had one week to leave. On September 23, 2026, her campsite was gone. The City had destroyed everything with machinery — the new tent, her clothing, her laptop, her mother's jewelry, and the medication and wound-care supplies she uses to treat her diabetic wound. (Jonas Decl.) No notice was provided. No property was stored. No replacement property was offered. The City's conduct violated the Court's orders requiring 72 hours' written notice, 90-day storage of non-contaminated property, and replacement of essential survival

property. (Dkt. 326 at 4-5; Dkt. 288 at 65-67, 69.) The loss of Ms. Jonas's wound-care supplies is particularly severe: without them, her diabetic wound cannot be properly treated, and her health is at serious risk. (Jonas Decl.)

**4) On September 21, City Deliberately Violated The Order As To Erin Spencer On The Direction Of Peter Radu and Okeya Vance**

On September 21, while his cart was temporarily in Eighth and Harrison, Mr. Spencer was arrested and his cart with all of his belongings was bulldozed on the spot. (Spencer Decl.; Prado Decl..)

**5) During the September 15 Abatement, the City and Peter Radu Deliberately Violated Dkt. 288 as applied to Robbie Peddycoart**

Robbie Peddycoart was identified as a disabled individual whose property would need assistance with sorting, storing, and moving. Dkt. 288 at 62-65. Peter Radu stated that he had directed his staff not to sort or store any of Mr. Peddycoart's belongings. (Powelson Decl.)

As the City did not provide moving assistance, Ms. Prado had to rent a U-Haul truck to assist him in relocating to a new location or he would face arrest and the destruction of his remaining property. (Prado Decl..)

**6) During the September 15 Abatement, the City and Peter Radu Deliberately Violated Dkt. 288 and 289 as applied to Thomas Barnett**

Thomas Barnett was identified as a disabled individual whose property would need assistance with sorting, storing, and moving. Dkt. 289 at 10, *see* Dkt. 288 at 62-65. Peter Radu stated that he had directed his staff not to sort or store any of Mr. Barnett's belongings. (Powelson Decl.) Additionally, the City used a backhoe to crush Mr. Barnett's vehicle, which was protected under the injunction Dkt. 289. (Barnett Decl.; Prado Decl..)

**7) After the September 15 Abatement, the City and Peter Radu Deliberately Violated Dkt. 288 and 289 as applied to Thomas Barnett By Seizing and Destroying His Property At 2nd and Camelia**

With what little Thomas was able to move, he moved to Camelia and Second Street. Peter Radu was out at the site and Thomas indicated where his campsite was. Later he came back and all of his property was gone and swept clean. (Barnett Decl.)

**8) Replacement Property**

Additionally, the Court had ordered that if tents are destroyed, alternative tents must be made reasonably available (ECF 288, 289, 326 at 4). However, numerous people have not been able to get replacement tents. (*See* Prado Decl.)

**9) Effective Communication**

"The City shall honor its documented commitments to accommodate communication-related disabilities during the interactive process and other discussions with disabled BHU members, including documenting a member's known communication needs and triggers and employing patient, low-stimulation communication consistent with City staff training and claimants' individual needs." (Dkt. 326 at 5 (citing Dkt. 288 at 68–69).)

Despite this obligation, City staff on site refused to engage with the BHU representatives — Yesica Prado and Robbie Powelson — who were present to communicate members' disability-related needs and facilitate their accommodations. (Prado Decl.; Powelson Decl.)

**10) The City Also Violated the Permanent Injunction in Its Abatement of Murray Street**

On August 26, 2026, the City abated the encampments of two disabled BHU members whose accommodation requests were pending: Ms. Sunny Jean Yow and Mr. Darrin Webster. (Prado Decl.) Ms. Yow, who lives with mental disabilities, had submitted her request on July 28, 2026. (*Id.*) On August 20, 2026, the City identified a site where her requested 10' x 35' footprint "could fit," but required her to vacate for cleaning and stated she "may return after August 28." (*Id.*) On August 25, 2026, BHU sent a follow-up email raising concerns that the City was requiring Ms. Yow to vacate without approved accommodations. (*Id.*) The City did not respond. (*Id.*) The next day, the City abated her encampment. (*Id.*)

Similarly, Mr. Webster, who lives with physical and mental disabilities, had submitted his request on July 28, 2026. (*Id.*) On August 25, 2026, BHU informed the City in writing that Mr. Webster had relocated one street over from Murray Street to Folger Avenue — outside the noticed abatement area — and requested clarification on whether the abatement applied to his new location. (*Id.*) The City did not respond. (*Id.*) That same day, Mr. Webster returned from school to find that his tent and all of his belongings were gone. (*Id.*)

In both cases, the City violated the permanent injunction in the same four ways. First, the City enforced its sidewalk-space limitations in a manner resulting in the destruction of tents and shelters without first conducting the individualized assessments the Court required. (Dkt. 326 at 4.) Second, the City destroyed all of Ms. Yow's and Mr. Webster's property — including tents, art supplies, sleeping gear, clothing, and essential survival equipment — without storing any of it, despite the Court's order requiring 90-day storage of non-contaminated property. (Dkt. 326 at 4; Dkt. 288 at 65.) Third, the City did not provide either member with any replacement property, despite the Court's order requiring replacement of essential survival property that was destroyed. (Dkt. 326 at 4; Dkt. 288 at 66-67.) Fourth, the City did not provide the 72 hours' written notice the Court ordered before seizing or destroying property. (Dkt. 326 at 4-5; Dkt. 288 at 69.) The harm to both members is severe and ongoing. (Prado Decl.) Both have been left unsheltered, without the tent and belongings they need to manage their disabilities, and the City has never responded to BHU's follow-up emails or provided any explanation for the destruction of their property. (*Id.*) Neither member's accommodation request has been resolved. (*Id.*)

**B. The Court's Orders Are Specific and Definite**

The Court's orders are specific and definite. Dkt. 288 identifies the specific services the City owes — "physical packing and moving assistance," "sort[ing] and stor[ing] non-contaminated property for a minimum of 90 days," and "replace[ment of] any essential survival property" that is destroyed. (Dkt. 288 at 65.) It defines the specific exception — items "observably wet, waterlogged, muddy, or porous." (*Id.*) It specifies the manner of communication the City must employ. (Dkt. 326 at 5.) Dkt. 331 is equally specific: individuals who timely file accommodation requests "shall be exempt from encampment abatement until their claims are adjudicated." (Dkt. 331 at 2.) There is no ambiguity in any of these orders. A city that litigated these exact obligations through summary judgment and final judgment cannot claim it did not know what they required.

**C. The City Failed to Take All Reasonable Steps to Comply**

The City did not take "all reasonable steps" to comply. It took none. It provided no packing or moving assistance to any disabled member. It stored no property. It replaced no tents, sleeping gear, or clothing for the majority of our members. It gave no 72 hours' written notice after the abatement

was completed. It destroyed the encampments whose residents had pending accommodation requests. And it refused to engage with BHU representatives on the ground about these reasonable accommodations. Compliance was within the City's power, and it chose not to follow the Court's orders. (Prado Decl.)

**D. The City Cannot Show Good Faith or Substantial Compliance**

The City cannot defeat contempt with a claim of good faith or substantial compliance. Good faith requires a reasonable interpretation of the order. There is no reasonable interpretation of "sort and store non-contaminated property for a minimum of 90 days" that permits destroying it. There is no reasonable interpretation of "shall be exempt from encampment abatement" that permits abating. And there is no substantial compliance where the City did not perform a single one of its obligations.

**E. The Violations Are Established by Clear and Convincing Evidence**

The evidence of the City's violations is clear and convincing. It comes from multiple witnesses — Yesica Prado, Robbie Powelson, Erin Spencer, Amy Jonas, and Thomas Barnett — and is corroborated by photographs, video footage, and the City's own statements. The City does not dispute that it provided no packing assistance, stored no property, replaced no tents, and gave no 72 hours' notice. Its own senior official said on the record that he would not work with BHU and had designated members' property as biohazard. (Powelson Decl.) This is not a close case. The evidence is overwhelming.

**IV. REMEDY**

Civil contempt sanctions may be imposed to coerce compliance and to compensate the injured party for losses caused by the violation. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986). Both purposes apply. Members remain without tents as the rainy season begins (Prado Decl.), and the City has destroyed property—medication, wound-care supplies, tools, a laptop, family jewelry—that the orders required it to store.

A remedy limited to repeating the City's existing obligations would not change its conduct; it already had those obligations and ignored them. BHU therefore requests the relief stated above, including a short, firm deadline for replacement survival property, compensation for destroyed non-contaminated property in amounts to be determined, written determinations on all pending requests

with enforcement stayed until they issue, a daily coercive fine for continued non-compliance, preservation of body-worn camera footage, photographs, and property inventory forms from September 15–23, and BHU's costs.

BHU further requests that the City be ordered to file, within fourteen days, a sworn compliance report identifying each BHU member whose property was removed between September 15 and September 23, what was stored and where, what replacement property was provided and when, and the status of each pending accommodation request. A report of this kind will allow the Court and the Special Master to verify compliance without further emergency motion practice.

Finally, BHU requests such further relief as the Court deems just and proper.

**V. CONCLUSION**

The Court's orders were specific, definite, and unambiguous. The City violated all of them. It was required to conduct individualized assessments before enforcing its sidewalk-space limitations. It did not. It was required to provide packing and moving assistance to disabled BHU members who requested it. It did not. It was required to sort and store non-contaminated property for at least 90 days. It did not. It was required to replace the tents, sleeping gear, and clothing it destroyed. It did not. It was required to give at least 72 hours' written notice before seizing property. It did not. And it was required to honor its commitments to accommodate communication-related disabilities. It did not. Not one violation was good faith, and not one was accidental.

This is a case of deliberate non-compliance, directed by a senior City official, communicated to City staff, and carried out over three days of enforcement operations. The City cannot claim it did not know what the orders required — it litigated these exact obligations through summary judgment and final judgment. The City cannot claim compliance was beyond its power — BHU volunteers with one pickup truck and one rented U-Haul did what the City's crews, trucks and backhoes would not. And the City cannot claim good faith — its own official told BHU that the City would not cooperate because BHU had sued.

The harm is ongoing and severe. BHU members remain unsheltered. The harm compounds every day the City continues to enforce without providing what the Court ordered.

The Court should issue an order to show cause, find the City in civil contempt, and grant the relief requested.

Dated: October 5, 2026

Respectfully submitted,

/s/ Anthony D. Prince
Attorney for Plaintiff
Berkeley Homeless Union