Farimah Faiz Brown, City Attorney (State Bar No. 201227)
Katrina Eiland, Assistant City Attorney (State Bar No. 275701)
Sara Stephens, Deputy City Attorney ((State Bar No. 300589)
Gabriel Martinez, Deputy City Attorney IV (State Bar No. 275142)
Nubyaan Scott, Deputy City Attorney (State Bar No. 331584)
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile: (510) 981-6960
Email: SStephens@berkeleyca.gov
GMartinez@berkeleyca.gov

Attorneys for Defendant
CITY OF BERKELEY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERKELEY HOMELESS UNION.<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BERKELEY, et al.<br><br>Defendants. | **Case No. 3:25-CV-01414-EMC**<br><br>**DEFENDANT CITY OF BERKELEY'S OPPOSITION TO PLAINTIFF'S MOTION TO SHOW CAUSE RE: CIVIL CONTEMPT**<br><br>Judge: Hon. Edward M. Chen<br>Place: Courtroom 5<br>Complaint Filed: February 11, 2025<br>Hearing Date: November 5, 2026<br>Time: 1:30 p.m. |

## I. INTRODUCTION

On October 6, 2026, 2026, Plaintiff Berkeley Homeless Union ("BHU" or "Plaintiff") filed a motion ("Motion") for an order to show cause ("OSC") why Defendant City of Berkeley should not be held in civil contempt for violating this Court's orders (Dkts. 288, 289, 326, and 331). BHU's motion lacks merit, entirely failing to make even a prima facie case of contempt through admissible evidence. By contrast, the City's substantial, admissible evidence proves that the City has fully complied with the Court's orders.

BHU maintains that the City violated the Court's orders because it seized and destroyed protected residents' tents or makeshift dwellings and did not offer replacement survival gear during its abatement of the Harrison encampment. As a threshold matter, however, BHU fails to present any admissible evidence that the City violated the Court's orders. BHU's non-attorney declarations, which consist almost entirely of hearsay, speculation, and other inadmissible testimony—are also not signed in accordance with Local Rule 5-1(i)(3) and, as such, are legally defective. Additionally, these threadbare declarations—even if they contained competent testimony—do not establish the basic elements of an injunction violation.

Indeed, the vague and conclusory allegations fail to assert that *any* of the belongings allegedly seized and destroyed were *not* contaminated, soiled, or otherwise exempt from storage pursuant to the Court's orders. In fact, the declarations fail to identify any of the allegedly destroyed belongings with sufficient specificity to determine whether they were contaminated, hazardous, or otherwise exempt from storage. Likewise, the declarations do not show through competent testimony that the City destroyed the belongings of any BHU members against their will or over their objection. In short, BHU does not demonstrate that the City seized or destroyed *any* personal property or failed to provide replacement gear in contravention of any court-imposed restrictions. As a result, BHU comes nowhere close to satisfying its burden to show an injunction violation by the clear and convincing evidence required for contempt.

In contrast, the City's declarations supporting this opposition detail the City's numerous attempts to offer packing and moving assistance, replacement gear, and store appropriate

belongings. Indeed, the City closely followed the plan that it set out for the Court in its August 5, 2026, submission, to which the Court did not offer any modifications or objections. Dkt. 316, 322. Where services or items were not furnished, they were either declined or the City's attempts to schedule providing those services went unanswered. In fact, the City went above-and-beyond to help individuals subject to abatement move in an orderly manner, including granting additional time for individuals to move belongings and collecting desired tent information well in advance of the abatement. For individuals who did not request a specific tent size in advance, the City offered replacement tents that it had in stock for last-minute requests. Where no existing stock was acceptable to the individual, the City gave them a voucher to obtain their desired tent size. None of BHU's "evidence" overcomes the City's substantial detailed record keeping of the abatement.

Because BHU fails to demonstrate based on clear and convincing evidence that the City violated the Court's orders, the Court must deny the Motion.[1]

## II. PROCEDURAL BACKGROUND

The substance of the Court's merits-adjudicating orders granting dispositive relief has been recounted at length in multiple post-judgment proceedings. Nevertheless, the City recites the relevant provisions of these orders below.

On August 20, 2026, the Court issued an order entering final judgment in the case (Dkt. 326 or "Final Judgment"). In its Final Judgment, the Court held the MSJ Order's determinations "merge[d] into the judgment entered pursuant to this Order." Dkt. 326 at 6:21-22. The Court also extended permanent injunctive relief in accordance with the requirements and provisions of the

[1] Even if the Court were to grant the Motion and issue an OSC, before making any finding of contempt, the Court must set an evidentiary hearing at which the City is afforded an opportunity to present evidence and otherwise be heard, as due process requires in the face of contested evidence. *See Hoffman for & on Behalf of N.L.R.B. v. Beer Drivers & Salesmen's Loc. Union No. 888, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 536 F.2d 1268, 1277 (9th Cir. 1976) ("We hold that a civil contempt proceeding, which may lead to the assessment of a fine, is a trial within the meaning of Fed. R. Civ. P. 43(a), rather than a hearing on a motion within the meaning of Fed. R. Civ. P. 43(e) . . . and that the issues may not be tried on the basis of affidavits").

MSJ Order "to all BHU members, wherever situated within the City." *Id.* at 3:4-9. The Court further decreed that where enforcement "would otherwise result in loss of shelter, the City must allow the member to retain or relocate the tent to a location that does not unreasonably obstruct pedestrian passage or must provide a replacement tent consistent with that standard. This latter requirement applies regardless of disability status." *Id.* at 4:9-15.

With respect to physical relocation assistance, storage, and property replacement, the Court held that where "a BHU member's documented disability prevents the member from independently packing, moving, or relocating personal belongings during an abatement, the City shall provide reasonable physical assistance and shall store the member's non-contaminated personal property for no fewer than 90 days, consistent with the City's existing property-retention regulations." *Id.* at 4:16-20. The further held that "[e]ssential survival property—including tents, sleeping gear, and basic clothing—that cannot safely be moved or stored because of contamination, and that is destroyed by City enforcement operations, shall be replaced." *Id.* at 4:21-23.

As in the MSJ Order, the Court imposed no deadline by which the City must replace survival property that is collected or destroyed. And as in the MSJ Order, the Court stressed that the City "retains discretion to decline to handle property that is observably wet, muddy, or otherwise plausibly contaminated, and to adopt reasonable safety protocols for its personnel." *Id.* at 4:23-25. The remaining provisions of the Final Judgment track the operative language of the MSJ Order.

On August 5, 2026, the City detailed its plan for abatement in its opposition to a BHU TRO. Dkt. 316. This included the City's plans regarding replacement tents, clothing, storage, and assistance with packing and moving belongings. *Id* at 13-15. The Court had no objection to this plan in its subsequent order. Dkt. 322.

On August 28, 2026, in response to ex parte papers filed by BHU, seeking a further temporary restraining order enjoining the City's abatement operation, the Court issued a post-judgment "Order re Abatement" (Dkt. 331 or "Abatement Order"). The Court decreed that

abatement of the Harrison encampment would "proceed on or around September 8, 2026," and that residents of the Harrison encampment seeking accommodations to the 3x3 rule "shall submit reasonable accommodation requests by September 1, 2026, at 5:00 p.m." Dkt. 331 at 1:1-19. The Court held that accommodation requests "must be in writing, describe the footprint the individual needs and is requesting, and the reason why the individual's disability warrants their requested accommodation." *Id.* at 1:19-21. To facilitate the interactive process, requesters were "encouraged to list at least 1-3 preferred relocation areas." *Id.* at 1:21-22. The Court "reminded the City that the infeasibility of any such identified preferred location does not terminate the obligation to provide other reasonable accommodations," and both sides were "directed to engage in good faith toward settling on a reasonable accommodation." *Id.* at 1:22-25. On September 9, 2026, the Court issued a subsequent order protecting seven individuals from the forthcoming abatement, but permitting it to proceed as to everyone else. Dkt. 342.

## III. LEGAL STANDARD

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). "[A] person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the" court's order. *Id.* (internal quotation marks and citations omitted). "'Substantial compliance' with the court order is a defense to civil contempt and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." *Id.* (citing *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)).

Moreover, the party alleging civil contempt "must demonstrate that the alleged contemnor violated the court's order by 'clear and convincing evidence,' not merely a preponderance of the evidence." *Id.* (internal citation omitted); s*ee also Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461, 466 (9th Cir. 1989) ("The proof for civil contempt must be clear and convincing—a higher standard than the preponderance of the evidence standard but less stringent than beyond a reasonable doubt.").

To prove civil contempt, the moving party must satisfy a four-part test. They must establish (1) that the alleged contemnor violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence. *U.S. v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010). An alleged contemnor can defeat an initial showing by demonstrating either that they took all reasonable steps to comply with the order and that any violation was technical or inadvertent (the substantial compliance defense) or that they were unable to comply with the order (the "impossibility" defense). *Coleman v. Newsom*, 131 F.4th 948, 956, 959-60 (9th Cir. 2025); see also *Labor/Community Strategy Center v. Los Angelees County Metropolitan Transp. Authority,* 564 F.3d 1115, 1123-24 (9th Cir. 2009) (transportation authority did not violate consent decree requiring it to expand buses, seats, and in-service hours to address overcrowding based on its alleged failure to allocate these resources to peak time periods, because no express provision imposed this condition, and even assuming authority violated order by allocating resources to some non-peak time periods, no evidence showed authority acted in bad faith); *In re Dual-Deck*, 10 F.3d at 694-95 (plaintiff "committed three technical violations" of protective order barring disclosure of discovery materials outside of lawsuit by referencing and using these materials in a second lawsuit, but no contempt finding sustained because the defendant "failed to prove by clear and convincing evidence that under a good faith, reasonable interpretation of the protective order, [the plaintiff] did not substantially comply with the order"].)

With respect to the impossibility defense, the Ninth Circuit has observed that the "power to impose coercive sanctions to compel obedience to an order in a civil contempt is limited by the individual's ability to comply with the court's order." *Falstaff Brewing Corp. v. Milling Brewing Corp.*, 702 F.2d 770, 781 (9th Cir. 1983). "If the record establishes that there in fact is a present inability to comply with" a court order, "the 'civil [contempt] inquiry is at an end' insofar as the court may coerce compliance because obedience to the order is no longer within the contemnor's power." *Id.* (internal citations omitted).

Furthermore, "a district court ordinarily should not impose contempt sanctions solely on the basis of affidavits." *Peterson v. Highland Music, Inc.* 140 F.3d 1313, 1324 (9th Cir. 2021); *see also Hoffman for & on Behalf of N.L.R.B. v. Beer Drivers & Salesmen's Loc. Union No. 888, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 536 F.2d 1268, 1277 (9th Cir. 1976) ("We hold that a civil contempt proceeding, which may lead to the assessment of a fine, is a trial within the meaning of Fed. R. Civ. P. 43(a), rather than a hearing on a motion within the meaning of Fed. R. Civ. P. 43(e) . . . and that the issues may not be tried on the basis of affidavits"). A court should hold an evidentiary hearing where there are genuine, disputed factual issues that cannot be resolved on the papers. See, e.g., *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 833-34 (2009) ("Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding.").

## IV. ARGUMENT

### A. BHU Fails to Make a Prima Facie Showing of Contempt.

As shown below (part B) and in the City's supporting declarations, the City has made every reasonable effort to comply with the Court's orders. And it has, in fact, complied with those orders. But separate and apart from the City's affirmative showing of compliance, BHU fails to carry its burden of proving by clear and convincing evidence that the City violated the Court's orders, failing even to make a prima facie case. The declarations BHU submits in support of its Motion are legally unsigned, and they are replete with hearsay, speculation, and other inadmissible testimony. BHU does not demonstrate through admissible evidence that the City seized and destroyed *any* personal property in contravention of the MSJ Order or the Final Judgment, or that it otherwise violated any injunctive terms the Court imposed on the City. City violations, if any, are purely technical and non-substantive. Accordingly, the Court should deny the Motion and decline to issue an OSC.

#### 1. BHU's Evidence in Support of Its Motion is Invalid and Largely Inadmissible.

As a general rule, under Rule 701 of the Federal Rules of Evidence, a witness may offer lay opinion if it is: (1) rationally based on the witness's perception; (2) helpful to clearly

understand the witness's testimony or determining a fact in issue; and (3) not based on scientific, technical, or otherwise specialized knowledge within the scope of Federal Rule of Evidence 702. However, the testimony cannot relate to a legal conclusion or apply facts to law. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059-1060 (9th Cir. 2008); *Tuan Anh Le v. Bank of New York Mellon*, 152 F.Supp. 3d 1200, 1220 (N.D. Cal. 2015). A witness also may not provide opinion testimony that is based on speculation. *United States v. Holguin*, 51 F.4th 841, 865 (9th Cir. 2022) (citing *United States v. Perez*, 962 F.3d 420, 435 (9th Cir. 2020); *see also Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (affidavit inadmissible where it was "not made on personal knowledge" and "did not set forth facts that would be admissible in evidence," but "instead relied on information from (unsworn) departmental personnel officers, and the source of these officers' information is unclear"; rather than "set forth facts that would be admissible in evidence, the affidavit was instead based on inadmissible hearsay.").

Furthermore, the Ninth Circuit has squarely held that speculation does not constitute clear and convincing proof of violation of an injunction. See *In N.L.R.B. v. San Francisco Typographical Union No. 21*, 465 F.2d 53, 58 (9th Cir. 1972) ("DeMartini speculated in his affidavit that these two officers were 'probably' aware of the picketing, but such speculation does not constitute clear and convincing proof that they participated in it."). Given the "high evidentiary burden" imposed on the movant, a finding of contempt must be based on "admissible evidence." *Hooks v. Int'l Longshore & Warehouse Union, Loc. 8*, 72 F. Supp.3d 1168, 1187 (D. Or. 2014).

BHU introduces declarations in support of its Motion from five declarants: (1) Yesica Prado ("Prado"), (2) Robbie Powelson ("Powelson"), (3) Amy Jonas ("Jonas"), (4) Erin Spencer ("Spencer"), and (5) Tom Barnett ("Barnett"). These declarations suffer from numerous deficiencies. First, the declarations lack "wet" signatures—rather, the declarant's name appears in typewritten print on the signature line, preceded by an "/s/" symbol. While this mode of electronic signature suffices for attorneys and registered users of the Court's Electronic Case Filing ("Dkt.") system, non-Dkt. users like these non-attorney declarants must satisfy a separate

requirement. Rule 5-1(i) of the Northern District's Civil Local Rules provides that the attorney who files the document "shall attest that each of the other Signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document." The filer's attestation "may be incorporated into the document itself or take the form of a declaration attached to the document." U.S. Dist. Ct. Rules N.D. Cal., Civil L.R. 5-1(i)(3). Alternatively, the filer "may attach a scanned image of the signature page of the document being electronically filed in lieu of maintaining the paper record for subsequent production if required" (in practice, this is the most common procedure for submitting declarations from non-Dkt. users). *Id.*

Here, BHU has failed to satisfy either of Rule 5-1(i)(3)'s alternative procedure. It did not submit a declaration containing the requisite attestation and its moving papers do not otherwise incorporate one, nor did it provide scanned "wet" signatures. As such, the declarations are unsigned and defective as a legal matter. On this basis alone, the Court should disregard them. 28 U.S.C.A. § 1746 (requiring declarations to be subscribed under penalty of perjury); *Davenport v. Board of Trustees of State Center Community College Dist.*, 654 F.Supp.2d 1073 1084 (E.D. Cal. 2009) (unsigned declaration "is not valid evidence for the purposes of deciding [a] motion for summary judgment on the merits"); *Young v. Allstate Company*, 662 F.Supp.3d 1066, 1072 (C.D. Cal. 2023) ("Young's declarations are fatally defective—neither was signed under penalty of perjury").

Second, BHU's declarations, particularly those of BHU representatives Ms. Prado and Mr. Powelson—largely rest on speculation, hearsay, and other inadmissible testimony. To begin with, paragraphs 3, 5, 12, 14, 15-20, 23-39, and 41 of Ms. Prado's declaration are inadmissible and should be disregarded because the statements: (1) lack foundation, (2) are speculative and conclusory, (3) rest on hearsay, and/or (4) amount to improper legal or medical opinions. Throughout her declaration, Ms. Prado contends the City destroyed the property of BHU members without adequate notice and "did not provide the 90-day storage the Court ordered for many of our members." Dkt. 400-1 ¶ 19. But she avers no facts establishing personal knowledge, how she acquired this information, identifying the specific belongings the City

destroyed, the individuals to whom the property belonged, or whether these individuals' belongings were non-contaminated and non-hazardous items appropriate for storage. She also fails to aver that the individuals—either directly or through BHU—asked that these items be stored in the first place. She also does not indicate whether the City offered to store the property of the BHU members in question, or whether the individual rejected any storage offers. Her testimony is almost entirely conclusory and rests on conjecture rather than personal knowledge.

Mr. Powelson's declaration suffers from the same evidentiary defects. Paragraphs 3 through 8 of the declaration are based on hearsay, lack foundation, and are speculative and conclusory. Mr. Powelson contends that he witnessed the City destroy "obviously uncontaminated, valuable property," but he does not identify the individuals to whom this property belonged—including whether they were BHU members—or explain how he was able to ascertain the value of the property and whether the property was uncontaminated. Dkt. 400-2 ¶ 3. Like Ms. Prado's declaration, Mr. Powelson's testimony is largely inadmissible.

Notably, both Ms. Prado and Mr. Powelson were present on the day of abatement and were allowed to observe the operation from behind the police lines, as required by the Court's order. Dkt. 374. Thus, it is especially telling that their declarations lack personal observations of injunction violations.

As discussed in greater detail below, the declarations of Spencer, Jonas, and Barnett are likewise based on hearsay and speculation and are otherwise inadmissible.

**2. BHU Does Not Show the City Violated the Court's Orders Through Admissible Evidence.**

To prevail on its Motion, BHU must demonstrate by clear and convincing evidence that the City violated the Court's orders "beyond substantial compliance" and that its noncompliance was not "based on a good faith and reasonable interpretation of the order." *Bright*, 596 F.3d 694. BHU falls far short of making this showing. In fact, the record reflects reasonable adherence to the Courts' orders.

a. Plaintiff Fails to Demonstrate Any City Violation with Regard to Shawman or Any of the Seven Protected Individuals.

BHU contends Shawman's dwelling "was clearly marked with chalk" and that, on the day of the abatement, the City "ignored it and destroyed the dwelling." It also claims that the City's Homeless Response Team ("HRT") "failed to provide any replacement gear to Shawman." Dkt. 400 at 5:6-11. BHU cites the Ms. Prado declaration for this proposition, which contends that HRT destroyed Shawman's tent and provided no replacement gear. Dkt. 400-1 ¶¶ 25-27. But as noted, this testimony is speculative and based on hearsay because Ms. Prado does not indicate how she made this determination, i.e., whether it was based on Shawman's statements to her or her own firsthand observations. Ms. Prado likewise does not indicate whether Shawman requested or wanted replacement gear in the first place, or if she intended to abandon her tent. A reasonable interpretation of the Court's order is that it requires the City to offer replacement tents—not that it must force individuals to accept them. BHU's evidence does not establish that the alleged BHU member did not intend to abandon their tent or if they accepted the City's offer to replace their tent. Indeed, it does not establish the City made no attempt to offer Shawman a replacement tent, either on the day of the abatement operation or at some later point.

In fact, on September 10, 2026, City Staff conducted outreach to the Harrison encampment ahead of the abatement. Vance-Dozier Decl. Ex. C. City Staff at the time explained, "Typically Schama doesn't have a space allocated to her she floats around." Vance-Dozier Decl. Ex. C. Yesica Prado has confirmed to Ms. Vance-Dozier that Shawman doesn't have a fixed location. Vance-Dozier Decl. ¶ 30. On September 23, 2026, Ms. Vance-Dozier encountered Shawman in a tent that Ms. Dozier knew belonged to another individual, Shareef Muwakkil. *Id.* ¶ 31. In fact, Mr. Muwakkil was also in the tent at the time. *Id.* Shawman left the tent and walked away, taking nothing. Shawman never asserted that the abated tent was hers. Nevertheless, Yesica Prado stated that the tent belonged to Shawman, and so Ms. Vance-Dozier offered Shawman a new tent so that she could have a fixed location if she so chose. Ms. Prado, however, declined the offer on Shawman's behalf. Vance-Dozier Decl. ¶ 31.

Moreover, City staff respected the Court's order to not abate the encampments of the seven individuals protected in its September 9 order. Vance-Dozier Decl. ¶ 29. City Staff made significant efforts to document protected encampments, including through photographs and communications concerning their locations. *See* Radu Decl. ¶ 16. The City even erred on the side of caution when it suspected bad faith. For example, Ms. Vance-Dozier witnessed Ms. Prado move property belonging to persons unprotected from the Court's orders onto protected encampment sites. Despite this obvious gamesmanship, City staff did not touch the property to avoid any dispute. Vance-Dozier Delc. ¶ 29.

b. <u>Plaintiff Fails to Demonstrate Any City Violation with Regard to Mr. Muwakkil.</u>

As to BHU member Shareef Muwakkil, BHU asserts that "Yesica Prado was present and observed that nothing was produced," and that "HRT failed to provide any replacement gear to Mr. Muwakkil." Dkt. 400 at 5:12-17. In her declaration, Ms. Prado testifies that Muwakkil "was not provided moving assistance," and that "HRT stored only three of his items: his phone, a power bank and a headlamp." Dkt. 400-1 ¶ 24. According to Ms. Prado, Muwakkil informed her he had "lost his wallet, money, identification documents, important paperwork, books, medication, clothing, and bedding when the City bulldozed the tent he had given to Shawman." *Id.* Again, this testimony is based on hearsay and should be disregarded. *See Jacobsen v. Filler*, 790 F.2d 1362, 1367 (9th Cir. 1986) ("Finally, Jacobsen's deposition testimony about what he read in a newspaper article (not introduced into evidence) and what his attorneys told him is not based on personal knowledge and is inadmissible hearsay."). Additionally, BHU does not establish whether Muwakkil wished to keep any of these items beyond what the City stored for him or that he (or BHU on his behalf) asked the City to store more items. Nor does BHU establish that the City never offered to store Muwakkil's belongings.

The actual facts of City Staff's interaction with Shawman and Mr. Muwakkil are stated above in addressing Shawman's allegations. In addition, Mr. Muwakkil has been enrolled in a six-month support program called CareBridge, since July 2026, which includes shelter. Vance-Dozier Decl. ¶ 32. When City staff contacted him, Mr. Muwakkil left the tent and did not request

a new tent, as he stated that he was going back to the CareBridge shelter. *Id*. He did not ask for any storage of left-behind items. *Id*.

c. Plaintiff Fails to Demonstrate Any City Violation with Regard to Amy Jonas.

As to Amy Jonas, BHU contends the City destroyed her tent and personal property like her laptop, her mother's jewelry, and her medication and wound-care supplies. Dkt. 400 at 4:20-5:3. In her declaration, Ms. Jonas testifies that on September 23, 2026, two days after a police officer informed her that she had one week to leave, she returned to her campsite and that her property was gone. Dkt. 400-3 ¶ 4. She states that a friend informed her the City had destroyed the new tent it had given her and her equipment, along with her mother's jewelry and other personal items. *Id.* ¶¶ 5-7. This testimony constitutes hearsay, is speculative, and lacks foundation. Jonas does not establish whether her unidentified friend directly observed the City destroy her tent or other belongings or indicate how the friend obtained this information.

In fact, Ms. Jonas was not protected from abatement under the Court's September 9 order, and after her tent was abated on September 15, 2026, the City provided Ms. Jonas with a replacement tent. Vance Dozier Decl. ¶ 33. During the abatement of her encampment, City staff instructed Ms. Jonas to leave the Harrison Corridor, as the area was actively being cleared and she was not protected from abatement. *Id*. Nonetheless, and in contravention of those directions, Ms. Jonas re-set up her new tent within the abatement area. As a result, the tent was again removed. While Ms. Jonas vaguely says an unspecified person told her she could stay, City Staff is only aware of telling Ms. Jonas that she could *not* stay in the area, a warning that Ms. Jonas did not heed. Vance-Dozier ¶ 33.

d. Plantiff Fails to Demonstrate Any City Violation with Regard to Erin Spencer.

BHU also maintains that on September 21, 2026, Erin Spencer "was arrested and his cart with all of his belongings was bulldozed on the spot." Dkt. 400 at 6:4-7. Spencer testifies that his "cart was neat, [and his] belongings were dry, and fairly clean." He adds that the City "did not provide me moving assistance." Dkt. 400-4 ¶ 4. First, Spencer does not identify any specific belongings the City allegedly destroyed, such that the Court can assess whether this

property qualified for storage under the injunction. Second, Spencer does not specify whether he or BHU on his behalf sought moving assistance or storage. Spencer also indicates that while he was being arrested for illegal lodging, he "heard one of the officers say that Peter Radu had told the officers to arrest me and destroy my belongings if I was in the area," and that "afterwards, I was told that my cart had been bulldozed." *Id.* ¶¶ 9-10. These statements amount to hearsay; in particular, Spencer's testimony that he "was told" his cart had been bulldozed. Spencer does not even identify the speaker who shared this information with him. As his declaration reflects, Spencer did not observe the City destroy any of his belongings. These averments are thus not based on Spencer's personal knowledge.

In fact, the abatement of the Harrison area was duly noticed and the City had been actively abating the area since September 15, 2026. Mr. Spencer's cart was "riddled with needles, some still with drugs in the syringe, some with visible blood in the syringe," and City staff determined it was not safe to sort through and store this particular property. Vance-Dozier Decl. ¶ 34. BHU does not explain what provisions of the order these actions violated. Nor does BHU disclose that Yesica Prado was present during this operation and moved many of Mr. Spencer's belongings to Quinton Cocklereese's encampment, an individual protected from the abatement by the Court's orders. Again, despite this obvious gamesmanship by BHU, City staff did not remove any items moved there. Vance-Dozier Decl. ¶ 34.

e. Plaintiff Fails to Demonstrate Any City Violation with Regard to Robby Peddycoart.

As to Robby Peddycoart ("Peddycoart"), BHU contends—vaguely citing Ms. Prado's declaration—that the City did not "provide moving assistance" to him and that Ms. Prado "had to rent a U-Haul truck to assist him in relocating to a new location or he would face arrest and the destruction of his remaining property." Dkt. 400 at 6:8-15. But as noted, Ms. Prado does not explain how she knows whether the City provided or offered moving assistance. She does not identify the personal property she removed for Peddycoart or indicate whether these items qualified for storage under the Court's orders and the City's administrative regulations (including A.R. 10.1, which sets forth the City's property collection and storage policies). Dkt.

400-1 ¶ 11. Nor does BHU present evidence showing that Peddycoart or BHU on his behalf requested moving assistance, or that the City made no offer of moving assistance or denied such a request.

In fact, despite repeated City requests, Mr. Peddycoat did not reach out to schedule any assistance in advance and did not ask for any assistance during the abatement. Vance-Dozier Decl. ¶ 35. Instead, City staff gave Mr. Peddycoart additional time to pack and move his property, which he did on his own. He made no requests for storage of any items. After he moved his belongings, the remaining items were hazardous and were discarded. My Peddycoart was offered replacement gear and initially declined but later accepted a 4-person tent from the City. Vance-Dozier Decl. ¶ 35.

f. Plaintiff Fails to Demonstrate Any City Violation With Regard to Thomas Barnett.

Ms. Prado's declaration likewise does not support BHU's contention that Peter Radu ("Radu"), the Assistant to the City Manager, "directed his staff not to sort or store any of" the belongings of Barnett. Ms. Prado also does not indicate whether BHU or Barnett requested storage on his behalf. Dkt. 400-1, ¶¶ 15, 29. Barnett in his own declaration alleges the City crushed his car "with a backhoe," but he does not aver facts establishing that his vehicle was protected under the Court's injunctions, i.e., that at the time of the abatement he was using it for shelter. Dkt. 400-5 ¶¶ 4; Dkt. 288 at 72:3-16. He also indicates that, after Radu and police officers refused to store his property, "primarily tools and auto parts," he moved his property "over to 2nd and Camelia," but that "[a]nother day, [he] came back all of [his] property was gone." Dkt. 400-5, ¶¶ 5-6. He postulates: "I do not think a thief took it; I think only the City would have had the capacity to take everything. It is my understanding that the City destroyed them." Dkt. 400-5, ¶ 6. This testimony is entirely speculative, and the Court should disregard it. Barnett avers no facts supporting his conjecture that the City seized his belongings.

In truth, Mr. Barnett was not protected from abatement and never scheduled any packing or moving assistance in advance, nor did he ask for assistance from City staff or for property

storage. Vance-Dozier Decl. ¶ 36. The City gave Mr. Barnett additional time to pack and move his own belongings, which he did. *Id.*

The "vehicle" that the City discarded was not a legal or functional vehicle—it was "just a heap of metal with no roof, engine, seats, windows, and had only two wheels." Vance-Dozier Decl. ¶ 37; *see also* Radu Decl. At 35. Mr. Barnett was not using it as shelter and had removed his belongings prior to it being discarded. *Id.* While the Court has required specific findings before the City destroys "any vehicle used by a BHU member as primary shelter in the Harrison Encampment," the City did not destroy any such vehicle. Dkt. 288 at 72:3-11.

On September 29, 2026, Mr. Barnett was again in the Harrison encampment and Mr. Powelson emailed City staff asking for packing and storage assistance for him. City staff followed up to ask for more specific information so that it could provide appropriate assistance, but BHU never responded. Finally, the City does not have knowledge of any City action that would have moved Mr. Barnett's property from Camelia and Second Street, as Mr. Barnett speculates in his declaration. Vance-Dozier ¶ 39. HRT did not have an operation scheduled there during the period that BHU alleges. *Id.*

**3. BHU's Other Allegations Are Vague and Fall Outside the Harrison Abatement at Issue.**

BHU makes other unsupported assertions. It argues "that numerous people have not been able to get replacement tents." Dkt. 400 at 7:1-4. BHU again broadly references Ms. Prado's declaration, and on this point Ms. Prado's declaration attests: "The City destroyed the tents, sleeping gear, and clothing of BHU members. The Court ordered the City to replace that property, but it did not do so for the majority of our members." Dkt. 400-1 ¶ 20. As noted, this testimony is conclusory and speculative and lacks foundation or any indicia of personal knowledge. This lack of specificity is surprising, given that Ms. Prado and other declarants were actually present and behind the police lines at the abatement, allowing them to personally observe the operations.

BHU also contends that, despite the City's obligation to "accommodate communication-related disabilities during the interactive process and other discussions with disabled BHU

members," it refused to engage with the BHU representatives Ms. Prado and Mr. Powelson, "who were present to communicate members' disability-related needs and facilitate their accommodations." Dkt. 400 at 7:6-13. But BHU does not demonstrate that (1) the City refused or failed to engage in any interactive process dialogue concerning a disabled BHU member; (2) Ms. Prado and Mr. Powelson made an interactive process or accommodation request on behalf of any disabled BHU member; (3) its members had communication-specific disabilities the City failed to accommodate; or (4) the City denied any reasonable accommodation request. On the contrary, the record demonstrates the City has satisfied its interactive process obligations under the ADA.

BHU also contends that on August 26, 2026, the City "abated the encampments of two disabled BHU members whose accommodation requests were pending," Sunny Jean Yow ("Yow" and Darrin Webster ("Webster"). Dkt. 400 at 7:14-22. However, neither Yow nor Webster are parties to this proceeding, they were not part of the Harrison abatement but instead a prior August abatement at a different location, and the Court has not designated them as protected individuals. Moreover, apart from conclusory and speculative testimony from Ms. Prado, BHU makes no showing through admissible evidence that these individuals have disabilities that entitle them to accommodations to the City's 3x3 rule. BHU references Ms. Prado's declaration, but Ms. Prado does not identify the disabilities Yow and Webster have or any facts supporting her assertion that these individuals have disabilities and that their disabilities have a nexus to requested accommodations. Dkt. 400-1, ¶¶ 34-42. Ms. Prado's testimony on this count is entirely conclusory and speculative and lacks foundation. BHU similarly does not establish that these campers' belongings were removed pursuant to the 3x3 rule, rather than on other public health and safety grounds. Lastly, BHU does not demonstrate that the City ever refused to engage in the interactive process with Yow and Webster. Ms. Prado's other speculative contentions about Yow and Webster—including that the City

separated Yow from her dog, Dkt. 400-1 ¶ 36—fall wholly outside the scope of the Court's orders and this case.[2]

**B. The City Has Fully Complied with the Court's Orders.**

BHU has failed to substantiate its allegations regarding contempt. In contrast, the record demonstrates that the City complied with the Court's order by offering packing assistance, relocation assistance, and storage, providing notice of the abatement, and offering survival gear to individuals whose property was discarded. Individual claims to the contrary mischaracterize what occurred during the abatement, which proceeded with accommodations for individuals needing assistance and time. There were zero arrests in the September 15-17 abatement.

**1. The City Offered Packing Assistance, Relocation Assistance, and Storage to All BHU Members Who Requested It.**

The City made offers for relocation, packing, and storage assistance for months before abatement occurred both through BHU and during extensive individual outreach to campers. *See e.g.*, Dkt. 316. On August 25, 2026, the City posted 50 notices of the upcoming abatement on tents, vehicles, and fences in the area. Vance-Dozier Decl. ¶ 4. The notices stated that the City would provide packing, storage, and relocation assistance for individuals with disabilities at their request. Id. The City's notices provided that the City would store property that is not plausibly contaminated for 90 days and gave instruction on how to request storage bins. *Id*.

---

In addition, neither Yow nor Webster resided at the Harrison encampment, and their belongings were not removed from that location. And BHU does not identify these individuals as Harrison campers in any of its supporting declarations. To the extent BHU relies on the Court's expansion of its MSJ Order in the Final Judgment to all BHU members citywide, contrary to its prior order expressly limiting any relief in this case to the Harrison encampment, Dkt. 69 at 2:8, the City would note the Court enlarged the MSJ Order without first providing notice to the City or an opportunity to contest this new requirement. *Armstrong v. Brown* (2024) 768 F.3d 975, 979-980 ("Before issuing injunctive relief, the court must provide the affected party with notice and an opportunity to be heard"). Additionally, the City has already provided a declaration regarding the duly noticed abatement on Murray Street, including that the City granted Ms. Yow's accommodation requests for extended time to move, replacement of survival gear, relocation assistance, and her request to have an advocate present during conversations with staff, and denying her request to stay at her then-current location. Dkt. 348-1.

On September 11, 2026, the City again posted substantially identical notices at the Harrison Street encampment. Vance-Dozier Decl. ¶ 5. This notice removed the list of categorically unstorable items and instead made it clear that the City would store anything not "plausibly contaminated with Leptospirosis or otherwise hazardous to store." Vance-Dozier Decl., Exhibit B. The City distributed 40 plastic tubs in the weeks leading up to abatement to help residents move and store belongings. Despite repeated follow up and extensive notice, no residents followed up to schedule packing, storage, or relocation assistance in advance of abatement. Vance Dozier Decl. ¶ 7, 25. The September 11, 2026 notice required all property to be removed from the area by September 15, 2026 and repeated notice that property that contaminated or hazardous property would be discarded. Id ¶ 5.

Despite not receiving any follow-up to schedule packing, storage, or relocation in advance, the City gave assistance as needs arose during abatement. Beginning on September 15, 2026, the City gave extra time for several individuals to sort, store, and move their belongings. In particular, the City provided packing help to Dianne Castro, Hector Navarro, and Marsha Dowell so that they could move out of the immediate abatement area. Vance-Dozier Decl. ¶ 24. When confronted with soiled and hazardous belongings, the City told BHU that, if individuals presented the City with non-contaminated belongings, the City would store them. This was in compliance with the plan the City had given the Court for abatement. See Dkt. 316 at 15 (explaining that do to disease risk, "campers must identify and point City staff to items they wish to store."). BHU never presented the City any belongings for storage. Id ¶ 26. Nor did BHU or any resident demarcate the encampment space of the protected seven individuals from the Court's order prior to abatement on September 15, 2026. Vance-Dozier Decl. ¶ 8. BHU only began demarcating after abatement began. *Id.* ¶ 9.

Nonetheless, the City stored clean tents, clothing, and survival gear, predominately for unattended belongings, and filled out inventory forms for those belongings. *Id.* ¶ 27. Following its policy, the City has stored this property at the City's Corp Yard. However, most property in the encampment was either moved by BHU members themselves or was discarded because it

was contaminated or hazardous. *Id*. ¶¶ 27-28. In many instances, survival gear was not destroyed at all, and residents communicated that they had everything they wanted to keep and gave permission for the City to clear the rest. *Id*. ¶ 26. The City did not interfere with BHU, who brought flatbed trucks and assisted certain members with packing and moving during the abatement. *Id*. ¶ 25.

Two requests were denied during the abatement and subsequent cleanup operations in the area: a request by an individual to move items to Albany and a request to move a very large, unwieldy structure on wheels that would have been unsafe to move. Vance-Dozier Decl. ¶ 25. There were zero arrests during the large abatement operation from September 15-17. The City's abatement of the Harrison encampment was patient and orderly.

**2. The City Offered Replacement Survival Belongings When Discarding Property Was Necessary.**

The City offered replacement survival gear to every person who had property discarded by the City. Vance-Dozier Decl. ¶ 20. Although the City solicited interest and desired sizes for months in advance, many requests for replacement gear came during the abatement itself. In those cases, as the City informed the Court it would do, the City offered what it had in stock and otherwise offered vouchers explaining how to contact the City to request specific sizes. Vance Dozier Decl. ¶ 20; see also *Id.* Ex. D (providing Vance-Dozier's email address and phone number on the voucher). In particular, the City provided the following people with tents:

- Andre Garcia- complete kit (tent, sleeping bag, clothes): 4–6-person tent
- Hector Navarro- complete kit: 4–6-person tent
- Jasmine Williams- 2-person tent
- Erik Coon (Priest)- 4-person tent and sleeping bag
- Alice Barbee- 8-person tent
- Amy Jones- 2-person tent
- Robert Pearce- 4–6-person tent and sleeping bag
- Charles Dye ("Reptile")-- 2-person tent and sleeping bag
- James Patten – voucher

- Orvel Roadlander ("Popcorn") – voucher. On September 16, Robbie Powelson requested a *20-person tent* for Mr. Roadlander by email, which is obviously too large for any City sidewalk, so the City did not provide it. HRT staff witnessed who they believed to be Mr. Roadlander using a new tent in the Harrison Corridor shortly thereafter. On October 14 Mr. Powelson emailed again asking for a tent. On October 16, the City responded asking what size he wanted, since it sounded like he was open to negotiating size, and offered a 4-person tent that the City had in stock immediately. As of this filing, the City received no response.

Vance-Dozier Decl. ¶ 20.

A few individuals requested tents despite not having their property discarded, and therefore no replacements were given. This applied to the following individuals:

- Ramondo Mackey
- Jasmine Blau
- Unknown black male in the Codornices Creek area
- Clarence Bailey

Vance-Dozier Decl. ¶ 21.

Some other individuals refused or otherwise did not respond to offers of replacement survival gear:

- Marsha Dowell
- Ms Vickie
- Jermaine White
- Robbie Peddycoart – City staff saw Mr. Peddycoart again on September 23 and, at that time, he accepted a 4-person tent. He said he did not want a larger tent because it would not fit at the location to which he planned to move.
- Hector Navarro's partner
- Diana Castro
- Elester Sheldon

- Thomas Barnett

Vance-Dozier Decl. ¶ 22.

**3. The City's Attempts to Obtain Information from BHU for Additional Replacement Gear Have Gone Unanswered.**

The City has been diligent to ensure that no BHU members still require replacement gear, but it has thus far not received information from BHU in response to requests. Shortly after the abatement, on September 17, 2026, Sara Stephens from the City Attorney's Office sent Yesica Prado a 3-page email outlining each person to whom the City had provided survival gear and offering to still provide "tents, sleeping bags, and clothing to any BHU members you identify whose survival equipment was destroyed and now require replacement survival gear." Stephens Decl. ¶ 3. Ms. Stephens requested the (1) name of any individual, (2) the items the person is requesting, and (3) the tent or clothing size requested. *Id*.

Ms. Prado did not respond to the email. Ms. Prado emailed Ms. Vance-Dozier weeks later, on October 9, 2026, after filing for contempt on October 6, 2026, demanding replacement gear for unspecified individuals without identifying what survival equipment or size was required. *Id*. ¶ 5. On October 16, 2026, Ms. Vance-Dozier emailed Ms. Prado offering what the City had on hand and asking for sizes if the City needed to order new tents. *Id*. ¶ 6. Ms. Prado's reply again did not provide the requested information regarding gear types and sizes, so Ms. Stephens wrote back on October 19, 2026 reiterating that, when the City knows the sizes of replacement tents and clothing, the City can propose a time to deliver them to affected individuals. Stephens Decl. ¶ 8. As of October 20, 2026, BHU has not provided the relevant information of who needs gear, what gear, and in what sizes. *Id*.

**4. The City Communicated the Abatement with Notice and Otherwise Communicated Respectfully with Individuals.**

The abatement of the Harrison encampment should not have come as a surprise to anyone. The abatement was noticed nine times, including in June, July, August, and most recently on September 11, 2026, four days before it took place. Radu Decl. ¶ 22. The Court expressly allowed abatement to go forward in its September 9 order, exempting only certain individuals from the cleanup. Dkt. 342.

Regarding other communications with individuals, the City again went above the minimums required by the Court. As an initial matter, the Court denied Plaintiff's summary judgment related to BHU's requested communication accommodation claims. Dkt. 288 at 69. Nonetheless, the City committed to using patient and respectful communications and addressing disability-related barriers in a reasonable manner. Dkt. 326.

The City communicated respectfully and patiently with residents. This is exemplified in the numerous individuals who did not move their belongings in accordance with the published notice, who the City nonetheless provided extra time and assistance to pack and move belongings to prevent the unnecessary destruction of items individuals wished to keep. Okeya-Vance Decl. Id ¶ 24.

For one resident, Alice Barbee, the City waited on abatement to make sure she got her medication. When Yesica Prado stated that she feared Ms. Barbee was having a heart attack, the City paused abatement, called 911, and had medics check on Ms. Barbee, who determined that she was not having any medical emergency. Radu Decl. ¶ 13.

The patient and respectful nature of City Staff is evident in the fact that during the Sept. 15-17 abatement everyone left on their own accord.

**5. The City Worked with Residents Regarding Their Accommodations.**

Peter Radu communicated with residents and to staff to ensure that encampment residents had time to move belongings and to ensure that the City responded to requests for assistance. Mr. Radu's approach was to distinguish between the practical work of addressing individuals' needs and legal disputes with BHU. Radu Decl. ¶ 6. Mr. Radu instructed BHU to contact the City Attorney's Office with legal questions or concerns while continuing to address individuals' practical needs directly. Radu Decl. ¶ 4. When BHU representatives identified items or assistance that they believed an individual needed, City staff responded directly with those individuals to address their needs. Radu Decl. ¶ 6.

The City did not receive requests to schedule packing or moving assistance in advance. Radu Decl. ¶7. Nonetheless, the City did not deny any individual extra time to pack or remove

belongings. Radu Decl ¶ 8. The City responded to individual requests for assistance as they sought to avoid hostile confrontations from BHU representatives, which interferes with attempts to provide assistance. Radu Decl. ¶9, 10. City staff was diligent in documenting its handling of property and filled out over 100 pages of inventory forms related to property. Radu Decl. ¶14. Staff even bagged and documented unattended non-contaminated items. Radu Decl. ¶13.

**6. The City's Responses to Accommodation Requests Submitted Following the September 9, 2026 Order**

The City has been in constant contact with BHU and individuals regarding all ADA accommodations requests. As stated above, many of the communications have gone unanswered for extended periods of time. A list of individuals that requested accommodation, primarily relocation, was submitted to the Special Master and is included here as Exhibit A to the Declaration of Thomas Gregory ("Gregory Decl."). On October 6, Mr. Gregory, the City's ADA Coordinator, emailed Yesica Prado with final determinations and alternatives to 19 pending 3x3 requests. Gregory Decl. Ex. F.

Other than those individuals and since September 9, 2026, there have been other communications with Ms. Prado regarding accommodation requests with Mr. Spencer, Mr. Barnett, Ms. Parnell, Mr. Navarro, Ms. Lewanda, Mr. Webster, Mr. Muwakkil, Ms. Selena, and Mr. Roadlander.

The communications with Mr. Spencer and Mr. Barnett went unanswered. Gregory Decl. Ex. E. Mr. Gregory met communicated with Ms. Prado about how Ms. Parnell could modify her footprint to meet City rules on October 8 and 13, 2026. Gregory Decl. Exs. G, I.

On October 9, 2026, Mr. Gregory responded with permissible dimensions for Mr. Navarro's requested 2285 Fourth Street location and offered relocation assistance. Mr. Navaro never provided alternative sites with a larger width. Id. Ex. H.

On October 14, Mr. Gregory emailed Ms. Prado regarding moving Ms. Lewanda and Darren Webster's footprint to comply with City rules. Mr. Gregory met with Ms. Prado, offered moving assistance, and granted an extension of time to move. Id. Ex J.

On October 16, 2026, Mr. Gregory engaged in emails with Ms. Prado regarding a request for relocation sites before learning that Mr. Muwakkil has been in a shelter program named CareBridge since July of 2026. Id. Exs. K, L.

On October 16, 2026, Mr. Gregory emailed Ms. Prado inquiring into what property of Ms. Selena's was destroyed, the dimensions of the requested footprint, and other information and is awaiting a response. Id. Ex. M.

On October 20, Mr. Gregory emailed Ms. Prado regarding relocation requests by Mr. Roadlander. Mr. Gregory explained that the requested footprint lacked a nexus, the relocation sites were either insufficient width or in No Lodging areas and requested to know what size tent Mr. Roadlander was requesting (initial request was a 20-person tent). Id. Ex. N.

As described above, the City provided replacement survival gear or vouchers to everyone who expressed interest, and the City has further attempted to provide additional gear to any other BHU member who needs it. However, BHU has obstructed the City's attempts to do so. Stephens Decl. Exhibits A, B.

## V. <u>CONCLUSION</u>

BHU has not met its burden of showing by clear and convincing evidence that the City violated the Court's orders, and in fact has presented evidence demonstrating its compliance with the orders. For the foregoing reasons, the City respectfully requests that the Court deny BHU's Motion. But if the Court is inclined to grant the Motion, the City asks the Court to ensure the City is afforded an opportunity to present evidence and defend itself, as due process requires, by calendaring an evidentiary hearing.

Respectfully Submitted,

CITY ATTORNEY'S OFFICE

Dated: October 20, 2026

/s/ Gabriel Martinez

GABRIEL MARTINEZ

Attorneys for Defendant City of Berkeley