**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

OCT 26 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BERKELEY HOMELESS UNION; FRANK MOORE,

Plaintiffs - Appellees,

ADRIEN BOUCHARD, NICHOLAS JOHNSON,

Plaintiffs,

v.

CITY OF BERKELEY; THOMAS GREGORY; PAUL BUDDENHAGEN; PETER RADU; OKEYA VANCE-DOZIER; RASHI KESERWANI,

Defendants - Appellants.

No. 25-7341

D.C. No.
3:25-cv-01414-EMC
Northern District of California,
San Francisco

ORDER

BERKELEY HOMELESS UNION; FRANK MOORE,

Plaintiffs - Appellees,

NICHOLAS JOHNSON, ADRIEN BOUCHARD,

Plaintiffs,

v.

CITY OF BERKELEY; THOMAS GREGORY; PAUL BUDDENHAGEN;

No. 26-842

D.C. No.
3:25-cv-01414-EMC

Northern District of California,
San Francisco

PETER RADU; OKEYA VANCE-DOZIER; RASHI KESERWANI,

Defendants - Appellants.

BERKELEY HOMELESS UNION,

Plaintiff - Appellee,

ADRIEN BOUCHARD, NICHOLAS JOHNSON, FRANK MOORE,

Plaintiffs,

v.

CITY OF BERKELEY; THOMAS GREGORY; PAUL BUDDENHAGEN; PETER RADU; OKEYA VANCE-DOZIER; RASHI KESERWANI,

Defendants - Appellants.

No. 26-2755

D.C. No.
3:25-cv-01414-EMC

Northern District of California,
San Francisco

BERKELEY HOMELESS UNION; FRANK MOORE,

Plaintiffs - Appellees,

and

ADRIEN BOUCHARD, NICHOLAS JOHNSON,

Plaintiffs,

v.

CITY OF BERKELEY; THOMAS GREGORY; PAUL BUDDENHAGEN;

No. 26-2820

D.C. No.
3:25-cv-01414-EMC

Northern District of California,
San Francisco

| | |
|---|---|
| PETER RADU; OKEYA VANCE-DOZIER; RASHI KESERWANI,<br><br>Defendants - Appellants. | |
| YESICA PRADO, on behalf of themselves and all others similarly situated; ERIN SPENCER; LUCIAN JEFFORDS; AMBER WHITSON; MONIQUE WILLIAMS; RUFUS LEE WHITE; WHERE DO WE GO, named as Where Do We Go Berkeley; JERMAINE WHITE,<br><br>Plaintiffs - Appellees,<br><br>ANGEL KENNETT, BARBARA GEIB,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BERKELEY,<br><br>Defendant - Appellant,<br><br>v.<br><br>BAY AREA COMMUNITY SERVICES, BUILDING OPPORTUNITIES FOR SELF-SUFFICIENCY, DOROTHY DAY HOUSE, INSIGHT HOUSING,<br><br>Third-pty-defendants. | No. 26-2823<br><br>D.C. No. 3:23-cv-04537-EMC<br><br>Northern District of California, San Francisco |
| BERKELEY HOMELESS UNION; FRANK MOORE,<br><br>Plaintiffs - Appellees, | No. 26-6170<br><br>D.C. No. 3:25-cv-01414-EMC |

| | |
|---|---|
| v.<br><br>CITY OF BERKELEY; THOMAS GREGORY; PAUL BUDDENHAGEN; PETER RADU; OKEYA VANCE-DOZIER; RASHI KESERWANI,<br><br>Defendants - Appellants. | Northern District of California, San Francisco |
| BERKELEY HOMELESS UNION,<br><br>Plaintiff - Appellee,<br><br>FRANK MOORE,<br><br>Plaintiff,<br>v.<br><br>CITY OF BERKELEY; THOMAS GREGORY; PAUL BUDDENHAGEN; PETER RADU; OKEYA VANCE-DOZIER; RASHI KESERWANI,<br><br>Defendants - Appellants. | No. 26-6177<br><br>D.C. No. 3:25-cv-01414-EMC<br><br>Northern District of California, San Francisco |

Before: Sidney R. Thomas, Morgan B. Christen, and Patrick J. Bumatay, Circuit Judges.
Concurrence in part and dissent in part by Judge Bumatay.

PER CURIAM:

This case arises from a challenge to the City of Berkeley's abatement of a long-running homeless encampment at 8th and Harrison in Berkeley, California (the "Harrison Encampment").[1] The court has received the City's emergency

[1] The City's Notice of Encampment Closure, dated September 11, 2026, defines the area as "bounded by San Pablo Avenue to the East, the Railroad tracks

motion for administrative stay and stay pending appeal. (Nos. 26-6170, 26-6177, Dkt. 4). The request for stay pending appeal is **GRANTED IN PART, AND DENIED IN PART WITHOUT PREJUDICE**. The request for administrative stay is **DENIED AS MOOT**.

"A request for a stay pending appeal is committed to the exercise of judicial discretion." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). "To secure a stay pending appeal, the Government must show that it is likely to succeed on the merits and that it is likely to suffer irreparable harm without a stay." *Trump v. California*, No. 26A124, 2026 WL 2473573, at *2 (U.S. Aug. 24, 2026) (per curiam). Because the "authority to grant stays has historically been justified by the perceived need 'to prevent irreparable injury to the parties or to the public' pending review," "simply showing some possibility of irreparable injury" is insufficient. *Nken v. Holder*, 556 U.S. 432, 434 (2009) (citation omitted).

Our court's application of the *Nken* factors "operates on a 'sliding scale,' such that 'if there is a probability or strong likelihood of success on the merits, a relatively low standard of hardship is sufficient.'" *California v. Express Scripts,*

---

to the West, Codornices Creek to the North, and Gilman St to the South." We refer to this area as the Harrison Encampment, encampment, and camp. The City did not provide a copy of this Notice of Encampment Closure in its emergency motion, but it is included in the district court docket. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").

*Inc.*, 139 F.4th 763, 772 n.8 (9th Cir. 2025) (quoting *Golden Gate Rest. Ass'n v. City and Cnty. of San Francisco*, 512 F.3d 1112, 1115 (9th Cir. 2008)). But "*Nken* instruct[s] 'that if the petition has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Doe #1*, 957 F.3d at 1058 (citation omitted). "We therefore begin our *Nken* analysis with consideration of irreparable harm." *Id.* When a party fails to demonstrate irreparable harm, the *Nken* analysis can "conclude." *Id.* at 1062; *see Rubin v. United States*, 524 U.S. 1301, 1301 (1998) (Rehnquist, C.J., in chambers) ("An applicant for stay first must show irreparable harm if a stay is denied.").

1. The most concerning aspect of the City's motion is the need to clear the Harrison Encampment because the City has detected leptospirosis in the camp and this presents a public health risk.[2] We do not question that the need to abate the encampment qualifies as a situation warranting emergency relief. The district court ordered abatement to go forward in mid-September 2026. The parties agree

---

[2] Leptospirosis is a disease that can include fever, headache, body or muscle aches, fatigue, and red eyes, and if left untreated can progress to kidney damage, meningitis, liver failure, and even death. *See About Leptospirosis*, Center for Disease Control and Prevention, https://www.cdc.gov/leptospirosis/about/index.html [https://perma.cc/L885-V86V]. The disease was first detected in the camp in winter 2025. The City did not seek emergency relief in our court for over ten months, despite having a docketed appeal from the district court's earlier rulings in November 2025.

that the primary abatement work was done between September 15 and September 17 of this year but it appears that continued work was contemplated. The City has not updated our court regarding the status of the abatement since filing its motion on September 24, but the City included internal emails in support of its motion for stay pending appeal that provide some additional information. In the emails, the Assistant City Manager described the abatement as "truly impressive" and informed his team that the Harrison area was "completely clear of encampments" as of September 23, except for two individuals temporarily protected by injunctive relief. In the district court, a Special Master entered an order dated October 16 that states, "the abatement of the 8th and Harrison encampment has already occurred." We are hesitant to peruse the parties' district court filings on our own, absent guidance from the parties or the district court. But near close of business on October 20, the City filed a declaration in the district court clarifying that at least a few BHU members remain in the encampment as of that date. Even on an incomplete record, we are persuaded that the City must be able to clear the Harrison Encampment because of the public health risk posed by leptospirosis.

The remaining *Nken* factors support the City. BHU waives any argument regarding the likelihood of success on the merits at this stage because it does not defend the merits in its opposition to the City's motion for stay. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009). A stay will not substantially injure

BHU members or other individuals remaining in the camp given the City's offer to BHU to "set up their new tents outside of the Harrison Corridor" and its proposal to connect those residents with interim housing. The public interest lies in reducing the risk that disease will spread. Therefore, to the extent the district court's orders prevent the City from abating and clearing the Harrison Encampment, the motion for stay pending appeal is **GRANTED.**

Our dissenting colleague incorporates outdated photos of the Harrison Encampment taken at the outset or during the abatement process. We agree that the conditions in the encampment warranted intervention without delay, but omitted from the dissent is any mention that, with one exception, the photos it incorporates were all taken prior to or during the September 15 and 16 abatement. The one exception is a photo on page 37 of the dissent. We cannot tell the date that photo was taken. Our record also shows that the pictured debris was "[a]ll discarded" prior to the filing of the City's motion for stay pending appeal. Our record is silent regarding the current conditions in the encampment. The most recent photo of the encampment in our record is dated September 21. It was also submitted in support of the City's motion and it shows Harrison between 6th and 8th to be a fully cleared street.[3]

---

[3] Two days later, on September 23, the City reaffirmed this area was "clear." We recognize the City has more recently voiced concerns regarding individual



2. The City's motion for stay raises concerns regarding re-encampment, but the district court's orders do not permit re-encampment. The record also reflects that the City has continued to exercise enforcement authority at the site, including arresting at least one individual who attempted to return to the Harrison Encampment. The City's September 24, 2026 motion states that BHU-member residents' vehicles remained in or near the encampment as of that date, but the

instances of re-encampment. But this order makes clear that the City may clear the Harrison Encampment without delay.

City's September 11 Notice of Encampment Closure states "[v]ehicles are not required to relocate at this time." We do not read the district court's orders to prohibit the City from removing vehicles, and the City does not argue otherwise. Indeed, it appears that the City's abatement process included removing at least one vehicle from the Harrison Encampment by "backhoe." Contrary to our dissenting colleague's suggestion, our record does not show that the district court required the City to "let BHU members keep their vehicles parked in the camps." It shows only that the court required the City to engage in certain steps before taking "more drastic measures such as impoundment" of vehicles used as shelter. Nothing in the record tells us how many, if any, vehicles are left in the Harrison Encampment. If any vehicles remain, we clarify that to the extent the district court's orders prevent the City from removing them, the motion to stay those orders pending appeal is **GRANTED.**

3. Regarding the removal of the former residents' personal property, the district court required the City to comply with its existing regulations and, in the context of a "one-time abatement action," ordered the City to not "summarily" destroy the property of disabled BHU members without providing relocation assistance and property storage. Recognizing the public health risk, the district court specified that the City need not "put its own staff at unreasonable risk" and is "not required to physically handle or store items" that are "observably"

contaminated. In short, the district court recognized that the removal and storage of personal property warranted special consideration because it implicates the health risk presented by the outbreak of leptospirosis. The City does not argue that complying with these parts of the district court's order risks irreparable injury.

4. The City argues that the August 20 order expands the relief afforded by the court's summary judgment ruling and earlier preliminary injunctions. More specifically, the City argues that it will suffer irreparable harm absent a stay because the court's order violated Article III by extending relief to include all members of BHU, wherever they are located in Berkeley. According to the City, this exceeded the scope of relief that BHU requested. On this point, the City's motion for emergency stay pending appeal is defeated by the current record.

In April 2026, the district court entered summary judgment and preliminary injunction rulings that required the City to engage in certain interactive processes pursuant to the Americans with Disabilities Act (ADA) before proceeding with abatement. The court also ordered limited relief to BHU pursuant to its Fourth Amendment and state-created danger claims. Before proceeding with abatement of the Harrison Encampment, the City requested entry of final judgment in May to facilitate its appeal of the district court's rulings on BHU's claims.

The City's motion for stay pending appeal is supported almost entirely by the written record, which leaves much of the relevant litigation story unexplained.

But on October 23, in conjunction with its supplemental merits briefing, the City filed a transcript of the July 17, 2026 hearing held on the City's motion for entry of final judgment. The newly filed transcript does not support the City's contention that the district court sua sponte expanded the scope of relief, but the colloquy does show that the parties and court may have miscommunicated at the hearing on the City's motion for entry of judgment.

By the time the July hearing was held, the terms of the court's earlier orders were well known to both parties. The City sought entry of final judgment to facilitate the appeal. In response to the City's motion for entry of final judgment, BHU objected that it had outstanding claims that had yet to be adjudicated and that entry of final judgment at that point would result in piecemeal litigation. That position was consistent with BHU's amended complaint, which did seek broader relief than its original complaint. The transcript of the July hearing shows that the district court agreed that it would benefit from our court's review of its merits rulings on BHU's claims, which present novel legal issues. In an effort to enter a final judgment that would facilitate an appeal of the merits issues as requested by the City, and also to avoid piecemeal litigation, the district court suggested several forms of final judgment and heard the parties' respective positions. At the beginning of the hearing, the district court asked the City if "there [was] some reason why I can't enter a final judgment on what I've ruled on [at summary

judgment] and maybe making it clear that it applies . . . to encampments anywhere in Berkeley that now we have a final judgment [because] *I mean, that's what you're looking for*." The City did not object; it responded, "Yes, Your Honor." After the district court suggested a final "judgment [that] applies to all members of the BHU for which BHU has standing" and repeated that the order would apply "throughout the city even though there may or not be threatened enforcement," the City responded "correct" and that such an "order accomplishes" and "support[s] entry of final judgment." The district court then expressly asked the parties: "Do you have any objection if [the court] were to enter an order to make clear that the summary judgment order applies - - its protection applies to all members of BHU and applies throughout Berkeley . . . [even though] there would[] be future litigation on who's a member, who's not, whether they're violating the actual terms[.]" Again, the City did not object. At the end of the hearing on the City's motion, the district court concluded that "I think the thing to do is enter a final judgment and it be phrased as a permanent injunction." The City responded: "We agree, Your Honor."

The City's motion for stay pending appeal takes the position that the court sua sponte expanded the scope of relief when it entered final judgment. But the motion does not acknowledge that the City requested entry of judgment or the positions the City took at the July 17, 2026, hearing. In its supplemental merits

brief filed yesterday, the City contends that it was not provided an opportunity to comment on the form of the written final judgment order before it was entered, and the transcript of the July 17 hearing suggests that the court did intend for the parties to have that opportunity. If that is the case, and/or if the court and counsel miscommunicated during their colloquy about the scope of the final judgment that was to be entered, the City should direct those concerns to the district court so that it may address them in the first instance. A hearing is set for October 29, 2026 in the district court on the City's motion for stay pending appeal. In the meantime, the present record does not support the City's motion for stay pending appeal on the ground that the district court impermissibly expanded the scope of the permanent injunction.

5. The City's motion for stay anticipates that the district court will order it to allow BHU members to camp in areas the City has designated as "No Lodging" areas. The dissent suggests that this is already occurring and analogizes to *Grants Pass* because, in its view, the district court's orders require the City to allow BHU members to pitch tents throughout the City "regardless of local prohibitions." The record does not support these assertions, and the situation in Berkeley differs from *Grants Pass* in important ways. *Cf. Grants Pass v. Johnson*, 603 U.S. 520, 556 (2024). To begin, Berkeley has not banned outdoor camping in

public spaces. From the beginning of this litigation, the City has been clear on this point.

At a June 2025 hearing, one of the city's attorneys told the district court that the City "does not have a camping ban" or "a blanket 'no camping' ordinance," and that "our position" is that "[i]f there is no limitation on camping in the city other than certain locations . . . folks are available and free to move in other locations where it may be allowed." At the March 2026 summary judgment hearing, the City again represented that it "doesn't have a policy of removing unhoused or homeless individuals from the streets" and emphasized that it did not want unhoused people to "move out of the City." Indeed, in a recent email dated October 19, 2026 and filed in the district court, a city attorney directed that for those BHU members evicted from the encampment, they "*are advised to set up their new tents outside of the Harrison Encampment*"; they were not asked to leave the City. This is consistent with Administrative Regulation 10.2, which the City adopted in 2018. As the Deputy City Manager explained to the district court, in the regulation, the City "recognized the need for unsheltered individuals to have a limited amount of personal space and possessions in public spaces."

Despite the dissent's suggestions, the record does not show that the district court has ever required the City to relocate a BHU member to a "No Lodging" area, or to require the City to allow BHU members to pitch tents regardless of local

prohibitions.[4] The court did provide temporary injunctive relief to seven disabled BHU-member residents of the Harrison Encampment and required the City to engage in an interactive process to facilitate the relocation of these seven people. The City argues that the district court overstepped because the process is excessively detailed. Against the backdrop described above, whether this process (or any other) is legally required under the ADA is a merits determination. We recognize the need to expedite resolution of this dispute. Therefore, pursuant to the parties' joint request, we consolidated the City's appeals and added this matter to our February calendar. The parties' merits briefing is not yet complete. At this stage of the proceedings and on the present record, the City has not met its burden to show that the district court's requirements that it engage in certain interactive processes to facilitate relocation within the City constitutes irreparable injury. Therefore, except as specified above, the City's request for stay pending appeal is denied without prejudice to renew if the circumstances change.

We remind the parties that our record of the proceedings is fragmented at best. Until October 23, the parties had not provided us with transcripts from the key hearings in the district court, and we do not have recent transcripts for other

---

[4] In addition to denying BHU's requested right to remain in the Harrison Encampment, the district court denied BHU's request for guaranteed housing, enforcement-free zones, city-owned campsites, and a map or list of enforcement-free areas.

hearings in which the district court or Special Master may have addressed the current situation on the ground. If the parties do return to our court to seek interim relief, it will be incumbent upon them to be sure that we have a sufficient record to address their requests.

If the parties would like to engage assistance from the Ninth Circuit Mediation Office, they may contact the mediator at ca09_mediation@ca9.uscourts.gov.

FILED

OCT 26 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Berkeley Homeless Union v. City of Berkeley*, No. 25-7341+
BUMATAY, Circuit Judge, concurring in part and dissenting in part:

"The growth of cities, the crowding of populations, the increased awareness of the responsibility of the state for the living conditions of its citizens"—"all have combined to create problems" for governments throughout this country. *Frank v. Maryland*, 359 U.S. 360, 371 (1959), *overruled on other grounds by Camara v. Mun. Ct.*, 387 U.S. 523 (1967). These difficult problems are for elected officials—not courts—to resolve. Yet the district court injects itself into managing—indeed, micromanaging—the problems of homelessness in the City of Berkeley.

A disease plagues one of Berkeley's homeless encampments—an outbreak of leptospirosis. This "ancient" sickness "flourishe[s]" where rats do. S. Faine et al., *Leptospira and Leptospirosis* 1–3 (2d ed. 1999) (describing "the extremely unwholesome condition of the Ottoman camp, and the numbers of dead putrid carcas[s]es of animals suffered to remain uncovered," where the disease broke out in the nineteenth century (simplified)). In humans, "the illness may be mild and self-limiting or severe and possibly fatal." *Id.* at 68.

Severe leptospirosis means kidney failure, bleeding from the lungs and heart, liver failure, and brain inflammation. David A. Haake & Paul N. Levett, *Leptospirosis in Humans*, *in Leptospira and Leptospirosis* 65, 74–78 (Ben Adler ed., 2015); Faine et al., *supra*, at 68–69. It kills when it's left untreated. Haake & Levett, *supra*, at 85–86; Faine et al., *supra*, at 68. And while modern antibiotics and dialysis

save many lives, permanent damage to the kidneys and heart is common—as is brain fog that doesn't go away. Haake & Levett, *supra*, at 79.

Diseased rats dwell in a Berkeley homeless encampment centered on Harrison Street, polluting the area and making it unsafe for the City's citizens. One person has already died. Berkeley is trying to abate the situation. As the Court recognized long ago, "a major concern of American government" is "to prevent the spread of disease." *Frank*, 359 U.S. at 371. Berkeley seeks to clean the homeless encampment by clearing away the filth and debris creating the rat infestation and exterminating the rats that carry leptospirosis. To do that, it must move and discard *all* illegally placed cars, tents, and other potential rodent harbors left in the encampment. Only then can Berkeley effectively eradicate the dangers of the disease.



The Harrison Encampment, During Abatement

Yet a district court prevents Berkeley from completely clearing the encampments. Why? Because an advocacy group calling itself the Berkeley Homeless Union ("BHU") says that Berkeley's clean-up deprives its members of constitutional and statutory rights. Based on that, the district court ordered ever-shifting, ever-expanding injunctions that preclude Berkeley from taking certain abatement measures. Under multiple district court injunctions, Berkeley must leave certain tents in the encampment untouched and not remove illegally parked vehicles used as housing in the area.

This patchwork of district court restrictions has undermined Berkeley's ability to effectively eradicate leptospirosis from the homeless camp. Now, the rats have refuge from the traps and rodenticide placed by City workers—allowing the disease to potentially survive and infect more people. As if that weren't enough, the district court's final injunction reaches BHU members citywide, hamstringing Berkeley's efforts to protect its citizens in camps far away from Harrison. Unsurprisingly, Berkeley seeks an emergency stay pending appeal. The City is entitled to a stay for *at least* three reasons.

First, BHU shouldn't even be in federal court. BHU doesn't meet the requirements for associational standing under our precedent. The district court simply ignored those requirements and gave BHU a pass. Whether the district court likes our precedent or not, it was not free to defy it. The tell that associational standing was improper? The district court ordered a mismatched remedy—rather than grant BHU any relief, it enjoined the City from taking certain measures against individual homeless non-parties. That defeats the purpose of associational standing. The district court lacked Article III jurisdiction to issue injunctions in this way.

Second, BHU is likely to lose on the merits. Its constitutional and statutory claims can't justify the district court's unprecedented actions.

To begin, based on BHU's Fourth Amendment argument, the district court enjoined Berkeley from impounding vehicles that violate numerous ordinances, and

from cleaning the surrounding areas. But this ignores the well-established and historic "caretaker exception" to warrantless searches and seizures. And in ruling for BHU, the district court invented a new Fourth Amendment test from whole cloth. The district court's orders should be stayed on this basis alone.

Next, the district court weaponized the Americans with Disabilities Act ("ADA") to force Berkeley to meet unreasonable demands when it clears camps. Yet even if the ADA applies here, it doesn't require Berkeley to fundamentally alter its abatement program to accommodate homeless persons with disabilities as it battles a public-health risk.

Finally, BHU's "state-created danger" claim goes nowhere. "State-created danger" is a judge-created doctrine untethered from text and history. Given this background, we should be skeptical of its expansion. Yet the district court substantially enlarged its reach to enjoin Berkeley from removing obstructive cars and tents—even though it's entirely speculative that any homeless person would be actually and particularly harmed by the abatement, and even though Berkeley's actions don't evince any deliberate indifference. Yes, Berkeley is removing illegally erected tents and illegally parked vehicles. But that's to stop the spread of a deadly disease.

Third, Berkeley suffers serious, irreparable harm. The district court both prevents the City from achieving its rat-eradication objectives and precludes

Berkeley from abating other encampments citywide without its say-so. Enjoining a city from undertaking a basic function of government without judicial approval is an irreparable harm in itself. And the balance of interests tips decisively in Berkeley's direction. Nothing else outweighs Berkeley's need to eliminate "the hazards of rodent-caused plague and other serious diseases" on Berkeley's streets. *Dawson v. City of Seattle*, 435 F.3d 1054, 1063 (9th Cir. 2006).

Given that all stay factors favor Berkeley, we should've granted the stay pending appeal in full. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

Unfortunately, we've seen this before. The Ninth Circuit is no stranger to misusing the law to craft misguided homelessness policy. *See Johnson v. City of Grants Pass*, 72 F.4th 868 (9th Cir. 2024), *rev'd*, 603 U.S. 520 (2025). It took the Supreme Court to slap down our misadventures in homelessness policymaking. No matter how well intentioned, courts have no business dictating to local governments what policies best address this persistent problem. The Ninth Circuit's *Grants Pass* ruling was as wrongheaded as it was cruel to that city's residents. But now the district court has manufactured an end run around the Supreme Court's decision and started us down this dangerous path again.

I concur with the majority in staying the district court's orders impeding the Harrison abatement. But we should have granted the stay in full and stopped the district court's interference with Berkeley's homelessness policy writ large. Because

the district court issued lawless orders enjoining Berkeley from effectively cleaning up homeless encampments, I respectfully dissent from the partial denial of the stay pending appeal.

## I.

## BACKGROUND

The origins of this case are themselves a rat's nest. Our suit began when BHU filed its complaint in February 2025, but its story stretches back further. In September 2024, Berkeley adopted a new policy that allowed for the abatement of encampments that pose health and safety concerns. And Berkeley soon put the policy to work—in December 2024, it declared an encampment at Eighth and Harrison Streets a public nuisance due to "significant health and safety hazards including loose and scattered syringes; rodent harborage conditions and evidence of extensive and active rodent burrows; unmitigated human and animal waste; and open/rotting sources of food." And "the accumulation of personal belongings and debris in the area" blocked the sidewalks and vehicle lanes.

In mid-January 2025, after Berkeley declared a nuisance, it posted notices announcing a planned abatement. Shortly afterward, it held a hearing, and, by the end of the month, a hearing officer had overruled the objections of those who occupied the encampment. Berkeley could clear the camp.

Or so it thought. Enter the "Berkeley Homeless Union." One of BHU's leading members, Yesica Prado, previously sued Berkeley in a challenge to its homelessness policy. See *Prado v. City of Berkeley*, No. 23-cv-04537, 2024 WL 3697037 (N.D. Cal. Aug. 6, 2024), which has been consolidated with this case. This time, BHU's complaint alleged that shutting down the Harrison encampment would cause a state-created danger, violate the Fourth and Fourteenth Amendments, and offend the ADA.

From the beginning, Berkeley has said it closes encampments to enforce the law, keep its citizens safe, and preserve access to public roads and sidewalks. As it turns out, the Harrison encampment provided the ideal conditions for leptospirosis. Roaming rats and standing water meant a brewing storm. And a public-health risk to some is a public-health risk to all: Given the lack of running water, the Harrison homeless bathed in a nearby creek, which sits across from family housing provided by UC Berkeley. Further, the encampment itself was not isolated. Restaurants, a brewery, and even an urban farm sat nearby. When rats tested positive for leptospirosis in December 2025, the abatement took on new importance.

Berkeley's abatement efforts have faced many obstacles from the start. Only three days after BHU sued, the district court issued its first temporary restraining order, preventing Berkeley from moving forward with the abatement. That TRO was extended to the end of April 2025, then to May. And in June 2025, the district

court gave Berkeley 60 days to complete the ADA's "interactive process" for BHU members who occupied the encampment and had submitted accommodation requests. That injunction extended on for months. The district court allowed a limited abatement on the east side of one block to proceed in September 2025. Berkeley had planned a February 2026 abatement to deal with the leptospirosis outbreak, but bad weather postponed it. Another TRO was issued in March 2026 and extended into April.

In April 2026, the district court expanded its relief in two related orders. These orders required Berkeley to undertake a new accommodations inquiry related to illegally parked vehicles, permit some camp inhabitants to take up more than nine square feet of public sidewalk space, and affirmatively provide physical assistance and storage for BHU members.

And when the district court entered final judgment on August 20, 2026, it expanded relief again. In its final order, the district court issued a permanent injunction sweeping in all BHU members and imposing its orders citywide. The district court stated that "[t]he permanent injunctive relief applies to all BHU members, wherever situated within the City, and is not limited to the Harrison Encampment or to any previously identified claimants."

The result is unprecedented. In addition to imposing a requirement that Berkeley provide 72-hour written notice before beginning an abatement—and use

"patient, low-stimulation communication" with BHU's members—the district court ordered Berkeley to comply with a litany of obligations:

*Vehicles.* Before Berkeley can tow, impound, or otherwise dispose of a vehicle used as shelter, it must make a determination that the specific vehicle poses "a concrete, individualized threat to health and safety"—beyond "mere parking violations, inoperability, or expired registration." Berkeley must give the owner of the vehicle an opportunity to respond. And Berkeley further must "consider and pursue reasonable, less restrictive alternatives, including targeted cleaning, pest treatment, containment orders, and assisted relocation." Before destroying any vehicle as a hazard, Berkeley must "additionally show that no reasonable alternative could adequately mitigate the identified hazard."

*Sidewalk Space and Tents.* The district court ordered that Berkeley could not enforce its general sidewalk restrictions "in a manner resulting in the destruction of a BHU member's tent or shelter unless the City first conducts an individualized assessment accounting for the member's disability-related needs, if any, the physical dimensions of the sidewalk or right-of-way at issue, and the public interest in maintaining a reasonable path of travel." And when enforcing sidewalk rules would lead to loss of shelter, Berkeley must "allow the [BHU] member to retain [the tent] or relocate [it] to a location that does not unreasonably obstruct pedestrian passage,

or . . . provide a replacement tent consistent with that standard." This last requirement applies even if the BHU member isn't disabled.

*Property Replacement and Storage.* For disabled BHU members who can't relocate their property, the district court ordered Berkeley to provide them with "reasonable physical assistance." And the City must provide 90-day storage for any property that isn't "contaminated." When Berkeley destroys "[e]ssential survival property" because of contamination, it must replace it.

These orders directly impacted an abatement that Berkeley had initially scheduled for early August 2026. After a month of delays, the district court let the abatement proceed in mid-September 2026—subject to the court's restrictions. The district court allowed all "[r]esidents of the Harrison Encampment" to submit requests for "reasonable accommodation[s]" and "exempt[ed]" those who submitted a request "from encampment abatement" until the district court adjudicated their claims.

The district court soon granted temporary injunctive relief to seven individuals—prohibiting Berkeley from abating their encampments. And it announced it'd appoint a special master to resolve accommodation requests for 21 more. The district court also suggested that two individuals should be free to set up camp at another location in the City—one very close to a preschool. And the district

court let five others make their case for why they should be free to move somewhere camping was banned.

The abatement finally began on September 15, 2026. Within three days, Berkeley collected 50 tons of trash. The district court's orders hampered Berkeley's abatement efforts. City officials saw individuals pile their personal belongings onto vehicles, which were protected under the district court's orders. City officials also saw the BHU President move other people's property to areas protected by the district court's orders to keep it from being removed. What's more, BHU personnel left chalk marks "inaccurately indicating" property and sidewalk space were protected by the district court when they weren't—up to half a block at a time, and "extending into the street." As for the requirement to replace survival gear—a BHU member requested a six-person, $400 tent.

After operations concluded on September 18, Berkeley's Assistant City Manager stated that the abatement efforts had been "truly impressive, and admittedly greatly in excess of what I expected to see." But the City encountered re-encampment almost immediately. Further efforts were needed to combat re-encampment—on September 21, one person was arrested and Berkeley removed 2.8 tons of debris, then, on September 23, Berkeley removed another 4.23 tons of trash and debris. Through late September and October, BHU members and non-members alike continued to encamp at Harrison—vehicles and all.

## II.

## LIKELIHOOD OF SUCCESS ON THE MERITS

As it stands, Berkeley fights an uphill battle to carry out the ordinary duties of municipal government: protecting public health and safety, enforcing laws, and simply ensuring people can walk on the sidewalk. And through a series of orders, the district court effectively exempted more and more people not just from abatement, but from Berkeley's ordinary laws—including banal provisions about vehicle parking and registration. Compliance with such a regime is legally unwarranted. Berkeley must be allowed to set its own policy.

For four reasons, Berkeley is likely to succeed on the merits—the most important of the stay factors. First, Berkeley is likely to show that BHU lacks associational standing to bring claims on behalf of homeless individuals. Second, the district court's Fourth Amendment ruling ignores the community-caretaker exception. Third, BHU's ADA claims likely fail because the district court's ordered accommodations fundamentally alter Berkeley's effort to abate homeless camps that endanger the public. And finally, BHU's state-created-danger theory likely can't establish that Berkeley exposes BHU members to non-speculative, concrete harms, or that it does so with deliberate indifference. In each case, the district court evaded established law to rule for BHU. "Such gross overreaching by a federal district court

simply cannot be tolerated . . . ." *Lewis v. Casey*, 518 U.S. 343, 364 (1996) (Thomas, J., concurring).

### A.

### BHU Lacks Associational Standing

No homeless person in Berkeley is a party to this motion. Instead, the linchpin of this case is associational standing. BHU, a homeless-advocacy organization, claims to bring this challenge on behalf of homeless individuals in Berkeley. This is contrary to the traditional view of Article III standing, which holds that plaintiffs generally "must assert [their] own legal rights and interests, and cannot rely on the interests of third parties." *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1013 (9th Cir. 2025) (simplified).

There's reason to doubt whether Article III even tolerates associational standing. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 402 (2024) (Thomas, J., concurring) ("Because no party should be permitted to obtain an injunction in favor of nonparties, I have difficulty seeing why an association should be permitted to do so for its members."); *Moody v. NetChoice, LLC*, 603 U.S. 707, 760 (2024) (Thomas, J., concurring in the judgment) (similar). So "[w]e must be [especially] careful in granting organizations associational standing." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 764 (9th Cir. 2025) (Bumatay, J., dissenting), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799

(2026). "[W]e mustn't relax any standing requirements just because an organization presses a claim on behalf of an injured member." *Id.* And we regularly reject associational standing. *See, e.g.*, *NetChoice*, 152 F.4th at 1014; *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 960 (9th Cir. 2021).

Rather than approach associational standing with skepticism, the district court did the opposite. It so lowered the bar to associational standing that it effectively wiped away one third of its requirements. Both Supreme Court and Ninth Circuit precedent make clear that a membership association has standing only if three requirements are met: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *NetChoice*, 152 F.4th at 1013.

Somehow, the district court thought it could dispense with these requirements. In its terse analysis, the district court ruled:

> As an initial matter, regarding associational standing, BHU easily satisfies the first two prongs of the *Hunt* associational standing test. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344–45 (1977). Because BHU's Americans with Disabilities Act ("ADA") claim requires substantial individualized evidence, BHU does not clearly satisfy the third prong of the *Hunt* test. However, because the third prong is prudential, the Court allows BHU to bring its claims on behalf of its members.

That was the district court's whole jurisdictional analysis. It has refused to revisit it since. This was inadequate for three reasons.

To begin, we don't adjudicate jurisdiction in gross. "We consider . . . standing on a claim-by-claim basis." *Valley Outdoor, Inc. v. City of Riverside*, 446 F.3d 948, 952 (9th Cir. 2006). While its ADA analysis was lacking, the district court didn't even consider BHU's standing for its Fourth Amendment and "state-created danger" claims. Instead, it seemingly applied a categorical approach, giving BHU carte blanche to raise any claim once it purportedly satisfied standing for one claim.

Next, and more importantly, the district court was not free to disregard our precedent on the requirements of associational standing. The district court expressly found that BHU doesn't satisfy the third prong of associational standing—whether individual association members must join the suit. But it excused that failing because it was only a "prudential" requirement. This was improper.

To be sure, the Supreme Court considers the third prong to be "prudentially imposed." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 558 (1996). But just because an element is "prudential," that doesn't make it *optional*. The district court can't defy our precedent and just ignore a requirement. Even if there's reason to doubt prudential-standing doctrine, *see, e.g.*, *Assoc. of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 538 (6th Cir. 2021), we lower-court

judges must still adhere to it. In other words, a "prudential" requirement is still a requirement.

Nor does the fact that BHU seeks injunctive relief excuse the disobedience. True, the Court has suggested "individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members." *United Food*, 517 U.S. at 546 (simplified). But that still requires an analysis of whether an "individual member" is in fact required for the "relief requested." *Hunt*, 432 U.S. at 343. In fact, we've *always* asked whether an associational plaintiff who wants injunctive relief can satisfy the third *Hunt* prong. *See, e.g.*, *NetChoice*, 152 F.4th at 1014 (denying associational standing where a district court required "participation of individual members—to adjudicate NetChoice's 'fact intensive' [First Amendment] claims"); *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 839 (9th Cir. 2012) (asking whether "the prospective relief that Plaintiffs seek . . . require[s] that individual . . . members participate in this action"); *Laws. for Fair Reciprocal Admission v. United States*, 141 F.4th 1056, 1065 (9th Cir. 2025) (same).

A proper analysis of this individual-member-participation prong dooms BHU's associational standing for each claim.

First, as the district court recognized, ADA claims require substantial individualized evidence. *See LA All.*, 14 F.4th at 960 ("Public sidewalk and

architectural obstruction ADA claims are fact-intensive[,] with specific requirements and evidentiary burdens."). And individualized evidence requires individual participation. Faithfully following our precedent means no standing here.

Second, it's the law of this circuit that civil Fourth Amendment claims are individualized and may not be raised by third parties. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001) ("[Plaintiff] has no standing to claim a violation of [another's] Fourth Amendment rights."). Fourth Amendment standing thus needs individual plaintiffs.

And third, "state-created dangers" require "particularized danger" to the individual—it's not enough to show danger to the public at large. *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (9th Cir. 2023); *see also Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 366 (6th Cir. 2012) (restricting "the application of this so-called 'state-created danger' doctrine to scenarios where the state's actions cause a special danger to the plaintiff, i.e., place him specifically at risk, as distinguished from a risk that affects the public at large" (simplified)); *L.R. v. Sch. Dist.*, 836 F.3d 235, 245 (3d Cir. 2016) (recognizing that "this inquiry is fact-specific"). Simply, Berkeley's abatement might endanger individuals differently. What's sufficiently harmful for one homeless person may not be for another. The harm two individuals experience can differ not only in magnitude, but in kind. *See Hernandez v. City of San Jose*, No. 16-cv-03957, 2019 WL 4450930, at *15 (N.D. Cal. Sept. 17, 2019) (Koh, J.)

("[I]ndividualized inquiries will be necessary to establish the existence of a state-created danger at each time and location where an altercation took place.").

Each of these claims thus requires individual participation to determine the scope of the right and the remedies needed. Tellingly, the district court never ordered blanket relief to BHU based on generalized evidence. Instead, the district court ordered *individualized* relief and appointed a special master to determine the rights of the individual non-parties to the case. That's pretty odd for an associational-standing case.

Simply put, that is not how associational standing works. An association brings *one* suit to resolve issues *as to all members*. That was abundantly clear even when the Court invented associational standing. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). That case dealt with a statute's constitutionality. *Id.* at 451. Striking down the statute necessarily provided relief to all individual NAACP members—without the need to adjudicate each member's constitutional rights. *See id.* at 458–60. Associational standing has never been a vehicle to bring dozens or hundreds of as-applied challenges. Yet the district court repeatedly awarded injunctive relief to individual BHU members. And in its latest order, the district court extended injunctive relief to an ever-increasing number of BHU members citywide, all while letting BHU act as the sole plaintiff.

Finally, on top of all this, the district court failed to verify injuries to BHU members. In this circuit, "to establish a member's injury for associational standing, an organization must submit individual affidavits from members who have suffered the requisite harm." *LA All.*, 14 F.4th at 959 (simplified); *see also Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (requiring "specific allegations establishing that at least one *identified member* had suffered or would suffer harm" (simplified)). That never happened. BHU didn't submit supporting affidavits with its amended complaint. It didn't identify its members in the complaint. And to the extent that later filings asserted supplemental individual harms, "[t]he fact that [BHU] may have broadened its membership after filing this action to include currently unhoused individuals—even ones who were unhoused at the time of the Complaint—does not factor into the standing calculus." *LA All.*, 14 F.4th at 959–60 n.9. "Judges are not like pigs, hunting for truffles buried in the record." *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (simplified). But the district court found truffles among the rats and leptospirosis anyway.

All in all, the district court provided expansive injunctive relief to nonparty individuals; whose standing may never be tested; on no legal authority; and in direct defiance of our precedents. This case—if it had any merit—should have been

brought by individual homeless persons. But BHU picked this as a representational case, so it must contend with the consequences.

Berkeley is thus likely to show that BHU lacked standing to bring this challenge.

## B.

## Berkeley's Vehicle Policy Doesn't Violate the Fourth Amendment

Even if BHU had standing, the district court still erred in ruling that Berkeley's vehicle policy violates the Fourth Amendment. Both history and precedent support what Berkeley seeks to do here—remove vehicles that pose a risk to public safety. Under the community-caretaker exception to the Fourth Amendment, Berkeley's goal to impound obstructive or unsafe RVs and cars used as shelter is reasonable.



Car, During and Post-Abatement

**1.**

**History of Community Caretaking**

"The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). That's because it falls within the Fourth Amendment's community-caretaker exception, which allows police to

temporarily seize property "[i]n the interests of public safety" without a warrant. *Id.* at 368. The exception comes from the recognition that the police have "varied responsibilities" in taking care of and promoting order in the community—apart from arresting criminals. *Id.* at 367–68. So not "all searches and seizures conducted for non-law-enforcement purposes must be analyzed under precisely the same Fourth Amendment rules developed in criminal cases." *Caniglia v. Strom*, 593 U.S. 194, 200–01 (2021) (Alito, J., concurring). While the community-caretaking exception isn't boundless, history shows that government action to remove risks to public health without a warrant was widely accepted.

Aspects of the community-caretaker function can be traced to the Colonial era, when watchmen were tasked not only with detaining criminals, but also with generally pursuing the "good order of the town." *See* An Act Establishing a Watch for the Safety and Better Securing the Good Order of the Town of Boston, 1761–62 Mass. Acts 462, ch. 5. Watchmen performed public-safety functions like lighting and maintaining streetlamps, An Act for Regulation and Continuing the Nightly Watch, Enlightening the Streets, Lanes and Alleys of the City of Philadelphia, and for Other Purposes Therein Mentioned, 1770–71 The Statutes at Large of Pennsylvania 96, ch. 636, § 1; preventing and responding to fires, *id*. at 98, § 4; and bringing those "very much in drink" to spend the night in the watchhouse, not because they were breaking a law but to keep them from harming themselves or

others. Nicole Breault, *Keeping Order in the North End: On Patrol with the Night Watch*, Old N. Church (Mar. 24, 2018) (quoting Isaac Townsend, *Return: September 1765*).[1]

Early governments also regulated parking. Boston imposed regulations in the 1790s remarkably similar to those at issue today. It designated specific parking areas—called "stands"—and anyone who left their "Cart[,] Truck[,] or Wheelbarrow" on the road outside one of those areas would be fined. Minutes of Meeting on May 24, 1799, *reprinted in* 35 *A Volume of Records Relating to the Early History of Boston Containing Boston Town Records, 1796 to 1813*, at 72, 74 (1905). Just like today, one of the driving concerns was the flow of traffic: Anyone who parked a vehicle "as to cross the street or foot path or prevent other carriages or foot passengers from passing in the direction of such street" had only "five minutes after the request of any passenger [to] cause the same to be removed." *Id.* Anyone who failed to do so or who wasn't there to move the vehicle would be fined. *Id.* Early evidence also shows that watchmen had the duty to keep the roads clear by "deliver[ing] to the constable of the watch any goods or merchandize [sic] they may find in the streets." Minutes of Meeting on January 27, 1819, *reprinted in* 39 *A Volume of Records Relating to the Early History of Boston Containing Minutes of the Selectmen's Meetings from September 1, 1818, to April 24, 1822*, at 40, 41

---

[1] https://perma.cc/A9YH-D2ZY.

(1909). And police had broad authority to "remov[e] incumbrances," including private property. *Id.* at 64–65 (Minutes of Meeting on May 4, 1819).

Local government's power extended to removing public-health risks. For example, city health officials in the State of New York could, "as they judge adviseable [sic]," remove "offensive noxious or putrid articles or substances" from "streets, alleys, passages, . . . and other places." An Act to Provide Against Infections and Pestilential Diseases, 1797–1800 N.Y. Laws 227, ch. 65. And all "things" in New York City that were "infected by or tainted with pestilential matter" could be "removed from the said city" and sent to a nearby island. *Id.* at 231–32. And Massachusetts law empowered town officials to "remove all filth of any kind whatever" from "Streets, Lanes, Wharves, Docks" or other public places "whenever such filth shall in their Judgment endanger the lives or the Health" of the city's inhabitants. An Act to Prevent the Spreading of Contagious Sickness, 1797–1798 Mass. Acts 363, ch. 16, § 11. Neither statute required a warrant to remove public health nuisances from public streets.

Given this history, what Berkeley has done here is not new—it is as old as the Republic.

**2.**

**The District Court's Novel Test Is Inconsistent with Precedent**

Today's Fourth Amendment caselaw confirms that Berkeley may "remove vehicles that are presently impeding traffic or creating a hazard." *Miranda v. City of Cornelius*, 429 F.3d 858, 866 (9th Cir. 2005). Our cases turn on whether a vehicle was impounded for a "valid caretaking purpose," *United States v. Torres*, 828 F.3d 1113, 1120 (9th Cir. 2016), as opposed to seized for an unlawful purpose like punishing an arrestee, *see Miranda*, 429 F.3d at 866. The only showing this court has required is a connection to a caretaking purpose.

These purposes—clearing the roads and removing hazards—are the two independent justifications that Berkeley asserted here. First, the vehicles were parked illegally, impeding the flow of traffic. All vehicles the City sought to tow at the Harrison encampment in March 2026 were noncompliant with state and local motor-vehicle codes, from expired registrations to being downright inoperable. Second, these vehicles all posed a public-health hazard. Berkeley made extensive factual findings about each vehicle and decided that public safety demanded each be removed. They were often used as drop sites for personal belongings, creating ideal habitats for leptospirosis-carrying rats. The rats roamed in and around the vehicles—as shown by the large amounts of rat droppings Berkeley officials found under them.

So the City could not achieve "complete eradication of rodent burrows" in the encampment without removing each vehicle.



But, despite acknowledging these findings, the district court demanded more. It invented a new test for Berkeley to satisfy before it impounds a vehicle. Berkeley must:

> (1) make a specific, fact-based determination—beyond mere parking violations, inoperability, or expired registration—that the particular vehicle obstructs traffic or poses a concrete, individualized public health or safety threat; (2) provide the vehicle's owner with written notice of the specific findings, an opportunity to respond, and a reasonable opportunity to remediate the identified condition or voluntarily relocate the vehicle; (3) consider and pursue reasonable,

> less restrictive alternatives . . . or demonstrate with particularity why such alternatives are ineffective for the given vehicle and occupant.

The Fourth Amendment doesn't require any of these steps.

Contrary to the district court's view, the Fourth Amendment permits police to "remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic." *Opperman*, 428 U.S. at 369. "Mere" parking violations *are* enough—illegally parked vehicles can impede lawful business operations, and police are authorized to prevent that harm. The same goes for violations of other regulations. This circuit has reasoned that police can impound a vehicle if it could not legally be driven away—for example, because the driver lacked a license or had expired tags—and impoundment was "necessary to remove the vehicle from an exposed or public location." *Miranda*, 429 F.3d at 865. The police can even impound based on their "reasonable interest in preventing [a] vehicle from being a target for vandalism or theft." *Torres*, 828 F.3d at 1120; *see also Hallstrom v. City of Garden City*, 991 F.2d 1473, 1477 n.4 (9th Cir. 1993); *United States v. Jensen*, 425 F.3d 698, 706 (9th Cir. 2005).

What none of these cases require is notice and opportunity to respond. That's consistent with the exception's purpose: to allow police to quickly remove a vehicle that is "impeding traffic or threatening public safety and convenience." *Opperman*, 428 U.S. at 369. The classic example is towing a car wrecked in the middle of the

road. *See id.* at 368. Every second the car remains in place undermines public safety. Bureaucratizing the process does little to further the public interest in safe and efficient travel.

Even so, it's unfair to accuse Berkeley of "summarily seizing and destroying the personal property of unhoused individuals" as it pursues abatement. This is far from taking "property like a thief in the night." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012) (simplified). Look at the notice from January 2025, before this suit was filed: Berkeley gave Harrison campers a month to comply. That deadline was almost two months after Berkeley declared the camp a nuisance that must be closed. And the notice also gave information on appeal rights and how to request accommodations. Or consider the September abatement: A notice in July 2026 gave a compliance period of five days, and after the district court hit that action with a TRO, a new notice gave a compliance deadline of two weeks, until September 8th. Even then, abatement was delayed until September 15th. So although no court, in this circuit or otherwise, has required notice and opportunity for a hearing in the context of the community-caretaker exception, Berkeley went out of its way to alert residents of the Harrison encampment about its abatement plans.

The "least restrictive means" rule the district court posits is also a novel invention. The Ninth Circuit has rejected such a rule, explaining that "[a]n officer, acting within the scope of his or her community care-taking function, is not required

to consider the existence of alternative less intrusive means when the vehicle must in fact be moved to avoid the creation of a hazard or the continued unlawful operation of the vehicle." *Miranda*, 429 F.3d at 865 n.6 (simplified). The vehicles observed at the Harrison encampment create a public-health hazard. Berkeley's Public Health Officer explained that "cleaning around [parked vehicles] is not sufficient" because they—"especially RVs that stay in one place for a long time—are attractive rodent harborages," which encourage the spread of leptospirosis. And parking them in "no parking" areas is unlawful. That is all Berkeley must show.

To be sure, the Fourth Amendment provides robust protections—even when it comes to vehicles. *See Verdun v. City of San Diego*, 51 F.4th 1033, 1048 (9th Cir. 2022) (Bumatay, J., dissenting). As I explained in my *Verdun* dissent, however, Fourth Amendment reasonableness often turns on individualized suspicion. *See id.* at 1051 (Bumatay, J., dissenting). In *Verdun*, the vehicles at issue had not violated any law and were searched anyway. This situation is different. That's because the Harrison vehicles pose a public-health risk and violate multiple motor-vehicle laws. Thus, even though a warrant is not required under the community-caretaker exception, these vehicles all raised individualized suspicion.

In short, BHU is not likely to prevail on its Fourth Amendment claim.

## C.

## BHU's ADA Claims Fare No Better

BHU also claims Berkeley violates its disabled members' rights under Title II of the ADA. How? By not offering enough accommodation as it tries to clear homeless encampments, even in the face of a deadly disease. Simply, any accommodation that undermines the City's objective to eradicate leptospirosis is no reasonable accommodation.

Begin with the law. The ADA says: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "The failure to provide reasonable accommodation can constitute discrimination." *Mayfield v. City of Mesa*, 131 F.4th 1100, 1110 (9th Cir. 2025) (simplified). And, generally, the ADA's "implementing regulations require [a city] to make reasonable modifications in policies, practices, or procedures" when the city offers a "service, program, or activity." *Where Do We Go Berkeley v. Cal. Dep't of Transp.* ("*We Go*"), 32 F.4th 852, 860 (9th Cir. 2022) (simplified).

To assert a reasonable-accommodation claim, BHU must first point out a city service, program, or activity. *See We Go*, 32 F.4th at 860. Next, it "bears the initial burden" of proposing a "reasonable accommodation[] that was denied or . . . not

provided." *Mayfield*, 131 F.4th at 1110 (simplified). Finally, Berkeley may "defeat the claim by showing that the plaintiff's proposed accommodation would cause an undue burden." *Id.* (simplified). An undue burden can be "financial," "administrative," or something that "fundamentally alter[s]" a city program. *We Go*, 32 F.4th at 862 (quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)).

That last concept, "fundamental alteration," kills BHU's ADA theory.

**1.**

**Berkeley Doesn't Have to Provide Unreasonable Accommodations**

Start with the "program." Let's assume that the City's abatement policy—cleaning up homeless camps that threaten health and safety—constitutes an ADA "program." *See We Go*, 32 F.4th at 860–62 (clearing homeless encampments was a program); *see also Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014) ("the broad language of Title II brings within its scope anything a public entity does," and so providing a city sidewalk was held to be a "service, program, or activity" (simplified)). In response, BHU proposed several accommodations it thinks are reasonable: an open-ended abatement moratorium, free guaranteed city housing, new city-run campsites, the right to store vehicles in the current encampments, the right to keep large tents on the sidewalk, moving and storage services, "individualized sanitation and utility infrastructure," bureaucracy "navigation

services" and other personalized treatment from city officials, and lots of extra process before Berkeley may do anything else.

That leaves undue burden. So what does an unduly burdensome "fundamental alteration" look like? This "fact-specific" question calls for a "case-by-case inquiry." *We Go*, 32 F.4th at 862 (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996)). And when city programs "address risks to the public," "[t]he distinction between a reasonable modification and fundamental alteration" turns on "the nature of the risk, whether the proposed modification would affect the [city's] ability to address the risk, and the probability of worsening the risk" if the accommodation forces the city to "alter its programs." *Id.* (simplified). "[O]ther logistical limitations" matter too. *Id.* (simplified).

Berkeley easily shows an undue burden. Berkeley "designed" its program to "address risks to the public," *id.*—here, the City wants to address "the clear and increased risk to property and life" created by the Harrison encampment, and to kill leptospirosis-infected rats that endanger public health. The "nature of the risk" is obviously serious. A rat infestation has spread a dangerous disease. A person not far from the Harrison encampment has even died from it. So the salient question is whether BHU's accommodations "fundamentally alter" Berkeley's camp-clearing program by making it less effective against these conditions, or upping the odds they get worse. Again, easily, "yes."

The district court ordered Berkeley to give BHU three accommodations. First, Berkeley must let BHU members keep their vehicles parked in the camps—making it difficult to remove rat burrows. Second, Berkeley must buy BHU members new tents and other equipment if it determines the old items pose a public-health risk—as well as provide personal services, like help packing and moving if the members choose to encamp on another public street. Third, Berkeley must let BHU members take up much more sidewalk space than the nine square feet per person Berkeley allows. One member demanded 330 square feet on the sidewalk for a ten-person tent. BHU filed *floor plans* with the district court.

**Figure 1. Example: 10′ × 20′ footprint with a 10′ × 10′ (6-person) tent, survival gear, and medical supplies — drawn to scale**




Tent (100 sq ft): 1 Sleeping 24 · 2 Medical/clothing storage 16 · 3 Interior walkway 30 · 4 Changing 9 · 5 Food & belongings 12 · 6 Toilet 9

Outside tent (100 sq ft): 7 Entry path 30 · 8–9 Cooking 35 · 10 Survival gear, recycling & cart 25 · 11 Water 10

**Total: 200 sq ft — every square foot is assigned to a basic life function (toilet clearance is counted within the walkway).**

*Cooking is outside the tent wall for fire safety. Medications and food are kept inside the tent.*

Minimums from Section I: sleeping 6′×4′; walkway ≥ 3′ wide; cooking surface 3′×3′ with 4′×4′ standing room; toilet 3′×3′ + 2′ clearance; changing 3′×3′. Dashed outer line = requested footprint boundary; heavy line = tent wall.

**Figure 2. Example: 11′ × 20′ footprint with a 16′ × 7′ (8-person) tent, an emotional support animal, and a bicycle used as a mobility aid — drawn to scale**




Inside the tent (112 sq ft): 1 Sleeping 24 · 2 Animal (indoor) 20 · 3 Hygiene 20 · 4 Medical supplies & clothing 9 · 5 Walkway 39

Outside the tent (108 sq ft): 6 Stove & prep 12 · 7 Cooking standing 16 · 8 Entry path 16 · 9 Animal (outdoor) 28 · 10 Bicycle 28 · 11 Gear 8

**Total: 220 sq ft — every square foot is assigned to a basic life function (toilet clearance is counted within the walkway).**

*The animal needs a resting place beside its handler inside the tent and room to stand, turn and move outside. The outdoor strip is only 4′ deep, so the 5′×5′ (25 sq ft) minimum is laid out as 7′×4′. Cooking is outside the tent for fire safety; the 83″ bicycle is parked along the front of the tent.*

Minimums from Section I: sleeping 6′×4′; walkway ≥ 3′ wide; cooking surface 3′×3′ with 4′×4′ standing room; toilet 3′×3′ + 2′ clearance; changing 3′×3′; large dog 5′×5′. Dashed outer line = requested footprint boundary; heavy line = tent wall.

These supposed accommodations fundamentally alter the City's goal to completely eradicate the ongoing public-health emergency. To stop the outbreak risk in its tracks, Berkeley must eliminate all rat burrows in the area. Yet the district court's orders endorsed providing tent space much bigger than UC Berkeley student bedrooms. *See, e.g.*, *Intersection Apartments*, UC Berkeley Housing.[2] These tents act as a safe haven from rodenticide and traps. Leaving current tents untouched—or putting in new tents for BHU members, many of whom demand hundreds of square feet in the Harrison encampment—thus undermines Berkeley's ability to target and kill all rats. The same goes for RVs and cars left in the encampment. The

[2] https://perma.cc/WFS4-KYPG.

district court's orders supposedly accommodating BHU members in fact worsen the threat of disease to Berkeleyans—particularly homeless people staying on top of and among infected rats. Finally, the ADA doesn't entitle BHU to free gear or packing/moving services. The law doesn't require cities "to provide to individuals with disabilities personal devices . . . or services of a personal nature." 28 C.F.R. § 35.135 (giving examples); *see also Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) (noting that the ADA doesn't require government to "create new programs that provide heretofore unprovided services to assist disabled persons"); *We Go*, 32 F.4th at 862 (same).

Simply, these accommodations are an undue burden under the ADA because they protect disease-carrying rats that threaten the public. The leptospirosis outbreak is spread by contaminated rodents and has killed a Berkeley citizen. No one suggests there's any way to eliminate the risk of leptospirosis while sparing some rats. The thing to do is eradicate them—all of them. To illustrate: On multiple occasions, *every single rat sample* captured at the Harrison encampment tested positive. And that's just the live ones. Infected dead rodents rot on the ground too. By undermining the clean-up, BHU's accommodations risk the spread of a deadly disease.



Rat, Post-Abatement

To sum up, ADA accommodations must be *reasonable*. *Mayfield*, 131 F.4th at 1110. And BHU's aren't. Instead, they "fundamentally alter" Berkeley's camp-clearing "program" by frustrating its objectives and threatening to spread the disease. *We Go*, 32 F.4th at 862 (simplified). It's "difficult to imagine a case that would more clearly demonstrate the soundness of the rule." *Harwood v. Wentworth*, 162 U.S. 547, 560 (1896).

## 2.

## The District Court Too Broadly Defined Berkeley's "Program"

The district court blundered the ADA analysis by mischaracterizing Berkeley's program to clear homeless camps. Recall that the ADA applies to city "services, programs, or activities." *We Go*, 32 F.4th at 860 (quoting 42 U.S.C. § 12132). But in the district court's telling, Berkeley's "program" wasn't clearing homeless encampments. Instead, the district court viewed it as something far broader and vaguer: "the City's maintenance of public roadways and sidewalks to ensure their functionality, orderly, [sic] use, and public health and safety." "This includes use of roadways and sidewalks which serve as locations of abode for the unhoused."

With this remarkably expansive definition, the district court foreclosed Berkeley's "fundamental alteration" argument by sweeping in many governmental interests besides Berkeley's pressing need to abate a public-health threat. The result: The district court "evaluate[d] the requested accommodations" against what even it called a "broader definition of the City's roadway and sidewalk management program." Conclusion? In the district court's view, these accommodations were reasonable and wouldn't fundamentally alter Berkeley's all-encompassing program.

To the district court, it was reasonable to make Berkeley let BHU members keep their RVs even though they could create safe havens for rat-infested burrows.

Why? Because the accommodation wouldn't "meaningfully disrupt[] parking turnover" or "traffic flow" at the Harrison encampment. And again, because it was reasonable to make Berkeley let BHU members pitch giant tents even though they could harbor and protect rat nests. Why? Because Berkeley could still "protect pedestrian access, disability access, and aesthetically pleasing streetscapes." All this ignores the fundamental alteration of Berkeley's plan to eradicate leptospirosis.

The district court thus provided a roadmap for weaponizing the ADA against municipalities when they try to create safe conditions at homeless encampments. Define a city's ADA "program" at a high enough level of generality and you manufacture an ADA violation. By conflating the City's *program* with all of the City's *interests*, the district court may minimize the interests that are inconvenient. What does it matter if accommodating BHU frustrates Berkeley's effort to stop a potentially deadly disease, when that's just one of many program goals—alongside parking enforcement, and protecting aesthetic streetscapes? Cobbling together a city's interests makes it harder to say granting some accommodations would fundamentally alter the generally defined, multifaceted program—when programs are so broad, almost nothing would be a "fundamental alteration."

"It's a clever workaround, but it doesn't succeed." *United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring in the judgment). Our caselaw defines "programs" very concretely. Take *We Go*. There, we defined the California

Department of Transportation's ADA "program" as "clearing [homeless] encampments." *We Go*, 32 F.4th at 861–62. And that program was precisely bounded by the actions the Department actually took to close down the camps. *See id.* at 860–62. Contrast that with the cornucopia of public interests the district court laid out on the sidewalk here. It was legal error for the district court to do that—just as it was error for the same district court to try the same stunt in *We Go*. *Id.* at 864.

Our other precedents underscore the point. Take *Crowder*. Hawaii's program was quarantining out-of-state dogs. *Crowder*, 81 F.3d at 1481–82. It was not "maintaining Hawaii's biosphere to promote a rabies-free environment, ecodiversity, and the Spirit of Aloha." *Cf. Wolford v. Lopez*, 609 U.S. 185, 206 (2025), *rev'g* 116 F.4th 959 (9th Cir. 2024). Or take *Cohen*. Culver City's program was providing the city sidewalk—just the sidewalk. *Cohen*, 754 F.3d at 695; *see LA All.*, 14 F.4th at 959 ("Skid Row area sidewalks are a service, program, or activity of the City"). It was not "ensur[ing its] functionality, orderly, [sic] use, and public health and safety," as well as the rival interests of future plaintiffs. Or take *Townsend*. Washington's program was providing Medicaid. *Townsend*, 328 F.3d at 518–19. And in rebuking a district court for accepting an earlier attempt to define ADA programs at the wrong level of generality, we said they cover the "services" the government actually "provide[s]"—not something vague like "adequate health care." *Id.* at 518 (quoting *Alexander v. Choate*, 469 U.S. 287, 303 (1985)).

The district court tried to bake the reasonableness of the accommodations into the program definition itself. That was wrong in *We Go* and it's wrong now.

**D.**

**BHU's State-Created-Danger Claims Also Fail**

Finally, BHU argues that Berkeley violates its members' substantive due process rights, claiming that Berkeley's abatement efforts constitute a "state-created danger." The so-called "state-created danger doctrine" is unmoored from the Constitution's text. *Murguia v. Langdon*, 73 F.4th 1103, 1108–10 (9th Cir. 2023) (Bumatay, J., dissenting from denial of rehearing en banc). It comes from two sentences in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). Using those two sentences "like Dr. Frankenstein, courts have cobbled together bits and pieces of standards from other contexts to try to breathe new life into substantive due process." *Murguia*, 73 F.4th at 1114 (Bumatay, J., dissenting from denial of rehearing en banc). Given its judge-made origin, we shouldn't so easily expand its reach. But that's what the district court did. It crafted an injunction based on speculative, non-particularized injuries and didn't grapple with Berkeley's need for abatement.

To succeed on a state-created-danger claim, a plaintiff must show: "(1) a state actor's affirmative actions created or exposed him to an actual, particularized danger that he would not otherwise have faced, (2) that the injury he suffered was

foreseeable, and (3) that the state actor was deliberately indifferent to the known danger." *Sinclair*, 61 F.4th at 680 (simplified). And a hangnail isn't enough to raise a state-created-danger claim. Instead, our past cases have all involved significant, imminent harm to life or limb: death, rape, battery, or abuse. *See 3Pak LLC v. City of Seattle*, 174 F.4th 1180, 1185 (9th Cir. 2026) (collecting cases).

BHU fails even this open-ended test. It faces no non-speculative injury, let alone state action that is deliberately indifferent. The district court paid lip service to the fact that "the generalized dangers of homelessness preexist the state's actions in abating an encampment." But it nevertheless converted the state-created-danger doctrine into a freewheeling right to stymie homelessness policy.

In its summary judgment order, the district court granted BHU's state-created-danger claims for two groups: BHU members who live out of vehicles in the Harrison encampment, and BHU members with tents that exceed Berkeley's nine-square-foot rule. The district court found that removing shelter—whether an illegally parked vehicle or an illegally placed tent—"transform[ed BHU members] from persons who are *unhoused but sheltered* into persons who are *unhoused and unsheltered*, exposing them to the elements, the cold, and the absence of any private, secure space." That isn't enough to raise a state-created-danger claim.

First, because the district court ordered *prospective* relief, any alleged injuries Berkeley's abatement might cause were necessarily speculative. The district court

didn't know if or how any BHU members would be harmed by some future abatement, because it hadn't yet happened. That didn't stop the district court from clairvoyance. Yet exposure to the elements—without more—isn't a concrete enough danger. It's speculative that BHU members wouldn't find other shelter. And it's speculative that BHU members would be seriously harmed by the lack of makeshift shelter.

Indeed, this shows the problem with injunctive relief for state-created-danger claims. To my knowledge, no other circuit court grants forward-looking injunctions based on this doctrine. With good reason. The injunctions rest on mere conjecture about how Berkeley's actions will affect BHU's different members. We must speculate on a chain of possibilities to find liability here. But that's not the role of the Due Process Clause.

Second, the broad nature of the forward-looking injunctive relief the district court ordered can't meet our "actual [and] particularized danger" requirement. *Sinclair*, 61 F.4th at 680. That's because Berkeley's only enforcing generally applicable traffic, parking, and nuisance laws. *See Vance v. Aldrich*, --- F.4th ----, 2026 WL 2652464, at *8 (10th Cir. Sept. 9, 2026) ("[G]enerally applicable policies don't meet the immediate-risk-of-harm requirement.").

Third, any injury to BHU members wouldn't be a foreseeable result of tent removal or car impoundment. *Sinclair*, 61 F.4th at 680. Under our caselaw,

foreseeability is only met if the state action leaves someone "in a situation more dangerous than the one she already faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 n.5 (9th Cir. 2006). Berkeley's actions don't place the BHU members at the Harrison encampment in a foreseeably more dangerous situation than the one they are already in. In fact, abatement arguably *reduces* the dangers BHU's members at Harrison face by eliminating the rats that serve as the source of leptospirosis.

Fourth, BHU hasn't shown that Berkeley acted with deliberate indifference. To show that, BHU needs to prove that Berkeley acted even beyond "gross negligence"—with "a culpable mental state." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (simplified). BHU hasn't cleared this high bar. BHU hasn't demonstrated that Berkeley "recognize[d] an unreasonable risk and actually intend[ed] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Id.* (simplified). The opposite is true. Berkeley has a robust policy of serving the homeless, including BHU members. For example, Berkeley has spent tens of millions of dollars to triple the number of private shelter beds in the City. In addition, Berkeley provides services to encampment residents, like shelter housing, port-a-potties, showers, and free laundry services. That Berkeley has found full abatement is in the best interest of public safety isn't close to negligence—let alone "gross negligence." Instead, this is the basic work of local government. The Due

Process Clause shouldn't be misused to judicially micromanage homelessness policy.

Thus, BHU's state-created-danger claims likely fail too.

**III.**

**IRREPARABLE HARM**

Since Berkeley is highly likely to succeed on the merits, it only needs to make a correspondingly low showing on irreparable harm. *See Mi Familia Vota v. Fontes*, 111 F.4th 976, 993 (9th Cir. 2024) (Bumatay, J., dissenting); *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020). That stems from the Ninth Circuit's unique—but wrongheaded—"sliding scale" approach to the stay factors. *See Whitfield v. Mullin*, --- F.4th ----, 2026 WL 3093506, at *1 (9th Cir. Oct. 16, 2026) (Bress, J., dissenting from denial of rehearing en banc). Yet even if our caselaw set the bar correctly, Berkeley would leap over it.

Because a "stay simply suspends judicial alteration of the status quo," *Nken*, 72 F. at 429 (simplified), it's important to get the baseline right. What's the status quo? BHU contends that it includes the district court's various orders. Not quite. "[T]he status quo here . . . is the legal landscape that would have existed prior to the district court's judicial misadventure." *Nat'l Urban League v. Ross*, 977 F.3d 698, 712 (9th Cir. 2020) (Bumatay, J., dissenting). With that clarification, it's clear that we should have issued a stay.

Berkeley faces irreparable harm. The district court's orders threaten Berkeley's ability to eradicate leptospirosis in the Harrison encampment and so protect health and safety, and they also fundamentally compromise Berkeley's ability to conduct effective homelessness policy. In short, Berkeley's efforts face the ongoing threat of paralysis by judicial fiat.

**A.**

**Ongoing Health and Safety Risks at the Harrison Encampment**

Rats with leptospirosis have infested the Harrison encampment—allowing a disease to fester that can escalate to serious organ damage and even death. Court orders irreparably harm the government when they prevent it from implementing lawful policies, *see Simon v. City & County of San Francisco*, 135 F.4th 784, 817 (9th Cir. 2025), and that's magnified here—"the police power is never more legitimately exercised than in removing such nuisances." *Leovy v. United States*, 177 U.S. 621, 636 (1900). Given the health risks posed by the conditions of the Harrison encampment, "[i]rreparable injury is obvious." *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023).

Although Berkeley undertook an abatement in mid-September 2026, it was precluded from completely realizing its objective—as Berkeley's Public Health Officer, Dr. Noemi Doohan, determined, "the entire encampment (tents, structures, vehicles) must be removed to allow for complete eradication of rodent burrows."

She also concluded that "[p]eople should be instructed not to re-encamp within 1/3 mile because rats can travel and will travel to a new encampment site with similar unsanitary conditions including lack of proper food storage." She said that people needed to leave the encampment "permanently because the eradication cannot be done if the encampment is there, including the dwellings and vehicles which harbor the rats." Finally, she believed that the cleanup "would take at least 30 days" because that's how long leptospirosis bacteria can survive in the soil. According to Dr. Doohan, that is the only way to "remove the risk of further spread of rat borne Lepto[spirosis]."

The district court's injunctions undermined all of this. It prevented Berkeley from completely removing tents and vehicles—and the debris within those structures—from the encampment. It allowed some BHU members to remain in the encampment—limiting the use of rodenticide and creating the conditions for repopulation. Thus, the district court interfered with Berkeley's ability to achieve its abatement goals and the City suffers irreparable harm—the continued risk of leptospirosis infections.

To see why, consider a few things about leptospirosis: The disease spreads through contact with contaminated animals or an environment in which the animal has urinated. Rats are the primary vector of the disease. The Harrison encampment—with its rat harborages, standing water, lack of containment of

animals, and adjacent creek—was a breeding ground for the disease. To eliminate the risk of the disease, Berkeley needs to eliminate the rats. And leaving any structures in place that may protect rats then creates the conditions for rat repopulation. That's true even if initial abatement was successful in killing many of the rats. According to the City's Environmental Health Division Manager, Ronald Torres, if any rats were left, they were likely to be infected and to infect.

Tents and property remaining in the encampment—like those of the seven BHU members protected by the district court's orders—make it easier for rats to survive partial abatement. That's because tents, with their piles of personal belongings, debris, furniture, clothing, and food, may provide or cover burrows and feed rat populations. And the district court's orders placed restrictions on Berkeley's ability to impound vehicles. But Berkeley's Public Health Officer concluded that "[v]ehicles—especially RVs that stay in one place for a long time—are attractive rodent harborages, so cleaning around them is not sufficient." According to Berkeley's Environmental Health Division Manager, it only takes one person "living in a tent or structure on the sidewalk, or in a long-term vehicle" to create a sanctuary for rat repopulation. And merely relocating people to replicate the conditions of the Harrison encampment elsewhere would be insufficient. Rats can and do travel where similarly unsanitary conditions exist. According to Berkeley, the proper eradication

of rats would require a weekly cycle of scouting burrows, baiting or trapping, removing carcasses, and repeating.

While partial abatement can reduce the risk of the disease, Berkeley believes that it won't be effective. For one, the presence of rat harborages threatens to disrupt the eradication process—the rats can hide in tents and cars instead of in their burrows. Operations may be further inhibited by dangerous conditions presented by the harborages themselves. And, of course, rat poison is harmful to humans and can't be used around those who remain in the encampment.

The district court's orders thus pose irreparable harm. When Berkeley finally undertook the September 2026 abatement, its hands were tied. The district court's orders limited access to rat burrows, hampering efforts to place rodenticide and set traps to clear the encampment. According to Berkeley, it didn't touch any protected BHU tents. What's more, all RVs—and nearly all vehicles—remained after the September 2026 abatement. According to Berkeley officials, members of the Harrison encampment piled personal belongings on top of vehicles, and at least one of those piles was left by city officials for fear of violating the court's orders. And the officials could not place rodenticide in the immediate vicinity of BHU members' property—since, after all, rodenticide is poisonous. Because the City could not accomplish a full abatement, not all rat harborages could be treated and eliminated—leading to rat repopulation.

Sure, a city official described the first round of cleanup efforts as "truly impressive and admittedly greatly in excess of what [he] expected to see." But initial success doesn't guarantee overall success. It didn't guarantee that all rats were eradicated or that they wouldn't return. Only complete abatement would do that. As Dr. Doohan warned, "[w]ith the high burden of Lepto[spirosis] disease in this population of rats at the Harrison Street encampment (as proven by the recent testing), it is unsafe to allow this rat population to reemerge after eradication efforts."

And predictably, allowing *any* BHU member to remain in the Harrison encampment encouraged other homeless persons to return after the initial abatement. As a city official said, "[w]hen people see that an area is encamped by some, it attracts others to encamp there." Indeed, within a week of initial abatement, the return of homeless individuals posed major problems for the City. Take an incident only a few days after abatement started. A city official saw BHU's President moving other individuals' property to a protected member's encampment to avoid the cleanup. After the initial abatement effort, city officials removed another 4.23 tons of debris—some from those re-encamping. Re-encampment and using court-protected areas to salvage potentially contaminated property risk continued spread of the disease.

Berkeley warned that the district court's actions would result in the Harrison encampment not being fully cleared; in risks that the homeless would return; and in

health concerns about using rat poison around those who stay behind. It was also predictable that others would take advantage of the district court's orders. While the abatement had some initial success, the district court's orders jeopardize Berkeley's overall efforts. And failure to fully abate the spread of disease is irreparable harm to the City.

**B.**

**Judicial Usurpation of Homelessness Policy Citywide**

What's more, the district court's orders are *not* limited to the Harrison encampment. The government is irreparably harmed whenever it's prevented from effectuating its lawful policies. *Simon*, 135 F.4th at 817. Simply, "hind[ering] . . . the government's ability to enforce the laws . . . constitutes irreparable harm." *Reach Cmty. Dev. v. U.S. DHS*, 174 F.4th 1143, 1150 (9th Cir. 2026). The City of Berkeley has shown this in spades.

The scope of the district court's orders is breathtaking. In its final order, the district court noted that "BHU seeks injunctive relief to achieve certain systemic reforms at the City-level [sic]." And that is what the district court ordered. It granted permanent injunctive relief "to all BHU members, wherever situated within the City, and . . . not limited to the Harrison encampment or to any previously identified claimants." And it required the City to comply with its restrictions citywide. This includes protections for "any vehicle used as a shelter by a BHU member anywhere

within the City." And "[t]he City shall not enforce . . . sidewalk-space limitation[s] in a manner resulting in the destruction of a BHU member's tent or shelter" without jumping through hoops. And Berkeley must provide physical relocation assistance "[w]here a BHU member's documented disability prevents the member from independently packing, moving, or relocating personal belongings during an abatement." And, of course, "the City shall provide at least 72-hours written notice before any enforcement action resulting in the seizure or destruction of a BHU member's property."

This threatens to handicap future abatements and law enforcement throughout Berkeley. By simply claiming membership in BHU, any person may receive the benefit of the district court's rewriting of homelessness policy and municipal law. Indeed, under the district court's final order, "parking violations, inoperability, or [an] expired registration" don't suffice to tow a BHU member's vehicle.

The orders take Berkeley's attempts to manage access to public spaces off the table for BHU members. City policy allows the homeless to occupy up to nine square feet of public sidewalk with their personal belongings. That policy attempts to balance concern for the homeless with competing concerns, like public safety and accessibility. The nine-square-foot policy is born of recognition that "accumulations of large amounts of personal possessions by unsheltered residents create nuisance conditions . . . including excessive litter, rodents, elevated fire, public health, and

environmental risks, obstruction of the public right of way, and interference with the operations of adjacent businesses."

But now, the district court's orders constrain Berkeley's ability to enforce this policy—or "any other sidewalk-space limitation," for that matter. If enforcement of Berkeley's sidewalk policies would result in the destruction of any BHU member's tent, Berkeley must "retain [the tent] or relocate [it] to a location that does not unreasonably obstruct pedestrian passage, or must provide a replacement tent consistent with that standard." This is lawmaking by injunction. Despite what the majority suggests, the fact that Berkeley has not banned all outdoor camping in public spaces did not give the district court license to crown itself the czar of sidewalks. "Homelessness is complex." *Grants Pass*, 603 U.S. at 560. It is up to city councils—not courts—to decide the proper policy solutions to these problems.

We cannot wave away the irreparable harm that Berkeley faces in attempting to satisfy BHU's extensive demands for relocation assistance under the ADA. Consider that some former members of the Harrison encampment seek alternative placement in no-camping zones. In granting relief from the September 2026 abatement to seven BHU members, the district court questioned Berkeley's decision to prohibit camping in certain areas at all. But that's not for the court to decide. Some requested accommodations are next to the site of a former homeless encampment with a dangerous history. In one year, it averaged nearly one fire call

every four days, and almost 400 police calls. In that same time, there were two arson calls within just a few weeks. The City has abated that site. The district court's orders would unravel these efforts.

To the extent the majority can be read to construe the district court's orders narrowly—covering only those identified BHU members from the Harrison encampment who are already in the ADA process—it would be a welcome narrowing. But even with such a limited reading, the district court's orders would still infringe on Berkeley's ability to govern. Such a reading would still permit BHU members to sleep on public sidewalks with outsized tents throughout Berkeley regardless of local prohibitions. And the City is still hamstrung by the onerous burdens of the ADA interactive process.

Still, under any reading of the district court's orders, Berkeley faces irreparable harm to its right to administer its homelessness policy citywide.

**IV.**

**BALANCE OF INTERESTS**

The combination of Berkeley's likely success on the merits and the irreparable harm it faces is decisive in itself. *See City & County of San Francisco v. U.S. Citizenship & Imm. Servs.*, 944 F.3d 773, 806 (9th Cir. 2019); *see also Trump v. Orr*, 146 S. Ct. 44, 46 (2025) (granting stay after determining that the government was likely to succeed on the merits and would suffer irreparable harm, with no ruling on

the balance of equities). Even so, the remaining *Nken* factors—"whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies," 556 U.S. at 434 (simplified)—favor Berkeley.

Because Berkeley is a party, these considerations merge: All that's left is to assess any harms a stay would cause BHU and weigh them against the public interest. *Cf. Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024). BHU argues that, without the protection of the orders, its members' property would be destroyed. It also highlights weather risks associated with the approaching El Niño season. These are serious concerns, but they aren't the end of the inquiry. After all, the homelessness "crisis impacts *everyone.* It reduces the quality of life for millions, increases anti-social behavior, and decimates businesses." *Sacramento Homelessness Union v. City of Sacramento*, 115 F.4th 1149, 1151 (9th Cir. 2024) (Nelson, J., statement respecting denial of rehearing en banc). We all agree the balance of interests favors staying the district court's interference with Berkeley's ongoing efforts to abate Harrison. After all, Berkeley's homeless are *themselves* affected by the risk of leptospirosis—previously, two "unhoused people living in an RV with extensive rat harborage not far from the Harrison Corridor Encampment" came down with serious cases of the disease. One of those individuals died. But a stay is equally necessary to conclude the never-ending story that the district court has authored for Berkeley. We need not indulge a cycle of

unreasonable ADA relocation requests, understandable denials, and orders undermining legitimate policy. *Cf. Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) ("A stay is appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation.").

We must always remember that homelessness policy—with its competing interests and fraught context—belongs to the people and their elected officials, not to federal judges and their special masters. *See Grants Pass*, 603 U.S. at 560.

## V.

## CONCLUSION

The majority rightfully stays the district court's injunctions that hinder Berkeley's ability to abate the Harrison encampment. Without full abatement of the area, it will continue to pose a public-health emergency. But we should have gone further and stayed all the other orders that hamper Berkeley's ability to manage its streets and abate other encampments. Berkeley must be allowed to conduct its homelessness policy without unmerited judicial micromanagement. I respectfully dissent in part.