Farimah Faiz Brown, City Attorney (State Bar No. 201227)
Katrina Eiland, Assistant City Attorney (State Bar No. 275701)
Laura Iris Mattes, Deputy City Attorney (State Bar No. 310594)
Nubyaan Scott, Deputy City Attorney (State Bar No. 331584)
Gabriel Martinez, Deputy City Attorney (State Bar No. 275142)
Berkeley City Attorney's Office
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6997
Facsimile: (510) 981-6960
Email: LMattes@berkeleyca.gov
KEiland@berkeleyca.gov

Attorneys for Defendant
CITY OF BERKELEY

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BERKELEY HOMELESS UNION,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BERKELEY, et al.<br><br>Defendants. | **Case No. 4:25-CV-01414-EMC**<br><br>**JOINT STATUS REPORT**<br><br>Judge: Hon. Ajay Kishnan |

Pursuant to Magistrate Judge Ajay Kishnan's October 16, 2026 Order, ECF 413, Defendant City of Berkeley (the "City") and Plaintiff Berkeley Homeless Union ("BHU") jointly submit this Status Report.

**<u>Defendant's Statement</u>**

## I. INTRODUCTION

The City supplements its September 29, 2026 filing by including diagrams with measurements for all potentially viable locations requested by BHU. The City conducted individualized, location specific reviews including gathering information from various City departments regarding pedestrian and emergency access, utilities, fire risk, and other considerations. The City has organized the requests by BHU member and attached the information requested by the Special Master as exhibits to the Declaration of Thomas Gregory, the City's ADA Coordinator.

The status report does not address BHU's arguments or facts because BHU did not exchange draft reports on Wednesday as ordered in the extension of time. See Declaration of Gabriel Martinez, Ex. A. (BHU "cannot and will not have [its] report ready by Wednesday.")

Additionally, at the request of the District Court, the City has briefed a Supplemental Motion for Stay Pending Appeal of the District Court's orders that extend beyond the Harrison Street encampment or to issues or individuals that were not resolved at summary judgment because of issues related to standing and relief. ECF 436. After working hours yesterday on November 19, 2026, BHU filed a motion to add five additional individuals to the Special Master's jurisdiction. ECF 444. They are not currently part of the Special Master's jurisdiction, were not part of the Special Master's order requesting this Status Report (ECF 413), and considering any additional individuals would prejudice the City as the City prepared according to the Special Master's order. It would also be improper to expand the Special Master's jurisdiction while the Motion to Stay is pending.

As the City's responses make clear, the pending accommodations requests are not

reasonable under the Americans with Disabilities Act ("ADA") for several reasons. *First*, the vast majority of the individuals fail to establish a nexus between their disability and the requested accommodation. *Second*, nearly all requested relocation sites have less available space than the requested footprints. *Third*, several individuals continue to request the right to establish an encampment on City owned lots even though the District Court has already preliminarily denied that relief as unreasonable. ECF 342. *Fourth*, several individuals continue to request the right to camp in the select areas of the City that have been established as "No Lodging/TNC Prohibited" areas. The City's responses both in this filing and previous filings in the District Court make clear that granting these new requests exceed the Article III jurisdiction of this Court, would pose a fundamental alteration and undue burden on the City, and the individuals have failed to prove why relocation to these sites are a necessary. The Ninth Circuit appeared to agree with the City in its order granting the City partial relief in its Stay Pending Appeal, withholding relief from the City on this issue only because "the record does not show that the district court has ever required the City to relocate a BHU member to a 'No Lodging' area, or to require the City to allow BHU members to pitch tents regardless of local prohibitions." ECF 433 at 18-19.

To comply with the Special Master's order, the City has provided reasonable maximum dimensions at all potentially viable locations (locations not on vacant lots, No Lodging areas, or residential areas) and has added new diagrams to assist the Special Master's review.[1]

## II. BACKGROUND

### A. Relevant City Filings and Court Orders

The City respectfully requests that the Special Master review the following City filings and Court orders in connection with his evaluation of the remaining accommodation disputes and preparation of his recommendation to Judge Chen. Given the length of the docket, the City has

[1] The City notes that the District Court ordered additional briefing regarding standing in this case. If the District Court finds the BHU lacks standing, that will likely impact the Special Master's review of individual accommodation requests. ECF 435.

identified materials that provide important legal, procedural, and factual context for the issues referred to the Special Master. These materials address standing and the scope of the claims, the City's obligations under Title II of the ADA, the Court's prior rulings, the history of the City’s no lodging zones, and the subsequent proceedings concerning individual accommodation assessments, site conditions, and abatement. Reviewing these materials will help the Special Master understand the legal and procedural framework governing the remaining disputes, distinguish issues already resolved from those still before him, and evaluate the City’s 3×3 accommodation assessments in the context of the record developed in this action.

**1. Standing and the scope of the claims.** ECF Nos. 107 and 113, the City's motion to dismiss and reply in support, address important threshold issues concerning standing and the scope of the claims and relief sought in this action. The City's briefing in connection with its motion for a stay pending appeal also addresses standing. See ECF 376, 403, and 436. The supplemental briefing at ECF 436 is particularly relevant to the standing issues and should be considered together with the City's earlier motion to dismiss briefing. These filings provide context for understanding the limits of the claims and the relief that may properly be considered in resolving the remaining accommodation disputes.

**2. The City's summary judgment briefing concerning its obligations under Title II.** ECF 219 and 256 contain the City's summary judgment briefing. These filings address the City's obligations under Title II of the ADA, including the reasonable modification requirement, the City's accommodation process, and the legal standards governing the City's consideration of requested accommodations. They also explain the City's position concerning the operation of its public right of way management program and the legal and practical constraints on the City's ability to modify that program. This briefing provides important context for evaluating the remaining disputes concerning the City's 3×3 accommodation assessments.

**3. The Court's prior orders and clarification of the issues remaining before the Special Master.** ECF 288, 289, 326, 342, and 355 contain the Court's relevant orders concerning summary judgment, preliminary and permanent injunctive relief, accommodation adjudication,

and additional site information. These orders should be reviewed together because they provide the procedural and legal context for the Special Master's assignment. They clarify the Court's prior rulings, the relief ordered, the issues resolved through the earlier litigation, and the matters that remain for further consideration. In particular, ECF 288 and 289 provide the principal context for understanding the Court's rulings on the City's ADA obligations and the relief previously ordered, while ECF 342 and 355 provide more specific direction concerning accommodation adjudication and site information relevant to the remaining disputes. The Special Master's review should be guided by these orders so that his recommendations address the matters currently referred to him without revisiting issues the Court has already resolved.

**4. The City's briefing concerning no lodging zones and location specific restrictions.** ECF 381, the joint status report concerning the Second Street abatement update, and its supporting declarations and exhibit (ECF 381-2, 381-3, and 381-4), contain the City's most extensive briefing and supporting factual submissions concerning the no lodging zones. These materials are particularly relevant to the Special Master's consideration of potential accommodation locations because they address the City's reasons for restricting lodging in designated areas and the location specific conditions underlying those restrictions. They provide important context for evaluating whether a proposed accommodation location is available and suitable, and for understanding the City's position that an individualized accommodation assessment must account for applicable location restrictions and the public interests those restrictions serve.

**5. Status reports and supporting declarations concerning relocation sites.** ECF 328, the City's status report, and its supporting declarations (ECF 328-1, 328-2, and 328-3), provide the City's account of the factual circumstances relevant to the accommodation and abatement issues at that stage of the proceedings. ECF 338, the joint status report, and its supporting submissions (ECF 338-1, 338-2, and 338-3), provide additional information concerning relocation sites and other outstanding disputes. ECF 352 and 352-1, the subsequent joint status report and supporting declaration of N. Scott, provide further updates.

The later site-related submissions also provide factual information relevant to the City's assessments and the conditions at particular locations. ECF No. 380, the joint statement concerning the diagram, together with the City's supplemental declarations (ECF Nos. 380-1 and 380-2), provides site-related information and supporting evidence. ECF No. 387, the declaration of T. Gregory in support of the September 18 status report, and ECF No. 388, the declaration of Deputy Fire Marshall S. Shaffer-Killey in support of the City's status report, provide additional factual submissions relevant to relocation sites. These materials should be considered in evaluating the site-specific circumstances bearing on the availability and suitability of proposed accommodations.

**6. The stay proceedings and appellate order.** ECF 376, the City's motion for a stay pending appeal; ECF 403, the City's reply in support of that motion; ECF 427, the Ninth Circuit's order; and ECF 436, the City's supplemental brief in support of its motion for a stay, provide relevant context concerning the pending appeal and the issues presented for appellate review. In addition to addressing the procedural posture of the appeal, the City's stay briefing further addresses standing, an issue relevant to understanding the scope of the claims and relief sought in this action. The Special Master should consider these submissions together with the City's earlier standing briefing at ECF Nos. 107 and 113.

Taken together, these filings provide the relevant legal, procedural, and factual context for the Special Master's review. The City is not asking the Special Master to reconsider matters already decided by the Court or to resolve issues outside the scope of his assignment. Rather, the City requests that he evaluate the remaining 3×3 accommodation disputes in light of the Court's prior rulings, the City's briefing concerning its obligations under Title II, the standing issues bearing on the scope of the claims and relief, the City's briefing concerning no lodging zones, and the factual record concerning implementation and the locations at issue. This review will help ensure that the Special Master's recommendations are consistent with the Court's rulings and address the matters that remain for resolution.

## III. ARGUMENT

**A. The City's Assessment of the Pending Accommodation Requests**

The City has assessed BHU members' accommodation requests based on the information BHU provided concerning each individual's asserted disability-related needs, proposed tent size, requested total footprint, and estimated allocation of space within that footprint. The City's assessment considers both whether an identified use of space has a sufficient nexus to a disability-related need, whether the amount of space requested for that use is reasonably necessary to accommodate that need, and whether the request is an undue burden or fundamental alteration. Many of the requests raise the same issues regarding available space in the public right of way, fire restrictions, nexus, vacant lots, and No Lodging areas. Those common issues are addressed as to all individuals below.

**i. The City's Obligation to Consider Reasonable Modifications Does Not Require a Fundamental Alteration of Its Public Right of Way Management Program**

The City recognizes that it must meaningfully consider reasonable modifications to its policies and practices when necessary to provide individuals with disabilities access to its services, programs, and activities. But that obligation has limits. Title II requires reasonable modifications; it does not require a public entity to make changes that would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7)(i). The fundamental alteration limitation is an essential part of the reasonable modification framework because it preserves a public entity's ability to carry out the essential functions of its programs while accommodating individuals with disabilities. *Alexander v. Choate*, 469 U.S. 287, 300 (1985). Thus, although the City must consider reasonable modifications in light of the circumstances presented, it is not required to abandon the essential purposes or safeguards of its public right of way management program.

The Court's own description of that program confirms that the City's responsibility extends beyond accommodating the use of sidewalks as places of abode. The Court recognized that public streets and sidewalks serve "numerous purposes," including "facilitating transit and movement, permitting speech and protests, enhancing urban aesthetics, [and] serving as places of

abode for the unhoused." ECF No. 288 at 28. Consistent with that recognition, the Court defined the City's relevant program as its "maintenance of public roadways and sidewalks to ensure their functionality, orderly use, and public health and safety," including their use "as locations of abode for the unhoused." Id. at 28–29. The Court further explained that the City's management must consider not only the need for abatement to protect public health and allow transit and passage, but also the effects on unhoused disabled residents seeking to occupy the public right of way. Id. at 29. The Court's framework therefore recognizes that the City must manage competing and sometimes overlapping uses of public space. The City's obligation to accommodate unhoused people with disabilities does not eliminate its responsibility to maintain sidewalks for their other public purposes.

That responsibility is particularly important because the effects of a proposed modification may extend beyond the individual requesting it and the immediate physical characteristics of the proposed location. Public rights of way serve neighborhood functions that may not be apparent from a location's configuration or predominant use. For example, evidence concerning Fourth and Camelia shows that the dead end is used for pickup and drop off at two nearby daycares. ECF Nos. 338, 338-1, 338-2, 338-3. That example illustrates why the City cannot assume that a location has no meaningful public use simply because a particular use is not readily apparent or because the location may appear suitable when considered in isolation. Nor can the City's accommodation process, or the Court's consideration of the multiple locations at issue, necessarily account for every neighborhood activity or every person who may be affected by a proposed modification. Constituents whose interests are affected may not know about this litigation and have no opportunity to bring their concerns to the Court's attention. The City must therefore retain the ability to consider the broader public interests implicated by its management decisions, including interests that may not be represented in an individual accommodation request or in the present proceedings.

The City's preventative approach to sidewalk access serves that broader responsibility. As the Court recognized, the City's program is intended to ensure the functionality and orderly

use of sidewalks, including the ability of the public to travel and pass through them. ECF No. 288 at 28–29. The Court's ruling also preserved the City's ability to assess proposed placements in light of location specific conditions, including whether they would obstruct pedestrian passage or emergency access. Id. at 56, 58. Those considerations cannot always be evaluated by looking only at whether a particular placement appears feasible at a particular moment. The City must account for the sidewalk's function as public infrastructure and for the range of uses and access needs that may arise. *Id.* A requirement that the City disregard those considerations whenever a particular placement appears possible would undermine the essential purposes of the program.

The Court should therefore evaluate the requested modifications in light of both the individual accommodation needs and the City's continuing responsibility to manage public space for the benefit and safety of the broader community.

**ii. The City's Generally Applicable Administrative Regulation 10.2 and Fire Restrictions**

The City's regulation of public rights-of-way is directed to maintaining sidewalks, streets, and other public spaces for pedestrian access, disability access, safety, and other public functions. Administrative Regulation 10.2 ("AR 10.2") expressly states that its purpose is to protect access and safety on sidewalks and parklets for pedestrians and persons with disabilities, as well as other City interests in maintaining public spaces. The regulation applies to temporary noncommercial ("TNC") objects on sidewalks and parklets regardless of whether the person using the object is housed or unhoused. AR 10.2 establishes objective requirements concerning the amount and location of space that may be occupied on a sidewalk. For sidewalks less than 14 feet wide, the regulation defines a six-foot-wide path of travel; for sidewalks 14 feet or wider, it defines a ten-foot-wide path of travel. TNC objects generally may occupy no more than nine square feet and may not exceed five feet in height. The regulation also prohibits placement that interferes with driveways, crosswalks, transit stops, fire hydrants, utility boxes, or other specified infrastructure, as well as placement that interferes with curb or wheelchair ramps or other disability access features or obstructs traffic signs or devices.

Additionally, the City's Deputy Fire Marshal has advised that combustible materials ordinarily must remain 10 feet from a property line under California Fire Code section 315.4, subject to a three-foot clearance where items remain under six feet in height, and if a tent encampment extends beyond 700 square feet, a 12-foot fire break is required. See ECF 381 at 12. The City provides a more fulsome explanation of these regulations and other City considerations in its September 18, 2026 Joint Status Report (ECF 381). For the locations requested by BHU members, the City has included the three-foot clearance within the six-foot-wide path of travel to maximize the accommodation to BHU members.

**iii. The City's Nexus Assessment**

The City's assessment distinguishes between the size of the proposed tent and the additional space requested for other items that make up the total footprint. Thus, where an individual requests a 153 square foot tent and an additional 48 square feet for "survival gear," the City has considered separately whether the additional 48 square feet is supported by a disability-related need. This is particularly important because the Court has identified clothing and tents as examples of survival related items, while the proposed tent size is already separately identified in each request. The submissions generally do not explain what additional items comprise the claimed "survival gear," why items require the specified amount of additional floor space, or why that space cannot be minimized through stacking or other consolidation.

The same issue arises with the approximately four square feet allocated to "medications" in multiple requests. Although medication may have a disability-related nexus where an individual requires medication to address a disability, the information provided does not establish that each individual requires medication to be stored on the PROW or explain why approximately four square feet of dedicated floor space is necessary in each case. The City therefore has distinguished between a potentially valid disability-related need and the separate question of whether the requested amount of PROW space is reasonably necessary to accommodate that need.

Lastly, several individuals request additional space for their Emotional Support Animals

("ESAs"). However, the ADA only applies to service animals, not ESAs, which are subject to a detailed multipart definitional test. *See* 28 C.F.R. § 35.104. Accordingly, the City is not required to accommodate ESAs, even ones that may provide comfort or companionship, under the ADA. *See, e.g.*, *Fisher v. City of Lansing,* No. 23-CV-1173, 2025 WL 1233946, at *6 (W.D. Mich. Apr. 29, 2025); *C.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 441 (E.D. Pa. 2021).

**iv. The City's PROW Footprint Assessments**

The City has likewise considered whether the proposed footprints reflect reasonable efforts to minimize the amount of PROW space occupied, given both parties repeated acknowledgment that PROW space is limited, in part due to the need to maintain a sufficient path of travel. The submissions generally allocate discrete square footage amounts to individual categories without explaining whether belongings can be stacked, consolidated, stored within or underneath other items, or otherwise arranged to reduce the total footprint. Such considerations are particularly relevant where BHU has repeatedly reported difficulty identifying PROW locations large enough to accommodate even the proposed tents themselves. A reasonable accommodation analysis must account for whether the asserted disability-related needs can be accommodated through a smaller or differently configured footprint; it does not establish a right to the particular spatial arrangement requested. ECF No. 288 at 72-73.

**v. The City's Vacant Lots Assessments**

The Special Master should not entertain requests to encamp on City-owned lots, as the District Court has already held that camping on City lots is not a reasonable accommodation in the context of this lawsuit. ECF No. 342. In its order, the Court explained that City lots are outside of the defined program at issue. *Id.* at 5. The order further found that because campers had not explained why City-owned lots are the only viable option for relocation, they have "not demonstrated a likelihood of success on the merits of their claim that encampment on public lots is a reasonable accommodation." *Id.* *Second*, and relatedly, because this category of requests was denied, this forum does not have jurisdiction over these requests. The District Court's order specified that BHU members may submit "other requests for reasonable accommodations

following abatement," it did not allow for re-litigation of the same request in a different forum. The City refers the Special Master to additional arguments in its prior filings, including the September 23, 2026, Joint Status Report and the September 4, 2026, Joint Status Report (ECF 338).

**vi. The City's No Lodging/TNC Prohibited Areas Assessments**

Under AR 10.2, no personal property is allowed to be stored in a TNC Prohibited Area, regardless of footprint size. As with City-owned lots, camping is entirely prohibited in these areas. Under Penal Code 647(e), it is a misdemeanor to "lodge[] in a building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it." The signs provide notice that the City does not grant permission for people to lodge in that location.

The prohibition on camping in TNC Prohibited Areas reflects the City's determination that these areas are not an appropriate location for lodging or encampments at all. The requested accommodation would therefore not merely modify the application of an otherwise applicable camping restriction; it would require the City to reverse the underlying policy determination that lodging is prohibited at this location and affirmatively authorize a use that the City has determined is not appropriate. Moreover, and as the Court has previously noted, "plaintiffs are not entitled to their preferred accommodation, but only a reasonable accommodation." ECF 288 at 30 (quoting *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 626 (9th Cir. 2024).

The City refers the Special Master to additional arguments in its prior filings, including the September 18, 2026, joint status report (ECF 381) and the September 4, 2026, Joint Status Report (ECF No. 338), explaining that No Lodging designations are outside the scope of the claims adjudicated in the case, would fundamentally alter City programs, and that Plaintiff have not established that these locations are necessary, among other arguments. See also ECF 381, Declaration of Peter Radu (explaining the history and reasons for the particular No Lodging/TNC Prohibited areas at issue here). Nonetheless, the City provided dimensions for No Lodging/TNC Prohibited locations in its September 18, 2026, Joint Status Report, ECF 381, but

maintains that these areas are off-limits to camping.

The City also made this argument before the Ninth Circuit. The majority denied relief on this point only because “the record does not show that the district court has ever required the City to relocate a BHU member to a ‘No Lodging’ area, or to require the City to allow BHU members to pitch tents regardless of local prohibitions.” ECF 433 at 18-19; see also concurrence, id at 66 (“[T]he district court questioned Berkeley’s decision to prohibit camping in certain areas at all. But that’s not for the court to decide.”). This statement, in context of the surrounding analysis, strongly suggests that if the City were to be required to allow camping in a No Lodging Zone, that decision would likely be overturned by the Ninth Circuit on appeal.[2]

### B. The City’s Individual Assessments

The Special Master identified the following individuals as within its jurisdiction and whose accommodation requests the Special Master may adjudicate: **Alice Barbee, Hector Navarro, Robbie Peddycoart, Robert Pearce, Alexander Wilson, Erik Alexander Coon, Kevin Martinez, Patrick Ford, Erik Keiser, Charles Dye, Andrew Venderzyl, Ramondo Mackey, Thomas Barnett, Erin Spencer, Monique Williams, Jason Charette, Kittivutt Patanapanich, Merced Dominguez, Yesica Prado, Jonny Ruel Holder, Ray Johnson, Bradford Raymer, Jackeline Mendoza, Shawman, Jermaine Lee White, Gregory Grove, Lisa Saechao-y-chain, and Quinton Cocklereese.** ECF 413.

In addition to the common issues identified and discussed above, the City addresses each of these individuals requests below and through the Exhibits to the Declaration of Thomas Gregory.

#### i. Withdrawn Requests

[2] On November 17, the City Council passed Resolution No. 72,502-N.S., creating a No Lodging zone “within 600 feet of any licensed preschool and/or in-home early childhood daycare facility.” The City noted the significant health risks from drug paraphernalia, rodents, and disease found at Berkeley homeless encampments and that “young children ages zero to five years are particularly vulnerable due to their size and age and at risk of picking up objects that could be dangerous or contaminated.” See https://berkeleyca.gov/city-council-special-meeting-eagenda-november-17-2026.

In the September 23, 2026, Joint Status Report, BHU identified **Kevin Martinez**, **Patrick Ford**, **Monique Williams**, **Johnny Ruel Holder**, and **Ray Johnson** as having withdrawn their requests.

**ii. Persons In Vehicles**

In the September 23, 2026, Joint Status Report, BHU identified **Jason Charette**, **Kittivutt Patanapanich**, **Merced Dominguez**, **Yesica Prado**, and **Erin Spencer** as living in their vehicles at the Harrison encampment.

For these individuals, BHU requests additional space outside of vehicles beyond the 3X3 space generally available. The Court has already rejected Plaintiff's argument as Plaintiff has not specified the disability requiring additional equipment, why survival gear does not fit in vehicles, and why the requested space is required. The Court "holds that these requests are properly denied as unreasonable." ECF 342. Plaintiff's additional information regarding these individuals does not cure its defects, as the additional information provided lacks information as to the nexus of the request to the disability, the size of the interior vehicle space and why the vehicle and 3X3 space are insufficient for any disability-related equipment. Finally, the Ninth Circuit has lifted restrictions on abating the sidewalks in the Harrison encampment area. ECF 433 at 12.

**iii. Seven Previously Protected Individuals**

On September 9, 2026, the District Court granted temporary injunctive relief from the then-planned Harrison Encampment abatement as to seven individuals: **Bradford Raymer, Jackeline Mendoza, Shawman, Jermaine Lee White, Gregory Grove, Lisa Saechao-y-chain, and Quinton Cocklereese**. ECF 432.

On October 26, 2026, the Ninth Circuit issued an order granting in part and denying in part the City's Stay Pending Appeal from the District Court's injunctive orders and judgment. The Ninth Circuit granted the City relief as to the seven individuals that remained in the Harrison encampment, allowing the City to finish abatement of the area. ECF 433 at 12. The Harrison encampment was abated as to these individuals on November 3, 2026.

The City addressed the relocation requests for these individuals in its September 18, 2026

Joint Status Report. ECF 381. **Shawman, Jermaine Lee White, and Gregory Grove** requested relocation to 1499-1451 Second Street, proposing footprints of approximately 11 by 20 feet, 11 by 30 feet, and 10 by 25 feet, respectively. The City's assessment of 1499 Second Street, however, identified several physical and operational constraints affecting the usable public-right-of-way area in this area, and it is within a City No Lodging area and is therefore not viable. ECF 338 at 11-12. The City's site assessment identified multiple utility access needs, power lines, and large K-rails that restrict the usable area. Id. Portions of the adjoining area are privately owned by the East Bay Municipal Utility District and Jones Development Co., and photographs submitted by BHU appeared to show active construction on the site. Id.; ECF 352.

Those conditions are particularly significant because these locations were previously used as encampment sites, and the City's experience with those encampments identified recurring health, safety, and operational concerns commonly associated with encampments in the public right-of-way. The City Council specifically cited the high volume of police and Fire Department calls associated with the Second and Cedar encampment, as well as safety impacts on nearby residents, workers, and visitors and detrimental impacts on business operations, in adopting the City's encampment policy. The Council also determined that the Second and Cedar area met the policy's health and safety exceptions and should be prioritized for enforcement, and authorized measures to deter re-encampment after an encampment had been cleared under those circumstances.

**Lisa Saechao-y-chain and Quinton Cocklereese** requested accommodations at Second and Page Streets. Second and Page Streets are within a No Lodging area with No Lodging signs posted at all four corners. Encampment at this location would therefore constitute a fundamental alteration of a City program. The City nonetheless conducted an assessment pursuant to prior direction from the District Court available at ECF 381 finding sufficient lengths but available widths of only 2.5 feet, 1 foot 1 inch, and 2 feet after accounting for the pedestrian path, adjacent parking, driveways, and fire safety. See also ECF 381, Declaration of Shannon Shaffer-Killey

regarding fire safety. The City determined that encampment conditions in the area warranted intervention under its encampment management policy based on documented health, safety, emergency response, and neighborhood impacts. The No Lodging designations thus reflected the application of the City's existing PROW and encampment management framework to locations where the City had identified conditions warranting intervention and serves to prevent reestablishment of lodging at locations where the City had previously determined that encampment conditions created health, safety, emergency response, and neighborhood impacts.

**Bradford Raymer** and **Jackeline Mendoza** requested relocation to Fourth and Camelia Street. ECF 352. Following the Court's direction to assess the potential relocation site at Fourth and Camelia Street, on September 3, 2026, the City provided BHU with its complete site measurements for two possible tent locations. ECF No. 338-3 at 21. The City measured available space at the first location at 32 feet in length and 75 inches (or 6.25 feet) in width, and the second location at 161 feet in length and 4.5 feet in width. Id. The City explained that these measurements reflected requirements for maintaining emergency access, pedestrian access, and vehicle ingress and egress. Id. The City also conveyed guidance from the Deputy Fire Marshal, including fire safety clearances from property lines, fire break requirements for larger encampments, and the prohibition on constructing any structures at the site other than tents. Id. The City produced a diagram with the available dimensions to the Court on September 21, 2026. ECF 387.

On November 17, 2026, the City Council passed Resolution No. 72,502-N.S., creating a No Lodging Area within 600 feet of a registered preschool or daycare facility. Fourth and Camelia is within 600 feet of Duck's Nest Preschool and therefore is not a viable relocation site. Relocation in a No Lodging area would constitute a fundamental alteration of a City program.

**iv. Remaining Individuals Requesting Relocation Sites**

The remaining individuals, **Alice Barbee, Hector Navarro, Robbie Peddycoart, Robert Pearce, Alexander Wilson, Erik Alexander Coon, Erik Keiser, Charles Dye, Andrew Venderzyl**, **Ramondo Mackey, Thomas Barnett**, have had their requests assessed by

the City as documented in the Declaration of Thomas Gregory. Exhibits A through K of the declaration apply the City's rules and accommodations to the 3X3 rule to each pending request. As those assessments explain, some categories of requested space may have a potential disability-related nexus, but the information provided does not establish that the full amount of additional space requested for those categories is reasonably necessary. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (explaining that a plaintiff must identify "specific reasonable" and "necessary" accommodations that the public entity failed to provide and that the public entity must undertake a fact-specific investigation to determine what constitutes a reasonable accommodation); *Wade v. Solis*, 2009 WL 1186638, at *17 (N.D. Cal. May 4, 2009) ("Wade is not entitled to the accommodation of his choice, but rather, one that is reasonable.")

In several instances, the submitted components also do not mathematically account for the full requested footprint, while in another the listed components exceed the requested footprint. The City has therefore identified the maximum available spaces in the viable requested locations, and a narrower accommodation may be necessary.

**v. Requests for Tents**

While this filing is focused on relocation sites, to the extent that the Special Master is requesting updates as to other accommodation requests, the City is providing the email correspondence with BHU regarding tent requests. Gregory Decl. Ex. M. The City has provided replacement tents to eight individuals and will not provide tents to seven other individuals that requested tents but did not have their tents discarded. The City is in the process of providing tents for six other individuals once they provide information regarding the size of the tents. Id.

To the extent that BHU alleges that the City has failed to follow the District Court's orders regarding providing notice, removing property, and withholding replacement tents, those issues are being considered by the District Court in a motion for an order to show cause regarding contempt. ECF 400, 418, 420, 434.

## IV. CONCLUSION

The Court's April 3, 2026 summary judgment order did not establish a right to remain at

any particular location, nor did it establish that individuals whose requested accommodations cannot be implemented at a particular location are left without any lawful place to go. Rather, the Court expressly recognized and upheld the City's existing, priority-based encampment management framework, under which abatement decisions are based on actual public health conditions, hazard severity, and community impacts—not simply the presence of an encampment or the availability of alternative shelter. ECF No. 288 at 9, 58. The Court required the City to accommodate the 3×3 rule but otherwise preserved the City's authority to enforce AR 10.2 and other applicable requirements, including pedestrian access, emergency access, and public health and safety requirements, through individualized, location-specific assessments. Id. at 58–59.

Accordingly, a determination that a particular location cannot reasonably accommodate a requested footprint does not, by itself, mean that the individual must leave the public right-of-way, faces imminent displacement, or is subject to immediate abatement. Individuals remain free to occupy otherwise permissible locations within the public right-of-way, subject to the same applicable location-specific requirements and the City's established prioritization framework. Those requirements apply equally to individuals receiving 3×3 accommodations, in that an accommodation does not confer immunity from otherwise applicable health, safety, access, or abatement requirements. ECF No. 288 at 58–59. Nor does the denial of a particular location-specific accommodation automatically elevate an individual or location in the City's abatement priorities.

The City requests that the Special Master find that (1) camping on City-owned lots or in No Lodging areas are a fundamental alteration to a City program and are not reasonable accommodations to the 3x3 rule; (2) the Court's required accommodations to the 3x3 rule do not apply to property stored outside of vehicles used as shelter; (3) the City's provision of maximum width and lengths at requested viable relocation sites constitutes alternative reasonable accommodations; (4) and the interactive process is complete as to the individuals under the Special Master's jurisdiction.

**Plaintiff's Statement**

## BERKELEY HOMELESS UNION SECTION OF JOINT REPORT TO SPECIAL MASTER ON REASONABLE ACCOMMODATIONS

### I. Introduction

This submission responds to the Special Master's Procedural Order of October 16, 2026 (Dkt. 413), which directs the parties to file a single joint submission addressing each disputed accommodation request in a consistent, combined format.

The City's determinations fall into three categories, and each category fails the ADA's requirements.

First, the City has denied most requests on the grounds that granting them would "fundamentally alter a City program." For members whose proposed sites fall within "No Lodging" or TNC-Prohibited areas, or in residential zones governed by PROW restrictions, the City's determination is a single sentence: the accommodation "would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited." This is not an individualized assessment. (Prado Decl., Ex. A.)

Second, where the City has offered an alternative footprint, it has offered dimensions that cannot accommodate any manufactured tent. Every one of these footprints is narrower than the smallest tent sold at retail, which is approximately seven feet wide. (Prado Decl., Ex. B.) An "accommodation" that no tent can fit into is not an accommodation, but a denial of shelter expressed in measurements. For members who live in vehicles, the City's responses are even

more plainly deficient: the City denied a modest 2' x 6' or 2' x 8' space for essential survival equipment—including cooking equipment and garbage storage—on the ground that "no nexus" was established, without ever asking any questions, identifying the evidentiary basis for that conclusion or engaging with the medical necessity documented in each request. (Prado Decl., Ex. C; Ex. A.)

Third, for a handful of applicants the City has issued no determination at all. For Orvel Roadlander and Shareef Muwakkil, the City states only that they are "not under the Special Master's jurisdiction" and that it "will send a separate response," yet as of November 20, 2026, no response has been sent. (Prado Decl.) For Bree Ann Hegeman, Salina Mares and Jasmine Williams, whose requests were filed September 23, as required by Dkt. 378, the City did not engage in the interactive process and did not provide any determinations. (Prado Decl., Ex. D.) And for the five members who proposed 1499–1451 Second Street, the City has provided no measurements and no alternative location—while permitting that site to be obstructed with K-rails. (Prado Decl., Ex. E.) Some BHU members relocated to these “no lodging” areas on Second Street and the City has conducted several abatements since September, destroying the shelter and property of our BHU members. (Prado Decl.)

## II. The Requests Before the Special Master

Dkt. 345 names twenty-one BHU members, whose requests can be adjudicated. Dkt. 358-1 listed nineteen accommodation requests that were filed to the City on September 14, and three additional accommodation requests on September 23, 2026. The two lists do not coincide and the reconciliation is as follows.

### A. Requests pending and within the appointment (sixteen)

The following BHU members have pending accommodation requests that need to be resolved:

Alice Barbee; Alexander Wilson; Hector Navarro; Robbie Peddycoart; Robert Pearce; Erik Alexander Coon; Erik Keiser; Charles Dye; Andrew Venderzyl; Ramondo Mackey; Erin Spencer; Thomas Barnett; Jason Charette; Kittivutt Patanapanich; Merced Dominguez and Yesica Prado.

**B. Requests no longer pending (six of the twenty-one named on Dkt. 345)**

- Jose E. Landos Martinez — request withdrawn on September 23, as Mr. Martinez obtained housing. (Prado Decl.)
- Kevin Martinez, Patrick Ford, Jonny Ruel Holder and Ray Johnson — requests withdrawn on September 14, as they were not present at the encampment at the time of the abatement operation. (Prado Decl.)
- Monique Williams, requests withdrawn on September 14, as the City was unwilling to provide any accommodations to Ms. Williams because she obtained housing. (Prado Decl.)

**C. Requests pending but outside the appointment (five)**

Orvel Roadlander and Shareef Muwakkil each have a pending accommodation request, each submitted additional documentation to the City including a detailed nexus statement and signed authorization, and each was treated by the City as part of the same batch of determinations — the City's September 14 response listed both men alongside the named members and demanded the same supplemental information from them. (Prado Decl., Ex. C.)

On September 23, BHU also submitted three accommodation requests by the deadline set on Dkt. 378. Disabled BHU members Bree Ann Hegeman, Salina Mares and Jasmine Williams provided a detailed nexus statement and signed authorization to the City's ADA Coordinator Thomas Gregory to begin the interactive process. (Prado Decl., Ex. D.) BHU received no determinations for these members. (Prado Decl.)

**III. Threshold Matters**

A. The City's "Fundamental Alteration" Denials Rest on a Legal Theory the Court Has Already Rejected

For several applicants—including Charles Dye, Ramondo Mackey, Erin Spencer, Jason Charette, Kittivutt Patanapanich, Merced Dominguez, Yesica Prado, Gregory Grove, Quinton Clockreese, Lisa Saechao-y-chain, Shawman, Jermaine Lee White and others—the City's entire determination is a single sentence: granting the accommodation "would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited." The ADA Coordinator provided no measurements, site-specific analysis or alternative. Thomas Gregory provided no statement of reasons beyond the recitation of the designation itself. (Prado Decl., Ex. A.)

The Court has already considered and rejected this argument. In the order granting the preliminary injunction, the Court held: "The City has not shown that relocation of BHU

members to these 'No Lodging/TNC Prohibited' locations pursuant to AR 10.2 is unreasonable, or that the accommodations to those locations would constitute a 'fundamental alteration' to a City program." Dkt. 342 at 4. The Court further found the record on the City's rationale "thin—indeed non-existent," and directed the parties to continue the interactive process so that the City could supply the explanation it had failed to provide. *Id.*

The City has now had that opportunity and has not used it. Instead, it has doubled down in their determinations and displaced our BHU members that had relocated to Second and Camelia Streets. (Prado Decl., Ex. E.) The City has also not explained why an individualized accommodation to a specific disabled person at this specific location constitutes a fundamental alteration of a City program—as opposed to a modification of the program, which is precisely what Title II requires. 28 C.F.R. § 35.130(b)(7). Nor has it complied with 28 C.F.R. § 35.164, which requires that a determination that an accommodation would fundamentally alter a program be made by the head of the public entity or their designee, in writing, and with a statement of the reasons for reaching that conclusion. (See Prado Decl.)

A one-sentence assertion, repeated verbatim across more than a dozen of applicants and attached to no individualized analysis, does not satisfy § 35.164. It is the generalized

summary conclusion the Court has already prohibited. Dkt. 288 at 21.

B. Every Alternative Footprint the City Has Offered Is Narrower Than Any Manufactured Tent

Where the City has offered an alternative rather than a bare denial, it has offered dimensions that no tent sold at retail can fit into. The Court has already found as much: "BHU represents that no tent can fit within a 3x3 feet space, and the City does not dispute this characterization." Dkt. 288 at 56.

Consider what the City's own numbers mean in practice. Nine square feet — the 3’x3’ rule — is roughly the size of a small closet. A person cannot lie flat in it, sit up in it, change clothes in it, store medication in it or care for an animal in it. The smallest tents sold at retail, two-person backpacking tents, measure approximately 7 feet by 5 feet — thirty-five square feet, nearly four times the size of the City's allowance.

Now compare the City's alternative footprints to the tents the City itself has provided. The City furnished BHU members with a Campros CP 4-person tent measuring approximately 8

feet by 7 feet. (Prado Decl., Ex. B.) For example, the City offered BHU member Hector Navarro a footprint of 2 feet 6 inches wide by 111 feet long at 2285 Fourth Street. (Prado Decl., Ex. A.) A 2'6" strip cannot accommodate an 8' or a 7' wide tent. It cannot accommodate a person lying down sideways. When BHU President Yesica Prado asked Mr. Gregory to explain how Mr. Navarro is supposed to use the tent the City provided within the footprint the City approved, she received no response at all. (See Prado Decl.)

The same contradiction runs through every alternative the City has offered. It has proposed strips of 2 feet, 2 feet 6 inches, 2 feet 11 inches, 4 feet 6 inches, and 4 feet 10 inches in width. (Prado Decl., Ex. A.) A 2-foot strip is narrower than a standard doorway. A 2'11" strip is narrower than a twin mattress. A 4'6" strip is narrower than the smallest two-person tent. An "accommodation" that no shelter can fit into is not an accommodation.

The Court has already set the standard the City was required to meet. In its Summary Judgment Order (Dkt. 288), the Court held that for Mr. Muwakkil, Mr. Spencer, Ms. Parnell, and Mr. White, the City's categorical enforcement of the 3x3 rule was unlawful. The Court held:

*"The City must conduct an individualized assessment for each claimant that accounts for the claimant's specific disability-related shelter needs; the actual dimensions and physical characteristics of the sidewalk or right-of-way in question; and the public interest in maintaining a regulatorily-mandated path of travel. In this regard, the ordinance's prescribed six-foot minimum path for most sidewalks is presumptively reasonable and sufficient."* Dkt. 288 at 72–73.

The Order's reasoning is explicit that the accommodation *must* actually allow shelter. The Court further held that for non-disabled BHU members, where abatement and application of other City laws "results in the loss of shelter (e.g., loss of their tent), the City's acts constitute a state-created danger unless the City allows for the retention of existing tents or shelter, considers reasonable accommodations allowing for continued shelter, or provides a replacement tent or shelter that does not obstruct reasonable sidewalk passage (e.g., six feet)." Dkt. 288 at 73.

Moreover, the Order states "is presumptively reasonable and sufficient." The word “presumptively” here matters. A presumption is not a mandate. It is a starting point that can be modified. The Court did not say six feet is required, or that six feet is the only acceptable measurement, or that any footprint reducing the path below six feet is unlawful. It said six feet is presumed reasonable — meaning the City may rely on it as a base, but the

presumption can be overcome by specific facts showing that a different arrangement is workable or needed for a particular disabled claimant at a particular location.

The Order also tells the City exactly how to apply that presumption. The City "may deny a proposed tent placement that would, on the *specific facts*, obstruct pedestrian passage or emergency access, but may not invoke such concerns categorically and without individualized analysis of the disabled claimant's needs."

Read together, the two parts set a clear rule: the City may use six feet as a default, but it must test that default against the actual facts of an actual sidewalk and an actual claimant. If the facts show that a different configuration preserves safe passage, the City must consider it. If the facts show that the six-foot default cannot be met without destroying the claimant's shelter, the City must weigh that against the public interest in passage — which is what the Court's earlier sentence requires ("the public interest in maintaining a regulatorily-mandated path of travel").

The City has done the opposite. It has converted a presumption into an absolute rule. The City has treated six feet as a floor it will never go below, in every case, at every location,

regardless of the width of the sidewalk, the height of the adjacent building, the presence or absence of obstructions, or the disability-related needs of the person in front of it. That is the definition of categorical enforcement. It is what the Court prohibited.

The City's reliance on six feet is also internally inconsistent. When it suited the City, it described the six-foot figure as a requirement of Public Right-of-Way Accessibility Guidelines ("PROWAG"), a federal guideline the City also follows. (Prado Decl., Ex. F.) When Ms. Prado pointed out that PROWAG actually sets a four-foot minimum, and the City shifted to enforcing Administrative Rule 10.2. (Prado Decl., Ex. F.) The City cannot treat six feet as a federal mandate in one email and a local ordinance in the next. (See Prado Decl.)

The City cannot have it both ways. It cannot provide a tent and then approve a footprint the tent cannot fit in. It cannot concede that no tent fits in nine square feet and then offer strips that are narrower than nine square feet in one dimension. It cannot invoke the six-foot path as a categorical rule when the Court described it as a presumption that must be tested against the facts of each claimant's situation. And it cannot call these approved footprints offers accommodations when the practical effect is the same as a denial: no shelter, no protection from the elements and no feasible way to comply.

C. The City's "No Nexus" Denials Do Not Identify What Evidence Was Missing

For the four applicants who requested modest outdoor space for essential survival equipment—Jason Charette (2' × 6' for a barbecue and garbage can), Kittivutt Patanapanich (2' × 8' for survival gear), Merced Dominguez (3' × 8' for survival gear and ESA supplies), and Yesica Prado (2' × 6' for a garbage can and cat tree)—the City denied on the ground that "you have not established a nexus between your disability and your need for space outside your vehicle." (Prado Decl., Ex. A.)

In each case, BHU had already supplied weeks and in some cases months ago a detailed nexus statement identifying the disability, the functional limitation, and the connection between the limitation and the requested space. On September 14, 2026, BHU submitted an additional written response to Mr. Gregory set out, for every member on the master list, describing the disability-related needs, the tent size required, measurements on how the footprint would be used and the preferred relocation locations. (Prado Decl., Ex. C.)

The same email explained the nexus in plain terms. Each member needs enough space for shelter, survival gear, medical supplies, mobility aids, and — for many — emotional

support animals. Those items cannot be stored inside a tent or vehicle without blocking the interior path of travel, and blocking that path directly aggravates each member's disability. For the four applicants at issue here, the connection is even simpler: a 3' × 3' space on the sidewalk cannot hold the items they need to store, and the City does not claim otherwise.

Moreover, the City's denial determination does not identify what was missing, even after BHU repeatedly asked. (Prado Decl., Ex. C.) It does not say whether the disability was disputed, whether the limitation was doubted, or whether the connection was considered too attenuated. It simply asserts the absence of a nexus. That is not an interactive process, but rather a refusal dressed as a finding. Where the City believes a nexus statement is insufficient, the ADA requires it to say what would suffice—not to deny and leave the applicant to guess.

The Court has held that the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." (Dkt. 288 at 21.) A bare assertion that no nexus exists, without identifying what is missing, is precisely the summary conclusion the Court prohibited.

These four denials are also internally inconsistent. The City does not dispute that Mr. Charette, Mr. Patanapanich, Ms. Dominguez and Ms. Prado are disabled, and it does not dispute that a 3'x3' space outside a vehicle cannot hold a barbecue, a garbage can, survival gear, or ESA supplies. What the City disputes is only whether the connection has been demonstrated to its satisfaction—a standard it has never clearly articulated and never applied to the single BHU member with an approved accommodation request, Ms. Lewanda Parnell. (Prado Decl., Ex. G.)

D. The City Has Issued No Determination At All for Five Members

For Orvel Roadlander and Shareef Muwakkil, the City's determination states only that they are "not under the Special Master's jurisdiction" and that the City "will send a separate response." No response has been sent. For Bree Ann Hegeman, Salina Mares, and Jasmine Williams—whose requests were filed September 23, 2026, within the deadline set by Dkt. 378—no determination appears in the record. For Ms. Mares, the City requested additional information on October 16 but issued no determination. (Prado Decl., Ex. D.)

These five members are in the same position as every other applicant: disabled, displaced, with a pending request and no answer. Each has a documented disability. Each submitted a written request through BHU. Each provided the disability, the functional limitations, the

accommodation sought and proposed locations. (Prado Decl., Ex. C; Ex. D.) None has received a determination.

The consequences of that gap are not abstract. For Ms. Mares, who submitted her request in September and responded to the City's October 16 request for information, the silence means she has spent two months waiting for an answer while living without a determination on whether she may store survival gear outside her tent. For Mr. Muwakkil and Mr. Roadlander, who were told they are "not under the Special Master's jurisdiction," the silence means they do not know whether their requests will be considered at all, or by whom, or when. For Ms. Hegeman and Ms. Williams, the silence means their requests have effectively disappeared.

BHU addresses the requests of these five members in this submission so that the record is complete. BHU has also filed a motion with Judge Chen to add them to the list of BHU members whose requests require adjudication under the Special Master. (Dkt. 444) That motion is pending.

E. The Sidewalk and New Buffer-zone Policies Prohibit Camping in Most of Berkeley

The City's position throughout this litigation has been that Berkeley "does not have a

camping ban." That position is no longer tenable. Between August and November 2026, BHU surveyed sidewalks in Berkeley where AR 10.2 applied to find places for relocation. The answer is almost nowhere. (See Prado Decl.)

*1. The Rules Confine Camping to One Neighborhood*

AR 10.2 prohibits personal belongings on sidewalks in every residential district — all of Berkeley's "R" zones, which the City Attorney confirms include R-SMU and R-BMU. (Prado Decl., Ex. H.) Belongings are allowed, with conditions, only in commercial and manufacturing districts. (Prado Decl., Ex. I.)

The commercial corridors — San Pablo, University, Shattuck, Telegraph, Solano, Fourth Street — are the busiest sidewalks in the city, lined with storefronts and foot traffic. No one is left alone there long enough to sleep. The BART Access Corridor downtown is excluded outright. What remains is the manufacturing zone of West Berkeley: the warehouse and workshop district between the railroad tracks and San Pablo Avenue, from Gilman Street south to the Emeryville line.

*2. Most of That Neighborhood Is Already Closed*

The manufacturing zone contains approximately 222 blocks, or 444 block faces (a face is one side of one block). The City has already closed much of it:

- Eighty block faces lie inside the Council-approved no-lodging zones around Harrison Street and the Second Street area. (Prado Decl., Ex. I.)
- Six more block faces carry no-lodging signs the City posted on Second and Camelia Streets without Council approval. (Prado Decl., Ex. I; Ex. E.)
- The November 17, 2026 amendment to Berkeley’s encampment policy bans encampments within 600 feet of the 117 preschools and in-home daycares listed in Councilmember Kesarwani's staff report, removes a further 170 block faces — 47% of everything that was left — when it takes effect in a matter of days. (Prado Decl., Ex. J; Ex. I.)

That leaves approximately 188 block faces, or 42% of the zone, not prohibited outright. But the City treats any block that touches a 600-foot circle as closed in full. And because

41 of those facilities are private homes whose addresses the State of California does not publish online, a person cannot see the boundaries they are expected to obey. No map or list of addresses was published with the council agenda item for this policy, nor is it available on the City's website.

*3. Most of the Remaining Sidewalks Are Too Narrow*

Permission is not space. Of the 152 block faces measured in the manufacturing zone, only about 13 — had 7 feet left after the required clear path, the minimum for a standard two-person tent. (Prado Decl., Ex. I.)

Thirteen measured block faces in the whole industrial zone are wide enough for a tent, outside every buffer, and not under a no-lodging sign. After double-checking each on satellite imagery for traffic and surroundings, they sort into two groups:

Wide but on busy, business-lined streets — expect complaints and foot traffic:

- Gilman Street between Tenth and San Pablo (Walgreens, Dollar Tree, Chevron), between Seventh and Eighth (the brewery block), between Fourth and Fifth, and between Second and Third (recycling-center trucks).
- Seventh Street between Gilman and Camelia — only 7 feet, the bare minimum.
- Potter Street at Seventh — plenty of width but a busy retail corner, and only the corner was measured.

Quieter industrial blocks — the most realistic options in the city:

- Carleton Street, Seventh to the railroad tracks (11 feet of room) — a dead-end block with a large parking lot on one side and workshops on the other.
- Carleton Street, Seventh to Eighth (11 feet) — auto shops and artist studios, light traffic.
- Grayson Street, Seventh to the tracks (7½ feet) — warehouses and a lab building, dead-ends at the tracks.
- Folger Avenue, San Pablo to Seventh, both sides (7–8 feet) — small businesses, a restaurant and a parking lot; moderate traffic.
- Folger Avenue, Seventh to Hollis (8 feet) — the Ashby Lumber block; truck traffic, and Hollis is the Emeryville line.
- Seventh Street, Parker to Dwight (14 feet) — wide sidewalk beside a big parking lot near Berkeley Bowl West; the street itself is a busy connector.

Even on these quiet streets, where a person might manage to comply with the rules, the Homeless Response Team has recently cleared the encampments — including some

where our BHU members were living. (Prado Decl.)

Outside the industrial zone, a few wide sidewalks exist on Shattuck, Blake at MLK, Bancroft and College, but those are commercial and campus frontages where people will be moved along quickly.

*4. Conclusion: The Survey Confirms the Supply of Usable Sidewalk Does Not Exist*

Berkeley's sidewalk regulations, no-lodging zones, daycare buffers and physical sidewalk widths combine to leave unhoused residents essentially no lawful place to shelter. The sidewalk survey did not find a hidden supply of usable sidewalk, but rather confirmed that the supply does not exist. Any enforcement that moves people off a sidewalk is, in practice, moving them to nowhere.

This matters for the pending motions for two reasons. First, it rebuts the City's representation to the Ninth Circuit that Berkeley "does not have a camping ban." A ban need not be written in a single ordinance; it can be assembled from a sidewalk regulation, a series of no-lodging designations, a buffer zone, and the physical width of the sidewalk itself. That is what the City has done.

Second, it establishes that the City's "no nexus" and "fundamental alteration" denials cannot be evaluated in the abstract. When the City denies an accommodation at one of the thirteen remaining block faces, it is not choosing between that location and another equally available one. It is choosing between that location and nowhere. The Court's individualized assessment requirement (Dkt. 288 at 72) cannot be satisfied by a process that ignores this reality.

BHU is completing measurements on the last 44 unmeasured faces outside the buffers. Nothing in the pattern so far suggests the conclusion will change. The measurements and map are attached to the Declaration of Yesica Prado.(Prado Decl., Ex. I.)

F. The Consequence: The City Has Not Conducted the Individualized Assessment the Court Ordered

Taken together, these deficiencies establish a single threshold fact: the City has not conducted the individualized assessment that the Court's orders require and that the ADA demands. It has substituted a categorical policy judgment ("fundamental alteration") for site-specific analysis, offered footprints that preclude shelter, denied nexus without

identifying the deficiency, and left five members unanswered.

The Court has been explicit that the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." Dkt. 288 at 21. The City's determinations are that summary conclusion, issued in writing and repeated across applicants. The individual sections that follow demonstrate, member by member, that each request is supported by a documented disability, a demonstrated nexus, and a requested footprint measured to actual need—and that the City's response to each is not an assessment but a refusal to assess.

## IV. STATUS CHART OF DISPUTED ACCOMMODATION REQUESTS

*The chart required by Dkt. 413 appears in the landscape pages that follow, using the column headings the order specifies.*

| APPLICANT | REQUEST STATUS | REQUEST DATE | DISABILITY | DISABILITY NEED | ADA ACCOMMODATION | DISABILITY NEXUS (for 3'x3' rule) | PROPOSED LOCATIONS | CITY'S FINAL RESPONSE |
|---|---|---|---|---|---|---|---|---|
| ***1) Alice Barbee*** | Denied.<br><br>Alternative does not offer a footprin | 09/14/26 | -Herniated disk (C6-C7) for over 20 years<br><br>-Congestive Heart | Her conditions severely limit her physical enduranc | -Packing and transportation<br><br>-Exemption of the 3'x3' | A standard 3'x3' footprint provides no | **ALT:** 700 Allston Way; 1120 Second St; OR 608 Virginia St | The City can grant a 3x3 accommodation of (1) up to 4'10" x 73" at 700 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | t a person can shelter in. | | Failure for 5 years<br><br>-Neuro damage | e and ability to regulate stress. Any sudden physical exertion or acute stress could trigger a fatal cardiac event. She requires space for shelter, survival gear, medical supplies, and one emotional support animal to safely manage her life-threatening conditions. | rule to occupy a 10-person tent on a 10'x 30' footprint. | space a person and her dogs can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | **FIRST:** 1281 University Avenue (lot) | Allston Way; or (2) up to 2'11" x 107' at 608 Virginia St. |
| ***2) Alexander Wilson*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/14/26 | -Clinical depression<br><br>-Heart condition that has already caused three strokes – he remains at risk for more<br><br>-Kidney stones<br><br>-Sciatica | He cannot stand for long periods as his spinal disks swell under pressure. Sudden exertion or stress could trigger another life- | - Packing and transportation.<br><br>-Exemption of the 3'x3' rule to occupy an 8-person tent on a 10'x20' footprint. | A standard 3'x3' footprint provides no space a person and his dog can physically shelter in. This small footprint cannot | **ALT:** 700 Allston Way; 1120 Second St; OR 608 Virginia St<br><br>**FIRST:** 1100 Fourth Street (Harrison House lot) | The City can grant a 3x3 accommodation of (1) up to 4'10" x 73" at 700 Allston Way; or (2) up to 2'11" x 107' at 608 Virginia St. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | threatening stroke. He requires space for shelter, mobility aids, medical supplies, and his emotional support animal to survive. He cannot navigate the physical demands of survival without adequate space. | | accommodate a tent, a sleeping surface nor protection from the elements. | | |
| ***3) Hector Navarro*** | Denied. Alternative does not offer a footprint a person can shelter in. | 09/14/26 | -Post-Traumatic Stress Disorder (PTSD) -Depression -Anxiety -High blood pressure -Hernia in the right side of his abdomen | He cannot lift no more than 10 pounds, making it difficult to move or carry his own belongings without pain. His psychiatric disabilities impair his ability to process stress and navigate | -Transportation -Exemption of the 3'x3' rule to occupy two 8 person tents on a footprint of 10' x 46'. [His footprint request includes a second tent for his caregiver, Julio.] -Communication assistance/tr | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protecti | **ALT:** 1099-1001 Second St; 1120 Second St; 2nd and Camelia; 650 Virginia St; 2285 Fourth St; OR Coordinates:37.873544, -122.300120 **FIRST:** 1901 Henry Street | The City can grant a 3x3 accommodation of up to 2'6" x 111' at 2285 Fourth St. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | complex systems such as relocation and enforcement proceedings. He requires space for shelter, survival gear, medical supplies, and critically, space for his caregiver, Julio, who provides essential mobility assistance. | anslation from Spanish to English | on from the elements. | | |
| ***4) Robbie Peddycoart*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/14/26 | -Ankylosing Spondylitis<br><br>-Lupus<br><br>-Reactive arthritis<br><br>-Depression<br><br>-Post-Traumatic Stress Disorder (PTSD)<br><br>-Severe anxiety | His conditions produce chronic pain, profound fatigue, and mobility limitations that make it difficult for him to stand, sit, lift, carry or move for extended periods. His depression, PTSD, and | -Packing and transportation<br><br>-Exemption of the 3'x3' rule to occupy a 10 person tent on a 10' x 30' footprint. | A standard 3'x3' footprint provides no space a person and his two dogs can physically shelter in. This small footprint cannot accommodate a tent, a sleepin | **ALT:** 700 Allston Way; 1120 Second St;<br>608 Virginia St;<br>OR<br>2285 Fourth St<br><br>**FIRST:** 1100 Fourth Street (Harrison House lot) | The City can grant a 3x3 accommodation of (1) up to 2'11 x 107' at <u>608 Virginia St.</u>; or (2) up to 2'6" x 111' at <u>2285 Fourth St.</u> |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | severe anxiety further impair his ability to process stress, regulate his emotions, and navigate complex systems. He requires space for his shelter, mobility aids, medical supplies, and two emotional support animals to maintain his safety and stability. | | g surface nor protection from the elements. | | |
| ***5) Robert Pearce*** | Denied. Alternative does not offer a footprint a person can shelter in. | 09/14/26 | -Post-Traumatic Stress Disorder (PTSD) -Severe anxiety and hypervigilance -Limited mobility in his left leg due to a past motorcycle accident | His physical disability impairs his ability to walk, stand for extended periods, lift and carry items. Limited ability to rest, feel safe, and move independ | -Transportation -Exemption of the 3'x3' rule to occupy an 8 person tent on a 10' x 25' footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate | **ALT:** 2134 Martin Luther King Jr. Way; 701 Harrison St (sidewalk); 700 Page St; 998 Murray St; OR 2285 Fourth St **FIRST:** 1100 Fourth Street (Harrison House lot) | The City can grant a 3x3 accommodation of (1) up to 2' x 89'6" at 70 Page St.; or (2) up to 2'6" x 11' at 2285 Fourth St. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | ently. He requires an adequately sized shelter and space for his survival gear and medical supplies to prevent further psychological and physical deterioration. | | a tent, a sleeping surface nor protection from the elements. | | |
| ***6) Erik Alexander Coon*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/14/26 | -Post-Traumatic Stress Disorder (PTSD) resulting from his military service in the Gulf War (Kuwait, 1993–1997), consistent with Gulf War Syndrome;<br><br>-Seizure disorder triggered by acute stress and auditory overstimulation (e.g., loud sirens or heavy machinery) | Impairs his concentration and ability to interact with others. He requires adequate space for shelter and survival gear to manage his condition. For individuals with PTSD, a secure, enclosed, and predictable environment is a clinical | - Packing and transportation<br><br>-Exemption of the 3’x3’ rule to occupy an 8 person tent on a 10’ x 20’ footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | **ALT:** 2nd and Cedar; 704-738 Cedar St; 2nd and Jones; OR 2nd and Page | The City can grant a 3x3 accommodation of 2’ x 97’ at 704-738 Cedar St. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | necessity as without stable shelter, Mr. Alexander is forced to sleep exposed and in a perpetual state of perceived threat, directly triggering hypervigilance, flashbacks, and emotional dysregulation. | | | | |
| ***7) Eric Keiser*** | Denied. Alternative does not offer a footprint a person can shelter in. | 09/14/26 | -Mobility limitations and chronic pain resulting from a car collision; - Schizophrenia with auditory hallucinations | Mr. Keiser has improperly healed leg bones causing significant mobility limitations and chronic pain that make walking, standing, and carrying items extremely difficult. His schizoph | -Transportation -Exemption of the 3'x3' rule to occupy an 8 person tent on a 10' x 20' footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protecti | **ALT:** 2nd and Camelia 2nd and Cedar; 2nd and Jones; 2nd and Page; OR 747 Bancroft Way | The City can grant a 3x3 accommodation of 4'6" x 139'8" at 747 Bancroft Way. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | renia impairs his executive functioning, including his ability to plan, organize, and navigate complex processes independently. He requires space for shelter, survival gear, mobility aids, art supplies, and medical supplies to accommodate his disabilities. | | on from the elements. | | |
| ***8) Charles Dye*** | Denied. Alternative does not offer a footprint a person can shelter in. | 09/14/26 | -Post Traumatic Stress Disorder (PTSD) -Diabetes | PTSD causes hypervigilance and acute anxiety. His diabetes requires him to store insulin and other medications at safe temperatures, keep | -Transportation -Exemption of the 3'x3' rule to occupy an 8 person tent on a 10' x 20' footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate | 2nd and Camelia 2nd and Cedar; 2nd and Jones; OR 2nd and Page | The City cannot grant an accommodation for your proposed footprint at these locations because it would require a fundamental alteration of a City program that designates certain areas |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | food and water accessible to manage blood sugar, and maintain a clean, stable environment to prevent infections and wounds that heal poorly in diabetic individuals.<br><br>Without an enclosed, stable shelter, Mr. Dye is left in a perpetual state of perceived danger. | | a tent, a sleeping surface nor protection from the elements. | | where lodging is prohibited. |
| ***9) Andrew Vanderzyl*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/14/26 | -Impaired Mobility;<br><br>-Post Traumatic Stress Disorder (PTSD) | His PTSD produces hypervigilance and acute anxiety — a persistent, involuntary state of scanning for threat that makes | -Transportation<br><br>-Exemption of the 3'x3' rule to occupy a 10 person tent on a 10' x 25' | A standard 3'x3' footprint provides no space a person and his two dogs can physically shelter in. This | 2285 Fourth St;<br>2nd and Camelia;<br>1399-1305 Second St;<br>2nd and Jones;<br>OR<br>Coordinates: 37.880810, -122.289813 | The City can grant a 3x3 accommodation of up to 2'6" x 111' at <u>2285 Fourth St.</u> |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | exposure and unpredictability genuinely dangerous to his mental health, not merely uncomfortable.<br><br>These conditions interact. Impaired mobility limits his ability to relocate quickly or to flee a perceived threat; hypervigilance means he perceives threats constantly and at high intensity. | | small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | | |
| ***10) Orvel Roadlander*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/14/26 | -Post-Traumatic Stress Disorder (PTSD)<br><br>-Bipolar Disorder<br><br>-Obsessive-Compulsive Disorder (OCD) | His hypervigilance and acute anxiety are triggered by enforcement actions and displacement. | -Transportation<br><br>-Exemption of the 3'x3' rule to occupy an 8 person tent on a 10' x 20' footprint. | A standard 3'x3' footprint provides no space a person and his dog can physically shelter | 704-738 Cedar St; 2nd and Camelia 2nd and Cedar; 2nd and Jones; OR 2nd and Page | NO DETERMINATION. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | His mood fluctuations impair his ability to plan and execute tasks. He requires space for shelter, mobility aids, medical supplies, and his emotional support animal to provide the stability necessary to prevent manic or depressive episodes. | | in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | | |
| ***11) Ramondo Mackey*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/14/26 | Psychiatric disabilities: clinical depression including persistent depressive episodes exacerbated by stress, instability, and the threat of displacement<br><br>Anxiety<br><br>Impaired executive functioning | Mr. Mackey's disabilities limit his ability to understand information, regulate emotions and organize complex tasks. Without direct assistance and a stable | -Transportation<br><br>-Exemption of the 3'x3' rule to occupy a 10 person tent on a 10' x 25' footprint. | A standard 3'x3' footprint provides no space a person with a caregiver can physically shelter in. This small footprint cannot accommodate a tent, a | 2nd and Camelia; 2nd and Cedar; 2nd and Jones; OR 2nd and Page | The City cannot grant an accommodation for your proposed footprint at these locations because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | environment, he is unable to pack, plan, or relocate safely. | | sleeping surface nor protection from the elements. | | |
| ***12) Shareef Muwakkil*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/14/26 | Post-Traumatic Stress Disorder (PTSD). Bipolar disorder and psychosis for over 15 years.<br><br>Heart valve condition that limits ability to lift, carry, or move personal belongings safely. Two previous myocardial infarctions (heart attacks) and an instance of heart failure.<br><br>Chronic swelling in both legs for past 3 years. Chronic pain from a poorly healed ankle fracture. | Mr. Muwakkil's cognitive disabilities cause executive functioning challenges that make scheduling, organizing, and coordinating tasks extremely difficult. His physical limitations make it impossible for him to lift, carry, or move his belongings safely without risking a cardiac event. He requires space for shelter, mobility aids and | -Transportation<br><br>-Exemption of the 3'x3' rule to occupy an 8 person tent on a 10' x 20' footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | 1499-1451 Second Street (sidewalk behind K-rails);<br>2nd and Cedar;<br>OR<br>704-738 Cedar St | NO DETERMINATION. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | medical supplies. | | | | |
| *13) Erin Spencer* | Denied. Alternative does not offer a footprint a person can shelter in. | 09/14/26 | Mobility issues including injuries to his right clavicle, sciatica, and displaced left hip PTSD and ADHD which impair his executive functioning | Mr. Spencer's injuries severely limit his physical ability to move independently. Cognitive disabilities make it difficult for him to organize, plan, and complete essential tasks without support. He requires space for mobility aids, medical supplies, art supplies, and his emotional support animals. | - Packing and transportation -Exemption of the 3'x3' rule to occupy a trailer on a 10' x 20' footprint. | A standard 3'x3' footprint provides no space a person and his dog can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | **ALT:** San Pablo Avenue between Harrison and Gilman **FIRST:** 8th and Harrison St | RE 8th/Harrison: The City cannot grant an accommodation for your proposed footprint at this location because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. RE San Pablo: NO DETERMINATION. |
| *14) Thomas Barnett* | Denied. Alternative does not offer a footprint a person can | 09/14/26 | Post-Traumatic Stress Disorder (PTSD). Short-term memory impairment. Dementia (early stage). | Cognitive disabilities limit his ability to concentrate, remember, process informati | - Packing and transportation -Exemption of the 3'x3' rule to occupy an 8 person tent on a 10' x | A standard 3'x3' footprint provides no space a person can physica | **ALT:** 2nd and Page; 2nd and Camelia; OR 700 Allston Way; **FIRST:** 8th and Harrison St | The City can grant a 3x3 accommodation of up to 4'10" x 73' at 700 Allston Way. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | shelter in. | | Limited mobility in his right arm and hand. Mobility impairment on his legs. | on, and regulate emotions. He has limited mobility in his right arm and hand, as well as mobility impairment in his legs, making walking long distances and lifting or carrying heavy objects extremely difficult. He requires space for shelter, survival gear, mobility aids, medical supplies and a work space to earn income. | 20' footprint. | lly shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | | |
| ***15) Jason Charette*** | Denied. | 09/14/26 | Clinical Depression<br><br>Post-Traumatic Stress Disorder (PTSD) | These conditions limit his sleeping, concentration, interaction with others, | -Exemption of the 3'x3' rule to occupy 2' x 6' on the sidewalk for his barbecue and a garbage can. | | 8th and Harrison St | The City cannot grant an accommodation for your proposed footprint at this location because it would |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | emotional regulation, and ability to handle stress. He needs space for survival gear, specifically a barbecue. The ability to prepare his own meals is a cornerstone of independent survival: it preserves his nutrition, sustains a daily routine that counters depressive paralysis, and maintains the basic autonomy and dignity essential to managing his disabilities. | | | | require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. As the District Court affirmed, an accommodation is also not reasonable because you have not established a nexus between your disability and your need for space outside your vehicle. |
| ***16) Kittivutt*** | Denied. | 09/14/26 | Nerve damage in | These condition | -Exemption of the 3'x3' | | 9th and Harrison St | The City cannot grant |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ***Patana panich*** | | | right foot, arm and hand from a 6-month untreated bacterial infection: weak grip, burning pain, poor temperature regulation, sudden numbness (unsafe to drive), multi-day fatigue, bathroom urgency. | s make it difficult for him to lift heavy objects, including items needed to clear and relocate from his campsite, and his intermittent numbness makes driving unsafe. His intense fatigue bouts lasting two to three days impair his ability to move around and make relocation arrangements, while his bathroom urgency requires reliable access to a nearby restroom. He requires space for survival gear and his emotiona | rule to occupy a 2’x8’ footprint on the sidewalk for outside storage of survival gear. | | | an accommodation for your proposed footprint at this location because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. As the District Court affirmed, an accommodation is also not reasonable because you have not established a nexus between your disability and your need for space outside your vehicle |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | l support animal to safely manage his disabilities. | | | | |
| ***17) Merced Dominguez*** | No determination. | 09/14/26 | Degenerative spondylosis causing chronic pain and limited mobility (cannot walk long distances). | Due to her disabilities, she cannot walk long distances and requires proximity to basic daily necessities.<br><br>Because she cannot lift or move heavy items, and because the interior of her RV must remain clear for her to move safely and prevent falls, she needs a modest footprint outside her RV to store her mobility | -Exemption of the 3'x3' rule to occupy a 3' x 8' footprint on the sidewalk for outside storage of survival gear. | | 8th and Harrison St | The City cannot grant an accommodation for your proposed footprint at this location because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. As the District Court affirmed, an accommodation is also not reasonable because you have not established a nexus between your disability and your need for space outside your vehicle. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | aids, survival gear, and supplies for her emotional support animals. | | | | |
| *18) Yesica Prado* | Denied. | 09/14/26 | ADHD and PTSD, affecting executive function, emotional regulation, sensory processing and handling sudden change. | Because she cannot reliably execute a daily routine of finding a public disposal location, and because keeping garbage inside her small RV creates sensory stimuli (smells, visual clutter) that trigger her ADHD, she needs a garbage can placed outside her dwelling. She also relies on an emotional support animal to regulate her | -Exemption of the 3'x3' rule to occupy a 2' x 6' footprint on the sidewalk for outside storage of survival gear. | | 8th and Harrison St | The City cannot grant an accommodation for your proposed footprint at this location because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. As the District Court affirmed, an accommodation is also not reasonable because you have not established a nexus between your disability and your need for space outside your vehicle. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | emotions, and the cat tree outside her dwelling allows her cat to enter and exit through her cat door safely and independently, making the ESA's presence and movement possible. | | | | |
| ***19) Bree Ann Hegeman*** | No determination. | 09/23/26 | Severe depression; ADHD; PTSD. | Her persistent depressive episodes impair her motivation, energy, and ability to complete daily tasks, and are directly exacerbated by stress, instability, and the threat of displacement. Her | - Packing and transportation<br><br>-Exemption of the 3'x3' rule to occupy an 8 person tent on a 10' x 20' footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the | 9th and Harrison Street; City-owned lot; 2nd Street and Cedar Street | NO DETERMINATION. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | ADHD impairs her executive functioning, including her ability to plan, organize, prioritize tasks, and process complex instructions under pressure. She also experiences symptoms of PTSD, including hypervigilance, flashbacks, and acute anxiety. She requires space for shelter, survival gear, and medical supplies to maintain the stable, predictable environment her disabilities require. | | elements. | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ***20) Salina Mares*** | No determination. | 09/23/26 | Ms. Mares lives with PTSD, bipolar disorder, anxiety, depression and a sleep disorder. | Her disabilities impair her executive functioning and ability to handle sudden changes, including relocation. They also make it difficult for her to plan, organize and complete complex tasks. She experiences symptoms of PTSD, including hypervigilance, flashbacks, and acute anxiety. Her sleep disorder compounds these effects, as disrupted sleep worsens emotional regulation, cognitive functioning, and | - Packing and transportation<br><br>-Exemption of the 3’x3’ rule to occupy an 8 person tent on a 10’ x 20’ footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | 1499-1451 Second Street; 2nd and Page; 2nd and Camelia; 700 Allston Way, OR 8th and Harrison. | NO DETERMINATION. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | anxiety. She requires space for an enclosed shelter, survival gear and medical supplies. | | | | |
| ***21) Jasmine Williams*** | No determination. | 09/23/26 | -Left knee replacement<br><br>-Sciatica<br><br>-Chronic low back pain | Her conditions limit her ability to walk, stand, lift, carry, bend, sleep, and perform manual tasks. She requires space for shelter, survival gear and medical supplies. | - Packing and transportation<br><br>-Exemption of the 3'x3' rule to occupy an 8 person tent on a 10' x 20' footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | | NO DETERMINATION. |
| ***22) Bradford Raymer*** | Denied.<br><br>Alternative does not offer a footprint a person can | 09/01/26 | -Clinical depression<br><br>- Severe anxiety<br><br>-Attention-deficit/hyperactivity disorder (ADHD) | His conditions impact his ability to function in high-pressure or fast-paced situations | -Transportation<br><br>-Exemption of the 3'x3' rule to occupy an 8 person tent on a 11' x | A standard 3'x3' footprint provides no space a person and his dog can | 4th and Camelia St | The City can grant a 3x3 accommodation of (1) up to 6'3" x 32' at Fourth and Camelia Street (near the railroad fence/red |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | shelter in. | | Disabilities began in early childhood, during second grade. | . Sudden enforcement actions, unexpected relocations, or being rushed can trigger acute anxiety attacks, emotional shutdowns and executive dysfunction. He requires space for shelter, survival gear, bicycle, medical supplies, and his emotional support animal. | 20' footprint. | physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | | curb); or (2) up to 4'6" x 161' at Fourth and Camelia Street (non-red curb area). |
| ***23) Jackeline Mendoza*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/01/26 | -Kidney failure<br><br>-Chronic back pain from epidural injections | Ms. Mendoza has kidney failure, which is a chronic and ongoing condition. It causes fatigue, weakness, and reduced stamina. The | -Transportation<br><br>-Exemption of the 3'x3' rule to occupy an 8 person tent on a 11' x 20' footprint. | A standard 3'x3' footprint provides no space a person with two emotional support animals, a cat and a dog, | 4th and Camelia | The City can grant a 3x3 accommodation of (1) up to 6'3" x 32' at Fourth and Camelia Street (near the railroad fence/red curb); or (2) up to 4'6" x 161' at Fourth and Camelia Street (non- |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | condition limits her ability to sustain physical exertion over time, including the sustained lifting, carrying, and walking. Her chronic back pain limits her mobility and her ability to bend, lift, carry, and stand for extended periods. She requires space for shelter, survival gear, bicycle, medical supplies, and her two emotional support animals. | | can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | | red curb area). |
| ***24) Gregory Grove*** | Denied.<br><br>Alternative does not offer a footprint a person | 09/01/26 | -Obsessive-Compulsive Disorder (OCD)<br><br>-Attention-Deficit/Hyperactivity | His disabilities impair his ability to regulate his emotions and | - Packing and transportation<br><br>-Exemption of the 3'x3' rule to occupy an 8 | A standard 3'x3' footprint provides no space a person | 1499-1451 Second Street (sidewalk behind K-rails) | The City cannot grant an accommodation for your proposed footprint at these locations |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | can shelter in. | | Disorder (ADHD)<br><br>- Cardiovascular condition that places him at risk of heart attack under stress. | function in high-stress environments. These conditions also impair his executive functioning, including his ability to plan, organize, prioritize tasks, and process complex instructions. He particularly struggles with time management, task completion, and maintaining focus. Physical exertion, sudden emotional distress can put him medically at risk for a cardiac event. He requires space for shelter, survival gear, art | person tent on a 10' x 20' footprint. | can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | | because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | and medical supplies. | | | | |
| ***25) Quinton Clockreese*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/01/26 | -Severe anxiety<br><br>-Clinical depression<br><br>-Bipolar disorder<br><br>-Borderline Personality Disorder (BPD)<br><br>-Attention Deficit Hyperactivity Disorder (ADHD)<br>-Oppositional Defiant Disorder (ODD) | These conditions limit his ability to communicate, concentrate, interact with others, regulate emotions, and handle stress. His fear of public visibility makes it difficult for him to engage with City staff, access services, or comply with enforcement directives without direct support. He requires space for shelter, survival gear, mobility aids, medical supplies, and his emotiona | -Transportation<br><br>-Exemption of the 3’x3’ rule to occupy an 8 person tent on a 11’ x 20’ footprint. | A standard 3'x3' footprint provides no space a person and his dog can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | 2nd and Page St | The City cannot grant an accommodation for your proposed footprint at these locations because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | l support animal. | | | | |
| ***26) Lisa Saechao,y-chain*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/01/26 | -Trouble communicating – both speaking and understanding<br><br>-Impaired memory<br><br>-Severe anxiety<br><br>-Fear of persecution<br><br>-Other mental health conditions stemming from abuse and trauma | These conditions substantially limit her ability to communicate, understand, remember, concentrate, interact socially, regulate emotions, and handle stress. Her communication impairment prevents her from effectively conveying her needs or understanding complex instructions without support, while her memory impairment means she will forget deadlines and instructio | - Transportation<br><br>- Communication assistance<br><br>-Exemption of the 3’x3’ rule to occupy a 6 person tent on a 10’ x 20’ footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface nor protection from the elements. | 2nd and Page St | The City cannot grant an accommodation for your proposed footprint at these locations because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | ns without repeated, clear communication. Her fear of persecution makes interactions with officials deeply traumatic and difficult to navigate independently. She requires space for shelter, survival gear and medical supplies. | | | | |
| ***27) Shawman*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/01/26 | -Traumatic brain injury<br><br>-Vision problems<br><br>-Hearing impairment in one ear (left), which contributes to spatial awareness difficulties.<br><br>-Severe anxiety<br><br>-Panic attacks<br><br>-Other mental | These disabilities impair her memory, executive function, concentration, decision-making, emotional regulation, stress management, and task initiation and completion. Her hearing | -Transportation<br><br>-Exemption of the 3'x3' rule to occupy a 6 person tent on a 10' x 20' footprint. | A standard 3'x3' footprint provides no space a person can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface | 1499-1451 Second Street (behind K-rails) | The City cannot grant an accommodation for your proposed footprint at these locations because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | health conditions stemming from abuse and trauma | impairment contributes to spatial awareness difficulties and her vision problems further limit her ability to navigate her surroundings safely. She requires space for shelter, survival gear and medical supplies. | | nor protection from the elements. | | |
| ***28) Jermaine Lee White*** | Denied.<br><br>Alternative does not offer a footprint a person can shelter in. | 09/01/26 | -Post-Traumatic Stress Disorder (PTSD<br><br>-Severe Anxiety<br><br>-Hoarding disorder | His disabilities impair his ability to organize, concentrate, decision-making, regulating emotions, handling stress, initiating and following through on tasks. His executive | -Transportation<br><br>-Exemption of the 3'x3' rule to occupy a 10 person tent on a 11' x 30' footprint. | A standard 3'x3' footprint provides no space a person and his dog can physically shelter in. This small footprint cannot accommodate a tent, a sleeping surface | **ALT:** 700 Allston Way<br><br>**FIRST:** 1499-1451 Second Street (sidewalk behind K-rails) | RE Second Street: The City cannot grant an accommodation for your proposed footprint at these locations because it would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | dysfunction means he cannot independently structure and complete tasks required for relocation without direct support, as his disabilities. He requires space for shelter, survival gear, medical supplies, and his emotional support animal. | | nor protection from the elements. | | RE Allston Way: No Determination. For others, the City can grant a 3x3 accommodation of (1) up to 4'10" x 73" at 700 Allston Way |

All eighteen requests were served on the City on September 14, 2026 at 11:46 a.m. (Prado Decl., Ex. C at 1.), within the window set by the City's September 11, 2026 Notice of Encampment Closure. Individualized nexus statements followed on September 14, 2026 at 11:53 p.m., and itemized measurement breakdowns on September 17, 2026 at 9:02 a.m. A written determination was issued until 3:28 p.m. on October 6, 2026.

# I. V. THE INDIVIDUAL REQUESTS

Each entry states the disability, the disability-related need, the accommodation requested, the nexus between them, the measurement supporting the requested footprint, and why the City's response is not reasonable. For each member, an annotated drawing of the requested footprint, annotated photographs of the proposed location, and other documentation providing evidentiary support are attached as exhibits to the Declaration of Yesica Prado, as indicated.

## A. <u>1. Alice Barbee</u>

### A. Disabilities

Ms. Barbee has had a herniated disk (C6-C7) for over 20 years. She has had congestive heart failure for 5 years. She has neurological damage. Ms. Barbee has difficulty walking, standing, and sitting for extended periods, as well as difficulties lifting, carrying, sleeping, breathing, and regulating physical stress. Due to the severity of her conditions, sudden physical exertion or acute stress can trigger serious cardiac events and exacerbate her neurological damage and chronic pain. (Prado Decl., Ex. K (Barbee Decl.); Ex. L.)

### B. Disability-related needs

Space for shelter, survival gear, medical supplies, and three emotional support animals. (Prado Decl., Ex. K (Barbee Decl.).)

### C. Requested ADA accommodations

<u>1) ADA-Exempted Footprint</u>

10-person tent (17′ × 9′ = 153 sq ft); footprint of 10′ × 30′ (300 sq ft).

A permanent accommodation allowing Ms. Barbee to maintain a tent footprint larger than the standard 9-square-foot limit —sufficient to accommodate herself and emotional support animals, her medical supplies and her essential belongings— on any public sidewalk where:

- She is not blocking pedestrian access, meaning a clear path remains for others to pass safely; and
- If located on a narrower sidewalk, the opposite side of the street remains clear for alternative pedestrian access.

This modification recognizes that for Ms. Barbee, her tent functions as medical equipment and her only accessible shelter, helping prevent the aggravation of her life-threatening disabilities.

2) Physical Assistance with Relocation

Due to her severe physical limitations, Ms. Barbee requires City staff assistance with lifting and transporting her medical supplies and essential belongings to any new location. This assistance must be:

- Scheduled in advance
- Completed at a pace that does not cause physical strain or pain
- Broken into manageable segments with rest breaks as needed

**D. Disability nexus**

The City's standard encampment management policies—as outlined in the February 17, 2026 Public Notice—will, if applied to Ms. Barbee without modification, foreseeably aggravate her disabilities in the following ways: (Prado Decl., Ex. K (Barbee Decl.); Ex. L; Ex. C.)

1) Short-notice relocation

Her congestive heart failure and neuro damage require predictability and stability. Sudden displacement triggers acute stress, which elevates heart rate and blood pressure, endangering her cardiac health. The physical demands of rapid packing and moving could precipitate a medical emergency.

2) Physical demands of relocation

Due to her herniated disk, neuro damage and heart failure, Ms. Barbee cannot lift heavy objects, walk long distances, stand for extended periods, or engage in sustained physical activity. Requiring her to pack and move her belongings without assistance would cause severe pain, potential injury, and life-threatening cardiac strain.

3) 9-square-foot limit on sidewalks

Compliance is physically impossible without abandoning her tent (her medical equipment and only accessible shelter), emotional support animals and essential belongings. The space is too small for her and dogs to rest, store her necessities, or protect her body from the elements—critical for managing her heart condition and chronic pain.

4) Separation from emotional support animals

Ms. Barbee relies on her dogs as emotional support animals (ESAs) to manage the psychological toll of her disabilities. These animals are not pets—they are medical equipment that provide emotional regulation and a sense of safety. Separating her from her dogs would trigger acute

psychological distress and destabilize her mental health. Additionally, she requires a bigger space for her dogs, as they cannot be confined to a small space without causing her additional stress.

5) Threat of citation, arrest, and property destruction

Penalizing Ms. Barbee for disability-related inability to comply—such as moving too slowly, being unable to pack within time limits, or being unable to fit her belongings into 9 square feet—would constitute discrimination under the ADA. The stress of such encounters could trigger a cardiac event.

6) No property storage due to leptospirosis

Losing all of her belongings—including medications, medical supplies and items essential to daily survival—would be harmful. For someone with congestive heart failure and neuro damage, losing access to medications and adaptive items can lead to serious medical deterioration.

7) Forced relocation without an accessible destination

Moving Ms. Barbee from one outdoor location to another does not achieve the City's stated goal of "moving all people indoors." It merely destabilizes her, disrupts access to medical care, and exposes her to repeated physical strain and stress—each time increasing her risk of cardiac crisis.

**E. Requested location**

First choice: 1281 University Avenue (lot). Alternatives: 700 Allston Way; 1120 Second Street; or 608 Virginia Street. (Prado Decl., Ex. L; Ex. M.)

**I. The requested accommodation is reasonable**

A nine-square-foot footprint leaves no space for shelter, let alone the supplies and animals she depends on. Without adequate space she is forced to choose between keeping her animals with

her and maintaining the shelter and medical supplies that sustain her — a choice that aggravates her disabilities.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

## I. The requested footprint is supported by measurement

The itemized components total 255 square feet within a requested footprint of 300 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. K (Barbee Decl.); Ex. C (Sept. 17, 2026 email); Ex. N.)

| **Component** | **Dimensions** | **Sq ft** |
|---|---|---|
| Tent (10-person) | 17′ × 9′ | 153 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Three large emotional support animals | 10′ × 5′ | 50 |
| **Total itemized need** | | **255** |
| **Footprint actually requested** | | **300** |

### I. The City's response is not reasonable

The City determined that Ms. Barbee's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 1281 University because it alleges that camping on City lots would fundamentally alter the City programs. The City rejected the proposed lots at 700 Allston Way, 1120 Second St, and 608 Virginia St because it alleges that none of these sites are compatible with the requested footprint. Instead, the City proposes an accommodation up to 4'10" x 73" at 700 Allston Way or up to 2'11" x 107' at 608 Virginia St. (Prado Decl., Ex. A.)

Neither alternative gives Ms. Barbee anywhere to shelter. The wider strip the City offers, 4′10″ at 700 Allston Way, is more than four feet narrower than the 9-foot width of her 10-person tent. It is also narrower than the smallest tent sold at retail (about 7 feet) and narrower than the Campros 4-person tent the City itself distributes (about 8′ × 7′). The 2′11″ strip at 608 Virginia Street is narrower than a twin mattress. In either strip Ms. Barbee, who lives with congestive heart failure and a herniated disk, would have no enclosed place to lie flat, keep her medications dry, or keep her dogs with her. That is the same result the 3×3 rule produces.

Space is not what the City lacks. By its own figures, the Allston strip covers roughly 353 square feet and the Virginia strip roughly 312 square feet—both more than the 300 square feet Ms. Barbee requested. The City has found the area; it will only allow it in a shape no shelter fits. The only reason given is the width of the pedestrian path. Yet the determination does not state the total sidewalk width at either address, the width of the path the City preserved, or why the presumptive six-foot path could not be adjusted for the length of a single tent. Without those facts, the six-foot presumption has not been tested against this sidewalk and this claimant, as Dkt. 288 at 72–73 requires.

As to 1281 University Avenue, the City states only that camping on a City lot would fundamentally alter City programs. It identifies no program, offers no facts about the lot, and provides none of the written reasons 28 C.F.R. § 35.164 requires. That is the kind of bare assertion the Court found insufficient in Dkt. 342 at 4.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Ms. Barbee's proposed locations or identify, with measurements, a location where a footprint at least as wide as her tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. N (drawing); Ex. M (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. K, Declaration of Alice Barbee, describing the disabilities, functional limitations, and the items the footprint must hold.
(2) Ex. L: BHU's written accommodation request for Alice Barbee, submitted to the City on September 14, 2026, with signed authorization.
(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.
(4) Ex. A: the City's written determination.
(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
(6) Ex. N: annotated drawing of the requested footprint; Ex. M: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Alice Barbee".

**I. 2. Alexander Wilson**

**A. Disabilities**

Mr. Wilson has clinical depression. He also has a heart condition that has already caused three strokes and he remains at risk for more. Further, he has kidney stones and sciatica which means his spinal disks swell under pressure. (Prado Decl., Ex. O (Wilson Decl.); Ex. P.)

Mr. Wilson has difficulty walking, standing, lifting, carrying, sleeping, concentrating, and regulating emotional and physical stress. Due to his past stroke, sudden physical exertion or acute stress can trigger another life-threatening stroke.

**B. Disability-related needs**

Space for shelter, survival gear, mobility aids, medical supplies, and his assistance animal. (Prado Decl., Ex. O (Wilson Decl.).)

**C. Requested ADA accommodations**

1) ADA-Exempted Footprint

8-person tent (7′ × 16′ = 112 sq ft); footprint of 10′ × 20′ (200 sq ft).

A tent footprint larger than 9 square feet sufficient to accommodate himself, his service animal, and medical supplies, on any public sidewalk where he is not blocking pedestrian access. Mr. Wilson needs to lie flat to relieve spinal pressure from sciatica (a standard twin bed is 27 sq. ft.). His service animal also requires space to lie down, turn around and rest. The City's own "Good Neighbor" policy contemplates one side of the street remaining clear, not a rigid 9 sq. ft. box.

2) Packing and transportation assistance

Due to his physical limitations, Mr. Wilson requires City staff assistance with lifting and transporting his medical supplies and essential belongings to any new location. This assistance must be:

- Scheduled at least 30 days in advance

- Completed at a pace that does not cause physical strain or pain
- Broken into manageable segments with rest breaks as needed

At least 30 days' advance notice of any enforcement activity, to allow time to prepare without acute stress, is not a preference—it is a medical necessity given his history of strokes.

**D. Disability nexus**

Mr. Wilson has already survived three strokes. His heart condition puts him at constant risk for another. The stress and physical exertion of a forced move such as packing belongings, walking, carrying items, navigating unfamiliar terrain, could easily trigger a fourth stroke. His sciatica prevents him from standing or walking for extended periods, so he cannot move his personal belongings very far. His kidney stones cause unpredictable pain and medical needs.Without a guaranteed, accessible destination, Mr. Wilson faces a foreseeable, life-threatening medical crisis and aggravation of his disabilities. (Prado Decl., Ex. O (Wilson Decl.); Ex. P; Ex. C.)

**E. Requested location**

First choice: 1100 Fourth Street (Harrison House lot). Alternatives: 700 Allston Way; 1120 Second Street; or 608 Virginia Street. (Prado Decl., Ex. P; Ex. Q.)

**I. The requested accommodation is reasonable**

Mr. Wilson has survived three strokes and lives with sciatica. Confining him to nine square feet would leave him without shelter or the stable environment his condition requires, and without the

animal that helps him manage daily life. The stress and instability of that loss place him at risk of another stroke.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

The requested footprint is smaller than the itemized need — 200 square feet against 201. This member is asking for less space than his or her documented disability-related needs require. That disposes of any suggestion that the request is inflated. (Prado Decl., Ex. O (Wilson Decl.); Ex. C (Sept. 17, 2026 email); Ex. R.)

| I. | **Component** | I. | **Dimensions** | I. | **Sq ft** |
|---|---|---|---|---|---|
| I. | Tent (8-person) | I. | 7′ × 16′ | I. | 112 |
| I. | Survival gear | I. | 8′ × 6′ | I. | 48 |
| I. | Medications | I. | 2′ × 2′ | I. | 4 |
| I. | Mobility aids | I. | 4′ × 3′ | I. | 12 |
| I. | Assistance animal (large) | I. | 5′ × 5′ | I. | 25 |
| **I.** | **Total itemized need** | I. | | **I.** | **201** |
| **I.** | **Footprint actually requested** | I. | | **I.** | **200** |

I.

**I. The City's response is not reasonable**

The City determined that Mr. Wilson's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 1100 Fourth Street (Harrison House lot) because it alleges that camping on City lots would fundamentally alter the City programs. The City rejected the proposed lots at 700 Allston Way, 1120 Second St, and 608 Virginia St because it alleges that none of these sites are compatible with the requested footprint. Instead, the City proposes an accommodation up to 4'10" x 73' at 700 Allston Way or up to 2'11" x 107' at 608 Virginia St. (Prado Decl., Ex. A.)

The alternatives fit neither Mr. Wilson's tent nor his body. His 8-person tent is 7 feet wide; the City offers 4′10″ at 700 Allston Way and 2′11″ at 608 Virginia Street. Mr. Wilson must lie flat to

relieve the spinal pressure of his sciatica, and the Virginia strip is narrower than a twin bed. Neither strip leaves room for his assistance animal to lie down beside him. After three strokes, the City's alternative would leave him sleeping exposed—the stress and instability that place him at risk of another.

The City's own numbers show the area exists: about 353 square feet at Allston and about 312 square feet at Virginia, against the 200 square feet Mr. Wilson requested. The City does not say how wide either sidewalk is, how wide a path it preserved, or why the path could not be adjusted for the 16-foot length of one tent. Its rejection of the Harrison House lot at 1100 Fourth Street rests on the same unexplained "fundamental alteration" assertion, with no statement of reasons under 28 C.F.R. § 35.164.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Wilson's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

## I. Visualization of requested accommodation

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. R (drawing); Ex. Q (photographs).)

## I. Further documentation of disability-related need

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. O, Declaration of Alexander Wilson, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. P: BHU's written accommodation request for Alexander Wilson, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.
(4) Ex. A: the City's written determination.
(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
(6) Ex. R: annotated drawing of the requested footprint; Ex. Q: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Alexander Wilson".

### B. 3. Hector Navarro

#### A. Disabilities

Mr. Navarro has Post-Traumatic Stress Disorder (PTSD), depression, and anxiety. He also has high blood pressure. Further, he has a hernia in the right side of his abdomen. (Prado Decl., Ex. S (Navarro Decl.); Ex. T.)

Mr. Navarro has difficulty walking, standing, lifting more than 10 pounds, carrying, sleeping, concentrating, and regulating emotional and physical stress. His hernia causes chronic pain and mobility limitations, while his mental health disabilities impair his ability to process stress and navigate complex systems.

#### B. Disability-related needs

Space for shelter, survival gear, medical supplies, and shelter for his caregiver, Julio. (Prado Decl., Ex. S (Navarro Decl.).)

#### C. Requested ADA accommodations

1) ADA-Exempted Footprint

8-person tent (7′ × 16′ = 112 sq ft); footprint of 10′ × 30′ (300 sq ft).

A permanent accommodation allowing Mr. Navarro to maintain a footprint larger than the standard 9-square-foot limit—sufficient to accommodate himself, his caregiver and his essential belongings—on any public sidewalk where:

- He is not blocking pedestrian access, meaning a clear path remains for others to pass safely; and
- If located on a narrower sidewalk, the opposite side of the street remains clear for alternative pedestrian access.

This modification recognizes that for Mr. Navarro, his pallet tiny home functions as medical equipment and his only accessible shelter.

<u>2) Physical Assistance with Relocation</u>

Due to his 10-pound lifting restriction, Mr. Navarro requires City staff assistance with lifting and transporting his essential belongings to any new location. This assistance must be scheduled in advance.

<u>3) Language Access Accommodations</u>

Mr. Navarro is a Spanish speaker and requires all communications to be provided in Spanish. We request:

- All written notices (including enforcement notices, accommodation determinations, and instructional materials) be provided in Spanish;

- A Spanish-speaking point of contact in the City designated for all interactions;
- Interpreters present at all meetings, including the interactive process meeting; and
- Spanish-language visual aids showing relocation options and permissible locations.

The Berkeley Homeless Union is available to assist with interpretation if the City lacks Spanish-speaking staff, but this does not relieve the City of its obligation to provide meaningful access. Failure to provide language access may violate Title VI of the Civil Rights Act of 1964 and undermines the ADA interactive process.

**D. Disability nexus**

The City's standard encampment management policies—as outlined in the February 17, 2026 Public Notice—will, if applied to Mr. Navarro without modification, foreseeably aggravate his disabilities in the following ways: (Prado Decl., Ex. S (Navarro Decl.); Ex. T; Ex. C.)

<u>1) Short-notice relocation</u>

His PTSD, anxiety and depression require predictability and stability. Sudden displacement triggers panic, emotional dysregulation and physical stress responses that elevate his blood pressure and exacerbate his mental health symptoms.

<u>2) Physical demands of relocation</u>

Due to his hernia, Mr. Navarro cannot lift more than 10 pounds. Requiring him to pack and move his belongings without assistance would cause severe pain, potential injury and hernia complications. His high blood pressure also makes physical exertion dangerous.

<u>3) 9-square-foot limit on sidewalks</u>

Compliance is physically impossible without abandoning his tiny home (his medical equipment and only accessible shelter), essential belongings and his friend, who is his caregiver. The space is too small for him and his caregiver to rest or store his necessities.

<u>4) Threat of citation, arrest and property destruction</u>

Penalizing Mr. Navarro for disability-related inability to comply—such as moving too slowly, being unable to pack within time limits, or being unable to lift his belongings—would constitute discrimination under the ADA. The stress of such encounters elevates his blood pressure that could lead to cardiac arrest and triggers PTSD symptoms.

<u>5) No property storage due to leptospirosis</u>

Losing all of his belongings—including medications and items essential to daily survival—would be harmful. For someone with high blood pressure and PTSD, losing familiar, essential items can trigger acute psychological crises and dangerous blood pressure spikes.

<u>6) Forced relocation without an accessible destination</u>

Moving Mr. Navarro from one outdoor location to another does not achieve the City's stated goal of "moving all people indoors." It merely destabilizes him, disrupts access to medical care, and exposes him to repeated physical strain and stress—each time endangering his health.

<u>7) Language barriers</u>

Mr. Navarro is a Spanish speaker. The City has not provided any notices, instructions or services in Spanish, leaving him unable to understand his rights, the enforcement timeline, or how to access available resources. This language barrier:

Prevents him from meaningfully participating in the interactive process and City services, programs and activities; Exacerbates his anxiety and stress, as he cannot understand what is

happening or what is expected of him; Compounds his disability-related limitations, making compliance impossible; May constitute language discrimination under Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on national origin in federally funded programs.

**E. Requested location**

First choice: 1901 Henry Street. Alternatives: 1099–1001 Second Street; 1120 Second Street; 2nd and Camelia; 650 Virginia Street; 2285 Fourth Street; or coordinates 37.873544, −122.300120 (Prado Decl., Ex. T; Ex. U.)

**I. The requested accommodation is reasonable**

Nine square feet cannot hold a tent for Mr. Navarro, a place for his caregiver, and the medical supplies he depends on. Without adequate space he loses both his shelter and the caregiver support that makes daily life possible.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (8-person), shared with caregiver | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| **Total itemized need** | | **164** |
| **Footprint actually requested** | | **300** |

The itemized components total 164 square feet within a requested footprint of 300 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. S (Navarro Decl.); Ex. C (Sept. 17, 2026 email); Ex. V.)

### I. The City's response is not reasonable

The City determined that Mr. Navarro's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lots at 1901 Henry Street and coordinates 37.873544, −122.300120 because it alleges that these lots are residential areas where PROW restrictions prohibit camping and that allowing camping at these sites would fundamentally alter City programs. The City rejected the proposed lots at 1099-1001 Second St, 1120 Second St, and 2285 Fourth St because it alleges that none of these sites are compatible with the requested footprint. The City rejected the proposed lot at 2nd and Camelia because it alleges that this site is a No Lodging area and allowing camping would fundamentally alter a City program. The City

rejected the proposed lot at 650 Virginia St because it alleges that this site is an unimproved street and allowing camping would violate AR 10.2 and fundamentally alter City programs. Instead, the City proposes an accommodation up to 2’6” x 111’ at 2285 Fourth St. (Prado Decl., Ex. A.)

Mr. Navarro’s case is the clearest example of an alternative that cannot be used. The City offers a strip 2′6″ wide at 2285 Fourth Street. His tent is 7 feet wide, and the tent the City itself issued is about 8′ × 7′. A 2′6″ strip cannot hold either tent, cannot hold his caregiver’s shelter, and cannot hold a person lying down sideways. When BHU asked Mr. Gregory how Mr. Navarro was supposed to use the City’s own tent inside the footprint the City approved, the City did not respond. (Prado Decl., Ex. C.)

The strip covers about 278 square feet—close to the 300 square feet requested—so the dispute again is width, not area. For the remaining sites the City relies on labels rather than facts: “No Lodging” at 2nd and Camelia; “residential” at 1901 Henry Street and the proposed coordinates; and AR 10.2 at 650 Virginia Street, an unimproved street. The City does not explain how a tent on an unimproved street would obstruct a pedestrian path. It does not measure any of these sites or provide the written statement of reasons 28 C.F.R. § 35.164 requires. Mr. Navarro cannot lift more than ten pounds, so each unexplained rejection means another forced move he cannot make without assistance.

The Special Master should find that the City’s response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Navarro’s proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. V (drawing); Ex. U (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. S, Declaration of Hector Navarro, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. T: BHU's written accommodation request for Hector Navarro, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. V: annotated drawing of the requested footprint; Ex. U: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Hector Navarro".

**C. <u>4. Robbie Peddycoart</u>**

**A. Disabilities**

Mr. Peddycoart has multiple autoimmune and chronic pain conditions, including ankylosing spondylitis, lupus, and reactive arthritis. Further, he has depression, Post-Traumatic Stress Disorder (PTSD), and severe anxiety. (Prado Decl., Ex. W (Peddycoart Decl.); Ex. X.)

Mr. Peddycoart has difficulty walking, standing, sitting for extended periods, lifting, carrying, sleeping, concentrating, regulating emotions and handling stress. His autoimmune conditions cause chronic pain, fatigue, and mobility limitations, while his mental health disabilities impair his ability to process stress, navigate complex systems and feel safe.

**B. Disability-related needs**

Space for shelter, survival gear, mobility aids, medical supplies, and two emotional support animals. (Prado Decl., Ex. W (Peddycoart Decl.).)

**C. Requested ADA accommodations**

1) ADA-Exempted Footprint

10-person tent (17′ × 9′ = 153 sq ft); footprint of 10′ × 30′ (300 sq ft)

A permanent accommodation allowing Mr. Peddycoart to maintain a tent footprint larger than the standard 9-square-foot limit—sufficient to accommodate himself, his emotional support animals, his medical supplies and essential belongings— on any public sidewalk where:

- He is not blocking pedestrian access, meaning a clear path remains for others to pass safely; and
- If located on a narrower sidewalk, the opposite side of the street remains clear for alternative pedestrian access.

This modification recognizes that for Mr. Peddycoart, his tent functions as medical equipment and his only accessible shelter, helping prevent the aggravation of his disabilities.

2) Packing and Transportation Assistance

Due to his severe physical limitations, Mr. Peddycoart requires City staff assistance with lifting and transporting his medical supplies and essential belongings to any new location. This assistance must be:

- Scheduled in advance

- Completed at a pace that does not cause physical strain or pain
- Take into account his emotional support animals
- Broken into manageable segments with rest breaks as needed

**D. Disability nexus**

The City's standard encampment management policies—as outlined in the February 17, 2026 Public Notice—will, if applied to Mr. Peddycoart without modification, foreseeably aggravate his disabilities in the following ways: (Prado Decl., Ex. W (Peddycoart Decl.); Ex. X; Ex. C.)

<u>1) Short-notice relocation</u>

His PTSD, severe anxiety and depression require predictability and stability. Sudden displacement triggers panic, emotional dysregulation and physical stress responses that exacerbate both his mental health symptoms and his autoimmune conditions (which flare under stress).

<u>2) Physical demands of relocation</u>

Due to his spondylitis, lupus, and arthritis, Mr. Peddycoart cannot lift heavy objects, walk long distances, stand for extended periods, or engage in sustained physical activity. Requiring him to pack and move his belongings without assistance would cause severe pain and potential injury.

<u>3) 9-square-foot limit on sidewalks</u>

Compliance is physically impossible without abandoning his tent (his medical equipment and only accessible shelter), mobility aids and essential belongings. The space is too small for him and his emotional support dogs to rest, store his necessities, or protect his body from the elements—critical for managing autoimmune conditions.

<u>4) Separation from support animals</u>

Mr. Peddycoart relies on emotional support animals (two dogs) to manage his PTSD, anxiety and depression. These animals are not pets—they are medical equipment that provide emotional regulation, grounding and a sense of safety. Separating him from his dogs would trigger acute psychological distress and destabilize his mental health.

5) Threat of citation, arrest, and property destruction

Penalizing Mr. Peddycoart for disability-related inability to comply—such as moving too slowly, being unable to pack within time limits, or being unable to fit his belongings into 9 square feet—would constitute discrimination under the ADA. The stress of such encounters can trigger autoimmune flares and mental health crises.

6) No property storage due to leptospirosis

Losing all of his belongings—including medications, medical supplies, and items essential to daily survival—would be devastating. For someone with chronic autoimmune conditions, losing access to medications and adaptive items can lead to serious medical deterioration.

7) Forced relocation without an accessible destination

Moving Mr. Peddycoart from one outdoor location to another does not achieve the City's stated goal of "moving all people indoors." It merely destabilizes him, disrupts access to medical care and exposes him to repeated physical strain and stress—each time increasing risk of autoimmune flare and mental health crisis.

8) Lack of sanitation services

His autoimmune conditions require access to clean water, restroom facilities, and basic sanitation. Without these, his risk of infection and medical complications increases significantly.

**E. Requested location**

First choice: 1100 Fourth Street (Harrison House lot). Alternatives: 700 Allston Way; 1120 Second Street; 608 Virginia Street; or 2285 Fourth Street. (Prado Decl., Ex. X; Ex. Y.)

### I. The requested accommodation is reasonable

Mr. Peddycoart lives with autoimmune conditions and PTSD, both of which require stability and accessibility. A nine-square-foot space cannot hold his mobility aids, his supplies, or his animals. Without adequate space his conditions will flare and he will lose the supports that keep him stable.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (10-person) | 17′ × 9′ | 153 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Mobility aids | 4′ × 3′ | 12 |
| Two large emotional support animals | 7′ × 5′ | 35 |
| **Total itemized need** | | **252** |
| **Footprint actually requested** | | **300** |

The itemized components total 252 square feet within a requested footprint of 300 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. W (Peddycoart Decl.); Ex. C (Sept. 17, 2026 email); Ex. Z.)

**I. The City's response is not reasonable**

The City determined that Mr. Peddycoart's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 1100 Fourth Street (Harrison House lot) because it alleges that camping on City lots would fundamentally alter the City programs. The City rejected the proposed lots at 1120 Second St, 608 Virginia St, and 2285 Fourth St because it alleges that none of these sites are compatible with the requested footprint. Instead, the City proposes an accommodation up to 2'11" x 107' at 608 Virginia St or up to 2'6" x 111' at 2285 Fourth St. (Prado Decl., Ex. A.)

Mr. Peddycoart's 10-person tent is 9 feet wide. The City offers 2′11″ at 608 Virginia Street and 2′6″ at 2285 Fourth Street—roughly a third of that width, and too narrow for any manufactured tent, including the one the City distributes. Without an enclosed shelter, Mr. Peddycoart cannot protect his body from the elements, which is critical to managing his ankylosing spondylitis, lupus, and reactive arthritis. He also cannot keep his two emotional support dogs with him.

The offered strips cover about 312 and 278 square feet against the 300 he requested. The City gives no sidewalk widths, no path measurements, and no reason the six-foot presumption could not yield for the length of one tent. Its rejection of the Harrison House lot rests on a bare "fundamental alteration" assertion with no statement of reasons under 28 C.F.R. § 35.164.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Peddycoart's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. Z (drawing); Ex. Y (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. W, Declaration of Robbie Peddycoart, describing the disabilities, functional limitations, and the items the footprint must hold.
(2) Ex. X: BHU's written accommodation request for Robbie Peddycoart, submitted to the City on September 14, 2026, with signed authorization.
(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.
(4) Ex. A: the City's written determination.
(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
(6) Ex. Z: annotated drawing of the requested footprint; Ex. Y: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Robbie Peddycoart".

**D. <u>5. Robert Pearce</u>**

**A. Disabilities**

Mr. Pearce has Post-Traumatic Stress Disorder (PTSD), which has been exacerbated by the City's repeated enforcement actions. He has severe anxiety and hypervigilance. He also has limited mobility in his left leg due to a past motorcycle accident. (Prado Decl., Ex. AA (Pearce Decl.); Ex. AB.)

Mr. Pearce has difficulties sleeping, concentrating, interacting with others, regulating emotions and moving independently. His anxiety and hypervigilance substantially limit his ability to rest, concentrate and feel safe. His limited mobility impairs his ability to walk, stand for extended periods, and lift and carry items.

**B. Disability-related needs**

Space for shelter, survival gear, and medical supplies. (Prado Decl., Ex. AA (Pearce Decl.).)

**C. Requested ADA accommodations**

<u>1) ADA-Exempted Footprint</u>

8-person tent (7′ × 16′ = 112 sq ft); footprint of 10′ × 25′ (250 sq ft).

A permanent accommodation allowing Mr. Pearce to maintain a tent footprint larger than the standard 9-square-foot limit —sufficient to accommodate himself and his essential belongings—on any public sidewalk where:

- He is not blocking pedestrian access, meaning a clear path remains for others to pass safely; and
- If located on a narrower sidewalk, the opposite side of the street remains clear for alternative pedestrian access.

This modification recognizes that for Mr. Pearce, his tent functions as medical equipment

and his only accessible shelter. Enforcing the 9-square-foot limit would force him to choose between compliance and his basic need for rest, sleep, safety and storage of essential items—an impossible choice that would directly aggravate his disabilities.

2) Physical Assistance with Relocation

Due to his limited mobility, Mr. Pearce requires City staff assistance with lifting and transporting his belongings to any new location. This assistance should be scheduled in advance.

**D. Disability nexus**

The City's standard enforcement and relocation policies—as outlined in the February 17, 2026 Public Notice—will, if applied to Mr. Pearce without modification, foreseeably aggravate his disabilities in the following ways: (Prado Decl., Ex. AA (Pearce Decl.); Ex. AB; Ex. C.)

1) Short-notice relocation

His PTSD and anxiety require predictability. Sudden displacement triggers hypervigilance, panic, and emotional dysregulation, leaving him unable to plan or comply with City orders.

2) 9-square-foot limit on sidewalks

Compliance is physically impossible without abandoning his tent (his only shelter that serves as medical equipment) and essential belongings. His limited mobility makes it difficult to pack and move quickly, and the space is too small for him to rest and store his necessities. Without his tent, Mr. Pearce is not able to regulate symptoms of PTSD.

3) Threat of citation, arrest, and property destruction

Penalizing Mr. Pearce for disability-related inability to comply—such as moving too slowly, being unable to pack within time limits, or being unable to fit his belongings into 9 square feet—would constitute discrimination under the ADA. The trauma of past enforcement actions has already deepened his PTSD.

4) No property storage due to leptospirosis

Losing all of his belongings—including items essential to his daily survival and emotional regulation—would be devastating. For someone living with hypervigilance and PTSD, losing familiar, essential items can trigger an acute psychological crisis.

5) Forced relocation without an accessible destination

Moving Mr. Pearce from one outdoor location to another does not achieve the City's stated goal of "moving all people indoors." It merely destabilizes him, disrupts any connection to services, and exacerbates his PTSD.

**E. Requested location**

First choice: 1100 Fourth Street (Harrison House lot). Alternatives: 2134 Martin Luther King Jr. Way; 701 Harrison Street (sidewalk); 700 Page Street; 998 Murray Street; or 2285 Fourth Street. (Prado Decl., Ex. AB; Ex. AC.)

**I. The requested accommodation is reasonable**

Nine square feet leaves no space for shelter or for the supplies Mr. Pearce relies on. Without adequate space he cannot maintain a safe place to live or access the essential survival items that help him manage his disabilities.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent

manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

| **Component** | **Dimensions** | **Sq ft** |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| **Total itemized need** | | **164** |
| **Footprint actually requested** | | **250** |

The itemized components total 164 square feet within a requested footprint of 250 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. AA (Pearce Decl.); Ex. C (Sept. 17, 2026 email); Ex. AD.)

### I. The City's response is not reasonable

The City determined that Mr. Pearce's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 1100 Fourth Street (Harrison House lot) because it alleges that camping on City lots would fundamentally alter the City programs. The City rejected the proposed lot at 701 Harrison St because it alleges that the site is a No Lodging

area and allowing camping at this site would fundamentally alter a City program. The City rejected the proposed lots at 700 Page St, 998 Murray St, and 2285 Fourth St because it alleges that none of these sites are compatible with the requested footprint. Instead, the City proposes an accommodation up to 2' x 89'6" at 70 Page St or up to 2'6" x 11' at 2285 Fourth St. (Prado Decl., Ex. A.)

The City's alternatives for Mr. Pearce are among the narrowest in the record. The strip at Page Street is 2 feet wide—narrower than a standard doorway. (The determination says "70 Page St."; Mr. Pearce proposed 700 Page Street.) The strip at 2285 Fourth Street is 2′6″ wide and, as written in the City's determination, only 11 feet long. That is about 27 square feet, too short for his 16-foot tent even if it were wide enough. The City offered other members a 111-foot strip at the same address and should clarify which figure it intends. Neither strip can hold any tent.

Mr. Pearce's PTSD and hypervigilance prevent him from resting when exposed, so an open strip of pavement is not shelter. The City rejected 701 Harrison Street as a "No Lodging" area and the Harrison House lot as a "fundamental alteration." In both cases it gave no site facts and none of the written reasons 28 C.F.R. § 35.164 requires. Nor did it explain why an individualized exemption for one disabled person would alter any program rather than reasonably modify it. 28 C.F.R. § 35.130(b)(7).

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Pearce's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. AD (drawing); Ex. AC (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. AA, Declaration of Robert Pearce, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. AB: BHU's written accommodation request for Robert Pearce, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. AD: annotated drawing of the requested footprint; Ex. AC: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Robert Pearce".

## E. <u>6. ERIK ALEXANDER COON</u>

**A. Disabilities**

Mr. Coon has Post-Traumatic Stress Disorder (PTSD), resulting from his military service in the Gulf War (Kuwait, 1993–1997), consistent with Gulf War Syndrome. He has a seizure disorder triggered by acute stress and auditory overstimulation (e.g., loud sirens or heavy machinery). (Prado Decl., Ex. AE (Coon Decl.); Ex. AF.)

Mr. Coon has difficulties with concentration, interaction with others, and stress regulation.

**B. Disability-related needs**

Space for shelter, survival gear, mobility aids, and medical supplies. (Prado Decl., Ex. AE (Coon Decl.).)

His disabilities impairs his concentration and ability to interact with others. He requires adequate space for shelter and survival gear to manage his condition. For individuals with PTSD, a secure, enclosed, and predictable environment is a clinical necessity as without stable shelter, Mr. Alexander is forced to sleep exposed and in a perpetual state of perceived threat, directly triggering hypervigilance, flashbacks, and emotional dysregulation.

**C. Requested ADA accommodations**

1) ADA-Exempted Footprint:

8-person tent (7′ × 16′ = 112 sq ft); footprint of 10′ × 20′ (200 sq ft).

A permanent accommodation allowing Mr. Coon to maintain a tent footprint of up to 100 square feet (e.g., 10’×10’) on any public sidewalk where he is not blocking access, provided he keeps a 4-foot clear path for pedestrians. This modifies the 9 sq ft rule specifically for him, recognizing that his tent is medical equipment providing shelter and stability.

2) Physical Assistance with Relocation

Due to his disabilities, Mr. Coon requires City staff assistance with lifting and transporting his belongings to any new location. This assistance should be scheduled in advance.

**D. Disability nexus**

The following accommodations are requested specifically to help Mr. Coon comply with the City’s orders, and to do so in a manner that does not exacerbate his documented disabilities: (Prado Decl., Ex. AE (Coon Decl.); Ex. AF; Ex. C.)

1) Safe, Quiet Place to Stay or Relocate To

Due to his PTSD and need for daily structure, Mr. Coon requires either:

- A non-congregate ADA-compliant shelter space, or

- A clearly designated, safe location where he may remain without harassment or risk of sudden displacement, particularly during City operations.

Without this, his PTSD symptoms are destabilized, increasing risk of dissociation and harm. Although the Homeless Response Team (HRT) has been visiting the encampment throughout the week, they have not offered Mr. Coon any services — even during times when he was present and visible at his location.

2) Reasonable Modification of Abatement Operations

Mr. Coon's seizures are triggered by intense noise. To prevent foreseeable harm, we request that:

- Sirens and high-decibel alarms (e.g., from dump trucks and bulldozers) not be used in proximity to his tent;
- Alternative, quieter notice methods or accommodations be used if enforcement or sanitation activity is required near him.

These steps are essential to prevent both physical and psychological harm directly connected to his disability.

**E. Requested location**

Proposed locations: 2nd and Cedar; 704–738 Cedar Street; 2nd and Jones; or 2nd and Page. **New alternatives:** 700 Allston Way; 8th and Harrison Streets (Prado Decl., Ex. AF; Ex. AG.)

**I. The requested accommodation is reasonable**

A nine-square-foot footprint cannot hold Mr. Coon's tent, his mobility aids, or his supplies. Without adequate space he loses both his shelter and the aids he needs to manage his disabilities.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

**I. The requested footprint is supported by measurement**

| **Component** | **Dimensions** | **Sq ft** |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Mobility aids | 4′ × 3′ | 12 |
| **Total itemized need** | | **176** |
| **Footprint actually requested** | | **200** |

The itemized components total 176 square feet within a requested footprint of 200 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity

requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. AE (Coon Decl.); Ex. C (Sept. 17, 2026 email); Ex. AH.)

### I. The City's response is not reasonable

The City determined that Mr. Coon's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lots at 2nd and Cedar, 2nd and Jones, and 2nd and Page because it alleges that these sites are in a No Lodging area and allowing camping at these sites would fundamentally alter a City program. The City rejected the proposed lots at 704-738 Cedar St because it alleges that none of these sites are compatible with the requested footprint. Instead, the City proposes an accommodation up to 2' x 97' at 704-738 Cedar St. (Prado Decl., Ex. A.)

The City offers Mr. Coon a strip 2 feet wide at 704–738 Cedar Street. No tent fits in it. For Mr. Coon, the tent is more than shelter. His PTSD requires a secure, enclosed space, and his seizures are triggered by acute stress and auditory overstimulation. A 2-foot strip leaves him sleeping in the open beside street noise, in a constant state of perceived threat—the conditions most likely to trigger both.

The strip covers about 194 square feet, nearly the 200 he requested, so area is not the obstacle. The City gives no sidewalk width and no reason a 7-foot section could not be provided. Its rejection of 2nd and Cedar, 2nd and Jones, and 2nd and Page rests on "No Lodging" designations the Court has already found the City failed to justify. Dkt. 342 at 4.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Coon's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. AH (drawing); Ex. AG (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. AE, Declaration of Erik Alexander Coon, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. AF: BHU's written accommodation request for Erik Alexander Coon, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. AH: annotated drawing of the requested footprint; Ex. AG: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Erik Alexander Coon".

**F. <u>7. Erik Keiser</u>**

**A. Disabilities**

Mr. Keiser has significant mobility limitations and chronic pain resulting from a car collision several years ago at the Shellmound encampment off I-80. He has schizophrenia and has been experiencing auditory hallucinations for the past 6–7 years. (Prado Decl., Ex. AI (Keiser Decl.); Ex. AJ.)

Since Mr. Keiser's leg bones healed improperly, he has significant mobility limitations and chronic pain that make walking, standing, and carrying items extremely difficult. His schizophrenia impacts his executive functioning, including his ability to plan, organize, and navigate complex processes independently.

**B. Disability-related needs**

Space for shelter, survival gear, mobility aids, art supplies, and medical supplies. (Prado Decl., Ex. AI (Keiser Decl.).)

**C. Requested ADA accommodations**

1) ADA-Exempted Footprint

8-person tent (7′ × 16′ = 112 sq ft); footprint of 10′ × 20′ (200 sq ft).

A permanent accommodation allowing Mr. Keiser to maintain a tent footprint larger than the standard 9-square-foot limit —sufficient to accommodate himself and his essential belongings—on any public sidewalk where:

- He is not blocking pedestrian access, meaning a clear path remains for others to pass safely; and
- If located on a narrower sidewalk, the opposite side of the street remains clear for alternative pedestrian access.

This modification recognizes that for Mr. Keiser, his tent functions as medical equipment and his only accessible shelter. Enforcing the 9-square-foot limit would force him to choose between compliance and his basic need for rest, sleep, safety and storage of

essential items—an impossible choice that would directly aggravate his disabilities.

2) Transportation Assistance

Advance-scheduled, hands-on assistance from City staff to transport his belongings if relocation is required. His leg injuries medically preclude lifting or moving heavy items. If he's not able to access the City's shelter program in which HRT staff assist with transportation, he would still need transportation to a secure location.

**D. Disability nexus**

Expecting Mr. Keiser to move his belongings under threat of enforcement forces him to choose between defying a City order and risking debilitating pain. This is not non-compliance as it is a physical impossibility. (Prado Decl., Ex. AI (Keiser Decl.); Ex. AJ; Ex. C.)

**E. Requested location**

Proposed locations: 2nd and Camelia; 2nd and Cedar; 2nd and Jones; 2nd and Page; or 747 Bancroft Way (Prado Decl., Ex. AJ; Ex. AK.)

**I. The requested accommodation is reasonable**

Mr. Keiser lives with schizophrenia and mobility limitations. Nine square feet cannot hold any of what he requires. Without adequate space and shelter his psychiatric symptoms are aggravated and he loses the stability essential to managing his condition.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all —

and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Mobility aids | 4′ × 3′ | 12 |
| Art supplies | 4′ × 4′ | 16 |
| **Total itemized need** | | **192** |
| **Footprint actually requested** | | **200** |

The itemized components total 192 square feet within a requested footprint of 200 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. AI (Keiser Decl.); Ex. C (Sept. 17, 2026 email); Ex. AL.)

### I. The City's response is not reasonable

The City determined that Mr. Keiser's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lots at 2nd and Camelia, 2nd and Cedar, and 2nd and Page because it alleges that these sites are in a No Lodging area and allowing camping at these sites would fundamentally alter a City program. The City rejected the proposed lot at 747 Bancroft Way because it alleges that this site is not compatible with the requested footprint.

Instead, the City proposes an accommodation up to 4'6" x 139'8" at 747 Bancroft Way. (Prado Decl., Ex. A.)

The City's own measurement at 747 Bancroft Way shows how close the parties are. The City found a strip 4′6″ wide and 139′8″ long—about 629 square feet, more than three times the 200 square feet Mr. Keiser requested. What the City will not provide is the additional 2′6″ of width his 7-foot tent requires along a 16-foot stretch of that block. The determination does not state the total sidewalk width or explain why the path could not be adjusted for that short segment.

A 4′6″ strip is narrower than the smallest two-person tent. Without shelter, Mr. Keiser loses the stable environment his schizophrenia requires and has no place to rest legs that healed improperly. The City's rejection of 2nd and Camelia, 2nd and Cedar, and 2nd and Page relies on "No Lodging" designations. It gives none of the site-specific facts or written reasons that the Court and 28 C.F.R. § 35.164 require.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Keiser's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

## I. Visualization of requested accommodation

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. AL (drawing); Ex. AK (photographs).)

## I. Further documentation of disability-related need

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. AI, Declaration of Erik Keiser, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. AJ: BHU's written accommodation request for Erik Keiser, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. AL: annotated drawing of the requested footprint; Ex. AK: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Erik Keiser".

### G. <u>8. Charles Dye</u>

#### A. Disabilities

Mr. Dye lives with post-traumatic stress disorder (PTSD) and diabetes. (Prado Decl., Ex. AM (Dye Decl.); Ex. AN.)

#### B. Disability-related needs

Space for shelter, survival gear, and medical supplies. (Prado Decl., Ex. AM (Dye Decl.).)

#### C. Requested ADA accommodations

<u>1) ADA-Exempted Footprint</u>

8-person tent (7′ × 16′ = 112 sq ft); footprint of 10′ × 20′ (200 sq ft).

A permanent accommodation allowing Mr. Dye to maintain a tent footprint larger than the standard 9-square-foot limit —sufficient to accommodate himself and his essential belongings—on any public sidewalk where:

- He is not blocking pedestrian access, meaning a clear path remains for others to pass safely; and

- If located on a narrower sidewalk, the opposite side of the street remains clear for alternative pedestrian access.

This modification recognizes that for Mr. Dye, his tent functions as medical equipment and his only accessible shelter. Enforcing the 9-square-foot limit would force him to choose between compliance and his basic need for rest, sleep, safety and storage of essential items.

<u>2) Transportation Assistant</u>

Advance-scheduled, hands-on assistance from City staff to transport his belongings if relocation is required.

### D. Disability nexus

A nine-square-foot footprint leaves no room for a tent or for the supplies he depends on. Without adequate space, he cannot maintain shelter or access the items essential to his survival. (Prado Decl., Ex. AM (Dye Decl.); Ex. AN; Ex. C.)

### E. Requested location

Proposed locations: 2nd and Camelia; 2nd and Cedar; 2nd and Jones; or 2nd and Page (Prado Decl., Ex. AN; Ex. AO.)

### I. The requested accommodation is reasonable

A nine-square-foot footprint leaves no room for a tent or for the supplies Mr. Dye depends on. Without adequate space he cannot maintain shelter or access the items essential to his survival.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

**I. The requested footprint is supported by measurement**

| **Component** | **Dimensions** | **Sq ft** |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| **Total itemized need** | | **164** |
| **Footprint actually requested** | | **200** |

The itemized components total 164 square feet within a requested footprint of 200 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. AM (Dye Decl.); Ex. C (Sept. 17, 2026 email); Ex. AP.)

**I. The City's response is not reasonable**

The City determined that Mr. Dye's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lots at 2nd and Camelia, 2nd and Cedar, 2nd and Jones, and 2nd and Page because it alleges that these sites are in a No Lodging area and allowing

camping at these sites would fundamentally alter a City program. The City has not provided an alternate location for Mr. Dye. (Prado Decl., Ex. A.)

The City has not offered Mr. Dye any alternative. It rejected all four proposed sites with one sentence—that an accommodation "would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited"—and stopped there. The Court has already held that the City had not shown that relocation to "No Lodging/TNC Prohibited" locations would be unreasonable or a fundamental alteration. Dkt. 342 at 4. The City's determination adds no facts, no measurements, and no written statement of reasons. 28 C.F.R. § 35.164.

The consequence for Mr. Dye is concrete. His diabetes requires him to keep insulin at safe temperatures, keep food and water at hand to manage his blood sugar, and keep wounds clean because they heal poorly. None of that is possible without a tent. A process that ends with no permitted location anywhere is not an alternative accommodation; it is a denial. As Section III.E shows, the sidewalks that remain outside the no-lodging zones and daycare buffers are few, and most are too narrow.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Dye's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

### I. Visualization of requested accommodation

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. AP (drawing); Ex. AO (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. AM, Declaration of Charles Dye, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. AN: BHU's written accommodation request for Charles Dye, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. AP: annotated drawing of the requested footprint; Ex. AO: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Charles Dye".

**H. <u>9. Andrew Venderzyl</u>**

**A. Disabilities**

Mr. Venderzyl has impaired physical mobility & Post Traumatic Stress Disorder. (Prado Decl., Ex. AQ (Venderzyl Decl.); Ex. AR.)

**B. Disability-related need**

Space for shelter, survival gear, mobility aids, medical supplies, and his two emotional support animals. -Impaired mobility — reduced ability to relocate quickly, navigate uneven ground, or physically withdraw from a perceived threat. Requires a stable, accessible location with a controllable perimeter. (Prado Decl., Ex. AQ (Venderzyl Decl.).)

-PTSD (hypervigilance and acute anxiety) — involuntary, persistent threat-scanning and heightened arousal. Requires an enclosed, defensible space with a clear boundary; open or exposed placements intensify symptoms and can trigger acute episodes.

**C. Requested ADA accommodations**

10-person tent (17′ × 9′ = 153 sq ft); footprint of 10′ × 25′ (250 sq ft). Transportation assistance requested.

**D. Disability nexus**

His PTSD produces hypervigilance and acute anxiety — a persistent, involuntary state of scanning for threat that makes exposure and unpredictability genuinely dangerous to his mental health, not merely uncomfortable. (Prado Decl., Ex. AQ (Venderzyl Decl.); Ex. AR; Ex. C.)

These conditions interact. Impaired mobility limits his ability to relocate quickly or to flee a perceived threat; hypervigilance means he perceives threats constantly and at high intensity. Together they mean that a placement offering no enclosed, defensible footprint — no walls, no controllable boundary, no stable point from which to monitor his surroundings — does not merely inconvenience him. It denies him the minimum conditions under which he can shelter at all. A person who cannot physically withdraw and cannot psychologically stand down is not sheltered by a spot on the ground.

**E. Requested location**

Proposed locations: 2285 Fourth Street; 2nd and Camelia; 1399–1305 Second Street; 2nd and Jones; or coordinates 37.880810, −122.289813 (Prado Decl., Ex. AR; Ex. AS.)

**F. Requested accommodation is reasonable**

Nine square feet cannot hold Mr. Venderzyl's tent, his mobility aids, or his animals. Without adequate space he would be separated from the animals and survival gear that help him manage his disabilities, and left without shelter.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

**G. Requested footprint is supported by measurement**

The requested footprint is smaller than the itemized need — 250 square feet against 252. This member is asking for less space than his or her documented disability-related needs require. That disposes of any suggestion that the request is inflated. (Prado Decl., Ex. AQ (Venderzyl Decl.); Ex. C (Sept. 17, 2026 email); Ex. AT.)

| Component | Dimensions | Sq ft |
| --- | --- | --- |
| Tent (10-person) | 17′ × 9′ | 153 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Mobility aids | 4′ × 3′ | 12 |
| Two large emotional support animals | 7′ × 5′ | 35 |
| **Total itemized need** | | **252** |
| **Footprint actually requested** | | **250** |

### H. The City's response is not reasonable

The City determined that Mr. Venderzyl's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 2285 Fourth St because it alleges that this site is not compatible with the requested footprint. The City rejected the proposed lots at 2nd and Camelia, 1399-1305 Second St, and 2nd and Jones because it alleges that these sites are in a No Lodging area and allowing camping at these sites would fundamentally alter a City program. The City rejected the proposed lot at coordinates 37.880810, −122.289813 because it alleges that this site is located in a residential area where PROW restrictions prohibit camping and allowing camping would fundamentally alter a City program. Instead, the City proposes an accommodation up to 2'6" x 111' at 2285 Fourth St. (Prado Decl., Ex. A.)

Mr. Venderzyl's 10-person tent is 9 feet wide; the City's only alternative is a strip 2′6″ wide at 2285 Fourth Street. That strip covers about 278 square feet—more than the 250 square feet he requested—but no tent can be pitched in it. His PTSD requires an enclosed, defensible space, and his impaired mobility prevents him from withdrawing from a perceived threat. For him, an open strip of pavement is the opposite of the accommodation he needs.

The City rejected 2nd and Camelia, 1399–1305 Second Street, and 2nd and Jones as "No Lodging" areas and the proposed coordinates as "residential." It gave no measurements, site facts, or the written reasons 28 C.F.R. § 35.164 requires. It does not explain why a 2′6″ strip was the most it could provide at 2285 Fourth Street.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Venderzyl's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. AT (drawing); Ex. AS (photographs).)

**J. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. AQ, Declaration of Andrew Venderzyl, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. AR: BHU's written accommodation request for Andrew Venderzyl, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. AT: annotated drawing of the requested footprint; Ex. AS: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Andrew Venderzyl".

**I. <u>10. Ramondo Mackey</u>**

**A. Disabilities**

Mr. Mackey has been diagnosed with the following mental health conditions, each of which is chronic and substantially limits one or more major life activities: (Prado Decl., Ex. AU (Mackey Decl.); Ex. AV.)

Psychiatric Disabilities

Clinical Depression: Mr. Mackey experiences persistent depressive episodes that impair his motivation, energy, and ability to complete daily tasks. These episodes are exacerbated by stress, instability, and the threat of displacement.

Anxiety: Mr. Mackey experiences significant anxiety that impairs his ability to function in high-stress environments, make decisions, and process complex instructions under pressure. The threat of enforcement and property destruction triggers acute anxiety responses.

Mr. Mackey's mental health disabilities also impair his executive functioning, including his ability to understand information, regulate his emotions, and understand social cues. These impairments make it difficult for him to plan, organize, and complete the complex tasks required for relocation without assistance.

Need for Caregiver Support

Mr. Mackey requires the assistance of a caregiver to help him with daily tasks, including personal care and navigation of complex systems. His caregiver is essential to his ability to function and remain stable. Any accommodation must allow for his caregiver to continue providing support.

**B. Disability-related needs**

Space for shelter, survival gear, medical supplies, and caretaker.. (Prado Decl., Ex. AU (Mackey Decl.).)

**C. Requested ADA accommodations**

Mr. Mackey respectfully requests the following reasonable accommodations under Title II of the Americans with Disabilities Act:

1. Pause on Enforcement Pending Interactive Process

Consistent with the Court's prior orders (Dkt. 288, Dkt. 326), Mr. Mackey requests that the City pause any abatement or enforcement action against him until the interactive process is sufficiently completed and the City issues a written determination on his accommodation requests. As the Court held, the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." (Dkt. 288 at 21).

2. Exemption from the 3x3 Rule

Permission to maintain a tent and living space larger than nine square feet, subject to an individualized assessment that accounts for his disability-related needs. Mr. Mackey requires a footprint of 10 feet wide by 25 feet long to accommodate:

A tent large enough for him to stand in, sleep, keep his caregiver and maintain a stable environment;

Space for his medical supplies, mobility aids, and personal belongings;

Space for his caregiver to assist him with daily tasks, mobility support, and personal care;

Sufficient room to move within his footprint without feeling cramped or confined.

If this footprint is not feasible at his proposed locations, we request that the City propose the maximum footprint available, consistent with previous location assessments for BHU members.

3. Physical Relocation Assistance

City-provided physical assistance with lifting, packing, and moving his personal belongings to a lawful location, consistent with the Court's Summary Judgment Order (Dkt. 288 at 65), which requires the City to provide physical relocation assistance to disabled claimants who cannot independently pack and relocate. This assistance is particularly critical given his psychiatric disabilities, which impair his ability to organize and complete tasks under pressure.

<u>4. Storage of Personal Property</u>

The City shall store Mr. Mackey's non-contaminated personal belongings for a minimum of 90 days, consistent with the Court's Summary Judgment Order (Dkt. 288 at 65) and the City's existing regulations (Administrative Regulation 10.1).

<u>5. Replacement of Essential Property</u>

If any essential survival equipment (tent, sleeping gear, basic clothing, or medical supplies) is destroyed during abatement, the City shall provide replacements, as required by the Court's Summary Judgment Order (Dkt. 288 at 66-67; Dkt. 326 at 4).

<u>6. Cognitive and Communication Accommodations</u>

- Permission to have a BHU representative or advocate present during all interactions with City staff;
- Low-stimulation meetings with City staff, scheduled in advance where possible;
- Trauma-informed communication consistent with best practices for individuals with PTSD, bipolar disorder, and OCD;
- Written step-by-step instructions on how to stay compliant with his new relocation site.

<u>7. Access to Caregiver</u>

Mr. Mackey requires continued access to his caregiver, who provides essential support for his daily needs. Any relocation or shelter placement must allow for his caregiver to continue assisting him.

**D. Disability nexus**

Mr. Mackey's disabilities directly impair his ability to comply with the City's abatement orders in the following ways: (Prado Decl., Ex. AU (Mackey Decl.); Ex. AV; Ex. C.)

Psychiatric Barriers to Compliance: His clinical depression, anxiety, and executive functioning impairments make it difficult or impossible for him to organize his belongings, plan a relocation, process complex instructions, or respond to rapidly changing enforcement conditions—particularly under pressure. The stress of enforcement—including the presence of City staff, loud noises, and the threat of property destruction—triggers his depressive symptoms, exacerbates his anxiety, and impairs his ability to understand and respond to instructions.

Inability to Transport Belongings: The combined effect of his disabilities prevents him from effectively packing and transporting his personal belongings without assistance. His depression impairs his motivation and energy; his anxiety impairs his focus and decision-making; his executive functioning impairments make it difficult to organize and complete tasks. The panic and anxiety triggered by enforcement can leave him paralyzed and unable to act.

The 3x3 Rule is Unworkable: The City's enforcement of Administrative Regulation 10.2, which limits personal property to nine square feet, is functionally impossible for Mr. Mackey. No tent can fit within a 3'x3' space, and a space that small cannot accommodate his essential belongings, medical supplies, or the needs of his caregiver. He requires additional space to maintain his belongings in an organized manner and to accommodate his caregiver's assistance.

Need for Caregiver Space: Mr. Mackey's caregiver provides essential support that allows him to function and remain stable. The 3x3 rule does not provide sufficient space for his caregiver to assist him with daily tasks, mobility support, or personal care. Any accommodation must include space for his caregiver to continue providing this support.

Property Loss: If the City abates his area without providing accommodations, Mr. Mackey will be unable to remove his tent and essential belongings due to his psychiatric symptoms. The destruction or loss of his survival equipment—tent, sleeping gear, clothing, and personal items—would render him completely unsheltered and destabilize his mental health.

**E. Requested location**

Proposed locations: 2nd and Camelia; 2nd and Cedar; 2nd and Jones; OR 2nd and Page. **New alternatives:** Streets available for camping. (Prado Decl., Ex. AV; Ex. AW.)

**I. The requested accommodation is reasonable**

Mr. Mackey lives with clinical depression, anxiety, and executive functioning impairments. Nine square feet cannot hold his tent, his medical supplies, or space for his caretaker. Without adequate space his psychiatric symptoms are aggravated and he loses the caretaker support his disabilities require.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

The itemized components total 205 square feet within a requested footprint of 250 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. AU (Mackey Decl.); Ex. C (Sept. 17, 2026 email); Ex. AX.)

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (10-person), shared with caretaker | 17′ × 9′ | 153 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| **Total itemized need** | | **205** |
| **Footprint actually requested** | | **250** |

### I. The City's response is not reasonable

The City determined that Mr. Mackey's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lots at 2nd and Camelia, 2nd and Cedar, 2nd and Jones, and 2nd and Page because it alleges that these sites are in a No Lodging area and allowing camping at these sites would fundamentally alter a City program. The City has not provided an alternative location for Mr. Mackey. (Prado Decl., Ex. A.)

The City has not offered Mr. Mackey any alternative location or footprint. It rejected all four proposed sites on the "No Lodging" ground alone, which the Court has already found unsupported. Dkt. 342 at 4. The determination contains no measurements, no site facts, and no written statement of reasons. 28 C.F.R. § 35.164.

The City's response also does not address what makes Mr. Mackey's request distinct. He depends on a caretaker for daily tasks, and his depression, anxiety, and executive-functioning impairments mean he cannot plan or carry out a relocation on his own. A denial without any alternative leaves him to find a lawful site alone—the task his disabilities prevent—and leaves no space in which his caretaker can help him.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Mackey's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. AX (drawing); Ex. AW (photographs).)

**I. Further documentation of disability-related need**

<u>Medical Verification and Disability Status:</u>
Mr. Mackey receives care from LifeLong Medical Street Team (925-507-0574), who can verify his diagnoses and functional limitations. We will provide supporting documentation as it becomes available. Given the urgency of the abatement deadline, we respectfully request that the City initiate the interactive process immediately, without conditioning it on the completion of medical verification.

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. AU, Declaration of Ramondo Mackey, describing the disabilities, functional limitations, and the items the footprint must hold.
(2) Ex. AV: BHU's written accommodation request for Ramondo Mackey, submitted to the City on September 14, 2026, with signed authorization.
(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.
(4) Ex. A: the City's written determination.
(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. AX: annotated drawing of the requested footprint; Ex. AW: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Ramondo Mackey".

## J. 11. Erin Spencer

### A. Disabilities

Mr. Spencer experiences significant physical and cognitive challenges that make compliance with the city's abatement policies impossible without direct assistance. His mobility issues (including injuries to his right clavicle, sciatica, and displaced left hip) severely limit his ability to move independently, and his PTSD and ADHD impair his executive functioning, making it difficult for him to organize, plan, and complete essential tasks without support. (Prado Decl., Ex. AY (Spencer Decl.); Ex. AZ.)

### B. Disability-related needs

Space for survival gear, mobility aids, emotional support animals, art supplies, and medical supplies. (Prado Decl., Ex. AY (Spencer Decl.).)

### C. Requested ADA accommodations

1. Trailer (approx. 10′ × 15′ = 150 sq ft); footprint of 10′ × 20′ (200 sq ft) of exterior space, exclusive of the trailer. Packing and transportation assistance to his trailer requested.
2. Permission to remain in place with his current shelter until an ADA-compliant alternative is available – Due to his mobility impairments, frequent relocation is physically dangerous and exacerbates his pain and disability-related limitations. Additionally, the city has displaced him multiple times, despite his efforts to find locations that are "out of the way" and do not obstruct public use.

3. Physical assistance with moving belongings and trash disposal – Due to severe mobility restrictions, Mr. Spencer cannot independently transport his belongings or remove trash without significant physical strain. His previous handmade flatbed housing/storage solutions have been destroyed by city workers, worsening his hardship and making each forced relocation even more difficult.
4. Assistance with logistics, planning, scheduling, and coordination – Due to executive functioning challenges from PTSD and ADHD, he cannot navigate relocation processes on his own and requires direct support in order to comply. The city has not offered any such assistance, making compliance an unreasonable burden.
5. Exemption from citation and arrest – Because his disability prevents him from independently relocating, penalizing him for his inability to comply would constitute disability-based discrimination under the ADA. Additionally, he has not been clearly informed of how his shelter violates city law, further complicating his ability to comply with the abatement order.

**D. Disability nexus**

Under Title II of the ADA (28 C.F.R. § 35.130(b)(7)), public entities must reasonably modify policies, practices, or procedures to accommodate individuals with disabilities unless the city can demonstrate that the modification would fundamentally alter the nature of the program or impose an undue burden. (Prado Decl., Ex. AY (Spencer Decl.); Ex. AZ; Ex. C.)

<u>City's Violation if Denied:</u>

- Requiring Mr. Spencer to move without physical assistance creates a direct physical hardship that could worsen his sciatica, hip displacement, and clavicle injury.

- Without executive functioning support, he is unable to organize, schedule, or plan the required steps for compliance, meaning he will be unable to follow city orders through no fault of his own.
- Issuing citations or arresting him for failure to comply with relocation requirements would be a punitive action against a person with disabilities and may constitute a violation of ADA protections against discrimination.
- The city has not demonstrated that an ADA-compliant alternative shelter is available, meaning forced relocation would put him at greater risk of harm without a suitable alternative.
- The destruction of his handmade flatbed housing/storage solutions by city workers has placed an additional undue hardship on him, making compliance even more difficult.

**E. Requested location**

First choice: 8th and Harrison Street. Alternatives: None identified to date. (Prado Decl., Ex. AZ; Ex. BA.)

**I. The requested accommodation is reasonable**

Mr. Spencer lives with PTSD, ADHD, and mobility impairments, all of which require a stable, accessible environment. Nine square feet cannot hold these items. Without adequate space he loses the supports essential to his stability.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking

medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

**I. The requested footprint is supported by measurement**

| Component | Dimensions | Sq ft |
|---|---|---|
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Mobility aids | 4′ × 3′ | 12 |
| Art supplies | 10′ × 10′ | 100 |
| Two large emotional support animals | 7′ × 5′ | 35 |
| **Total itemized need** | | **199** |
| **Footprint actually requested** | | **200** |

The itemized components total 199 square feet within a requested footprint of 200 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. AY (Spencer Decl.); Ex. C (Sept. 17, 2026 email); Ex. BB.)

**I. The City's response is not reasonable**

The City determined that Mr. Spencer's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 8th and Harrison because it alleges that this site is in a No Lodging area and allowing camping at this site would fundamentally alter a City program. The City has not provided an alternative location for Mr. Spencer. (Prado Decl., Ex. A.)

The Court has already ruled on Mr. Spencer. In the Summary Judgment Order, it held that the City's categorical enforcement of the 3×3 rule against him was unlawful. It directed the City to conduct an individualized assessment of his disability-related needs and the actual sidewalk in question. Dkt. 288 at 72–73. The City's response does not do that. It rejects 8th and Harrison with the one-sentence "No Lodging" rationale. It issues no determination at all on San Pablo Avenue between Harrison and Gilman, the alternative BHU proposed.

The injuries to Mr. Spencer's right clavicle, his sciatica, and his displaced left hip make every forced move physically dangerous. The City has not measured either site or offered another. It has not explained why an exterior footprint beside his trailer would alter any program. 28 C.F.R. § 35.164.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City approve the requested footprint at one of Mr. Spencer's proposed locations or identify, with measurements, a location where it can be accommodated.

## I. Visualization of requested accommodation

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. BB (drawing); Ex. BA (photographs).)

## I. Further documentation of disability-related need

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. AY, Declaration of Erin Spencer, describing the disabilities, functional limitations, and the items the footprint must hold.
(2) Ex. AZ: BHU's written accommodation request for Erin Spencer, submitted to the City on September 14, 2026, with signed authorization.
(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.
(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. BB: annotated drawing of the requested footprint; Ex. BA: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Erin Spencer".

**K.**

**L. 12. Thomas Barnett**

**A. Disabilities**

Mr. Barnett experiences significant physical and cognitive challenges that make compliance with the city's abatement policies impossible without direct assistance. His mobility issues including injury to his right arm and hand prevent him from lifting heavy objects. His mobility impairment in his legs limit him from walking long distances. His mental health disabilities of Post-Traumatic Stress Disorder (PTSD), Short-term memory impairment and early stage Dementia impair his executive functioning, making it difficult for him to organize, plan, and complete essential tasks without support. (Prado Decl., Ex. BC (Barnett Decl.); Ex. BD.)

**B. Disability-related needs**

Space for shelter, survival gear, mobility aids, and medical supplies, including space for the recycling that is his source of income. (Prado Decl., Ex. BC (Barnett Decl.).)

**C. Requested ADA accommodations**

Car, or 8-person tent (7′ × 16′ = 112 sq ft); footprint of 10′ × 20′ (200 sq ft). Packing and transportation assistance requested.

**D. Disability nexus**

The City's standard encampment management policies—as outlined in the February 17, 2026 Public Notice—will, if applied to Mr. Barnett without modification, foreseeably aggravate his disabilities in the following ways: (Prado Decl., Ex. BC (Barnett Decl.); Ex. BD; Ex. C.)

a) Short-notice relocation

His PTSD, short-term memory impairment, and dementia require predictability and adequate time to process information. Sudden displacement triggers confusion, disorientation, and emotional dysregulation, leaving him unable to plan or comply with City orders.

b) Physical demands of relocation

Due to his limited mobility in his right arm and hand, Mr. Barnett cannot lift heavy objects. His mobility impairment prevents him from walking long distances. Requiring him to pack and move his belongings without physical assistance would be impossible and would cause significant physical strain and risk of injury.

c) 9-square-foot limit on sidewalks

Compliance is physically impossible without abandoning his tent (his only shelter), mobility tools, and essential belongings. His physical disabilities prevent him from carrying items to another location, and the space is too small for him to rest or store his necessities.

d) Threat of citation, arrest, and property destruction

Penalizing Mr. Barnett for disability-related inability to comply—such as moving too slowly, being unable to pack within time limits, or being unable to lift or carry his belongings—would constitute discrimination under the ADA.

e) No property storage due to leptospirosis

Losing all of his belongings—including his mobility tools and items essential to daily survival—would be devastating. For someone with PTSD and dementia, losing familiar, essential items can trigger acute psychological crises and further cognitive decline.

f) Forced relocation without an accessible destination

Moving Mr. Barnett from one outdoor location to another does not achieve the City's stated goal of "moving all people indoors." It merely destabilizes him, disrupts any connection to services, and exacerbates his PTSD and cognitive impairments.

### E. Requested location

First choice: 8th and Harrison Street. Alternatives: 2nd and Page; 2nd and Camelia; or 700 Allston Way. (Prado Decl., Ex. BD; Ex. BE.)

### I. The requested accommodation is reasonable

Nine square feet cannot hold these items. Without adequate space Mr. Barnett loses his mobility aids, his essential survival gear, and the recycling that is his source of income, all of which he needs to manage his disabilities.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking

medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

**I. The requested footprint is supported by measurement**

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Mobility aids | 4′ × 3′ | 12 |
| **Total itemized need** | | **176** |
| **Footprint actually requested** | | **200** |

The itemized components total 176 square feet within a requested footprint of 200 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. BC (Barnett Decl.); Ex. C (Sept. 17, 2026 email); Ex. BF.)

**I. The City's response is not reasonable**

The City determined that Mr. Barnett's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lots at 8th and Harrison, 2nd and Page, and 2nd and Camelia because it alleges that these sites are in a No Lodging area and allowing camping at these sites would fundamentally alter a City program. The City rejected the proposed lot at 700 Allston Way because it alleges that this site is not compatible with the requested footprint. Instead, the City proposes an accommodation up to 4'10" x 73' at 700 Allston Way. (Prado Decl., Ex. A.)

The City offers Mr. Barnett a strip 4′10″ wide at 700 Allston Way. That is narrower than the 7-foot width of his 8-person tent and of any manufactured tent. The strip covers about 353 square feet—more than the 200 square feet he requested—so the City has found the area but will only allow it in a shape no tent fits. The determination does not state the sidewalk width at Allston Way or why the path could not be adjusted for the length of one tent.

Mr. Barnett has limited use of his right arm and hand, a leg impairment, and early-stage dementia, so he cannot repeatedly pack, carry, and re-establish a camp. The City rejected 8th and Harrison, 2nd and Page, and 2nd and Camelia as "No Lodging" areas. Again it gave no site facts and none of the written reasons 28 C.F.R. § 35.164 requires.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Barnett's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

## I. Visualization of requested accommodation

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. BF (drawing); Ex. BE (photographs).)

## I. Further documentation of disability-related need

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. BC, Declaration of Thomas Barnett, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. BD: BHU's written accommodation request for Thomas Barnett, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
(6) Ex. BF: annotated drawing of the requested footprint; Ex. BE: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name “Thomas Barnett”.

**13. Jason Charette**

**A. Disabilities**

Mr. Charette has had mental health disabilities for nearly two decades, including clinical depression and Post-Traumatic Stress Disorder (PTSD). These conditions substantially limit one or more major life activities, including sleeping, concentrating, interacting with others, regulating emotions and handling stress. (Prado Decl., Ex. BG (Charette Decl.); Ex. BH.)

**B. Disability-related needs**

Space for survival gear, including the barbecue he uses for cooking and a garbage can. (Prado Decl., Ex. BG (Charette Decl.).)

**C. Requested ADA accommodations**

RV; footprint of 2′ × 6′ (12 sq ft) of exterior space, exclusive of the RV.

<u>1) Recognition of RV as Medical Equipment</u>

A formal acknowledgment that Mr. Charette's RV constitutes medical equipment and will not be towed, impounded, or destroyed during any enforcement action. If relocation is required, the RV must be permitted to move intact to a designated safe location.

<u>2) Exemption from RV Towing and Impoundment</u>

Mr. Charette's RV serves as his home and medical equipment. Towing it would:

- Render him immediately unsheltered without any accessible alternative
- Separate him from his essential belongings and source of stability

- Trigger acute PTSD symptoms and depressive episodes
- Violate his rights under the ADA by punishing disability-related needs

3) ADA-Exempted Footprint

A permanent accommodation allowing Mr. Charrette to maintain a footprint larger than the standard 9-square-foot limit, exclusive of the RV, to maintain a barbecue and garbage can, necessary for feeding himself and disposing of waste outside the RV.

**D. Disability nexus**

The City's standard encampment management policies—as outlined in the February 17, 2026 Public Notice—will, if applied to Mr. Charette without modification, foreseeably aggravate his disabilities in the following ways: (Prado Decl., Ex. BG (Charette Decl.); Ex. BH; Ex. C.)

a) Short-notice relocation

Mr. Charette's PTSD and clinical depression require predictability and stability. Sudden displacement triggers hypervigilance, anxiety and emotional dysregulation, leaving him unable to plan or comply with City orders.

b) Loss of RV as medical equipment

For Mr. Charette, his RV is not merely personal property—it is essential medical equipment that provides: A private, locked space where he can manage PTSD symptoms without fear of intrusion; A controlled environment that minimizes stress triggers; Access to basic sanitation (bathroom) and nutrition (kitchen), which are critical for managing depression and maintaining daily function; The stability and predictability his disabilities require; Removing him from his

RV without a suitable, accessible alternative would constitute denial of medical necessity and would foreseeably aggravate his mental health disabilities.

<u>c) Threat of citation, arrest, and property destruction</u>

Penalizing Mr. Charette for disability-related inability to comply—such as moving his RV without an accessible and endpoint destination—would constitute discrimination under the ADA. The trauma of enforcement actions and towing his RV can deepen PTSD and trigger depressive episodes. d) Forced relocation without an accessible destination Moving Mr. Charette from one location to another without a guaranteed, accessible indoor placement does not achieve the City's stated goal of "moving all people indoors." It merely destabilizes him, disrupts any connection to services, and exacerbates his PTSD and depression.

**E. Requested location**

8th and Harrison St. (Prado Decl., Ex. BH; Ex. BI.)

**I. The requested accommodation is reasonable**

Nine square feet cannot accommodate Mr. Charette's exterior needs or the supplies he relies on. Without adequate exterior space he cannot maintain his belongings or manage his disabilities.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

## I. The requested footprint is supported by measurement

The itemized need and the requested footprint are identical at 12 square feet. Nothing in the request is surplus. (Prado Decl., Ex. BG (Charette Decl.); Ex. C (Sept. 17, 2026 email); Ex. BJ.)

| Component | Dimensions | Sq ft |
|---|---|---|
| Exterior space for survival gear, essential for cooking | 2′ × 6′ | 12 |
| **Total itemized need** | | **12** |
| **Footprint actually requested** | | **12** |

## I. The City's response is not reasonable

The City determined that Mr. Charette's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 8th and Harrison because it alleges that BHU has not established a nexus between Mr. Charette's disability and the need for storage outside of his vehicle. The City also alleges that allowing camping in this site would fundamentally alter a City program. The City has not provided an alternative location for Mr. Charette. (Prado Decl., Ex. A.)

The City's "no nexus" finding does not identify what is missing. BHU's submission explains three things. First, Mr. Charette's depression and PTSD limit his sleep, concentration, and ability to handle stress. Second, preparing his own meals preserves his nutrition and a daily routine that counters depressive paralysis. Third, the barbecue he cooks on and his garbage can must sit outside the RV. A barbecue cannot be used safely inside an enclosed vehicle, and keeping garbage inside a small living space defeats the clean, controlled environment his disabilities require. The City does not dispute any of this. It does not say which link it doubts or what further information would satisfy it.

The City also states that "the District Court affirmed" the absence of a nexus. The determination cites no order, and BHU is aware of none making that finding as to Mr. Charette. The request is also modest by any measure: 12 square feet, three more than the nine square feet AR 10.2 already allows where belongings are permitted. The City has not explained how three additional square feet beside his RV would fundamentally alter any program. Its "No Lodging" rationale has already been found unsupported. Dkt. 342 at 4.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City approve the 2′ × 6′ exterior footprint.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. BJ (drawing); Ex. BI (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. BG, Declaration of Jason Charette, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. BH: BHU's written accommodation request for Jason Charette, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. BJ: annotated drawing of the requested footprint; Ex. BI: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Jason Charette".

**M. <u>14. Kittivutt Patanapanich</u>**

**A. Disabilities**

Mr. Patanapanich seeks accommodation for the following disability: Nerve damage sustained from a prolonged illness, as a result of a bacterial infection originating in a cut on his right foot. The wound was aggravated and the infection spread due to lack of consistent access to hygiene supplies and clean running water. He was not able to be seen at a hospital, which resulted in the infection being prolonged for six months. This resulted in significant nerve damage to his right foot, arm, and hand. These appendages have lost a significant amount of strength, making it very difficult to lift heavy objects. He also experiences poor temperature regulation in his right arm. Other aftereffects of this period include intense bouts of fatigue, which can last for two to three days, and bathroom urgency. He cannot perform a tight grip with his right hand, which is further exacerbated by the cold and physical exertion. (Prado Decl., Ex. BK (Patanapanich Decl.); Ex. BL.)

**B. Disability-related needs**

Space for survival gear and his emotional support animal. (Prado Decl., Ex. BK (Patanapanich Decl.).)

**C. Requested ADA accommodations**

- Truck; footprint of 2′ × 8′ (16 sq ft) of exterior space, exclusive of the truck.
- We ask the city to use their discretion to grant Mr. Panapanich temporary exemption from the towing program due to the additional time needed to get his registration up to date, and make arrangements to move his vehicle in compliance with the zone specified on the coming public notices regarding the Harrison corridor, when they are posted.
- Temporary stay on enforcement actions at his location

- A visual aid in the form of a legible map or diagram, showing a list of viable, legally designating permissible parking spots covering 12x25 feet. His restricted movement due to the pain in his foot prevents him from seeking and confirming the viability of new areas without input from the city.

**D. Disability nexus**

Mr. Patanapanich's fatigue makes it difficult to move around and make arrangements to move his vehicle out of the sweep zone. His nerve damage also leaves him dealing with the task of finding a hygienic place to use the restroom with his level of fatigue, which can create a burden on his time. Intermittent numbness in the affected foot, arm, and hand comes on suddenly and makes it risky to drive. This means he needs community support to operate the vehicle as needed for him to be in compliance with the city's requirements. (Prado Decl., Ex. BK (Patanapanich Decl.); Ex. BL; Ex. C.)

The nerve damage in his hand results in significant burning pain and makes the area more susceptible to severe pain from relatively minor injuries, exertion, and cold outside temperatures, which have prevented him from doing the tasks needed to get his registration up to date.

**E. Requested location**

First choice: 9th and Harrison Street. Alternatives: None identified to date. (Prado Decl., Ex. BL; Ex. BM.)

**I. The requested accommodation is reasonable**

Nine square feet cannot accommodate Mr. Patanapanich's needs. Without adequate exterior space he cannot maintain the belongings essential to his survival or keep items his emotional support animal requires.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

| Component | Dimensions | Sq ft |
|---|---|---|
| Exterior space for survival gear, cooking, and daily living supplies | 2′ × 6′ | 12 |
| Animal supplies | 2′ × 2′ | 4 |
| **Total itemized need** | | **16** |
| **Footprint actually requested** | | **16** |

The itemized need and the requested footprint are identical at 16 square feet. Nothing in the request is surplus. (Prado Decl., Ex. BK (Patanapanich Decl.); Ex. C (Sept. 17, 2026 email); Ex. BN.)

### I. The City's response is not reasonable

The City determined that Mr. Patanapanich's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 9th and Harrison because it alleges that BHU has not established a nexus between Mr. Patanapanich's disability and the need for storage outside of his vehicle. The City also alleges that allowing camping in this site would

fundamentally alter a City program. The City has not provided an alternative location for Mr. Patanapanich. (Prado Decl., Ex. A.)

The nexus here is direct. Nerve damage has left Mr. Patanapanich without a tight grip in his right hand and with weakness in his right arm and foot, and he suffers bouts of fatigue lasting two to three days. If his survival gear and his dog's supplies must be kept inside the truck, he has to lift and shift them every time he needs to sleep, drive, or reach anything. That is exactly the lifting and gripping his disability prevents. A 2′ × 8′ space beside the truck removes that burden. The City does not dispute any of these facts and does not say what further information it needs.

The request is for 16 square feet—seven more than AR 10.2 allows. The City's determination does not explain how that space at 9th and Harrison would fundamentally alter a City program, and it offers no alternative location. It cites no order for its assertion that "the District Court affirmed" the absence of a nexus. 28 C.F.R. § 35.164; Dkt. 342 at 4.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City approve the 2′ × 8′ exterior footprint.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. BN (drawing); Ex. BM (photographs).)

**I. Further documentation of disability-related need**

The bosses at Whole Foods and the construction site for the slated new Berkeley fireman's headquarters respectively both gave him hygiene supplies to help care for the wound. He has their names on file and can, with their consent, provide their contacts. Either of these individuals can confirm their knowledge of his injury if needed. (Prado Decl., Ex. BO.) A neighbor called Lifelong Medical on his behalf upon learning of the infection, but he was not able to be seen.

Lifelong Medical 837 Addison St, Berkeley CA 94710

Care provider phone number: (510)-981-4100.

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. BK, Declaration of Kittivutt Patanapanich, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. BL: BHU's written accommodation request for Kittivutt Patanapanich, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. BN: annotated drawing of the requested footprint; Ex. BM: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Kittivutt Patanapanich".

### N. <u>15. Merced Dominguez</u>

#### A. Disabilities

Merced lives with degenerative spondylosis, which causes chronic pain and limits her mobility. She cannot walk long distances or sit for extended periods, making it physically impossible for her to repeatedly move her RV or relocate. Additionally, the emotional stress caused by the ongoing threat of abatement has exacerbated her high blood pressure, further jeopardizing her health. (Prado Decl., Ex. BP (Dominguez Decl.); Ex. BQ.)

#### B. Disability-related needs

Exterior space for survival gear and supplies for her emotional support animals. (Prado Decl., Ex. BP (Dominguez Decl.).)

#### C. Requested ADA accommodations

RV (approx. 20-inch interior walkway); footprint of 2′ × 8′ (16 sq ft) of exterior space, exclusive of the RV. None requested.

**D. Disability nexus**

The interior of the RV has only about 20 inches of walkway width along the length of the vehicle. This narrow path is the only space available for Ms. Dominguez to move, and it must remain clear for her to safely navigate inside her home. Due to her degenerative spondylosis, she requires: (Prado Decl., Ex. BP (Dominguez Decl.); Ex. BQ; Ex. C.)

● A clear path of travel inside the RV to avoid falls and to move without pain;

● Space to sit and rest when her pain becomes unmanageable; and

● A stable, unobstructed environment to prevent aggravation of her condition.

Because the walkway must remain clear, there is no interior space to store her essential mobility aids, survival gear and supplies for her emotional support animals. These items cannot be stored inside the RV without obstructing her path of travel and places where she can sit, creating a serious risk of falls and injury.

For someone with degenerative spondylosis, a fall could cause a fracture, spinal injury, or permanent loss of mobility. The 3x3 rule therefore does not merely inconvenience her—it forces her to choose between complying with the rule and protecting her physical safety.

The City's enforcement of Administrative Regulation 10.2, which limits personal property on sidewalks to nine square feet, does not account for Ms. Dominguez's disability-related needs. She requires exterior space immediately adjacent to her RV to store:

● Mobility aids essential to her ability to move and function;

- Survival gear necessary for daily living; and
- Supplies for her emotional support animals, which are essential to her mental health and stability.

Without this exterior space, Ms. Dominguez would be forced to choose between maintaining a clear path inside her RV and having access to the mobility aids and supplies she needs to survive. Neither option is acceptable, and both would aggravate her disabilities. The Court has already held that the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." (Dkt. 288 at 21.) The City's prior determination that the 3x3 rule is a "fundamental operational feature" of its sidewalk management program does not address Ms. Dominguez's specific circumstances or explain why a modest, individualized exemption for one disabled individual would fundamentally alter the program.

**E. Requested location**

First choice: 8th and Harrison Street. Alternatives: None identified to date. (Prado Decl., Ex. BQ; Ex. BR.)

**I. The requested accommodation is reasonable**

Ms. Dominguez lives with degenerative spondylosis, which limits her mobility and causes chronic pain. Her RV has only about a 20-inch interior walkway, which must remain clear for her to move safely. Nine square feet of exterior space cannot hold her mobility aids, survival gear, or animal supplies. Without adequate exterior space she would be forced to obstruct her interior path of travel, increasing her risk of falls and aggravating her disabilities.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

| Component | Dimensions | Sq ft |
|---|---|---|
| Exterior space for survival gear and shelter maintenance | 2′ × 6′ | 12 |
| Emotional support animal supplies | 2′ × 2′ | 4 |
| **Total itemized need** | | **16** |
| **Footprint actually requested** | | **16** |

The itemized need and the requested footprint are identical at 16 square feet. Nothing in the request is surplus. (Prado Decl., Ex. BP (Dominguez Decl.); Ex. C (Sept. 17, 2026 email); Ex. BS.)

### I. The City's response is not reasonable

The City determined that Ms. Dominguez's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 8th and Harrison because it alleges that BHU has not established a nexus between Ms. Dominguez's disability and the need for storage outside of her vehicle. The City also alleges that allowing camping in this site would

fundamentally alter a City program. The City has not provided an alternative location for Ms. Dominguez. (Prado Decl., Ex. A.)

Ms. Dominguez's request is among the most precisely documented in the record, and the City's "no nexus" finding does not engage with it. Her RV has a single interior walkway about 20 inches wide. Degenerative spondylosis limits her mobility and causes chronic pain, and a fall could cause a fracture or spinal injury. If her mobility aids, survival gear, and her animals' supplies are stored inside, they block the only path she has. The exterior footprint is what keeps that path clear. The City does not dispute the walkway width, her diagnosis, or the risk of falls. It does not say what is missing.

The City offers no alternative location and does not explain how a few square feet beside her RV would fundamentally alter a City program. 28 C.F.R. § 35.164; Dkt. 342 at 4. Its assertion that "the District Court affirmed" the absence of a nexus cites no order addressing Ms. Dominguez.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City approve the requested exterior footprint.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. BS (drawing); Ex. BR (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. BP, Declaration of Merced Dominguez, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. BQ: BHU's written accommodation request for Merced Dominguez, submitted to the City on September 14, 2026, with signed authorization.

(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.
(4) Ex. A: the City's written determination.
(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
(6) Ex. BS: annotated drawing of the requested footprint; Ex. BR: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Merced Dominguez".

**O. <u>16. Yesica Prado</u>**

**A. Disabilities**

Yesica Prado lives with PTSD and ADHD. (Prado Decl., Ex. BT.)

**B. Disability-related needs**

Exterior space for survival gear and a cat tree used by her emotional support animal as steps into and out of her dwelling. (Prado Decl.)

**C. Requested ADA accommodations**

RV; footprint of 2′ × 6′ (12 sq ft) of exterior space, exclusive of the RV. None requested.

**D. Disability nexus**

Ms. Prado's PTSD and ADHD impair her executive functioning, emotional regulation, sensory processing, and ability to cope with sudden change. The exterior footprint serves two disability-related needs. (Prado Decl., Ex. BT; Ex. C.)

<u>1) Garbage can outside the dwelling</u>

Ms. Prado's ADHD prevents her from reliably carrying out a daily routine of finding a public disposal site, so garbage accumulates. Kept inside her small RV, it produces smells and visual clutter, sensory stimuli that trigger her ADHD symptoms and

undermine the stable environment her PTSD requires. A garbage can immediately outside the RV lets her dispose of waste without that daily routine and keeps the interior clear.

2) Cat tree for her emotional support animal

Ms. Prado relies on her cat, an emotional support animal, to regulate her emotions. The cat tree outside the RV serves as steps that let the cat enter and leave through its cat door safely and on its own. Without it, the animal cannot come and go, and keeping the support Ms. Prado depends on becomes impractical in the RV.

**E. Requested location**

First choice: 8th and Harrison Street. Alternatives: None identified to date. (Prado Decl., Ex. BT; Ex. BU.)

**I. The requested accommodation is reasonable**

Nine square feet cannot accommodate Ms. Prado's exterior needs or her animal's supplies. The cat tree is not ornamental — it functions as the animal's means of entering and leaving the RV. Without adequate exterior space she cannot maintain her belongings or keep her animal's environment stable.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

| Component | Dimensions | Sq ft |
|---|---|---|
| Exterior space for survival gear | 2′ × 4′ | 8 |
| Cat tree used as steps into and out of the dwelling | 2′ × 2′ | 4 |
| **Total itemized need** | | **12** |
| **Footprint actually requested** | | **12** |

The itemized need and the requested footprint are identical at 12 square feet. Nothing in the request is surplus. (Prado Decl., Ex. C (Sept. 17, 2026 email); Ex. BV.)

### I. The City's response is not reasonable

The City determined that Ms. Prado's requested accommodation at the proposed locations could not be granted. The City rejected the proposed lot at 8th and Harrison because it alleges that BHU has not established a nexus between Ms. Prado's disability and the need for storage outside of her vehicle. The City also alleges that allowing camping in this site would fundamentally alter a City program. The City has not provided an alternative location for Ms. Prado. (Prado Decl., Ex. A.)

The City's "no nexus" finding does not respond to the explanation above. The City does not dispute Ms. Prado's diagnoses, her reliance on her emotional support animal, or the function of either item, and it does not say what is missing. The request is for 12 square feet—three more than AR 10.2 allows. The City has not explained how that space beside her RV at 8th and Harrison would fundamentally alter a City program. 28 C.F.R. § 35.164; Dkt. 342 at 4. Nor does it cite any order for its statement that "the District Court affirmed" the absence of a nexus.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City approve the 2′ × 6′ exterior footprint.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. BV (drawing); Ex. BU (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Declaration of Yesica Prado, describing the disabilities, functional limitations, and the items the footprint must hold.
(2) Ex. BT: BHU's written accommodation request for Yesica Prado, submitted to the City on September 14, 2026, with signed authorization.
(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.
(4) Ex. A: the City's written determination.
(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
(6) Ex. BV: annotated drawing of the requested footprint; Ex. BU: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Yesica Prado".

## *P.* <u>17. Orvel Roadlander</u>

**A. Disabilities**

Post-Traumatic Stress Disorder (PTSD): Mr. Roadlander experiences symptoms of PTSD, including hypervigilance, flashbacks, and acute anxiety triggered by enforcement actions, displacement, and the threat of property destruction. These symptoms are exacerbated by sudden change and the loss of stability. (Prado Decl., Ex. BW (Roadlander Decl.); Ex. BX.)

Bipolar Disorder: Mr. Roadlander experiences bipolar disorder, which causes significant fluctuations in mood, energy, and cognitive functioning. During depressive episodes, he struggles with motivation, fatigue, and the ability to complete tasks. During manic episodes, he

may experience heightened anxiety, impulsivity, and difficulty concentrating. Both phases impair his ability to plan, organize, and execute the complex tasks required for relocation.

Obsessive-Compulsive Disorder (OCD): Mr. Roadlander experiences obsessive thoughts and compulsive behaviors that significantly impair his ability to function in high-stress environments. His OCD symptoms include difficulty with change, a need for predictability and routine, and distress when his environment and community are disrupted—all of which are triggered by enforcement actions and forced relocation.

**B. Disability-related needs**

Space for shelter, survival gear, mobility aids, medical supplies, and his emotional support animal. (Prado Decl., Ex. BW (Roadlander Decl.).)

**C. Requested ADA accommodations**

8-person tent (7′ × 16′ = 112 sq ft); footprint of 10′ × 20′ (200 sq ft). Transportation assistance requested.

**D. Disability nexus**

Mr. Roadlander's disabilities directly impair his ability to comply with the City's encampment closure notice in the following ways: (Prado Decl., Ex. BW (Roadlander Decl.); Ex. BX; Ex. C.)

Psychiatric Barriers to Compliance: His PTSD, bipolar disorder, and OCD impair his executive functioning, making it difficult or impossible for him to organize his belongings, plan a relocation, process complex instructions, or respond to rapidly changing enforcement conditions—particularly under pressure. The stress of enforcement—including the presence of City staff, loud noises, and the threat of property destruction—triggers his PTSD symptoms, destabilizes his mood, and exacerbates his OCD-related need for order and predictability.

Inability to transport Belongings: The combined effect of his disabilities prevents him from effectively transporting his personal belongings without assistance. His PTSD and bipolar disorder impair his ability to focus, plan, and complete tasks; his OCD makes it distressing to disrupt his living space and belongings. The panic and anxiety triggered by enforcement can leave him paralyzed and unable to act.

The 3x3 Rule is Unworkable: The City's enforcement of Administrative Regulation 10.2, which limits personal property to nine square feet, is functionally impossible for Mr. Roadlander. No tent can fit within a 3'x3' space, and a space that small cannot accommodate his essential belongings, medical supplies, or his need for a stable, predictable environment. He requires additional space to maintain his belongings in an organized manner, which is essential to managing his OCD.

Property Loss: If the City abates his area without providing accommodations, Mr. Roadlander will be unable to remove his tent and essential belongings due to his psychiatric symptoms. The destruction or loss of his survival equipment—tent, sleeping gear, clothing, and personal items—would render him completely unsheltered and destabilize his mental health.

**E. Requested location**

Proposed locations: 704–738 Cedar Street; 2nd and Camelia; 2nd and Cedar; 2nd and Jones; or 2nd and Page (Prado Decl., Ex. BX; Ex. BY.)

**I. The requested accommodation is reasonable**

Mr. Roadlander lives with PTSD, bipolar disorder, and OCD. Nine square feet cannot hold his tent, his mobility aids, or his animal. Without adequate space his psychiatric symptoms are aggravated and he loses the stability essential to managing his disabilities.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

**I. The requested footprint is supported by measurement**

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Mobility aids | 4′ × 3′ | 12 |
| Emotional support animal (large) | 5′ × 5′ | 25 |
| **Total itemized need** | | **201** |
| **Footprint actually requested** | | **200** |

The requested footprint is smaller than the itemized need — 200 square feet against 201. This member is asking for less space than his or her documented disability-related needs require. That

disposes of any suggestion that the request is inflated. (Prado Decl., Ex. BW (Roadlander Decl.); Ex. C (Sept. 17, 2026 email); Ex. BZ.)

**I. The City's response is not reasonable**

The City has issued no written determination on this request. It has not granted it, denied it, or proposed an alternative. It has not assessed any of the locations this member proposed. Instead, between September 14 and September 17, the City asked three successive rounds of questions, each introducing a category of information it had never before required — including in Lewanda Parnell's case, where the City approved a 10′1″ × 45′ footprint on a submission containing the same four categories of information BHU provided here. When asked to identify the legal authority or City procedure requiring the new information, the City's ADA Program Coordinator answered that it was "outside of my role to debate the interpretation of any court order" and that the City "does not have a 'nexus procedure' at this time." (Prado Decl.)

That is not an individualized assessment. The Court has held that the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." Dkt. 288 at 21. The City instead abated this member's location on September 15 and 16 without completing the process, without providing the relocation assistance and property storage the permanent injunction requires, and without supplying the replacement tents the Court ordered. Dkt. 326 at 4; Dkt. 288 at 65–67. A response that consists of escalating information demands followed by abatement is not a reasonable response to an accommodation request; it is the absence of one.

The City has also told BHU that Mr. Roadlander "is not under the Special Master's jurisdiction" and that it "will send a separate response." As of November 20, 2026, no response has been sent.

Whether the Special Master's appointment reaches Mr. Roadlander is a question pending before Judge Chen (Dkt. 444). That question does not suspend the City's own obligations. The permanent injunction protects BHU members citywide (Dkt. 326), and the City's duty to engage in the interactive process does not depend on which judicial officer will review the outcome.

On the merits, Mr. Roadlander's request is identical in form to those the City did decide: an 8-person tent on a 10′ × 20′ footprint, with the nexus documented by a detailed statement and signed authorization. Nine square feet cannot hold his tent or keep his emotional support animal with him. His PTSD, bipolar disorder, and OCD all depend on the stable, organized environment that only shelter provides.

If Dkt. 444 is granted, the Special Master should adjudicate this request on this record. In any event, the Special Master should recommend that the City issue a written determination on Mr. Roadlander's request within 14 days, supported by site measurements and, for any denial, the written statement of reasons 28 C.F.R. § 35.164 requires.

## I. Visualization of requested accommodation

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. BZ (drawing); Ex. BY (photographs).)

## I. Further documentation of disability-related need

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. BW, Declaration of Orvel Roadlander, describing the disabilities, functional limitations, and the items the footprint must hold.
(2) Ex. BX: BHU's written accommodation request for Orvel Roadlander, submitted to the City on September 14, 2026, with signed authorization.
(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.
(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
(6) Ex. BZ: annotated drawing of the requested footprint; Ex. BY: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Orvel Roadlander".

## *Q.* 18. Shareef Muwakkil

### A. Disabilities

Physical Disabilities: (Prado Decl., Ex. CA (Muwakkil Decl.); Ex. CB.)

Mr. Muwakkil has experienced chronic swelling in both legs for the past three years. He also has a heart valve condition and has suffered two myocardial infarctions (heart attacks).

Mental Health Disabilities:

Mr. Muwakkil has lived with bipolar disorder and psychosis for over fifteen years.

### B. Disability-related needs

Space for shelter, survival gear, mobility aids, and medical supplies. (Prado Decl., Ex. CA (Muwakkil Decl.).)

### C. Requested ADA accommodations

8-person tent (7′ × 16′ = 112 sq ft); footprint of 10′ × 20′ (200 sq ft). Transportation assistance requested.

1) ADA-Exempted Footprint

A footprint larger than the 9-square-foot limit, sufficient for an 8-person tent, his mobility aids, and his medical supplies, on any public sidewalk where a clear path remains for pedestrians. Mr. Muwakkil's heart valve condition and two prior heart attacks make it unsafe for him to lift and carry his belongings. His chronic leg swelling and poorly healed ankle fracture limit how far he can walk.

2) Transportation Assistance

Advance-scheduled, hands-on assistance from City staff to pack and transport his belongings if relocation is required. His executive-functioning challenges make it extremely difficult for him to schedule and coordinate a move on his own, and the physical exertion of moving belongings risks a cardiac event.

**D. Disability nexus**

Physical Disability-Related Limitations: (Prado Decl., Ex. CA (Muwakkil Decl.); Ex. CB; Ex. C.)

Mr. Muwakkil's leg swelling limits his mobility from day to day. His heart condition limits his ability to lift, carry, or move personal belongings safely.

Mental Health Disability-Related Limitations:

Mr. Muwakkil's mental health disabilities contribute to executive functioning challenges, including difficulty scheduling, organizing, and coordinating complex tasks. His conditions also result in antisocial tendencies that may complicate direct interactions with City staff during enforcement activities.

**E. Requested location**

Proposed locations:1499–1451 Second Street (sidewalk behind K-rails); 2nd and Cedar; or 704–738 Cedar Street (Prado Decl., Ex. CB; Ex. CC.)

**I. The requested accommodation is reasonable**

Mr. Muwakkil lives with PTSD, chronic pain, and a history of heart attacks. Nine square feet cannot hold his tent, his mobility aids, or his medical supplies. Without adequate space he faces a heightened risk of cardiac strain and psychiatric decompensation.

The threshold question is settled on this record. The City has conceded that no tent fits within a 3×3-foot space, and the Court recorded that concession without dispute. Dkt. 288 at 56. No tent manufactured and sold at retail is narrower than approximately seven feet. It follows that a footprint larger than nine square feet is necessary for this member to have any shelter at all — and shelter is the precondition for sleeping, sitting, standing, changing clothes, storing and taking medication, eating, and maintaining the privacy that psychiatric and physical disabilities alike require.

### I. The requested footprint is supported by measurement

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Mobility aids | 4′ × 3′ | 12 |
| **Total itemized need** | | **176** |
| **Footprint actually requested** | | **200** |

The itemized components total 176 square feet within a requested footprint of 200 square feet. The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult’s single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. CA (Muwakkil Decl.); Ex. C (Sept. 17, 2026 email); Ex. CD.)

**I. The City's response is not reasonable**

The City has issued no written determination on this request. It has not granted it, denied it, or proposed an alternative. It has not assessed any of the locations this member proposed. Instead, between September 14 and September 17, the City asked three successive rounds of questions, each introducing a category of information it had never before required — including in Lewanda Parnell's case, where the City approved a 10′1″ × 45′ footprint on a submission containing the same four categories of information BHU provided here. When asked to identify the legal authority or City procedure requiring the new information, the City's ADA Program Coordinator answered that it was "outside of my role to debate the interpretation of any court order" and that the City "does not have a 'nexus procedure' at this time." (Prado Decl.)

That is not an individualized assessment. The Court has held that the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." Dkt. 288 at 21. The City instead abated this member's location on September 15 and 16 without completing the process, without providing the relocation assistance and property storage the permanent injunction requires, and without supplying the replacement tents the Court ordered. Dkt. 326 at 4; Dkt. 288 at 65–67. A response that consists of escalating information demands followed by abatement is not a reasonable response to an accommodation request; it is the absence of one.

The Court has already ruled on Mr. Muwakkil. In the Summary Judgment Order, the Court held that the City's categorical enforcement of the 3×3 rule against him was unlawful. It directed an individualized assessment of his disability-related needs and the actual sidewalk at issue. Dkt. 288 at 72–73. Telling him now that he is "not under the Special Master's jurisdiction," and then

sending nothing, is not that assessment. As of November 20, 2026, the promised "separate response" has not arrived.

His first-choice site, 1499–1451 Second Street, is a sidewalk the City has allowed to be obstructed with K-rails. The City has given no measurements for it and no alternative. Whether the Special Master adjudicates his request is pending before Judge Chen (Dkt. 444). In the meantime, the City's obligation to issue a written determination stands on its own.

If Dkt. 444 is granted, the Special Master should adjudicate this request on this record. In any event, the Special Master should recommend that the City issue a written determination on Mr. Muwakkil's request within 14 days, supported by site measurements and, for any denial, the written statement of reasons 28 C.F.R. § 35.164 requires.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. CD (drawing); Ex. CC (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. CA, Declaration of Shareef Muwakkil, describing the disabilities, functional limitations, and the items the footprint must hold.
(2) Ex. CB: BHU's written accommodation request for Shareef Muwakkil, submitted to the City on September 14, 2026, with signed authorization.
(3) Ex. C: BHU's individualized nexus statement (September 14, 2026) and itemized footprint measurements (September 17, 2026), emailed to City ADA Program Coordinator Thomas Gregory.
(4) Ex. A: the City's written determination.
(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
(6) Ex. CD: annotated drawing of the requested footprint; Ex. CC: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Shareef Muwakkil".

R. **19. Bradford Raymer**

**A. Disabilities**

Mental Health Disabilities: (Prado Decl., Ex. CE (Raymer Decl.); Ex. CF.)

- Clinical depression
- Severe anxiety
- Attention-deficit/hyperactivity disorder (ADHD)

Mr. Raymer's disabilities began in early childhood, during second grade. His conditions impact his ability to function in high-pressure or fast-paced situations. Sudden enforcement actions, unexpected relocations, or being rushed can trigger acute anxiety attacks, emotional shutdowns and executive dysfunction.

**B. Disability-related needs**

Space for shelter, survival gear, bicycle, medical supplies, and his emotional support animal. (Prado Decl., Ex. CE (Raymer Decl.).)

**C. Requested ADA accommodations**

Transportation

Mr. Raymer's depression, severe anxiety, and ADHD impair his ability to function when rushed. Sudden enforcement and unexpected relocation trigger acute anxiety attacks, emotional shutdowns, and executive dysfunction. These leave him unable to organize and move his tent, bicycle, gear, and emotional support animal on a deadline. He requests

advance-scheduled, hands-on assistance from City staff to transport his belongings if relocation is required.

Footprint Larger than 9 Square Feet:

Mr. Raymer requests an exemption to the 3'x3' rule to occupy an 8-person tent on a 11' x 20' footprint.

**D. Disability nexus**

Mr. Raymer requires a footprint large enough to accommodate a tent (shelter), his survival gear, his medical supplies, his bicycle, and his emotional support animals. These items cannot be stored inside a tent or vehicle without obstructing the interior path of travel, which directly aggravates his disabilities. (Prado Decl., Ex. CE (Raymer Decl.); Ex. CF.)

**E. Requested location**

4th and Camelia St. (Prado Decl., Ex. CF; Ex. CG.)

**I. The requested accommodation is reasonable**

Nine square feet cannot hold a tent, let alone Mr. Raymer's survival gear, bicycle, medical supplies, and emotional support animal. The City has conceded that no tent fits within a 3×3-foot space. Dkt. 288 at 56. Without a tent, Mr. Raymer has no stable, private space in which to manage the anxiety and emotional shutdowns that sudden disruption triggers, and no way to keep his emotional support animal with him. A footprint larger than nine square feet is the precondition to his having any shelter at all.

**I. The requested footprint is supported by measurement**

The itemized components total 201 square feet within a requested footprint of 220 square feet (11′ × 20′). The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. CE (Raymer Decl.); Ex. CH.)

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Bicycle | 6′ × 2′ | 12 |
| Emotional support animal (large) | 5′ × 5′ | 25 |
| **Total itemized need** | | **201** |
| **Footprint actually requested** | | **220** |

**I. The City's response is not reasonable**

The City has repeatedly denied Mr. Raymer's requests for accommodations and requested more information at each stage, including information that City had not previously required before conducting individualized assessments and approving exemptions to its policies. (Prado Decl., Ex. A.)

The City offered Mr. Raymer (1) up to 6′3″ × 32′ at Fourth and Camelia Street near the railroad fence and red curb, or (2) up to 4′6″ × 161′ in the non-red-curb area. Neither fits a tent. The first strip is 9 inches narrower than his 7-foot tent, and narrower than even the tent the City distributes. The second is narrower than the smallest two-person tent. The second strip alone covers about 725 square feet, more than three times the 220 he

requested, so the City has found the space at the very site he proposed. The determination does not state the sidewalk width at either segment. It does not explain why the path could not yield the 9 inches that separate the first strip from a usable footprint.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Raymer's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. CH (drawing); Ex. CG (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. CE, Declaration of Bradford Raymer, describing the disabilities, functional limitations, and the items the footprint must hold.
(2) Ex. CF: BHU's written accommodation request for Bradford Raymer, submitted to the City on September 1, 2026, with signed authorization.
(3) Dkt. __: the request and supporting materials previously submitted to the Court.
(4) Ex. A: the City's written determination.
(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
(6) Ex. CH: annotated drawing of the requested footprint; Ex. CG: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Bradford Raymer".

S. <u>**20.** Jackeline Mendoza</u>

**A. Disabilities**

<u>Physical Disabilities:</u> (Prado Decl., Ex. CI (Mendoza Decl.); Ex. CJ.)

- Kidney failure

- Chronic back pain from epidural injections

Ms. Mendoza has kidney failure, which is a chronic and ongoing condition. It causes fatigue, weakness, and reduced stamina. The condition limits her ability to sustain physical exertion over time, including the sustained lifting, carrying, and walking. Her chronic back pain limits her mobility and her ability to bend, lift, carry, and stand for extended periods.

**B. Disability-related needs**

She requires space for shelter, survival gear, bicycle, medical supplies, and her two emotional support animals. (Prado Decl., Ex. CI (Mendoza Decl.).)

**C. Requested ADA accommodations**

<u>Transportation</u>

Ms. Mendoza's kidney failure causes fatigue, weakness, and reduced stamina, and her chronic back pain limits her ability to bend, lift, carry, and stand. She cannot sustain the lifting, carrying, and walking that moving a tent, bicycle, gear, and two animals requires. She requests advance-scheduled, hands-on assistance from City staff to pack and transport her belongings if relocation is required.

<u>Footprint Larger than 9 Square Feet</u>:

Ms. Mendoza requests an exemption to the 3'x3' rule to occupy an 8-person tent on a 11' x 20' footprint.

**D. Disability nexus**

Ms. Mendoza requires a footprint large enough to accommodate a tent (shelter), her survival gear, her medical supplies, her bicycle, and her emotional support animals. These items cannot be stored inside a tent or vehicle without obstructing the interior path of travel, which directly aggravates her disabilities. (Prado Decl., Ex. CI (Mendoza Decl.); Ex. CJ.)

**E. Requested location**

4th and Camelia St. (Prado Decl., Ex. CJ; Ex. CK.)

**I. The requested accommodation is reasonable**

Nine square feet holds no tent. The City has conceded that no tent fits within a 3×3-foot space. Dkt. 288 at 56. Without shelter, Ms. Mendoza, whose kidney failure leaves her fatigued and weak, has no place to rest and no dry place to keep her medical supplies. She also has no way to keep her two emotional support animals, a cat and a dog, with her. A footprint larger than nine square feet is the precondition to her having any shelter at all.

**I. The requested footprint is supported by measurement**

The itemized components total 211 square feet within a requested footprint of 220 square feet (11′ × 20′). The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. CI (Mendoza Decl.); Ex. CL.)

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |

| | | |
|---|---|---|
| Bicycle | 6′ × 2′ | 12 |
| Two emotional support animals (cat and dog) | 7′ × 5′ | 35 |
| **Total itemized need** | | **211** |
| **Footprint actually requested** | | **220** |

## I. The City's response is not reasonable

The City offered Ms. Mendoza (1) up to 6′3″ × 32′ at Fourth and Camelia Street near the railroad fence and red curb, or (2) up to 4′6″ × 161′ in the non-red-curb area. These are the same two strips it offered Mr. Raymer. (Prado Decl., Ex. A.)

Neither strip fits Ms. Mendoza's 7-foot tent or the tent the City distributes. The first strip is 9 inches too narrow, and the second is narrower than the smallest two-person tent. The second strip alone covers about 725 square feet, so the City has found the space at the site she proposed. It has not stated the sidewalk width or explained why the path could not yield the difference.

The City offered the identical two strips to Mr. Raymer, who proposed the same site. The determination does not say whether both members could be accommodated at once, or where the second would go if the first accepted. An offer that may be available to only one of the two people it was made to is not an individualized assessment of either.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Ms. Mendoza's proposed locations or identify, with measurements, a location where a footprint at least as wide as her tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. CL (drawing); Ex. CK (photographs).)

**I. Further documentation of disability-related need**

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. CI, Declaration of Jackeline Mendoza, describing the disabilities, functional limitations, and the items the footprint must hold.

(2) Ex. CJ: BHU's written accommodation request for Jackeline Mendoza, submitted to the City on September 1, 2026, with signed authorization.

(3) Dkt. __: the request and supporting materials previously submitted to the Court.

(4) Ex. A: the City's written determination.

(5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

(6) Ex. CL: annotated drawing of the requested footprint; Ex. CK: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Jackeline Mendoza".

**T. <u>21. Shawman</u>**

**A. Disability**

Shawman lives with documented, multiple disabilities resulting from trauma and other medical conditions, including: (Prado Decl., Ex. CM (Shawman Decl.); Ex. CN.)

<u>Physical Disabilities:</u>

- Traumatic Brain Injury due to history of being hit in the head with a club, causing:
  - Internal bleeding
  - Impaired memory
  - Executive functioning issues
- Vision problems

- Hearing impairment in one ear (left), which contributes to spatial awareness difficulties.

<u>Mental Health Disabilities:</u>

- Severe anxiety
- Panic attacks
- Other mental health conditions stemming from abuse and trauma

These conditions substantially limit one or more major life activities, including remembering, concentrating, decisionmaking, task initiation and completion, seeing, hearing, regulating emotions and handling stress. Her executive functioning impairment means she cannot independently structure and complete the complex tasks required for relocation without direct, step-by-step support.

**B. Disability-related needs**

She requires space for shelter, survival gear and medical supplies. (Prado Decl., Ex. CM (Shawman Decl.).)

**C. Requested ADA accommodations**

<u>Transportation</u>

Shawman's traumatic brain injury impairs her memory and executive function, and her vision and hearing impairments limit her ability to navigate unfamiliar surroundings safely. Panic attacks triggered by enforcement can leave her unable to act. She cannot independently pack, carry, and re-establish her belongings at a new site. She requests advance-scheduled, hands-on assistance from City staff to transport her belongings if relocation is required.

Footprint Larger than 9 Square Feet:

Shawman requests an exemption to the 3'x3' rule to occupy a 6-person tent on a 10' x 20' footprint.

**D. Disability nexus**

The City's standard encampment management policies will, if applied to Shawman without modification, foreseeably aggravate her disabilities in the following ways: (Prado Decl., Ex. CM (Shawman Decl.); Ex. CN.)

1) Short-notice relocation

Her traumatic brain injury, impaired memory, and executive dysfunction require predictability and adequate time to process information. Sudden displacement triggers confusion, disorientation, panic attacks and complete task paralysis, leaving her unable to plan or comply with City orders. The ability to safely store her belongings at a singular site will mitigate these symptoms.

2) Physical demands of relocation

Due to her executive functioning impairment, vision problems and panic attacks, Shawman cannot independently organize, pack, or transport her belongings. The ability to safely store her belongings at a singular site will mitigate the physical demands of relocation.

3) 9-square-foot limit on sidewalks

Compliance is impossible without abandoning her tent (her medical equipment and only shelter) and essential personal belongings. Her executive dysfunction prevents her from

making rapid decisions about what to keep or discard, and her vision and hearing impairments make navigating a new environment dangerous.

<u>4) Panic attacks triggered by enforcement activity</u>

The stress of enforcement encounters—loud noises, unfamiliar officials, sudden demands—directly triggers Shawman's panic attacks, which can be debilitating and leave her in a state of shock unable to function or comply.

<u>5) Threat of citation, arrest, and property destruction</u>

Penalizing Shawman for disability-related inability to comply—such as being unable to organize her belongings, pack within time limits, or make decisions under pressure—would constitute discrimination under the ADA. The stress of such encounters would trigger panic attacks and deepen her trauma.

<u>6) No property storage due to leptospirosis</u>

Losing all of her belongings—including items essential to daily survival—would be devastating. For someone with traumatic brain injury, memory impairment, and anxiety, losing familiar, essential items can trigger acute psychological crisis and further cognitive decline.

<u>7) Vision and hearing impairments</u>

Shawman's vision problems and hearing impairment in her left ear mean that standard written notices may be difficult for her to read, and verbal instructions may be difficult for her to hear or understand, especially in stressful enforcement environments. She has been completely unaware all this time of the notices that have been posted for the encampment closure.

**E. Requested location**

1499-1451 Second St. (behind K-rails) (Prado Decl., Ex. CN; Ex. CO.)

**I. The requested accommodation is reasonable.**

Nine square feet holds no tent. The City has conceded that no tent fits within a 3×3-foot space. Dkt. 288 at 56. For Shawman, a tent at a single, stable site is what makes her other limitations manageable. It lets her keep her belongings in one known place despite her memory impairment and gives her a protected space when panic attacks strike. It also spares her the repeated navigation of new surroundings that her vision and hearing impairments make dangerous. A footprint larger than nine square feet is the precondition to her having any shelter at all.

**I. The requested footprint is supported by measurement.**

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (6-person) | 10′ × 9′ | 90 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| **Total itemized need** | | **142** |
| **Footprint actually requested** | | **200** |

The itemized components total 142 square feet within a requested footprint of 200 square feet (10′ × 20′). The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. CM (Shawman Decl.); Ex. CP.)

**I. The City's response is not reasonable.**

The City originally determined that it could not grant an extended sidewalk footprint because it would fundamentally alter the City's management of the public right-of-way. The City has yet to make an individualized determination concerning Shawman's need for expanded space. The City relied on Berkeley Administrative Regulation 10.2 to deny Shawman's initial request for a larger footprint. (Prado Decl., Ex. A.)

The City's determination for Shawman is a single sentence: the "No Lodging" designation makes any accommodation at 1499–1451 Second Street a fundamental alteration. The Court has already found that rationale unsupported. Dkt. 342 at 4. The City provides no measurements of the site, no alternative footprint, and no alternative location. Meanwhile, it has allowed this same stretch of sidewalk to be obstructed with K-rails. If K-rails can occupy the sidewalk without fundamentally altering a City program, the City must explain why one disabled person's tent would. It has not. 28 C.F.R. § 35.164.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Shawman's proposed locations or identify, with measurements, a location where a footprint at least as wide as her tent can be accommodated.

***I.* Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. CP (drawing); Ex. CO (photographs).)

**I. Further documentation of disability-related need**

I. Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

- I. (1) Ex. CM, Declaration of Shawman, describing the disabilities, functional limitations, and the items the footprint must hold.
- I. (2) Ex. CN: BHU's written accommodation request for Shawman, submitted to the City on September 1, 2026, with signed authorization.
- I. (3) Dkt. __: the request and supporting materials previously submitted to the Court.
- I. (4) Ex. A: the City's written determination.
- I. (5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
- I. (6) Ex. CP: annotated drawing of the requested footprint; Ex. CO: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Shawman".

**U. <u>22. Jermaine Lee White</u>**

**A. Disability**

Mr. White lives with documented disabilities, including: (Prado Decl., Ex. CQ (White Decl.); Ex. CR.)

<u>Psychiatric Disabilities:</u>

- Post-Traumatic Stress Disorder (PTSD
- Severe Anxiety

- Hoarding disorder

These conditions impair his ability to organize, concentrate, decision-making, regulating emotions, handling stress, initiating and following through on tasks. His executive dysfunction means he cannot independently structure and complete tasks required for relocation without direct support.

**B. Disability-related needs**

He requires space for shelter, survival gear, medical supplies, and his emotional support animal. (Prado Decl., Ex. CQ (White Decl.).)

**C. Requested ADA accommodations**

<u>Transportation</u>

Mr. White's PTSD, severe anxiety, and executive dysfunction mean he cannot structure and complete the steps of a relocation—sorting, packing, carrying, and re-establishing his camp—without direct support. He requests advance-scheduled, hands-on assistance from City staff to pack and transport his belongings if relocation is required.

<u>Footprint Larger than 9 Square Feet</u>:

Mr. White requests an exemption to the 3'x3' rule to occupy a 10-person tent on a 11' x 30' footprint.

**D. Disability nexus**

The City's standard encampment management policies will, if applied to Mr. White without modification, foreseeably aggravate his disabilities in the following ways: (Prado Decl., Ex. CQ (White Decl.); Ex. CR.)

Short-notice relocation

His anxiety and executive dysfunction require predictability and adequate time to process information. Sudden displacement triggers panic, task paralysis and emotional dysregulation, leaving him unable to plan or comply with City orders. The stability provided by a singular site would mitigate these symptoms.

Physical demands of relocation

Due to his executive dysfunction, Mr. White cannot independently organize, pack, or transport his belongings. The physical tasks of relocation are impossible without direct assistance because he cannot structure the work or follow through without support. The stability provided by a singular site would mitigate these symptoms.

9-square-foot limit on sidewalks

Compliance is impossible without abandoning his tent (his medical equipment and only accessible shelter) and essential belongings. His executive dysfunction prevents him from making rapid decisions about what to keep or discard, and the space is too small for him to rest or store his necessities.

Threat of citation, arrest, and property destruction

Penalizing Mr. White for disability-related inability to comply—such as being unable to organize his belongings, pack within time limits, or make decisions under pressure—would constitute discrimination under the ADA. The stress of such encounters would deepen his anxiety and render him even less able to comply. The stability provided by a singular site would mitigate these symptoms.

No property storage due to leptospirosis

Losing all of his belongings—including items essential to daily survival—would be devastating. For someone with anxiety and executive dysfunction, losing familiar, essential items can trigger acute psychological crises. A singular site to store his belongings would mitigate these symptoms.

**E. Requested location**

1499-1451 Second Street (sidewalk behind K-rails) (Prado Decl., Ex. CR; Ex. CS.)

I. **The requested accommodation is reasonable.**

Nine square feet holds no tent. The City has conceded that no tent fits within a 3×3-foot space. Dkt. 288 at 56. Mr. White's disabilities make decisions about what to keep or discard extremely difficult under pressure. The 3×3 rule demands exactly that decision, and then leaves him without shelter or a place to keep his emotional support animal. The Court has already held that the City's categorical enforcement of the 3×3 rule against Mr. White was unlawful. Dkt. 288 at 72–73. A footprint larger than nine square feet is the precondition to his having any shelter at all.

**I. The requested footprint is supported by measurement**

| **Component** | **Dimensions** | **Sq ft** |
|---|---|---|
| Tent (10-person) | 17′ × 9′ | 153 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Emotional support animal (large) | 5′ × 5′ | 25 |
| **Total itemized need** | | **230** |
| **Footprint actually requested** | | **330** |

The itemized components total 230 square feet within a requested footprint of 330 square feet (11′ × 30′). The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. CQ (White Decl.); Ex. CT.)

**I. The City's response is not reasonable.**

The City originally determined that it could not grant an extended sidewalk footprint because it would fundamentally alter the City's management of the public right-of-way. The City has yet to make an individualized determination concerning Mr. White's need for expanded space. The City relied on Berkeley Administrative Regulation 10.2 to deny Mr. White's initial request for a larger footprint. (Prado Decl., Ex. A.)

Mr. White is one of the claimants on whom the Court has already ruled. Dkt. 288 at 72–73. The City's response does not conduct the individualized assessment that ruling requires. At his first-choice site, 1499–1451 Second Street, the City repeats the one-sentence "No Lodging" rationale. It does so at a sidewalk it has allowed to be obstructed with K-rails, and without measurements, an alternative, or the written reasons 28 C.F.R. § 35.164 requires.

At his alternative, 700 Allston Way, the City has made no determination for Mr. White at all. The only figure it gives is the 4′10″ × 73′ strip it offered other members. That strip is narrower than his 9-foot tent and than any manufactured tent.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at

one of Mr. White's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. CT (drawing); Ex. CS (photographs).)

**I. Further documentation of disability-related need**

I. Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

I. (1) Ex. CQ, Declaration of Jermaine Lee White, describing the disabilities, functional limitations, and the items the footprint must hold.

I. (2) Ex. CR: BHU's written accommodation request for Jermaine Lee White, submitted to the City on September 1, 2026, with signed authorization.

I. (3) Dkt. __: the request and supporting materials previously submitted to the Court.

I. (4) Ex. A: the City's written determination.

I. (5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

I. (6) Ex. CT: annotated drawing of the requested footprint; Ex. CS: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Jermaine Lee White".

**V. <u>23. Gregory Grove</u>**

**A. Disability**

Mr. Grove has been diagnosed with the following conditions, each of which substantially limits one or more major life activities: (Prado Decl., Ex. CU (Grove Decl.); Ex. CV.)

<u>Mental Health Disabilities:</u>

- Obsessive-Compulsive Disorder (OCD)
- Attention-Deficit/Hyperactivity Disorder (ADHD)

<u>Physical Disabilities:</u>

- Cardiovascular condition that places him at risk of heart attack under stress

Mr. Grove experiences persistent, intrusive thoughts and compulsive behaviors that significantly impair his ability to function in high-stress environments. These symptoms are exacerbated by sudden change, chaos, and the threat of property loss. Mr. Grove's ADHD impairs his executive functioning, including his ability to plan, organize, prioritize tasks, and process complex instructions under pressure. He struggles with time management, task completion, and maintaining focus—all of which are essential to complying with an abatement order that requires packing, downsizing and relocating within a defined timeframe. Additionally, physical exertion and sudden emotional distress can put him medically at risk for a cardiac event.

**B. Disability-related needs**

He requires space for shelter, survival gear, art and medical supplies. (Prado Decl., Ex. CU (Grove Decl.).)

**C. Requested ADA accommodations**

<u>Packing and Transportation:</u>

Mr. Grove's cardiovascular condition places him at risk of a heart attack under physical exertion and sudden emotional distress, the two conditions a forced move combines. His OCD and ADHD impair his ability to organize, plan, and complete a relocation under time pressure. He requests advance-scheduled, hands-on assistance from City staff to pack and transport his belongings if relocation is required.

<u>Footprint Larger than 9 Square Feet</u>:

Mr. Grove requests an exemption to the 3'x3' rule to occupy an 8-person tent on a 10' x 20' footprint.

**D. Disability nexus**

Mr. Grove's disabilities directly impair his ability to comply with the City's abatement orders in the following ways: (Prado Decl., Ex. CU (Grove Decl.); Ex. CV.)

<u>1) Psychiatric Barriers to Compliance</u>

Mr. Grove's OCD and ADHD impair his executive functioning, making it difficult or impossible for him to:

- Organize his belongings under pressure;
- Plan a relocation in a logical, step-by-step manner;
- Process complex instructions from City staff, particularly when delivered in a high-stress environment;
- Respond calmly or rationally to rapidly changing enforcement conditions.

The stress of enforcement—including the presence of City staff, loud noises, threats of citation or arrest, and the risk of property destruction—triggers symptoms of his disabilities, including intrusive thoughts and compulsive behaviors, and difficulties with

focus and task completion. This leaves him unable to effectively advocate for himself or comply with instructions.

2) Physical Barriers to Compliance

Mr. Grove's heart condition makes it difficult for him to independently carry and transport his personal belongings for long distances. The combination of physical exertion and emotional stress inherent to forced relocation creates a medically risky situation for him.

3) The 3x3 Rule is Unworkable

The City's enforcement of Administrative Regulation 10.2, which limits personal property to nine square feet, would require Mr. Grove to downsize his living space to an area smaller than the dimensions of a standard tent. This is functionally impossible for anyone, let alone a person with his physical and mental disabilities. His tent serves as his home, providing:

- Shelter from the elements, which is critical for managing his physical health and heart condition;
- Privacy and a stable environment essential to managing his OCD and ADHD;
- Space to store medications and medical supplies;
- A predictable, controlled environment that helps him manage his mental disabilities.

Without adequate space, he cannot safely store essential medical supplies, survive the elements, or maintain the stability necessary to manage his psychiatric conditions.

4) Property Loss

If the City abates his area without providing accommodations, Mr. Grove will be unable to remove his tent and essential belongings due to his physical limitations and executive dysfunction. The destruction and loss of his survival equipment such as his tent, sleeping gear, medications and clothing would render him completely unsheltered, exposed to the elements, and at heightened risk of medical crisis, including a potentially fatal cardiac event.

**E. Requested location.**

1499-1451 Second Street (sidewalk behind K-rails) (Prado Decl., Ex. CV; Ex. CW.)

**I. The requested accommodation is reasonable.**

Nine square feet holds no tent. The City has conceded that no tent fits within a 3×3-foot space. Dkt. 288 at 56. Mr. Grove's tent does three things. It provides the shelter from the elements his heart condition requires and a safe place for his medications. It also provides the private, predictable environment that keeps his OCD and ADHD manageable. Requiring him to downsize to nine square feet would take away all three. A footprint larger than nine square feet is the precondition to his having any shelter at all.

**I. The requested footprint is supported by measurement.**

| **Component** | **Dimensions** | **Sq ft** |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Art supplies | 4′ × 4′ | 16 |
| **Total itemized need** | | **180** |
| **Footprint actually requested** | | **200** |

The itemized components total 180 square feet within a requested footprint of 200 square feet (10′ × 20′). The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. CU (Grove Decl.); Ex. CX.)

I. **The City's response is not reasonable.**

The City determined that it cannot grant an accommodation at 1499–1451 Second Street because it "would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited." The City has not provided an alternative location or footprint. (Prado Decl., Ex. A.)

The City's determination for Mr. Grove is a single sentence: the "No Lodging" designation makes any accommodation at 1499–1451 Second Street a fundamental alteration. The Court has already found that rationale unsupported. Dkt. 342 at 4. The City provides no measurements of the site, no alternative footprint, and no alternative location. Meanwhile, it has allowed this same stretch of sidewalk to be obstructed with K-rails. If K-rails can occupy the sidewalk without fundamentally altering a City program, the City must explain why one disabled person's tent would. It has not. 28 C.F.R. § 35.164.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at

one of Mr. Grove's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. CX (drawing); Ex. CW (photographs).)

**I. Further documentation of disability-related need**

I. Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

- I. (1) Ex. CU, Declaration of Gregory Grove, describing the disabilities, functional limitations, and the items the footprint must hold.
- I. (2) Ex. CV: BHU's written accommodation request for Gregory Grove, submitted to the City on September 1, 2026, with signed authorization.
- I. (3) Dkt. __: the request and supporting materials previously submitted to the Court.
- I. (4) Ex. A: the City's written determination.
- I. (5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
- I. (6) Ex. CX: annotated drawing of the requested footprint; Ex. CW: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Gregory Grove".

## W. <u>24. Lisa Saechao,y-chain</u>

**A. Disability**

<u>Mental Health Disabilities:</u> (Prado Decl., Ex. CY (Saechao,y-chain Decl.); Ex. CZ.)

- Trouble communicating – both speaking and understanding

- Impaired memory
- Severe anxiety
- Fear of persecution
- Other mental health conditions stemming from abuse and trauma

These conditions substantially limit one or more major life activities, including communicating, understanding, remembering, concentrating, social interaction, regulating emotions and handling stress. Her communication impairment means she cannot effectively convey her needs or understand complex instructions without support. Her memory impairment means she will forget deadlines and instructions without repeated, clear communication. Her fear of persecution makes interactions with officials deeply traumatic and difficult to navigate independently.

**B. Disability-related needs.**

Space for shelter, survival gear and medical supplies. (Prado Decl., Ex. CY (Saechao,y-chain Decl.).)

**C. Requested ADA accommodations**

<u>1) Transportation:</u>

Ms. Saechao,y-chain requires direct support to help with tasks involved in the relocation process:

- Understanding and tracking deadlines
- Communicating with City staff
- Breaking tasks into manageable steps

- Offering reminders and check-ins

2) Communication assistance:

Ms. Saechao,y-chain requires all instructions to be broken down into clear, simple, step-by-step tasks, provided in writing and reviewed with her by a trusted support person. This accommodates her communication and memory impairments.

3) Footprint Larger than 9 Square Feet:

Ms. Saechao,y-chain requests an exemption of the 3’x3’ rule to occupy a 6-person tent on a 10’ x 20’ footprint.

She requests a permanent accommodation that allows Ms. Saechao,y-chain to maintain a tent footprint larger than the standard 9-square-foot limit—sufficient to accommodate herself and her essential belongings—on any public sidewalk where:

- She is not blocking pedestrian access, meaning a clear path remains for others to pass safely; and
- If located on a narrower sidewalk, the opposite side of the street remains clear for alternative pedestrian access.

This modification recognizes that for Ms. Saechao-y-chain, her tent functions as her medical equipment and only accessible shelter.

**D. Disability nexus.**

The City's standard encampment management policies will, if applied to Ms. Saechao,y-chain without modification, foreseeably aggravate her disabilities in the following ways: (Prado Decl., Ex. CY (Saechao,y-chain Decl.); Ex. CZ.)

<u>1) Short-notice relocation</u>

Her severe anxiety, fear of persecution, and memory impairment require predictability and adequate time to process information. Sudden displacement triggers panic, hypervigilance, and emotional dysregulation, leaving her unable to plan or comply with City orders. Her memory impairment means she may forget deadlines or instructions without repeated, clear communication.

<u>2) Communication demands of relocation</u>

The enforcement process requires individuals to communicate with City staff, understand instructions, and convey decisions—all of which are directly impaired by her disability. She cannot effectively speak or understand under pressure, making independent compliance impossible.

<u>3) Fear of persecution triggered by enforcement encounters</u>

Interactions with uniformed officials, demands to comply, and threats of citation or arrest directly trigger Ms. Saechao,y-chain's disability, causing acute psychological distress, panic, and an inability to function or comply.

<u>4) 9-square-foot limit on sidewalks</u>

Compliance is impossible without abandoning her tent (her only shelter) and essential belongings. Her memory and communication impairments prevent her from making rapid decisions about what to keep or discard, and the stress of the situation would overwhelm her ability to act.

<u>5) Threat of citation, arrest, and property destruction</u>

Penalizing Ms. Saechao,y-chain for disability-related inability to comply—such as being unable to communicate, understand instructions, or make decisions under pressure—would constitute discrimination under the ADA. The stress of such encounters would trigger her disabilities and cause severe psychological harm.

<u>6) No property storage due to leptospirosis</u>

Losing all of her belongings—including items essential to daily survival—would be devastating. For someone with severe anxiety and fear of persecution, losing familiar, essential items can trigger acute psychological crises.

**E. Requested location.**

2nd and Page St. (Prado Decl., Ex. CZ; Ex. DA.)

I. **The requested accommodation is reasonable**

Nine square feet holds no tent. The City has conceded that no tent fits within a 3×3-foot space. Dkt. 288 at 56. Ms. Saechao,y-chain's communication and memory impairments and her fear of persecution make each forced move and each encounter with officials deeply destabilizing. A tent at a single, stable site lets her keep her belongings in one place she can remember. It also gives her a private space away from the interactions that

trigger her disability. A footprint larger than nine square feet is the precondition to her having any shelter at all.

**I. The requested footprint is supported by measurement**

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (6-person) | 10′ × 9′ | 90 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| **Total itemized need** | | **142** |
| **Footprint actually requested** | | **200** |

The itemized components total 142 square feet within a requested footprint of 200 square feet (10′ × 20′). The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. CY (Saechao,y-chain Decl.); Ex. DB.)

**I. The City's response is not reasonable.**

The City has yet to make an individualized determination concerning Ms. Saechao,y-chain's need for expanded space at 2nd and Page St. The City relied on Berkeley Administrative Regulation 10.2 to deny Ms. Saechao,y-chain's initial request for a larger footprint. (Prado Decl., Ex. A.)

The City's only stated basis is the "No Lodging" designation at 2nd and Page Street, recited in the same sentence it used for more than a dozen other members. The City has not measured the site or proposed an alternative footprint or location. It has not explained why an individualized exemption for one disabled person would fundamentally alter its program rather than reasonably modify it. 28 C.F.R. §§ 35.130(b)(7), 35.164; Dkt. 342 at

4. Ms. Saechao,y-chain's disability makes communicating with officials and tracking instructions extremely difficult. For her, a bare denial with no alternative leaves no path to compliance at all.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Ms. Saechao,y-chain's proposed locations or identify, with measurements, a location where a footprint at least as wide as her tent can be accommodated.

### *I.* **Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. DB (drawing); Ex. DA (photographs).)

**I. Further documentation of disability-related need**

I. Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

- I. (1) Ex. CY, Declaration of Lisa Saechao,y-chain, describing the disabilities, functional limitations, and the items the footprint must hold.
- I. (2) Ex. CZ: BHU's written accommodation request for Lisa Saechao,y-chain, submitted to the City on September 1, 2026, with signed authorization.
- I. (3) Dkt. __: the request and supporting materials previously submitted to the Court.
- I. (4) Ex. A: the City's written determination.
- I. (5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.
- I. (6) Ex. DB: annotated drawing of the requested footprint; Ex. DA: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Lisa Saechao,y-chain".

## X. <u>25. Quinton Cocklereese</u>

**A. Disability**

<u>Mental Health Disabilities:</u> (Prado Decl., Ex. DC (Cocklereese Decl.); Ex. DD.)

- Severe anxiety
- Depression
- Bipolar Disorder
- Borderline Personality Disorder (BPD)
- Attention Deficit Hyperactivity Disorder (ADHD)
- Oppositional Defiant Disorder (ODD)

- Other related mental health impairments affecting his ability to navigate public spaces and interact with officials

These conditions substantially limit one or more major life activities, including concentrating, interacting with others, regulating emotions, and handling stress. His fear of public visibility makes it difficult for him to engage with City staff, access services, or comply with enforcement directives without direct support.

**B. Disability-related need**

Space for shelter, survival gear, mobility aids, medical supplies, and his emotional support animal. (Prado Decl., Ex. DC (Cocklereese Decl.).)

**C. Requested ADA accommodations**

1) Transportation:

Mr. Cocklereese requires direct support to help with tasks involved in the relocation process:

- Scheduling and coordinating services
- Understanding and tracking deadlines
- Communicating with City staff
- Packing and organizing his belongings
- Navigating the relocation process

2) Footprint Larger than 9 Square Feet:

Mr. Cocklereese requests an exemption to the 3'x3' rule to occupy an 8-person tent on a 11' x 20' footprint.

**D. Disability nexus**

The City's standard encampment management policies will, if applied to Mr. Cocklereese without modification, foreseeably aggravate his disabilities in the following ways: (Prado Decl., Ex. DC (Cocklereese Decl.); Ex. DD.)

<u>1) Short-notice relocation</u>

His anxiety and fear of public visibility require predictability and support. Sudden displacement forces him into public view and interaction, triggering acute anxiety, panic, and an inability to function or comply with City orders. The ability to safely store his belongings at a singular site will mitigate these symptoms.

<u>2) Requirement to engage with officials independently</u>

The enforcement process requires individuals to interact with City staff, pack belongings, and coordinate logistics—all of which require public visibility and engagement. For Mr. Cocklereese, these demands are paralyzing due to his disability. Assistance with storing, packing, and moving his belongings will mitigate these symptoms for Mr. Cocklereese.

<u>3) Threat of citation, arrest, and property destruction</u>

Penalizing Mr. Cocklereese for disability-related inability to comply—such as being unable to engage with officials or manage logistics independently—would constitute discrimination under the ADA.

<u>4) No property storage due to leptospirosis</u>

Losing all of his belongings—including his tent and items essential to daily survival—would be devastating. For someone with his disabilities, losing familiar, essential items can trigger acute psychological crises and further cognitive decline.

5) Forced relocation without an accessible destination

Moving Mr. Cocklereese from one outdoor location to another does not achieve the City's stated goal of "moving all people indoors." It merely destabilizes him, disrupts any connection to services, and exacerbates his cognitive impairments.

**E. Requested location.**

2nd and Page St. (Prado Decl., Ex. DD; Ex. DE.)

**I. Requested accommodation is reasonable**

Nine square feet holds no tent. The City has conceded that no tent fits within a 3×3-foot space. Dkt. 288 at 56. Mr. Cocklereese's anxiety and fear of public visibility make exposure itself the trigger. Without an enclosed tent he is forced into constant public view, which his disabilities make paralyzing. The tent also lets him keep his emotional support animal, mobility aids, and medical supplies with him. A footprint larger than nine square feet is the precondition to his having any shelter at all.

**I. Requested footprint is supported by measurement**

| Component | Dimensions | Sq ft |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| Mobility aids | 4′ × 3′ | 12 |
| Emotional support animal (large) | 5′ × 5′ | 25 |

| | | |
|---|---|---|
| **Total itemized need** | | **201** |
| **Footprint actually requested** | | **220** |

The itemized components total 201 square feet within a requested footprint of 220 square feet (11′ × 20′). The difference is the circulation space this member requires to move, turn, and reach without obstruction. An average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. DC (Cocklereese Decl.); Ex. DF.)

**I. The City's response is not reasonable.**

The City determined that it cannot grant an accommodation at 2nd and Page Street because it "would require a fundamental alteration of a City program that designates certain areas where lodging is prohibited." The City has not provided an alternative location or footprint. (Prado Decl., Ex. A.)

The City's only stated basis is the "No Lodging" designation at 2nd and Page Street. The Court has already found that rationale unsupported. Dkt. 342 at 4. The City has not measured the site or proposed an alternative footprint or location, and it has given no written statement of reasons. 28 C.F.R. § 35.164. Mr. Cocklereese's disabilities make engaging with City staff on his own extremely difficult. A denial that leaves him to find another lawful site by himself asks him to do exactly what his disabilities prevent.

The Special Master should find that the City's response is not a reasonable accommodation and recommend that the City either approve the requested footprint at one of Mr. Cocklereese's proposed locations or identify, with measurements, a location where a footprint at least as wide as his tent can be accommodated.

**I. Visualization of requested accommodation**

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. DF (drawing); Ex. DE (photographs).)

**I. Further documentation of disability-related need**

I. Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

I. (1) Ex. DC, Declaration of Quinton Cocklereese, describing the disabilities, functional limitations, and the items the footprint must hold.

I. (2) Ex. DD: BHU's written accommodation request for Quinton Cocklereese, submitted to the City on September 1, 2026, with signed authorization.

I. (3) Dkt. __: the request and supporting materials previously submitted to the Court.

I. (4) Ex. A: the City's written determination.

I. (5) Declaration of Yesica Prado: interactive-process history and conditions at the proposed locations.

I. (6) Ex. DF: annotated drawing of the requested footprint; Ex. DE: annotated photographs of the proposed location; video, if any, on the thumb drive under the file name "Quinton Cocklereese".

***26. Jasmine Williams***

Location at time of request: Tent at 8th and Harrison Street

<u>a. Disability</u>

Ms. Williams has undergone a full replacement of her left knee, which causes chronic pain, instability, and limited range of motion; she cannot kneel, squat, or stand for extended

periods and is at risk of falls. She experiences sciatica, causing radiating pain, numbness, and weakness in her lower back and legs, aggravated by prolonged standing and by carrying weight. She experiences chronic low back pain that limits her mobility and her ability to lift and carry. (Prado Decl., Ex. DG (Williams Decl.); Ex. DH.)

b. The requested accommodation is reasonable

Ms. Williams cannot lift, carry, bend, or stand for extended periods, and cannot independently pack, move, or transport her belongings; any attempt without assistance would place her at risk of falls, injury, and severe pain. A nine-square-foot footprint holds no tent, so without an exemption she would sleep on the ground, unable to store her medications safely, change clothes, prepare food, or perform the basic functions of daily life — each of which directly aggravates a musculoskeletal condition that is worsened by exposure, immobility, and the absence of a supported surface on which to rest.

The accommodations requested are the ones the Court has already held the City must provide. Dkt. 326 at 4; Dkt. 288 at 65–67, 72–73. Nothing in this request asks the Special Master to order relief the Court has not already required.

c. Working footprint figures

BHU maintains that identifying the largest available footprint is the City's obligation, but supplies the components below on the same basis used for the September 14 requests so that the Special Master has a concrete figure.

| **Component** | **Dimensions** | **Sq ft** |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |

| | | |
|---|---|---|
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| **Total itemized need** | | **164** |
| **Footprint proposed on that basis** | | **200** |

The itemized components total 164 square feet within a proposed footprint of 200 square feet. The difference is circulation space: an average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. DG (Williams Decl.); Ex. DI.)

d. The City's response is not reasonable

The City did not respond to this request at all. BHU followed up with the City's ADA Program Coordinator after service and received no response. (Prado Decl.)

That silence is not a neutral fact. A total non-response cannot be a reasonable response to a request for accommodation. The City's obligation under the ADA is not satisfied by inaction. On this record, no further fact-finding is required to determine that the City's conduct was not reasonable.

e. Visualization of requested accommodation

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. DI (drawing); Ex. DJ (photographs).)

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. DG, Declaration of Jasmine Williams.

(2) Ex. DH: BHU's written accommodation request, submitted to the City on September 23, 2026, with signed authorization (see also Ex. D).

(3) Declaration of Yesica Prado: BHU's follow-up with the City's ADA Program Coordinator and the absence of any response.

(4) Ex. DI: annotated drawing; Ex. DJ: annotated photographs; video, if any, on the thumb drive under the file name "Jasmine Williams".

***27. Bree Ann Hegeman***

Location at time of request. Tent at 7th and Harrison Street

<u>a. Disability</u>

Ms. Hegeman experiences persistent depressive episodes that impair her motivation, energy, and ability to complete daily tasks, and that are exacerbated by stress, instability, and the threat of displacement. Her ADHD impairs executive functioning, including her ability to plan, organize, prioritize, and process complex instructions under pressure. Her PTSD produces hypervigilance, flashbacks, and acute anxiety triggered by enforcement actions, displacement, and the threat of property destruction. (Prado Decl., Ex. DK (Hegeman Decl.); Ex. DL.)

<u>b. The requested accommodation is reasonable</u>

The accommodation she needs is the direct counterpart of the limitation she has. Abatement demands exactly what her disabilities impair: organizing belongings, planning a relocation, processing instructions, and responding to changing conditions under time pressure, in the presence of City staff and heavy equipment. The stress of enforcement triggers her PTSD symptoms, deepens her depression, and compounds her ADHD-related difficulty with focus and

task completion. A nine-square-foot footprint holds no tent, and without one she cannot maintain the stable, organized environment on which her psychiatric stability depends.

<u>c. Working footprint figures</u>

BHU maintains that identifying the largest available footprint is the City's obligation, but supplies the components below on the same basis used for the September 14 requests so that the Special Master has a concrete figure.

| **Component** | **Dimensions** | **Sq ft** |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| **Total itemized need** | | **164** |
| **Footprint proposed on that basis** | | **200** |

The itemized components total 164 square feet within a proposed footprint of 200 square feet. The difference is circulation space: an average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. DK (Hegeman Decl.); Ex. DM.)

<u>d. The City's response is not reasonable</u>

The City did not respond to this request at all. BHU followed up with the City's ADA Program Coordinator after service and received no response. (Prado Decl.)

That silence is not a neutral fact. A total non-response cannot be a reasonable response to a request for accommodation. The City's obligation under the ADA is not satisfied by inaction.

On this record, no further fact-finding is required to determine that the City's conduct was not reasonable.

e. Visualization of requested accommodation

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. DM (drawing); Ex. DN (photographs).)

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. DK, Declaration of Bree Ann Hegeman.

(2) Ex. DL: BHU's written accommodation request, submitted to the City on September 23, 2026, with signed authorization (see also Ex. D).

(3) Declaration of Yesica Prado: BHU's follow-up with the City's ADA Program Coordinator and the absence of any response.

(4) Ex. DM: annotated drawing; Ex. DN: annotated photographs; video, if any, on the thumb drive under the file name "Bree Ann Hegeman".

***28. Salina Mares***

Location at time of request: Tent in the Harrison Corridor

a. Disability

Ms. Mares experiences mental health disabilities that impair her executive functioning, her ability to regulate her emotions, and her ability to handle sudden changes including relocation. These conditions make it difficult for her to plan, organize, and complete the complex tasks required to comply with an abatement order within a defined timeframe. She depends on

her community for stability, mutual aid, and daily assistance, and her disabilities require that she remain in proximity to people she knows and trusts. (Prado Decl., Ex. DO (Mares Decl.); Ex. DP.)

b. The requested accommodation is reasonable

Ms. Mares's request presents a dimension absent from the others: her accommodation is partly locational rather than purely dimensional. Displacing her to an isolated site would sever the mutual aid and daily assistance on which she depends, and would aggravate her condition even if the footprint at that site were adequate. That is why her request asks not only for an exemption from the 3×3 rule but for placement near other encampments.

On the dimensional question, the analysis is the same as for every other member: a nine-square-foot footprint holds no tent, and without shelter she cannot store medications safely, change clothes, prepare food, or maintain the routine her psychiatric disabilities require. A footprint larger than nine square feet is therefore a precondition to this member having any shelter at all.

c. Working footprint figures

BHU maintains that identifying the largest available footprint is the City's obligation, but supplies the components below on the same basis used for the September 14 requests so that the Special Master has a concrete figure.

| **Component** | **Dimensions** | **Sq ft** |
|---|---|---|
| Tent (8-person) | 7′ × 16′ | 112 |

| | | |
|---|---|---|
| Survival gear | 8′ × 6′ | 48 |
| Medications | 2′ × 2′ | 4 |
| **Total itemized need** | | **164** |
| **Footprint proposed on that basis** | | **200** |

The itemized components total 164 square feet within a proposed footprint of 200 square feet. The difference is circulation space: an average adult's single arm span is roughly 2.1 to 2.4 feet, so any activity requiring the arms to extend needs at least five feet of clear width. (Prado Decl., Ex. DO (Mares Decl.); Ex. DQ.)

d. The City's response is not reasonable

The City did not respond to this request at all nor asked any further questions. BHU followed up with the City's ADA Program Coordinator after service and received no response. (Prado Decl.)

That silence is not a neutral fact. A total non-response cannot be a reasonable response to a request for accommodation. The City's obligation under the ADA is not satisfied by inaction. On this record, no further fact-finding is required to determine that the City's conduct was not reasonable.

e. Visualization of requested accommodation

An annotated drawing of the requested footprint and annotated photographs of the proposed location are attached as exhibits. (Prado Decl., Ex. DQ (drawing); Ex. DR (photographs).)

Evidentiary support for this request, attached as exhibits to the Declaration of Yesica Prado:

(1) Ex. DO, Declaration of Salina Mares.

(2) Ex. DP: BHU's written accommodation request, submitted to the City on September 23, 2026, with signed authorization (see also Ex. D).

(3) Declaration of Yesica Prado: BHU's follow-up with the City's ADA Program Coordinator and the absence of any response.

(4) Ex. DQ: annotated drawing; Ex. DR: annotated photographs; video, if any, on the thumb drive under the file name "Salina Mares".

**VI. Why members chose the locations they proposed**

The Special Master's order asks the parties to identify, for each request, the "Proposed Alternatives." The City has proposed none. BHU therefore writes to explain why its members chose the locations they did — and why those choices reflect disability-related needs, not preferences.

The locations BHU members have identified share a common set of characteristics. They are out of the way of residential areas and busy commercial corridors with heavy foot traffic. Some of these locations are near the resources members need for survival — water, food, medical care, and community support. (Prado Decl., see member declarations.) And they offer privacy, which is itself a disability-related need: many BHU members live with PTSD, anxiety, OCD, autism, and other conditions that are aggravated by noise, crowding, and the absence of a stable, private space.

These are not arbitrary locations. They are the locations where members can live without further aggravating their disabilities.

The City may object that some of these locations cannot accommodate a six-foot path of travel. But the City has itself conceded that not every sidewalk in Berkeley can accommodate a six-foot path while also accommodating a tent. (Dkt. __.) There are simply not enough wide sidewalks in Berkeley to house the number of unhoused residents who need them. That is a problem of the City's own making, not a reason to deny a reasonable accommodation.

When the City cannot accommodate a requested footprint at a proposed location while maintaining the required path of travel, the ADA does not permit the City to deny the request outright. It requires the City to conduct an individualized assessment of the location, propose an alternative footprint, propose an alternative location, or explain in writing why no reasonable accommodation is available. The City has done none of these things.

## II. VII. RELIEF REQUESTED

BHU respectfully requests that the Special Master:

- Find that, for each member addressed in Section V, the City has not conducted the individualized assessment required by the Court’s orders (Dkt. 288 at 21, 72–73; Dkt. 326 at 4). The City has substituted “fundamental alteration” and “no nexus” conclusions, and footprints no tent can fit, for site-specific analysis.
- Recommend that each member’s requested exemption from the 3×3 rule be granted at one of the member’s proposed locations. Where the City contends a requested footprint cannot be accommodated there, the City should be required within 14 days to identify, with site measurements, the largest footprint at least as wide as the member’s tent that can be

accommodated at or near a proposed location. The measurements should include the total sidewalk width, the path of travel preserved, and any obstructions.

- Recommend that the City's "fundamental alteration" denials be set aside because they do not satisfy 28 C.F.R. § 35.164 or Dkt. 342 at 4, and that any renewed denial on that ground be made in writing with a statement of reasons.
- Recommend that the City approve the exterior footprints requested by the members who live in vehicles (Jason Charette, Kittivutt Patanapanich, Merced Dominguez, and Yesica Prado), each between 12 and 16 square feet.
- Recommend that the City issue written determinations within 14 days for each member who has received none (Orvel Roadlander, Shareef Muwakkil, Bree Ann Hegeman, Salina Mares, and Jasmine Williams). If Judge Chen grants Dkt. 444, the Special Master should adjudicate those requests on this record.
- Recommend that the City provide the packing and transportation assistance each member has requested, consistent with Dkt. 326 at 4 and Dkt. 288 at 65.
- Where further factual development would help, conduct the site inspections and interviews the Special Master reserved in Dkt. 413.

## III. VIII. INDEX OF EXHIBITS TO THE DECLARATION OF YESICA PRADO

Each exhibit below is attached to the Declaration of Yesica Prado and is lettered in the order it is first cited in this submission, including each member's declaration, written request, annotated drawing, and annotated photographs. Video is submitted on the thumb drive, with each file named for the member, in the order the members appear in Section V (Dkt. 413 n.1).

| Exhibit | Document (file in this order) |
|---|---|
| Ex. A | Exhibit: City's written determinations on the pending 3×3 requests (Oct. 6, 2026) and any later determinations |
| Ex. B | Exhibit: Tent dimensions: smallest retail tents and the Campros CP 4-person tent distributed by the City |
| Ex. C | Exhibit: Email thread "REQUESTS: ADA Accommodations for BHU members at 8th and Harrison" (Sept. 14 – Oct. 6, 2026), including the Sept. 14 nexus statements and Sept. 17 measurements |
| Ex. D | Exhibit: Sept. 23, 2026 requests for Bree Ann Hegeman, Salina Mares, and Jasmine Williams; City's Oct. 16, 2026 request for information to Ms. Mares |
| Ex. E | Exhibit: Photographs of no-lodging signage and K-rails at Second and Camelia Streets and 1499–1451 Second Street |
| Ex. F | Exhibit: Correspondence in which the City described the six-foot path as a PROWAG requirement and then as an AR 10.2 requirement |
| Ex. G | Exhibit: City's approval of Lewanda Parnell's 10′1″ × 45′ footprint at 9th and Camelia, and BHU's submission for her |
| Ex. H | Exhibit: City Attorney correspondence confirming that AR 10.2's residential prohibition covers R-SMU and R-BMU |
| Ex. I | Exhibit: BHU sidewalk survey: block-face measurements and map of AR 10.2 zones, no-lodging zones, and daycare buffers |
| Ex. J | Exhibit: Nov. 17, 2026 City Council item and staff report adopting the 600-foot daycare/preschool buffer |
| Ex. K | Declaration: Declaration of Alice Barbee |
| Ex. L | Exhibit: Alice Barbee — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. M | Photographs: Alice Barbee — annotated photographs of the proposed location |
| Ex. N | Drawing: Alice Barbee — annotated drawing of the requested footprint |
| Ex. O | Declaration: Declaration of Alexander Wilson |
| Ex. P | Exhibit: Alexander Wilson — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. Q | Photographs: Alexander Wilson — annotated photographs of the proposed location |
| Ex. R | Drawing: Alexander Wilson — annotated drawing of the requested footprint |
| Ex. S | Declaration: Declaration of Hector Navarro |
| Ex. T | Exhibit: Hector Navarro — written accommodation request submitted September 14, 2026, with signed authorization |

| | |
|---|---|
| Ex. U | Photographs: Hector Navarro — annotated photographs of the proposed location |
| Ex. V | Drawing: Hector Navarro — annotated drawing of the requested footprint |
| Ex. W | Declaration: Declaration of Robbie Peddycoart |
| Ex. X | Exhibit: Robbie Peddycoart — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. Y | Photographs: Robbie Peddycoart — annotated photographs of the proposed location |
| Ex. Z | Drawing: Robbie Peddycoart — annotated drawing of the requested footprint |
| Ex. AA | Declaration: Declaration of Robert Pearce |
| Ex. AB | Exhibit: Robert Pearce — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. AC | Photographs: Robert Pearce — annotated photographs of the proposed location |
| Ex. AD | Drawing: Robert Pearce — annotated drawing of the requested footprint |
| Ex. AE | Declaration: Declaration of Erik Alexander Coon |
| Ex. AF | Exhibit: Erik Alexander Coon — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. AG | Photographs: Erik Alexander Coon — annotated photographs of the proposed location |
| Ex. AH | Drawing: Erik Alexander Coon — annotated drawing of the requested footprint |
| Ex. AI | Declaration: Declaration of Erik Keiser |
| Ex. AJ | Exhibit: Erik Keiser — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. AK | Photographs: Erik Keiser — annotated photographs of the proposed location |
| Ex. AL | Drawing: Erik Keiser — annotated drawing of the requested footprint |
| Ex. AM | Declaration: Declaration of Charles Dye |
| Ex. AN | Exhibit: Charles Dye — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. AO | Photographs: Charles Dye — annotated photographs of the proposed location |
| Ex. AP | Drawing: Charles Dye — annotated drawing of the requested footprint |
| Ex. AQ | Declaration: Declaration of Andrew Venderzyl |

| | |
|---|---|
| Ex. AR | Exhibit: Andrew Venderzyl — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. AS | Photographs: Andrew Venderzyl — annotated photographs of the proposed location |
| Ex. AT | Drawing: Andrew Venderzyl — annotated drawing of the requested footprint |
| Ex. AU | Declaration: Declaration of Ramondo Mackey |
| Ex. AV | Exhibit: Ramondo Mackey — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. AW | Photographs: Ramondo Mackey — annotated photographs of the proposed location |
| Ex. AX | Drawing: Ramondo Mackey — annotated drawing of the requested footprint |
| Ex. AY | Declaration: Declaration of Erin Spencer |
| Ex. AZ | Exhibit: Erin Spencer — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. BA | Photographs: Erin Spencer — annotated photographs of the proposed location |
| Ex. BB | Drawing: Erin Spencer — annotated drawing of the requested footprint |
| Ex. BC | Declaration: Declaration of Thomas Barnett |
| Ex. BD | Exhibit: Thomas Barnett — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. BE | Photographs: Thomas Barnett — annotated photographs of the proposed location |
| Ex. BF | Drawing: Thomas Barnett — annotated drawing of the requested footprint |
| Ex. BG | Declaration: Declaration of Jason Charette |
| Ex. BH | Exhibit: Jason Charette — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. BI | Photographs: Jason Charette — annotated photographs of the proposed location |
| Ex. BJ | Drawing: Jason Charette — annotated drawing of the requested footprint |
| Ex. BK | Declaration: Declaration of Kittivutt Patanapanich |
| Ex. BL | Exhibit: Kittivutt Patanapanich — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. BM | Photographs: Kittivutt Patanapanich — annotated photographs of the proposed location |

| | |
|---|---|
| Ex. BN | Drawing: Kittivutt Patanapanich — annotated drawing of the requested footprint |
| Ex. BO | Declarations: Kittivutt Patanapanich — declarations of witnesses (Whole Foods and fire-station construction supervisors) |
| Ex. BP | Declaration: Declaration of Merced Dominguez |
| Ex. BQ | Exhibit: Merced Dominguez — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. BR | Photographs: Merced Dominguez — annotated photographs of the proposed location |
| Ex. BS | Drawing: Merced Dominguez — annotated drawing of the requested footprint |
| Ex. BT | Exhibit: Yesica Prado — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. BU | Photographs: Yesica Prado — annotated photographs of the proposed location |
| Ex. BV | Drawing: Yesica Prado — annotated drawing of the requested footprint |
| Ex. BW | Declaration: Declaration of Orvel Roadlander |
| Ex. BX | Exhibit: Orvel Roadlander — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. BY | Photographs: Orvel Roadlander — annotated photographs of the proposed location |
| Ex. BZ | Drawing: Orvel Roadlander — annotated drawing of the requested footprint |
| Ex. CA | Declaration: Declaration of Shareef Muwakkil |
| Ex. CB | Exhibit: Shareef Muwakkil — written accommodation request submitted September 14, 2026, with signed authorization |
| Ex. CC | Photographs: Shareef Muwakkil — annotated photographs of the proposed location |
| Ex. CD | Drawing: Shareef Muwakkil — annotated drawing of the requested footprint |
| Ex. CE | Declaration: Declaration of Bradford Raymer |
| Ex. CF | Exhibit: Bradford Raymer — written accommodation request submitted September 1, 2026, with signed authorization |
| Ex. CG | Photographs: Bradford Raymer — annotated photographs of the proposed location |
| Ex. CH | Drawing: Bradford Raymer — annotated drawing of the requested footprint |
| Ex. CI | Declaration: Declaration of Jackeline Mendoza |

| | |
|---|---|
| Ex. CJ | Exhibit: Jackeline Mendoza — written accommodation request submitted September 1, 2026, with signed authorization |
| Ex. CK | Photographs: Jackeline Mendoza — annotated photographs of the proposed location |
| Ex. CL | Drawing: Jackeline Mendoza — annotated drawing of the requested footprint |
| Ex. CM | Declaration: Declaration of Shawman |
| Ex. CN | Exhibit: Shawman — written accommodation request submitted September 1, 2026, with signed authorization |
| Ex. CO | Photographs: Shawman — annotated photographs of the proposed location |
| Ex. CP | Drawing: Shawman — annotated drawing of the requested footprint |
| Ex. CQ | Declaration: Declaration of Jermaine Lee White |
| Ex. CR | Exhibit: Jermaine Lee White — written accommodation request submitted September 1, 2026, with signed authorization |
| Ex. CS | Photographs: Jermaine Lee White — annotated photographs of the proposed location |
| Ex. CT | Drawing: Jermaine Lee White — annotated drawing of the requested footprint |
| Ex. CU | Declaration: Declaration of Gregory Grove |
| Ex. CV | Exhibit: Gregory Grove — written accommodation request submitted September 1, 2026, with signed authorization |
| Ex. CW | Photographs: Gregory Grove — annotated photographs of the proposed location |
| Ex. CX | Drawing: Gregory Grove — annotated drawing of the requested footprint |
| Ex. CY | Declaration: Declaration of Lisa Saechao,y-chain |
| Ex. CZ | Exhibit: Lisa Saechao,y-chain — written accommodation request submitted September 1, 2026, with signed authorization |
| Ex. DA | Photographs: Lisa Saechao,y-chain — annotated photographs of the proposed location |
| Ex. DB | Drawing: Lisa Saechao,y-chain — annotated drawing of the requested footprint |
| Ex. DC | Declaration: Declaration of Quinton Cocklereese |
| Ex. DD | Exhibit: Quinton Cocklereese — written accommodation request submitted September 1, 2026, with signed authorization |
| Ex. DE | Photographs: Quinton Cocklereese — annotated photographs of the proposed location |

| | |
|---|---|
| Ex. DF | Drawing: Quinton Cocklereese — annotated drawing of the requested footprint |
| Ex. DG | Declaration: Declaration of Jasmine Williams |
| Ex. DH | Exhibit: Jasmine Williams — written accommodation request submitted September 23, 2026, with signed authorization |
| Ex. DI | Drawing: Jasmine Williams — annotated drawing of the requested footprint |
| Ex. DJ | Photographs: Jasmine Williams — annotated photographs of the proposed location |
| Ex. DK | Declaration: Declaration of Bree Ann Hegeman |
| Ex. DL | Exhibit: Bree Ann Hegeman — written accommodation request submitted September 23, 2026, with signed authorization |
| Ex. DM | Drawing: Bree Ann Hegeman — annotated drawing of the requested footprint |
| Ex. DN | Photographs: Bree Ann Hegeman — annotated photographs of the proposed location |
| Ex. DO | Declaration: Declaration of Salina Mares |
| Ex. DP | Exhibit: Salina Mares — written accommodation request submitted September 23, 2026, with signed authorization |
| Ex. DQ | Drawing: Salina Mares — annotated drawing of the requested footprint |
| Ex. DR | Photographs: Salina Mares — annotated photographs of the proposed location |
| Ex. DS | Exhibit: BHU master list of Harrison Street ADA requests (Sept. 14, 2026) (see Dkt. 358-1) |

Respectfully Submitted,

Dated: November 20, 2026

CITY ATTORNEY'S OFFICE

_/s/ Gabriel Martinez_______________________

Gabriel Martinez
Attorney for Defendants

Dated: November 20, 2026

__/s/ Anthony Prince__________________

Anthony Prince
Attorney for Plaintiff